UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHRISTOPHER DILORENZO<br>89 Ralphie Lane<br>Monroe, NY 10950,<br>Derivatively on Behalf of EPLUS INC., | ) Civil No.<br>)<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | )<br>) |
| PHILLIP G. NORTON<br>1166 Chain Bridge Road<br>McLean, VA 22101 | )<br>)<br>) |
| and | )<br>) |
| BRUCE M. BOWEN<br>10895 Lake Windermere Drive<br>Great Falls, VA 22066 | )<br>)<br>) |
| and | )<br>) |
| STEVEN J. MENCARINI<br>1921 Batten Hollow Road<br>Vienna, VA 22182 | )<br>)<br>) |
| and | )<br>)<br>)<br>) |
| | ) DEMAND FOR JURY TRIAL |

[Caption continued on following page.]

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR
BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS
AND UNJUST ENRICHMENT**

KLEYTON L. PARKHURST                    )
1348 Lancia Drive                       )
McLean, VA  22102                       )
                                        )
     and                                )
                                        )
MILTON E. COOPER, JR.                   )
34 Shinnecock Drive                     )
Palm Coast, FL  32137                   )
                                        )
     and                                )
                                        )
TERRENCE O'DONNELL                      )
5133 Yuma Street, NW                    )
Washington, DC  20016                   )
                                        )
     and                                )
                                        )
LAWRENCE S. HERMAN                      )
856 Sconset Lane                        )
McLean, VA  22102                       )
                                        )
     and                                )
                                        )
C. THOMAS FAULDERS III                  )
6721 Benjamin Street                    )
McLean, VA  22102,                      )
                                        )
                 Defendants,            )
                                        )
     and                                )
                                        )
EPLUS INC., a Delaware corporation,     )
13595 Dulles Technology Drive           )
Herndon, VA  20171,                     )
                                        )
                 Nominal Defendant.     )
                                        )
                                        )
_____)

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of ePlus Inc.[1] ("ePlus" or the "Company"), on behalf of the Company against its Board of Directors and certain of its senior executives (collectively, "Defendants").  This action seeks to remedy Defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of business whereby Defendants allowed senior ePlus insiders to divert hundreds of millions of dollars of corporate assets to themselves via the manipulation of grant dates associated with hundreds of thousands of stock options granted to ePlus insiders.  Each of the Defendants also participated in the concealment of the backdating option scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these senior insiders to disgorge the hundreds of millions in illicitly obtained incentive compensation and proceeds diverted to them since at least 1997.

2.      Between 1997 and 2006, Defendants also caused ePlus to file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC which stated that the options granted by ePlus carried with them an exercise price that was *not less than* the fair market value of ePlus stock on the date of grant and issuance.

3.      In fact, Defendants were aware that the practices employed by the Board allowed the stock option grants to be *backdated* to dates when the Company's shares were trading at or near the lowest price for that relevant period.  By August 2006, Defendants' backdating scheme had yielded stock option grants to the Company's executive officers worth millions of dollars.

---

[1]      Previously known as MLC Holdings Inc.

4.      Defendants' misrepresentations and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Virginia and Delaware law. By authorizing and/or acquiescing in the stock option backdating scheme, Defendants: (i) caused ePlus to issue false statements; (ii) diverted hundreds of millions of dollars of corporate assets to senior ePlus executives; and (iii) subjected ePlus to potential liability from regulators, including the SEC and the IRS.

5.      Defendants' gross mismanagement and malfeasance over the past decade has exposed ePlus and its senior executives to criminal and civil liability for issuing false and misleading financial statements. Specifically, Defendants caused or allowed ePlus to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated Generally Accepted Accounting Principles ("GAAP"); and (iii) that the Company's public disclosures presented an inflated view of ePlus's earnings and earnings per share.

6.      Defendants' malfeasance and mismanagement during the relevant period has wreaked hundreds of millions of dollars of damages on ePlus. The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds. Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations so as to void all grants made pursuant to the plans. The Company has now been mentioned as one of several companies likely to have manipulated options. This action seeks recovery for ePlus against these faithless fiduciaries, as ePlus's Board of Directors, as currently composed, is simply unable or unwilling to do so.

## JURISDICTION AND VENUE

7.    The claims asserted herein arise under §14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78n(a), and under Delaware law for breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement.  In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

8.    This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

9.    This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.    Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, including SEC filings, occurred in substantial part in this District.  ePlus conducts its business in this District.  Further, Defendants conduct business in this District, and certain of the Defendants (including defendant O'Donnell) are citizens of the District of Columbia and reside in this District.

## PARTIES

11.    Plaintiff Christopher Dilorenzo is and at relevant times was a shareholder of nominal party ePlus.

12.    Nominal party ePlus is a Delaware corporation with its principal executive offices located in Herndon, Virginia.

13.    Defendant Phillip G. Norton ("Norton") has been CEO and Chairman of the Board of Directors of ePlus since 1993. Because of Norton's positions, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Norton participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

14.    Defendant Bruce M. Bowen ("Bowen") has been Executive Vice President of ePlus since 1999 and a director since 1990. Bowen is a founder of ePlus. Because of Bowen's positions, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Bowen participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

15.    Defendant Steven J. Mencarini ("Mencarini") has been Senior Vice President and Chief Financial Officer ("CFO") of ePlus since 1997. Because of Mencarini's positions, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant

period, Mencarini participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

16.    Defendant Kleyton L. Parkhurst ("Parkhurst") has been Senior Vice President, Treasurer and Assistant Secretary of ePlus since 2001. Because of Parkhurst's positions, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Parkhurst participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

17.    Defendant Milton E. Cooper, Jr. ("Cooper") has been a director of ePlus since 2003. Because of Cooper's position, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Cooper participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

18.    Defendant Terrence O'Donnell ("O'Donnell") has been a director of ePlus since 1996. Because of O'Donnell's position, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, O'Donnell

participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

19.    Defendant Lawrence S. Herman ("Herman") has been a director of ePlus since 2001. Because of Herman's position, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.   During the relevant period, Herman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

20.    Defendant C. Thomas Faulders III ("Faulders") has been a director of ePlus since 1998. Because of Faulders' position, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, Faulders participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

21.    The defendants identified in ¶¶13-14 and 17-20 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶13-16 are referred to herein as the "Officer Defendants."

## DEFENDANTS' DUTIES

22.    Each officer and director of ePlus named herein owed the Company and ePlus shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and

administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of ePlus's directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of ePlus. Further, the misconduct of ePlus's officers has been ratified by ePlus's Board, which has failed to take any legal action on behalf of the Company against them.

23.    By reason of their positions as officers, directors and fiduciaries of ePlus and because of their ability to control the business and corporate affairs of the Company, the Defendants owed ePlus and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage ePlus in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of ePlus and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to refrain from utilizing their control over ePlus to divert assets to themselves via improper and/or unlawful practices. Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

24.    Because of their positions of control and authority as directors or officers of ePlus, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein. As to the Director Defendants, these acts include: (i) agreement to and/or acquiescence in Defendants' option backdating scheme; (ii) willingness to cause ePlus to disseminate false Proxy Statements for 1997-2005, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options they received. Because of their positions with ePlus, each of the Defendants was aware of these wrongful

acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to ePlus shareholders and the financial markets but failed to do so.

25.    Between 1997 and 2005, Defendants repeated in each Proxy Statement that the stock option grants made during that period carried an exercise price that was not less than the fair market value of ePlus stock on the date granted, as calculated by the public trading price of the stock at the market's close on that date.  However, Defendants concealed until August 2006 that the stock option grants were repeatedly and consciously backdated to ensure that the strike price associated with the option grants was at or near the lowest trading price for that fiscal period.  Due to Defendants' breach of their fiduciary duty in the administration of the stock option plans, Plaintiff seeks to have the directors' and officers' plans voided and gains from those plans returned to the Company.  In the alternative, Plaintiff seeks to have all of the unexercised options granted to Defendants between at least 1997 and 2002 cancelled, the financial gains obtained via the exercise of such options returned to the Company and to have Defendants revise the Company's financial statements to reflect the truth concerning these option grants.

26.    To discharge their duties, the directors of ePlus were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of ePlus.  By virtue of such duties, the officers and directors of ePlus were required, among other things, to:

(a)    manage, conduct, supervise and direct the business affairs of ePlus in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of ePlus);

(b)    neither engage in self-dealing nor knowingly permit any officer, director or employee of ePlus to engage in self-dealing;

(c)      neither violate nor knowingly permit any officer, director or employee of ePlus to violate applicable laws, rules and regulations;

(d)      remain informed as to the status of ePlus's operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e)      prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)      establish and maintain systematic and accurate records and reports of the business and affairs of ePlus and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)      maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that ePlus's financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)      exercise control and supervision over the public statements to the securities markets and trading in ePlus stock by the officers and employees of ePlus; and

(i)      supervise the preparation and filing of any financial reports or other information required by law from ePlus and to examine and evaluate any reports of examinations,

audits or other financial information concerning the financial affairs of ePlus and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

27.    Each Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of ePlus, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders which Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Defendants who were officers and/or directors of the Company during the relevant period has been ratified by the Director Defendants who comprised ePlus's entire Board during the relevant period.

28.    Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Defendants from taking such illegal actions. As a result, ePlus has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

    (a)    improvidently paid executive compensation;

    (b)    increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

    (c)    costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

    (d)    incurring possible IRS penalties for improperly reporting compensation.

29.    These actions have irreparably damaged ePlus's corporate image and goodwill. For at least the foreseeable future, ePlus will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that ePlus's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**AIDING AND ABETTING AND CONCERTED ACTION**

30.    In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

31.    During all times relevant hereto, Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert hundreds of millions of dollars to ePlus insiders and directors and causing ePlus to misrepresent its financial results; (ii) maintain Defendants' executive and directorial positions at ePlus and the profits, power and prestige which Defendants enjoyed as a result of these positions; (iii) deceive the investing public, including shareholders of ePlus, regarding Defendants' compensation practices and ePlus's financial performance.

32.    The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operation and financial condition and to artificially inflate the price of ePlus common stock so they could dispose of millions of dollars of their own ePlus stock, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

33.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent ePlus's financial results.  Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

34.     Each of the Defendants aided and abetted and rendered substantial  assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

35.     ePlus provides information technology products, sales and services, leasing and financing services, procurement software, document management and distribution software, and electronic catalog content management software and services.  The Company sells its products primarily by using its internal sales force and through vendor relationships to commercial customers, federal, state and local governments, and higher education institutions.

36.     Throughout the relevant period, Defendants caused ePlus to grant them millions of stock options permitting them to buy ePlus stock for pennies on the dollar which they could in turn sell as the Company's stock price increased.  A stock option gives the holder the right to buy a stock at a certain price in the future.  Typically, companies set that price at the same time their directors approve an option grant, with an exercise price – also known as the "strike price" – usually set at the closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

37.     However, many of the hundreds of thousands of options granted to ePlus's executives had a hidden, valuable component: they were misdated, often making them even more significantly valuable.  The misdated stock option grants fell largely into three categories: (i) "look back" grants, in which the date of the grant was picked retroactively (*e.g.*, a decision in February to pick a January date); (ii) "wait and see" grants, in which a grant date was selected, but the decision was finalized – and sometimes changed – at a later date (*e.g.*, a decision on January 1 to issue a grant on January 15, but there is a period after January 15 in which the grantor waits to see if a more advantageous price occurs and, if one does, uses that later date instead); and (iii) grants where there was a failure to complete the option grant process by the date of the grant (*e.g.*, where there is a decision to issue a grant as of a certain date, but after that date there are changes in the grantees or amounts to grantees, and although the work is not complete on those grants as of the stated grant date, that date is nonetheless used).

38.     Complicating matters and magnifying the harm to ePlus, during the relevant period, ePlus's internal controls and accounting controls with respect to option grants and exercises, and its financial reporting, were grossly inadequate.  The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially understated.  They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

39.     Specifically, in many instances the reported dates ePlus stock options were granted differed from the dates on which the options appear to have been actually granted.  The practice applied to the overwhelming majority of stock option grants made during the relevant period, which allowed executives and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to take larger profits when the stock price later rose.

40.     Through their fiduciary duties of care, good faith and loyalty, Defendants owed to ePlus a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.  This material non-public information included the problems ePlus faced because of its deficient internal controls. Furthermore, defendants who were members of the Audit Committee during the relevant period, had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with management, the Company's policies generally with respect to the Company's earnings press releases and with respect to financial information and earnings guidance provided to analysts and rating agencies.  Defendants who were officers of ePlus had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.  Moreover, the Director Defendants had ample opportunity to discuss this material information with fellow directors at any of the scores of Board meetings that occurred during the relevant period as well as at committee meetings of the Board.  Despite these duties, Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the misleading statements to be disseminated by ePlus to the investing public and the Company's shareholders during the relevant period.

41.     Specifically, since at least 1997, Defendants have caused ePlus to report false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

| YEAR | REPORTED EARNINGS (in millions) | REPORTED DILUTED EARNINGS PER SHARE FROM CONTINUING OPERATIONS |
|------|------|------|
| 1997 | $ 3.49 | $0.66 |
| 1998 | $ 6.04 | $0.98 |
| 1999 | $ 6.72 | $0.98 |
| 2000 | $ 8.38 | $0.91 |
| 2001 | $ 8.32 | $0.80 |
| 2002 | $ 8.91 | $0.85 |
| 2003 | $ 9.71 | $0.96 |
| 2004 | $10.15 | $1.02 |
| 2005 | $25.29 | $2.68 |

42.     On Friday, August 11, 2006, ePlus announced financial restatements relating to stock option grants:

> ePlus inc. announced today that its previously issued financial statements for the fiscal years ended March 31, 2004 and 2005, as well as for the quarters ended June 30, September 30 and December 31, 2005, will be restated. The Company further announced that the financial statements included in the Company's quarterly reports on Form 10-Q and annual reports on Form 10-K for the periods commencing with the fiscal year ended March 31, 1998 should no longer be relied upon because of incorrect accounting for stock-based compensation expense described therein. The Company has filed a form 8-K, which describes these matters, with the Securities and Exchange Commission ("SEC") today.
>
> As previously reported on Form 12b-25 filed with the SEC on June 30, 2006, and as further reported on Form 8-K filed with the SEC on July 17, 2006, ePlus' Chief Executive Officer, Phillip G. Norton, received a letter dated June 20, 2006 from an ePlus stockholder raising concerns regarding certain options issued to the Company's four senior officers in 2004 (the "2004 Options"). The Chief Executive Officer forwarded the June 20, 2006 letter to the Chairman of the Company's Audit Committee. The Audit Committee's review and assessment is ongoing.
>
> The Audit Committee's review and assessment included, among other things, review of a large volume of company documents, emails, and other electronic documents; interviews of the Company's senior management, certain other Company employees whom the Audit Committee believed may have relevant information, the Company's outside securities counsel, and the members of the Company's Compensation Committee; and, with the assistance of its outside accounting advisors, analysis of accounting rules and regulations. The Audit Committee's review and assessment initially focused on the matters raised in the June 20, 2006 letter regarding the 2004 Options and subsequently was expanded to cover all options granted to the Company's four senior officers, and then was expanded again to cover all options granted by the Company since its initial public offering in 1996.

Based on its review and assessment, the Audit Committee preliminarily has concluded that the actual measurement dates for certain stock options granted by the Company in the fiscal years ended March 31, 1998 through March 31, 2005 differ from the recorded measurement dates. As a result, non-cash stock-based compensation expense should have been recorded with respect to these stock option grants, and the amount of such expense is expected to be material. The Audit Committee has further determined that certain stock option grants that were not in accordance with the Company's stock-based compensation plans should have been accounted for using variable plan accounting for the duration of the options. Under variable plan accounting, stock-based compensation expense is recognized based on the difference between the market price of the stock as of the end of each fiscal quarter and the exercise price of the option. Accordingly, the Company will restate its previously issued financial statements for the fiscal years ended March 31, 2004 and 2005, as well as previously reported interim financial information, to reflect additional non-cash charges for stock-based compensation expense in certain reported periods commencing with the fiscal year ended March 31, 1998. In addition, the Company's financial statements as of and for the fiscal year ended March 31, 2006, to be included in the Company's annual report on Form 10-K for the fiscal year ended March 31, 2006, will include non-cash charges for stock-based compensation expense.

The Audit Committee has not determined the final amounts of additional stock-based compensation expense to be recorded in prior periods or the impact in any future periods. However, based on the review and assessment performed to date, the aggregate amount of stock-based compensation expense to be recorded from April 1, 1997 to March 31, 2006 is presently estimated to be approximately $3 million, which represents approximately 2% of the Company's cumulative earnings before taxes over the nine-year period. This estimate is preliminary, unaudited and subject to change. There can be no assurance that the final amount of the restatement will not differ materially from this estimate. The stock-based compensation expense in certain years may be greater than the aggregate net impact over the entire period, and in other years may result in negative stock-based compensation expense, depending on the market price of the Company's common stock. In periods where negative stock-based compensation expense is recorded, the restatement will have the effect of increasing reported amounts of earnings before income taxes, net earnings, net earnings per share and retained earnings, and decreasing paid in capital. The cumulative stock-based compensation expenses incurred as a result of the restatement will have the effect of decreasing reported amounts of earnings before income taxes, net earnings, net earnings per share and retained earnings, and increasing paid in capital. The Company presently believes that the restatement related to stock-based compensation expense will not affect its revenues, cash flows, or cash balances.

In addition, as previously reported on its Form 8-K filed on June 28, 2006, the Company's financial statements for fiscal years ended March 31, 2005 and 2004 will be restated in connection with the presentation of dealer floor plan financing arrangements.

The Audit Committee also has concluded that the Company's internal controls, system of reporting, and documentation with respect to options were inadequate during the affected periods and will recommend specific measures designed to remedy such inadequacies.

The Company has not yet determined the tax consequences that may result from these matters or whether tax consequences will give rise to monetary liabilities which may have to be satisfied in any future period. The Company also expects that expenses arising from the investigation, the restatement and related activities, which will be recorded in the periods incurred, will be significant.

For the above-stated reasons, the Company's prior financial statements, and the related reports from the Company's independent registered public accountants, earnings statements and press releases, and similar communications issued by the Company, relating to periods commencing with the fiscal year ended March 31, 1998 should no longer be relied upon.

The Audit Committee has discussed the matters described above, and reflected in the Form 8-K filed today, with its independent registered public accounting firm.

The Company intends to file its restated financial statements and its annual report for the year ended March 31, 2006 as soon as practicable. As previously announced, the Company received a Staff Determination letter from Nasdaq on July 18, 2006 indicating that the Company's securities are subject to delisting because the Company has not yet filed its Form 10-K for the fiscal year ended March 31, 2006 and is therefore not in compliance with the continued listing standard in Nasdaq Marketplace Rule 4310(c)(14). The Company has requested a hearing before a Nasdaq Listing Qualifications Panel ("Panel") to review the Staff Determination. At the hearing, which is scheduled for September 7, 2006, the Company will ask the Panel for additional time to remedy the late filing and to restate its financial statements. There can be no assurance that the Panel will grant the additional time or that the Company will maintain its Nasdaq listing.

43.     In effect, during the relevant period, the Defendants caused ePlus's shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial statements, business and prospects. Specifically, Defendants caused or allowed ePlus to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses

the Company's financial results violated GAAP; and (iii) that the Company's public disclosures presented an inflated view of ePlus's earnings and restated earnings.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

44.     Plaintiff brings this action derivatively in the right and for the benefit of ePlus to redress injuries suffered and to be suffered by ePlus as a direct result of Defendants' violations of state and federal law, breaches of fiduciary duty, abuse of control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

45.     Plaintiff will adequately and fairly represent the interests of ePlus and its shareholders in enforcing and prosecuting its rights.

46.     Plaintiff is an owner of ePlus stock and was an owner of ePlus stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

47.     Based upon the facts set forth throughout this Complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the ePlus Board of Directors to institute this action against the officers and members of the ePlus Board of Directors is excused as futile. A pre-filing demand would be a useless and futile act because:

(a)     The members of ePlus's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(b)     The ePlus Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from ePlus's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting. Pursuant to their specific duties as Board members, the Director Defendants are charged with the management of the Company and to conduct its business affairs. Defendants breached the fiduciary duties that they owed to ePlus and its shareholders in that they failed to prevent and correct the improper stock option granting and financial reporting. Certain directors are also dominated and controlled by other directors and cannot act independently of them. Thus, the ePlus Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

(c)     The acts complained of constitute violations of the fiduciary duties owed by ePlus's officers and directors and these acts are incapable of ratification.

(d)     The members of ePlus's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

(e)     Any suit by the current directors of ePlus to remedy these wrongs would likely further expose the liability of Defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the Defendants, thus,

they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(f)     ePlus has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for ePlus any part of the damages ePlus suffered and will suffer thereby.

(g)     In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other Defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal sanctions, or IRS penalties. This they will not do.

(h)     ePlus's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of ePlus. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions which eliminate coverage for any action brought directly by ePlus against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of ePlus, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

(i)     In order to bring this action for breaching their fiduciary duties, the members of the ePlus Board would have been required to sue themselves and/or their fellow directors and

allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

48.    Plaintiff has not made any demand on shareholders of ePlus to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    ePlus is a publicly traded company with approximately 8 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT ON EPLUS'S FINANCIAL STATEMENTS

### The Fiscal 1997 Form 10-K

49.    On or about June 30, 1997, the Company filed its fiscal 1997 Form 10-K with the SEC. The fiscal 1997 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1997 Form 10-K included ePlus's 1997 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, ePlus's compensation expense was understated and its net earnings were overstated.

### The Fiscal 1998 Form 10-K405

50.    On or about June 29, 1998, the Company filed its fiscal 1998 Form 10-K405 with the SEC. The fiscal 1998 Form 10-K405 was simultaneously distributed to shareholders and the public. The fiscal 1998 Form 10-K405 included ePlus's 1998 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the

backdated stock options. As a result, ePlus's compensation expense was understated and its net earnings were overstated.

**The Fiscal 1999 Form 10-K**

51.    On or about June 29, 1999, the Company filed its fiscal 1999 Form 10-K with the SEC. The fiscal 1999 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 1999 Form 10-K included ePlus's 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, ePlus's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2000 Form 10-K**

52.    On or about June 29, 2000, the Company filed its fiscal 2000 Form 10-K with the SEC. The fiscal 2000 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2000 Form 10-K included ePlus's 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, ePlus's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2001 Form 10-K**

53.    On or about June 29, 2001, the Company filed its fiscal 2001 Form 10-K with the SEC. The fiscal 2001 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2001 Form 10-K included ePlus's 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, ePlus's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2002 Form 10-K**

54.      On or about July 1, 2002, the Company filed its fiscal 2002 Form 10-K with the SEC. The fiscal 2002 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2002 Form 10-K included ePlus's 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ePlus's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2003 Form 10-K**

55.      On or about June 30, 2003, the Company filed its fiscal 2003 Form 10-K with the SEC. The fiscal 2003 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2003 Form 10-K included ePlus's 2003 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ePlus's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2004 Form 10-K**

56.      On or about June 15, 2004, the Company filed its fiscal 2004 Form 10-K with the SEC. The fiscal 2004 Form 10-K was simultaneously distributed to shareholders and the public. The fiscal 2004 Form 10-K included ePlus's 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ePlus's compensation expense was understated and its net earnings were overstated.

**The Fiscal 2005 Form 10-K**

57.      On or about June 29, 2005, the Company filed its fiscal 2005 Form 10-K with the SEC. The fiscal 2005 Form 10-K was simultaneously distributed to shareholders and the public.

The fiscal 2005 Form 10-K included ePlus's 2005 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, ePlus's compensation expense was understated and its net earnings were overstated.

## DEFENDANTS' SCHEME BEGINS TO UNRAVEL

58.    The 1997-2005 Proxy Statements concealed Defendants' option backdating scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on proxy proposals between at least 1997 and 2005. In fact, it was not until August 2006 that shareholders learned that the Proxy Statements which they had relied upon for years were false and misleading. Defendants have been unjustly enriched at the expense of ePlus, which has received and will receive less money from the Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

59.    On August 11, 2006, ePlus issued a press release and filed an 8-K disclosing its past improper option practices and its intention to restate its past financial statements to correct these practices.

## THE ADVERSE IMPACT OF DEFENDANTS' MISCONDUCT

60.    Unlike most companies which avoid such option backdating abuse by issuing stock option grants at the same time each year, which eliminates the potential for backdating, Defendants ensured that executives would not have any such restrictions. Given the many times ePlus's grants were the low of the month in which options were granted, the date of their stock option grants was clearly more than merely coincidental.

61.    As a result of the backdating of options, Defendants have been unjustly enriched at the expense of ePlus, which has received and will receive less money from Defendants when they

exercise their options at prices substantially lower than they would have if the options had not been backdated.

## TOLLING OF THE STATUTE OF LIMITATIONS

62.     The Counts alleged herein are timely. As an initial matter, Defendants wrongfully concealed their manipulation of the stock option plans, through strategic timing and fraudulent backdating, by issuing false and misleading Proxy Statements, by falsely reassuring ePlus's public investors that ePlus's option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based on the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

63.     Finally, as fiduciaries of ePlus and its public shareholders, the Defendants cannot rely on any limitations defense where they withheld from ePlus's public shareholders the facts that give rise to the claims asserted herein, *i.e.*, that the ePlus Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs for the Company.

## COUNT I

### Violations of §14(a) of the Exchange Act Against
### All Defendants

64.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

65.     Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to

- 25 -

state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

66.   The 1997-2005 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing ePlus to engage in an option backdating scheme, a fact which Defendants were aware of and participated in from at least 1997.

67.   In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

68.   The misrepresentations and omissions in the Proxy Statements were material to plaintiff in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

69.   The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT II

### Accounting

70.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

71.   At all relevant times, Defendants, as directors and/or officers of ePlus, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

72.   In breach of their fiduciary duties owed to ePlus and its shareholders, the Defendants caused ePlus, among other things, to grant backdated stock options to themselves and/or certain

other officers and directors of ePlus.  By this wrongdoing, the Defendants breached their fiduciary duties owed to ePlus and its shareholders.

73.     The Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the Defendants.

74.     As a result of Defendants' misconduct, ePlus has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

75.     Plaintiff demands an accounting be made of all stock options grants made to Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the Defendants, as well as the disposition of any proceeds received by the Defendants via sale or other exercise of backdated stock option grants received by the Defendants.

### COUNT III

**Breach of Fiduciary Duty and/or Aiding and Abetting
Against All Defendants**

76.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

77.     Each of the Defendants agreed to and did participate with Norton and the other Defendants and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties the Defendants owed to the Company.

78.     The Defendants have violated fiduciary duties of care, loyalty, candor and independence owed to ePlus and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of ePlus and its shareholders.

- 27 -

79.     As demonstrated by the allegations above, Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to ePlus and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding Defendants' option backdating scheme.

80.     By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward ePlus and its public shareholders.

81.     As a proximate result of Defendants' conduct, in concert with Norton, ePlus has been injured and is entitled to damages.

**COUNT IV**

**Abuse of Control Against All Defendants**

82.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

83.     The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, ePlus, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at ePlus.  As a part of this scheme, Defendants actively made and/or participated in the making of or aided and abetted the making of, misrepresentations regarding ePlus.

84.     Defendants' conduct constituted an abuse of their ability to control and influence ePlus.

85.     By reason of the foregoing, ePlus has been damaged.

## COUNT V

### Gross Mismanagement Against All Defendants

86.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

87.     Defendants had a duty to ePlus and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of ePlus.

88.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of ePlus in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of ePlus's affairs and in the use and preservation of ePlus's assets.

89.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused ePlus to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to ePlus, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged ePlus.

90.     By reason of the foregoing, ePlus has been damaged.

## COUNT VI

### Constructive Fraud Against All Defendants

91.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

92.     As corporate fiduciaries, Defendants owed to ePlus and its shareholders a duty of candor and full accurate disclosure regarding the true state of ePlus's business and assets and their conduct with regard thereto.

93.     As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from ePlus's shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of ePlus.  Thus they have committed constructive fraud and violated their duty of candor.

94.     By reason of the foregoing, ePlus has been damaged.

## COUNT VII

### Corporate Waste Against All Defendants

95.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.     By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to Defendants via the option backdating scheme, Defendants have caused ePlus to waste valuable corporate assets.

97.     As a result of Defendants' corporate waste, they are liable to the Company.

## COUNT VIII

### Unjust Enrichment Against All Defendants

98.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

99.     As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of ePlus, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

100.    All the payments and benefits provided to the Defendants were at the expense of ePlus. The Company received no benefit from these payments. ePlus was damaged by such payments.

101.    Certain of the Defendants sold ePlus stock for a profit during the period of deception, misusing confidential non-public corporate information. These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of ePlus. A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT IX

### Against the Officer Defendants for Rescission

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

103.    As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and ePlus entered into during the relevant period were obtained through Defendants' fraud, deceit, and abuse of control. Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Officer Defendants' employment agreements and the Company's stock option plan which was also approved by ePlus shareholders and filed with the SEC.

104.    All contracts which provide for stock option grants between the Officer Defendants and ePlus and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

- 31 -

A.    Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.    Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.    Directing ePlus to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

(i)    a proposal requiring that the office of CEO of ePlus and Chairman of the ePlus Board of Directors be permanently held by separate individuals and that the Chairman of the ePlus Board meets rigorous "independent" standards;

(ii)    a proposal to strengthen the ePlus Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)    appropriately test and then strengthen the internal audit and control function;

(iv)    rotate independent auditing firms every five years;

(v)    control and limit insider stock selling and the terms and timing of stock option grants; and

(vi)    reform executive compensation.

D.    Ordering the imposition of a constructive trust over Defendants' stock options and any proceeds derived therefrom;

E.    Awarding punitive damages;

F.    As to all improperly dated and/or improperly priced options that have been exercised, ordering Defendants to make a payment to the Company in an amount equal to the difference between the prices at which the options were exercised and the exercise prices the options should have carried if they were priced at fair market value on the actual date of grant;

G.    As to all improperly dated and/or improperly priced options that have been granted but not yet exercised or expired, ordering the Company to rescind such options so they carry the exercise prices they should have carried if they were priced at fair market value on the actual date of grant;

H.    Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

I.    Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 18, 2007                 CUNEO GILBERT & LaDUCA, LLP
                                        JONATHAN W. CUNEO (DC Bar# 939389)
                                        WILLIAM H. ANDERSON
                                        (Admitted to DC Bar Jan. 8, 2007 – awaiting Bar#)


                                        _____
                                        JONATHAN W. CUNEO

                                        507 C Street, N.E.
                                        Washington, DC  20002
                                        Telephone:  202/789-3960
                                        202/789-0489 (fax)

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Avenue, NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
TRAVIS E. DOWNS III
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

Counsel for Plaintiff

### EPLUS, INC. VERIFICATION

I, Christopher Dilorenzo, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information and belief.

DATE: _12·26-06_

SIGNATURE

E 07-144
RJL

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Christopher Dilorenzo    88888 | Phillip G. Norton, et al. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)    88888

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Jonathan W. Cuneo
Cuneo Gilbert & LaDuca, LLP
507 C Street, NE
Washington, DC 20002

ATTOF

CASE NUMBER   1:07CV00144

JUDGE: Richard J. Leon

DECK TYPE: General Civil

DATE STAMP: 01/18/2007

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

⊙ 3 Federal Question (U.S. Government Not a Party)

○ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHI
FOR PLAINTIFF AN

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

⊙ **E. General Civil (Other)**   OR   ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

⑨

| ○ G. Habeas Corpus/ 2255 | ○ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ○ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Shareholder derivative action based on section 14(a) of the Exchange Act.

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☒ ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint   JURY DEMAND:   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE   January 18, 2006   SIGNATURE OF ATTORNEY OF RECORD   /s/

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.