UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTOPHER DILORENZO, Derivatively on Behalf of EPLUS INC., | ) ) | Civil No. 07-CV-00144-RJL |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | |
| vs. | ) ) | |
| | ) | |
| PHILLIP G. NORTON, et al., | ) ) | |
| | ) | |
| Defendants, | ) ) | |
| | ) | |
| –and– | ) ) | |
| | ) | |
| EPLUS INC., a Delaware corporation, | ) ) | |
| | ) | |
| Nominal Defendant. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |
| | ) | |

**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND
STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY, WASTE OF
CORPORATE ASSETS AND UNJUST ENRICHMENT**

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by a shareholder of ePlus Inc.[1] ('ePlus'

or the 'Company'), on behalf of the Company against its Board of Directors and certain of its senior

executives (collectively, 'Defendants'). This action seeks to remedy Defendants' violations of federal

and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate

waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of

business whereby Defendants allowed senior ePlus insiders to divert millions of dollars of corporate

assets to themselves via the manipulation of grant dates associated with thousands of stock options

granted to ePlus insiders. Each of the Defendants also participated in the concealment of the

backdating option scheme complained of herein and/or refused to take advantage of the Company's

legal rights to require these senior insiders to disgorge the hundreds of millions in illicitly obtained

incentive compensation and proceeds diverted to them since at least 1997. While the price of ePlus

stock was artificially inflated by the false financial statements issued due to the backdated options,

Defendants engaged in a massive insider trading bailout, selling *more than $5 million* worth of

ePlus stock in violation of securities laws.

2.     Between fiscal years ended March 31, 1997 and March 31, 2006, Defendants also

caused ePlus to file false and misleading statements with the Securities and Exchange Commission

('SEC'), including Proxy Statements filed with the SEC which stated that the options at issue herein

granted by ePlus carried with them an exercise price that was *not less than* the fair market value of

ePlus stock on the date of grant and issuance.

3.     In fact, Defendants were aware that the practices employed by the Board allowed the

stock option grants to be *backdated* to dates when the Company's shares were trading at or near the

---

[1]     Previously known as MLC Holdings Inc.

lowest price for that relevant period. Yet, Defendants continued to engage in this conduct and the subsequent cover–up via materially false SEC filings until it could no longer hide from the mounting public inquiries into backdating that were plaguing scores of companies following the March 19, 2006, *Wall Street Journal* exposè that first brought the underworld of backdating into public view. On August 11, 2006, ePlus abruptly announced that it would restate its financial results for fiscal years ended March 31, 2004 and March 31, 2005, as well as for quarters ended June 30, September 30, and December 31, 2005, because of "incorrect accounting" for stock option awards. The August 11 announcement admitted to problems with options granted to Chief Executive Officer Phillip G. Norton, Executive Vice President Bruce M. Bowen, Treasurer Kleyton Parkhurst and Chief Financial Officer Steven J. Mencarini. The Company further announced that "actual measurement dates" for options granted between 1998 and 2005 "differ from the recorded measurement dates," *i.e.*, backdating.

4.       Defendants' misrepresentations and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Virginia and Delaware law. By authorizing and/or acquiescing in the stock option backdating scheme, Defendants: (i) caused ePlus to issue false statements; (ii) diverted hundreds of millions of dollars of corporate assets to senior ePlus executives; (iii) subjected ePlus to potential liability from regulators, including the SEC and the IRS; and (iv) as of July 20, 2007, was to cause Nasdaq to delist the stock due to failure to timely file periodic reports with the SEC.

5.       Defendants' gross mismanagement and malfeasance over the past decade has exposed ePlus and its senior executives to criminal and civil liability for issuing false and misleading financial statements. Specifically, Defendants caused or allowed ePlus to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of

- 2 -

improperly recorded stock-based compensation expenses, the Company's financial results violated Generally Accepted Accounting Principles ("GAAP"); and (iii) that the Company's public disclosures presented an improperly inflated view of ePlus' earnings and earnings per share.

6.     Defendants' malfeasance and mismanagement during the relevant period has wreaked millions of dollars of damages on ePlus.  The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds.  Defendants' breaches of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations so as to void all grants made pursuant to the plans.  This action seeks recovery for ePlus against these faithless fiduciaries, as ePlus' Board of Directors, at the time this action was commenced, was simply unable or unwilling to do so.

## INTRODUCTION

7.     On March 18, 2006, an article appeared in *The Wall Street Journal* entitled, "The Perfect Payday–Some CEOs reap millions by landing stock options when they are most valuable; Luck–or something else?" *The Wall Street Journal's* analysis focused on financial filings from several high-tech companies and was an extension of recent academic articles which suggested that 'backdating [stock options] was widespread, particularly from the start of the tech-stock boom in the 1990s though the Sarbanes-Oxley corporate reform act of 2002."

8.     As Securities and Exchange Commission ("SEC") Chairman Christopher Cox testified before the U.S. Senate Committee on Banking, Housing and Urban Affairs on September 6, 2006, 'backdating' is a practice by which a stock option is publicly reported as having been granted on one date, but is actually backdated weeks or months to a date where the stock price was trading at a lower price.  Such backdating allows company executives and stock option grantees to realize immediate unearned and undisclosed financial gains at the expense of the company and its shareholders.

-3-

9.    Because ePlus is only obligated to disclose option grants to certain executive officers in its proxy filings, the full breadth of the unlawful stock options and false financial reporting scheme is not yet known. Further, there can be no guarantee that ePlus made all required disclosures. Indeed, because ePlus has failed to timely file reports with the SEC due to its purported internal backdating investigation, key facts have been obscured from the market, ePlus' shareholders and plaintiff.

10.    There is no debate that stock options backdating represents unbridled corporate corruption and the worst sort of abuse of shareholders. Lynn Turner, the SEC's former Chief Accountant, described backdating as follows:"It's like allowing people to place bets on a horse race after the horses have crossed the finish line." Arthur Levitt, former Chairman of the SEC, described backdating as stealing:"It is ripping off shareholders in an unconscionable way" and "represents the ultimate in greed."

11.    Similarly, Harvey Pitt, former Chairman of the SEC, recently opined that "backdating" plainly violates both the federal securities laws and state corporate fiduciary laws.

> What's so terrible about backdating options grants?
>
> For one thing, it likely renders a company's proxy materials false and misleading. Proxies typically indicate that options are granted at fair market value. But if the grant is backdated, the options value isn't fair–at least not from the vantage point of the company and its shareholders.
>
> For another, backdating means a corporate document used to permit access to corporate assets has been falsified, a violation of the Foreign Corrupt Practices Act. Moreover, if backdating occurs without the compensation committee's knowledge, illegal insider trading may also have occurred.
>
> Securities law violations are not the only potential problems with backdating options grants. Backdating may violate the Internal Revenue Code, and companies may not be able to deduct the options payments. On the state level, backdating could involve a breach of fiduciary duty, a waste of corporate assets and even a usurpation of a corporate opportunity.

*    *    *

More fundamentally, the financial statements of a company that has engaged in backdating may require restatement. The options may not be deductible, and the expenses, as well as the various periods to which they may have been allocated, may also be incorrect. . . .

More to the point, what does this kind of conduct say about those who do it and those who allow it to occur (either wittingly or unwittingly)?

Those who backdate options grants violate federal and state law. And those on whose watch this conduct occurs are also potentially liable: If they knew about the backdating, they're participants in fraudulent and unlawful conduct. If they didn't know about the backdating, the question will be: Should they have done more to discover it?

Harvey Pitt, *The Next Big Scandal*, Forbes.com, May 26, 2006.

12.     Recently, the Honorable James M. Rosenbaum from the United States District Court, District of Minnesota, likened backdating to events in the landmark film *The Sting* (Universal Pictures, 1973), involving a scheme known "as 'past-posting,' or betting on horse races after the results are known." *See In re UnitedHealth Group PSLRA Litig.*, No. 06-CV-1691 (JMR/FLN), 2007 U.S. Dist. LEXIS 40623, at *7-*8 (D. Minn. June 4, 2007).

13.     Defendants' backdating scheme not only surreptitiously and illegally lined Defendants' pockets and caused ePlus to issue materially false financial statements (which Defendants have admitted by disclosing the need to formally restate), but Defendants' conduct undermined the key purpose of stock option-based executive compensation, *i.e.*, to provide incentive to improve the Company's performance and increase the Company's stock price and market capitalization. By manipulating options such that they carried a strike price lower than the trading price of the stock on the date of grant, ePlus insiders profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition.

14.     By this action, plaintiff seeks to remedy the substantial damage and injuries inflicted upon ePlus by Defendants' secret backdating scheme. By approving backdated grants to ePlus' executives and employees, the ePlus Board of Directors: (i) diverted millions of dollars of corporate assets to top ePlus insiders, including themselves; (ii) caused ePlus to materially understate its

- 5 -

compensation expenses and both materially understate its net loss and overstate its net income (and income/losses per share), exposing ePlus to potential liability for violations of the securities laws; (iii) subjected ePlus to substantial investigative costs and massive potential liability from regulators, including the SEC and the Internal Revenue Service ('IRS'); (iv) damaged ePlus' credibility with shareholders and business partners alike; (v) subjected ePlus to millions in direct restatement costs; and (vi) has subjected ePlus to delisting by Nasdaq.

15.    By this action, plaintiff seeks Defendants' ill-gotten profits and to institute corporate governance reforms to ensure Defendants' compliance with the high fiduciary standards expected of corporate fiduciaries.

## JURISDICTION AND VENUE

16.    The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 ('Exchange Act'), 15 U.S.C. §§78j(b), 78n(a) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5 promulgated thereunder, §304 of the Sarbanes-Oaxley Act of 2002, and under Delaware and Virginia law for breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

17.    This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §§1331 and 1337. This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

18.    This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

19.    Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and

dissemination of materially false and misleading information, including SEC filings, occurred in substantial part in this District. ePlus conducts its business in this District. Further, Defendants conduct business in this District, and certain of the Defendants (including Defendant O'Donnell) are citizens of the District of Columbia and reside in this District.

**PARTIES**

20.    Plaintiff Christopher Dilorenzo is and at relevant times was a shareholder of nominal party ePlus.

21.    Nominal party ePlus is a Delaware corporation with its principal executive offices located in Herndon, Virginia. On July 20, 2007, ePlus' stock was to be delisted from Nasdaq as a result of its failure to timely submit SEC filings due to the ongoing internal investigation of its accounting for options.

22.    Defendant Phillip G. Norton ('Norton') has been CEO and Chairman of the Board of Directors of ePlus since 1993. Norton was formerly employed by the same entity as Defendant Bowen: Pacific Corp. Capital. Because of Norton's positions at ePlus, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Norton participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Norton has served on ePlus' Stock Incentive Committee from at least fiscal years 1997 through and including 2005. Defendant Norton sold at least 120,540 ePlus shares between March 27, 2006 and June 27, 2006 for illegal insider trading proceeds of over $1.58 million.

23.    Defendant Bruce M. Bowen ('Bowen') has been Executive Vice President of ePlus since 1999 and a director since 1990. Bowen founded ePlus in 1990. Because of Bowen's positions,

he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Bowen participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Bowen has served on ePlus' Stock Incentive Committee from at least fiscal years 1997 through and including 2005. Defendant Bowen sold at least 153,000 ePlus shares between December 10, 1998 and February 28, 2006 for illegal insider trading proceeds of over $1.87 million.

24.    Defendant Steven J. Mencarini ('Mencarini') has been Senior Vice President and Chief Financial Officer ('CFO') of ePlus since 1997. Because of Mencarini's positions, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the relevant period, Mencarini participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Mencarini sold 12,000 ePlus shares on March 9 and 10, 2006 for illegal insider proceeds of at least $169,368.

25.    Defendant Kleyton L. Parkhurst ('Parkhurst') has been Senior Vice President, Treasurer and Assistant Secretary of ePlus since 2001. Because of Parkhurst's positions, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and

via reports and other information provided to him in connection therewith. During the relevant period, Parkhurst participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Parkhurst sold at least 102,000 ePlus shares between May 6, 2005 and June 27, 2006 for illegal insider trading proceeds of at least $1.41 million.

26.    Defendant Milton E. Cooper, Jr. ('Cooper') has been a director of ePlus since 2003. Because of Cooper's position, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, Cooper participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Cooper served on ePlus' Audit Committee and Compensation Committee during fiscal year 2005.

27.    Defendant Terrence O'Donnell ('O'Donnell') has been a director of ePlus since 1996. Because of O'Donnell's position, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the relevant period, O'Donnell participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. O'Donnell served on ePlus' Audit Committee from fiscal year 1997 through 2005 and on the Compensation Committee from fiscal years 1997 through 2005.

28.     Defendant Lawrence S. Herman ("Herman") has been a director of ePlus since 2001. Because of Herman's position, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, Herman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Herman served on ePlus' Audit Committee during fiscal years 2001 through 2005.  Herman served on the Compensation Committee during fiscal years 2003 through 2005.

29.     Defendant C. Thomas Faulders III ("Faulders") has been a director of ePlus since July 14, 1998. Because of Faulders' position, he knew the adverse non-public information about the business of ePlus, as well as its finances, markets and present and future prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the relevant period, Faulders participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Faulders served on ePlus' Compensation Committee during fiscal years 1998 through 2005, and on the Audit Committee from fiscal years 2000 through 2005.

30.     The Defendants identified in ¶¶22-23 and 26-29 are referred to herein as the "Director Defendants." The Defendants identified in ¶¶24-25 are referred to herein as the "Officer Defendants." "Defendants" refers to all defendants named herein.

31.    Because of their positions with the Company, Defendants, and each of them, knew or should have known the adverse non-public information about their stock option backdating scheme, as well as ePlus' finances, excessive compensation payments, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

32.    Each of the Defendants is sued individually as a conspirator and aider and abettor, as well as in his or her capacity as an officer and/or director of ePlus, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes or transactions complained of herein.

## DEFENDANTS' DUTIES

33.    Each officer and director of ePlus named herein owed the Company and ePlus shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of ePlus' directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of ePlus. Further, the misconduct of ePlus' officers has been ratified by ePlus' Board, which has failed to take any legal action on behalf of the Company against them.

34.    By reason of their positions as officers, directors and fiduciaries of ePlus and because of their ability to control the business and corporate affairs of the Company, the Defendants owed ePlus and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage ePlus in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of ePlus and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to refrain from utilizing their control

- 11 -

over ePlus to divert assets to themselves via improper and/or unlawful practices. Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

35.    Because of their positions of control and authority as directors or officers of ePlus, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein. As to the Director Defendants, these acts include: (i) agreement to and/or acquiescence in Defendants' option backdating scheme; (ii) willingness to cause ePlus to disseminate false Proxy Statements for *1997-2005*, which Proxy Statements failed to disclose Defendants' option backdating scheme and omitted the fact that executive officers were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options they received. Because of their positions with ePlus, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to ePlus shareholders and the financial markets but failed to do so.

36.    Between 1997 and 2005, Defendants repeated in each Proxy Statement that the stock option grants made during that period that are at issue herein carried an exercise price that was not less than the fair market value of ePlus stock on the date granted, as calculated by the public trading price of the stock at the market's close on that date. However, Defendants concealed until August 2006 that stock option grants were repeatedly and consciously backdated to ensure that the strike price associated with the option grants was at or near the lowest trading price for that fiscal period. Due to Defendants' breach of their fiduciary duty in the administration of the stock option plans, plaintiff seeks to have the directors' and officers' plans voided and gains from those plans returned to the Company. In the alternative, plaintiff seeks to have all of the unexercised options granted to Defendants between at least 1997 and 2005 cancelled, the financial gains obtained via the exercise of

such options returned to the Company and to have Defendants revise the Company's financial statements to reflect the truth concerning these option grants.

37. To discharge their duties, the directors of ePlus were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of ePlus. By virtue of such duties, the officers and directors of ePlus were required, among other things, to:

(a) manage, conduct, supervise and direct the business affairs of ePlus in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of ePlus);

(b) neither engage in self-dealing nor knowingly permit any officer, director or employee of ePlus to engage in self-dealing;

(c) neither violate nor knowingly permit any officer, director or employee of ePlus to violate applicable laws, rules and regulations;

(d) remain informed as to the status of ePlus' operations, including its practices in relation to the cost of allowing the pervasive backdating and improperly accounting for such, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e) prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)      establish and maintain systematic and accurate records and reports of the business and affairs of ePlus and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)      maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that ePlus' financial statements—including its expenses, accounting for stock option grants and other financial information—would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)      exercise control and supervision over the public statements to the securities markets and trading in ePlus stock by the officers and employees of ePlus; and

(i)      supervise the preparation and filing of any financial reports or other information required by law from ePlus and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of ePlus and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

38.      Each Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of ePlus, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders which Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Defendants who were officers and/or directors

of the Company during the relevant period has been ratified by the Director Defendants who comprised ePlus' entire Board during the relevant period.

39.     Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Defendants from taking such illegal actions. As a result, ePlus has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

      (a)     improvidently paid executive compensation;

      (b)     increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

      (c)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

      (d)     incurring possible IRS penalties for improperly reporting compensation.

40.     These actions have irreparably damaged ePlus' corporate image and goodwill. For at least the foreseeable future, ePlus will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that ePlus' ability to raise equity capital or debt on favorable terms in the future is now impaired.

### AIDING AND ABETTING AND CONCERTED ACTION

41.     In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

42.     During all times relevant hereto, Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to divert millions of dollars to ePlus insiders and directors

and causing ePlus to misrepresent its financial results; (ii) maintain Defendants' executive and directorial positions at ePlus and the profits, power and prestige which Defendants enjoyed as a result of these positions; (iii) deceive the investing public, including shareholders of ePlus, regarding Defendants' compensation practices and ePlus' financial performance.

43.    The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operation and financial condition and to artificially inflate the price of ePlus common stock so they could dispose of millions of dollars of their own ePlus stock, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

44.    Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly engage in the option backdating scheme alleged herein and misrepresent ePlus' financial results. Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

45.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

46.    ePlus provides information technology products, sales and services, leasing and financing services, procurement software, document management and distribution software, and electronic catalog content management software and services. The Company sells its products

primarily by using its internal sales force and through vendor relationships to commercial customers, federal, state and local governments, and higher education institutions.

47.    Throughout the relevant period, Defendants caused ePlus to grant them scores of stock options permitting them to buy ePlus stock for pennies on the dollar which they could in turn sell as the Company's stock price increased. A stock option gives the holder the right to buy a stock at a certain price in the future. Typically, companies set that price at the same time their directors approve an option grant, with an exercise price–also known as the "strike price"–usually set at the closing price of the stock that day, the closing price of the night before or by computing an average of the high and low prices on the day of the vote.

48.    However, many of the thousands of options granted to ePlus' executives had a hidden, valuable component: they were misdated, often making them even more significantly valuable. The misdated stock option grants fell largely into three categories: (i) "look back" grants, in which the date of the grant was picked retroactively (e.g., a decision in February to pick a January date); (ii) "wait and see" grants, in which a grant date was selected, but the decision was finalized–and sometimes changed–at a later date (e.g., a decision on January 1 to issue a grant on January 15, but there is a period after January 15 in which the grantor waits to see if a more advantageous price occurs and, if one does, uses that later date instead); and (iii) grants where there was a failure to complete the option grant process by the date of the grant (e.g., where there is a decision to issue a grant as of a certain date, but after that date there are changes in the grantees or amounts to grantees, and although the work is not complete on those grants as of the stated grant date, that date is nonetheless used).

49.    Complicating matters and magnifying the harm to ePlus, during the relevant period, ePlus' internal controls and accounting controls with respect to option grants and exercises, and its financial reporting, were grossly inadequate. The weaknesses allowed dates of both grants and exercises to be manipulated and the Company's executive compensation expenses to be materially

understated. They also allowed grant dates to be changed to provide executives with more favorably priced options, in effect augmenting their compensation, with no benefit running to the Company.

50.    Specifically, in many instances the reported dates ePlus stock options were granted differed from the dates on which the options appear to have been actually granted. The practice applied to the overwhelming majority of stock option grants made during the relevant period, which allowed executives and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to take larger profits when the stock price later rose.

51.    Through their fiduciary duties of care, good faith and loyalty, Defendants owed to ePlus a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.    In order to adequately carry out these duties, it is necessary for Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.    This material non-public information included the problems ePlus faced because of its deficient internal controls. Furthermore, Defendants Cooper, O'Donnell, Herman and Faulders, who were members of the Audit Committee at various times during the relevant period, had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with management, the Company's policies generally with respect to the Company's earnings press releases and with respect to financial information and earnings guidance provided to analysts and rating agencies.    Defendants Norton, Bowen, Mencarini and Parkhurst, who were officers of ePlus, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.    Moreover, Director Defendants Norton, Bowen, Cooper, O'Donnell, Herman and Faulders, had ample opportunity to discuss this material information with fellow directors at any

of the scores of board meetings that occurred during the relevant period as well as at committee meetings of the Board. Despite these duties, Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the misleading statements to be disseminated by ePlus to the investing public and the Company's shareholders during the relevant period.

52.    Specifically, since at least 1997, Defendants have caused ePlus to report false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

| YEAR | REPORTED EARNINGS (in millions) | REPORTED DILUTED EARNINGS PER SHARE FROM CONTINUING OPERATIONS |
|------|------|------|
| 1997 | $ 3.49 | $0.66 |
| 1998 | $ 6.04 | $0.98 |
| 1999 | $ 6.72 | $0.98 |
| 2000 | $ 8.38 | $0.91 |
| 2001 | $ 8.32 | $0.80 |
| 2002 | $ 8.91 | $0.85 |
| 2003 | $ 9.71 | $0.96 |
| 2004 | $10.15 | $1.02 |
| 2005 | $25.29 | $2.68 |

53.    On Friday, August 11, 2006, ePlus announced financial restatements relating to stock option grants:

ePlus inc. announced today that its previously issued financial statements for the fiscal years ended March 31, 2004 and 2005, as well as for the quarters ended June 30, September 30 and December 31, 2005, will be restated. The Company further announced that the financial statements included in the Company's quarterly reports on Form 10-Q and annual reports on Form 10-K for the periods commencing with the fiscal year ended March 31, 1998 should no longer be relied upon because of incorrect accounting for stock-based compensation expense described therein. The Company has filed a form 8-K, which describes these matters, with the Securities and Exchange Commission ('SEC') today.

As previously reported on Form 12b-25 filed with the SEC on June 30, 2006, and as further reported on Form 8-K filed with the SEC on July 17, 2006, ePlus' Chief Executive Officer, Phillip G. Norton, received a letter dated June 20, 2006 from an ePlus stockholder raising concerns regarding certain options issued to the Company's four senior officers in 2004 (the "2004 Options"). The Chief Executive Officer forwarded the June 20, 2006 letter to the Chairman of the Company's Audit Committee. The Audit Committee's review and assessment is ongoing.

The Audit Committee's review and assessment included, among other things, review of a large volume of company documents, emails, and other electronic documents; interviews of the Company's senior management, certain other Company employees whom the Audit Committee believed may have relevant information, the Company's outside securities counsel, and the members of the Company's Compensation Committee; and, with the assistance of its outside accounting advisors, analysis of accounting rules and regulations. The Audit Committee's review and assessment initially focused on the matters raised in the June 20, 2006 letter regarding the 2004 Options and subsequently was expanded to cover all options granted to the Company's four senior officers, and then was expanded again to cover all options granted by the Company since its initial public offering in 1996.

Based on its review and assessment, the Audit Committee preliminarily has concluded that the actual measurement dates for certain stock options granted by the Company in the fiscal years ended March 31, 1998 through March 31, 2005 differ from the recorded measurement dates.    As a result, non-cash stock-based compensation expense should have been recorded with respect to these stock option grants, and the amount of such expense is expected to be material.   The Audit Committee has further determined that certain stock option grants that were not in accordance with the Company's stock-based compensation plans should have been accounted for using variable plan accounting for the duration of the options.  Under variable plan accounting, stock-based compensation expense is recognized based on the difference between the market price of the stock as of the end of each fiscal quarter and the exercise price of the option.  Accordingly, the Company will restate its previously issued financial statements for the fiscal years ended March 31, 2004 and 2005, as well as previously reported interim financial information, to reflect additional non-cash charges for stock-based compensation expense in certain reported periods commencing with the fiscal year ended March 31, 1998.   In addition, the Company's financial statements as of and for the fiscal year ended March 31, 2006, to be included in the Company's annual report on Form 10-K for the fiscal year ended March 31, 2006, will include non-cash charges for stock-based compensation expense.

The Audit Committee has not determined the final amounts of additional stock-based compensation expense to be recorded in prior periods or the impact in any future periods. However, based on the review and assessment performed to date, the aggregate amount of stock-based compensation expense to be recorded from April 1, 1997 to March 31, 2006 is presently estimated to be approximately $3 million, which represents approximately 2% of the Company's cumulative earnings before taxes over the nine-year period. This estimate is preliminary, unaudited and subject to change. There can be no assurance that the final amount of the restatement will not differ materially from this estimate. The stock-based compensation expense in certain years may be greater than the aggregate net impact over the entire period, and in other years may result in negative stock-based compensation expense, depending on the market price of the Company's common stock. In periods where negative stock-based compensation expense is recorded, the restatement will have the effect of increasing reported amounts of earnings before income taxes, net earnings, net earnings per share and retained earnings, and decreasing paid in capital. The cumulative stock-based compensation expenses incurred as a result of the

restatement will have the effect of decreasing reported amounts of earnings before income taxes, net earnings, net earnings per share and retained earnings, and increasing paid in capital. The Company presently believes that the restatement related to stock-based compensation expense will not affect its revenues, cash flows, or cash balances.

In addition, as previously reported on its Form 8-K filed on June 28, 2006, the Company's financial statements for fiscal years ended March 31, 2005 and 2004 will be restated in connection with the presentation of dealer floor plan financing arrangements.

The Audit Committee also has concluded that the Company's internal controls, system of reporting, and documentation with respect to options were inadequate during the affected periods and will recommend specific measures designed to remedy such inadequacies.

The Company has not yet determined the tax consequences that may result from these matters or whether tax consequences will give rise to monetary liabilities which may have to be satisfied in any future period. The Company also expects that expenses arising from the investigation, the restatement and related activities, which will be recorded in the periods incurred, will be significant.

For the above-stated reasons, the Company's prior financial statements, and the related reports from the Company's independent registered public accountants, earnings statements and press releases, and similar communications issued by the Company, relating to periods commencing with the fiscal year ended March 31, 1998 should no longer be relied upon.

The Audit Committee has discussed the matters described above, and reflected in the Form 8-K filed today, with its independent registered public accounting firm.

The Company intends to file its restated financial statements and its annual report for the year ended March 31, 2006 as soon as practicable. As previously announced, the Company received a Staff Determination letter from Nasdaq on July 18, 2006 indicating that the Company's securities are subject to delisting because the Company has not yet filed its Form 10-K for the fiscal year ended March 31, 2006 and is therefore not in compliance with the continued listing standard in Nasdaq Marketplace Rule 4310(c)(14). The Company has requested a hearing before a Nasdaq Listing Qualifications Panel (Panel) to review the Staff Determination. At the hearing, which is scheduled for September 7, 2006, the Company will ask the Panel for additional time to remedy the late filing and to restate its financial statements. There can be no assurance that the Panel will grant the additional time or that the Company will maintain its Nasdaq listing.

54.    In effect, during the relevant period, the Defendants caused ePlus' shares to trade at

artificially inflated levels by issuing a series of materially false and misleading statements regarding

the Company's financial statements, business and prospects. Specifically, Defendants caused or allowed ePlus to issue statements that failed to disclose or misstated the following: (i) that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and projections; (ii) that because of improperly recorded stock-based compensation expenses the Company's financial results violated GAAP; and (iii) that the Company's public disclosures presented an inflated view of ePlus' earnings and restated earnings.

## THE STOCK OPTION PLANS

55.    The 1997 Proxy solicited shareholders to, among other things, ratify amendments adopted May 14, 1997, by the Board to MLC Holdings, Inc.'s Master Stock Incentive Plan (formerly the 1996 Stock Incentive Plan),[2] approve amendments to MLC Holdings, Inc.'s Amended and Restated Outside Director Stock Plan (formerly the 1996 Outside Director Stock Option Plan) and approve amendments to MLC Holdings, Inc.'s Amended and Restated Incentive Plan (formerly the 1996 Incentive Stock Option Plan).    The full Board (Norton, Bowen, Ledecky, O'Donnell, and Rickertsen) recommended that shareholders vote "for" these amendments. On September 30, 1997, shareholders ratified these amendments.

56.    As described in the 1997 Proxy, the Master Stock Incentive Plan (formerly the 1996 Stock Incentive Plan) "provides the Company a means to offer a critical long-term incentive" and to "attract, retain and motivate newly acquired personnel." 1997 Proxy at 27.    According to the 1997 Proxy, the Master Stock Incentive Plan is administered by the Stock Incentive Committee, who determines the recipients and all award terms.    Members of the Stock Incentive Committee may only participate in grants of options in the Master Stock Incentive Plan if the grant is approved by a majority of the Board.

---

[2]    The 1996 Stock Incentive Plan is attached at Exhibits 10.1-10.4 to the September 11, 1996 Form S-1.

57.    The Amended and Restated Incentive Stock Option Plan, a component plan of the

Master Stock Option Plan, was designed to comply with the provision of the Internal Revenue Code

of 1985 . . . including a requirement that exercise prices be equal to at least 100% of fair market

value of the shares of common stock on the grant date. . . ." 1997 Proxy at 28. This restriction is

consistent with the restriction in place in the 1996 Incentive Stock Option Plan. *See* September 11,

1996 Form S-1 at Ex. 10.4 at Article 6:02.

58.    The Amended and Restated Outside Director Stock Option Plan, also a component

plan of the Master Stock Incentive Plan, permitted grants to outside directors of options for shares at

"an exercise price equal to the market price as of the date of grant. . . ." 1997 Proxy at 29. This

restriction was also in place in the predecessor plan known as the 1996 Outside Director Stock

Option Plan. *See* September 11, 1996 Form S-1 at Ex. 10.2 at Article 6:02.

59.    Pursuant to the 1998 Proxy, the Board solicited shareholder approval for the 1998

Long-Term Incentive Plan ("LTIP") (adopted by the Board on July 28, 1998) by recommending

shareholders vote "for" the LTIP plan. When approved by shareholders, on September 30, 1998, the

Master Stock Option Plan (except for the Employee Stock Purchase Plan) was to terminate pursuant

to a Board resolution. *See* 1998 Proxy at 21. As stated in the 1998 Proxy, "[t]he Board . . . has

determined that it is in the best interest of the Company to adopt a "Long Term Incentive Plan". . . to

afford the Board . . . and the Compensation Committee expanded flexibility relating to stock and

performance base compensation. . . ."

60.    The LTIP's purpose was to promote ePlus' "success" and "enhance" its "value" by "linking" the

"personal interests of employees, officers, consultants and directors to those of the stockholders" and

provide an "incentive for outstanding performance." 1998 Proxy at 21. *See also* 1998 Proxy at

Appendix A, Article 1.

61.    The LTIP included authorization for incentive stock options, among other things. 1998 Proxy at 21. The LTIP was administered by the Compensation Committee. 1998 Proxy at 22 and at Appendix A at Article 4. The LTIP provided, however, that the Board had all powers of the Compensation Committee under the plan when it acted as administrator. *See* 1998 Proxy, Appendix A at Article 4.1. The Compensation Committee had full power to determine recipients of grants and the terms and conditions. *See id.* at Article 4.3. The Committee's decisions and actions under the LTIP are "final, binding and conclusive on all parties." *Id.* at Article 4.4. Incentive stock options granted pursuant to the LTIP could not be granted at an exercise price that was less than fair market value on the date of grant. *See* Proxy, Appendix A at Article 7.1(a) and 7.2(a). Similarly, the 1998 proxy provided that LTIP option grants to non-employee directors (via non-qualified options) "will be 100% of the fair market value of the stock on the date of grant." 1998 Proxy at 22.

62.    The July 29, 2003 Proxy sought shareholder approval of an amendment to the ePlus, Inc. Amended and Restated 1998 Long-Term Incentive Plan ("Amended LTIP"), to set the number of shares of common stock available for awards under the plan at 3 million. The Board approved the amendment on July 15, 2003 by written consent. Shareholders voted for the amendment on September 18, 2003.

63.    The 2003 Proxy, which appended a copy of the Amended and Restated 1998 Long-Term Incentive Plan, provided that the Amended LTIP's purpose was to "promote the success" and "enhance the value" of ePlus by "linking" the "personal interests" of officers and directors "to those of the stockholders" and to provide an "incentive for outstanding performance." 2003 Proxy at 25. The LTIP was to be administered by the Compensation Committee. 2003 Proxy at 26. All formula grants to non-employee directors of non-qualified options were to be at "100% of fair market value of the common stock on the sate of grant." 2003 Proxy at 26. Discretionary awards of either incentive stock options or nonqualified stock options were also subject to the requirement that the exercise

price be "not less than the fair market value of the underlying stock on the date of grant." 2003 Proxy at 27.

## A SAMPLING OF BACKDATED GRANTS

64.     Certain of ePlus' option grants with highly suspicious grant dates are described below. Because ePlus does not report all option grants, only discovery will reveal the full extent of Defendants' backdating conduct. In addition, however, to the grants alleged below, Defendants have admitted to problems with options issued between fiscal years ended 1998 and 2005, including in connection with options to Norton, Bowen, Parkhurst and Mencarini.

**Fiscal Year Ended March 31, 1998 Grants[3]**

| Purported Date of Options Grant | Recipient | Exercise Price | Number of Options |
|---|---|---|---|
| 9/8/97 | Mencarini | $13.25 | 5,100 |
| 2/5/98 | Howard[4] | $11.50 | 2,500 |
| 2/5/98 | Norton | $12.65 | 25,000 |
| 2/5/98 | Parkhurst | $11.50 | 10,000 |
| 2/5/98 | Mencarini | $11.50 | 5,000 |

65.     The grant dated September 8, 1997 to Mencarini was purportedly made pursuant to his June 19, 1997 employment agreement. *See* 1998 Proxy at 17. The Form 10-K for fiscal year ended March 31, 1997 represented that the exercise price of options issued pursuant to Executive Compensation Agreements were equivalent to the fair market value of the Company's stock on the date of grant. *See* 1997 Form 10-K at F-18.

66.     The February 5, 1998 grants to Howard, Mencarini, Norton and Parkhurst were reportedly made pursuant to the Incentive Stock Option Plan. *See* 1998 Proxy at 14. According to ePlus' 1997 and 1998 Proxies, and the terms of the Incentive Stock Option Plan, the grants to

---

[3]     ePlus' fiscal year end is March 31st.

[4]     Thomas B. Howard, Jr. served as ePlus' Vice President and Chief Operating Officer commencing in January 1997.

Howard, Parkhurst and Mencarini were approved by the Stock Incentive Committee and the grant to Norton required a majority vote of the Board.

**Fiscal Year Ended March 31, 1999 Grants**

67.    During fiscal year ended March 31, 1999, Defendants made a highly suspicious grant to Faulders as follows:

| Purported Date of Options Grant | Recipient | Exercise Price | Number of Options |
|---|---|---|---|
| 7/15/98 | Faulders | $13.63 | 3,507 |

68.    According to information derived from ePlus' Proxy Statements, the grant dated July 15, 1998 to non-employee director Faulders was made pursuant to the Amended and Restated Outside Director Stock Option Plan.

**Fiscal Year Ended March 31, 2000 Grants**

69.    During fiscal year ended March 31, 2000, Defendants made highly suspicious grants as follows:

| Purported Date of Options Grant | Recipient | Exercise Price | Number of Options |
|---|---|---|---|
| 11/19/99 | Faulders | $9.13 | 10,000 |
| 11/19/99 | O'Donnell | $9.13 | 10,000 |

70.    The grants dated November 19, 1999 to non-employee directors Faulders and O'Donnell were made pursuant to either the Amended and Restated Outside Director Plan or the LTIP.

**Fiscal Year Ended March 31, 2001 Grants**

71.    During fiscal year ended March 31, 2001, Defendants made a highly suspicious grant to Defendant Mencarini as follows:

| Purported Date of Options Grant | Recipient | Exercise Price | Number of Options |
|---|---|---|---|
| 12/27/00 | Mencarini | $7.75 | 5,000 |

72.    The grants dated December 27, 2000 to Mencarini were made pursuant to the Long-

Term Incentive Plan. *See* March 31, 2001 Proxy at 12.

**Fiscal Year Ended March 31, 2002 Grants**

73.    During fiscal year ended March 31, 2002, Defendants made highly suspicious grants

as follows:

| Purported Date of Options Grant | Recipient | Exercise Price | Number of Options |
|---|---|---|---|
| 9/21/01 | Faulders | $6.86 | 10,000 |
| 9/21/01 | Herman | $6.86 | 7,500 |
| 9/21/01 | Hewitt[5] | $6.86 | 5,000 |
| 9/21/01 | O'Donnell | $6.86 | 10,000 |
| 11/30/01 | Faulders | $7.90 | 10,000 |
| 11/30/01 | O'Donnell | $7.90 | 10,000 |

74.    According to information derived from ePlus' Proxy Statements, the grants dated

September 21, 2001 and November 30, 2001, were made pursuant to the LTIP.

**Fiscal Year Ended March 31, 2004 Grants**

75.    During fiscal year ended March 31, 2004, Defendants made highly suspicious grants

as follows:

| Purported Date of Options Grant | Recipient | Exercise Price | Number of Options |
|---|---|---|---|
| 4/1/03 | Faulders | $7.14 | 10,000 |
| 4/1/03 | Herman | $7.14 | 10,000 |
| 4/1/03 | O'Donnell | $7.14 | 10,000 |

76.    According to information derived from ePlus' Proxy Statement, the grants dated April

1, 2003 were made pursuant to the LTIP. The April 1, 2003 grants were not disclosed in any SEC

filing until March 31, 2004 in SEC Form 5 filings by O'Donnell, Faulders and Herman.

_____

[5]    Thomas L. Hewitt, was a director of ePlus from June 18, 2001 to June 13, 2003.

**Fiscal Year Ended March 31, 2005 Grants**

77.    During fiscal year ended March 31, 2005, Defendants made highly suspicious grants

as follows:

| Purported Date of Options Grant | Recipient | Exercise Price | Number of Options |
|---|---|---|---|
| 11/16/04 | Bowen | $10.87 | 50,000 |
| 11/16/04 | Norton | $10.87 | 258,200 |
| 11/16/04 | Norton | $11.96 | 41,800 |
| 11/16/04 | Parkhurst | $10.87 | 50,000 |

78.    The grants dated November 16, 2004 to Bowen, Norton and Parkhurst were pursuant

to the ePlus Amended LTIP. *See* 7/29/05 Proxy at 15.

79.    Plaintiffs analyzed the January 7, 1997, September 8, 1997, February 5, 1998, July

15, 1998, November 19, 1999, September 13, 2000, December 27, 2000, September 21, 2001,

November 30, 2001, April 1, 2003, and November 16, 2004 stock option grants at ePlus using the

same analysis as Merrill Lynch.  Merrill Lynch analyzes the 20 trading day performance of each

questionable stock option grant reported in a company's proxy statements during the relevant

backdating period.  The analysis also calculates the annualized return of the questionable stock

option grants at 20 trading days after the grant and compares that with the company's overall annual

return.

80.    Applying the Merrill Lynch analysis, the following result occurs: annualized investor

returns were 25% for fiscal year ended March 31, 1998; -35.3% for fiscal year ended March 31,

1999; 289.7% for fiscal year ended March 31, 2000; -70.6% for fiscal year ended March 31, 2001;

7.7% for fiscal year ended March 31, 2002; -22.2% for fiscal year ended March 31, 2003; 81.7% for

fiscal year ended March 31, 2004; and -8.5% for fiscal year ended March 31, 2005.  Next, a

comparison of the 20-day and annualized returns to management on the subject grants was

undertaken.

81.    Applying the Merrill Lynch analysis for the option grants in fiscal year ended March 31, 1998, for the grant on September 8, 1997, the 20-day return to management is 2.6%, or 47.4% annualized, as compared to the 25% annualized return to investors in fiscal year ended March 31, 1998. For the grants on February 5, 1998, the 20-day return to management is 8.7%, or 156.5% annualized, as compared to the 25% annualized return to investors in fiscal year ended March 31, 1998.

82.    For the option grants in fiscal year ended March 31, 1999, the July 15, 1998 grant has a 20-day return to management of 2.8%, or 49.5% annualized, as compared to -35.3% annualized return to investors in fiscal year ended March 31, 1999.

83.    For the option grant in fiscal year ended March 31, 2000 on November 19, 1999, the 20-day return to management is 146.6%, or 2638.4% annualized, as compared to 289.7% annualized return to investors in fiscal year ended March 31, 2000.

84.    For the option grants in fiscal year ended March 31, 2001, the 20-day return to management on the December 27, 2000 grant is 77.4%, or 1393.5% annualized, as compared to -70.6% to investors in fiscal year ended March 31, 2001.

85.    For the option grants in fiscal year ended March 31, 2002, on the September 21, 2001 grant, the 20-day return to management is 18.8%, or 338.5% annualized, as compared to 7.7% annualized return to investors in fiscal year ended March 31, 2002. For the November 30, 2001 grant, the 20-day return to management is 20.9%, or 375.9% annualized, as compared to 7.7% annualized return to investors in fiscal year ended March 31, 2002.

86.    For the option grants in fiscal year ended March 31, 2004, on the April 1, 2003 grant, the 20-day return to management is 26.1%, or 468.9% annualized, as compared to 81.7% annualized return to investors in fiscal year ended March 31, 2004.

87.    For the option grants in fiscal year ended March 31, 2005, on the November 6, 2004 grant, the 20-day return to management is 12.1%, or 216.9% annualized, as compared to -8.5% annualized return to investors in fiscal year ended March 31, 2005.

88.    As readily seen by the vast discrepancies between the annualized management and annualized investors returns, backdating is indicated under the Merrill Lynch analysis.

89.    Below are charts reflecting several of ePlus' grants which occurred right before significant stock price increases:



















## FALSE AND MISLEADING PROXY STATEMENTS

90.    Defendants caused ePlus to send shareholders proxy statements in connection with the Company's annual shareholder meetings every year of its existence as a public company, including fiscal years 1997 through 2005. Defendants prepared and/or reviewed each proxy statement for fiscal 1997 through and including 2005 before the statements were filed with the SEC, and before the statements were sent to shareholders. Each proxy statement sent to shareholders during this period contained materially false and misleading statements or omitted material information about ePlus' stock option practices. Each Director Defendant reviewed or approved proxy statements mailed to shareholders during their service on the ePlus Board. Defendants knew, or were deliberately reckless in not knowing, that the proxy statements were materially false and misleading when issued. In addition to reviewing and participating in preparing the materially false proxy statements during the relevant period, Defendants Norton and Parkhurst signed the fiscal 1997 through fiscal 2002 Proxy Statements, and Defendant Norton signed the fiscal 2003 through 2005 Proxy Statements.

91.    In each proxy statement, the ePlus Board, by and through its Compensation Committee, stated that ePlus issued stock options to maximize shareholder value and provide key employees with the incentive to act in the best interests of the Company and its shareholders, as detailed herein. Defendants reiterated these statements–usually verbatim–in each proxy statement issued during the relevant period, as detailed herein.

92.    Defendants' statements about their compensation philosophy were false and materially misleading. By granting backdated stock options that provided immediate, reckless gains to the option recipients–including directors, executives and senior management–Defendants were not either providing any incentive for attainment of long-term goals or aligning the interests of option recipients with shareholders. In fact, Defendants issued backdated stock options at the expense of shareholders. According to Andrew Metrick, a professor of finance and corporate governance at the

Wharton School of Business at the University of Pennsylvania, stock option backdating, as alleged herein, is nothing more than stealing from the "corporate till," at shareholders' expense. Moreover, none of the backdated options issued to Defendants and others were ever approved by shareholders, nor were shareholders even aware of the illicit compensation.

93.    Each of the Defendants' statements concerning the terms of ePlus' stock plans and Defendants' options pricing practices were also knowingly false and misleading because ePlus had, in fact, backdated option grants to directors and executives.

94.    The ePlus proxy statements also typically concerned the election of directors, the approval and adoption of ePlus' stock option plan and authorization to reserve shares for future issuance under the stock option plans, and ratification of the selection of ePlus' auditor. Each proxy statement sent to shareholders during this period contained materially false and misleading statements or omitted material information about ePlus' stock option practices. As described herein, Defendants represented in these proxy statements that they granted stock options pursuant to each stock plan with exercise prices equal to the fair market value on the date of the grant. Despite these representations, Defendants repeatedly requested that shareholders authorize new stock option plans and amend existing stock plans on that basis, without disclosing that they had not been and would not be granting stock options with exercises prices at or above the fair market value on the date of the grant:

(a)    on September 30, 1997, shareholders, acting on the recommendation of the ePlus Board, approved the Master Stock Incentive Plan (adopted by the Board on May 14, 1997);

(b)    on September 30, 1998, shareholders acting in the recommendation of the ePlus Board, ratified the LTIP (adopted by the Board on July 28, 1998);

(c)    on September 18, 2003 shareholders ratified the Amended and Restated LTIP (approved by the Board on July 15, 2003).

## THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT
## ON EPLUS' FORM 10-K FILINGS

95.     Defendants' secret option backdating scheme caused each of ePlus' Forms 10-K for fiscal years ended March 31, 1997 through 2005 to be materially false and misleading because Defendants did not properly account for their issuance of backdated stock options. Defendants knew, or were reckless in not knowing, that ePlus' annual reports were materially false and misleading—each Defendant directly participated in the backdating scheme by granting backdated options, failing to properly account for the backdated options and/or received backdated stock options.

96.     Defendants' caused ePlus to report false financial results because the Company, at Defendants' direction, violated GAAP. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. The SEC requires that public companies prepare their financial statements in accordance with GAAP. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, '[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate . . . ." 17 C.F.R. §210.4-01(a)(1).

97.     Management is responsible for preparing financial statements that conform with GAAP. As noted by AICPA auditing standards, §110.02:

> Financial statements are management's responsibility . . . .   Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.    The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

98.     Defendants stated in ePlus' Forms 10-K for fiscal years ended March 31, 1997 through 2005 that the Company accounted for stock options using the intrinsic method described in

Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB No. 25").

99.     The Form 10-K for fiscal year ended March 31, 1997 represented that the exercise price of options granted pursuant to the Executive Compensation Agreements, the Employee Plan and the Outside Director Plan were all equivalent to the fair market value of the Company's stock on the date of grant. (*See* 1997 Form 10-K at F-18.) The Form 10-K for fiscal year ended March 31, 1997 also represented that "the Company opted to continue to account for its stock-based awards using the intrinsic value method in accordance with APB No. 25. Accordingly, no compensation expense has been recognized in the financial statements for employee stock arrangements." (*Id*. at F-19.) This same representation as to APB No. 25 was made in the fiscal year ended March 31, 1998 Form 10-K at F-20, the fiscal year ended March 31, 1999 Form 10-K at F-21, the fiscal year ended March 31, 1999 Form 10-K/A at F-21, the fiscal year ended March 31, 2000 Form 10-K at F-20 to F-21, the fiscal year ended March 31, 2001 Form 10-K at F-21, the fiscal year ended March 31, 2002 Form 10-K at F-29, the fiscal year ended March 31, 2003 Form 10-K at F-24, the fiscal year ended March 31, 2004 Form 10-K at F-20, the fiscal year ended March 31, 2005 Form 10-K at F-23.

100.     Under APB No. 25, ePlus was required to record as an expense on its financial statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is "in-the-money" on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are "at-the-money" or "underwater" on the measurement date need not be expensed. By granting options that were "in-the-money," but accounting for them as if they were "at-the-money," Defendants violated GAAP and caused ePlus' financial statements to be materially false and misleading by understating ePlus' compensation expense. As a result of having done so, Defendants both materially understated the Company's net loss for certain years and

materially overstated ePlus' net income in other years. ePlus' reported earnings and losses per share were correspondingly false. Such falsity is confirmed by ePlus' restatement of its reported financial results.

101.    The Form 10-K/A for fiscal year ended March 31, 1997 represented, among other things, that options granted pursuant to the Amended and Restated Outside Director Stock Option Plan were to be issued at an "exercise price equal to the market price as of the date of grant" (*id.* at 9). The Form 10-K/A for fiscal year ended March 31, 1997 also described the Master Stock Incentive Plan (formerly the 1996 Stock Incentive Plan), which includes an Incentive & Stock Plan for Employees (formerly the 1996 Incentive Stock Option Plan) and an Outside Director Stock Plan (formerly the 1996 Outside Director Stock Option Plan). The Stock Incentive Plan is described in the Form 10-K/A for fiscal year ended March 31, 1997, as being administered by the Stock Incentive Committee who selects the recipients and grant terms. (*Id.* at 11-12.) Stock Incentive Committee members can only receive grants pursuant to the Stock Incentive Plan by the approval of a majority of the Board. (*Id.* at 12.) Incentive Stock Options issued pursuant to the 1996 Incentive Stock Option Plan "are designed to comply with the provisions of the Internal Revenue Code of 1986, as amended" and are "subject to restrictions . . . including a requirement that exercise prices be equal to at least 100% of fair market value of the shares of Common Stock on the grant date . . . ." (*Id.* at 12-13.) *See also* Form 10-K for fiscal year ended March 31, 1998 at F-18 to F-19 (referencing Master Stock Incentive Plan and representing that "the exercise price of options granted under the Master Stock Incentive Plan is equivalent to the fair market value of the Company's stock on the date of grant. . . ."). *See also* Form 10-K for fiscal year ended March 31, 1999 at F-19 to F-20 (same representations); Form 10-K/A for fiscal year ended March 31, 1999 at F-19 to F-20 (same); Form 10-K for fiscal year ended March 31, 2000 at F-19 to F-20 (same); Form 10-K for fiscal year ended March 31, 2001 at F-19 to F-20 (same); Form 10-K for fiscal year ended March 31, 2002 at F-27 to

- 39 -

F-28 (same); Form 10-K for fiscal year ended March 31, 2003 at F-22 to F-23 (same); Form 10-K

for fiscal year ended March 31, 2004 at F-19 to F-20 (same); Form 10-K for fiscal year ended March

31, 2005 at F-21 to F-22 (same).

102.    Each Form 10-K for fiscal years ended March 31, 1997 through 2005 was filed with

the SEC and simultaneously distributed to shareholders and the public, and each Form 10-K included

financial statements applicable to the fiscal year of the report as well as certain prior years.  The

following Defendants signed false and misleading Forms 10-K as set forth below:

| Defendant | Forms 10-K Signed |
|---|---|
| Norton | FYE 3/31/1997-2005 |
| Bowen | FYE 3/31/1997-2005 |
| Mencarini | FYE 3/31/1997-2005 |
| O'Donnell | FYE 3/31/1997-2005 |
| Faulders | FYE 3/31/2000-2005 |
| Herman | FYE 3/31/2001-2003 & 2005 |
| Parkhurst | FYE 3/31/1997-1998 |
| Cooper | FYE 3/31/2005 |

103.    For fiscal years ended March 31, 2003, 2004 and 2005, Norton and Mencarini signed

false certifications pursuant to SOX.  For example the certification attached to the Form 10-K for

fiscal year ended March 31, 2003, represented that the financial statements "fairly present[], in all

material respects the financial condition, results of operations and cash flows of the registrant as of,

and for, the periods presented in this annual report'of the Company.  In the certifications attached to

the Form 10-K for fiscal year ended March 31, 2005, Norton and Mencarini further falsely certified

that, *inter alia*, that the quality and accuracy of the information contained in each Form 10-K

concerning the Company's financial performance and condition was safeguarded by internal financial

controls in place at the Company, which were designed to foster the development of reliable

financial statements.  Norton and Mencarini also falsely reprinted that the reports did'not contain any

untrue statement of a material fact or omit to state a material fact necessary to make the statements

made, in light of the circumstances under which such statements were made, not misleading." *Id.* at 84-85.

**The Fiscal Year Ended March 31, 1997 Form 10-K**

104.    On or about June 30, 1997, the Company filed its Form 10-K for fiscal year ended March 31, 1997. The Form 10-K was simultaneously distributed to shareholders and the public. This Form 10-K included ePlus' fiscal year ended March 31, 1997 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, ePlus' compensation expense was understated and its net earnings were overstated.

**The Fiscal Year Ended March 31, 1998 Form 10-K**

105.    On or about June 29, 1998, the Company filed its Form 10-K for fiscal year ended March 31, 1998 with the SEC. The Form 10-K was simultaneously distributed to shareholders and the public. The Form 10-K included ePlus' fiscal year ended March 31, 1998 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, ePlus' compensation expense was understated and its net earnings were overstated.

**The Fiscal Year Ended March 31, 1999 Form 10-K**

106.    On or about June 29, 1999, the Company filed its Form 10-K for fiscal year ended March 31, 1999 with the SEC. The Form 10-K was simultaneously distributed to shareholders and the public. The Form 10-K included ePlus' fiscal year ended March 31, 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, ePlus' compensation expense was understated and its net earnings were overstated.

**The Fiscal Year Ended March 31, 2000 Form 10-K**

107.    On or about June 29, 2000, the Company filed Form 10-K for fiscal year ended March 31, 2000 with the SEC. The Form 10-K was simultaneously distributed to shareholders and the public. The Form 10-K included ePlus' fiscal year ended March 31, 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, ePlus' compensation expense was understated and its net earnings were overstated.

**The Fiscal Year Ended March 31, 2001 Form 10-K**

108.    On or about June 29, 2001, the Company filed its Form 10-K for fiscal year ended March 31, 2001 with the SEC. The Form 10-K was simultaneously distributed to shareholders and the public. The Form 10-K included ePlus' fiscal year ended March 31, 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, ePlus' compensation expense was understated and its net earnings were overstated.

**The Fiscal Year Ended March 31, 2002 Form 10-K**

109.    On or about July 1, 2002, the Company filed its Form 10-K for fiscal year ended March 31, 2002 with the SEC. The Form 10-K was simultaneously distributed to shareholders and the public. The Form 10-K included ePlus' fiscal year ended March 31, 2002 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ePlus' compensation expense was understated and its net earnings were overstated.

**The Fiscal Year Ended March 31, 2003 Form 10-K**

110.    On or about June 30, 2003, the Company filed its Form 10-K for fiscal year ended March 31, 2003 with the SEC. The Form 10-K was simultaneously distributed to shareholders and the public. The Form 10-K included ePlus' fiscal year ended March 31, 2003 financial statements

which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ePlus' compensation expense was understated and its net earnings were overstated.

**The Fiscal Year Ended March 31, 2004 Form 10-K**

111.    On or about June 15, 2004, the Company filed its Form 10-K for fiscal year ended March 31, 2004 with the SEC. The Form 10-K was simultaneously distributed to shareholders and the public. The Form 10-K included ePlus' fiscal year ended March 31, 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, ePlus' compensation expense was understated and its net earnings were overstated.

**The Fiscal Year Ended March 31, 2005 Form 10-K**

112.    On or about June 29, 2005, the Company filed its Form 10-K for fiscal year ended March 31, 2005 with the SEC. The Form 10-K was simultaneously distributed to shareholders and the public. The Form 10-K included ePlus' fiscal year ended March 31, 2005 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options. As a result, ePlus' compensation expense was understated and its net earnings were overstated.

### ePLUS' FALSE FINANCIAL REPORTING VIOLATED GAAP, SEC REGULATIONS, AND IRS RULES AND REGULATIONS

113.    As a result of the Individual Defendants' improper backdating of stock options, defendants caused ePlus to violate GAAP, SEC regulations, and IRS rules and regulations.

114.    ePlus' financial results for fiscal years ended March 31, 1997 through 2005 were included in reports filed with the SEC and in other shareholder reports. In these reports, Defendants represented that ePlus' financial results were presented in a fair manner and in accordance with GAAP.

115.    Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

116.    GAAP consists of those principles recognized by the accounting profession as the conventions, rule, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

**Violations of GAAP**

117.    During the relevant period, Defendants caused the Company to understate its compensation expense by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.

118.    Under well-settled accounting principles in effect throughout the relevant period, ePlus did not need to record an expense for options granted to employees at the current market price ("at the money"). The Company was, however, required to record an expense in its financial statements for any options granted below the current market price ("in the money"). In order to provide ePlus executives and employees with far more lucrative "in the money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), Defendants systematically falsified Company records to create the false appearance that options had been granted at the market price on an earlier date.

119.    Throughout the relevant period, ePlus accounted for stock options using the intrinsic method described in APB 25, "Accounting for Stock Issued to Employees." Under APB 25,

employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." An option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are "at-the-money" or "out-of-the-money" on the measurement date need not be expensed. Excluding non-employee directors, APB 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were in-the-money or not on the date of grant.

**ePlus' GAAP Violations Were Material**

120.    ePlus' false and misleading relevant period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality. SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality. Among other items, SAB Topic 1M says: "A matter is "material" if there is a substantial likelihood that a reasonable person would consider it important." It also stresses that materiality requires qualitative, as well as quantitative, considerations.

121.    SAB Topic 1M further states:

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are–

\*      \*      \*

•      whether the misstatement masks a change in earnings or other trends

•      whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

\*      \*      \*

•      whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

122.   SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

123.   ePlus' misstatements satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

**ePlus' Financial Statements Violated
Fundamental Concepts of GAAP**

124.   Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a)   The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, 10);

(b)   The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board (FASB') Statement of Concepts No. 1, ¶34);

(c)   The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(d)   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)   The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

125.    Further, the undisclosed adverse information concealed by the Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

**ePlus' Financial Statements Violated SEC Regulations**

126.    During the relevant period, the Defendants caused ePlus to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

127.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K 17 C.F.R. §229.402. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers–the company's CEO and its next four most highly paid executives. Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year.

128.    The Defendants caused ePlus to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted options with exercise prices below the market value on the date the Board or Compensation Committee approved the grant.

## VIOLATIONS OF IRS RULES AND REGULATIONS

129.    During the relevant period, the Defendants further caused ePlus to violate IRS rules and regulations due to its improper accounting for the backdated stock options. As a result, the Company's tax liabilities were understated, exposing ePlus to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

130.    The Defendants caused the Company to violate §162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based." In order for compensation to be performance-based, the Compensation Committee must have set pre-established and objective performance goals. The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant. Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

131.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance. This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162(m)] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

132.    The Defendants caused ePlus to violate §162(m) by providing backdated options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant. As a result, all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

- 48 -

133.    The Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the exercise of ePlus' stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options ("ISOs").

134.    ISOs are a form of equity compensation that may be provided to a company's employees. ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment as they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise). Stock options that do not qualify as ISOs are considered to be NSOs. NSOs are not entitled to preferential treatment as they are subject to income tax and FICA withholding upon exercise. As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

135.    By improperly treating its backdated options as ISOs, the Defendants failed to provide proper income tax and FICA withholdings upon the exercise of its options by its executives and employees in violation of IRS rules and regulations.

136.    The chart below illustrates ePlus' false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings or understated its losses:

| YEAR | REPORTED EARNINGS (in millions) | REPORTED DILUTED EARNINGS PER SHARE FROM CONTINUING OPERATIONS |
|------|--------------------------------|---------------------------------------------------------------|
| 1997 | $ 3.49 | $0.66 |
| 1998 | $ 6.04 | $0.98 |
| 1999 | $ 6.72 | $0.98 |
| 2000 | $ 8.38 | $0.91 |
| 2001 | $ 8.32 | $0.80 |
| 2002 | $ 8.91 | $0.85 |
| 2003 | $ 9.71 | $0.96 |
| 2004 | $10.15 | $1.02 |
| 2005 | $25.29 | $2.68 |

## DEFENDANTS' SCHEME BEGINS TO UNRAVEL

137.    The 1997-2005 Proxy Statements and fiscal 1997 to 2005 Forms 10-K concealed Defendants' option backdating scheme. Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when voting on proxy proposals between at least 1997 and 2005. In fact, it was not until August 2006 that shareholders learned that the Proxy Statements which they had relied upon for years were false and misleading. Defendants have been unjustly enriched at the expense of ePlus, which has received and will receive less money from the Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

138.    On August 11, 2006, ePlus issued a press release and filed an 8-K disclosing its past improper option practices and its intention to restate its past financial statements to correct these practices.

## THE ADVERSE IMPACT OF DEFENDANTS' MISCONDUCT

139.    Unlike most companies which avoid such option backdating abuse by issuing stock option grants at the same time each year, which eliminates the potential for backdating, Defendants ensured that executives would not have any such restrictions. Given the many times ePlus' grants were the low of the month in which options were granted, the date of their stock option grants was clearly more than merely coincidental.

140.    As a result of the backdating of options, Defendants have been unjustly enriched at the expense of ePlus, which has received and will receive less money from Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

## TOLLING OF THE STATUTE OF LIMITATIONS

141.    The Counts alleged herein are timely. As an initial matter, Defendants wrongfully concealed their manipulation of the stock option plans, through strategic timing and fraudulent backdating, by issuing false and misleading proxy statements, by falsely reassuring ePlus' public investors that ePlus' option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically timed option grants were issued based on the manipulation of insider information that ensured that the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

142.    Finally, as fiduciaries of ePlus and its public shareholders, the Defendants cannot rely on any limitations defense where they withheld from ePlus' public shareholders the facts that give rise to the claims asserted herein, *i.e.*, that the ePlus Board had abdicated its fiduciary responsibilities to oversee the Company's executive compensation practices, and that the option grant dates had been manipulated to maximize the profit for the grant recipients and, accordingly, to maximize the costs for the Company.

## UNLAWFUL INSIDER SALES

143.    Between 1998 and 2006, certain Defendants exercised stock options (including backdated stock options), permitting them to collectively sell over $5 million worth of ePlus stock they obtained often by cashing in under-priced stock options. These option exercises and stock sales occurred while each Defendant was in possession of adverse non-public information regarding the

secret stock option backdating scheme and ePlus' materially false financial results for the relevant

reporting periods and, therefore, violated federal securities laws:

| ePlus Inc. (PLUS) | | | | | |
|---|---|---|---|---|---|
| Insider Sales: 11/14/96 (IPO) - 6/22/07 | | | | | |
| | | | | | |
| Last Name | First Name | Date | Shares | Price | Proceeds |
| BOWEN | BRUCE | 12/10/1998 | 20,000 | $8.88 | $177,600 |
| | | 3/3/1999 | 20,000 | $8.38 | $167,600 |
| | | 8/28/2003 | 25,000 | $13.10 | $327,500 |
| | | 3/4/2004 | 25,000 | $13.62 | $340,500 |
| | | 3/1/2005 | 12,500 | $13.00 | $162,500 |
| | | 3/8/2005 | 12,500 | $13.00 | $162,500 |
| | | 11/28/2005 | 5,900 | $14.26 | $84,134 |
| | | 11/29/2005 | 5,800 | $14.27 | $82,766 |
| | | 11/30/2005 | 5,800 | $14.32 | $83,056 |
| | | 12/1/2005 | 5,500 | $14.44 | $79,420 |
| | | 2/27/2006 | 933 | $14.15 | $13,202 |
| | | 2/28/2006 | 14,067 | $14.00 | $196,938 |
| | | | 153,000 | | $1,877,716 |
| | | | | | |
| | | | | | |
| MENCARINI | STEVEN | 3/9/2006 | 3,600 | $14.24 | $51,264 |
| | | 3/10/2006 | 8,400 | $14.06 | $118,104 |
| | | | 12,000 | | $169,368 |
| | | | | | |
| NORTON | PHILLIP | 3/27/2006 | 24,469 | $13.45 | $329,108 |
| | | 3/28/2006 | 50,000 | $13.48 | $674,000 |
| | | 3/29/2006 | 12,955 | $13.56 | $175,670 |
| | | 6/27/2006 | 33,116 | $12.18 | $403,353 |
| | | | 120,540 | | $1,582,131 |
| | | | | | |
| PARKHURST | KLEYTON | 5/6/2005 | 1,000 | $13.78 | $13,780 |
| | | 5/9/2005 | 1,000 | $13.73 | $13,730 |
| | | 5/10/2005 | 1,000 | $13.73 | $13,730 |
| | | 1/18/2006 | 5,164 | $14.03 | $72,451 |
| | | 1/23/2006 | 1,000 | $14.25 | $14,250 |
| | | 1/27/2006 | 1,133 | $14.25 | $16,145 |
| | | 2/15/2006 | 7,000 | $14.36 | $100,520 |
| | | 2/16/2006 | 3,800 | $14.30 | $54,340 |
| | | 3/6/2006 | 1,000 | $14.21 | $14,210 |
| | | 3/7/2006 | 1,000 | $14.21 | $14,210 |
| | | 3/9/2006 | 1,000 | $14.19 | $14,190 |
| | | 3/10/2006 | 1,000 | $14.06 | $14,060 |
| | | 3/13/2006 | 1,000 | $14.06 | $14,060 |
| | | 3/14/2006 | 1,000 | $13.93 | $13,930 |
| | | 3/15/2006 | 1,000 | $14.00 | $14,000 |

| | | | | | |
|---|---|---|---|---|---|
| | | 3/16/2006 | 1,000 | $13.91 | $13,910 |
| | | 3/17/2006 | 1,000 | $13.90 | $13,900 |
| | | 3/20/2006 | 1,000 | $13.92 | $13,920 |
| | | 3/21/2006 | 1,000 | $13.89 | $13,890 |
| | | 3/22/2006 | 1,000 | $13.91 | $13,910 |
| | | 3/23/2006 | 1,000 | $13.70 | $13,700 |
| | | 3/24/2006 | 1,000 | $13.77 | $13,770 |
| | | 3/27/2006 | 1,000 | $13.42 | $13,420 |
| | | 3/28/2006 | 1,000 | $13.48 | $13,480 |
| | | 3/29/2006 | 1,000 | $13.59 | $13,590 |
| | | 3/30/2006 | 1,000 | $13.87 | $13,870 |
| | | 3/31/2006 | 1,000 | $13.98 | $13,980 |
| | | 4/3/2006 | 1,000 | $14.21 | $14,210 |
| | | 4/4/2006 | 1,000 | $14.54 | $14,540 |
| | | 4/5/2006 | 1,000 | $14.17 | $14,170 |
| | | 4/6/2006 | 1,000 | $14.64 | $14,640 |
| | | 4/7/2006 | 1,000 | $14.66 | $14,660 |
| | | 4/10/2006 | 1,250 | $14.75 | $18,438 |
| | | 4/11/2006 | 1,250 | $14.60 | $18,250 |
| | | 4/12/2006 | 1,250 | $14.66 | $18,325 |
| | | 4/13/2006 | 1,250 | $14.69 | $18,363 |
| | | 4/17/2006 | 1,000 | $14.45 | $14,450 |
| | | 4/18/2006 | 1,000 | $14.38 | $14,380 |
| | | 4/19/2006 | 1,000 | $14.23 | $14,230 |
| | | 4/20/2006 | 1,000 | $14.14 | $14,140 |
| | | 4/21/2006 | 1,000 | $13.94 | $13,940 |
| | | 4/24/2006 | 1,000 | $13.68 | $13,680 |
| | | 4/25/2006 | 1,000 | $13.69 | $13,690 |
| | | 4/26/2006 | 1,000 | $14.00 | $14,000 |
| | | 4/27/2006 | 1,000 | $13.80 | $13,800 |
| | | 4/28/2006 | 1,000 | $13.74 | $13,740 |
| | | 5/1/2006 | 1,000 | $13.83 | $13,830 |
| | | 5/2/2006 | 1,000 | $13.76 | $13,760 |
| | | 5/3/2006 | 1,000 | $13.75 | $13,750 |
| | | 5/4/2006 | 1,000 | $13.67 | $13,670 |
| | | 5/5/2006 | 1,000 | $13.80 | $13,800 |
| | | 5/8/2006 | 1,000 | $13.78 | $13,780 |
| | | 5/9/2006 | 1,000 | $13.73 | $13,730 |
| | | 5/10/2006 | 1,000 | $13.73 | $13,732 |
| | | 5/11/2006 | 1,000 | $13.75 | $13,750 |
| | | 5/12/2006 | 1,000 | $13.52 | $13,520 |
| | | 5/15/2006 | 1,000 | $13.45 | $13,450 |
| | | 5/16/2006 | 1,000 | $13.47 | $13,470 |
| | | 5/17/2006 | 1,000 | $13.45 | $13,450 |
| | | 5/18/2006 | 1,000 | $13.31 | $13,310 |
| | | 5/19/2006 | 1,000 | $13.44 | $13,440 |
| | | 5/22/2006 | 1,000 | $13.46 | $13,460 |
| | | 5/23/2006 | 1,000 | $13.50 | $13,500 |
| | | 5/24/2006 | 1,000 | $13.67 | $13,670 |
| | | 5/25/2006 | 1,000 | $13.71 | $13,710 |

| | | | | | |
|---|---|---|---|---|---|
| | | 5/26/2006 | 1,000 | $13.58 | $13,580 |
| | | 5/30/2006 | 1,000 | $13.22 | $13,220 |
| | | 5/31/2006 | 1,300 | $13.59 | $17,667 |
| | | 6/1/2006 | 1,350 | $13.26 | $17,901 |
| | | 6/2/2006 | 1,350 | $13.74 | $18,549 |
| | | 6/5/2006 | 1,000 | $13.76 | $13,760 |
| | | 6/6/2006 | 1,000 | $13.56 | $13,560 |
| | | 6/7/2006 | 1,000 | $13.60 | $13,600 |
| | | 6/8/2006 | 1,000 | $13.53 | $13,530 |
| | | 6/9/2006 | 1,000 | $13.57 | $13,570 |
| | | 6/12/2006 | 1,000 | $13.52 | $13,520 |
| | | 6/13/2006 | 1,000 | $13.51 | $13,510 |
| | | 6/14/2006 | 1,000 | $13.50 | $13,500 |
| | | 6/15/2006 | 1,000 | $13.45 | $13,450 |
| | | 6/16/2006 | 1,000 | $13.41 | $13,410 |
| | | 6/19/2006 | 1,000 | $13.49 | $13,490 |
| | | 6/20/2006 | 1,000 | $13.43 | $13,430 |
| | | 6/21/2006 | 1,000 | $12.85 | $12,850 |
| | | 6/22/2006 | 1,000 | $12.58 | $12,580 |
| | | 6/23/2006 | 1,000 | $12.59 | $12,590 |
| | | 6/26/2006 | 1,000 | $12.72 | $12,720 |
| | | 6/27/2006 | 903 | $12.01 | $10,845 |
| | | | 102,000 | | $1,412,205 |
| | | | | | |
| | | **TOTAL** | **387,540** | | **5,041,420** |

### ENTIRE FAIRNESS APPLIES

144.    Because Defendants both granted and received unlawfully backdated options, they stood on both sides of the transaction and their misconduct may not be sanctioned unless they bear their burden to demonstrate the entire fairness of the actions, a burden they cannot discharge.

145.    Because Defendants' misconduct is to be scrutinized under the standard of entire fairness, Defendants are not entitled to any presumption that their misconduct was taken in accordance with the proper exercise of business judgment.

146.    Because Defendants' misconduct was in breach of their duty of loyalty and undertaken in bad faith, their misconduct cannot be shielded by any exculpatory provision in the Company's Articles of Incorporation that purports to limit Defendants' liability for actions that violate their duty of care.

## DERIVATIVE ALLEGATIONS

147.    Plaintiff incorporates the above allegations.

148.    Plaintiff brings this action derivatively on behalf of ePlus to redress injuries suffered, and yet to be suffered, by the Company as a direct and proximate result of the breaches of fiduciary duty and other violations of law. ePlus is named as a nominal defendant solely in a derivative capacity.

149.    Plaintiff is a shareholder of ePlus common stock and will adequately and fairly represent the interests of the Company in this litigation.

150.    The secret backdating scheme detailed herein subjects, and will persist in subjecting, ePlus to continuing harm because the adverse consequences of the injurious effects are still in effect.

151.    At all relevant times, the wrongful actions complained of herein were unlawfully concealed from ePlus shareholders until at least August 11, 2006.

152.    On the date of the first Complaint filed by plaintiff, the Board of Directors of ePlus consisted of eight members: Defendants Norton, Bowen, Faulders, O'Donnell, Herman, Cooper, and non-defendants Eric D. Hovde and Irving Beimler.

153.    Demand is excused because the ePlus Board of Directors played a central role in the events leading up to the backdating debacle that has ensnarled ePlus, and the Board members face a substantial likelihood of personal liability as a result of their action and conscious failures to act. More specifically, a pre-suit demand on the ePlus Board of Directors is excused because the directors wasted the Company's valuable assets by secretly granting backdated stock options to ePlus executives and employees pursuant to the unlawful backdating scheme particularized herein.

154.    As described herein, the ePlus Board of Directors recommended to shareholders that they approve–and shareholders subsequently did approve–the Master Stock Option Plan, the 1998 Long Term Incentive Plan ('LTIP'), and the later restated and amended LTIP in 2003. Under each Plan, as disclosed by the Director Defendants in proxy statements or in the text of the plans, the

Stock Incentive Committee and/or the Compensation Committee administered the plans, which included authority to select the participants that would be granted options. The exercise price for grants issued under the ePlus stock option plans at issue herein was not to be less than the fair market value of the Company's common stock at the date of grant.

155.    As detailed herein in the sampling of backdated grants, each referenced grant was backdated, coming at or near a periodic low in the trading price of ePlus stock. As a result of their decisions to grant backdated options to ePlus' directors and top executives, the Director Defendants violated the terms of ePlus' stock option plans in breach of their fiduciary duties of good faith and loyalty to ePlus. These Defendants, and each of them, therefore, face a substantial likelihood of liability to ePlus for the claims asserted in this Complaint. Thus, they cannot, and will not, disinterestedly or objectively evaluate any pre-suit demand upon the ePlus Board of Directors to bring, let alone vigorously prosecute, the claims for damages and other relief arising from the unlawful backdating scheme that plaintiff may have made.

156.    A pre-suit demand upon the ePlus Board of Directors is also excused because a certain directors personally and financially benefited from the unlawful backdating scheme particularized in this Complaint. Director Defendants Norton, Bowen, Faulders, O'Donnell, and Herman, each received backdated stock options.

157.    Norton and Bowen are not disinterested because they stood on both sides of stock option grants having both granted and received backdated grants, and while aware of the non-public information about the scheme, engaged in insider selling.

158.    Director Defendants Cooper, O'Donnell, Herman and Faulders, also face a substantial risk of liability because as members of the Audit Committee, they met regularly with their Director Defendants who both granted backdated stock options and oversaw and approved false financial reporting due to stock options backdating for the purpose of either: (i) overseeing and approving

- 56 -

false financial reporting; or (ii) discussing, planning, approving and awarding stock options and executive compensation Cooper, O'Donnell, Herman and Faulders were therefore aware of the backdating scheme and fraudulent accounting at ePlus. O'Donnell, Herman and Faulders also served on the Compensation Committee when stock option improprieties detailed herein occurred. Cooper was on the Compensation Committee during fiscal year 2005 when ePlus admits options were incorrectly priced. As a result, they are liable for breaching their fiduciary duties. Moreover, by colluding with their colleagues on the ePlus Board of Directors to conceal the existence of the backdating scheme via false proxy statements and SEC filings, these Director Defendants have demonstrated their hostility toward plaintiffs claims and they are unable or unwilling to act independently of the other Defendants.

159.    As a result of their profiteering at the expense of ePlus, the Director Defendants (each of them) face a substantial likelihood of liability to ePlus based on their participation in, and financial profits from, the unlawful backdating scheme particularized herein. Thus, they are not disinterested in the outcome of this litigation, and therefore, cannot and will not, fairly and/or objectively evaluate any demand, let alone prosecute, the claims for damages and other relief arising from their unlawful backdating scheme that plaintiff may have made.

160.    As particularized herein, due to the backdating scheme, ePlus' fiscal year ended March 31, 1997 through 2005 Form 10-K financial reports materially overstated the Company's compensation expenses and materially understated its net loss or overstated its net income (and similarly misstated earnings/losses per share). As a result of their decisions to sign and publish ePlus' false financial results, which have been restated because of the unlawful stock option backdating scheme detailed herein, Director Defendants Norton, Bowen, Faulders, O'Donnell, Herman and Cooper (each of them) are not disinterested in the outcome of this litigation. Instead, they each face a substantial likelihood of being found personally liable for making false statements

- 57 -

in ePlus' financial reports in breach of their fiduciary duties of good faith and honesty and in violation of securities laws. As such, these Director Defendants cannot, and will not, disinterestedly and objectively evaluate any demand to bring, let alone vigorously prosecute, the claims for damages and other relief arising from their backdating scheme that plaintiff may have made.

161.    To compound matters, Defendants Norton, Bowen, Faulders, O'Donnell, Herman and Cooper, each of them, caused ePlus to issue proxy statements to ePlus shareholders. With respect to ePlus' stock option granting practices, ePlus' 1997-2005 proxy statements falsely stated that stock options granted under ePlus' stock option plans at issue herein were granted with an exercise price of not less than the fair market value on the date of grant. As pleaded with particularity in this Complaint, options were not granted to ePlus directors and officers with exercise prices equal to the fair market value of ePlus stock on the date of grant. Thus, Defendants' statements in ePlus' fiscal 1997-2005 Proxy Statements were false and misleading when issued. As a result, Director Defendants Norton, Bowen, Faulders, O'Donnell, Herman and Cooper (each of them) face a substantial likelihood of liability to ePlus for breaching their fiduciary duties owed to the Company and violating the securities and corporation laws. Therefore, they are not disinterested in this litigation and are unable to fairly and/or objectively evaluate, let alone vigorously prosecute, the claims for damages and other relief asserted in this Complaint.

162.    Furthermore, demand is excused because the secret backdating scheme was not, and could not have been, an exercise of good faith business judgment. As represented in ePlus' 1997-2005 proxy statements, the stated purpose of the Company's shareholder-approved stock option plans is to provide executives and employees incentives to achieve long-term corporate goals and act in the best interest of ePlus shareholders to increase shareholder returns. However, by granting options with backdated exercise prices, Defendants undermined the purpose of the stock option plans by awarding executives and employees compensation that had intrinsic value regardless of ePlus' stock

performance. In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders.

163. Defendants could have achieved the stated purpose of the stock option plans by granting those persons additional options under their incentive plans, or by granting options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants. Instead, Defendants were able to placate ePlus' directors and officers by backdating option grants in violation of the Company's shareholder-approved stock option plans and improperly reporting these grants in their financial disclosures to improve their bottom line.

164. In combination with the particularized allegations above, a pre-suit demand is also excused as futile in this action for the following reasons:

(a)    There was no basis or justification for backdating stock options. It was designed solely to benefit certain of the Defendants in a manner that was inconsistent with their fiduciary duties of good faith and loyalty to ePlus, and the Company's public disclosures, to the detriment of ePlus. Consequently, the secret backdated stock option grants detailed herein constituted a waste of corporate assets, and could not have been the product of the proper exercise of business judgment by Defendants;

(b)    The members of ePlus' Board of Directors have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein. The targets of such an action are people the ePlus Board members have developed professional relationships, who are their friends, and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action;

- 59 -

(c)      All of the Director Defendants authorized the filing of proxy statements, in support of their nomination as directors, which failed to disclose that the Defendants' stock option grants had been backdated. They also authorized the filing of shareholder-approved stock option plans, which misrepresented how options were priced. Any suit by Defendants to remedy the wrongs complained of herein would expose them to a substantial likelihood of liability for securities and proxy violations, as well as breach of fiduciary duty. Therefore, they are hopelessly conflicted in making a supposedly independent determination of a demand that they cause the Company to bring this action; and

(d)      All of the Defendants participated in, approved, or through a conscious failure to act or abdication of duty, permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from ePlus' shareholders and/or acting with negligence, gross negligence or recklessness disregarded the wrongs complained of herein, and therefore are not disinterested parties in the outcome of this litigation.

165.    ePlus' current and past officers and directors will assert that they are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of ePlus. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions which eliminate coverage for any action brought directly by ePlus against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of ePlus, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.

On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

166.    Plaintiff has not made any demand on shareholders of ePlus to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    at the time plaintiff filed suit, ePlus was a publicly traded company with approximately 8 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

COUNT I

**(Against All Defendants for Violation of Section 10(b) of the Exchange Act)**

167.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

168.    Throughout the relevant period, Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to divert hundreds of millions of dollars to Defendants via improper option grants.

169.    Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about ePlus not misleading.

170.    Defendants, as top executive officers and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and

authority as officers of the Company, each of the Defendants was able to and did control the conduct complained of herein and the content of the public statements disseminated by ePlus.

171.    Defendants acted with scienter throughout the relevant period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. Defendants, in fact, granted, received, and approved the allocation of ePlus stock options that were improperly backdated in violation of every shareholder-approved stock option plan during the relevant period. Additionally, Defendants were among the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

172.    Each of the Defendants participated in a scheme to defraud with the purpose and effect of defrauding ePlus. ePlus relied upon Defendants' false statements and conduct alleged herein in, among other things, accounting for stock options, issuing proxy statements and Form 10-K filings and in awarding stock option grants.

173.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

174.    Plaintiff, as a shareholder of ePlus, seeks damages and other relief for ePlus.

## COUNT II

### Violations of Section 14(a) of the Exchange Act Against
### All Defendants

175.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances

under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

177.    The 1997-2005 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing ePlus to engage in an option backdating scheme, a fact which Defendants were aware of and participated in from at least 1997.

178.    In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

179.    The misrepresentations and omissions in the proxy statements were material to ePlus in issuing each proxy statement and to plaintiff and ePlus shareholders in voting on each Proxy Statement. The proxy statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

180.    The Company was damaged as a result of the material misrepresentations and omissions in the proxy statements. Plaintiff, as a shareholder of ePlus, seeks damages and other relief for ePlus.

### COUNT III

### Against All Defendants for Violation of Section 20(a) of the Exchange Act

181.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

182.    Defendants, by virtue of their positions with ePlus and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of ePlus and of each other within the meaning of §20(a) of the Exchange Act. They had the power and influence and exercised the same to cause ePlus to engage in the illegal conduct and practices complained of herein.

183.    Plaintiff, as a shareholder of ePlus, seeks damages and other relief for ePlus.

## COUNT IV

### Accounting

184.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185.    At all relevant times, Defendants, as directors and/or officers of ePlus, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

186.    In breach of their fiduciary duties owed to ePlus and its shareholders, the Defendants caused ePlus, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of ePlus. By this wrongdoing, the Defendants breached their fiduciary duties owed to ePlus and its shareholders.

187.    The Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the Defendants.

188.    As a result of Defendants' misconduct, ePlus has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

189.    Plaintiff demands an accounting be made of all stock options grants made to Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the Defendants, as well as the disposition of any proceeds received by the Defendants via sale or other exercise of backdated stock option grants received by the Defendants.

190.    Plaintiff, as a shareholder of ePlus, seeks damages and other relief for ePlus.

## COUNT V

### Breach of Fiduciary Duty and/or Aiding and Abetting
### Against All Defendants

191.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.    Each of the Defendants agreed to and did participate with Norton and the other Defendants and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties the Defendants owed to the Company.

193.    The Defendants have violated fiduciary duties of care, loyalty, candor and independence owed to ePlus and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of ePlus and its shareholders.

194.    As demonstrated by the allegations above, Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to ePlus and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding Defendants' option backdating scheme.

195.    By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward ePlus and its public shareholders.

196.    As a proximate result of Defendants' conduct, in concert with Norton, ePlus has been injured and is entitled to damages.

197.    Plaintiff, as a shareholder of ePlus, seeks damages and other relief for ePlus.

## COUNT VI

### Abuse of Control Against All Defendants

198.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

199.    The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, ePlus, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at ePlus. As a part of this scheme, Defendants actively made and/or participated in the making of or aided and abetted the making of, misrepresentations regarding ePlus.

200.    Defendants' conduct constituted an abuse of their ability to control and influence ePlus.

201.    By reason of the foregoing, ePlus has been damaged.

### COUNT VII

### Gross Mismanagement Against All Defendants

202.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

203.    Defendants had a duty to ePlus and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of ePlus.

204.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of ePlus in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of ePlus' affairs and in the use and preservation of ePlus' assets.

205.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused ePlus to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to ePlus, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged ePlus.

206.    By reason of the foregoing, ePlus has been damaged.

207.    Plaintiff, as a shareholder of ePlus, seeks damages and other relief for ePlus.

## COUNT VIII

### Constructive Fraud Against All Defendants

208.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.    As corporate fiduciaries, Defendants owed to ePlus and its shareholders a duty of candor and full accurate disclosure regarding the true state of ePlus' business and assets and their conduct with regard thereto.

210.    As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from ePlus' shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of ePlus. Thus they have committed constructive fraud and violated their duty of candor.

211.    By reason of the foregoing, ePlus has been damaged.

212.    Plaintiff, as a shareholder of ePlus, seeks damages and other relief for ePlus.

## COUNT IX

### Corporate Waste Against All Defendants

213.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

214.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to Defendants via the option backdating scheme, Defendants have caused ePlus to waste valuable corporate assets.

215.    As a result of Defendants' corporate waste, they are liable to the Company.

216.    Plaintiff, as a shareholder of ePlus, seeks damages and other relief for ePlus.

### COUNT X

### Unjust Enrichment Against All Defendants

217.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

218.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of ePlus, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

219.    All the payments and benefits provided to the Defendants were at the expense of ePlus. The Company received no benefit from these payments. ePlus was damaged by such payments.

220.    Certain of the Defendants sold ePlus stock for a profit during the period of deception, misusing confidential non-public corporate information. These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of ePlus. A constructive trust for the benefit of the Company should be imposed thereon.

221.    Plaintiff, as a shareholder of ePlus, seeks damages and other relief for ePlus.

### COUNT XI

### Against the Officer Defendants for Rescission

222.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

- 68 -

223.    As a result of the acts alleged herein, the stock option contracts between the Officer

Defendants and ePlus entered into during the relevant period were obtained through Defendants'

fraud, deceit, and abuse of control. Further, the backdated stock options were illegal grants and thus

invalid as they were not authorized in accordance with the terms of the publicly filed contracts

regarding the Officer Defendants' employment agreements and the Company's stock option plan

which was also approved by ePlus shareholders and filed with the SEC.

224.    All contracts which provide for stock option grants between the Officer Defendants

and ePlus and were entered into during the relevant period should, therefore, be rescinded, with all

sums paid under such contracts returned to the Company, and all such executory contracts cancelled

and declared void.

## COUNT XII

### Against Defendants Norton and Mencarini for
### Disgorgement Under the Sarbanes-Oxley Act of 2002

225.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

226.    Section 304 of the Sarbanes-Oxley Act of 2002 provides that if a public company

prepares an accounting restatement due to material non-compliance with any financial reporting

requirement under federal securities laws, and such non-compliance resulted from misconduct, then

the company's CEO and CFO must reimburse the company for certain payments made by the

company to those executives. Section 304, entitled "Forfeiture of Certain Bonuses and Profits,"

provides in full:

> (a)    Additional Compensation Prior to Noncompliance With Commission
> Financial Reporting Requirements–If an issuer is required to prepare an accounting
> restatement due to the material noncompliance of the issuer, as a result of
> misconduct, with any financial reporting requirement under the securities laws, the
> chief executive officer and chief financial officer of the issuer shall reimburse the
> issuer for–

(1)    any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and

(2)    any profits realized from the sale of securities of the issuer during that 12-month period.

(b)    Commission Exemption Authority–The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

227.    ePlus' financial statements during the relevant period were in material non-compliance with federal securities laws reporting requirements and were restated. This non-compliance and need for restatement suffices as "misconduct" within the meaning of §304 of the Sarbanes-Oxley Act of 2002. As a result, Defendants Norton and Mencarini are required to reimburse ePlus for all bonuses or other incentive-based or equity-based compensation received by them from the Company during the period of July 30, 2002 (the date of enactment of the Sarbanes-Oxley Act of 2002), through the present.

228.    Further, Defendants Norton and Mencarini also are liable to ePlus for any profits realized from the sales of securities by the Company during that same period of time.

229.    Defendants Norton and Mencarini are also liable to plaintiffs for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of ePlus.

230.    Plaintiffs, as shareholders of ePlus, seek damages and other relief for ePlus.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.    Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct,

including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

      C.     Directing ePlus to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

      (i)     a proposal requiring that the office of CEO of ePlus and Chairman of the ePlus Board of Directors be permanently held by separate individuals and that the Chairman of the ePlus Board meets rigorous "independent" standards;

      (ii)     a proposal to strengthen the ePlus Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      (iii)     appropriately test and then strengthen the internal audit and control function;

      (iv)     rotate independent auditing firms every five years;

      (v)     control and limit insider stock selling and the terms and timing of stock option grants; and

      (vi)     reform executive compensation.

      D.     Ordering the imposition of a constructive trust over Defendants' stock options and any proceeds derived therefrom;

      E.     Awarding punitive damages;

      F.     As to all improperly dated and/or improperly priced options that have been exercised, ordering Defendants to make a payment to the Company in an amount equal to the difference

between the prices at which the options were exercised and the exercise prices the options should have carried if they were priced at fair market value on the actual date of grant;

G.    As to all improperly dated and/or improperly priced options that have been granted but not yet exercised or expired, ordering the Company to rescind such options so they carry the exercise prices they should have carried if they were priced at fair market value on the actual date of grant;

H.    Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

I.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 24th, 2007

CUNEO GILBERT & LaDUCA, LLP
JONATHAN W. CUNEO (DC Bar # 939389)
WILLIAM H. ANDERSON (DC Bar # 502380)

WILLIAM H. ANDERSON

507 C Street, N.E.
Washington, DC 20002
Telephone: 202/789-3960
202/789-0489 (fax)

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Avenue, NW, Suite 730
Washington, DC 20036
Telephone: 202/822-0600
202/822-6722 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
TRAVIS E. DOWNS III
KATHLEEN A. HERKENHOFF
BENNY C. GOODMAN III
MARY LYNNE CALKINS
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
MONIQUE C. WINKLER
AELISH M. BAIG
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiff

S:\CasesSD\Eplus Derivative\CPT00043692_First Amended.doc

### **VERIFICATION**

I, KATHLEEN A. HERKENHOFF, hereby declare as follows:

1.      I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing First Amended Verified Shareholder Derivative Complaint for Violations of the Federal Securities Laws and State Law Claims For Breach of Fiduciary Duty, Waste of Corporate Assets and Unjust Enrichment and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 24th day of July, 2007 at San Diego, California.

KATHLEEN A. HERKENHOFF