UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTOPHER DILORENZO, Derivatively on Behalf of EPLUS INC., | ) ) ) | Civil No. 07-CV-00144-RJL |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| PHILLIP G. NORTON, et al., | ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) | |
| EPLUS INC., a Delaware corporation, | ) ) | |
| Nominal Defendant. | ) ) | |
| | ) | |

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**<u>ORAL ARGUMENT REQUESTED</u>**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................1

II.    FACTS .................................................................................................4

III.   DEMAND ON ePLUS' BOARD WOULD BE FUTILE....................................8

     A.     Legal Standards for Demand Futility.......................................8

     B.     Both Delaware and Federal Law Hold that Defendants Who Grant or Receive Backdated Options Are Interested for Purposes of Demand Futility and Have Upheld Allegations that Are Nearly Identical to Those Made Herein.................................................................10

     C.     Norton, Bowen, O'Donnell, Herman, Faulders and Cooper Are Interested Because They Granted Backdated Options.............................13

     D.     Norton, Faulders, O'Donnell, Herman and Bowen Are Interested Because They Received Backdated Options.......................................15

     E.     Cooper, O'Donnell, Herman and Faulders Face a Substantial Likelihood of Liability as Members of the Audit Committee................................17

     F.     The Business Judgment Rule Does Not Protect Backdating ................................18

     G.     Defendants' Illegal Backdating Was an *Ultra Vires* Act........................................18

IV.   PLAINTIFF HAS STANDING TO MAINTAIN THIS ACTION....................................18

V.    DEFENDANTS VIOLATED FEDERAL SECURITIES LAWS ....................................20

     A.     Legal Standards for Motion to Dismiss ................................20

          1.     The Complaint Adequately Pleads a Violation of §10(b)........................21

               a.     The Complaint Adequately Alleges Materially False and Misleading Statements in Connection with the Purchase or Sale of Securities................................................21

               b.     Plaintiff Amply Alleges Scienter ................................24

               c.     Defendants' Creation and Participation in the Backdating Scheme Creates a Strong Inference of Scienter............................24

               d.     Defendants' False and Misleading SEC Filings Create a Strong Inference of Scienter .......................................27

**Page**

   e. The Complaint Sufficiently Pleads Each Defendant's Liability as a Participant in a Scheme to Defraud Pursuant to Rule 10b-5(a) & (c) .................................................................. 28

  2. The Complaint Adequately Alleges Reasonable Reliance ........................ 29

 B. The Complaint Adequately Pleads §14(a) Violation .............................................. 31

VI. PLAINTIFF'S STATE LAW CLAIMS ARE ADEQUATELY PLED ............................ 33

 A. Pleading Standards for State Law Claims ................................................................ 33

 B. Defendants' Backdating Scheme Breached Their Fiduciary Duties to ePlus Shareholders and Aided and Abetted Each Other's Breach .................................. 33

  1. Any Exculpatory Provision in ePlus' Certificate of Incorporation Does Not Shield Defendants from Liability Herein .................................. 35

 C. Defendants' Backdating Scheme Wasted Corporate Assets .................................. 36

 D. Plaintiff Has Adequately Pled a Claim for Unjust Enrichment and Restitution ................................................................................................................ 37

 E. The Complaint's §304 Claim Is Actionable .......................................................... 38

VII. PLAINTIFF'S CLAIMS ARE NOT TIME-BARRED .................................................. 39

 A. Plaintiff's §§10(b) and 14(a) Claims Are Timely .................................................. 40

 B. Plaintiff's State Law Claims Are Not Time-Barred .............................................. 43

VIII. CONCLUSION ................................................................................................................ 45

# TABLE OF AUTHORITIES

Page

## CASES

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ....................................................................30

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002)..........................................................................26

*Apple Computer, Inc. v. Exponential Tech.*,
  No. 16315, 1999 Del. Ch. LEXIS 9
  (Del. Ch. Jan. 21, 1999) ...............................................................................18

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984) ..................................................................... *passim*

*Asdar Group v. Pillsbury, Madison & Sutro*,
  99 F.3d 289 (9th Cir. 1996) ..........................................................................40

*Aurora Credit Servs., Inc. v. Liberty W. Dev., Inc.*,
  970 P.2d 1273 (Utah 1998)...........................................................................20

*Barnebey v. E.F. Hutton & Co.*,
  715 F. Supp. 1512 (M.D. Fla. 1989)..............................................................30

*Bateson v. Magna Oil Corp.*,
  414 F.2d 128 (5th Cir. 1969) ........................................................................20

*Bell Atl. Corp. v. Twombly*,
  __U.S.__, 127 S. Ct. 1955 (2007)..................................................................20

*Borden, Inc. v. Spoor Behrins Campbell & Young*,
  778 F. Supp. 695 (S.D.N.Y. 1991).................................................................41

*Cal. Pub. Employees' Ret. Sys. v. Coulter*,
  No. 19191, 2002 Del. Ch. LEXIS 144
  (Del. Ch. Dec. 18, 2002) ...............................................................................18

*Cal. Sansome Co. v. U.S. Gypsum*,
  55 F.3d 1402 (9th Cir. 1995) ........................................................................39

*Chiarella v. United States*,
  445 U.S. 222 (1980).......................................................................................29

*Conrad v. Blank*,
  No. 2611-VCL, 2007 Del. Ch. LEXIS 130
  (Del. Ch. Sept. 7, 2007) ........................................................................ *passim*

**Page**

*Durning v. Citibank, Int'l,*
    990 F.2d 1133 (9th Cir. 1993) ........................................................................40

*Emerald Partners v. Berlin,*
    726 A.2d 1215 (Del. 1999) ....................................................................35, 36

*Falkowski v. Imation Corp.,*
    309 F.3d 1123 (9th Cir. 2002) ..............................................................23, 24

*First Pac. Bancorp, Inc. v. Helfer,*
    224 F.3d 1117 (9th Cir. 2000) ......................................................................39

*Fradkin v. Ernst,*
    571 F. Supp. 829 (N.D. Ohio 1983) ..............................................................31

*Fujimoto v. Au,*
    19 P.3d 699 (Haw. 2001) ................................................................................20

*Gebhardt v. ConAgra Foods, Inc.,*
    335 F.3d 824 (8th Cir. 2003) ........................................................................23

*Gerstle v. Gamble-Skogmo, Inc.,*
    478 F.2d 1281 (2d Cir. 1973) ........................................................................31

*Gould v. American-Hawaiian S.S. Co.,*
    535 F.2d 761 (3d Cir. 1976) ..........................................................................31

*Grimes v. Donald,*
    673 A.2d 1207 (Del. 1996) ..............................................................................9

*Halpern v. Barran,*
    313 A.2d 139 (Del. Ch. 1973) ................................................................43, 44

*Hollinger v. Titan Capital Corp.,*
    914 F.2d 1564 (9th Cir. 1990) ......................................................................30

*Howard v. Everex Sys.,*
    228 F.3d 1057 (9th Cir. 2000) ......................................................................27

*In re 3COM Sec. Litig.,*
    761 F. Supp. 1411 (N.D. Cal. 1990) ............................................................30

*In re Accelr8 Tech. Corp. Sec. Litig.,*
    147 F. Supp. 2d 1049 (D. Colo. 2001) ........................................................30

**Page**

*In re Adaptive Broadband Sec. Litig.*,
  No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887
  (N.D. Cal. Apr. 2, 2002) ........................................................................................30

*In re AFC Enters.*,
  224 F.R.D. 515 (N.D. Ga. 2004) ...........................................................................38

*In re BankAmerica Corp. Sec. Litig.*,
  78 F. Supp. 2d 976 (E.D. Mo. 1999).......................................................................31

*In re Cendant Corp. Derivative Action Litig.*,
  189 F.R.D. 117 (D.N.J. 1999) .................................................................................9

*In re CNET Networks, Inc.*,
  483 F. Supp. 2d 947 (N.D. Cal. 2007) .............................................................10, 15, 36

*In re Computer Scis. Corp. Derivative Litig.*,
  No. CV 06-05288 MRP (Ex), 2007 U.S. Dist. LEXIS 25414
  (C.D. Cal. Mar. 26, 2007) ........................................................................... *passim*

*In re Cylink Sec. Litig.*,
  178 F. Supp. 2d 1077 (N.D. Cal. 2001) .................................................................30

*In re Daley's Dump Truck Servs.*,
  108 F.3d 213 (9th Cir. 1997) .................................................................................30

*In re Daou Sys.*,
  411 F.3d 1006 (9th Cir. 2005), *cert. denied*,
  546 U.S. 1172 (2006).............................................................................................26

*In re Dynex Capital Sec. Litig.*,
  No. 05 Civ. 1897 (HB), 2006 U.S. Dist. LEXIS 4988
  (S.D.N.Y. Feb. 10, 2006) ................................................................................40, 42

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002) ...................................................................42

*In re HealthSouth Corp. S'holders Litig.*,
  845 A.2d 1096 (Del. Ch. 2003), *aff'd*,
  2004 Del. LEXIS 175 (Del. Apr. 14, 2004).............................................................37

*In re infoUSA, Inc. S'holders Litig.*,
  No. 1956-CC, 2007 Del. Ch. LEXIS 123
  (Del. Ch. Aug. 13, 2007).........................................................................................17

**Page**

*In re Lattice Semiconductor Corp. Sec. Litig.*,
   No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262
   (D. Or. Jan. 3, 2006) ...........................................................................................28

*In re Linear Technology Corp. Deriv. Litig.*,
   No. C-06-3290 MMC, 2006 WL 35330294
   (N.D. Cal. Dec. 7, 2006) .......................................................................................11

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..........................................................26, 31

*In re Micron Techs., Inc. Sec. Litig.*,
   No. CV-06-085-S-BLW, 2007 U.S. Dist. LEXIS 12446
   (D. Idaho Feb. 21, 2007) ........................................................................................39

*In re Openwave Sys. Sec. Litig.*,
   No. 07 Civ. 1309 (DLC), 2007 U.S. Dist. LEXIS 80558
   (S.D.N.Y. Oct. 31, 2007) ...............................................................................3, 4, 25

*In re Openwave Systems Inc. S'holder Deriv. Litig.*,
   2007 WL 1456039 (N.D. Cal. May 17, 2007) .......................................................11

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
   387 F. Supp. 2d 1130 (D. Colo. 2005) ...................................................................38

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).....................................................................................26

*In re Silicon Graphics Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ...............................................................................9, 24

*In re Sipex Corp. Sec. Litig.*,
   No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854
   (N.D. Cal. Nov. 17, 2005).......................................................................................26

*In re Stone & Webster, Inc. Sec. Litig.*,
   No. 00-10874-RWZ, 2006 U.S. Dist. LEXIS 42061
   (D. Mass. June 23, 2006) ........................................................................................41

*In re Syncor Int'l Corp. Sec. Litig.*,
   327 F. Supp. 2d 1149 (C.D. Cal. 2004),
   *aff'd in part and rev'd in part on other grounds*,
   239 F. App'x 318 (9th Cir. 2007) ...........................................................................27

**Page**

*In re Taser Int'l S'holder Derivative Litig.*,
    No. CV-05-123-PHX-SRB, 2006 U.S. Dist. LEXIS 11554
    (D. Ariz. Mar. 17, 2006) .................................................................................8, 9

*In re THQ, Inc. Derivative Litig.*,
    No. BC 357 600 (Cal. Super. Ct. –
    Los Angeles County Oct. 11, 2007)..................................................10, 13, 15

*In re Tower Air, Inc.*,
    416 F.3d 229 (3d Cir. 2005)...........................................................................33, 35

*In re Tyson Foods, Inc. Consol. S'holder Litig.*,
    919 A.2d 563 (Del. Ch. 2007) ...........................................................................39

*In re Tyson Foods, Inc. Consol. S'holder Litig.*,
    No. 1106-CC, 2007 Del. Ch. LEXIS 120
    (Del. Ch. Aug. 15, 2007)................................................................................34, 35

*In re UnitedHealth Group PSLRA Litig.*,
    No. 06-CV-1691(JMR/FLN), 2007 U.S. Dist. LEXIS 40623
    (D. Minn. June 4, 2007) ......................................................................................33

*In re Veeco Instruments, Inc. Sec. Litig.*,
    434 F. Supp. 2d 267 (S.D.N.Y. 2006)...............................................................10

*In re VistaCare, Inc.*,
    No. CIV 04-1739-PHX RCB, 2006 U.S. Dist. LEXIS 62021
    (D. Ariz. Aug. 29, 2006) .......................................................................................8

*In re Zoran Corp. Derivative Litig.*,
    511 F. Supp. 2d 986 (N.D. Cal. 2007) ................................................... *passim*

*Jackson Nat'l Life Ins. Co. v. Kennedy*,
    741 A.2d 377 (Del. Ch. 1999).............................................................33, 36, 37

*Johnson v. Aljian*,
    490 F.3d 778 (9th Cir. 2007) ..............................................................................39

*Kahn v. Seaboard Corp.*,
    625 A.2d 269 (Del. Ch. 1993).............................................................................43

*Kamen v. Kemper Fin. Servs.*,
    500 U.S. 90 (1991).................................................................................................8

*Knollenberg v. Harmonic, Inc.*,
    152 F. App'x 674 (9th Cir. 2005) .......................................................................31

**Page**

*Levine v. Smith,*
    591 A.2d 194 (Del. 1991) ..........................................................................9

*Lewis v. Anderson,*
    477 A.2d 1040 (Del. 1984) ......................................................................18

*Maher v. Durango Metals,*
    144 F.3d 1302 (10th Cir. 1998) ...............................................................30

*Malone v. Brincat,*
    722 A.2d 5 (Del. 1998) .......................................................................33, 36

*Malone v. Microdyne Corp.,*
    26 F.3d 471 (4th Cir. 1994) .....................................................................26

*McCall v. Scott,*
    239 F.3d 808 (6th Cir. 2001) ...................................................................10

*Michelson v. Duncan,*
    407 A.2d 211 (Del. 1979) ...................................................................36, 37

*Nev. Power Co. v. Monsanto Co.,*
    955 F.2d 1304 (9th Cir. 1992) .................................................................39

*Newby v. Enron Corp.,*
    188 F. Supp. 2d 684 (S.D. Tex. 2002) .....................................................39

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
*Am. West Holding Corp.,*
    320 F.3d 920 (9th Cir. 2003) .........................................................20, 29, 30

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000).....................................................................26

*Oakland Raiders v. Nat'l Football League,*
    93 Cal. App. 4th 572 (2001) ......................................................................9

*Oberly v. Kirby,*
    592 A.2d 445 (Del. 1991) ...................................................................33, 36

*Parsons v. Jefferson-Pilot Corp.,*
    789 F. Supp. 697 (M.D.N.C. 1992) ..........................................................31

*Pogostin v. Rice,*
    480 A.2d 619 (Del. 1984) .........................................................................15

**Page**

*Primavera Familienstiftung v. Askin*,
   173 F.R.D. 115 (S.D.N.Y. 1997) ...................................................................30

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) .......................................................................26

*Quaak v. Dexia, S.A.*,
   357 F. Supp. 2d 330 (D. Mass. 2005) .....................................................40, 42

*Rales v. Blasband*,
   634 A.2d 927 (Del. 1993) ...........................................................9, 10, 12, 15

*Reina v. Tropical Sportswear Int'l*,
   No. 8:03-cv-1958-T-23TGW, 2005 U.S. Dist. LEXIS 6129
   (M.D. Fla. Apr. 4, 2005) ...............................................................................38

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) .........................................................................26

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000)..............................................................................26

*Rudginski v. Pullella*,
   378 A.2d 646 (Del. Super. Ct. 1977) ............................................................43

*Ryan v. Gifford*,
   918 A.2d 341 (Del. Ch. 2007)................................................................ *passim*

*Salit v. Stanley Works*,
   802 F. Supp. 728 (D. Conn. 1992)............................................................31, 32

*Sanders v. Wang*,
   No. 16640, 1999 Del. Ch. LEXIS 203
   (Del. Ch. Nov. 8, 1999)..............................................................................18, 35

*Schaffer v. Weast*,
   546 U.S. 49 (2005)..........................................................................................38

*Schock v. Nash*,
   732 A.2d 217 (Del. 1999) ...............................................................................37

*SEC v. Adler*,
   137 F.3d 1325 (11th Cir. 1998) ......................................................................29

*SEC v. First Pac. Bancorp*,
   142 F.3d 1186 (9th Cir. 1998) ........................................................................38

**Page**

*Shaw v. Digital Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996)............................................................29

*Siemers v. Wells Fargo & Co.*,
  No. C 05-04518 WHA, 2006 U.S. Dist. LEXIS 60858
  (N.D. Cal. Aug. 14, 2006)...............................................................42

*Simpson v. AOL Time Warner, Inc.*,
  452 F.3d 1040 (9th Cir. 2006) ...................................................28, 29

*Smith v. McGee*,
  No. 2101-S, 2006 Del. Ch. LEXIS 187
  (Del. Ch. Oct. 16, 2006)..................................................................43

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
  365 F.3d 353, 365 (5th Cir. 2004) ............................................27, 28

*Superintendent of Ins. v. Bankers Life & Cas. Co.*,
  404 U.S. 6 (1971)............................................................................28

*Surowitz v. Hilton Hotels Corp.*,
  383 U.S. 363 (1966)........................................................................19

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506 (2002)........................................................................33

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
  No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506
  (S.D.N.Y. Sept. 6, 2005)..................................................................41

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  __U.S.__, 127 S. Ct. 2499 (2007)......................................20, 24, 27

*TSC Indus. v. Northway, Inc.*,
  426 U.S. 438 (1976).........................................................................32

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991)...........................................................23

*United States v. O'Hagan*,
  521 U.S. 642 (1997).........................................................................29

*United States v. Redwood City*,
  640 F.2d 963 (9th Cir. 1981) ...........................................................21

Page

*Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*,
    192 F. Supp. 2d 852 (N.D. Ill. 2002) ...............................................................41

*Wilson v. Great Am. Indus.*,
    855 F.2d 987 (2d Cir. 1988)............................................................................31

*Wool v. Tandem Computers, Inc.*,
    818 F.2d 1433 (9th Cir. 1987) ........................................................................30

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78c(a)(10)........................................................................................................23
    §78j(b) ........................................................................................................ *passim*
    §78n(a) ....................................................................................................... *passim*
    §78t(a) ......................................................................................................4, 30, 41
    §78u-4(b)(2) .....................................................................................................24
    §7243(a) ...........................................................................................................38

Delaware Code Annotate Title 8
    §102(b)(7) ........................................................................................................35

Federal Rules of Civil Procedure
    Rule 8 ...............................................................................................................33
    Rule 9(b) ...........................................................................................................22
    Rule 12(b)(6)......................................................................................20, 21, 33, 34
    Rule 23.1 .................................................................................................... *passim*

17 C.F.R.
    §240.10b-5 .................................................................................................. *passim*

## I.     INTRODUCTION

On August 11, 2006, ePlus Inc. ("ePlus" or the "Company") abruptly announced that it would restate its financial results for fiscal years ended March 31, 2004 and March 31, 2005, as well as for quarters ended June 30, September 30, and December 31, 2005, because of "incorrect accounting" for stock option awards. ¶3.[1] The August 11 announcement admitted to problems with options granted to Chief Executive Officer Phillip G. Norton, Executive Vice President Bruce M. Bowen, Treasurer Kleyton Parkhurst and Chief Financial Officer Steven J. Mencarini, all named as defendants herein. *Id.* The Company admitted that "actual measurement dates" for options granted between 1998 and 2005 "differ from the recorded measurement dates," *i.e.*, backdating. *Id.* ePlus acknowledged that "non-cash stock-based compensation expense should have been recorded with respect to these stock option grants, and the amount of such expense is expected to be material." ¶53.

Ultimately, on August 16, 2006, ePlus filed with the Securities and Exchange Commission ("SEC") a Form 10-K for the fiscal year ended March 31, 2006, which included a restatement covering a period from the fiscal year ended March 31, 2004 and through the first three quarters of fiscal 2006. The reported impact through fiscal year ended March 31, 2005 was $3.6 million net of tax effects. *See* Plaintiff's Request for Judicial Notice in Support of Opposition to Defendants' Motion to Dismiss the First Amended Verified Shareholder Derivative Complaint ("RJN"), Ex. 1 (2006 Form 10-K). Among other things, the 2006 Form 10-K admits that the date and exercise price of certain stock options awarded on dates ranging from 1997 through 2003 were "determined with hindsight to provide a more favorable exercise price for such grants. These options were priced at

---

[1]     Paragraph references ("¶__" or "¶¶__") are to the First Amended Verified Shareholder Derivative Complaint for Violations of the Federal Securities Laws and State Law Claims For Breach of Fiduciary Duty, Waste of Corporate Assets and Unjust Enrichment ("Complaint").

the lowest closing price during the prior quarter, and not, as required by the applicable stock option plans, at the closing price on the date the options were actually awarded." *See id.* at 4. ePlus also admitted specific problems with grants in April 2004 for which SEC Forms 4 were not timely filed. *See id.*

Defendants' admitted backdating misconduct is inherently fraudulent conduct and provided "a windfall [to defendants] because the falsely dated stock option grants . . . coincide[d] with market lows. Such timing reduce[d] the strike prices and inflate[d] the value of stock options, thereby increasing management compensation." *Ryan v. Gifford*, 918 A.2d 341, 345 (Del. Ch. 2007). It is no surprise that backdating "runs afoul of many state and federal common and statutory laws that prohibit dissemination of false and misleading information." *Id.* "Simply put, backdating is a form of fraud." *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1008 (N.D. Cal. 2007).

Despite admitting that a pattern of backdating stock options occurred from at least 1998 to 2005, defendants make three primary attacks on the Complaint, each of which is unsound. First, defendants assert that the Complaint should be denied because plaintiff did not ask ePlus' Board of Directors (the "Board") to take action before filing this lawsuit. This is not a case, however, where plaintiff was required to ask the Board to take action because ePlus' Board is hopelessly conflicted, as at least six members of ePlus' eight-member Board (Norton, Bowen, Faulders, O'Donnell, Herman and Cooper) are interested in the backdated stock option grants as either recipients, grantors or both. ¶¶3, 22-23, 26-29, 56, 61, 64-92. Additionally, Cooper, O'Donnell, Herman and Faulders served on the Audit Committee and were responsible for ensuring the accuracy of ePlus' financial statements, an alternative basis for their substantial likelihood of liability. ¶¶26-29, 51.

Second, defendants assert that even if demand is futile, backdating is not alleged. To the contrary, the Complaint identifies nine "too-good-to-be-true" stock option grants to ePlus directors and officers. ¶¶64-89. The allegations detail each of the challenged option grants, the date they

were purportedly granted, the number of options granted and the exercise price for each backdated

option grant.  Plaintiff also provides an analysis of the 20-day and annualized returns and a

comparison of those returns to that of ePlus shareholders which is often referred to as the "Merrill

Lynch" analysis.  As discussed herein, the Merrill Lynch analysis, in particular, has been endorsed as

a method to support the inference of backdating by both the Delaware Chancery Court and federal

courts.  *See Ryan*, 918 A.2d at 355; *Conrad v. Blank*, No. 2611-VCL, 2007 Del. Ch. LEXIS 130

(Del. Ch. Sept. 7, 2007); *In re Computer Scis. Corp. Derivative Litig*., No. CV 06-05288 MRP (Ex),

2007 U.S. Dist. LEXIS 25414, at *44-*45 (C.D. Cal. Mar. 26, 2007).  For example, plaintiff alleges

that on December 27, 2000, defendant Mencarini was granted 5,000 options with an exercise price of

$7.75 per share.  ¶71.  The 20-day return to Mencarini for this grant was 77.4 % or 1393.5 %

annually.  ¶84.  Shareholders, on the other hand, suffered with a -70.6% return for the fiscal year

ended March 31, 2001.  *Id.*

Finally, defendants assert that plaintiff fails to state a claim for defendants' violations of

federal securities laws and state laws.  Defendants are wrong on all counts.  In particular, defendants'

assertion that scienter is not plead is flatly rejected by the recent opinion in *In re Openwave Sys. Sec.*

*Litig.*, No. 07 Civ. 1309 (DLC), 2007 U.S. Dist. LEXIS 80558, at *32-*34, *54 (S.D.N.Y. Oct. 31,

2007), wherein the court in a securities class action case alleging stock option backdating found that

§10(b) scienter was adequately pled as to the company, its compensation committee members who

granted backdated options and the recipients of those options.  In particular, the *Openwave* court

found that the compensation committee members had a "specific 'duty to monitor' the exercise dates

of the options granted.  Their failure to do so . . . gives rise to an inference of scienter."  *Id*. at *34-

*35.[2]  The same "specific" duty applies to individuals serving on ePlus' Audit Committee as they

---

[2]      Citations are omitted and emphasis is added throughout unless otherwise indicated.

had a duty to oversee the preparation of ePlus' financial statements, a material portion of which was compliance with APB No. 25, as documented by the fact that ePlus' Forms 10-K reported accounting for stock options as one of the "Significant Accounting Policies" that the Company observed in financial reporting. *See, e.g.*, RJN, Ex. 1 at F-12 (2006 Form 10-K at Notes to Consolidated Financial Statements, Organization and Summary of Significant Accounting Policies, at "Stock Based Compensation" (at F-12)). Finally, as to the recipients, the *Openwave* court succinctly held that scienter is pled as to backdated option recipients because they "'benefitted in a concrete and personal way from the purported fraud.'" 2007 U.S. Dist. LEXIS 80558, at *32-*33. *See also Zoran*, 511 F. Supp. 2d at 1019-20 (upholding §§10(b) and 14(a) claims in a derivative action alleging stock options backdating). As further demonstrated herein, defendants' attempt to attack the substantive claims fail, nor are defendants able to meet their burden of demonstrating that the claims are untimely. Accordingly, their motion to dismiss should be denied.

## II.    FACTS

Plaintiff filed this lawsuit on behalf of ePlus against its entire Board and certain of its current and former officers and directors seeking to remedy, among other things, defendants' breaches of their fiduciary duties, unjust enrichment, abuse of control, waste of corporate assets and violation of §§10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). ¶¶167-230. Between fiscal years ended March 31, 1997 and March 31, 2006 (the "relevant period"), defendants engaged in a covert scheme and wrongful course of conduct whereby they granted and/or received backdated ePlus stock options to and for the benefit of ePlus' directors and top executive officers. Their unified backdating scheme violated the non-discretionary terms of ePlus' shareholder-approved stock option plans which mandated that stock options should be granted at the fair market value on the date of grant. ¶¶2, 55-63. Defendants' scheme exposes them to liability for breach of fiduciary duty and stripped them of business judgment protection under Delaware law.

The options at issue herein were granted pursuant to one of two plans: The Master Stock Incentive Plan or the Long Term Incentive Plan. ¶¶55-63. Defendants represented that the Master Stock Incentive Plan "provides the Company a means to offer a critical long-term incentive" and that its purpose was to "attract, retain and motivate newly acquired personnel." ¶56. The Master Stock Incentive Plan, by its terms, was to be administered by the Stock Incentive Committee, who would determine the recipients and all award terms. From at least fiscal 1997 through 2005, Norton and Bowen served on the Stock Incentive Committee. ¶¶22-23. Grants to the members of the Stock Incentive Committee (*i.e.*, Norton and Bowen) pursuant to the Master Stock Incentive Plan had to be approved by a majority of the Board.[3] Incentive stock option grants pursuant to the Master Stock Option Plan had to have "exercise prices be equal to at least 100% of fair market value of the shares of common stock on the grant date." ¶¶56-67. Similarly, any grants to directors via the Amended and Restated Outside Director Stock Option Plan, a component plan of the Master Stock Incentive Plan, had to be made at "an exercise price equal to the market price as of the date of grant." ¶58.

The Company also issued incentive options pursuant to the 1998 Long-Term Incentive Plan ("LTIP") (adopted by the Board on July 28, 1998). ¶¶59-61. The LTIP's purpose was to promote ePlus' "success" and "enhance" its "value" by "linking" the "personal interests of employees, officers, consultants and directors to those of the stockholders" and provide an "incentive for outstanding performance." ¶60. The LTIP included authorization for incentive stock options, among other things, and was to be administered by the Compensation Committee. ¶61. During the

---

[3]    By way of example, this means that the February 5, 1998 grant to Norton (¶64) had to be approved by a majority of the Board, which at that time included Norton, Bowen, O'Donnell (¶¶22-23, 27) and Carl Rickertsen. *See* RJN, Ex 2 (1998 Form 10-K).

relevant period, the Compensation Committee consisted of Cooper (fiscal 2005)[4], O'Donnell (fiscal 1997 through 2005), Herman (fiscal 2003 through 2005) and Faulders (fiscal 1998 through 2005). ¶¶26-29.

Incentive stock options granted pursuant to the LTIP could not be granted at an exercise price that was less than fair market value on the date of grant. Similarly, the 1998 Proxy Statement provided that LTIP option grants to non-employee directors (via non-qualified options) "will be 100% of the fair market value of the stock on the date of grant." ¶61.

Despite the clear, non-discretionary terms of the Plans, defendants granted scores of stock options to themselves and others with strike prices well below the "fair market price" required by the shareholder-approved Plans. ¶¶64-94, 138. Backdated stock option grants allow the grantees to realize immediate unearned and undisclosed financial gains at the expense of the Company and its shareholders. ¶¶139-146.[5] Worse yet, defendants Bowen, Mencarini, Norton and Parkhurst used their inside knowledge of the backdating scheme to unload $5 million worth of their ePlus stock, all at the expense of the Company. ¶143.

Defendants' scheme remained undetected by shareholders for many years because, throughout the relevant period, defendants continuously issued materially false and misleading proxy statements. ¶¶55-63, 90-94. Despite knowing that they were granting stock options at below fair market value, defendants caused ePlus to issue proxy statements telling shareholders that stock options were being granted at the fair market value on the date of the grant. Defendants have

_____

[4] While defendants choose to ignore Cooper's role in the granting of backdated options, given his service on the Compensation Committee during a fiscal year in which ePlus admits options were improperly granted, this argument fails. *See, e.g.*, ¶¶3, 53, 77.

[5] ePlus is the counterparty to each of the option contracts at issue, therefore, when defendants exercise their backdated options, money is siphoned on a dollar-for-dollar basis directly from the Company.

admitted that stock options were not granted in accordance with the explicit terms of the Plans that require grants to be made at "fair market value." *Id.*

Defendants also perpetrated their backdating scheme by filing false and misleading financial results with the SEC. These financial results were false because they improperly accounted for backdated stock options by understating compensation expense and net losses. ¶¶95-136. Year after year, defendants reviewed, approved and signed publicly filed financial reports that were false and misleading because ePlus' compensation expense and net losses did not account for defendants' backdating scheme. *Id.* Defendants have since admitted that ePlus' previously issued financial statements were materially false and misleading by restating ePlus' historical financial results by $3.6 million through fiscal year ended March 31, 2005 alone.

Defendants' nearly ten-year long backdating scheme started to unravel when, on March 18, 2006, *The Wall Street Journal* published an article statistically analyzing financial filings from several high-tech companies. *The Wall Street Journal* article brought to light academic studies suggesting backdating stock options was widespread at various companies throughout the United States. ¶3.

On August 11, 2006, ePlus abruptly announced that it would restate its financial results for fiscal years ended March 31, 2004 and March 31, 2005, as well as for quarters ended June 30, September 30, and December 31, 2005, because of "incorrect accounting" for stock option awards. The August 11 announcement admitted to problems with options granted to Norton, Bowen, Parkhurst and Mencarini. *Id.* The Company admitted that "actual measurement dates" for options granted between 1998 and 2005 "differ from the recorded measurement dates," *i.e.*, backdating. ePlus acknowledged that "non-cash stock-based compensation expense should have been recorded with respect to these stock option grants, and the amount of such expense is expected to be material." ¶¶3, 53.

As noted above, on August 16, 2006, ePlus filed a Form 10-K for the fiscal year ended March 31, 2006, which included a restatement covering a period from the fiscal year ended March 31, 2004 through the first three quarters of fiscal 2006. The reported impact through fiscal year ended March 31, 2005 alone was $3.6 million net of tax effects. *See* RJN, Ex. 1 (2006 Form 10-K). In the 2006 Form 10-K, ePlus admits that the date and exercise price of stock options awarded on dates ranging from 1997 through 2003 were "determined with hindsight to provide a more favorable exercise price for such grants. These options were priced at the lowest closing price during the prior quarter, and not, as required by the applicable stock option plans, at the closing price on the date the options were actually awarded." *See id.* at 4.

The harm to ePlus from defendants' conduct continues to unfold. On December 4, 2007, ePlus filed a Form 8-K detailing the Company's need to enter a "Tenth Amendment to Credit Agreement" to grant the Company a waiver until February 29, 2008 to "deliver its audited financial statements for fiscal year 2007 and its quarterly financial statements for the periods ended June 30, 2007 and September 30, 2007." *See* RJN, Ex. 3.

## III.    DEMAND ON ePLUS' BOARD WOULD BE FUTILE

### A.    Legal Standards for Demand Futility

No pre-suit demand on a board of directors is required if the facts alleged in the complaint "support the inference" that such a demand would be futile.[6] *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984); *Zoran*, 511 F. Supp. 2d at 1001-02; *In re Taser Int'l S'holder Derivative Litig.*, No. CV-05-123-PHX-SRB, 2006 U.S. Dist. LEXIS 11554, at \*23-\*24 (D. Ariz. Mar. 17, 2006). In pleading that demand was futile, a plaintiff is not required to plead evidence, nor is proof of success on the merits required. *See In re VistaCare, Inc.*, No. CIV 04-1739-PHX RCB, 2006 U.S. Dist. LEXIS

---

[6]    ePlus is a Delaware corporation (¶21) and therefore Delaware law governs the issue of demand futility. *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 96-97 (1991).

62021, at *7 (D. Ariz. Aug. 29, 2006) (citing *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991)).  In

assessing demand under Delaware law, all reasonable inferences must be drawn in the light most

favorable to the plaintiff.  *Taser*, 2006 U.S. Dist. LEXIS 11554, at *23-*27, *35-*37; *In re Cendant*

*Corp. Derivative Action Litig.*, 189 F.R.D. 117, 127 (D.N.J. 1999) (applying Delaware law).

There are two different tests for demand futility in Delaware.  One test, known as the

*Aronson* test,[7] applies when a board decision is made, while the second test, known as the *Rales* test,

applies when there is board inaction or a failure to act.  Defendants contend that only *Rales* applies

because action by the entire Board is not alleged.  *See* Defendants' Motion to Dismiss the First

Amended Verified Shareholder Derivative Complaint ("Mem.") at 22.[8]

Under *Rales*, demand futility is demonstrated when the particular allegations in a complaint

create a reasonable doubt[9] that at the time the action was filed, the majority of the members of the

company's board of directors could have properly exercised their independent and disinterested

---

[7]    Under *Aronson*, 473 A.2d 805, a disjunctive test is applied and the court examines whether plaintiffs "allege particularized facts creating a reasonable doubt that (1) the directors are disinterested and independent, *or* (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 990 (9th Cir. 1999) (citing *Aronson*, 473 A.2d at 814).  *See also Oakland Raiders v. Nat'l Football League*, 93 Cal. App. 4th 572, 587 (2001).  As set forth herein, "interestedness" is amply alleged as to a majority of directors, and thus plaintiff meets both the *Aronson* and *Rales* standards.

[8]    Plaintiff disagrees that full Board action is not present given that the proxy statements issued by the Board every year reported on stock option compensation.  Nevertheless, as shown above, it is a distinction without a difference given that once interestedness is plead under either *Rales* or *Aronson*, demand is futile.  Moreover, by adopting *Rales*, defendants waive any argument that they made a decision protected by the business judgment rule.  "Where there is no conscious decision by [the corporate board of] directors to act or refrain from acting, the business judgment rule has no application."  *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993).

[9]    "Reasonable doubt can be said to mean that there is a reason to doubt."  *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996).

business judgment in responding to a demand.  *Rales*, 634 A.2d at 934.[10]  Only a majority of the

directors on a board need be interested for demand to be futile.  *See In re Veeco Instruments, Inc.*

*Sec. Litig.*, 434 F. Supp. 2d 267, 274 (S.D.N.Y. 2006); *McCall v. Scott*, 239 F.3d 808, 824 (6th Cir.

2001); *Zoran*, 511 F. Supp. 2d at 1008-09.  In the present action, therefore, plaintiff need only allege

that four out of eight directors are interested to satisfy Delaware standards – a burden plaintiff easily

meets.[11]  As discussed herein, plaintiff also alleges demand futility with sufficient particularity

pursuant to Rule 23.1.

> **B.    Both Delaware and Federal Law Hold that Defendants Who Grant or Receive Backdated Options Are Interested for Purposes of Demand Futility and Have Upheld Allegations that Are Nearly Identical to Those Made Herein**

In *Ryan*, the Delaware Chancery Court made clear that directors who grant or receive

backdated options are "interested" under Delaware law for purpose of demand futility.  918 A.2d at

355 ("[a] director who approves the backdating of options faces at the very ***least*** a substantial

likelihood of liability") (emphasis in original).[12]  A recent September 2007 opinion from the

---

[10]    "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."  *Aronson*, 473 A.2d at 816.  A reasonable doubt as to disinterestedness exists if a plaintiff can show that a director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."  *Rales*, 634 A.2d at 936.  A plaintiff may also show interestedness by establishing that a director faces a "'substantial likelihood'" of liability.  *Id.*

[11]    Once the Court has determined that the pleading standard for demand futility has been met under any applicable test, ***no further inquiry is required*** for the Court to deny a motion to dismiss. *See, e.g.*, *Aronson*, 473 A.2d at 815; *see also Zoran*, 511 F. Supp. 2d at 1008-09 (once the court found demand futility met by plaintiffs' argument that six of eight board members received backdated options, it had no need to examine plaintiffs' other demand futility arguments).

[12]    Numerous courts agree that the approval or receipt of backdated stock options is sufficient to excuse demand as to the approving board member(s).  *See Computer Scis.*, 2007 U.S. Dist. LEXIS 25414, at *47 (directors are interested "by virtue of having allegedly received the backdated options or by virtue of having directly served on the committee that controlled their timing, pricing and approval"); *Zoran*, 511 F. Supp. 2d at 1003 ("if plaintiffs can plead with particularity that the directors received backdated grants, those directors will be considered interested"); *In re CNET*

Chancery Court, *Conrad*, 2007 Del. Ch. LEXIS 130, reaffirms not only the holding in *Ryan*, but the well-settled Delaware law that shareholders need not make a pre-suit demand upon a board of directors when the directors who sit on that board face a substantial risk of personal liability and are, therefore, interested in the outcome of the litigation.

The *Conrad* court also explained the level of particularity necessary to properly plead demand futility under Delaware law:

> To the extent *CNET* [*Networks, Inc. S'holder Litig.*] and several other recent decisions of that court, *In re Linear Technology Corp. Deriv. Litig.*, No. C-06-3290 MMC, 2006 WL 35330294 (N.D. Cal. Dec. 7, 2006); *In re Openwave Systems Inc. S'holder Deriv. Litig.*, 2007 WL 1456039 (N.D. Cal. May 17, 2007), can be read as applying a substantially harsher standard than is applied in *Ryan* or in this decision, the court declines to follow them. Particularly in relation to option grants to senior officers or executives pursuant to plans that require at-the-money pricing, a finding of a pattern or practice of assigning improper measurement dates to option grants resulting in the issuance of millions of stock options with strike prices set at a lower price than that required by the plan raises substantial risks of personal liability on the part of both the grant executives who got the options and the directors who approved them.

*Id.* at *22-*23 n.22.[13]  Thus, backdating is alleged with sufficient particularity to withstand a Rule 23.1 motion to dismiss when a complaint pleads that a company, such as ePlus here, conducted an internal review and found evidence of options that were mispriced due to incorrect measurement dates or similar errors, resulting in the issuance of millions of options with exercise prices lower than required by the terms of the stock option plans.

---

*Networks, Inc.*, 483 F. Supp. 2d 947, 962 (N.D. Cal. 2007) ("By receiving backdated options, [defendant] Bonnie still has a chance of being subject to personal liability . . . . Plaintiffs have pleaded facts that give rise to a reasonable doubt that Bonnie was disinterested."); *In re THQ, Inc. Derivative Litig.*, No. BC 357 600 (Cal. Super. Ct. – Los Angeles County Oct. 11, 2007) (same) (*see* RJN, Ex. 6).

[13]     In *Ryan*, to satisfy Rule 23.1 plaintiff need only allege "specific grants, specific language in option plans, specific public disclosures, and supporting empirical analysis to allege knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures" to satisfy the particularity standard and survive a motion to dismiss for failure to make demand. *See Ryan*, 918 A.2d at 355.

The *Conrad* court also held that directors who allegedly received backdated stock options when the company has later admitted broad errors due to misdating, are interested for purposes of the demand futility analysis:

> Turning to the rest of the analysis, the court observes that the two directors who allegedly received backdated options, Sargent and Anderson, are clearly not disinterested under *Rales*. In the recent cases of *Ryan v. Gifford* and *Desimone v. Barrows*, the court decisively found directors in essentially the same situation interested for purposes of *Rales*. Staples disclosed in its December 2006 Form 8-K that the July 1, 2003 option grant to Sargent . . . was mispriced. Anderson received an option grant on the same day and at the same strike price . . . . Given Staples's November 2006 disclosure of broader "errors," it is readily inferred that Sargent and Anderson received other mispriced options. In the circumstance, the plaintiff's pleadings are adequate to raise a reasonable doubt as to whether these two directors are disinterested.

*Id*. at *23-*24.

Similarly, the *Conrad* court held that at the pleading stage, allegations that certain directors face a substantial likelihood of liability because they knowingly granted backdated stock options as members of the compensation committee are sufficient to demonstrate demand futility:

> The issue is only slightly less clear as to the three directors who served on the compensation committee. As discussed above, the plaintiff contends that these directors, Blank, Trust, and Nakasone, should be deemed interested because they face a substantial likelihood of liability for authorizing the purported option grants. The board charged the committee at all times pertinent to this litigation with the full and exclusive authority to oversee and approve option grants. These directors all served on the compensation committee for at least one of the challenged option grants.
>
> *        *        *
>
> Suffice it to say that, for purposes of the *Rales* analysis, the court concludes that the allegations of the complaint are sufficient to excuse demand on the members of the compensation committee, since they raise, as the court noted, a reasonable inference that the compensation committee members acted knowingly in awarding options priced at dates other than the actual dates of the grant. The evidence developed in discovery and adduced at trial may more strongly support some other inference. For example, the evidence may support the same conclusion Staples claims to have reached in its internal review: *i.e.*, that there was no intentional wrongdoing by those directors. That is, however, for another day.

*Id*. at *24, *30-*31.

- 12 -

As demonstrated below and in the Complaint, plaintiff sufficiently alleges options backdating using, among other things, the Merrill Lynch analysis, and amply alleges each defendant's (*i.e.*, not simply the sitting Board members') role in the backdating scheme, whether as a recipient (Mencarini, Howard, Norton, Parkhurst, Faulders, O'Donnell, Herman, Hewitt and Bowen), grantor (Norton, Bowen, O'Donnell, Herman, Faulders and Cooper) or Audit Committee member (Cooper, O'Donnell, Herman and Faulders).

### C.   Norton, Bowen, O'Donnell, Herman, Faulders and Cooper Are Interested Because They Granted Backdated Options

Pursuant to the terms of the Master Incentive Plan, the Stock Incentive Committee, consisting of Norton and Bowen at times relevant hereto, administered stock options.  Pursuant to the Long-Term Incentive Plan, members of the Compensation Committee, consisting of Cooper, Herman, O'Donnell and Faulders at times relevant hereto, administered stock options.  As grantors of options that plaintiff has alleged are backdated, these six defendants – all members of the Board when plaintiff initiated this lawsuit – are interested for demand futility purposes and face a substantial likelihood of liability for breaching their fiduciary duties owed to ePlus and its shareholders.

As discussed above, the *Ryan* court found that a "director who approves the backdating of options faces at the very **least** a substantial likelihood of liability."  918 A.2d at 355 (emphasis in original).  The *Ryan* court explained that "it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violations of a shareholder-approved plan, no less) and yet satisfy his duty of loyalty."  *Id.*  Thus, according to the court, "[b]ackdating options qualifies as one of those 'rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.'"  *Id.* at 355-56 (citing *Aronson*, 473 A.2d at 815); *see also THQ*, No. BC 357 600, slip op. (same).  Indeed, the *Ryan* court noted that:

> [I]t is difficult to understand how a plaintiff can allege that directors backdated options *without* simultaneously alleging that such directors *knew* that the options were being backdated. After all, any grant of options had to have been approved by the committee, and that committee can be reasonably expected to know the date of the options as well as the date on which they actually approve a grant. Nor is it any defense to say that directors might not have had knowledge that backdating violated their duty of loyalty. Directors of Delaware corporations should not be surprised to find that lying to shareholders is inconsistent with loyalty, which necessarily requires good faith.

*Ryan*, 918 A.2d at 355 n.35 (emphasis in original); *accord Computer Scis.*, 2007 U.S. Dist. LEXIS 25414, at *24-*25 ("The Court finds that the Complaint makes particularized allegations creating a reasonable doubt as to [directors] Bailey's and McFarlan's interestedness, due to their direct participation in the options backdating transactions as the primary gatekeepers for CSC's options grant process during the liability period.").

Here, just as in *Ryan* and its progeny, the Complaint unambiguously states that: (i) the Master Stock Option Plan was administered by the Stock Incentive Committee and that the LTIP was administered by the Compensation Committee (¶¶56, 61); (ii) the exercise price of stock options could not be less than the fair market value of a share of ePlus stock on the date of grant under either plan (¶¶57-58, 61, 63); and (iii) from at least 1998 through 2005, the members of these committees granted to specified defendants specified stock option grants on specified dates, all of which were designed to coincide with historically low ePlus stock prices (¶¶64-78). These particularized facts detailing the "specific grants, specific language in option plans, specific public disclosures, and supporting empirical analysis to allege knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures" are sufficiently particularized under Delaware law to survive a motion to dismiss for failure to make demand. *See Ryan*, 918 A.2d at 355; *see also Conrad*, 2007 Del. Ch. LEXIS 130, at *22-*23 n.22.

Accordingly, the Complaint alleges particularized facts sufficient to raise a reasonable doubt that Norton, Bowen, Herman, Faulders, O'Donnell and Cooper are capable of considering a demand

because they are substantially likely to be held responsible for the approval of the backdated grants of ePlus stock options. *See Ryan*, 918 A.2d at 355-56 (holding sufficient the allegation that "[p]laintiff alleges that three members of a [six-member] board ***approved*** backdated options, and another member accepted them") (emphasis in original).

### D.    Norton, Faulders, O'Donnell, Herman and Bowen Are Interested Because They Received Backdated Options

Demand is also futile as to Norton, Faulders, O'Donnell, Herman and Bowen because they received backdated stock options. ¶¶64-89. Under Delaware law, "a director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *See Rales*, 634 A.2d at 936; *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984) (a director is interested if he or she has divided loyalties in relation to, or who has or is entitled to receive, specific financial benefit from the challenged transaction); *see also Ryan*, 918 A.2d at 356 (holding that allegations that a board member accepted backdated options was sufficient to raise a reason to doubt the director's disinterestedness and to suggest that the director is incapable of impartially considering demand).[14]

The improbable returns for the backdated option grants alleged in the Complaint (*see* ¶¶79-88) demonstrate how the benefit of receiving backdated stock options was not equally shared with ePlus shareholders. *See CNET*, 483 F. Supp. 2d at 958 ("When purchasing the company's stock, the

---

[14]    Other courts agree. *See Zoran*, 511 F. Supp. 2d at 1002 ("[D]irectors receiving backdated stock options receive a benefit ***not*** shared by stockholders.") (emphasis in original); *Computer Scis.*, 2007 U.S. Dist. LEXIS 25414, at *24-*25 ("The Court finds that the Complaint makes particularized allegations creating a reasonable doubt as to [directors] Bailey's and McFarlan's interestedness, due to their direct participation in the options backdating transactions as the primary gatekeepers for CSC's options grant process during the liability period."); *THQ*, No. BC 357 600, slip op. (finding a director who received a backdated option not disinterested for purposes of demand futility regardless of whether or not he knew it was backdated as that director received a personal benefit from the challenged transaction).

shareholders did not have the benefit of reaching back in time to buy their shares at [a] low-price point.").

Indeed, the Complaint here sets forth the same methodology used by Merrill Lynch and accepted by the Delaware Chancery in *Ryan* and *Conrad* where, among other things, plaintiff compared the 20-day return and an annualized 20-day return for the grants at issue. ¶¶79-88.[15] Plaintiff's allegations, including this analysis, allow the Court to draw the reasonable inference that ePlus backdated the stock option grants to defendants. *Ryan*, 918 A.2d at 355 n.34 ("Given the choice between improbable good fortune and knowing manipulation of option grants, the Court may reasonably infer the latter, even when applying the heightened pleading standards of Rule 23.1."). As such, Norton, Faulders, O'Donnell, Herman and Bowen are unable to disinterestedly consider a demand because they received backdated stock options.

Accordingly, plaintiff alleges that six out of ePlus' eight Board members granted backdated options and five out of eight members received them. Under Delaware law "[t]hese are sufficient allegations to raise a reason to doubt the disinterestedness of the current board and to suggest that they are incapable of impartially considering demand." *Id.* at 356. Therefore, because a majority of the members of the Board granted and/or received backdated stock options, a pre-suit demand on the ePlus Board to commence this action was excused as futile. *Computer Scis.*, 2007 U.S. Dist. LEXIS 25414, at *25; *Zoran*, 511 F. Supp. 2d at 1002-03. Yet, plaintiff goes even further and also demonstrates that defendants Cooper, O'Donnell, Herman and Faulders also face a substantial likelihood of liability, as demonstrated below, based upon their service on the Audit Committee.

---

[15]    Defendants' attempt to dispute the Merrill Lynch analysis is improper given that plaintiff's allegations must be taken as true. *See* §V.A. Defendants will have their chance in expert discovery to present their own Merrill Lynch analysis – but not on this motion.

### E.    Cooper, O'Donnell, Herman and Faulders Face a Substantial Likelihood of Liability as Members of the Audit Committee

Cooper, O'Donnell, Herman and Faulders also face a substantial likelihood of liability for causing ePlus to issue false financial statements.  ¶¶26-29, 51.  As members of the Audit Committee, Cooper, O'Donnell, Herman and Faulders were responsible for approving the Company's financial statements and disclosures prior to their filing and dissemination.  Plaintiff alleges specific instances where these defendants caused the Company to disseminate false financial statements which materially overstated ePlus' profits by failing to properly account for backdated stock options.  *See, e.g.*, ¶102 (2005 Form 10-K signed by Cooper; 1997-2005 Forms 10-K signed by O'Donnell; 2000-2005 Forms 10-K signed by Faulders; 2001-2003 and 2005 Forms 10-K signed by Herman).

The Audit Committee is responsible for reviewing and approving financial statements which mischaracterized the backdated option grants.  *Ryan*, 918 A.2d at 356.  The filing and dissemination of materially false and misleading financial statements regarding option grants "runs afoul of many state and federal common and statutory laws that prohibit dissemination of false and misleading information."  *Id.* at 345.  Thus, Cooper, O'Donnell, Faulders and Herman "might be exposed to potential criminal liability for securities fraud, tax fraud, and mail and wire fraud."  *Id.* at 356 n.38.  Moreover, the dissemination of false disclosures regarding the Board's purported compliance with the stock option plans constitutes "conduct that is disloyal to the corporation and is therefore an act in bad faith."  *Id.* at 358; *see also In re infoUSA, Inc. S'holders Litig.*, No. 1956-CC, 2007 Del. Ch. LEXIS 123, at *58-*59 (Del. Ch. Aug. 13, 2007) (holding that directors who filed a Form 10-K they knew was "deceptive or incomplete," violated their fiduciary duties and face a substantial likelihood of liability).  Accordingly, these defendants face a substantial likelihood of liability for breaching their fiduciary duties to ePlus' shareholders.  In light of the myriad potential civil and criminal liabilities these defendants face, they are undoubtedly interested in any shareholder demand to remedy their own misconduct.  Accordingly, demand would be futile as to them.

- 17 -

Because at least six members of ePlus' eight-member Board received backdated options, granted backdated options, or served as Audit Committee members, and therefore face a substantial likelihood of liability as a result of the backdating scheme, demand is excused and defendants' motions to dismiss should be denied.

### F.    The Business Judgment Rule Does Not Protect Backdating

Backdating options does not merit protection under the "business judgment rule." *See Ryan*, 918 A.2d at 356-58; *Sanders v. Wang*, No. 16640, 1999 Del. Ch. LEXIS 203, at *14-*15 (Del. Ch. Nov. 8, 1999). Nor was defendants' issuance of false and misleading proxy statements and financial results a valid exercise of business judgment. *Ryan*, 918 A.2d at 358. By rejecting *Aronson* as applicable to their conduct, they cannot claim protection of the business judgment rule.

### G.    Defendants' Illegal Backdating Was an *Ultra Vires* Act

Demand is also futile because stock option backdating is an *ultra vires* act. *Apple Computer, Inc. v. Exponential Tech.*, No. 16315, 1999 Del. Ch. LEXIS 9, at *22 (Del. Ch. Jan. 21, 1999). *Ultra vires* acts are not entitled to the protection of the business judgment rule and thus demand is excused. *See Cal. Pub. Employees' Ret. Sys. v. Coulter*, No. 19191, 2002 Del. Ch. LEXIS 144, at *40 (Del. Ch. Dec. 18, 2002) (acts outside the authority of a board are "not entitled to the protection of the business judgment rule and [thereby] demand is excused") (footnote omitted). By alleging pricing of options contrary to the shareholder-approved terms of the options Plans, plaintiff alleges "*ultra vires*" acts. *See Sanders*, 1999 Del. Ch. LEXIS 203, at *3, *14 (dismissing demand futility motion because board faced substantial likelihood of liability for issuing excess shares under option plan).

## IV.    PLAINTIFF HAS STANDING TO MAINTAIN THIS ACTION

Plaintiff has satisfied the standing requirement under Fed. R. Civ. P. 23.1 by alleging that he is, and at times relevant to the conduct alleged in the Complaint was, an ePlus shareholder. ¶20. Contrary to defendants' argument that plaintiff must allege the date of stock purchase and expressly state that he held the stock continuously, nothing more is required to allege standing. *Lewis v.*

- 18 -

*Anderson*, 477 A.2d 1040, 1045 n.7 (Del. 1984) (derivative "'complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which he complains'") (quoting Del. Ch. Rule 23.1).

Rule 23.1 was never designed as a procedural bar to meritorious derivative actions. *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371 (1966). In fact, the Supreme Court has recognized that Rule 23.1 was "was originally adopted . . . as a means to discourage 'strike suits' by people who might be interested in getting quick dollars by making charges without regard to their truth so as to coerce corporate managers to settle worthless claims in order to get rid of them." *Id.* This case, where plaintiff asserts derivative claims that defendants engaged in a multi-year scheme to enrich themselves with backdated stock option grants in breach of their fiduciary duties and to the detriment of ePlus and its shareholders, is most certainly not the kind of "strike suit" the Supreme Court was referring to in *Surowitz*.

Even if plaintiff did not hold as far back as the first alleged backdating misconduct, it would not warrant dismissal of the action, especially because of the Company's inadequate internal investigation and response to the alleged backdating. As the court explained in *Conrad*, a conclusion that a plaintiff

> lacks standing to challenge aspects of the alleged [backdating] scheme that predate her [stock] ownership will deprive the stockholders of any "reasonable opportunity to rectify" the corporate aberrations alleged to have taken place before she bought shares in 1998. This concern is amplified by the fact that [the company] and its audit committee have already investigated the matter and, while they found "errors due to the use of incorrect measurement dates," have apparently taken no action to hold any individuals accountable. In the circumstances, the court will condition the dismissal of [plaintiff's] pre-1998 claims on the receipt of further information from the parties about the possibility of some other stockholder intervening to assert those early claims, or the adoption of some other measure to preserve those claims in the event that they prove to be of value to [the company].

2007 Del. Ch. LEXIS 130, at *36-*37.

Hence, even if plaintiff were deemed to lack standing due to his holding period, a shareholder with standing should have an opportunity to intervene. However, the currently-named plaintiff does in fact have standing to maintain his derivative claims on behalf of ePlus.

Likewise, plaintiff has standing to sue for the entire period of backdating conduct alleged under both the fraudulent concealment and continuing harm doctrines, which permit shareholders to bring claims concealed by defendants' misconduct or misrepresentations.

> Because the considerations underlying the doctrine are the same in both the case of a statute of limitations and the contemporaneous ownership rule, the same standard should govern both situations. Therefore, following the reasoning in *Berenda* [*v. Langford*, 914 P.2d 45 (Utah 1996)], we will allow a noncontemporaneous shareholder to bring a derivative suit if he or she can show (i) that the corporation fraudulently concealed wrongdoing from shareholders and (ii) that a reasonable shareholder would not have discovered the wrongdoing earlier.

*Aurora Credit Servs., Inc. v. Liberty W. Dev., Inc.*, 970 P.2d 1273, 1279 (Utah 1998) (footnote omitted); *see also Bateson v. Magna Oil Corp.*, 414 F.2d 128, 130 (5th Cir. 1969) (continuing wrong exception to the continuous ownership requirement under Rule 23.1 protects plaintiffs' derivative standing); *Fujimoto v. Au*, 19 P.3d 699, 730-31 (Haw. 2001) (same). Hence, because defendants concealed their backdating scheme by issuing false proxy statements and SEC filings, plaintiff has standing under the "fraudulent concealment" exception to the contemporaneous ownership rule. ePlus' arguments to the contrary are incorrect.

## V.    DEFENDANTS VIOLATED FEDERAL SECURITIES LAWS

### A.    Legal Standards for Motion to Dismiss

The court must deny a Rule 12(b)(6) motion if plaintiffs have pled "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, __U.S.__, 127 S. Ct. 1955, 1974 (2007). In considering the sufficiency of a securities fraud complaint under Rule 12(b)(6), the court must "accept all factual allegations in the complaint as true" and "consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __U.S.__, 127 S. Ct. 2499, 2509 (2007); *see also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320

F.3d 920, 931 (9th Cir. 2003) (the court must accept plaintiff's allegations as true and construe them in the light most favorable to the plaintiff).   Applying these standards, only "extraordinary" circumstances warrant dismissal under Rule 12(b)(6).  *United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

1.      **The Complaint Adequately Pleads a Violation of §10(b)[16]**

a.      **The Complaint Adequately Alleges Materially False and Misleading Statements in Connection with the Purchase or Sale of Securities**

The Complaint is replete with allegations that defendants made misrepresentations or omissions in ePlus' SEC filings.  For example, statements contained in ePlus' proxy statements that stock options for ePlus' were granted with an exercise price not less than "the fair market value" on the date of grant were materially false and misleading because defendants actually granted stock options to themselves and others at prices that were below fair market value on the date of grant. ¶¶55-94.  Defendants further concealed and misrepresented their backdating scheme in the proxy statements by describing the purpose of ePlus' stock options plans as promoting the interests of ePlus and its shareholders by "provid[ing] the Company a means to offer a critical long-term incentive" and to promote ePlus' "success" and "enhance" its "value" by "linking" the "personal interests of employees, officers, consultants and directors to those of the stockholders" and provide an "incentive for outstanding performance."  ¶¶56, 60.

---

[16]      Section 10(b) of the Exchange Act prohibits, in pertinent part, "any person, directly or indirectly . . . [from] us[ing] or employ[ing], in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. §78j(b).  To establish a claim under §10(b), a plaintiff must allege that defendants made: (1) a misrepresentation or omission; (2) of a material fact; (3) with scienter; (4) relied on by the plaintiff; and (5) that proximately caused the plaintiff's injury.  *Id.*; 17 C.F.R. §240.10b-5(a)-(c).

Similarly, ePlus' 1997-2005 Forms 10-K falsely stated that the Company followed APB No. 25 in accounting for stock options. ¶99. This was false because ePlus had not taken a compensation expense for the backdated options as required by APB No. 25 and ePlus' reported earnings and expenses were false and misleading because they were not in compliance with Generally Accepted Accounting Principles ("GAAP"). *See, e.g.*, ¶¶100-101. Indeed, ePlus has admitted that at least $3.6 million in compensation expense was not properly recorded pursuant to APB No. 25 through the end of fiscal 2005 because options were incorrectly priced. *See* RJN, Ex. 1 (2006 Form 10-K).

Notwithstanding defendants' arguments otherwise, plaintiff in fact pleads specific and detailed facts supporting his allegation that defendants backdated stock option grants to themselves and others. Plaintiff alleges *who* backdated or received backdated options, *what* options were backdated, approximately *when* the options were backdated, and *how* the options were backdated. *See, e.g.*, ¶¶22-23, 26-29, 56, 61, 66 (identifying *who* approved backdated options); ¶¶64-77 (identifying *who* received backdated options, *what* options were backdated, and approximately *when* the options were backdated, *i.e.*, after the date of the purported option grant); ¶¶79-89 (explaining *how* the options were backdated, *i.e.*, to coincide with previous lows in trading prices and that the options qualify as backdated pursuant to the Merrill Lynch analysis). *See also supra* §§I & II (referencing Company admissions of mispriced options, including options granted to Norton, Bowen Parkhurst and Mencarini). Accordingly, defendants' argument (*see* Mem. at 7-8) and the cases purportedly cited in support thereof, do *not* support dismissal for purported failure to comply with Fed. R. Civ. P. 9(b) or the Private Securities Litigation Reform Act of 1995 ("PSLRA").

Indeed, it is a bit wishful to suggest plaintiff's allegations of backdating have no basis (*see id.* at 8) given the Company's recent admissions of incorrect stock option pricing and categorical presentation of numerous improprieties in connection with stock option grants that formed the basis

for ePlus' massive restatement of financial results.  Absent omniscience or discovery, it is difficult if not impossible to get much more specific than what plaintiff avers here.

In addition to adequately alleging falsity with particularity, the allegations of defendants' backdating, and their misrepresentations and omissions in connection therewith are material, contrary to defendants' assertions.  *See id.* at 8-9.  Defendants' receipt and/or granting of thousands of backdated options for nearly a decade is undeniably material.  Questions regarding the integrity of the Company's management, such as those that arise given the admitted backdating that has occurred herein, are material to investors.  *See, e.g.*, *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829-30 (8th Cir. 2003) (noting that "[m]anagement's integrity" is important to investors); *Zoran*, 511 F. Supp. 2d at 1015 (holding it is material to investors "that the board was feathering the nests of insiders via backdated options").  *See also Zoran*, 511 F. Supp. 2d at 1011 (holding that materiality is plead in a backdating case where plaintiff alleges that company had to restate its financials and was facing delisting by Nasdaq).[17]

Finally, the argument that the claims asserted related to the backdated stock options are not claims in connection with the purchase or sale of a security is blatantly incorrect.  *See* Mem. at 6-7.  Stock option plans involve "contracts to sell stock for money at a later date" and thus is a "sale under the securities laws because it is a contract to sell a security when the option is exercised."  *See, e.g.*, *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1130-31 (9th Cir. 2002) (finding that fraud with respect to employee stock option plans was "'in connection with' the 'sale or purchase of a covered security'" under SLUSA).  *See also* 15 U.S.C. §78c(a)(10) (defining "security" to include any "option").  Further, misrepresentations about the value of options, such as the exercise price, are

---

[17]    Defendants' argument about stock fluctuations being necessary for materiality is simply incorrect.  *See, e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) (stock fluctuations are not determinative of materiality).

inherently misrepresentations "'in connection with'" the options.  *See, e.g.*, *Falkowski*, 309 F.3d at 1131.  Indeed, the court in *Zoran* rejected exactly the argument made by defendants herein, and held that the allegations concerning stock option backdating satisfied the "in connection with" requirement.  *See Zoran*, 511 F. Supp. 2d at 1011-12.

### b.    Plaintiff Amply Alleges Scienter

The PSLRA requires that the Complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," or scienter.  15 U.S.C. §78u-4(b)(2).  The required state of mind is one of actual knowledge or "deliberate recklessness."  *Silicon Graphics*, 183 F.3d at 975.

In *Tellabs*, 127 S. Ct. 2499, the Supreme Court established the standard courts must now apply in determining whether a plaintiff has pleaded a "strong inference of scienter" for purposes of §10(b) liability, as required under §21D(b)(2) of the PSLRA.  The Court adopted the following standard: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Id.* at 2511.  The *Tellabs* Court then concluded that:  "A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 2510.

### c.    Defendants' Creation and Participation in the Backdating Scheme Creates a Strong Inference of Scienter

Plaintiff's scienter allegations satisfy *Tellabs*.  When the allegations are viewed collectively as required by *Tellabs*, 127 S. Ct. at 2509, the proposition that defendants' conduct was conscious or deliberately reckless is cogent and compelling, and at least as compelling and likely as any competing inference.  Indeed, the inferences that may be drawn from the allegations are more plausible than any competing adverse inference.  Indeed, this is inherent in the unequivocal rulings

of courts such as the Northern District of California: "[B]ackdating is a form of fraud." *Zoran*, 511 F. Supp. 2d at 1008.

In particular, defendants' assertion that scienter is not plead is flatly rejected by the recent opinion in *Openwave*, 2007 U.S. Dist. LEXIS 80558, at *32-*34, *54, wherein the court in a securities class action case alleging stock option backdating found that §10(b) scienter was adequately pled as to the company, its compensation committee members who granted backdated options and the recipients of those options. In particular, the *Openwave* court found that the compensation committee members had a "specific 'duty to monitor' the exercise dates of the options granted. Their failure to do so . . . gives rise to an inference of scienter." *Id.* at *34-*35. The same "specific" duty applies to individuals serving on ePlus' Audit Committee as they had a duty to oversee the preparation of ePlus' financial statements, a material portion of which was compliance with APB No. 25, as documented by the fact that ePlus' Forms 10-K reported accounting for stock options as one of the "Significant Accounting Policies" that the Company observed in financial reporting. *See, e.g.*, RJN, Ex. 1 at F-12 (2006 Form 10-K at Notes to Consolidated Financial Statements, Organization and Summary of Significant Accounting Policies, at "Stock Based Compensation" (page F-12)). Finally, as to the recipients, the *Openwave* court succinctly held that scienter is pled as to backdated option recipients because they "'benefitted in a concrete and personal way from the purported fraud.'" 2007 U.S. Dist. LEXIS 80558, at *32-*33. *See also Zoran*, 511 F. Supp. 2d at 1019-20 (upholding §§10(b) and 14(a) claims in a derivative action alleging stock options backdating).

Not only is each defendant named herein tagged with §10(b) scienter under the *Openwave* decision, but ePlus has itself admitted that options were priced with "hindsight." As a result, the

Company has endured a $3.6 million restatement. This disclosure of "material" accounting adjustments is also strong evidence of scienter.[18]

Indeed, defendants' conduct violated the Company's own stock option plans and GAAP by overstating Company earnings and understating compensation expense in SEC filings.[19] The Complaint also demonstrates, through defendants' high-level executive positions and Board membership, as well as their participation on the Stock Incentive, Compensation and Audit Committees, that they were, at best, consciously reckless in permitting the backdating to occur and to go unreported, or, more likely, deliberately concealing the backdating.

As numerous courts have now held, backdating is inherently knowing, fraudulent conduct. For example, in *Ryan*, 918 A.2d 341, Chancellor Chandler rejected defendants' arguments

---

[18]    Restatements of this sort are not commonplace and provide powerful indirect evidence of scienter. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273-74 (N.D. Cal. 2000) ("[W]hen significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves. . . . Companies do not routinely announce massive restatements of revenue accompanied by press releases announcing that various employees have been fired 'for cause.'"); *see also Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001); *In re Daou Sys.*, 411 F.3d 1006, 1016-17 (9th Cir. 2005), *cert. denied*, 546 U.S. 1172 (2006). Indeed, when the corporation's own internal investigation leads to the announcement of a restatement, as the case here, this "establish[es] a strong inference that the company itself believes that fraud" occurred. *In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 U.S. Dist. LEXIS 30854, at *3-*4 (N.D. Cal. Nov. 17, 2005).

[19]    The fact that defendants violated the policies and stock option plans they asked shareholders to put in place permits a strong inference of fraudulent intent. *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (violation of company's own policies on revenue recognition on OEM contracts); *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996); *Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir. 2000); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001). Moreover, Cooper, O'Donnell, Herman and Faulders were also members of the Audit Committee. It was their obligation to review the Company's accounting for these options and in so doing, are charged with knowing the options' fortuitous strike prices in order to undertake an APB No. 25 accounting treatment. The extensive $3.6 million in admitted GAAP violations is also strong evidence of scienter. *See Daou*, 411 F.3d at 1016; *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 79, 83 (1st Cir. 2002) (finding scienter sufficiently alleged where defendants violated FAS 48 and their own internal revenue recognition policies); *Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994) ("We cannot find a single precedent, however, holding that a company may violate FAS 48 and substantially overstate its revenues . . . without running afoul of Rule 10b-5.").

concerning knowledge, holding "it is difficult to understand how a plaintiff can allege that directors backdated options *without* simultaneously alleging that such directors *knew* that the options were being backdated." *Id.* at 355 n.35 (emphasis in original). "After all," the court explained, "any grant of options had to have been approved by the [compensation] committee, and that [compensation] committee can be reasonably expected to know the date of the options as well as the date on which they actually approve a grant." *Id.*

Defendants do not (and reasonably cannot) dispute knowing the date on which they granted or received options and the date for which those options were priced. Because it is reasonable, in fact eminently rational, to conclude that extensive stock option backdating for a decade cannot occur absent conscious or knowing acts, well-pleaded allegations of backdating sufficiently demonstrate scienter.

In sum, as *Tellabs* clearly states, the inquiry regarding scienter "is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" 127 S. Ct. at 2510. The instant Complaint makes clear that the most reasonable inference is that defendants were aware, or at the very least deliberately reckless regarding the widespread, decade-long backdating at ePlus.

### d.    Defendants' False and Misleading SEC Filings Create a Strong Inference of Scienter

"[W]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true." *Howard v. Everex Sys.*, 228 F.3d 1057, 1061 (9th Cir. 2000). Thus, allegations that defendants have signed false financial statements directly evidence scienter. *In re Syncor Int'l Corp. Sec. Litig.*, 327 F. Supp. 2d 1149, 1172 (C.D. Cal. 2004) (citing *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (corporate officers' signature on a document links them to the fraudulent statements therein)), *aff'd in part and rev'd in part on other grounds*, 239 F. App'x 318

(9th Cir. 2007).  *See also Zoran*, 511 F. Supp. 2d at 1011-13 (directors who sign or prepare false disclosures are liable for statements therein).

The Complaint here specifically alleges that Norton, Bowen, Mencarini, O'Donnell, Faulders, Herman, Parkhurst and Cooper actually signed ePlus' financial reports (and the years they signed) which have been restated to correct the accounting irregularities caused by defendants' backdating scheme.  ¶102.  Moreover, Norton and Mencarini signed Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") certifications attached to ePlus' Forms 10-K filed with the SEC.  *See* ¶103.  These certifications provide additional evidence that these defendants were made aware of ePlus' accounting problems and were at least deliberately reckless in causing or permitting false financial statements to be published.  *See In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *45 (D. Or. Jan. 3, 2006) (CEO's and CFO's "Sarbanes-Oxley certifications provide an inference of at least deliberate recklessness").

### e.    The Complaint Sufficiently Pleads Each Defendant's Liability as a Participant in a Scheme to Defraud Pursuant to Rule 10b-5(a) & (c)

Plaintiff has met the requirements of the PSLRA by alleging that each defendant participated in a deceptive backdating scheme which had the purpose and effect of defrauding ePlus and its shareholders.  *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 n.7 (1971) ("'We believe that § 10(b) and Rule 10b-5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception.'") (emphasis in original).  In *AOL*, the Ninth Circuit noted that it could "see no justification to limit liability under § 10(b) to only those who draft or edit the statements released to the public.  To the contrary, § 10(b) prohibits any person or entity from using or employing any deceptive device, directly or indirectly, in connection with the purchase and sale of

securities." *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1049 (9th Cir. 2006), *petition for cert. filed* (Oct. 19, 2006).

Plaintiff has alleged the details of nine specific stock option grants to defendants Norton, Bowen, Mencarini, Howard, Parkhurst, Faulders, O'Donnell, Herman and Hewitt between 1997 and 2004 which were backdated or manipulated and which were granted by Norton, Bowen, Cooper, O'Donnell, Herman and Faulders. ¶¶64-89. Accordingly, plaintiff has alleged that these defendants engaged in transactions – a deceptive device – whose principal purpose and effect which was to create a false appearance that stock options were being granted and accounted for pursuant to the Company's stock option plans and disclosures, and that the Company was earning revenue when in fact defendants were diverting funds from ePlus to themselves.

Plaintiff also alleges that Bowen, Mencarini, Norton and Parkhurst engaged in insider selling for proceeds in excess of $5 million. *See, e.g.*, ¶143. Having backdated stock options and/or received backdated stock options, these defendants had inside knowledge of backdating at ePlus. Trading on inside information alone is a "deceptive device" sufficient to impose liability under §10(b). *See United States v. O'Hagan*, 521 U.S. 642, 652 (1997); *see also Am. West*, 320 F.3d at 937 (insider trading is a deceptive device or act that suffices for §10(b) liability).[20]

### 2.    The Complaint Adequately Alleges Reasonable Reliance

Defendants' arguments that the Complaint fails to adequately allege reliance must also fail. *See* Mem. at 10. ePlus reasonably relied upon defendants' false statements about the granting of

---

[20]    Moreover, defendants who sold ePlus stock are further liable under the "disclose-or-abstain" doctrine. Regardless whether a defendant made a false statement, "an individual corporate insider in possession of material nonpublic information is prohibited by the federal securities laws from trading on that information unless he makes public disclosure. He must disclose or abstain from trading." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1203 (1st Cir. 1996); *see also O'Hagan*, 521 U.S. at 651-52; *Chiarella v. United States*, 445 U.S. 222, 226-29 (1980); *SEC v. Adler*, 137 F.3d 1325 (11th Cir. 1998) (insider trading on nonpublic information, even in the absence of false statements, sufficient to establish liability under §10(b) and Rule 10b-5).

stock options at fair market value and to its detriment did not record compensation expense for in-the-money options.  Moreover, ePlus relied to its detriment on defendants to issue accurate and truthful financial statements.  The Complaint alleges that the backdating of stock option grants and issuance thereof in the amounts awarded to defendants caused, and continues to cause, substantial harm to ePlus and to its shareholders.  Plaintiff has detailed concrete losses ePlus has suffered by relying on defendants in the issuance of stock options and the preparation of its financial statements, including the need to restate more than $3.6 million in compensation expense.[21]  *Zoran*, 511 F. Supp. 2d at 1012.[22]

---

[21]    In any event, reliance is a factual inquiry not appropriate for resolution on a motion to dismiss.  *See In re Daley's Dump Truck Servs.*, 108 F.3d 213, 215 (9th Cir. 1997) (in contract rescission action, justifiable reliance "normally a factual question to be determined by the jury"); *In re Accelr8 Tech. Corp. Sec. Litig.*, 147 F. Supp. 2d 1049, 1057 (D. Colo. 2001) (reliance involves "detailed factual inquiry and is rarely amenable to resolution under a motion to dismiss standard"); *Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 127 (S.D.N.Y. 1997) (same); *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1527 (M.D. Fla. 1989) (same).

[22]    Because plaintiff adequately pleads a §10(b) violation, §20(a) liability is also plead.  To establish control person liability at the pleading stage, plaintiff need only allege that the defendants had the status of control persons.  *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990) (en banc).  This is satisfied by pleading "'who they are alleged to control and what acts or status indicate such control.'"  *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1442 (9th Cir. 1987); *accord In re 3COM Sec. Litig.*, 761 F. Supp. 1411, 1418 (N.D. Cal. 1990).  Plaintiff need only allege an ability to control or influence a primary violator (*Wool*, 818 F.2d at 1440) and need not allege or prove that the individual defendants actually exercised that control.  *See Am. West*, 320 F.3d at 945.  Thus, "courts generally agree that the plaintiff need only show the power to control . . . and not the exercise of that power."  *Maher v. Durango Metals*, 144 F.3d 1302, 1306 n.8 (10th Cir. 1998).  Here, the Complaint adequately pleads that defendants had the ability to control the content and dissemination of the false and misleading statements.  These allegations suffice to plead control.  *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir. 2003); *In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887, at *58-*59 (N.D. Cal. Apr. 2, 2002) (holding "the fact that the named individual defendants held important positions in the company is sufficient at the pleadings stage" and denying motion to dismiss §20(a) claims); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1089 (N.D. Cal. 2001) ("'by virtue of their executive and managerial positions [defendants] had the power to control and influence [the company], which exercised'").  Corporate officers and board members regularly are considered control persons for purposes of §20(a) liability.  *See, e.g.*, *Am. West*, 320 F.3d at 945-46 (noting that "having a seat on the board" is "'traditional indicia of control'" and finding officers and directors liable under §10(b) and §20(a)).  Moreover, proper pleading of control liability does not require allegations that each

### B.   The Complaint Adequately Pleads §14(a) Violation

Defendants caused ePlus to file false and misleading proxy statements between at least 1997 and 2005, violating §14(a) of the Exchange Act.  Section 14(a) makes it unlawful to solicit a proxy in violation of rules requiring disclosure of material facts to shareholders.  *See* 15 U.S.C. §78n(a).  Scienter is not required for §14(a) claims – negligence is sufficient.  *Zoran*, 511 F. Supp. 2d at 1015; *McKesson*, 126 F. Supp. 2d at 1265-66 (finding officers and directors liable under §14(a) negligence standard); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682-83 (9th Cir. 2005) (same); *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 777 (3d Cir. 1976); *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1301 (2d Cir. 1973).  Defendants agree that negligence is the standard.  *See* Mem. at 16.  The showing plaintiff is required to make is thus minimal: "[P]laintiffs need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive.  Liability can be imposed for negligently drafting a proxy statement."  *Wilson v. Great Am. Indus.*, 855 F.2d 987, 995 (2d Cir. 1988).[23]

Here, plaintiff alleges that defendants made false representations in annual proxy statements from 1997-2005, representing to shareholders that incentive stock options would have exercise prices equal to at least 100% of the fair market value of the stock on the date of the grant.  *See* §§I & II.  Each ePlus proxy statement issued during the relevant period contained materially false and misleading statements, including, *inter alia*, false statements regarding executive compensation and the Company's stock option granting policies.  *Id.*  While the proxy statements accurately described

---

defendant actually controlled a specific person, transaction, or activity giving rise to a primary violation, nor are §20(a) claims subject to the heightened pleadings requirement of the PSLRA.  *See Adams*, 340 F.3d at 1109.

[23]    A*ccord, e.g., McKesson*, 126 F. Supp. 2d at 1256; *In re BankAmerica Corp. Sec. Litig.*, 78 F. Supp. 2d 976, 989 (E.D. Mo. 1999); *Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 697, 701 (M.D.N.C. 1992); *Fradkin v. Ernst*, 571 F. Supp. 829, 843-44 (N.D. Ohio 1983); *Salit v. Stanley Works*, 802 F. Supp. 728, 733 (D. Conn. 1992).

the **terms** of the Plans – that the exercise price was equal to the fair market value on the date of grant – they were materially false and misleading because they failed to disclose to shareholders that this provision was routinely ignored by defendants and that defendants' past and anticipated future grants of ePlus options were routinely in-the-money at the time of grant. *Id.* The proxy statements thus omitted the truth about ePlus' executive compensation and backdating practices.

Not only did defendants use the proxy statements to perpetrate their lies about the terms of the option grants, but they also used the proxy statements to secure the approval and adoptions of amendments to the stock option plans. For example, the 1997 Proxy Statement solicited shareholders to, among other things, ratify amendments to the Master Stock Incentive Plan. The full Board (Norton, Bowen, Ledecky, O'Donnell and Rickertsen) recommended that shareholders vote "for" these amendments, and on September 30, 1997, shareholders ratified these amendments. Pursuant to the 1998 Proxy Statement, the Board solicited shareholder approval for the 1998 Long-Term Incentive Plan ("LTIP") by recommending shareholders vote "for" the LTIP plan, which shareholders voted to approve. The July 29, 2003 Proxy Statement sought shareholder approval of an amendment to the LTIP, to set the number of shares of common stock available for awards under the Plan at three million. Shareholders subsequently voted for the amendment on September 18, 2003. *See* §II.

Contrary to defendants' assertions (Mem. at 12-14), there could not be a more direct link between the false information in these proxy statements and defendants' concealment of their backdating plan. *See Zoran*, 511 F. Supp. 2d at 1016.[24] The very touchstone of a §14(a) violation is a material misstatement – something "that a reasonable shareholder would consider . . . important in deciding how to vote." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). It is hardly a leap

---

[24]    Defendants' arguments as to pleading the falsity of the proxy statements and the materiality of those statements are addressed in §V above.

of logic that in approving, adopting and amending stock option plans, a reasonable shareholder would consider the fact that defendants were issuing grants at lower than the fair market value important in deciding how to vote on that plan given the adverse expense reporting and the tax ramifications of doing so.

## VI.    PLAINTIFF'S STATE LAW CLAIMS ARE ADEQUATELY PLED

### A.    Pleading Standards for State Law Claims

Under the applicable pleading standards, plaintiff's state law claims must be sustained.  In order to survive a Rule 12(b)(6) motion as to the state law claims, a plaintiff need only satisfy Fed. R. Civ. P. 8.  *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005).  The purpose of Rule 8 is to "'give the defendant fair notice of what plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).  Here, plaintiff's Complaint asserts the incredibly simple claim that "[w]hen awarded options, with deliberately selected grant dates which were already in the money, defendants were playing a game they knew they could not lose; and, unsurprisingly, defendants won."  *In re UnitedHealth Group PSLRA Litig.*, No. 06-CV-1691(JMR/FLN), 2007 U.S. Dist. LEXIS 40623, at *6-*7 (D. Minn. June 4, 2007).  Thus, plaintiff's allegations give defendants "fair notice" of plaintiff's claims and the grounds upon which they rest such that the motions to dismiss must be denied.

### B.    Defendants' Backdating Scheme Breached Their Fiduciary Duties to ePlus Shareholders and Aided and Abetted Each Other's Breach

Defendants' backdating scheme plainly implicates defendants' duties of loyalty and good faith.  *See, e.g.*, *Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) ("It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary.");  *Malone v. Brincat*, 722 A.2d 5, 10-11 (Del. 1998) (same); *see also Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 389 (Del. Ch. 1999) (same).  Here, plaintiff specifically alleges that defendants are liable for

breaches of the fiduciary duties of loyalty and good faith for, among other things, engaging in a scheme to grant backdated stock options, and then hiding the scheme from shareholders.

*Ryan* is instructive. There, as here, the plaintiff pled facts showing that the director and officer defendants engaged in the backdating of stock option grants. As Chancellor Chandler reasoned:

> I am unable to fathom a situation where the deliberate violation of a shareholder approved stock option plan and false disclosures, obviously intended to mislead shareholders into thinking that the directors complied honestly with the shareholder-approved option plan, ***is anything but an act of bad faith***. It certainly cannot be said to amount to faithful and devoted conduct of a loyal fiduciary. Well-pleaded allegations of such conduct are sufficient, in my opinion, to rebut the business judgment rule and to survive a motion to dismiss.

918 A.2d at 358; *Zoran*, 511 F. Supp. 2d at 1017. Thus, a corporate board's decision to backdate stock options unquestionably does not deserve protection under the "business judgment rule."[25] The Chancery Court further reasoned in *Ryan* "[b]ackdating options qualifies as one of those 'rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists.'" *Ryan*, 918 A.2d at 355-56.[26]

Indeed, the skeptical eye with which the Delaware Chancery Court in *Conrad*, 2007 Del. Ch. LEXIS 130, viewed defendants' conduct and scant disclosures, is entirely appropriate. As succinctly explained in another recent Delaware Chancery opinion in *In re Tyson Foods, Inc. Consol. S'holder Litig.,* No. 1106-CC, 2007 Del. Ch. LEXIS 120 (Del. Ch. Aug. 15, 2007), directors owe

---

[25]    In upholding the plaintiff's claim for breach of fiduciary duty, the *Ryan* court held that "where plaintiff alleges particularized facts sufficient to prove demand futility under the second prong of *Aronson*, that plaintiff *a fortiori* rebuts the business judgment rule for the purpose of surviving a motion to dismiss [breach of fiduciary duty claims] pursuant to Rule 12(b)(6)." *Ryan*, 918 A.2d at 357.

[26]    Thus, defendants' argument that the business judgment rule protects them is a non-starter.

"*unremitting* loyalty" to shareholders and all communications made by directors to their shareholders must be made with "*complete candor*." *Id.* at *10 (emphasis in original). As stated in *Tyson:*

> Loyalty. Good faith. Independence. Candor. These are words pregnant with obligation. The Supreme Court did not adorn them with half-hearted adjectives. Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor. It is against these standards, and in this spirit, that the alleged actions of spring-loading or backdating should be judged.

*Id.* at *10-*11.

The Complaint here details the backdating scheme at ePlus and how and why it violated defendants' fiduciary duties of good faith and loyalty. *See* §§I & II.[27]

### 1. Any Exculpatory Provision in ePlus' Certificate of Incorporation Does Not Shield Defendants from Liability Herein

Defendants attempt to avoid demand futility by arguing that the Certificate of Incorporation exempts defendants from liability for breaches of the duty of "care." Mem. at 37. Defendants' use of this document is improper and thus, should not be relied upon, as a complaint should not be dismissed based on an affirmative defense at the pleading stage. *Tower Air*, 416 F.3d at 238, 242; *Sanders*, 1999 Del. Ch. LEXIS 203, at *35. Even if the Court considers ePlus' Certificate, defendants are still liable because the exculpatory provision would not protect the defendants from breaches of duty of loyalty and good faith. A corporation may not exempt its directors from liability for violations of the duties of loyalty and good faith. Del. Code Ann. tit. 8, §102(b)(7) ("§102(b)(7)"). Accordingly, §102(b)(7) will support a motion to dismiss only where the sole conceivable basis of liability is a violation of the duty of care. *Emerald Partners v. Berlin*, 726 A.2d

---

[27]    Plaintiff has adequately alleged federal and state law violations such that his equitable claims for accounting, rescission and unjust enrichment are also properly before this Court.

1215, 1225-27 (Del. 1999).  As the Delaware Chancery Court recently discussed in *Ryan*, the misconduct that plaintiff has alleged, including, *inter alia*, backdating stock options and the dissemination of misleading and inaccurate information to shareholders and the public, indisputably implicates the duties of loyalty and good faith.  *See, e.g.*, 918 A.2d at 357; *Oberly*, 592 A.2d at 463 ("It is an ***act of disloyalty*** for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary."); *Malone*, 722 A.2d at 10-11 (same); *see also Jackson*, 741 A.2d at 389 (same).

Further, even assuming *arguendo*, that the nature of defendants' alleged breaches of duty are unclear, plaintiff's claims should not be dismissed pursuant to an exculpatory charter provision.  *See Emerald Partners*, 726 A.2d at 1223 (use of exculpatory provisions to shield directors from personal liability presents an affirmative defense not amenable for pre-trial disposition).

## C. Defendants' Backdating Scheme Wasted Corporate Assets

The backdating of stock options constitutes corporate waste.  Manipulating the strike price allows the recipient to pay the company less for the stock, and the company receives less money when the option is exercised.  This improper backdating confers a benefit upon the grant recipient without any corresponding consideration going to the company.  *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979) (holding that directors' receipt of stock options without consideration established a claim for corporate waste and that "[i]t is common sense that a transfer for no consideration amounts to a gift or waste of corporate assets").

As reasoned in *CNET*, "[t]he employee gets the incentive [*i.e.*, the backdated option] without doing anything to increase the company's value."  483 F. Supp. 2d at 956.  *See also Zoran*, 511 F. Supp. 2d at 1018-19 (upholding corporate waste allegations based on options backdating).  Moreover, Bowen, Mencarini, Norton and Parkhurst were permitted to use their insider information

concerning ePlus' true financial condition to sell their ePlus stock for a windfall of over $5 million.

¶143; *see also Michelson*, 407 A.2d at 217.

### D.    Plaintiff Has Adequately Pled a Claim for Unjust Enrichment and Restitution

A defendant is liable for unjust enrichment if he receives a benefit at another's expense. *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999).  The elements of unjust enrichment are: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy at law.  *Jackson Nat'l Life*, 741 A.2d at 393.  Thus, unjust enrichment is the "'unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"  *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1105 (Del. Ch. 2003), *aff'd*, 2004 Del. LEXIS 175 (Del. Apr. 14, 2004).

Plaintiff alleges that defendants received valuable compensation for approving manipulated stock options and false and misleading financial statements, the defendants received the direct benefit of the manipulated options and performance-based compensation tied to the falsely inflated performance of the Company, and the insider selling defendants achieved increased profits as a result of the manipulated options.  Thus the Complaint adequately alleges claims for unjust enrichment against defendants by alleging that, as a result of the stock option backdating scheme, defendants have unjustly received excessive compensation and stock option/insider trading proceeds at the expense of ePlus.  *Id*.; *see also Ryan*, 918 A.2d at 36 (refusing to dismiss unjust enrichment claim with nearly identical allegations); *Zoran*, 511 F. Supp. 2d at 1018-19 (denying motion to dismiss unjust enrichment claims).  Defendants' arguments should be rejected.

### E.    The Complaint's §304 Claim Is Actionable

In an effort to escape disgorgement of bonuses, incentives and other equity-based compensation, Norton and Mencarini contend that Sarbanes-Oxley §304 cannot be enforced against them by ePlus or plaintiff acting on behalf of ePlus.  They are wrong.

The starting point for any task of statutory construction is the statute's plain text.  *Schaffer v. Weast*, 546 U.S. 49 (2005).  And, the plain text of §304 sets forth a private remedy for a corporation (and by extension of Delaware law, to derivative plaintiffs) to recover illicitly-garnered profits from defalcating executives.  Section 304, in no uncertain terms, states that "the chief executive officer and chief financial officer of the issuer ***shall reimburse the issuer***" for any bonus or incentive-based compensation received in the 12 months following issuance of the false financial statements, and also for "any bonus or other incentive-based or equity-based compensation."  15 U.S.C. §7243(a).  By its terms, the statute by its terms mandates the CEO and CFO to pay, and their corporate employer correspondingly to collect, the specified benefits.  This clear private right of action under §304 has been recognized throughout the country.  *See, e.g.*, *In re AFC Enters.*, 224 F.R.D. 515 (N.D. Ga. 2004) (denying motion to dismiss aimed, in part, at a §304 claim brought derivatively on behalf of AFC Enterprises, Inc.); *Reina v. Tropical Sportswear Int'l*, No. 8:03-cv-1958-T-23TGW, 2005 U.S. Dist. LEXIS 6129 (M.D. Fla. Apr. 4, 2005) (denying motion to dismiss a complaint bringing a §304 claim); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130 (D. Colo. 2005) (acknowledging a private right of action under §304, but dismissing the §304 claim because the plaintiff was not the issuer or derivative litigant entitled to bring claims on the issuer's behalf).

Where the remedy is disgorgement back to the issuer, the only viable person or entity to seek recovery is the issuer itself or a shareholder of that issuer in a derivative context.  Indeed, §304 works a statutory codification of the remedy of disgorgement, intended to benefit issuers – a remedy that is equitable in nature.  *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1191-93 (9th Cir. 1998); *cf.*

*Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 699-707 (S.D. Tex. 2002) (discussing equitable remedies under securities laws and noting that remedies do not lose their equitable character when mandated by statute). Where equitable remedies are created in favor of an intended beneficiary, there is a presumption in favor of finding an implied private right of action when congressional intent is silent or otherwise ambiguous. *See First Pac. Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1125-26 (9th Cir. 2000). This Court should not assume that Congress by its silence "intended to strip away [the Court's] power to do equity." *Id. at* 1125.

## VII.  PLAINTIFF'S CLAIMS ARE NOT TIME-BARRED

On a motion to dismiss, it is defendants' burden to prove their affirmative defense that the case was brought too late. "A defendant raising the statute of limitations as an affirmative defense has the burden of proving that the action is time-barred." *In re Micron Techs., Inc. Sec. Litig.*, No. CV-06-085-S-BLW, 2007 U.S. Dist. LEXIS 12446, at *10-*11 (D. Idaho Feb. 21, 2007) (citing *Cal. Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995)); *Johnson v. Aljian*, 490 F.3d 778, 782 n.13 (9th Cir. 2007) (holding that statute of limitations is not an element of §10(b) claim that must be plead and proven by plaintiffs, but rather an affirmative defense for defendants to prove), *petition for cert. filed* (Dec. 7, 2007); *Zoran*, 511 F. Supp. 2d at 1013-14. "This has been described as an 'extremely difficult burden . . . .'" *Micron*, 2007 U.S. Dist. LEXIS 12446, at *11 (quoting *Nev. Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1307 (9th Cir. 1992)); *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 589-91 (Del. Ch. 2007) (tolling statute of limitations in spring loading case). Given the nature and extent of defendants' surreptitious backdating, defendants' burden here is ultimately insurmountable.

Moreover, defendants' statute of limitations defense here (as to both the federal and state claims) is unconvincing because plaintiff ***could not have been reasonably expected*** to figure out defendants' backdating scheme as it was occurring. *Ryan*, 918 A.2d at 360. This makes sense

because "[s]hareholders may be expected to exercise reasonable diligence with respect to their shares, but this diligence does not require a shareholder to conduct complicated statistical analysis in order to uncover alleged malfeasance." *Id*.; *Zoran*, 511 F. Supp. 2d at 1014 ("Outsiders like plaintiff did not have superpowers to detect secret backdating inside the company."). Indeed, shareholders "may rely on public filings and accept them as true, and need not assume that directors and officers will falsify such filings." *Ryan*, 918 A.2d at 360. Ignoring this obvious principle, defendants offer several misguided arguments claiming plaintiff's claims should fail as time-barred. Each of these arguments fail, and defendants' time-bar arguments should be rejected.

### A.    Plaintiff's §§10(b) and 14(a) Claims Are Timely[28]

Plaintiff's §14(a) has a three year statute of repose, and the §10(b) claim has a five year statute of repose. Contrary to defendants' suggestion, repose periods for violations of the federal securities laws begin to run when the ***last*** alleged misrepresentation was made. *Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 294-95 (9th Cir. 1996) (holding that the repose period for Rule 10b-5 "begins to run . . . when a person commits the act that gives rise to liability under that section"); *Durning v. Citibank, Int'l*, 990 F.2d 1133, 1136 (9th Cir. 1993); *accord In re Dynex Capital Sec. Litig.*, No. 05 Civ. 1897 (HB), 2006 U.S. Dist. LEXIS 4988, at *13 (S.D.N.Y. Feb. 10, 2006) ("In a case like this one, in which a series of fraudulent misrepresentations is alleged, this 'period of repose begins when the last alleged misrepresentation was made.'"); *Quaak v. Dexia, S.A.*, 357 F. Supp. 2d 330, 338 (D. Mass. 2005) ("Under Section 10(b), the statute of repose runs from the

---

[28]    Plaintiff does not belabor the point of addressing the statute of limitations (*i.e.*, inquiry notice) provisions of §§10(b) and 14(a) since, as detailed in the preceding section, courts – particularly those addressing the conduct of backdating – have held that a plaintiff is not on notice of the conduct, such that the statute begins to run, simply based on the fact that defendants may have disclosed the date of option grants or that a stock's price was public. *See* Mem. at 43. Accordingly, plaintiff addresses the repose issue, but notes that even if defendants' arguments as to repose are accepted by this Court, defendants do not dispute that the §10(b) claims after January 18, 2002 or the §14(a) claims after January 18, 2004, are timely. *See id*. at 43-44.

date of the last fraudulent misrepresentation . . . . Thus, the period of repose in this case was triggered on . . . the date of [the] last allegedly false financial statement."); *Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*, 192 F. Supp. 2d 852, 864 (N.D. Ill. 2002).[29]

Since the Complaint alleges a unified scheme of deceptive conduct whereby defendants secretly backdated stock options and the backdating of options caused ePlus' proxy statements filed with the SEC throughout the relevant period to be materially false and misleading, the statute of repose did not begin to run until the ***last*** of these deceptive statements. Defendants caused the Company to file the last allegedly false proxy statement on July 29, 2005, when defendants caused ePlus to file its 2005 Proxy Statement with the SEC. ¶90; RJN, Ex. 4 (2005 Proxy Statement). The last allegedly false Form 10-K, for fiscal year ended March 31, 2005, was filed on June 29, 2005. *See* RJN, Ex. 5 (2005 Form 10-K). As described below, the repose period begins to run at the time of ePlus' last statement in furtherance of the unified backdating scheme. As the 2005 Proxy Statement filed on July 29, 2005 was the last event in the scheme perpetuated by the defendants, it serves as the beginning date for the statute of repose pursuant to §§10(b) and 14(a). Consequently, plaintiff was required to file his Complaint by July 29, 2010 for §10(b) claims and July 29, 2008 for §14(a) claims. This action was filed on January 18, 2007 – years before either deadline. Accordingly, plaintiff's §10(b) (and also §20(a) and §304), as well as §14(a) claims were timely brought within the period of repose.

---

[29]     *See also Borden, Inc. v. Spoor Behrins Campbell & Young*, 778 F. Supp. 695, 699 (S.D.N.Y. 1991) (under previous statute of repose, plaintiff was required to initiate suit within three years of most recent violation); *In re Stone & Webster, Inc. Sec. Litig.*, No. 00-10874-RWZ, 2006 U.S. Dist. LEXIS 42061, at *7 (D. Mass. June 23, 2006) (holding that the "period of repose begins to run on the date that the fraudulent activity occurred, which in securities fraud cases is the date of the defendant's last fraudulent misstatement"); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506, at *19 (S.D.N.Y. Sept. 6, 2005) ("The period of repose [for a §10b claim] begins when the last alleged misrepresentation was made.").

Additionally, each defendant is subject to liability for the entirety of their scheme. This is because the backdating scheme perpetuated by ePlus comprises a single coherent episode, and thus satisfies the requirement that it be comprised of a continuous, integrated scheme operated by the same group of people over a period of time to achieve the same purposes. *Dynex*, 2006 U.S. Dist. LEXIS 4988, at *13; *Quaak*, 357 F. Supp. 2d at 338. Because defendants' last action in furtherance of the scheme falls within the repose period, ***none of the prior bad acts in furtherance of the integrated scheme are time-barred***.

Here, the Complaint explains how defendants filed false and misleading Forms 10-K and proxy statements with the SEC between 1997 and 2005. *See, e.g.*, ¶¶90-112. As alleged in the Complaint, defendants' scheme here consisted of the identical type of fraud perpetuated by the same group of individuals over an extended time frame, qualifying as a "continuous, integrated scheme[] . . . operated by the same group of people over a period of time to achieve the same purposes." *Zoran*, 511 F. Supp. 2d at 1014. Accordingly, plaintiff's action is timely.

Assuming, arguendo, that defendants' scheme was not a "continuous, integrated scheme" defendants' pre-repose wrongdoing can still form the basis of plaintiff's claims. As the *Zoran* court held, a plaintiff "may still refer to grants before [the beginning of the pertinent statute of limitation or repose] to establish that . . . management had a predisposition to engage in backdating." *Id.* at 1010. Moreover, the making of false statements to shareholders and other deceptive conduct outside the statute of repose period neither creates a license for defendants to continue their fraud without consequence into the actionable period, nor sanitizes defendants' actionable false and misleading statements. *See, e.g.*, *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 689 (S.D. Tex. 2002) (holding that time-barred fraudulent transactions may be used: (a) as evidence of an alleged scheme to defraud; and (b) to establish scienter during the actionable period); *Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2006 U.S. Dist. LEXIS 60858, at *26, *38 (N.D. Cal.

Aug. 14, 2006) (holding that where a complaint "alleges a persistent and deliberate scheme to use half truths," claims based on "violations [that] are alleged to have occurred" within the repose period will survive dismissal).

Thus, because plaintiff's claims describe defendants' continuous integrated scheme and are timely asserted, defendants' claims otherwise must be rejected.

### B.    Plaintiff's State Law Claims Are Not Time-Barred

The statute of limitations as to plaintiff's state law claims[30] is tolled due to defendants' fraudulent conduct.  Under Delaware law, the statute of limitations is tolled where defendants engage in "'fraud or concealment of the facts which would have disclosed'" the wrongdoing.  *Kahn v. Seaboard Corp.*, 625 A.2d 269, 276 (Del. Ch. 1993); *Ryan*, 918 A.2d at 359; *Zoran*, 511 F. Supp. 2d at 1019.  Under the doctrine of fraudulent concealment, plaintiffs "may toll the limitations period by specifically alleging that the facts were 'so hidden that a reasonable plaintiff could not have made timely discovery of an injury necessary to file a complaint.'"  *Ryan*, 918 A.2d at 359 (quoting *Smith v. McGee*, No. 2101-S, 2006 Del. Ch. LEXIS 187, at *8 (Del. Ch. Oct. 16, 2006)).  The "fraud" or "concealment" exception is "well defined," and fraudulent concealment tolls the statute of limitations when a defendant does "something affirmative" which "'prevents a plaintiff from gaining knowledge of the facts or ***some misrepresentation that is intended to put the plaintiff off the trail of inquiry***.'"  *Ryan*, 918 A.2d 359-60; *Halpern v. Barran*, 313 A.2d 139, 143 (Del. Ch. 1973).  Chancellor Chandler in *Ryan* noted the doctrine of fraudulent concealment applies when defendants have made false public representations regarding the compliance of the company's stock option plans.  918 A.2d at 359-60.

---

[30]    Delaware courts apply a three-year statute of limitations to shareholder derivative actions that begins to run at the time the alleged harmful act is committed, regardless of plaintiffs' knowledge of the act.  *Ryan*, 918 A.2d at 359-60; *Rudginski v. Pullella*, 378 A.2d 646 (Del. Super. Ct. 1977).

The Complaint is replete with sufficiently particularized allegations that the defendants fraudulently concealed facts which would have disclosed the backdating scheme. Here, just as in *Ryan*, the Complaint clearly and precisely explains that the defendants filed numerous documents with the SEC misrepresenting that they were acting in compliance with ePlus' Plans, by repeatedly claiming that option prices would always be at least 100% of fair stock value when in reality defendants were backdating stock option grants.

Thus, the Complaint clearly illustrates how defendants fraudulently concealed the backdating scheme. Indeed, there can be no serious dispute regarding defendants' fraudulent concealment designed to foreclose the necessity of any inquiry into their options practices. *See Ryan*, 918 A.2d at 360 (shareholders are not required "to conduct complicated statistical analysis in order to uncover alleged malfeasance"); *see also Halpern*, 313 A.2d at 143.

Moreover, as described elsewhere herein, defendants have effectively admitted that the representations they made to shareholders about their options grants were false, and they continued to make false statements in documents filed with the SEC until the 2005 Proxy Statement was filed. Defendants provided no indication of their backdating scheme until August 11, 2006, when ePlus announced the need to restate because of "incorrect accounting" for stock option awards. ¶3. ePlus and its shareholders relied on defendants' statements in annual filings regarding the propriety and details of their stock options practices – statements that were outright falsehoods designed to cover up massive self-dealing. Thus, the statute of limitations is tolled and defendants' motions to dismiss should be denied.

## VIII.  CONCLUSION

Based on the foregoing, defendants' motion to dismiss should be denied.  Should the Court

grant defendants' motion, plaintiff respectfully requests leave to amend the Complaint.

DATED:  December 21, 2007                    Respectfully submitted,

                                             CUNEO GILBERT & LaDUCA, LLP
                                             JONATHAN W. CUNEO (DC Bar # 939389)
                                             WILLIAM H. ANDERSON (DC Bar # 502380)


                                                  s/ WILLIAM H. ANDERSON
                                                 WILLIAM H. ANDERSON

                                             507 C Street, N.E.
                                             Washington, DC  20002
                                             Telephone:  202/789-3960
                                             202/789-0489 (fax)

                                             LAW OFFICES OF ROGER M. ADELMAN
                                             ROGER M. ADELMAN (DC Bar # 056358)
                                             1100 Connecticut Avenue, NW, Suite 730
                                             Washington, DC  20036
                                             Telephone:  202/822-0600
                                             202/822-6722 (fax)

                                             COUGHLIN STOIA GELLER
                                               RUDMAN & ROBBINS LLP
                                             TRAVIS E. DOWNS III
                                             KATHLEEN A. HERKENHOFF
                                             BENNY C. GOODMAN III
                                             MARY LYNNE CALKINS
                                             655 West Broadway, Suite 1900
                                             San Diego, CA  92101-3301
                                             Telephone:  619/231-1058
                                             619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
MONIQUE C. WINKLER
AELISH M. BAIG
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiff

S:\CasesSD\Eplus Derivative\BRF00048024.doc

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on December 21, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

      I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 21, 2007.

 s/ WILLIAM H. ANDERSON
WILLIAM H. ANDERSON

CUNEO GILBERT & LaDUCA, LLP
WILLIAM H. ANDERSON
507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-0489 (fax)

E-mail:wanderson@cuneolaw.com

# Mailing Information for a Case 1:07-cv-00144-RJL

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **William H. Anderson**
  wanderson@cuneolaw.com

- **Jonathan Watson Cuneo**
  jonc@cuneolaw.com

- **Jason J. Mendro**
  jmendro@gibsondunn.com

- **Francis Joseph Warin**
  fwarin@gibsondunn.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`