UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTOPHER DILORENZO, Derivatively on Behalf of EPLUS INC., | ) ) | Civil No. 07-CV-00144-RJL |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| PHILLIP G. NORTON, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| – and – | ) | |
| | ) | |
| EPLUS INC., a Delaware corporation, | ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) | |
| _____ | ) | |

PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED VERIFIED
SHAREHOLDER DERIVATIVE COMPLAINT

Pursuant to Federal Rule of Evidence 201, plaintiff hereby requests that the Court take judicial notice of public filings, true and correct copies of which are attached to this Request for Judicial Notice as Exhibits 1-5. Plaintiff submits these documents in support of his concurrently filed Opposition to Defendants' Motion to Dismiss the First Amended Verified Shareholder Derivative Complaint.

It is appropriate for the Court to take judicial notice of the public filings, attached hereto under Fed. R. Evid. 201, for those documents are public records referenced in the First Amended Verified Shareholder Derivative Complaint for Violations of the Federal Securities Laws and State Law Claims for Breach of Fiduciary Duty, Waste of Corporate Assets and Unjust Enrichment ("Complaint"). *See, e.g.*, *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003) (court may consider documents incorporated by reference in the complaint in ruling on a motion to dismiss); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986-87 (9th Cir. 1999) (court may consider public filings with the Securities and Exchange Commission ("SEC") in ruling on a motion to dismiss); *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994) (same); *In re Computer Scis. Corp. Derivative Litig.*, No. CV 06-05288 MRP (Ex), 2007 U.S. Dist. LEXIS 25414, at *23 n.5 (C.D. Cal. Mar. 26, 2007) (considering SEC filings in connection with ruling on motion to dismiss derivative claims arising out of stock option backdating). These documents are true and correct copies of public records filed with the SEC that are relevant to the Complaint and are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

In addition, plaintiff has attached for the Court's convenience as Exhibit 6 the opinion in *In re THQ, Inc. Derivative Litig.*, No. BC 357 600, Ruling on Demurrer (Cal. Super. Ct. – Los Angeles County Oct. 11, 2007).

For all the reasons stated herein, plaintiff respectfully requests that the Court take judicial notice of the publicly-filed documents attached hereto:

Exhibit 1:    ePlus Inc. Form 10-K for the fiscal year ended March 31, 2006, filed with the SEC on or about August 16, 2006;

Exhibit 2:    MLC Holdings, Inc. Form 10-K for the fiscal year ended March 31, 1998, filed with the SEC on or about June 29, 1998;

Exhibit 3:    ePlus Inc. Form 8-K dated December 4, 2007, filed with the SEC on or about December 4, 2007;

Exhibit 4:    ePlus Inc. Schedule 14A Proxy Statement dated August 8, 2005, filed with the SEC on or about July 29, 2005;

Exhibit 5:    ePlus Inc. Form 10-K for the fiscal year ended March 31, 2005, filed with the SEC on or about June 29, 2005; and

Exhibit 6:    *In re THQ, Inc. Derivative Litig.*, No. BC 357 600, Ruling on Demurrer (Cal. Super. Ct. – Los Angeles County Oct. 11, 2007).

DATED:  December 21, 2007          CUNEO GILBERT & LaDUCA, LLP
                                   JONATHAN W. CUNEO (DC Bar # 939389)
                                   WILLIAM H. ANDERSON (DC Bar # 502380)


                                        s/ WILLIAM H. ANDERSON
                                   WILLIAM H. ANDERSON

                                   507 C Street, N.E.
                                   Washington, DC  20002
                                   Telephone:  202/789-3960
                                   202/789-0489 (fax)

                                   LAW OFFICES OF ROGER M. ADELMAN
                                   ROGER M. ADELMAN (DC Bar # 056358)
                                   1100 Connecticut Avenue, NW, Suite 730
                                   Washington, DC  20036
                                   Telephone:  202/822-0600
                                   202/822-6722 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
TRAVIS E. DOWNS III
KATHLEEN A. HERKENHOFF
BENNY C. GOODMAN III
MARY LYNNE CALKINS
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
MONIQUE C. WINKLER
AELISH M. BAIG
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiff

S:\CasesSD\Eplus Derivative\REQ00048035_Judicial Notice.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 21, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 21, 2007.

s/ WILLIAM H. ANDERSON
WILLIAM H. ANDERSON

CUNEO GILBERT & LaDUCA, LLP
WILLIAM H. ANDERSON
507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-0489 (fax)
E-mail:wanderson@cuneolaw.com

## Mailing Information for a Case 1:07-cv-00144-RJL

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **William H. Anderson**
  wanderson@cuneolaw.com

- **Jonathan Watson Cuneo**
  jonc@cuneolaw.com

- **Jason J. Mendro**
  jmendro@gibsondunn.com

- **Francis Joseph Warin**
  fwarin@gibsondunn.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`

EXHIBIT 1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934
For the fiscal year ended **March 31, 2006**
OR
☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the transition period from ___ to ___.

Commission file number: <u>0-28926</u>

# *e*Plus inc.

(Exact name of registrant as specified in its charter)

<u>Delaware</u>                                                                                          <u>54-1817218</u>
(State or other jurisdiction of incorporation or organization)                    (I.R.S. Employer Identification No.)

<u>13595 Dulles Technology Drive, Herndon, VA 20171-3413</u>
(Address, including zip code, of principal offices)

Registrant's telephone number, including area code: <u>(703) 984-8400</u>

Securities registered pursuant to Section 12(b) of the Act:
Title of each class Name of each exchange on which registered
<u>None</u>

Securities registered pursuant to Section 12(g) of the Act:
<u>Common Stock, $.01 par value</u>

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934
during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days.
Yes ☐ No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will
not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-
K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer
and large accelerated filer"
in Rule 12b-2 of the Exchange Act (Check one):

Large accelerated filer ☐ Accelerated filer ☐ Non-accelerated filer ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐ No ☒

The aggregate market value of the common stock held by non-affiliates of *e*Plus, computed by reference to the closing price at which the stock was sold as of
September 30, 2005 was $59,854,541. The outstanding number of shares of common stock of *e*Plus as of July 31, 2007, was 8,231,741.

**DOCUMENTS INCORPORATED BY REFERENCE**

The following documents are incorporated by reference into the indicated parts of this Form 10-K:

None

Table of Contents

|                                                                      | Page |
|----------------------------------------------------------------------|------|
| Cautionary Language About Forward-Looking Statements                 | 2    |
| Explanatory Note                                                     | 3    |
| **Part I**                                                           |      |
| Item 1.          Business                                            | 12   |

| Item 1A. | Risk Factors | 21 |
| Item 1B. | Unresolved Staff Comments | 27 |
| Item 2. | Properties | 27 |
| Item 3. | Legal Proceedings | 29 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 30 |

**Part II**

| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 31 |
| Item 6. | Selected Financial Data | 33 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 38 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 63 |
| Item 8. | Financial Statements and Supplementary Data | 63 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 63 |
| Item 9A. | Controls and Procedures | 63 |
| Item 9B. | Other Information | 67 |

**Part III**

| Item 10. | Directors and Executive Officers of the Registrant | 68 |
| Item 11. | Executive Compensation | 71 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 74 |
| Item 13. | Certain Relationships and Related Transactions | 76 |
| Item 14. | Principal Accounting Fees and Services | 77 |

**Part IV**

| Item 15. | Exhibits and Financial Statement Schedules | 78 |

| Signatures | | 84 |

## CAUTIONARY LANGUAGE ABOUT FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains certain statements that are, or may be deemed to be, "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and are made in reliance upon the protections provided by such acts for forward-looking statements. Such statements are not based on historical fact, but are based upon numerous assumptions about future conditions that may not occur. Forward-looking statements are generally identifiable by use of forward-looking words such as "may," "will," "should," "intend," "estimate," "believe," "expect," "anticipate," "project," and similar expressions. Readers are cautioned not to place undue reliance on any forward-looking statements made by or on our behalf. Any such statement speaks only as of the date the statement was made. We do not undertake any obligation to publicly update or correct any forward-looking statements to reflect events or circumstances that subsequently occur, or of which we hereafter become aware. Actual events, transactions and results may materially differ from the anticipated events, transactions, or results described in such statements. Our ability to consummate such transactions and achieve such events or results is subject to certain risks and uncertainties. Such risks and uncertainties include, but are not limited to, the matters set forth below.

Although we have been offering information technology ("IT") financing since 1990 and direct marketing of IT products since 1997, our comprehensive set of solutions—the bundling of our direct IT sales, professional services, and financing with our proprietary software—has been available since 2002. Consequently, we may encounter some of the challenges, risks, difficulties, and uncertainties frequently faced by companies providing new and/or bundled solutions in an evolving market. Some of these challenges relate to our ability to:

- manage the diverse product set of rapidly-evolving solutions in highly-competitive markets;

- increase the total number of users of bundled services by cross-selling within our customer base and gain new customers;

- adapt to meet changes in markets and competitive developments;

- maintain and increase advanced professional services by retaining highly-skilled personnel and vendor certifications;

- integrate with external IT systems including those of our customers and vendors; and

- continue to update our software and technology to enhance the features and functionality of our products.

We cannot be certain that our business strategy will be successful or that we will successfully address these and other challenges, risks, and uncertainties. For a further list and description of various risks, relevant factors and uncertainties that could cause future results or events to differ materially from those expressed or implied in our forward-looking statements, see the "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" sections contained elsewhere in this document.

Table of Contents

## Explanatory Note

This Annual Report on Form 10-K contains the restatement of our Consolidated Balance Sheet as of March 31, 2005 and our Consolidated Statements of Operations, Stockholders' Equity and Cash Flows for each of the years ended March 31, 2005 and 2004, for each of the four quarters in the fiscal year ended March 31, 2005 and for the first three quarters in the fiscal year ended March 31, 2006 for the effects of errors in accounting for stock options and other items. See Note 2, "Restatement of Consolidated Financial Statements" to the Consolidated Financial Statements contained elsewhere in this document.

This Annual Report also presents the effects of the restatement on our Selected Consolidated Financial Data in Item 6, "Selected Financial Data" as of and for the years ended March 31, 2005, 2004, 2003 and 2002, and the amendment of "Management's Discussion and Analysis of Financial Condition and Results of Operations" presented in our Form 10-K for the fiscal year ended March 31, 2005 as it related to the fiscal years ended March 31, 2005 and 2004.

Management has determined that we did not maintain effective control over (1) the granting of stock options and the related recording and disclosure of share-based compensation expense under Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25"), and related

interpretations issued under the Financial Accounting Standards Board's ("FASB") statement on financial Accounting Standards ("SFAS") No. 123, "*Accounting for Stock-Based Compensation,*" as amended by SFAS No. 148, "*Accounting for Stock-Based Compensation — Transition and Disclosure,*" and (2) the proper classification of amounts on the Statements of Cash Flows. The control deficiencies identified constituted material weaknesses in internal control over financial reporting as of March 31, 2006. See Item 9A, "Controls and Procedures," for a description of these material weaknesses.

**Stock Option Accounting Restatement**

*Background*

As previously disclosed, our Chief Executive Officer ("CEO") received a letter, dated June 20, 2006, from a stockholder raising concerns about 450,000 options awarded in 2004 to our four senior officers ("2004 Options"). On June 21, 2006, our CEO forwarded the letter to the Chairman of the Audit Committee. On June 23, 2006, the Audit Committee commenced a voluntary investigation (the "Audit Committee Investigation" or "Investigation") of the issues raised concerning the 2004 Options. Subsequently, the Audit Committee Investigation was expanded to cover all of our stock option grants since our initial public offering ("IPO") in 1996 through August 10, 2006 (the "Relevant Period"), and the historical practices related to stock option grants. The Audit Committee retained independent legal counsel, who in turn retained forensic accountants, to assist in the Investigation.

With the assistance of independent counsel, the Audit Committee obtained and reviewed corporate books and records relating to option grants since our IPO, including relevant stock option plans, option agreements, minutes and written consents of our Board of Directors ("Board") and Compensation Committee, relevant public filings and other available documentation. In addition, independent counsel for the Audit Committee reviewed a large volume of potentially relevant emails and electronic documents and interviewed 28 individuals, many on multiple occasions. The Audit Committee's independent counsel developed an exhaustive search term list, which was applied to electronic data retrieved. Approximately 79 gigabytes of electronic data was located and reviewed. The Audit Committee met frequently throughout the course of its Investigation.

On August 11, 2006, we filed a Form 8-K which disclosed that based on its review and assessment, the Audit Committee preliminarily concluded that the appropriate measurement dates for determining the accounting treatment for certain stock options we granted differ from the recorded measurement dates used in preparing our Consolidated Financial Statements. The Audit Committee determined that certain stock option grants or modifications of the stock option grants that were not in accordance with our stock-based compensation plans should have been accounted for using variable plan accounting for the duration of the options. As a result, non-cash stock-based compensation expense should have been recorded with respect to these stock option grants. Accordingly, it was further disclosed that we would restate our previously issued financial statements for the fiscal years ended March 31, 2004 and 2005, as well as previously reported interim financial information, to reflect additional non-cash charges for stock-based compensation expense and the related tax effects in certain reported periods. We further disclosed that for the above-stated reasons, certain of our prior financial statements and the related reports from our independent registered public accountants, earnings statements and press releases, and similar communications issued by us should no longer be relied upon.

*Summary of the Restatement*

As stated above, through our fiscal year ended March 31, 2006, we accounted for share-based compensation granted under our stock option plans using the recognition and measurement provisions of APB 25 and related interpretations and follow the disclosure requirements under SFAS No. 123. Under APB 25, a company was not required to recognize compensation expense for stock options issued to employees if the exercise price of the stock options was at least equal to the quoted market price of the company's common stock on the "measurement date." APB 25 defined the measurement date as the first date on which both the number of shares an individual employee was entitled to receive and the option or purchase price, if any, were known.

The restatement in this Form 10-K principally reflects additional non-cash stock-based compensation expense and related tax effects under APB 25 and related interpretations, our historical accounting method, relating to our historic stock option practices. The total impact of the restatement, net of tax effects, through March 31, 2005, was $3.6 million.

As a result of the Audit Committee Investigation, the Audit Committee determined that:

- subsequent to July 1998, the Stock Incentive Committee ("SIC") was not formally approved to administer the stock option plans. Nonetheless, the SIC continued to grant stock options as disclosed in the proxy statements. We intend to honor the awards made to employees by the SIC;

- the 2004 Options, which were the initial subject of the Audit Committee Investigation, were effectively awarded (i.e., all necessary granting actions were completed) by the Compensation Committee in April 2004. The Compensation Committee, believing that the options had not been effectively awarded in April 2004, approved a new award of the same options in November 2004, at the then fair market value of the stock, which was lower than the April value. Because the original award of options was determined to be effective in April 2004, the November 2004 approval constituted a modification of the earlier awards to provide for a lower exercise price. Such modification was not in accordance with the governing stock option plan. As described elsewhere herein, these options have been cancelled. Because the awards were determined to be originally approved and granted as of April 2004, the Forms 4 filed by our four senior officers with respect to these options and the Form 8-K filed by us inaccurately describe the options. Moreover, the Forms 4 were not timely filed;

- on one occasion in 1997, two occasions in 1998, and in each of the quarters from late 2000 to early 2003 in which options were granted, the date and exercise price of certain stock options were determined with hindsight to provide a more favorable exercise price for such grants. These options were priced at the lowest closing price during the prior quarter, and not, as required by the applicable stock option plans, at the closing price on the date the options were actually awarded. Recipients of such quarterly low priced options included employees, management and directors. Two members of management, who were not involved in the accounting function, as well as our then head of Human Resources, were involved in implementing this practice;

- certain grants to non-employee directors were not made on the dates specified by the then-applicable stock option plans;

- the measurement date we used for accounting purposes for certain stock option grants was not accurate because all the required granting actions were not completed as of the original grant date. In addition, for several option grants, the accounting consequences of modifications to the original awards, or the presence of employee performance criteria, were not properly applied;

- our internal controls, system of reporting, application of accounting principles generally accepted in the United States ("U.S. GAAP") and documentation with respect to option awards were inadequate. See Item 9A, "Controls and Procedures;" and

- there was no evidence of falsified corporate records of meetings, consents or "phantom" options. Nor was there any evidence of the destruction of documents.

The Audit Committee investigated all of our internal review documentation contained in the video and documented in our stock option grants. We concluded that we (1) used incorrect measurement dates for the accounting of certain stock options, (2) had not properly accounted for certain modifications of stock options, and (3) had incorrectly accounted for certain stock options that required the application of the variable accounting method.

We performed a review of the treatment of stock option grants as part of our internal review referred to above for financial reporting purposes. Based on the individual facts and circumstances, we concluded that the exercise price for a number of option grants during the Relevant Period were below the fair market value of our common stock on the revised measurement date of the grant. This resulted from certain option grant dates having been established prior to the completion of all the final granting actions necessary for those grants. In some cases, the exercise price and date of the grant was determined with hindsight to provide a more favorable exercise price for such grants at quarterly or monthly low stock prices. The grants in question included grants made to newly hired employees, annual director grants, grants made to employees in connection with certain acquisitions, and discretionary grants made to officers, non-employee and employee directors, and rank and file employees. Applying the revised measurement dates to the impacted stock option grants resulted in a stock-based compensation charge if the fair market value of our common stock as of the revised measurement date exceeded the exercise price of the option grant, in accordance with APB 25.

We determined revised measurement dates for those option grants with incorrect measurement dates and recorded stock-based compensation expense to the extent that the fair market value of our stock on the revised measurement date exceeded the exercise price of the stock option, in accordance with APB 25 and related FASB interpretations. As such, we recorded stock-based compensation expense in our historical financial statements through March 31, 2005 totalling $5.2 million, as well as the tax-related impact resulting from the stock-based compensation adjustments of $1.6 million. Additionally, we restated both basic and diluted weighted average shares outstanding for changes in measurement dates resulting from the Investigation. The combination of recording stock-based compensation expense and restating our weighted average shares outstanding has resulted in restated basic and diluted earnings per share ("EPS").

We adopted a methodology for determining the most likely appropriate accounting measurement dates for all stock option grants. We reviewed all available documentation and considered all facts and circumstances for each award and attempted to identify the date at which the award was most likely authorized and approved and the recipient, number of shares and price were approved and determined with finality. As such, we adopted the following framework for determining the revised historical measurement dates of our employee stock option grants and have applied this framework based on the facts, circumstances and availability of the documentation for each grant.

*Step 1*

We reviewed, as available, the documents noted below for sufficient evidence that the approval and terms of the stock options were determined with finality:

1. Board meeting minutes, resolutions and written consent actions;
2. Compensation Committee and SIC meeting minutes and resolutions;

Table of Contents

3. offer letters signed by an authorized approver and the recipient and stating the number of shares and exercise price;
4. internal communications from an authorized approver stating the recipient, number of shares and exercise price;
5. executed acquisition agreements stating the number of shares and the option price;
6. historical stock prices as reflected on Nasdaq to determine when stock price based performance vesting occurred;
7. public filings as they relate to awards granted in connection with the IPO; and
8. all stock option plans in place over the Relevant Period.

We reviewed minutes, consents, resolutions, offer letters and other corporate records for the purpose of validating their accuracy, and at no time determined that any of the records were altered or appeared to have not occurred as recorded. While we considered the above documents in order, all documents and all facts and circumstances were considered when determining the revised measurement date. Measurement dates for approximately 52.3% of the total number of grants made during the Relevant Period were determined based on the documentation listed in Step 1 above. In instances where the above documentation was not available or provided ambiguous information, we proceeded to Step 2.

*Step 2*

If after review of the available documents as listed in Step 1, there was insufficient documentation to select the date at which the recipient, number of shares and price were determined with finality, we attempted to select the most likely date at which the terms were determined with finality. In considering the most likely date, we considered all available documentation and all facts and circumstances.

In addition to the documents listed in Step 1, we examined the following documents:

1. all internal and external communications including emails, offer letters, memos, faxes, letters and handwritten notes;
2. acquisition agreements that do not contain recipients, exercise price and number of shares;
3. outside stock option administrator transaction data (e.g. data from First Union, Wachovia, or AST Equity Plan Solutions ("AST"));
4. management practice regarding the annual non-employee director grants; and
5. stock option agreements hand dated or not hand dated.

In conjunction with all available documentation, we considered the following facts and circumstances:

1. our stock option granting practices;
2. acquisition dates;
3. new hires start dates;
4. effective dates of non-employee director appointments to the Board;
5. our stock performance; and
6. all other available information.

Selecting the date at which the most likely granting actions occurred with finality required a significant amount of judgment. While we considered all the documents and facts in the order noted above, the level of reliance on each type of document depended on the facts and circumstances surrounding each award. In some instances, we grouped awards based on similar characteristics and similar underlying facts and circumstances. In these instances, we treated all of the grouped awards in a uniform manner. Measurement dates for approximately 40.1% of the total number of grants made during the Relevant Period were determined based on the documentation listed in Step 2 above.

*Step 3*

If there was insufficient evidence, after reviewing all available documentation and all facts and circumstances listed in Step 1 and Step 2, to select a specific date at which the recipient, number of shares and price were approved and determined with finality, we used the earliest of the dates below. We believe that the required granting actions would have occurred with finality 'no later than' at each of the following dates:

6

*Table of Contents*

1. stock option agreement signed by a member of the SIC and hand dated by the optionee unless other facts and circumstances exist that present ambiguity as to the accuracy of the hand date;
2. the legible 'run date' of the stock option administrator report; and
3. subsequent Form 10-Q or 10-K filing date. As of this date and pursuant to our stock option granting process, an authorized approver would have approved the awards which would have resulted in the administration of the awards to include input into the stock option administration software. Quarterly reports were run from the stock option administration software and reconciled to the general ledger and the stock registrar's reports and the EPS calculation. This reconciliation resulted in the stock-based compensation and the EPS disclosures, which included the awarded shares as filed in the Form 10-Q or Form 10-K.

Measurement dates for approximately 7.6% of the total number of grants made during the Relevant Period were determined based on the documentation listed in Step 3 above.

We also determined that we should have recorded stock-based compensation expense associated with the modification of certain stock option grants which resulted in the application of variable accounting under FASB Interpretation No. 44, "*Accounting for Certain Transactions Involving Stock Compensation*" ("FIN 44"). The modified grants included certain grants made to newly hired employees, annual director grants, grants made to employees in connection with an acquisition, and discretionary grants made to officers, employee directors, and rank and file employees. For these grants, documentation exists that supports the completion of all the final granting actions necessary for an original grant and measurement date. However, certain of the the terms of the awards were subsequently modified.

*Income and Payroll Tax Related Matters*

In certain instances where a revised measurement date was applied to those stock options classified as incentive stock options ("ISO"), in accordance with United States tax rules it had the effect of disqualifying the ISO tax treatment of those stock options, causing those stock options to be recharacterized as non-qualified options. For purposes of assessing the tax impact of the accounting change, we concluded that the grant date for tax purposes is the same as the measurement date for financial reporting purposes. The recharacterization of the ISOs to non-qualified status resulted in a failure to withhold certain employee payroll taxes and consequently we have recorded an adjustment to salaries and benefits, along with an adjustment for penalties, based on the period of exercise. In subsequent periods in which the liabilities were legally extinguished due to statutes of limitations, the payroll taxes and penalties were reversed, and recognized as a reduction in the related functional expense category in our consolidated statements of operations. The fluctuations in the table below for payroll taxes and related penalties are the result of (1) the timing of stock option exercises, and (2) the reversals of expenses previously recorded due to the expiration of these statutes of limitations.

In addition, we have recorded a net income tax benefit of approximately $2.0 million in connection with the stock-based compensation related expense during the period from fiscal years 1997 to 2005. This tax benefit has resulted in an increase of our deferred tax assets for all affected stock options prior to the exercise or cancellation of the related options. Upon exercise or cancellation of the underlying options, the excess or deficiency in deferred tax assets is written-off to either expense or additional paid-in capital in the period of exercise or cancellation.

The table below under "Summary of Impact of Restatement Adjustments for Historical Option Grants" shows income tax benefits recorded in relation to the non-cash stock-based compensation adjustments.

**Restatement Adjustments for Historical Option Grants**

With the completion of the Audit Committee Investigation, previously discussed, we determined that errors had occurred in the accounting for share-based compensation. Specifically, we determined that 661 of the total 759 individual grants made from our IPO through August 10, 2006 used incorrect measurement dates or were modified in such a way as to cause variable plan accounting. We recorded pre-tax compensation expense of $5.2 million in the aggregate over the fiscal years March 31, 1997 through March 31, 2005, as presented in the table below:

*Summary of Impact of Restatement Adjustments for Historical Option Grants*

| Fiscal Year | Share-Based Compensation Expense | | Payroll Tax Due On Options | | Payroll Withholding Tax Penalty On Exercises | | Income Tax Provision (Benefit) Related to Share-Based Compensation and Payroll Taxes | | Total Adjustments, Net of Tax | |
|---|---|---|---|---|---|---|---|---|---|---|
| *(in thousands)* | | | | | | | | | | |
| 1997 | $ | 81 | $ | - | $ | - | $ | (31) | $ | 50 |
| 1998 | | 137 | | - | | - | | (53) | | 84 |
| 1999 | | 149 | | - | | - | | (57) | | 92 |
| 2000 | | 962 | | 568 | | 121 | | (564) | | 1,087 |
| 2001 | | 990 | | 57 | | 12 | | (364) | | 695 |
| 2002 | | 1,602 | | - | | - | | (622) | | 980 |
| 2003 | | 465 | | 34 | | 8 | | (138) | | 369 |
| Cumulative effect on April 1,2003 opening retained earnings | | 4,386 | | 659 | | 141 | | (1,829) | | 3,357 |
| 2004 | | 810 | | 213 | | 48 | | (409) | | 662 |
| 2005 | | (20) | | (503) | | (104) | | 209 | | (418) |
| **Total** | $ | **5,176** | $ | **369** | $ | **85** | $ | **(2,029)** | $ | **3,601** |

See Note 2, "Restatement of Consolidated Financial Statements," to our Consolidated Financial Statements for a detailed summary of adjustments.

Of the gross $5.2 million of incremental compensation expense for fiscal years 1997 through 2005, approximately $3.8 million was related to options granted to employees who were neither our executive officers nor our directors at the time the grants were made and approximately $1.4 million related to various options granted to individuals who were our executive officers or directors at the time the grants were made.

**Our Process for Granting Stock Options**

7

*Table of Contents*

Beginning in 1996, two employee directors, Bruce Bowen and Phillip G. Norton, began awarding options to employees under the authority of the SIC as prescribed by the provisions of our then current stock compensation plans (in its original form and as amended, collectively, the "1996 Plans").

Under the terms of the 1996 Plans, a majority of the members of the SIC was required to approve each stock option grant. In practice, Mr. Bowen and Mr. Norton discussed each stock option award prior to instructing the human resources manger to administer the awards. Accordingly, for purposes of selecting revised measurement dates, we considered documentation demonstrating approval by either Mr. Bowen or Mr. Norton as sufficient evidence of approval during the Relevant Period.

Under the terms of our 1998 Long Term Incentive Plan (the "LTIP"), the Compensation Committee was required to approve any awards. In practice, however, the SIC continued to administer the awards under our current stock compensation plan, the Amended and Restated 1998 Long Term Incentive Plan (the "Amended LTIP," and together with the LTIP, the "1998 Plans"). The LTIP and Amended LTIP permit a delegation of authority to one or more employee-directors to issue options in certain cases. While we have been unable to locate a document such as Board minutes or a unanimous written consent reflecting a delegation of such authority, our public disclosures provided that the SIC was authorized to award stock, and various stock options and rights and other stock-based compensation grants under the 1998 Plans.

Even if the SIC did not have actual authority to grant awards, we have historically honored and intend to continue to honor the stock options. Moreover, since (1) the SIC was comprised of two employee directors, who could have been given delegated authority pursuant to the amended terms of the LTIP, (2) the directors were our two top executives, (3) we actually administered the stock options, (4) we instructed our transfer agent to issue the stock options, (5) our proxy statement stated that the SIC had authority, and (6) the employees were able to exercise the stock options, we believe that the SIC had the implicit authority to grant stock option awards.

The SIC met on an ad hoc basis to determine to which employees to grant stock options. In addition to one occasion in which all employees were awarded options, the SIC considered awarding options to (1) employees of companies we acquired in order to enhance employee retention, (2) key *e*Plus employees in order to provide incentives and enhance retention, and (3) new employees in connection with their hiring.

*Administration and Tracking of Stock Options*

Historically, our human resources manager prepared the stock option agreements and either administered the stock options internally or communicated with outside stock option administrators who maintained the detail records of outstanding stock options. Our human resources manager was primarily responsible for retrieving the executed agreements from the employees.

Our human resources manager would receive instruction from Mr. Bowen or Mr. Norton for all grants prior to entering them in our internal stock option system or communicating with outside stock option administrators, as applicable. For those awards that required Board or Compensation Committee approval, such as options granted to the SIC members, Mr. Bowen or Mr. Norton usually provided the applicable Board or Compensation Committee minutes to our human resources manager.

The stock options were tracked on a spreadsheet administered by the accounting department for the period from our IPO in 1996 through 1997. In late 1997 to early 1998, we licensed stock option administration software ("SOA Software") that was used internally by our human resources manager to enter and track all the stock option information. This software was used through April 2000.

In April of 2000, we solicited the services of First Union to process the stock option administration externally. First Union utilized the same SOA Software to maintain the stock option data. The stock option files from our SOA Software were exported and sent to First Union in May of 2000 to upload into their system. Our human resources manager sent the stock option update information to First Union primarily by email, but sometimes by fax and on occasion by phone. The data sent to First Union, usually no less than quarterly, consisted of any stock options that were granted, employee terminations and employee address changes. First Union eventually merged with Wachovia. Effective June 30, 2006, the shareholder services business at Wachovia was purchased by AST.

8

*Table of Contents*

*Types of Awards*

*Annual Non-Employee Director Grants*

These are grants relating to the annual awards made to non-employee directors in the Relevant Period. The stock option awards to outside directors were provided for as automatic grants under the terms of the 1996 Plans and the 1998 Plans. The administration of awards to outside directors was not consistently performed in accordance with the provisions of the applicable plans until 2003. The 1996 Plans provided that stock option grants were to be awarded on the anniversary date of a director's admission to the Board. This provision changed in the 1998 Plans to provide for the stock option grants to be awarded on the date following the annual stockholder meeting. A certain number of the awards issued after the change in the provision in the stock plans were administered after the change in the stock option plan as if the appropriate grant date was the anniversary date of our IPO, November 20. In addition, certain awards were issued on the director's new appointment anniversary date or the date following the annual stockholders meeting.

Until 2003, management believed that the annual awards should be given on the anniversary of the IPO, November 20. We believe this thought process came about because the initial two directors were appointed as of the IPO date, November 20, 1996. Consequently, for two years, management awarded the options appropriately on November 20 which was also the anniversary of the IPO. This process was correct for the initial two directors until the adoption of the 1998 Plans which provided for the options to be granted the day after the annual meeting. However, under the 1996 Plans, as other directors were appointed, management continued to grant the awards on the IPO anniversary even though the plan required that they be granted on the anniversary of the director's appointment. For purposes of determining the revised measurement date for the awards incorrectly issued at the IPO anniversary date instead of the day after the annual meeting, we selected the approach of relying on the process in which management believed was correct, which was the IPO anniversary date, as that was the genesis of the granting action for options granted prior to 2003. Beginning in 2003, management began processing the annual grants on the day after the annual meeting pursuant to the 1998 Plans.

*Acquisition Grants*

These are grants relating to options awarded to new employees who joined us by way of an acquisition. These options were not replacement options for options that existed prior to the acquisition. In our acquisitions prior to 2002, often times, the prior owners of the selling company would negotiate employment benefits for their key employees to induce them to stay during the acquisition. Many times, stock options were negotiated prior to acquisition and the specific optionees and number of shares awarded to each optionee were documented in a letter of intent or other documentation created during the acquisition process. In some cases, the request was brought before the Compensation Committee to be voted upon in conjunction with the overall presentation of the acquisition opportunity.

For purposes of the restatement, we grouped acquisition-type grants together and applied the earliest date on which the recipients, number of shares and exercise price were approved with finality for the entire tranche as the 'no later than' date on which the recipients, number of shares and exercise price were approved with finality for the entire tranche. Therefore, we believe that the earliest handwritten signature date of a stock option agreement in a tranche represents a reliable level of evidence for the entire tranche on which to base the revised measurement date. In cases when there was a spread of dates between the stock option agreement handwritten signature dates by recipients, we believe that, because of the characteristics of the acquisition-type grants and the process by which we administer the grants, the reliability of the earliest handwritten signature date is not diminished.

There are instances in which an incorrect measurement date had been used for the accounting of certain of these grants as not all of the required granting actions had been completed as of the original grant date or as the stock option administration did not occur consistent with the underlying documentation.

Table of Contents

*New Hire Grants*

These are grants relating to options awarded to new employees who did not join us as a result of an acquisition. Candidates for hire received an offer letter, which contained, among other things, the candidate's name, title of the position, tentative start date, salary and information regarding a grant of stock options, if any. Most offer letters contained the number of options to be granted but did not specify when the options would be granted or the price of the options. There are several instances, occurring in 2001, in which the offer letter specifies that the strike price will be set for the lowest closing price between the date of hire and the end of the quarter.

Prior to March 2003, some offer letters were signed by executives of the subsidiary whom did not have the authority to grant stock options. In these instances, the subsidiary executives contacted either Mr. Bowen or Mr. Norton, primarily by phone, in order to obtain approval to grant the options. Once approval was obtained, Mr. Bowen or Mr. Norton would instruct our human resources manager to issue the awards.

There are instances in which an incorrect measurement date had been used for the accounting of certain of these grants as not all of the required granting actions had been completed as of the original grant date or as the stock option administration did not occur consistent with the underlying documentation. As such, we applied our three-step methodology, as described above, to determine the most likely appropriate accounting measurement dates for the stock option grants.

*Discretionary Grants*

These grants include all other stock option awards not otherwise included in the director, acquisition or new hire grants. Discretionary grants were awarded to employee directors, non-employee directors, officers, and rank-and-file employees. Discretionary awards were communicated to our human resources manager through the Board or Compensation Committee minutes or a member of the SIC.

Employee Directors (SIC Members). On three occasions, other than the IPO awards, discretionary grants were made to the members of the SIC, Mr. Norton and Mr. Bowen. Members of the SIC did not have the authority to grant options to themselves. Mr. Norton and Mr. Bowen would work with the Board or Compensation Committee and would receive written approval in the form of a memo or meeting minutes.

Non-Employee Directors, Officers and Rank-and-File Employees. The specific facts and circumstances surrounding these discretionary awards vary from grant to grant. We did not have a written policy other than the plans regarding the issuance and administration of stock option awards and, due to the lack of contemporaneous documentation, we are unable to definitively state the specific policies and practices surrounding these awards. We believe the common practice was to obtain an authorized approval from the Board, the Compensation Committee or the SIC members. Once approval was obtained and the number of shares and price were determined, Mr. Bowen or Mr. Norton would communicate the information to our human resources manager who would administer the award.

There are instances in which an incorrect measurement date had been used for the accounting of certain of these grants as not all of the required granting actions had been completed as of the original grant date or as the stock option administration did not occur consistent with the underlying documentation. As such, we applied our three-step methodology, as described above, to determine the most likely appropriate accounting measurement dates for the stock option grants.

**Additional Information**

Note 2, "Restatement of Consolidated Financial Statements" of the Notes to Consolidated Financial Statements in this Form 10-K sets forth the impact under APB 25 of recognizing additional stock-based compensation expense and related tax effects as a result of historic stock option practices.

Because determining the revised measurement date is subjective and uncertain, we performed a sensitivity analysis to determine the impact of using alternate revised measurement dates for grants for which determining the appropriate measurement date involved significant judgment. See "—Management's Discussion and Analysis of Financial Condition and Results of Operations — Critical Accounting Policies," presented in Item 7 of this Form 10-K, for information regarding the incremental stock-based compensation expense that would result from using alternate measurement date determination methodologies. See Item 1A, "Risk Factors" for a discussion of certain risk factors related to our historic stock option practices

Table of Contents

On May 11, 2007, we entered into separate stock option cancellation agreements with our four senior officers pursuant to which the four senior officers agreed to the cancellation of their respective 2004 Options. Cancellation of the 2004 Options will result in an acceleration of the associated compensation expense. As a result, we will record non-cash stock-based compensation expense in the quarter ended June 30, 2007 of approximately $1.5 million for these cancellations.

**Summary of the Restatement — Other Items**

In addition to the stock option errors described above, we have also restated our Consolidated Balance Sheet as of March 31, 2005 and our Consolidated Statements of Cash Flows for the years ended March 31, 2005 and 2004 for the following reasons:

We use floor planning agreements for dealer financing of products purchased from distributors and resold to end-users. Historically, we classified the cash flows from our floor plan financing arrangements in operating activities in our Consolidated Statements of Cash Flows. We previously treated the floor plan facility as an outsourced accounts payable function and, therefore, considered the payments made by our floor plan facility as cash paid to suppliers under Financial Accounting Standards No. 95, "*Statement of Cash Flows*."

We have now determined that when an unaffiliated finance company remits payments to our suppliers on our behalf, we should show this transaction as a financing cash inflow and an operating cash outflow. In addition, when we repay the financing company, we should present this transaction as a financing cash outflow. As a result, we have restated the accompanying fiscal years 2005 and 2004 Consolidated Financial Statements to correct this error.

The restatement also resulted in a reclassification from our Consolidated Balance Sheets for the accounts payable related to floor plan financing agreements which had previously been included in accounts payable—trade.

Also, payments made by our lessees directly to third-party, non-recourse lenders were previously reported on our Consolidated Statements of Cash Flows as repayments of non-recourse debt in the financing section and a decrease in our investment in leases and leased equipment—net in the operating section. As these payments were not received or disbursed by us, management determined that these amounts should not be shown as cash used in financing activities and cash provided by operating activities on our Consolidated Statements of Cash Flows. Rather, these payments are now disclosed as a non-cash financing activity on our Consolidated Statements of Cash Flows.

In addition, certain corrections were made for errors noted on our Consolidated Statements of Cash Flows between the line items reserves for credit losses and changes in accounts receivable, both of which are in the operating section. See the impact of corrections in Note 2, "Restatement of Consolidated Financial Statements" to our Consolidated Financial Statements contained elsewhere in this document.

**Prior Reports**

All financial information contained in this Annual Report on Form 10-K gives effect to the restatements of our Consolidated Financial Statements as described above. We have not amended, and we do not intend to amend, our previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for each of the fiscal years and fiscal quarters of 1997 through 2005. Financial information included in reports that we previously filed or furnished for the periods from April 1, 1996 through March 31, 2005 should not be relied upon and are superseded by the information in this Annual Report on Form 10-K.

11

---

*Table of Contents*

**PART I**

**ITEM 1.  BUSINESS**

**_e_Plus inc. CORPORATE STRUCTURE**

_e_Plus inc. ("_e_Plus" or "we"), a Delaware corporation, was formed in 1996. We changed our name from MLC Holdings, Inc. to _e_Plus inc. on October 19, 1999. We engage in no other business other than serving as the parent holding company for the following companies:

- _e_Plus Group, inc.;

- _e_Plus Technology, inc.;

- _e_Plus Government, inc.;

- _e_Managed Solutions, inc.;

- _e_Plus Canada Company;

- _e_Plus Capital, inc.;

- _e_Plus Systems, inc.;

- _e_Plus Content Services, inc.;

- _e_Plus Document Systems, inc.;

- _e_Plus Information Holdings, inc.;

- _e_Plus Government Services, inc.;

- _e_Plus Jamaica, inc.; and

- _e_Plus Iceland, inc.

On March 31, 2003, the former entities _e_Plus Technology of PA, inc. and _e_Plus Technology of NC, inc. were merged into _e_Plus Technology, inc. This combination created one national entity through which our IT reseller and technical support conducts business. _e_Plus Systems, inc. and _e_Plus Content Services, inc. were incorporated on May 15, 2001 and are the entities that hold certain assets and liabilities originally acquired from ProcureNet, Inc. _e_Plus Capital, inc. owns 100 percent of _e_Plus Canada Company, which was created on December 27, 2001 to transact business within Canada. _e_Plus Government, inc. was incorporated on September 17, 1997 to handle business servicing the Federal government marketplace, which includes financing transactions that are generated through government contractors. _e_Plus Document Systems, inc. was incorporated on October 15, 2003 and is the entity that holds certain assets and liabilities originally acquired from Digital Paper Corporation. On January 6, 2004, _e_Plus Information Holdings, inc. was incorporated; however, to date, the entity has conducted no business and has no employees or business locations. In October 2005, the stock of _e_Plus Information Holdings was reissued to _e_Plus Technology, inc. On April 2, 2004, _e_Plus Government Services, inc. was incorporated; however, to date, the entity has conducted no business and has no employees or business locations.

_e_Plus Jamaica, inc. was incorporated on April 8, 2005 and _e_Plus Iceland, inc. was incorporated on August 10, 2005. Both companies are subsidiaries of _e_Plus Group, inc. and were created to transact business in their respective country; however, neither entity has conducted any significant business, or has any employees or business locations outside the United States.

12

---

*Table of Contents*

**ACQUISITIONS**

We have acquired the following material entities or assets since 2002. The following is a summary of the acquisitions, presented in chronological order.

| Date Acquired | Acquisition | Major Business Locations | Accounting Method | Consideration |
| --- | --- | --- | --- | --- |

| May 28, 2004 | Certain assets and liabilities from Manchester Technologies, Inc. (merged into ePlus Technology, inc. upon acquisition; subsequently moved the consulting group to ePlus Systems, inc.) | Metro New York, South Florida and Baltimore, MD | Purchase | $5,000,000 in cash and assumptions of certain liabilities |
| October 10, 2003 | Certain assets and liabilities from Digital Paper Corporation | Herndon, VA | Purchase | $1,601,632 in cash plus the assumption of certain liabilities |
| March 29, 2002 | Certain assets and liabilities from Elcom International, Inc.'s IT fulfillment and professional service business (merged into ePlus Technology, inc. upon acquisition) | Boston, MA, Philadelphia, PA, San Diego, CA and New York, NY | Purchase | $2,150,000 in cash plus the assumption of certain liabilities |

## OUR BUSINESS

We have evolved our product set by intermixing our historical leasing and IT product sales business with our proprietary software and business process services over the past five years. Our primary focus is to deliver strategic business value through the use of technology and services. Our current offerings include:

- direct marketing of information technology equipment and third-party software;

- advanced professional services;

- leasing and business process services; and

- proprietary software, including procurement, asset management, document management and distribution software, and electronic catalog content management software and services.

13

Table of Contents

We have been in the business of selling, leasing, financing, and managing information technology and other assets for more than 15 years and have been providing software for more than six years. We currently derive the majority of our revenues from IT product sales, professional services, and leasing. We sell primarily by using our internal sales force and through vendor relationships to commercial customers; federal, state and local governments; K-12 schools; and higher education institutions. We also lease and finance equipment, and supply software and services directly and through relationships with vendors and equipment manufacturers.

Our broad product offerings provide customers with a highly-focused, end-to-end, turnkey solution for purchasing, lifecycle management, and financing for the indirect supply chain. In addition, we offer asset-based financing and leasing of capital assets and lifecycle management solutions for the assets during their useful life, including disposal. For the customer, we can offer a multi-disciplinary approach for implementing, controlling, and maintaining cost savings throughout an organization, allowing customers to simplify their administrative processes, gain data transparency and visibility, and enhance internal controls and reporting.

The key elements of our business are:

- **Direct IT Sales:** We are a direct marketer and authorized reseller of leading IT products via our direct sales force and web-based ordering solutions, such as OneSource®.

- **Advanced Professional Services:** We provide an array of internet telephony and internet communications, network design and implementation, storage, security, business continuity, maintenance, and implementation services to support our customer base as part of our consolidated service offering.

- **Leasing, Lease and Asset Management, and Lifecycle Management:** We offer a wide range of competitive and tailored leasing and financing options for primarily IT, medical, and capital assets. These include operating and direct finance leases, lease process automation and tracking, asset tracking and management, risk management, disposal of end-of-life assets, and lifecycle management.

- **Proprietary Software:** We offer proprietary software, which can be used as stand-alone solutions or be a component of a bundled solution. These include eProcurement, asset management, document management, and product content management software.

- **Consulting Services:** ePlus Consulting provides business process consulting, solution definition and implementation, and customer software application design.

Our proprietary software and associated business process services are key functions of supporting and retaining customers for our sales and finance businesses. We have developed and acquired these products and services to distinguish us from our competition by providing a comprehensive offering to customers.

Our primary target customers are middle-market and larger companies in the United States of America with annual revenues between $25 million and $2.5 billion. We believe there are more than 70,000 target customers in this market. Our target customer has one or more of the following business characteristics that we believe qualify us as a preferred solution:

- desires an integrated provider of products, services, and business processes for the entire indirect supply chain that can be customized to the customer's specific needs and requirements;

- would benefit from the cost savings and efficiency gains of an integrated solution, including eProcurement, asset management, catalog content functionality, document management and distribution software, electronic bill presentment and payment, and financing;

14

Table of Contents

- seeks a comprehensive solution for its entire supply chain from selection to requisition, purchase, settlement, ownership, financing, and disposal of assets;

- uses leasing to reduce its total cost of ownership of fixed assets and/or proactively manage its fixed asset base over the life of the asset; and

- seeks a lower cost alternative to licensing enterprise software solutions while preserving the investment in legacy IT infrastructures.

## BUSINESS SEGMENTS

See Note 14, "Segment Reporting" in the attached Consolidated Financial Statements. We have two basic business segments. Our first segment is our financing business unit that consists of the equipment and financing business to both commercial and government-related entities and the associated business process outsourcing services. Our second segment is our technology sales business unit that includes all the technology sales and related services, including procurement, asset management, and catalog software sales and services.

## INDUSTRY BACKGROUND

Prior to late 2000, the IT industry experienced strong growth rates as a result of Y2K spending and the emerging Internet industry. Sales of IT products in the following years decreased due to sluggish economic growth, the September 11, 2001 terrorist act, and an overall lengthening of IT replacement cycles. The slowdown in IT spending appeared to begin in the fourth quarter of 2000, and recovery was first evident in the latter half of 2003, which continued in 2004 and 2005. In the leasing business, low historical interest rates combined with healthy corporate earnings from 2003 to late 2005 caused a decline in lease origination volumes throughout the industry. We believe that changing customer behaviors will make bundled offerings a more desirable approach to managing costs, and we are continuing to reposition our offerings to meet changing marketplace requirements. For example, financial officers are increasingly playing greater roles in the purchasing decisions for IT equipment. We believe that demand is no longer primarily driven by technology replacement cycles, but by the need to replace worn equipment, thus reducing the total cost of ownership and increasing the return on investment of IT expenditures and the adoption of the Internet and internetworking technologies. Furthermore, we believe customers are seeing single-solution providers that can provide IT products and services with the automated business services and process such as those provided by us. Therefore, direct marketers are increasing efforts to include professional services, managed services, and order automation in their solutions. We have continuously evolved our advanced professional service and software capabilities. We believe that we are distinctively positioned to take advantage of this shift in client purchasing as evidenced by our development of our various integrated solutions beginning in 1999 (earlier than many other direct marketers) and we continue to believe that our bundled solution set is unsurpassed in the marketplace because of its breadth and depth of offerings.

We believe that we will continue to benefit from industry changes as a cost-effective provider of a full range of IT products and services with the added competitive advantage of in-house proprietary software. In addition, our ability to provide financing for capital assets to our clients and our lifecycle management solutions, provides an additional benefit and differentiator in the marketplace. While purchasing decisions will continue to be influenced by product selection and availability, price, and convenience, we believe that our comprehensive set of solutions will become the differentiator that businesses will look for to reduce the total cost of ownership.

## COMPETITION

The market for IT sales and professional services is intensely competitive, subject to economic conditions and rapid change, and significantly affected by new product introductions and other market activities of industry participants. We expect to continue to compete in all areas of our business against local, regional, and national firms, including manufacturers; other direct marketers; national and regional resellers; and regional, national, and international services providers. In addition, many computer manufacturers may sell or lease directly to our customers, and our continued ability to compete effectively may be affected by the policies of such manufacturers.

We believe that we offer enhanced solution capability, broader product selection and availability, competitive prices, and greater purchasing convenience than traditional retail stores or value-added resellers. In addition, our dedicated account executives offer the necessary support functions (e.g., software, purchases on credit terms, leasing, and efficient return processes) that Internet-only sellers do not usually provide. We are not aware of any competitors in the United States with both the breadth and depth of solution offerings that we have.

15

Table of Contents

The market for leasing is intensely competitive and subject to changing economic conditions and market activities of industry participants. We expect to continue to compete in all areas of business against local, regional, and national firms, including banks, specialty finance companies, hedge funds, vendor's captive finance companies, and third-party leasing companies. Banks and large specialty financial services companies sell directly to business clients, particularly larger enterprise clients, and may provide other financial or ancillary services that we do not provide. Vendor captive leasing companies may utilize internal transfer pricing to effectively lower lease rates and/or bundle equipment sales and leasing to provide highly competitive packages to customers. Third-party leasing companies may have deep customer and contractual relationships that are difficult to displace. However, these competitors typically do not offer the breadth of product, service, and software offerings that we offer our clients.

We believe that we offer an enhanced leasing solution to our customers which provides a business process services approach that can automate the leasing process and reduce our clients' cost of doing business with us. The solution incorporates value-added services at every step in the leasing process, including:

- front end processing, such as eProcurement, order aggregation, order automation, vendor performance measurement, ordering, reconciliation, dispute resolution, and payment;

- lifecycle and asset ownership services, including asset management, change management, and property tax filing; and

- end-of-life services such as equipment audit, removal, and disposal.

In addition, we are able to bundle equipment sales and professional services to provide a turnkey leasing solution. This allows us to differentiate ourselves with a client service strategy that spans the continuum from fast delivery of competitively priced products to end-of-life disposal services, and a selling approach that permits us to grow with clients and solidify those relationships.

The software market is in a constant state of change due to overall market acceptance and economic conditions. There are a number of companies developing and marketing business-to-business electronic commerce solutions targeted at specific vertical markets. Other competitors are also attempting to migrate their technologies to an Internet-enabled platform. Some of these competitors and potential competitors include enterprise resource planning system vendors and other major software vendors that are expected to sell their procurement and asset management products along with their application suites. These enterprise resource planning vendors have a significant installed customer base and have the opportunity to offer additional products to those customers as additional

components of these products and services. We also face competition from vendors' and manufacturers' internal development efforts and have to overcome potential customers' reluctance to move away from existing legacy systems and processes.

We believe that the principal competitive factors for the solution are scalability, functionality, ease-of-use, ease-of-implementation, ability to integrate with existing legacy systems, experience in business-to-business supply chain management, and knowledge of a business' asset management needs. We believe we can compete favorably with our competitors in these areas within our framework that consists of Procure+®, Manage+®, Content+®, ePlus Leasing, strategic sourcing, document management software, and business process outsourcing.

In all of our markets, some of our competitors have longer operating histories and greater financial, technical, marketing, and other resources than us. In addition, some of these competitors may be able to respond more quickly to new or changing opportunities, technologies, and client requirements. Many current and potential competitors also have greater name recognition and engage in more extensive promotional marketing and advertising activities, offer more attractive terms to clients, and adopt more aggressive pricing policies than we do.

For a discussion of risks associated with the actions of our competitors, see "Risk Factors" in Item 1A of this Form 10-K.

Table of Contents

## STRATEGY

Our goal is to become a leading provider of bundled solution offerings in the IT supply chain. The key elements of our strategy include the following:

- selling additional products and services to our existing client base;
- expanding our client base;
- making strategic acquisitions;
- expanding our professional services offerings;
- strengthening vendor relationships; and
- expanding the functionality of our Internet offerings, especially OneSource®.

### *Selling Additional Products and Services to Our Existing Client Base*

We seek to become the primary provider of IT solutions for our customers by delivering the best customer service, pricing, availability, and professional services in the most efficient manner. We continue to focus on improving our sales efficiency by providing on-going training, targeted incentive compensation, and by implementing better automation processes to reduce costs and improve productivity. Our account executives are being trained on our broad solutions capabilities and to sell in a consultative manner that increases the likelihood of cross-selling our solutions. We believe that our bundled offering is an important differentiating factor from our competitors.

In 2006, we rolled out a new software portal called OneSource®, which is an integrated order entry platform that we expect will enhance product sales, increase incremental sales, and reduce costs by eliminating touch-points for order automation.

### *Expanding Our Client Base*

We intend to increase our direct sales and targeted marketing efforts in each of our geographic and vertical industry areas. We actively seek to acquire new account relationships through a new outbound telesales effort, face-to-face field sales, electronic commerce (especially OneSource®), and targeted direct marketing, to increase awareness of our solutions.

### *Making Strategic Acquisitions*

Based on our prior experience, capital structure and business systems and processes, we believe we are well positioned to take advantage of strategic acquisitions that broaden our client base, expand our geographic reach, scale our existing operating structure, and/or enhance our product and service offerings. It is part of our growth strategy to evaluate and consider strategic acquisition opportunities if and when they become available.

### *Expand Advanced Professional Service Offerings*

Since 2004, we have focused on gaining engineering certifications and advanced professional services expertise in advanced technologies of strategic vendors, such as Cisco Systems, IBM, HP, and Network Appliance. We are especially focused on internetworking, security, and storage technologies that are currently in high demand. We believe our ability to deliver advanced professional services provides benefits in two ways. First, we gain recognition and mindshare of our strategic vendor partners and become the "go-to" partner in selected regional and national markets. This significantly increases direct and referral sales opportunities to provide our products and services, and allows us to achieve optimal pricing levels. Second, within our own existing and potential customer base, our advanced professional services is a key differentiator against competitors who cannot provide services or advanced services for these key technologies.

Table of Contents

### *Strengthening Vendor Relationships*

We believe it is important to maintain relationships with key manufacturers such as HP, IBM, Cisco, and Network Appliances on both a national level, for strategic purposes, and at the local level, for tactical objectives. Strategically, national relationships with key manufacturers give us increased visibility and legitimacy, and authenticate our services. In addition, by maintaining a number of high level engineering certifications, we are promoted as a high level solutions provider and are cited in numerous case studies and external marketing venues by the manufacturers. On the tactical level, by having more than 29 locations, we are able to maintain direct relationships with key sales and marketing personnel, who provide referral sales opportunities that are unavailable to Internet-only and catalog-based direct marketers.

### *Expand the functionality of our Internet-based solutions, especially OneSource*

We will continue to provide and expand the functionality or richness of our net-based platform. In addition to these products and services, we intend to use the flexibility of our platform to offer additional products and services when economically feasible. As part of this strategy, we may also acquire technology companies to expand and enhance the platform of solutions to provide additional functionality and value-added services.

## RESEARCH AND DEVELOPMENT

Our software has been acquired from third-party vendors or has been developed by us. In earlier stages of our development, we relied heavily on licensed software and outsourced development, but with the acquisition of the software products and the hiring of the employees obtained from the acquisition of ProcureNet, Inc. on May 15, 2001, Digital Paper Corporation on October 10, 2003, and the consulting arm of Manchester Technologies, Inc. on May 28, 2004, much of our current software development is handled by us. We have also outsourced certain programming tasks to a highly specialized offshore development company. We market both software that we own and software that we have obtained perpetual license rights and source code from a third party. Subject to certain exceptions, we generally retain the source code and intellectual property rights of the customized software.

To successfully implement our business strategy and service the disparate requirements of our customers and potential customers, we have a flexible delivery model, which includes:

- traditional enterprise licenses;

- on-demand, hosted, or subscription; and

- software-as-a-service, or a services model, where our personnel may utilize our software to provide one or more solutions to our customers.

We expect that competitive factors will create a continuing need for us to improve and add to our technology platform. The addition of new products and services will also require that we continue to improve the technology underlying our applications. We expect to continue to make significant investments in systems, personnel, and offshore development costs to maintain a competitive advantage in this market.

## SALES AND MARKETING

We focus our marketing efforts on lead generation activities and converting our existing customer base to our bundled solution set. The target market for our customer base is primarily middle and large market companies with annual revenues between $25 million and $2.5 billion. We believe there are over 70,000 potential customers in our target market. We undertake many of our direct marketing campaigns and target certain markets in conjunction with our primary vendor partners, who may provide financial reimbursement, outsourced services, and personnel to us in these efforts.

18

*Table of Contents*

Our sales representatives are compensated primarily on a commission basis. To date, the majority of our customers have been generated from direct sales. We market to different areas within a customer's organization depending on the products or services we are selling.

As of March 31, 2006, our sales force was organized regionally in 29 office locations throughout the United States. See Item 2, "Properties" of this Form 10-K for additional office location information. As of March 31, 2006 our sales organization included 247 sales and sales support personnel.

## INTELLECTUAL PROPERTY RIGHTS

Our success depends in part upon proprietary business methodologies and technologies that we have licensed and modified. We own certain software programs or have entered into software licensing agreements to provide services to our customers. We rely on a combination of copyright, trademark, service mark, trade secret protection, confidentiality and nondisclosure agreements and licensing arrangements to establish and protect intellectual property rights. We seek to protect our software, documentation and other written materials under trade secret and copyright laws, which afford only limited protection.

For example, we have three electronic sourcing systems patents, two catalog management patents, and two image transmission management patents in the United States, among others. We have a counterpart of the electronic sourcing system patents in nine European countries, and of the image transmission management patents in Israel, Mexico, and China. In 2005, the three U.S. patents for electronic sourcing systems were determined to be valid and enforceable by a jury at trial; however, in 2006, a trial in defense of the same patents ended in a mistrial. Therefore, we cannot provide any assurance that any patents, as issued, will prevent the development of competitive products or that our patents will not be successfully challenged by others or invalidated through the administrative process or litigation. We also have the following registered service/trademarks: *e*Plus, *e*PlusSuite, Procure+, Manage+, Service+, Finance+, *e*Plus Leasing, International Computer Networks, Docpak, Simply Faster, Viewmark, Digital Paper, Intranetdocs, OneSource, Content+, *e*ECM, Directsight, ICN, and *e*Plus Enterprise Cost Management. We also have over twenty registered copyrights and additional common-law trademarks and copyrights.

Despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy aspects of our products or to obtain and use information that we regard as proprietary. Policing unauthorized use of our products is difficult, and while we are unable to determine the extent to which piracy of our software products exists, software piracy can be expected to be a persistent problem. Our means of protecting our proprietary rights may not be adequate and our competitors may independently develop similar technology, duplicate our products or design around our proprietary intellectual property.

## SALES AND FINANCING ACTIVITIES

We have been in the business of selling, leasing, financing, providing procurement, document management and asset management software and managing information technology and various other assets for over ten years and currently derive the majority of our revenues from such activities.

*IT Sales and Professional Services.* We are an authorized reseller of, or have the right to resell products and services from, over 400 manufacturers. Our larger manufacturer relationships include HP, IBM, Cisco, and Microsoft Corporation. Tech Data and Ingram Micro, Inc. are our largest distributors. We have multiple vendor engineering certifications that authorize us to market their products and enable us to provide advanced professional services. Our flexible platform and customizable catalogs facilitate the addition of new vendors with a minimal incremental effort. Using the distribution systems available, we usually sell products that are shipped from the distributors or suppliers directly to our customer location, which allows us to keep our inventory of any product to a minimum. The products we sell typically have payment account terms ranging from due upon delivery up to a maximum 90 days to pay, depending on the customer's credit and payment structuring.

19

*Table of Contents*

*Leasing and Financing.* Our leasing and financing transactions generally fall into two categories: direct financing and operating leases. Direct financing transfers substantially all of the benefits and risks of equipment ownership to the customer. Operating leases consist of all other leases that do not meet the criteria to be direct financing or sales-type leases. Our lease transactions include true leases and installment sales or conditional sales contracts with corporations, non-profit entities and municipal and federal government contractors. Substantially all of our lease transactions are net leases with a specified non-cancelable lease term. These non-cancelable leases have a provision which requires the lessee to make all lease payments without offset or counterclaim.

A net lease requires the lessee to make the lease payment and pay other expenses associated with the use of equipment such as maintenance, casualty and liability insurance, sales or use taxes and personal property taxes. We primarily lease computers, associated accessories and software, communication-related equipment, medical equipment, industrial related machinery and equipment, office furniture and general office equipment, transportation equipment, and other general business equipment.

In anticipation of the expiration of the initial term of a lease, we initiate the remarketing process for the related equipment. Our goal is to maximize revenues on the remarketing effort by either (1) releasing or selling the equipment to the initial lessee, (2) renting the equipment to the initial lessee on a month-to-month basis, or (3) selling or leasing the equipment to an equipment broker or a different customer. The remarketing process is intended to enable us to recover or exceed the residual value of the leased equipment. Any amounts received over the estimated residual value less any commission expenses become profit margin to us and can significantly impact the degree of profitability of a lease transaction.

We aggressively manage the remarketing process of our leases to maximize the residual values of our leased equipment portfolio. To date, we have realized a premium over our original recorded residual assumption or the net book value.

*Financing and Bank Relationships.* We have a number of bank and finance company relationships that we use to provide working capital for all of our businesses and long-term financing for our lease financing businesses. Our finance department is responsible for maintaining and developing relationships with a diversified pool of commercial banks and finance companies with varying terms and conditions. See Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Risk Management and Process Controls.* It is our goal to minimize the financial risks of our balance sheet assets. To accomplish this goal, we use and maintain conservative underwriting policies and disciplined credit approval processes. We also have internal control processes, including contract origination and management, cash management, servicing, collections, remarketing and accounting. Whenever possible and financially prudent, we use non-recourse financing (which is limited to the underlying equipment and the specific lessee and not our general assets) for our leasing transactions and we try to obtain lender commitments before acquiring the related assets.

When desirable, we manage our risk in assets by selling leased assets, including the residual portion of leases, to third parties rather than owning them. We try to obtain commitments for these asset sales before asset origination in a financing transaction. We also use agency purchase orders to procure equipment for lease to our customers as an agent, not a principal, and otherwise take measures to minimize our inventory. Additionally, we use fixed-rate funding and issue proposals that adjust for material adverse interest rate movements as well as material adverse changes to the financial condition of the customer.

We have an executive management review process and other internal controls in place to protect against entering into lease transactions that may have undesirable financial terms or unacceptable levels of risk. Our lease and sale contracts are reviewed by senior management for pricing, structure, documentation, and credit quality. Due in part to our strategy of focusing on a few types of equipment categories, we have product knowledge, historical re-marketing information and experience on many of the items that we lease, sell and service. We rely on our experience or outside opinions in the process of setting and adjusting our sale prices, lease rate factors and the residual values.

*Default and Loss Experience.* During the fiscal year ended March 31, 2005, we reserved for $1.1 million in credit losses and incurred actual credit losses of $0.5 million. During the fiscal year ended March 31, 2006 we reserved for $1.0 million in credit losses and incurred actual credit losses of $0.8 million.

*Table of Contents*

## EMPLOYEES

As of March 31, 2006, we employed 680 full-time and part-time employees who operated through 29 office locations, including our principal executive offices and regional sales offices. No employees are represented by a labor union and we believe that we have a good relationship with our employees. The functional areas of our employees are as follows:

|  | Number of Employees |
| --- | --- |
| Sales and Marketing | 247 |
| Technical Support | 142 |
| Administration | 198 |
| Software and Implementations | 85 |
| Executive | 8 |

## U.S. SECURITIES AND EXCHANGE COMMISSION REPORTS

Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and all amendments to those reports, filed with or furnished to the U.S. Securities and Exchange Commission ("SEC"), are available free of charge through our internet website, www.eplus.com, as soon as reasonably practical after we have electronically filed such material with, or furnished it to, the SEC. The public may read and copy any materials filed by us with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Room 1580, Washington, DC 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC at www.sec.gov. The contents of these websites are not incorporated into this filing. Further, our references to the URLs for these websites are intended to be inactive textual references only.

## ITEM 1A. RISK FACTORS

We Have Received Inquiries Related to Our Historical Stock Option Grant Practices.

As described elsewhere herein, we are involved in a shareholder derivative action and a SEC informal inquiry in connection with certain historical stock option grants. We are currently preparing a response to plaintiff's amended complaint. With respect to the SEC informal inquiry, we have cooperated and intend to continue to cooperate with the SEC. The inquiry of the SEC may look at the accuracy of the stated dates of our historical option grants, our disclosures regarding executive compensation, whether all proper corporate and other procedures were followed, and whether our historical financial statements are materially accurate and other issues. Counsel for the Audit Committee also received an inquiry from the Office of the United States Attorney for the Eastern District of Virginia. To date, there have been no further communications with the United States Attorney's Office. We are currently being audited by the Internal Revenue Service ("IRS"). In connection with this audit, the IRS has requested information concerning stock options. Regardless of the outcome of these inquiries and the derivative action, we may continue to incur substantial costs, which could have a material adverse effect on our financial condition and results of operations. In addition, it is possible that other governmental or regulatory agencies may undertake inquiries with respect to our historical option grants. Such inquiries could lead to formal proceedings against us, as well as our officers and/or directors. While we believe we have made appropriate judgments in determining the financial and tax impacts of our historic stock option practices, we cannot provide assurance that the SEC or the IRS will (i) agree with the manner in which we have accounted for and reported, or not reported, the financial and tax impacts, or (ii) not find inappropriate activity in connection with our historical stock option practices. If the SEC or the IRS disagrees with our financial or tax adjustments and such disagreement results in material changes to our historical financial statements, we may have to further restate our prior financial statements, amend prior filings with the SEC, or take other actions not currently contemplated.

The Matters Relating To the Investigation by the Audit Committee of the Board and the Restatement of Our Consolidated Financial Statements May Result in Additional Litigation and Governmental Enforcement Actions, Which Could Have a Material Adverse Effect on Us.

Based on management's internal review and that of our Audit Committee, it was determined that incorrect measurement dates were used for financial accounting purposes for many stock option grants made since our IPO in 1996. As a result, we have recorded additional share-based compensation expense, and related tax effects, with regard to certain past stock option grants, and we have restated certain previously issued financial statements included in this Annual Report on Form 10-K. We have also restated our financial statements for fiscal years ended March 31, 2005 and 2004 in connection with the presentation of dealer floor plan financing arrangements and other items. See Explanatory Note immediately preceding Part I, Item 1, "Business;" Part II, Item 7, "—Management's Discussion and Analysis of Financial Condition and Results of Operations — Results of Audit Committee Review; Restatement of Consolidated Financial Statements" and Note 2, "Restatement of Consolidated Financial Statements" in the Notes to Consolidated Financial Statements.

Table of Contents

Our historical stock option granting practices and the restatement of our prior financial statements have exposed us to greater risks associated with litigation, regulatory proceedings and government enforcement actions. As described in Part I, Item 3, "Legal Proceedings," we are a party to a lawsuit containing allegations relating to stock option grants. We have fully cooperated with the inquiry by the SEC, and we intend to continue to fully cooperate. We cannot provide assurance that any determinations made in the current litigation, the SEC inquiry or any future litigation or regulatory action will reach the same conclusions on these issues that we have reached. The conduct and resolution of these matters will be time consuming, expensive and distracting from the conduct of our business. Furthermore, if we are subject to adverse findings in any of these matters, we could be required to pay damages or penalties or have other remedies imposed upon us which could have a material adverse effect on our business, financial condition, results of operations and cash flows.

Material Weaknesses in Internal Control Over Financial Reporting Resulted in a Restatement of, or Adjustments To, Our Financial Statements, and the Transitional Changes To Our Control Environment May Be Insufficient to Effectively Remediate These Deficiencies.

We have identified material weaknesses in our internal control over financial reporting, and we have restated our Consolidated Financial Statements for the years ended March 31, 2005 and 2004, as included in this Form 10-K. Specifically, we did not maintain effective controls over the determination of the accounting measurement dates for our granting of stock option awards and the classification of certain cash flows. We have taken steps to remediate these weaknesses by implementing changes to our control environment, which include plans for additional procedures as well as additional controls over financial reporting. Any ineffectiveness of these remedial measures, or a delay in their implementation, could affect the accuracy or timing of our future filings with the SEC or other regulatory authorities. See Item 9A, "Controls and Procedures."

Because We Did Not File Our Periodic Reports With the SEC on a Timely Basis, Our Common Stock Was Delisted From The Nasdaq Global Market.

Due to the findings of the Audit Committee Investigation and the resulting restatement, we did not file any of our periodic reports with the SEC on a timely basis since we last filed our Quarterly Report on Form 10-Q for the quarter ended December 31, 2005. When we file our Forms 10-Q for the periods ended June 30, 2006, September 30, 2006, and December 31, 2006, and our Forms 10-K for the fiscal years ended March 31, 2007 and 2006, we will be current with SEC reporting requirements. On July 18, 2007, we received a letter from Nasdaq advising that the Board of Directors of Nasdaq had decided to withdraw its call for review of the May 10, 2007 decision of the Listing Council to suspend our securities from trading on the Nasdaq Stock Market. Consequently, our common stock was delisted from the Nasdaq Global Market on July 20, 2007. As a result, the price of our stock and the ability of our stockholders to trade in our stock may be adversely affected. In addition, we cannot determine how long it will take for us to regain compliance with the Nasdaq listing requirements and reapply for listing of our common stock. Since we are not current in our filings with the SEC, we are subject to a number of restrictions regarding the registration of our stock under federal securities laws, and we may not be able to issue stock options or other equity awards to our employees or allow them to exercise their outstanding options, which could adversely affect retention of executive management and our business and results of operations.

Table of Contents

Our Assessment As To the Adequacy of Our Internal Control Over Financial Reporting As Required by Section 404 of the Sarbanes-Oxley Act of 2002 May Cause Our Operating Expenses to Increase. If We Are Unable to Certify the Adequacy of Our Internal Controls, Investors Could Lose Confidence in the Reliability of Our Financial Statements, Which Could Result in a Decrease in the Value of Our Common Stock.

As directed by Section 404 of the Sarbanes-Oxley Act of 2002, the SEC adopted rules requiring public companies to include a report from management on internal control over financial reporting in their annual reports on Form 10-K. We expect that these rules will first apply to us with respect to our fiscal year ending March 31, 2008. To comply with the Sarbanes-Oxley Act and the SEC's new rules and regulations, we are evaluating our internal control systems and taking remedial actions to allow management to report on, and our independent auditors to attest to, our internal control over financial reporting. As a result, we have incurred expenses, and expect to incur additional expenses, and diversion of management's time and attention from the daily operations of the business, which may increase our operating expenses and impair our ability to sustain profitability based on U.S. GAAP. While we are endeavoring to implement the requirements relating to internal controls and all other aspects of Section 404 in a timely manner, there can be no assurance that we will be able to maintain our schedule to complete all assessment and testing in a timely manner and, if we do not, that we will have the resources available to complete necessary assessment and reporting on internal controls on a timely basis. Further, we cannot be certain that our testing of internal control and resulting remediation actions will yield adequate internal control over financial reporting as required by Section 404. If we are not able to implement the requirements of Section 404 in a timely manner or with adequate compliance, there could be an adverse reaction in the financial markets due to a loss of confidence in the reliability of our financial statements, which could cause the market price of our common stock to decline.

We Depend on Having Creditworthy Customers.

Our leasing and technology sales business requires sufficient amounts of debt and equity capital to fund our equipment purchases. If the credit quality of our customer base materially decreases, or if we experience a material increase in our credit losses, we may find it difficult to continue to obtain the capital we require and our business, operating results and financial condition may be harmed. In addition to the impact on our ability to attract capital, a material increase in our delinquency and default experience would itself have a material adverse effect on our business, operating results and financial condition.

We May Not Reserve Adequately for Our Credit Losses.

We maintain a consolidated reserve for credit losses on receivables. Our consolidated reserve for credit losses reflects management's judgment of the loss potential. Our management bases its judgment on the nature and financial characteristics of our obligors, general economic conditions and our bad debt experience. It also considers delinquency rates and the value of the collateral underlying the finance receivables. We cannot be certain that our consolidated reserve for credit losses will be adequate over time to cover credit losses in our portfolio because of unanticipated adverse changes in the economy or events adversely affecting specific customers, industries or markets. If our reserves for credit losses are not adequate, our business, operating results and financial condition may suffer.

We Rely on Inventory and Accounts Receivable Financing Arrangements.

We have two credit facilities. The failure of our customers to meet their obligations could have a material adverse effect on our results as we may have to use this facility for daily working capital and liquidity for our leasing business. The loss of the technology sales credit facility could have a material adverse effect on our future results as we currently rely on this facility and its components for daily working capital and the operational function for our accounts payable process.

<u>We May Not Adequately Protect Ourselves Through Our Contract Vehicles.</u>

We may not properly create contracts to protect ourselves against the risks inherent in our business including, but not limited to, warranties, limitations of liability, human resources and subcontractors, patent and product liability, and financing activities.

23

<u>Table of Contents</u>

Despite the non-recourse nature of the loans financing our activities, non-recourse lenders have in the past brought suit when the underlying transaction turns out poorly for the lenders. We have vigorously defended such cases in the past and will do so in the future and believe investors should be aware that such suits are normal risks, and the cost of defense are normal costs of our business.

<u>Costs to Protect Our Intellectual Property May Affect Our Earnings.</u>

The legal and associated costs to protect our intellectual property may have a material adverse effect on our business, operating results and financial condition. We may deem it necessary to protect our intellectual property rights and significant expenses could be incurred with no certainty of the results of these potential actions. Costs relative to lawsuits are usually expensed in the periods incurred and there is no certainty in recouping any of the amounts expended regardless of the outcome of any action. Additionally, recent Supreme Court decisions could make patents harder to obtain and enforce, and could limit the availability of damages, especially in the software industry.

<u>We Face Risks of Claims From Third Parties for Intellectual Property Infringement That Could Harm Our Business.</u>

Although we believe that our intellectual property rights are sufficient to allow us to market our existing products without incurring liability to third parties, we cannot provide assurance that our products and services do not infringe on the intellectual property rights of third parties.

In addition, because patent applications in the United States are not publicly disclosed until the patent is issued, we may not be aware of applications that have been filed which relate to our products or processes. We could incur substantial costs in defending ourselves and our customers against infringement claims. In the event of a claim of infringement, we and our customers may be required to obtain one or more licenses from third parties. We cannot provide assurance that such licenses could be obtained from third parties at a reasonable cost or at all. Defense of any lawsuit or failure to obtain any such required license could harm our business, operating results and financial condition. In addition, in certain instances, third parties licensing software to us have refused to indemnify us for possible infringement claims.

<u>Capital Spending by Our Customers May Decrease.</u>

We rely on our customers to purchase capital equipment from us to maintain or increase our earnings. If there is a downward turn in the economy, or an increase in competition, sales of capital equipment may decrease, thus adversely affecting our earnings.

<u>We Face Substantial Competition From Larger Companies As Well As Our Vendor and Financial Partners.</u>

In our leasing business, we face competition from many sources including much larger companies with greater financial resources. Our competition may even come from some of our vendor or financial partners who choose to market directly to customers. Our competition may lower lease rates in order to gain additional business. Our business is also subject to customer demand which is affected by economic conditions, liquidity and capital spending.

In our reseller business, direct marketing to end-users, rather than through resellers such as us, by manufacturers may adversely affect future sales. Many competitors compete principally on the basis of price and may have lower costs than us and, therefore, current gross margins may not be maintainable. In addition, we do not have guaranteed commitments from our customers and, therefore, our sales volume may be volatile.

<u>We May Not Be Able to Hire and Retain Personnel That We Need to Succeed.</u>

To increase market awareness and sales of our offerings, we may need to expand our sales operations and marketing efforts in the future. Our products and services require a sophisticated sales effort and significant technical support. Competition for qualified sales, marketing and technical personnel fluctuates depending on market conditions and we might not be able to hire or retain sufficient numbers of such personnel to maintain and grow our business.

24

<u>Table of Contents</u>

<u>We Do Not Have Long-term Supply or Guaranteed Price Agreements With Our Vendors.</u>

The loss of a key vendor or manufacturer or changes in their policies could adversely impact our ability to sell. In addition, violation of a contract that results in either the termination of our ability to sell the product or a decrease in our certification with the manufacturer could adversely impact our earnings.

<u>We May Not Have Designed Our Information Technology Systems to Support Our Business Without Failure.</u>

We are dependent upon the reliability of our information, telecommunication and other systems, which are used for sales, distribution, marketing, purchasing, inventory management, order processing, customer service and general accounting functions. Interruption of our information systems, Internet or telecommunications systems could have a material adverse effect on our business, financial condition, cash flows or results of operations.

<u>Our Earnings May Fluctuate.</u>

Our earnings are susceptible to fluctuations for a number of reasons, including the seasonal and cyclical nature of our customers' procurement patterns. Our earnings will continue to be affected by fluctuations in our historical business, such as lower sales of equipment, increased direct marketing by manufacturers rather than through distributors, reductions in realized residual values, fluctuations in interest rates, and lower overall sales activity. In the event our revenues or earnings are less than the level expected by the market in general, such shortfall could have an immediate and significant adverse impact on our common stock's market price.

<u>We May Not Be Able to Realize Our Entire Investment in the Equipment We Lease.</u>

We lease various types of equipment to customers through two distinct types of transactions: capital leases and operating leases. The duration of an operating lease is shorter relative to the equipment's useful life. We bear a greater risk in operating leases in that we may not be able to remarket the equipment on terms that will allow us to fully recover our investment.

At the inception of each lease, we estimate the fair market value of the item as a residual value for the leased equipment based on the terms of the lease contract. A decrease in the market value of such equipment at a rate greater than the rate we expected, whether due to rapid technological obsolescence or other factors, would adversely affect the residual values of such equipment. Any such loss, which is considered by management to be other than temporary in nature, would be recognized in the period of impairment in accordance with SFAS No. 13, "*Accounting for Leases.*" Consequently, there can be no assurance that our estimated residual values for equipment will be realized. Our lease portfolio has recently expanded to new types of equipment under lease of which we may not experience the same residual realization economics.

We May Not Perform Adequate Due Diligence or Integration of an Acquisition.

We have the potential to acquire entities with unknown liabilities, fraud, cultural or business environment issues or that may not have adequate internal controls as required by Section 404 of the Sarbanes-Oxley Act of 2002. In addition, we may not fully understand their business or adequately integrate their employees into our organization.

Treating Stock Options As a Compensation Expense Could Significantly Impair Our Ability to Maintain Profitability.

FASB has begun requiring companies to record compensation expense based on fair-value determination for stock options and participation in employee stock purchase plans, in accordance with SFAS No. 123R. We grant stock options to our employees, officers and directors and we administered an employee stock purchase plan ("ESPP") which ended December 31, 2002. Information on our stock option plan and ESPP, including the shares reserved for issuance under those plans, the terms of options granted, and the shares subject to outstanding stock options, is included in Note 12, "Benefit and Stock Option Plans" of the Notes to Consolidated Financial Statements. The current FASB guidance is that, effective for our fiscal year starting April 1, 2006, we will have to begin expensing stock options based on fair-value determination, in accordance with SFAS No. 123R, rather than intrinsic value as has been recorded historically, under APB 25. When we are required to record an expense based on a fair value determination for our stock-based compensation plans, we could incur a significant compensation expense, and any such expense could significantly impair our ability to return to and maintain profitability on a U.S. GAAP basis. That impact on our ability to maintain profitability on a U.S. GAAP basis could have a material adverse effect on the market price of our common stock.

25

Table of Contents

If We Are Unable to Protect Our Intellectual Property, Our Business Will Suffer.

The success of our business strategy depends, in part, upon proprietary technology and other intellectual property rights. To date, we have relied primarily on a combination of copyright, trademark, patent and trade secret laws and contractual provisions with our subcontractors to protect our proprietary technology. It may be possible for unauthorized third parties to copy certain portions of our products or reverse engineer or obtain and use information that we regard as proprietary. Some of our agreements with our customers and technology licensors contain residual clauses regarding confidentiality and the rights of third parties to obtain the source code for our products. These provisions may limit our ability to protect our intellectual property rights in the future that could seriously harm our business, operating results and financial condition. We cannot provide assurance that our means of protecting our intellectual property rights will be adequate. If any of these events happen, our business, operating results and financial condition could be harmed.

The Limited Operating History of Our e-Commerce Related Products and Services Makes It Difficult to Evaluate Our Business and Our Prospects.

Our comprehensive set of solutions, introduced in May 2002, has had a limited operating history. As a result, we expect to encounter some of the challenges, risks, difficulties and uncertainties frequently encountered by early-stage companies using new and unproved business models in rapidly evolving markets. Some of these challenges relate to our ability to:

- increase the total number of users of our services;

- adapt to meet changes in our markets and competitive developments; and

- continue to update our technology to enhance the features and functionality of our suite of products.

We cannot be certain that our business strategy will be successful or that it will successfully address these and other challenges, risks and uncertainties.

The Electronic Commerce Business-to-business Solutions Market Is Highly Competitive and We Cannot Provide Assurance That We Will Be Able to Compete Effectively.

The market for Internet-based, business-to-business electronic commerce solutions is extremely competitive. We expect competition to intensify as current competitors expand their product offerings and new competitors enter the market. We cannot provide assurance that we will be able to compete successfully against current or future competitors, or that competitive pressures faced by us will not harm our business, operating results or financial condition. In addition, the market for electronic procurement solutions is relatively new and evolving. Our strategy of providing an Internet-based electronic commerce solution may not be successful, or we may not execute it effectively. Accordingly, our solution may not be widely adopted by businesses.

Because there are relatively low barriers to entry in the electronic commerce market, competition from other established and emerging companies may develop in the future. Increased competition is likely to result in reduced margins, longer sales cycles and loss of market share, any of which could materially harm our business, operating results or financial condition. The business-to-business electronic commerce solutions offered by our competitors now or in the future may be perceived by buyers and suppliers as superior to ours. Our current or future competitors may have more experience developing Internet-based software and end-to-end purchasing solutions. They may also have greater technical, financial, marketing and other resources than we do. As a result, competitors may be able to develop products and services that are superior, achieve greater customer acceptance or have significantly improved functionality as compared to our products and services.

26

Table of Contents

Over the long term, we expect to derive more revenues from our software, which is unproven. We expect to incur expenses that may negatively impact profitability. We also expect to incur significant sales and marketing, research and development, and general and administrative expenses in connection with the development of this area of our business. These expected expenses may have a material adverse effect on our future operating results as a whole.

If Our Products Contain Defects, Our Business Could Suffer.

Products as complex as those used to provide our electronic commerce solutions often contain known and undetected errors or performance problems. Many serious defects are frequently found during the period immediately following introduction of new products or enhancements to existing products. Although we attempt to resolve all errors that we believe would be considered serious by our customers, our products are not error-free. Undetected errors or performance problems may not be discovered in the future and errors considered by us to be minor may be considered serious by our customers. This could result in lost revenues, delays in customer acceptance or unforeseen liabilities that would be detrimental to our reputation and to our business.

If We Publish Inaccurate Catalog Content Data, Our Business Could Suffer.

Any defects or errors in catalog content data could harm our customers or deter businesses from participating in our offering, damage our business reputation, harm our ability to attract new customers, and potentially expose us to legal liability. In addition, from time to time some participants in bundled services could submit to us inaccurate pricing or other catalog data. Even though such inaccuracies are not caused by our work and are not within our control, such inaccuracies could deter current and potential customers from using our products and could harm our business, operating results and financial condition.

## ITEM 1B.  UNRESOLVED STAFF COMMENTS

Not applicable.

## ITEM 2.  PROPERTIES

As of March 31, 2006, we operated from 29 office locations. Our total leased square footage as of March 31, 2006, was approximately 150,600 square feet for which we incurred rent expense of approximately $212,000 per month. Some of our companies operate in shared office space to improve sales, marketing and cost efficiency. We do not own any real estate. Some sales and technical service personnel operate from either residential offices or space that is provided for by another entity or are located on a customer site. The following table identifies our largest locations, the number of current employees as of March 31, 2006, the square footage and the general office functions.

27

*Table of Contents*

| Location | Company | Employees | Square Footage | Function |
|---|---|---|---|---|
| Herndon, VA | *e*Plus Group, inc.<br>*e*Plus Technology, inc.<br>*e*Plus Government, inc.<br>*e*Plus Document Systems, inc. | 255 | 50,232 | Corporate and subsidiary headquarters, sales office, technical support and warehouse |
| Pittsford, NY | *e*Plus Systems, inc. | 61 | 9,155 | Sales office and technical development |
| Pottstown, PA | *e*Plus Technology, inc. | 46 | 12,853 | Sales office, technical support and warehouse |
| Sunnyvale, CA | *e*Plus Technology, inc. | 38 | 11,200 | Sales office, technical support and warehouse |
| Hauppauge, NY | *e*Plus Technology, inc. | 33 | 8,370 | Sales office, technical support and warehouse |
| Hamilton, NJ | *e*Plus Technology, inc. | 23 | 8,000 | Sales office and technical support |
| Canton, MA | *e*Plus Technology, inc. | 30 | 6,228 | Sales office and technical support |
| New York, NY | *e*Plus Technology, inc. | 25 | 5,121 | Sales office and technical support |
| Wilmington, NC | *e*Plus Technology, inc. | 23 | 4,000 | Sales office and technical support |
| Elkridge, MD | *e*Plus Technology, inc. | 19 | 5,092 | Sales office and technical support |
| Raleigh, NC | *e*Plus Group, inc.<br>*e*Plus Technology, inc. | 18 | 8,428 | Sales office-shared, technical support and warehouse |
| Houston, TX | *e*Plus Content Services, inc. | 16 | 4,000 | Subsidiary headquarters, sales office and technical support |
| Avon, CT | *e*Plus Systems, inc. | 11 | 2,345 | Subsidiary headquarters, sales office and technical development |
| Boca Raton, FL | *e*Plus Technology, inc. | 8 | 3,214 | Sales office and technical support |
| Other Office Locations | | 36 | 12,330 | Sales offices and technical support |
| Home Offices/Customer Sites | | 38 | | |

The largest location is Herndon, VA, which has a lease expiration date of December 31, 2009.

28

*Table of Contents*

## ITEM 3.  LEGAL PROCEEDINGS

### Cyberco Related Matters

We have been involved in several matters described below, arising from four separate installment sales to a customer named Cyberco Holdings, Inc. ("Cyberco").  Two of the lawsuits arising from this matter have been resolved.  According to the United States Attorney for the Western District of Michigan, the Cyberco principals were allegedly perpetrating a scam, which victimized several dozen leasing and lending institutions. Three Cyberco principals have pled guilty to criminal conspiracy and other charges including bank fraud, mail fraud and money laundering.  At least two additional Cyberco principals or employees have been indicted. Cyberco, related affiliates, and at least one principal are in Chapter 7 bankruptcy. No future payments are expected from Cyberco, and at this time, the bankruptcy estate is anticipated to have insignificant funds.

In a bankruptcy adversarial complaint filed on December 7, 2006 in the United States Bankruptcy Court for the Western District of Michigan, the bankruptcy trustee filed a claim against ePlus Group, inc. seeking payments of approximately $775,000 as alleged preferential transfers.  We retained none of those payments, and instead forwarded them to the appropriate assignees of the underlying leases. Of the $775,000 in payments, approximately $200,000 was forwarded to Banc of America Leasing and Capital, LLC ("BoA") and the remainder was forwarded to GMAC Commercial Finance, LLC ("GMAC").  Subsequent to its filing suit against us, the trustee added BoA and GMAC as defendants.  We intend to vigorously defend these claims.

On January 4, 2005 we filed suit in the United States District Court for the Southern District of New York against our insurance carrier, Travelers Property Casualty Company of America ("Travelers"), seeking a declaratory judgment that any potential liability for claims made against us by GMAC or BoA, which are described below, is covered by our insurance policy with Travelers. On February 9, 2006, the court granted summary judgment for Travelers, determining that our claim was not covered by our insurance policies. A final judgment was entered on or about October 25, 2006, and we timely appealed to the United States Court of Appeals for the Second Circuit. The ultimate decision on insurance coverage will apply to the claims filed against us by both underlying lenders, GMAC and BoA. We believe that our position asserting insurance coverage is correct, but we cannot predict the outcome of our appeal.

On January 4, 2005, GMAC filed suit, which we removed to the United States District Court for the Southern District of New York, against *e*Plus Group, inc. seeking repayment of three promissory notes underlying our non-recourse assignment of Cyberco's loan payments. GMAC's suit sought approximately $10,646,000, plus interest. The suit was settled on July 24, 2006 for $6,000,000 in cash, which we paid on July 25, 2006.

On May 10, 2005, BoA filed a lawsuit against *e*Plus Group, inc. in the Circuit Court for Fairfax County, Virginia. BoA funded one of the Cyberco sales in exchange for assignment of the payment stream. After Cyberco went into bankruptcy, BoA sought to recover its loss of approximately $3,062,792 plus interest. On September 14, 2006, a jury awarded BoA $3,025,000 plus interest. On or about February 6, 2007, a final judgment was entered, which also awarded BoA $871,232 in attorneys' fees. We paid the total judgment, including interest and fees, of $4,258,237 in two payments, the last of which was made on June 15, 2007.

In addition, BoA filed a lawsuit against *e*Plus inc. on November 3, 2006 in the Circuit Court for Fairfax County, Virginia, seeking to enforce a guaranty in which *e*Plus inc. guaranteed *e*Plus Group, inc.'s obligations to BoA relating to the Cyberco transaction. *e*Plus Group has already paid to BoA the judgment in the Fairfax County lawsuit referenced above. We are vigorously defending the suit. We cannot predict the outcome of this suit.

On January 12, 2007, *e*Plus Group, inc. filed a complaint against BoA in the Superior Court of California, County of San Diego, seeking relief on matters not adjudicated in the Virginia state court action described above. While we believe that we have a basis for our claims to recover certain of our losses related to the Cyberco matter, we cannot predict whether we will be successful in our claim for damages, whether any award ultimately received will exceed the costs incurred to pursue this matter or how long it will take to bring this matter to resolution.

On June 22, 2007, *e*Plus Group, inc. and two other entities victimized by Cyberco filed suit in the United States District Court for the Western District of Michigan against The Huntington National Bank. The complaint alleges counts of aiding and abetting fraud, aiding and abetting conversion, and statutory conversion. While we believe that we have a basis for our claims to recover certain of our losses related to the Cyberco matter, we cannot predict whether we will be successful in our claim for damages, whether any award ultimately received will exceed the costs incurred to pursue this matter or how long it will take to bring this matter to resolution.

29

*Table of Contents*

**Other Matters**

On January 18, 2007 a shareholder derivative action related to stock option practices was filed in the United States District Court for the District of Columbia. The complaint names *e*Plus inc. as nominal defendant, and personally names eight individual defendants who are directors and/or executive officers of *e*Plus. The complaint alleges violations of federal securities law and state law claims for breach of fiduciary duty, waste of corporate assets and unjust enrichment. We are currently preparing a response to the plaintiff's amended complaint.

On December 11, 2006, *e*Plus inc. and SAP America, Inc. and its German parent, SAP AG (collectively, "SAP") entered into a Patent License and Settlement Agreement (the "Agreement") to settle a patent lawsuit between the companies which we filed on April 20, 2005. Under the terms of the Agreement, we will license to SAP our existing patents, together with those developed and/or acquired by us within the next five years, in exchange for a one-time cash payment of $17,500,000, which was paid by SAP on January 16, 2007. In addition, SAP has agreed not to pursue legal action against us for patent infringement as to any of our current lines of business on any of SAP's patents for a period of five years. The Agreement also provides for general release, indemnification for its violation, and dismisses the existing litigation with prejudice.

We are currently engaged in a dispute with the government of the District of Columbia ("DC") regarding personal property taxes on property we financed for our customers. DC is seeking approximately $508,000, plus interest and penalties, relating to property we financed for our customers. We believe the tax is owed by our customers, and are seeking resolution in DC's Office of Administrative Hearings. We cannot predict the outcome of this matter. While management does not believe this matter will have a material effect on our financial condition and results of operations, resolution of this dispute is ongoing.

There can be no assurance that these or any existing or future litigation arising in the ordinary course of business or otherwise will not have a material adverse effect on our business, consolidated financial position, results of operations or cash flows.

**ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

No matters were submitted to a vote of security holders during the fourth quarter of the fiscal year covered by this report.

30

*Table of Contents*

**PART II**

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**MARKET INFORMATION**

During the two fiscal years ended March 31, 2006, our common stock traded on The Nasdaq Global Market under the symbol "PLUS." The following table sets forth the range of high and low sale prices for our common stock during each quarter of the two fiscal years ended March 31, 2006.

| Quarter Ended | High | | Low | |
|---|---|---|---|---|
| **Fiscal Year 2005** | | | | |
| June 30, 2004 | $ | 12.98 | $ | 9.97 |
| September 30, 2004 | $ | 11.58 | $ | 8.80 |
| December 31, 2004 | $ | 12.80 | $ | 9.32 |
| March 31, 2005 | $ | 17.14 | $ | 11.01 |
| **Fiscal Year 2006** | | | | |
| June 30, 2005 | $ | 14.00 | $ | 10.26 |

| | | | | |
|---|---|---|---|---|
| December 31, 2005 | $ | 14.94 | $ | 12.61 |
| March 31, 2006 | $ | 14.94 | $ | 13.25 |

On July 31, 2007, the closing price of our common stock was $9.25 per share. On July 31, 2007, there were 161 shareholders of record of our common stock. We believe there are over 400 beneficial holders of our common stock.

Effective at the opening of business on Friday, July 20, 2007, our common stock was delisted from The Nasdaq Global Market.  Our common stock was delisted because we were out of compliance with Nasdaq Rule 4310(c)(14), which requires the timely filing of reports with the SEC.  Our inability to file our reports with the SEC was due to the matters discussed in this Form 10-K in the "Explanatory Note."  We are committed to regaining compliance with all filing requirements and obtaining relisting of our common stock on Nasdaq as soon as possible.  Currently, our common stock is quoted Over-the-Counter.

## DIVIDENDS

We have never paid a cash dividend to stockholders. We have retained our earnings for use in the business. There is also a contractual restriction in our ability to pay dividends. Our leasing business credit facility restricts dividends to 50% of net income accumulated after September 30, 2000. Therefore, the payment of cash dividends on our common stock is unlikely in the foreseeable future. Any future determination concerning the payment of dividends will depend upon the elimination of this restriction and the absence of similar restrictions in other agreements, our financial condition, results of operations and any other factors deemed relevant by our Board

Table of Contents

## PURCHASES OF OUR COMMON STOCK

The following table provides information regarding our purchases of *e*Plus inc. common stock during the fiscal year ended March 31, 2006:

| Period | Total number of shares purchased (1) | | Average price paid per share | Total number of shares purchased as part of publicly announced plans or programs | Maximum number of shares that may yet be purchased under the plans or programs |
|---|---|---|---|---|---|
| April 1, 2005 through April 30, 2005 | 30,000 | $ | 11.20 | 30,000 | 621,212(2) |
| May 1, 2005 through May 31, 2005 | 25,000 | $ | 11.97 | 25,000 | 557,577(3) |
| June 1, 2005 through June 30, 2005 | - | $ | 12.45 | - | 536,342(4) |
| July 1, 2005 through July 31, 2005 | 49,300 | $ | 12.70 | 49,300 | 476,890(5) |
| August 1, 2005 through August 31, 2005 | 20,000 | $ | 12.86 | 20,000 | 450,693(6) |
| September 1, 2005 through September 30, 2005 | 46,000 | $ | 12.76 | 46,000 | 409,293(7) |
| October 1, 2005 through October 31, 2005 | 230,685 | $ | 13.27 | 230,685 | 166,335(8) |
| November 1, 2005 through November 17, 2005 | 19,051 | $ | 13.76 | 19,051 | 141,384(9) |
| November 18, 2005 through November 30, 2006 | 2,800 | $ | 14.27 | 2,800 | 873,163(10) |
| December 1, 2005 through December 31, 2005 | 24,220 | $ | 13.99 | 24,220 | 866,318(11) |
| January 1, 2006 through January 31, 2006 | 23,966 | $ | 14.20 | 23,966 | 829,354(12) |
| February 1, 2006 through February 28, 2006 | 30,568 | $ | 14.15 | 30,568 | 802,166(13) |
| March 1, 2006 through March 31, 2006 | 42,500 | $ | 13.99 | 42,500 | 768,950(14) |

(1) All shares acquired were in open-market purchases.
(2) The share purchase authorization in place for the month ended April 30, 2005 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). As of April 30, 2005, the remaining authorized dollar amount to purchase shares was $6,960,058 and, based on April's average price per share of $11.204, 621,212 represents the maximum shares that may yet be purchased.
(3) The share purchase authorization in place for the month ended May 31, 2005 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). As of May 31, 2005, the remaining authorized dollar amount to purchase shares was $6,675,308 and, based on May's average price per share of $11.972, 557,577 represents the maximum shares that may yet be purchased.
(4) The share purchase authorization in place for the month ended June 30, 2005 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). As of June 30, 2005, the remaining authorized dollar amount to purchase shares was $6,675,308 and, based on June's average price per share of $12.446, 536,342 represents the maximum shares that may yet be purchased.
(5) The share purchase authorization in place for the month ended July 31, 2005 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). As of July 31, 2005, the remaining authorized dollar amount to purchase shares was $6,056,503 and, based on July's average price per share of $12.700, 476,890 represents the maximum shares that may yet be purchased.
(6) The share purchase authorization in place for the month ended August 31, 2005 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). As of August 31, 2005, the remaining authorized dollar amount to purchase shares was $5,796,808 and, based on August's average price per share of $12.862, 450,693 represents the maximum shares that may yet be purchased.
(7) The share purchase authorization in place for the month ended September 30, 2005 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). As of September 30, 2005, the remaining authorized dollar amount to purchase shares was $5,221,348 and, based on September's average price per share of $12.757, 409,293 represents the maximum shares that may yet be purchased.
(8) The share purchase authorization in place for the month ended October 31, 2005 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). As of October 31, 2005, the remaining authorized dollar amount to purchase shares was $2,207,597 and, based on October's average price per share of $13.272, 166,335 represents the maximum shares that may yet be purchased.
 (9) The share purchase authorization in place during the period of November 1–17, 2005 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). As of November 17, 2005, the remaining authorized dollar amount to purchase shares was $1,945,422 and, based on this period's average price per share of $13.761, 141,384 represents the maximum shares that may yet be purchased.

Table of Contents

(10) The Board authorized a share purchase authorization effective November 18, 2005 which had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). For the period of November 18–30, 2005, the remaining authorized dollar amount to purchase shares was $12,460,034 and, based on this period's average price per share of $14.274, 873,163 represents the maximum shares that may yet be purchased.
(11) The share purchase authorization in place for the month ended December 31, 2005 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). As of December 31, 2005, the remaining authorized dollar amount to purchase shares was $12,119,788 and, based on December's average price per share of $13.990, 866,318 represents the maximum shares that may yet be purchased.
(12) The share purchase authorization in place for the month ended January 31, 2006 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). As of January 31, 2006, the remaining authorized dollar amount to purchase shares was $11,780,149 and, based on January's average price per share of $14.204, 829,354 represents the maximum shares that may yet be purchased.

(13) The share purchase authorization in place for the month ended February 28, 2006 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). As of February 28, 2006, the remaining authorized dollar amount to purchase shares was $11,349,850 and, based on February's average price per share of $14.149, 802,166 represents the maximum shares that may yet be purchased.

(14) The share purchase authorization in place for the month ended March 31, 2006 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). As of March 31, 2006, the remaining authorized dollar amount to purchase shares was $10,756,072 and, based on March's average price per share of $13.988, 768,950 represents the maximum shares that may yet be purchased.

The timing and expiration date of the stock repurchase authorizations are included in Note 11, "Stock Repurchase" to our Consolidated Financial Statements.

## ITEM 6.  SELECTED FINANCIAL DATA

The Selected Consolidated Financial Data set forth below should be read in conjunction with our Consolidated Financial Statements and related Notes thereto and the information included under Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and Item 1, "Business."

The information presented in the following tables has been adjusted to reflect the restatement of our financial results, which is more fully described in the "Explanatory Note" immediately preceding Part I, Item 1, "Business;" Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and in Note 2, "Restatement of Consolidated Financial Statements" to our Consolidated Financial Statements contained elsewhere in this Form 10-K.

We have not amended our previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for the periods affected by the restatement. The financial information that has been previously filed or otherwise reported for these periods is superseded by the information in this Annual Report on Form 10-K, and the financial statements and related financial information contained in those previously filed reports should no longer be relied upon.

33

Table of Contents

**ePLUS INC. AND SUBSIDIARIES**
**SELECTED CONSOLIDATED FINANCIAL DATA**
(Dollar amounts in thousands, except per share data)

| | Year Ended March 31, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** |
| | As Restated | As Restated | As Restated | As Restated | |
| **CONSOLIDATED STATEMENTS OF OPERATIONS** | | | | | |
| Revenues: | | | | | |
| Sales of product and services | $ 133,008 | $ 228,770 | $ 267,899 | $ 480,970 | $ 583,068 |
| Sales of leased equipment | 9,353 | 6,096 | - | - | 1,727 |
| Lease revenues | 48,850 | 50,520 | 51,254 | 46,344 | 49,161 |
| Fee and other income | 13,774 | 14,260 | 11,405 | 48,485(1) | 13,363 |
| Total revenues | 204,985 | 299,646 | 330,558 | 575,799 | 647,319 |
| Costs and Expenses: | | | | | |
| Cost of sales,  product and services | 114,554 | 201,277 | 236,283 | 432,838 | 524,967 |
| Cost of sales,  leased equipment | 9,044 | 5,892 | - | - | 1,690 |
| Direct lease costs | 9,579 | 6,582 | 10,561 | 11,445 | 16,695 |
| Professional and other fees | 2,718 | 3,188 | 3,701 | 9,417 | 6,696 |
| Salaries and benefits | 31,767 | 43,927 | 42,349 | 54,335 | 62,308 |
| General and administrative expenses | 12,193 | 14,499 | 14,631 | 18,253 | 18,603 |
| Litigation settlement and judgment | - | - | - | - | 10,176 |
| Interest and financing costs | 11,810 | 8,316 | 6,894 | 5,877 | 7,250 |
| Total costs and expenses | 191,665 | 283,681 | 314,419 | 532,165 | 648,385 |
| Earnings (loss) before provision for income taxes | 13,320 | 15,965 | 16,139 | 43,634 | (1,066) |
| Provision for (benefit from) income taxes | 5,388 | 6,622 | 6,647 | 17,928 | (545) |
| Net earnings (loss) | $ 7,932 | $ 9,343 | $ 9,492 | $ 25,706 | $ (521) |
| Net earnings (loss) per common share—Basic | $ 0.77 | $ 0.93 | $ 1.02 | $ 2.89 | $ (0.06) |
| Net earnings (loss) per common share—Diluted | $ 0.76 | $ 0.92 | $ 0.95 | $ 2.73 | $ (0.06) |
| Weighted average shares outstanding—Basic | 10,235,155 | 10,060,179 | 9,333,388 | 8,898,296 | 8,347,727 |
| Weighted average shares outstanding—Diluted | 10,448,021 | 10,108,211 | 9,976,822 | 9,409,119 | 8,347,727 |

(1) Includes proceeds from a patent-infringement litigation settlement of $37.0 million for the year ended March 31, 2005.

34

Table of Contents

**ePLUS INC. AND SUBSIDIARIES**
**SELECTED CONSOLIDATED FINANCIAL DATA**
(Dollar amounts in thousands)

| | As of March 31, | | | | |
|---|---|---|---|---|---|
| | **2002** | | **2003** | **2004** | **2005** | **2006** |
| | As Restated | | As Restated | As Restated | As Restated | |
| **CONSOLIDATED BALANCE SHEETS** | | | | | |
| Assets: | | | | | |
| Cash and cash equivalents | $ 28,224 | $ 27,784 | $ 25,155 | $ 38,852 | $ 20,697 |
| Accounts receivable—net | 41,397 | 38,385 | 51,189 | 93,555 | 103,060 |
| Notes receivable | 228 | 53 | 52 | 115 | 330 |
| Inventories | 872 | 1,373 | 900 | 2,117 | 2,292 |

| | | | | | |
|---|---|---|---|---|---|
| Investment in leases and leased equipment—net | | | | | 205,774 |
| Other assets | | 39,188 | 29,177 | 30,239 | 36,633 | 41,792 |
| Total assets | $ | 278,915 | $ 278,431 | $293,080 | $360,128 | $373,945 |
| | | | | | |
| Liabilities: | | | | | |
| Accounts payable | $ | 15,909 | $ 28,314 | $ 39,404 | $ 55,499 | $ 73,657 |
| Salaries and commissions payable | | 492 | 620 | 584 | 771 | 4,124 |
| Recourse notes payable | | 4,660 | 2,736 | 6 | 6,265 | 6,000 |
| Non-recourse notes payable | | 129,977 | 116,255 | 117,857 | 114,839 | 127,973 |
| Other liabilities | | 20,704 | 19,938 | 22,777 | 49,428 | 33,615 |
| Total liabilities | | 171,742 | 167,863 | 180,628 | 226,802 | 245,369 |
| Stockholders' equity | | 107,173 | 110,568 | 112,452 | 133,326 | 128,576 |
| Total liabilities and stockholders' equity | $ | 278,915 | $ 278,431 | $293,080 | $360,128 | $373,945 |

Certain liabilities presented for prior periods have been reclassified to conform to the March 31, 2006 presentation.

35

Table of Contents

ePLUS INC. AND SUBSIDIARIES
SELECTED CONSOLIDATED FINANCIAL DATA
(Dollar amounts in thousands, except per share data)

| | Year Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2002** | | | | **2003** | |
| | As Previously Reported | Stock-Based Compensation and Tax-Related Adjustments | As Restated | As Previously Reported | Stock-Based Compensation and Tax-Related Adjustments | As Restated |
| **CONSOLIDATED STATEMENTS OF OPERATIONS** | | | | | | |
| Revenues: | | | | | | |
| Sales of product and services | $ 133,008 | $ - | $ 133,008 | $ 228,770 | $ - | $ 228,770 |
| Sales of leased equipment | 9,353 | - | 9,353 | 6,096 | - | 6,096 |
| Lease revenues | 48,850 | - | 48,850 | 50,520 | - | 50,520 |
| Fee and other income | 13,774 | - | 13,774 | 14,260 | - | 14,260 |
| Total revenues | 204,985 | - | 204,985 | 299,646 | - | 299,646 |
| Costs and Expenses: | | | | | | |
| Cost of sales, product and services | 114,554 | - | 114,554 | 201,277 | - | 201,277 |
| Cost of sales, leased equipment | 9,044 | - | 9,044 | 5,892 | - | 5,892 |
| Direct lease costs | 9,579 | - | 9,579 | 6,582 | - | 6,582 |
| Professional and other fees | 2,718 | - | 2,718 | 3,188 | - | 3,188 |
| Salaries and benefits | 30,165 | 1,602 | 31,767 | 43,428 | 499 | 43,927 |
| General and administrative expenses | 12,193 | - | 12,193 | 14,499 | - | 14,499 |
| Interest and financing costs | 11,810 | - | 11,810 | 8,308 | 8 | 8,316 |
| Total costs and expenses | 190,063 | 1,602 | 191,665 | 283,174 | 507 | 283,681 |
| Earnings before provision for income taxes | 14,922 | (1,602) | 13,320 | 16,472 | (507) | 15,965 |
| Provision for income taxes | 6,010 | (622) | 5,388 | 6,760 | (138) | 6,622 |
| Net earnings | $ 8,912 | $ (980) | $ 7,932 | $ 9,712 | $ (369) | $ 9,343 |
| | | | | | | |
| Net earnings per common share—Basic | $ 0.87 | $ (0.10) | $ 0.77 | $ 0.97 | $ (0.04) | $ 0.93 |
| Net earnings per common share—Diluted | $ 0.85 | $ (0.09) | $ 0.76 | $ 0.96 | $ (0.04) | $ 0.92 |
| | | | | | | |
| Weighted average shares outstanding—Basic | 10,235,129 | 26 | 10,235,155 | 10,061,088 | (909) | 10,060,179 |
| Weighted average shares outstanding—Diluted | 10,458,235 | (10,214) | 10,448,021 | 10,109,809 | (1,598) | 10,108,211 |

See comparable information for the years ended March 31, 2004 and 2005 in Note 2 to our Consolidated Financial Statements.

36

Table of Contents

ePLUS INC. AND SUBSIDIARIES
SELECTED CONSOLIDATED FINANCIAL DATA
(Dollar amounts in thousands)

| | As Previously Reported | Stock-based Compensation Adjustments | Other Adjustments | As Restated |
|---|---|---|---|---|
| **CONSOLIDATED BALANCE SHEETS** | | | | |
| As of March 31, 2002 | | | | |
| Assets: | | | | |
| Cash and cash equivalents | $ 28,224 | $ - | $ - | $ 28,224 |
| Accounts receivable—net | 41,397 | - | - | 41,397 |
| Notes receivable | 228 | - | - | 228 |

| Inventories | 872 | | | 872 |
|---|---|---|---|---|
| Investment in leases and leased equipment—net | 169,087 | - | (81) | 169,006 |
| Other assets | 39,188 | - | - | 39,188 |
| Total assets | $ 278,996 | $ - | $ (81) | $ 278,915 |
| | | | | |
| Liabilities: | | | | |
| Accounts payable | $ 18,122 | $ - | $ (2,213) | $ 15,909 |
| Salaries and commissions payable | 492 | - | - | 492 |
| Recourse notes payable | 4,660 | - | - | 4,660 |
| Non-recourse notes payable | 129,977 | - | - | 129,977 |
| Other liabilities | 19,456 | (884) | 2,132 | 20,704 |
| Total liabilities | 172,707 | (884) | (81) | 171,742 |
| Stockholders' equity | 106,289 | 884 | - | 107,173 |
| Total liabilities and stockholders' equity | $ 278,996 | $ - | $ (81) | $ 278,915 |
| | | | | |
| As of March 31, 2003 | | | | |
| Assets: | | | | |
| Cash and cash equivalents | $ 27,784 | - | - | 27,784 |
| Accounts receivable—net | 38,385 | - | - | 38,385 |
| Notes receivable | 53 | - | - | 53 |
| Inventories | 1,373 | - | - | 1,373 |
| Investment in leases and leased equipment—net | 182,169 | - | (510) | 181,659 |
| Other assets | 29,177 | - | - | 29,177 |
| Total assets | $ 278,941 | $ - | $ (510) | $ 278,431 |
| | | | | |
| Liabilities: | | | | |
| Accounts payable | $ 31,550 | - | (3,236) | 28,314 |
| Salaries and commissions payable | 620 | - | - | 620 |
| Recourse notes payable | 2,736 | - | - | 2,736 |
| Non-recourse notes payable | 116,255 | - | - | 116,255 |
| Other liabilities | 18,163 | (951) | 2,726 | 19,938 |
| Total liabilities | 169,324 | (951) | (510) | 167,863 |
| Stockholders' equity | 109,617 | 951 | - | 110,568 |
| Total liabilities and stockholders' equity | $ 278,941 | $ - | $ (510) | $ 278,431 |
| | | | | |
| As of March 31, 2004 | | | | |
| Assets: | | | | |
| Cash and cash equivalents | $ 25,155 | - | - | 25,155 |
| Accounts receivable—net | 51,189 | - | - | 51,189 |
| Notes receivable | 52 | - | - | 52 |
| Inventories | 900 | - | - | 900 |
| Investment in leases and leased equipment—net | 186,667 | - | (1,122) | 185,545 |
| Other assets | 30,239 | - | - | 30,239 |
| Total assets | $ 294,202 | $ - | $ (1,122) | $ 293,080 |
| | | | | |
| Liabilities: | | | | |
| Accounts payable | $ 42,134 | $ - | $ (2,730) | $ 39,404 |
| Salaries and commissions payable | 584 | - | - | 584 |
| Recourse notes payable | 6 | - | - | 6 |
| Non-recourse notes payable | 117,857 | - | - | 117,857 |
| Other liabilities | 22,037 | (868) | 1,608 | 22,777 |
| Total liabilities | 182,618 | (868) | (1,122) | 180,628 |
| Stockholders' equity | 111,584 | 868 | - | 112,452 |
| Total liabilities and stockholders' equity | $ 294,202 | $ - | $ (1,122) | $ 293,080 |

See comparable information as of March 31, 2005 in Note 2 to the Consolidated Financial Statements.

37

Table of Contents

**ITEM 7.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**RESULTS OF AUDIT COMMITTEE REVIEW; RESTATEMENT OF CONSOLIDATED FINANCIAL STATEMENTS**

In this Annual Report for the year ended March 31, 2006, we have restated our Consolidated Balance Sheet as of March 31, 2005, and the related Consolidated Statements of Operations, Stockholders' Equity and Cash Flows for each of the fiscal years ended March 31, 2005 and 2004, and quarterly data for each of the four quarters in the fiscal year ended March 31, 2005, and for the first three quarters in the fiscal year ended March 31, 2006, for the effects of errors in accounting for stock options. Our Consolidated Balance Sheet as of March 31, 2005 and our Consolidated Statements of Cash Flows for the years ended March 31, 2005 and 2004 were also restated to correct errors related to cash flows from dealer floor plan financing arrangements and the cash flow statement presentation of payments made by our lessees directly to our third-party, non-recourse lenders.  See Note 2, "Restatement of Consolidated Financial Statements" and Note 15, "—Quarterly Data — Restated and Unaudited" in the Notes to the Consolidated Financial Statements for further discussion of the effects of the restatement.

As part of the restatement, we have recorded additional pre-tax share-based compensation expense (recovery) with regard to past stock option grants of approximately $(20) thousand and $810 thousand for our fiscal years ended March 31, 2005 and 2004, respectively.  The total additional cumulative pre-tax share-based compensation expense for fiscal years prior to 2004 was $4.4 million.  In addition, the reclassification of cash flows related to our direct financing and sales-type lease transactions decreased net cash used in operating activities and increased net cash used in financing activities by $19.5 million for the fiscal year ended March 31, 2005 and $19.9 million for the fiscal year ended March 31, 2004.

This Annual Report also presents the effects of the restatement on our Selected Consolidated Financial Data in Item 6, "Selected Financial Data" as of and for the years ended March 31, 2005, 2004, 2003 and 2002, and "—Results of Operations" for our fiscal years ended March 31, 2005 and 2004.

Previously filed Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q affected by the restatement will not be amended.  Accordingly, previously issued financial statements and related reports of our independent registered public accounting firm should not be relied on.

As discussed in greater detail in "Review of Historical Financial Statements" and our Consolidated Financial Statements, the restatement included in this Form 10-K corrects certain items related to:

(i)        stock-based compensation adjustments related to revised measurement dates under APB 25;

(ii)        stock-based compensation adjustments related to previously unrecorded modifications under FIN 44;

(iii)        tax-related adjustments resulting from the above errors in stock option accounting;

(iv)        reclassification of our dealer floor plan financing agreements within the Consolidated Balance Sheets and Statements of Cash Flows; and

(v)        reclassification of payments made by lessees to third-party non-recourse lenders within the Statements of Cash Flows.

Our decision to restate the previously issued Consolidated Financial Statements for the effects of errors in accounting for stock options was based on the findings of the Audit Committee Investigation of our historical stock option granting practices and related accounting.

38

Table of Contents

## Stock Option Accounting Restatement

### Internal Review and Audit Committee Investigation

On June 21, 2006, our CEO received a letter, dated June 20, 2006, from a shareholder raising concerns about 450,000 options awarded to our four senior officers in 2004. Our CEO forwarded the letter to the Chairman of the Audit Committee. On June 23, 2006, the Audit Committee commenced a voluntary investigation of the issues raised in the June 20, 2006 letter concerning the 2004 Options. Subsequently, the Audit Committee Investigation was expanded to cover all grants issued by us, since our IPO in 1996. The Audit Committee retained outside legal counsel, who in turn retained forensic accountants, to assist in the Investigation.

With the assistance of independent counsel, the Audit Committee Investigation obtained and reviewed corporate books and records relating to option grants since our IPO in 1996, including relevant stock option plans, option agreements, minutes and consents of the Board and Compensation Committee, relevant public filings and other available documentation. In addition, independent counsel for the Audit Committee reviewed a large volume of potentially relevant emails and electronic documents, and interviewed 28 individuals, many on multiple occasions. The Audit Committee's independent counsel developed an exhaustive search term list, which was applied to the electronic data received. Approximately 79 gigabytes of electronic data was located and reviewed. The Audit Committee met frequently throughout this course of its Investigation.

As a result of the Audit Committee Investigation, the Audit Committee determined that:

- subsequent to July 1998, the SIC was not formally approved to administer the stock option plans. Nonetheless, the SIC continued to grant stock options as disclosed in the proxy statements. We intend to honor the awards made to employees by the SIC;

- the 2004 Options, which were the initial subject of the Audit Committee Investigation, were effectively awarded (i.e., all necessary granting actions were completed) by the Compensation Committee in April 2004. The Compensation Committee, believing that the options had not been effectively awarded in April 2004, approved a new award of the same options in November 2004, at the then fair market value of the stock, which was lower than the April value. Because the original award of options was determined to be effective in April 2004, the November 2004 approval constituted a modification of the earlier awards to provide for a lower exercise price. Such modification was not in accordance with the governing stock option plan. As described elsewhere herein, these options have been cancelled. Because the awards were determined to be originally approved and granted as of April 2004, the Forms 4 filed by our four senior officers with respect to these options and the Form 8-K filed by us inaccurately describe the options. Moreover, the Forms 4 were not timely filed;

- on one occasion in 1997, two occasions in 1998, and in each of the quarters from late 2000 to early 2003 in which options were granted, the date and exercise price of certain stock options were determined with hindsight to provide a more favorable exercise price for such grants. These options were priced at the lowest closing price during the prior quarter, and not, as required by the applicable stock option plans, at the closing price on the date the options were actually awarded. Recipients of such quarterly low priced options included employees, management and directors. Two members of management, who were not involved in the accounting function, as well as our then head of Human Resources, were involved in implementing this practice;

- certain grants to non-employee directors were not made on the dates specified by the then-applicable stock option plans;

- the measurement date we used for accounting purposes for certain stock option grants were not accurate because all the required granting actions were not completed as of the original grant date. In addition, for several option grants, the accounting consequences of modifications to the original awards, or the presence of employee performance criteria, were not properly applied;

39

Table of Contents

- our internal controls, system of reporting, application of U.S. GAAP and documentation with respect to option awards were inadequate. See Item 9A, "Controls and Procedures;" and

- there was no evidence of falsified corporate records of meetings, consents or "phantom" options. Nor was there any evidence of the destruction of documents.

As a result of the Audit Committee Investigation, the Audit Committee and *e*Plus determined that the appropriate measurement dates for determining the accounting treatment for certain stock options we granted from September 1, 1996 through August 10, 2006 differ from the recorded measurement dates used in preparing our Consolidated Financial Statements. As a result, non-cash stock-based compensation expense should have been recorded with respect to these stock option grants. The Audit Committee further determined that certain stock option grants or modifications of stock option grants that were not in accordance with our stock-based compensation plans should have been accounted for using variable plan accounting for the duration of the options. The restatement in this Form 10-K principally reflects additional stock-based compensation expense and related tax effects under APB 25 and related interpretations issued by the FASB, which was our historical accounting method, relating to our historic stock option practices.

### Restated Accounting for Historical Stock Option Grants

In connection with our review of our historical granting practices, we performed a review of stock option grant measurement dates through March 31, 2005 used during the Relevant Period. The accounting literature in effect during the Relevant Period was primarily APB 25, and the related FASB interpretations. This guidance focused on the establishment of a "measurement date" for purposes of determining compensation expense relating to stock option awards. Under APB 25, "measurement date" is defined as the first date on which both of the following are known (1) the number of shares that an individual employee is entitled to receive, and (2) the option or purchase price, if any. This accounting guidance provided that companies would not have to record compensation expense in connection with options granted to employees, officers and directors if the quoted market price of the stock at the measurement date of the stock option award was equal to the amount the employee was required to pay. In contrast, companies would have to record compensation expense to the extent that the quoted market price of the stock at the measurement date exceeded the amount the employee was required to pay.

We performed a review of the treatment of stock option grants as part of our internal review referred to above for financial reporting purposes. Based on the individual facts and circumstances, we concluded that the exercise price for a number of option grants during the Relevant Period were below the fair market value of our common stock on the revised measurement date of the grant. This resulted from certain option grant dates having been established prior to the completion of all the final granting actions necessary for those grants. In some cases, the exercise price and date of the grant was determined with hindsight to provide a more favorable exercise price for such grants at quarterly or monthly low stock prices. The grants in question included grants made to newly hired employees, annual director grants, grants made to employees in connection with certain acquisitions, and discretionary grants made to officers, non-employee and employee directors, and rank and file employees. Applying the revised measurement dates to the impacted stock option grants resulted in a stock-based compensation charge if the fair market value of our common stock as of the revised measurement date exceeded the exercise price of the option grant, in accordance with APB 25.

We determined revised measurement dates for those option grants with incorrect measurement dates and recorded stock-based compensation expense to the extent that the fair market value of our stock on the revised measurement date exceeded the exercise price of the stock option, in accordance with APB 25 and related FASB interpretations. As such, we recorded stock-based compensation expense in our historical financial statements through March 31, 2005 totaling $5.2 million, as well as the tax related impact resulting from the stock-based compensation adjustments of $1.6 million. Additionally, we restated both basic and diluted weighted average shares outstanding for changes in measurement dates resulting from the Investigation. The combination of recording stock-based compensation expense and restating our weighted average shares outstanding has resulted in restated basic and diluted EPS.

We adopted a methodology for determining the most likely appropriate accounting measurement dates for all stock option grants. We reviewed all available documentation and considered all facts and circumstances for each award and attempted to identify the date at which the award was most likely authorized and approved and the recipient, number of shares and price were approved and determined with finality. As such, we adopted the following framework for determining the revised historical measurement dates of our employee stock option grants and have applied this framework based on the facts, circumstances and availability of the documentation for each grant.

*Step 1*

We reviewed, as available, the documents noted below for sufficient evidence that the approval and terms of the stock options were determined with finality:

1. Board meeting minutes, resolutions and written consent actions;
2. Compensation Committee and SIC meeting minutes and resolutions;

40

Table of Contents

3. offer letters signed by an authorized approver and the recipient and stating the number of shares and exercise price;
4. internal communications from an authorized approver stating the number, number of shares and exercise price;
5. executed acquisition agreements stating the number of shares and the option price;
6. historical stock prices as reflected on Nasdaq to determine when stock price based performance vesting occurred;
7. public filings as they relate to awards granted in connection with the IPO; and
8. all stock option plans in place over the Relevant Period.

We reviewed minutes, consents, resolutions, offer letters and other corporate records for the purpose of validating their accuracy, and at no time determined that any of the records were altered or appeared to have not occurred as recorded. While we considered the above documents in order, all documents and all facts and circumstances were considered when determining the revised measurement date. Measurement dates for approximately 52.3% of the total number of grants made during the Relevant Period were determined based on the documentation listed in Step 1 above. In instances where the above documentation was not available or provided ambiguous information, we proceeded to Step 2.

*Step 2*

If after review of the available documents as listed in Step 1, there was insufficient documentation to select the date at which the recipient, number of shares and price were determined with finality, we attempted to select the most likely date at which the terms were determined with finality. In considering the most likely date, we considered all available documentation and all facts and circumstances.

In addition to the documents listed in Step 1, we examined the following documents:

1. all internal and external communications including emails, offer letters, memos, faxes, letters and handwritten notes;
2. acquisition agreements that do not contain recipients, exercise price and number of shares;
3. outside stock option administrator transaction data (e.g. data from First Union, Wachovia, or AST);
4. management practice regarding the annual non-employee director grants; and
5. stock option agreements hand dated or not hand dated.

In conjunction with all available documentation, we considered the following facts and circumstances:

1. our stock option granting practices;
2. acquisition dates;
3. new hires start dates;
4. effective dates of non-employee director appointments to the Board;
5. our stock performance; and
6. all other available information.

Selecting the date at which the most likely granting actions occurred with finality required a significant amount of judgment. While we considered all the documents and facts in the order noted above, the level of reliance on each type of document depended on the facts and circumstances surrounding each award. In some instances, we grouped awards based on similar characteristics and similar underlying facts and circumstances. In these instances, we treated

all of the group ascertainable in firm documentation. Measurement dates for approximately 40.1% of the total number of grants made during the Relevant Period were determined based on the documentation listed in Step 2 above.

*Step 3*

If there was insufficient evidence, after reviewing all available documentation and all facts and circumstances listed in Step 1 and Step 2, to select a specific date at which the recipient, number of shares and price were approved and determined with finality, we used the earliest of the dates below.  We believe that the required granting actions would have occurred with finality 'no later than' at each of the following dates:

*Table of Contents*

1. stock option agreement signed by a member of the SIC and hand dated by the optionee unless other facts and circumstances exist that present ambiguity as to the accuracy of the hand date;
2. the legible 'run date' of the stock option administrator report; and
3. subsequent Form 10-Q or 10-K filing date.  As of this date and pursuant to our stock option granting process, an authorized approver would have approved the awards which would have resulted in the administration of the awards to include input into the stock option administration software.  Quarterly reports were run from the stock option administration software and reconciled to the general ledger and the stock registrar's reports and the EPS calculation.  This reconciliation resulted in the stock-based compensation and the EPS disclosures, which included the awarded shares as filed in the Form 10-Q or Form 10-K.

Measurement dates for approximately 7.6% of the total number of grants made during the Relevant Period were determined based on the documentation listed in Step 3 above.

We also determined that we should have recorded stock-based compensation expense associated with the modification of certain stock option grants which resulted in the application of variable accounting under FASB Interpretation No. 44, "Accounting for Certain Transactions Involving Stock Compensation" ("FIN 44").  The modified grants included certain grants made to newly hired employees, annual director grants, grants made to employees in connection with an acquisition, and discretionary grants made to officers, employee directors, and rank and file employees.

### Our Process for Granting Stock Options

*Stock Incentive Committee*

Beginning in 1996, two employee directors, Bruce Bowen and Phillip G. Norton, began issuing options to employees under the authority of the SIC as prescribed by the provisions of the 1996 Plans.

Under the terms of the 1996 Plans, a majority of the members of the SIC was required to approve each stock option grant.  In practice, Mr. Bowen and Mr. Norton discussed each stock option award prior to instructing the human resources manger to administer the awards.  Accordingly, for purposes of selecting revised measurement dates, we considered documentation demonstrating approval by either Mr. Bowen or Mr. Norton as sufficient evidence of approval during the Relevant Period.

Under the terms of the LTIP, the Compensation Committee was required to approve any awards.  In practice, however, the SIC continued to administer the awards under our current stock compensation plan, the Amended LTIP.  The LTIP and Amended LTIP permit a delegation of authority to one or more employee-directors to issue options in certain cases.  While we have been unable to locate a document such as Board minutes or a unanimous written consent reflecting a delegation of such authority, our public disclosures provided that the SIC was authorized to award stock, and various stock options and rights and other stock-based compensation grants under the 1998 Plans.

Even if the SIC did not have actual authority to grant awards, we have historically honored and intend to continue to honor the stock options.  Moreover, since (1) the SIC was comprised of two employee directors, who could have been given delegated authority pursuant to the amended terms of the LTIP, (2) the directors were our two top executives, (3) we actually administered the stock options, (4) we instructed our transfer agent to issue the stock options, (5) our proxy statement stated that the SIC had authority, and (6) the employees were able to exercise the stock options, we believe that the SIC had the implicit authority to grant stock option awards.

The SIC met on an ad hoc basis to determine to which employees to grant options.  In addition to one occasion in which all employees were awarded options, the SIC considered awarding options to (1) employees of companies we acquired in order to enhance employee retention; (2) key *e*Plus employees in order to provide incentives and enhance retention; and (3) new employees in connection with their hiring.

*Administration and Tracking of Stock Options*

Historically, our human resources manager prepared the stock option agreements and either administered the stock options internally or communicated with outside stock option administrators, who maintained the detail records of outstanding stock options.  Our human resources manager was primarily responsible for retrieving the executed agreements from the employees.

Our human resources manager would receive instruction from Mr. Bowen or Mr. Norton for all grants prior to entering them in our internal stock option system or communicating with outside stock option administrators, as applicable.  For those awards that required Board or Compensation Committee approval, such as options granted to the SIC members, Mr. Bowen or Mr. Norton usually provided the applicable Board or Compensation Committee minutes to our human resources manager.

*Table of Contents*

The stock options were tracked on a spreadsheet administered by the accounting department for the period from our IPO in 1996 through 1997.  In late 1997 to early 1998, we licensed SOA Software that was used internally by our human resources manager to enter and track all the stock option information.  This software was used from its acquisition through April 2000.

In April of 2000, we solicited the services of First Union to process the stock option administration externally.  First Union utilized the same SOA Software to maintain the stock option data.  The stock option files from our SOA Software were exported and sent to First Union in May of 2000 to upload into their system.  Our human resources manager sent the stock option update information to First Union primarily by email, but sometimes by fax and on occasion by phone.  The data sent to First Union usually no less than quarterly consisted of any stock options that were granted, employee terminations and employee address changes.  First Union eventually merged with Wachovia.  Effective June 30, 2006, the shareholder services business at Wachovia was purchased by AST.

*Types of Awards*

*Annual Non-Employee Director Grants*

These are grants relating to the annual awards made to non-employee directors in the Relevant Period. The stock option awards to outside directors were provided for as automatic grants under the terms of the 1996 Plans and the 1998 Plans. The administration of awards to outside directors was not consistently performed in accordance with the provisions of the applicable plans until 2003. The 1996 Plans provided that stock option grants to be awarded on the anniversary date of a director's admission to the Board. This provision changed in the 1998 Plans to provide for the stock option grants were to be awarded on the date following the annual stockholder meeting. A certain number of the awards issued after the change in the provision in the stock plans were administered after the change in the stock option plan as if the appropriate grant date was the anniversary date of our IPO, November 20. In addition, certain awards were issued on the director's new appointment anniversary date or the date following the annual stockholders meeting.

Until 2003, management believed that the annual awards should be given on the anniversary of the IPO, November 20. We believe this thought process came about because the initial two directors were appointed as of the IPO date, November 20, 1996. Consequently, for two years, management awarded the options appropriately on November 20 which was also the anniversary of the IPO. This process was correct for the initial two directors until the adoption of the 1998 Plans which provided for the options to be granted the day after the annual meeting. However, under the 1996 Plans, as other directors were appointed, management continued to grant the awards on the IPO anniversary even though the plan required that they be granted on the anniversary of the director's appointment. For purposes of determining the revised measurement date for the awards incorrectly issued at the IPO anniversary date instead of the day after the annual meeting, we selected the approach of relying on the process in which management believed was correct, which was the IPO anniversary date, as that was the genesis of the granting action for options granted prior to 2003. Beginning in 2003, management began processing the annual grants on the day after the annual meeting pursuant to the 1998 Plans.

### Acquisition Grants

These are grants relating to options awarded to new employees who joined us by way of an acquisition. These options were not replacement options for options that existed prior to the acquisition. In our acquisitions prior to 2002, often times the prior owners of the selling company would negotiate employment perks for their key employees to induce them to stay during the acquisition. Many times, stock options were negotiated prior to acquisition and the specific optionees and number of shares awarded to each optionee were documented in a letter of intent or other documentation created during the acquisition process. In some cases, the request was brought before the Compensation Committee to be voted upon in conjunction with the overall presentation of the acquisition opportunity.

Table of Contents

For purposes of the granting process, we grouped acquisition-related grants together and approved and administered them on an acquisition-by-acquisition basis. In some cases, the stock option agreements contained handwritten signature dates by the recipients. Because we processed and administered these grants as a group, it is reasonable to rely upon the earliest handwritten signature date in the group as the 'no later than' date on which the recipients, number of shares and exercise price were approved with finality for the entire tranche. Therefore, we believe that the earliest handwritten signature date of a stock option agreement in a tranche represents a reliable level of evidence for the entire tranche on which to base the revised measurement date. In cases where there was a spread of dates between the stock option agreement handwritten signature dates by recipients, we believe that, because of the characteristics of the acquisition-type grants and the process by which we administer the grants, the reliability of the earliest handwritten signature date is not diminished.

There are instances in which an incorrect measurement date had been used for the accounting of certain of these grants as not all of the required granting actions had been completed as of the original grant date or as the stock option administration did not occur consistent with the underlying documentation.

### New Hire Grants

These are grants relating to options awarded to new employees who did not join us as a result of an acquisition. Candidates for hire received an offer letter, which contained, among other things, the candidate's name, title of the position, tentative start date, salary and information regarding a grant of stock options, if any. Most offer letters contained the number of options to be granted but did not specify when the options would be granted or the price of the options. There are several instances, occurring in 2001, in which the offer letter specifies that the strike price will be set for the lowest closing price between the date of hire and the end of the quarter.

Prior to March 2003, some offer letters were signed by executives of the subsidiary whom did not have the authority to grant stock options. In these instances, the subsidiary executives contacted either Mr. Bowen or Mr. Norton, primarily by phone, in order to obtain approval to grant the options. Once approval was obtained, Mr. Bowen or Mr. Norton would instruct our human resources manager to issue the awards.

There are instances in which an incorrect measurement date had been used for the accounting of certain of these grants as not all of the required granting actions had been completed as of the original grant date or as the stock option administration did not occur consistent with the underlying documentation. As such, we applied our three-step methodology, as described above, to determine the most likely appropriate accounting measurement dates for the stock option grants.

### Discretionary Grants

These grants include all other stock option awards not otherwise included in the director, acquisition or new hire grants. Discretionary grants were awarded to employee directors, non-employee directors, officers, and rank-and-file employees. Discretionary awards were communicated to our human resources manager through the Board or Compensation Committee minutes or a member of the SIC.

Employee Directors (SIC Members). On three occasions, other than the IPO awards, discretionary grants were made to the members of the SIC, Mr. Norton and Mr. Bowen. Members of the SIC did not have the authority to grant options to themselves. Mr. Norton and Mr. Bowen would work with the Board or Compensation Committee and would receive written approval in the form of a memo or meeting minutes.

Non-Employee Directors, Officers and Rank-and-File Employees. The specific facts and circumstances surrounding these discretionary awards vary from grant to grant. We did not have a written policy other than the plans regarding the issuance and administration of stock option awards and, due to the lack of contemporaneous documentation, we are unable to definitively state the specific policies and practices surrounding these awards. We believe the common practice was to obtain an authorized approval from the Board, the Compensation Committee or the SIC members. Once approval was obtained and the number of shares and price were determined, Mr. Bowen or Mr. Norton would communicate the information to our human resources manager who would administer the award.

Table of Contents

There are instances in which an incorrect measurement date had been used for the accounting of certain of these grants as not all of the required granting actions had been completed as of the original grant date or as the stock option administration did not occur consistent with the underlying documentation. As such, we applied our three-step methodology, as described above, to determine the most likely appropriate accounting measurement dates for the stock option grants.

### Income and Payroll Tax Related Matters

In certain instances covered in the summary table was appropriate. Since our stock options were granted at a discount, in accordance with United States tax rules, it had the effect of disqualifying the ISO tax treatment of those stock options, causing those stock options to be recharacterized as non-qualified options. For purposes of assessing the tax impact of the accounting change, we concluded that the grant date for tax purposes is the same as the measurement date for financial reporting purposes. The recharacterization of ISOs to non-qualified status resulted in a failure to withhold certain employee payroll taxes and consequently we have recorded an adjustment to salaries and benefits, along with an adjustment to interest and financing costs for penalties and interest, based on the period of exercise. In subsequent periods in which the liabilities were legally extinguished due to statutes of limitations, the payroll taxes, interest and penalties were reversed, and recognized as a reduction in the related functional expense category in our consolidated statements of operations. The fluctuations in the table below for payroll taxes and related penalties are the result of (1) the timing of stock option exercises, and (2) the reversals of expenses previously recorded due to the expiration of these statutes of limitations.

In addition, we have recorded a net income tax benefit of approximately $2.0 million in connection with the stock-based compensation related expense during the period from fiscal years 1997 to 2005. This tax benefit has resulted in an increase of our deferred tax assets for all affected stock options prior to the exercise or cancellation of the related options. Upon exercise or cancellation of the underlying options, the excess or deficiency in deferred tax assets is written-off to either expense or additional paid-in capital in the period of exercise or cancellation.

The table below under "—Summary of Impact of Restatement Adjustments for Historical Option Grants" shows income tax benefits recorded in relation to the non-cash stock-based compensation adjustments.

*Summary of Impact of Restatement Adjustments for Historical Option Grants*

| Fiscal Year | Share-Based Compensation Expense | Payroll Tax Due On Options | Payroll Withholding Tax Penalty On Exercises | Income Tax Provision (Benefit) Related to Share-Based Compensation and Payroll Taxes | Total Adjustments, Net of Tax |
|---|---|---|---|---|---|
| *(in thousands)* | | | | | |
| 1997 | $ 81 | $ - | $ - | $ (31) | $ 50 |
| 1998 | 137 | - | - | (53) | 84 |
| 1999 | 149 | - | - | (57) | 92 |
| 2000 | 962 | 568 | 121 | (564) | 1,087 |
| 2001 | 990 | 57 | 12 | (364) | 695 |
| 2002 | 1,602 | - | - | (622) | 980 |
| 2003 | 465 | 34 | 8 | (138) | 369 |
| Cumulative effect on April 1, 2003 opening retained earnings | 4,386 | 659 | 141 | (1,829) | 3,357 |
| 2004 | 810 | 213 | 48 | (409) | 662 |
| 2005 | (20) | (503) | (104) | 209 | (418) |
| **Total** | $ 5,176 | $ 369 | $ 85 | $ (2,029) | $ 3,601 |

See Note 2, "Restatement of Consolidated Financial Statements," to our Consolidated Financial Statements for a detailed summary of adjustments.

**Summary of the Restatement — Other Items**

In addition to the stock option errors described above, we have also restated our Consolidated Balance Sheet as of March 31, 2005 and our Consolidated Statements of Cash Flows for the fiscal years ended March 31, 2005 and 2004 for the following reasons:

We use floor planning agreements for dealer financing of products purchased from distributors and resold to end-users. Historically, we classified the cash flows from our floor plan financing agreements in operating activities in our Consolidated Statements of Cash Flows. We previously treated the floor plan facility as an outsourced accounts payable function, and, therefore, considered the payments made by our floor plan facility as cash paid to suppliers under Financial Accounting Standards No. 95, "*Statement of Cash Flows*."

*Table of Contents*

We have now determined that when an unaffiliated finance company remits payments to our suppliers on our behalf, we should show this transaction as a financing cash inflow and an operating cash outflow. In addition, when we repay the financing company, we should present this transaction as a financing cash outflow. As a result, we have restated the accompanying fiscal year 2005 and 2004 Consolidated Financial Statements to correct this error.

The restatement also includes a separate line item on our Consolidated Balance Sheets for the accounts payable related to our floor plan financing agreements which had previously been included in accounts payable—trade.

Also, payments made by our lessees directly to third-party, non-recourse lenders were previously reported on our Consolidated Statements of Cash Flows as repayments of non-recourse debt in the financing section and a decrease in our investment in leases and leased equipment—net in the operating section. As these payments were not received or disbursed by us, management determined that these amounts should not be shown as cash used in financing activities and cash provided by operating activities on our Consolidated Statements of Cash Flows. Rather, these payments are now disclosed as a non-cash financing activity on our Consolidated Statements of Cash Flows.

In addition, certain corrections were made for errors noted on our Consolidated Statements of Cash Flows between the line items reserves for credit losses and changes in accounts receivable, both of which are in the operating section. See the impact of corrections in Note 2, "Restatement of Consolidated Financial Statements" to our Consolidated Financial Statements contained elsewhere in this document.

**Remedial Actions Taken**

The Board cancelled $400,000 in cash bonuses that were scheduled to be paid to the four senior officers in 2006. The determination was made that executive bonuses were not appropriate in light of the issues raised in the Audit Committee Investigation and the expense of that Investigation.

On May 11, 2007, we entered into separate stock option cancellation agreements with our four senior officers pursuant to which the four senior officers agreed to the cancellation of their respective 2004 Options. Cancellation of the 2004 Options will result in an acceleration of the associated compensation expense. As a result, we will record non-cash stock-based compensation expense in the quarter ended June 30, 2007 of approximately $1.5 million for these cancellations.

Recognizing a need to strengthen our administration, we retained an experienced human resources executive as the new head of our Human Resources Department. In addition, our Board has been expanded to add two additional independent directors.

Moreover, recognizing past events and the processes relating to our option awards, the Board adopted new policies designed to govern the award of stock options, if any, in the future, as follows:

- We now require that all option grants be effective and priced as of the date approved or at a predetermined date certain in the future, in accordance with the applicable plan and the terms of the grant.

- The SIC was discontinued and all decisions regarding stock options will be made by the Compensation Committee or the full Board.

- Each option grant shall be approved at an in-person or telephonic meeting of the Compensation Committee or full Board. Option grants shall not be approved by unanimous written consent.

- We now require systematic authorization for option grants to ensure that all option transactions adhere to our plans and stated policies. All such transactions must be accurately reflected in our books and records and have appropriate supporting documentation. Determinations of the Compensation Committee and/or the Board regarding options must be implemented in an accurate and timely manner.

46

Table of Contents

- We have established a policy to issue options only during a specified window each year, immediately after release of the Form 10-K for the prior year or after quarterly earnings reports, with narrow exceptions for new employees and other special circumstances as determined by the Compensation Committee or the Board.

- Each option granted must specify all material terms of any options granted, including date of grant, exercise price, vesting schedule, duration, breakdown of ISOs versus non-qualified stock options, and any other terms the Compensation Committee or the Board deems appropriate.

- All Forms 4 must be filed within two business days of any grant.

- Option agreements for executive officers must be in the form on file with the SEC.

- All option agreements must be signed contemporaneously with each grant.

- The Compensation Committee will in its discretion engage independent outside counsel to obtain legal advice on issues that are significant and not ministerial rather than relying on company counsel for advice on such matters.

- The Compensation Committee must be advised of the accounting and reporting impact of each grant.

- We will strengthen our Internal Audit function by: (i) having the Internal Audit function report directly to the Audit Committee; (ii) implementing appropriate enhancements to our independent monitoring of financial controls, including specifically the monitoring of stock options and compensation issues; and (iii) implementing appropriate additional compliance training for our employees and management.

- Our general counsel must review all proposed grants to ensure that all legal requirements have been met.

- We shall adopt a new long-term incentive plan to effectuate these recommendations. We will ensure that the new plan is accurately described in public filings.

In connection with the restatement of our Consolidated Statements of Cash Flows, we are working with the Audit Committee to identify and implement corrective actions, where required, to improve the effectiveness of our internal controls, including enhancements of systems, accounting and review procedures and communications among our staff.

## DISCUSSION AND ANALYSIS OVERVIEW

The following discussion and analysis of results of operations and financial condition of *e*Plus gives effect to the restatement discussed in Note 2, "Restatement of Consolidated Financial Statements" to our Consolidated Financial Statements and should be read in conjunction with the Consolidated Financial Statements and the related Notes included elsewhere in this report.

Our results of operations are susceptible to fluctuations for a number of reasons, including, without limitation, customer demand for our products and services, supplier costs, interest rate fluctuations and differences between estimated residual values and actual amounts realized related to the equipment we lease. Operating results could also fluctuate as a result of the sale of equipment in our lease portfolio prior to the expiration of the lease term to the lessee or to a third party. Such sales of leased equipment prior to the expiration of the lease term may have the effect of increasing revenues and net earnings during the period in which the sale occurs, and reducing revenues and net earnings otherwise expected in subsequent periods.

We currently derive the majority of our revenue from sales and financing of information technology and other assets. We have expanded our product and service offerings under our comprehensive set of solutions which represents the continued evolution of our original implementation of our e-commerce products entitled *e*PlusSuite.

47

Table of Contents

The expansion to our bundled solution is a framework that combines our IT sales and professional services, leasing and financing services, asset management software and services, procurement software, and electronic catalog content management software and services.

We expect to expand or open new sales locations and hire additional staff for specific targeted market areas in the near future whenever we can find both experienced personnel and qualified geographic areas.

As a result of our acquisitions and expansion of sales locations, our historical results of operations and financial position may not be indicative of our future performance over time.

**RECENT ACCOUNTING PRONOUNCEMENTS—** In December 2004, the FASB issued SFAS No. 123 (revised 2004), "*Share-Based Payment,*" or SFAS No. 123R. SFAS No. 123R replaces SFAS No 123, "*Accounting for Stock-Based Compensation,*" and supersedes APB 25, "*Accounting for Stock Issued to Employees,*" and subsequently issued stock option related guidance. This statement focuses primarily on accounting for transactions in which an entity obtains employee services in share-based transactions. It also addresses transactions in which an entity incurs liabilities in exchange for goods or services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. Entities will be

required to measure cost of employee share-based transactions at the grant-date fair value of the award (with limited exceptions). That cost will be recognized over the period during which an employee is required to provide services in exchange for the award (usually the vesting period). The grant-date fair value of employee share options and similar instruments will be estimated using option-pricing models. If an equity award is modified after the grant date, incremental compensation expense will be recognized in an amount equal to the excess of the fair value of the modified award over the fair value of the original award immediately before the modification. We are required to apply SFAS No. 123R to all awards granted, modified, or settled as of the beginning of the annual fiscal reporting period that begins after June 15, 2005. We are also required to use either the modification-prospective method or modified-retrospective method. Under the modification-prospective method we must recognize compensation expense for all awards subsequent to adopting the standard and for the unvested portion of previously granted awards outstanding upon adoption. Under the modified-retrospective method, we must restate our previously issued financial statements to recognize the amounts we previously calculated and reported on a pro forma basis, as if the prior standard had been adopted. Under both methods, we are permitted to use either the straight-line or an accelerated method to amortize the cost as an expense for awards with graded vesting. The standard permits and encourages early adoption. We have commenced our analysis of the impact of SFAS No. 123R, but have decided not to early adopt. We will use the modified-prospective and the straight-line method. We are currently evaluating the impact that SFAS No. 123R will have on our results of operations and our financial position.

In May 2005, the FASB issued SFAS No. 154, "*Accounting Changes and Error Corrections — A Replacement of APB Opinion No. 20 and FASB Statement No. 3.*" SFAS No. 154 requires retrospective application, or the latest practical date, as the preferred method to report a change in accounting principle or correction of an error. SFAS No. 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. While the adoption of SFAS No. 154 did not have a material impact on our Consolidated Financial Statements, the restatement disclosures included herein comply with the provisions of the standard.

In June 2006, the FASB issued FASB Interpretation No. 48, "*Accounting for Uncertainty in Income Taxes — An Interpretation of FASB Statement No. 109*" ("FIN 48"). The interpretation clarifies the accounting for uncertainty in income taxes recognized in a company's financial statements in accordance with SFAS No. 109, "*Accounting for Income Taxes.*" Specifically, the pronouncement prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. The interpretation also provides guidance on the related derecognition, classification, interest and penalties, accounting for interim periods, disclosure and transition of uncertain tax positions. The interpretation is effective for us on April 1, 2007. We are assessing FIN 48 and have not determined the impact that the adoption of FIN 48 will have on our Consolidated Financial Statements. We do, however, expect to record a cumulative effect adjustment to our fiscal year 2008 balance of beginning earnings retained for use in business, and that adjustment may be material.

During September 2006, the SEC released SAB No. 108, "*Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements.*" SAB No. 108 requires a registrant to quantify all misstatements that could be material to financial statement users under both the "rollover" and "iron curtain" approaches. If either approach results in quantifying a misstatement that is material, the registrant must adjust its financial statements. SAB No. 108 is applicable for our fiscal year 2007. The adoption of SAB No. 108 is not expected to have a material impact on our Consolidated Financial Statements.

In September 2006, the FASB issued SFAS No. 157, "*Fair Value Measurements.*" SFAS No. 157 defines fair value, establishes a framework for measuring fair value in accordance with U.S. GAAP and expands disclosures about fair value measurements. SFAS No. 157 applies under other accounting pronouncements that require or permit fair value measurements. SFAS No. 157 does not require any new fair value measurements. SFAS No. 157 is effective for our fiscal year 2009. At this time, we do not believe the adoption of SFAS No. 157 will have a material impact on our results of operations or financial position.

In February 2007, the FASB issued SFAS No. 159, "*The Fair Value Option for Financial Assets and Financial Liabilities — Including an Amendment of FASB Statement No. 115.*" SFAS No. 159 gives companies an opportunity to use fair value measurements in financial reporting and permits entities to measure many financial instruments and certain other items at fair value. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007. We are currently evaluating the impact that SFAS No. 159 will have on our financial condition and results of operations.

## CRITICAL ACCOUNTING POLICIES

**SALES OF PRODUCT AND SERVICES.** We adhere to guidelines and principles of sales recognition described in Staff Accounting Bulletin ("SAB") No. 104, "*Revenue Recognition,*" issued by the staff of the SEC. Under SAB No. 104, sales are recognized when the title and risk of loss are passed to the customer, there is persuasive evidence of an arrangement for sale, delivery has occurred and/or services have been rendered, the sales price is fixed and determinable and collectibility is reasonably assured. Using these tests, the vast majority of our sales represent product sales recognized upon delivery; however, we make an adjustment for our sales that have FOB Shipping Point terms.

From time to time, in the sales of product and services, we may enter into contracts that contain multiple elements. Sales of services currently represent a small percentage of our sales. For services that are performed in conjunction with product sales and are completed in our facilities prior to shipment of the product, sales for both the product and services are recognized upon shipment. Sales of services that are performed at customer locations are recorded as sales of product or services when the services are performed. If the service is performed at a customer location in conjunction with a product sale or other service sale, we recognize the sale in accordance with SAB No. 104 and Emerging Issues Task Force ("EITF") 00-21 "*Accounting for Revenue Arrangements with Multiple Deliverables.*" Accordingly, in an arrangement with multiple deliverables, we recognize sales for delivered items only when all of the following criteria are satisfied:

- the delivered item(s) has value to the client on a stand-alone basis;

- there is objective and reliable evidence of the fair value of the undelivered item(s); and

- if the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in our control.

We sell certain third-party service contracts and software assurance or subscription products for which we evaluate whether the subsequent sales of such services should be recorded as gross sales or net sales in accordance with the sales recognition criteria outlined in SAB No. 104, EITF 99-19, "*Reporting Revenue Gross as a Principal versus Net as an Agent,*" and FASB Technical Bulletin 90.1, "*Accounting for Separately Priced Extended Warranty and Product Contracts.*" We must determine whether we act as a principal in the transaction and assume the risks and rewards of ownership or if we are simply acting as an agent or broker. Under gross sales recognition, the entire selling price is recorded in sales of product and services and our costs to the third-party service provider or vendor is recorded in cost of sales, product and services. Under net sales recognition, the cost to the third-party service provider or vendor is recorded as a reduction to sales resulting in net sales equal to the gross profit on the transaction and there are no cost of sales.

In accordance with EITF 00-10, "*Accounting for Shipping and Handling Fees and Costs,*" we record freight billed to our customers as sales of product and services and the related freight costs as a cost of sales, product and services.

**VENDOR CONSIDERATION.** We receive payments and credits from vendors, including consideration pursuant to volume sales incentive programs, volume purchase incentive programs and shared marketing expense programs. Vendor consideration received pursuant to volume sales incentive programs is recognized as a reduction to costs of sales, product and services in accordance with EITF Issue No. 02-16, "*Accounting for Consideration Received from a Vendor by a Customer (Including a Reseller of the Vendor's Products).*" Vendor consideration received pursuant to volume purchase incentive programs is allocated to inventories based on the applicable incentives from each vendor and is recorded in cost of sales, product and services, as the inventory is sold.

Vendor consideration provided after recognizing revenue in a period is recorded as a reduction of our gross sales and distributive expenses in the period the program takes place only if the consideration represents a reimbursement of specific, incremental, identifiable costs. Consideration that exceeds the specific, incremental, identifiable costs is classified as a reduction of cost of sales, product and services.

Table of Contents

**SOFTWARE SALES AND RELATED COSTS.** Revenue from hosting arrangements is recognized in accordance with EITF 00-3, "*Application of AICPA Statement of Position 97-2 to Arrangements That Include the Right to Use Software Stored on Another Entity's Hardware.*" Hosting arrangements that are not in the scope of Statement of Position ("SOP") 97-2, "*Software Revenue Recognition,*" require that allocation of the portion of the fee allocated to the hosting elements be recognized as the service is provided. Currently, the majority of our software revenue is generated through hosting arrangements and is included in fee and other income on our Consolidated Statements of Operations.

Revenue from sales of our software is recognized in accordance with SOP 97-2, as amended by SOP 98-4, "*Deferral of the Effective Date of a Provision of SOP 97-2,*" and SOP 98-9, "*Modification of SOP 97-2 With Respect to Certain Transactions.*" We recognize revenue when all the following criteria exist: there is persuasive evidence that an arrangement exists, delivery has occurred, no significant obligations by us related to services essential to the functionality of the software remain with regard to implementation, the sales price is determinable, and it is probable that collection will occur. Revenues from sales of our software are included in fee and other income on our Consolidated Statements of Operations.

At the time of each sale transaction, we make an assessment of the collectibility of the amount due from the customer. Revenue is only recognized at that time if management deems that collection is probable. In making this assessment, we consider customer creditworthiness and assess whether fees are fixed or determinable and free of contingencies or significant uncertainties. If the fee is not fixed or determinable, revenue is recognized only as payments become due from the customer, provided that all other revenue recognition criteria are met. In assessing whether the fee is fixed or determinable, we consider the payment terms of the transaction and our collection experience in similar transactions without making concessions, among other factors. Our software license agreements generally do not include customer acceptance provisions. However, if an arrangement includes an acceptance provision, we record revenue only upon the earlier of (1) receipt of written acceptance from the customer or (2) expiration of the acceptance period.

Our software agreements often include implementation and consulting services that are sold separately under consulting engagement contracts or as part of the software license arrangement. When we determine that such services are not essential to the functionality of the licensed software and qualify as "service transactions" under SOP 97-2, we record revenue separately for the license and service elements of these agreements. Generally, we consider that a service is not essential to the functionality of the software based on various factors, including if the services may be provided by independent third parties experienced in providing such consulting and implementation in coordination with dedicated customer personnel. If an arrangement does not qualify for separate accounting of the license and service elements, then license revenue is recognized together with the consulting services using either the percentage-of-completion or completed-contract method of contract accounting. Contract accounting is also applied to any software agreements that include customer-specific acceptance criteria or where the license payment is tied to the performance of consulting services. Under the percentage-of-completion method, we may estimate the stage of completion of contracts with fixed or "not to exceed" fees based on hours or costs incurred to date as compared with estimated total project hours or costs at completion. If we do not have a sufficient basis to measure progress towards completion, revenue is recognized upon completion of the contract. When total cost estimates exceed revenues, we accrue for the estimated losses immediately. The use of the percentage-of-completion method of accounting requires significant judgment relative to estimating total contract costs, including assumptions relative to the length of time to complete the project, the nature and complexity of the work to be performed, and anticipated changes in salaries and other costs. When adjustments in estimated contract costs are determined, such revisions may have the effect of adjusting, in the current period, the earnings applicable to performance in prior periods.

Table of Contents

We generally use the residual method to recognize revenues from agreements that include one or more elements to be delivered at a future date when evidence of the fair value of all undelivered elements exists. Under the residual method, the fair value of the undelivered elements (e.g., maintenance, consulting and training services) based on vendor-specific objective evidence ("VSOE") is deferred and the remaining portion of the arrangement fee is allocated to the delivered elements (i.e., software license). If evidence of the fair value of one or more of the undelivered services does not exist, all revenues are deferred and recognized when delivery of all of those services has occurred or when fair values can be established. We determine VSOE of the fair value of services revenue based upon our recent pricing for those services when sold separately. VSOE of the fair value of maintenance services may also be determined based on a substantive maintenance renewal clause, if any, within a customer contract. Our current pricing practices are influenced primarily by product type, purchase volume, maintenance term and customer location. We review services revenue sold separately and maintenance renewal rates on a periodic basis and update our VSOE of fair value for such services to ensure that it reflects our recent pricing experience, when appropriate.

Maintenance services generally include rights to unspecified upgrades (when and if available), telephone and Internet-based support, updates and bug fixes. Maintenance revenue is recognized ratably over the term of the maintenance contract (usually one year) on a straight-line basis and is included in fee and other income on our Consolidated Statements of Operations.

When consulting qualifies for separate accounting, consulting revenues under time and materials billing arrangements are recognized as the services are performed. Consulting revenues under fixed-price contracts are generally recognized using the percentage-of-completion method. If there is a significant uncertainty about the project completion or receipt of payment for the consulting services, revenue is deferred until the uncertainty is sufficiently resolved. Consulting revenues are classified as fee and other income on our Consolidated Statements of Operations.

Training services include on-site training, classroom training, and computer-based training and assessment. Training revenue is recognized as the related training services are provided and is included in fee and other income on our Consolidated Statements of Operations.

**SALES OF LEASED EQUIPMENT.** Sales of leased equipment consist of sales of equipment subject to an existing lease, under which we are a lessor, including any underlying financing related to the lease. Sales of equipment subject to an existing lease are recognized when constructive title passes to the purchaser. For the year ended March 31, 2006, we sold the equipment on an existing lease to a third party, relieving us of all rights and obligations on this lease. This sale resulted in an extinguishment of non-recourse debt of $1.4 million.

**LEASE CLASSIFICATION.** The manner in which lease finance transactions are characterized and reported for accounting purposes has a major impact upon reported revenue and net earnings. Lease accounting methods critical to our business are discussed below.

We classify our lease transactions in accordance with SFAS No. 13, "*Accounting for Leases*," as: (1) direct financing; (2) sales-type; or (3) operating leases. Revenues and expenses between accounting periods for each lease term will vary depending upon the lease classification.

As a result of these three classifications of leases for accounting purposes, the revenues resulting from the "mix" of lease classifications during an accounting period will affect the profit margin percentage for such period and such profit margin percentage generally increases as revenues from direct financing and sales-type leases increase. Should a lease be financed, the interest expense declines over the term of the financing as the principal is reduced.

For financial statement purposes, we present revenue from all three classifications in lease revenues, and costs related to these leases in direct lease costs.

**DIRECT FINANCING AND SALES-TYPE LEASES.** Direct financing and sales-type leases transfer substantially all benefits and risks of equipment ownership to the customer. A lease is a direct financing or sales-type lease if the creditworthiness of the customer and the collectibility of lease payments are

reasonably certain. An important consideration in the lease classification is based upon whether it meets any of the following criteria: (1) the lease transfers ownership of the equipment to the customer by the end of the lease term; (2) the lease contains a bargain purchase option; (3) the lease term at inception is at least 75% of the estimated economic life of the leased equipment; or (4) the present value of the minimum lease payments is at least 90% of the fair market value of the leased equipment at the inception of the lease.

Table of Contents

Direct financing leases are recorded as investment in leases and leased equipment—net upon acceptance of the equipment by the customer. At the commencement of the lease, unearned lease income is recorded that represents the amount by which the gross lease payments receivable plus the estimated unguaranteed residual value of the equipment exceeds the equipment cost. Unearned lease income is recognized, using the interest method, as lease revenue over the lease term.

Sales-type leases include a dealer profit or loss that is recorded by the lessor upon acceptance of the equipment by the lessee. The dealer's profit or loss represents the difference, at the inception of the lease, between the present value of minimum lease payments computed at the interest rate implicit in the lease and the cost or carrying amount of the equipment (less the present value of the unguaranteed residual value) plus any initial direct costs. Interest earned on the present value of the lease payments and residual value is recognized over the lease term using the interest method.

**OPERATING LEASES.** All leases that do not meet the criteria to be classified as direct financing or sales-type leases are accounted for as operating leases. Rental amounts are accrued on a straight-line basis over the lease term and are recognized as lease revenue. Our cost of the leased equipment is recorded on the balance sheet as investment in leases and leased equipment—net and is depreciated on a straight-line basis over the lease term to our estimate of residual value. Revenue, depreciation expense, and the resulting profit for operating leases are recorded on a straight-line basis over the life of the lease.

Lease revenues consist of rentals due under operating leases and amortization of unearned income on direct financing and sales-type leases. Equipment under operating leases is recorded at cost on the balance sheet as investment in leases and leased equipment—net and depreciated on a straight-line basis over the lease term to our estimate of residual value. For the periods subsequent to the lease term, where collectibility is certain, revenue is recognized on an accrual basis. Where collectibility is not reasonably assured, revenue is recognized upon receipt of payment from the lessee.

**RESIDUAL VALUES.** Residual values represent our estimated value of the equipment at the end of the initial lease term. The residual values for direct financing and sales-type leases are included as part of the investment in direct financing and sales-type leases. The residual values for operating leases are included in the leased equipment's net book value and are reported in the investment in leases and leased equipment—net. The estimated residual values will vary, both in amount and as a percentage of the original equipment cost, and depend upon several factors, including the equipment type, manufacturer's discount, market conditions and the term of the lease.

We evaluate residual values on a quarterly basis and record any required changes in accordance with SFAS No. 13, paragraph 17.d., in which impairments of residual value, other than temporary, are recorded in the period in which the impairment is determined. Residual values are affected by equipment supply and demand and by new product announcements by manufacturers.

We seek to realize the estimated residual value at lease termination mainly through (1) renewal or extension of the original lease, (2) the sale of the equipment either to the lessee or on the secondary market, or (3) lease of the equipment to a new customer. The difference between the proceeds of a sale and the remaining estimated residual value is recorded as a gain or loss in lease revenues when title is transferred to the lessee, or, if the equipment is sold on the secondary market, in sales of product and services and cost of sales, product and services when title is transferred to the buyer.

**INITIAL DIRECT COSTS.** Initial direct costs related to the origination of direct financing or operating leases are capitalized and recorded as part of the net investment in direct financing leases, or net operating lease equipment, and are amortized over the lease term.

Table of Contents

**OTHER SOURCES OF REVENUE.** Amounts charged for hosting arrangements in which the customer accesses the programs from an *e*Plus-hosted site and does not have possession of the software, and for Procure+, our procurement software package, are recognized as services are rendered. Amounts charged for Manage+, our asset management software service, are recognized on a straight-line basis over the period the services are provided. In addition, other sources of revenue are derived from: (1) income from events that occur after the initial sale of a financial asset; (2) re-marketing fees; (3) brokerage fees earned for the placement of financing transactions; (4) agent fees received from various manufacturers in the IT reseller business unit; (5) settlement fees related to disputes or litigation; and (6) interest and other miscellaneous income. These revenues are included in fee and other income on our Consolidated Statements of Operations.

**RESERVES FOR CREDIT LOSSES.** The reserves for credit losses is maintained at a level believed by management to be adequate to absorb potential losses inherent in our lease and accounts receivable portfolio. Management's determination of the adequacy of the reserve is based on an evaluation of historical credit loss experience, current economic conditions, volume, growth, the composition of the lease portfolio, and other relevant factors. The reserve is increased by provisions for potential credit losses charged against income. Accounts are either written off or written down when the loss is both probable and determinable, after giving consideration to the customer's financial condition, the value of the underlying collateral and funding status (i.e., discounted on a non-recourse or recourse basis). Our allowance also includes consideration of uncollectible vendor receivables which arise from vendor rebate programs and other promotions.

**CAPITALIZATION OF COSTS OF SOFTWARE FOR INTERNAL USE.** We have capitalized certain costs for the development of internal-use software under the guidelines of SOP 98-1, "*Accounting for the Costs of Computer Software Developed or Obtained for Internal Use.*" These capitalized costs are included in the accompanying Consolidated Balance Sheets as a component of property and equipment—net. Capitalized costs, net of amortization, totaled $0.6 million as of March 31, 2005 and March 31, 2006.

**CAPITALIZATION OF COSTS OF SOFTWARE TO BE MADE AVAILABLE TO CUSTOMERS.** In accordance with SFAS No. 86, "*Accounting for Costs of Computer Software to be Sold, Leased, or Otherwise Marketed,*" software development costs are expensed as incurred until technological feasibility has been established, at such time such costs are capitalized until the product is made available for release to customers. These capitalized costs are included in the accompanying Consolidated Balance Sheets as a component of other assets. We had $1.2 million and $1.0 million of capitalized costs, net of amortization, as of March 31, 2005 and March 31, 2006, respectively.

**SHARE-BASED PAYMENT.** In December 2004, the FASB issued SFAS No. 123 (revised 2004), "*Share-Based Payment,*" or SFAS No. 123R. SFAS No. 123R replaces SFAS No. 123, "*Accounting for Stock-Based Compensation,*" and supersedes APB 25 and subsequently issued stock option related guidance. This statement establishes standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services, primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions. It also addresses transactions in which an entity incurs liabilities in exchange for goods or services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. We are required to apply SFAS No. 123R to all awards granted, modified or settled as of the beginning of the annual fiscal reporting period that begins after June 15, 2005. We have analyzed the impact of SFAS No. 123R, but have decided not to early adopt. Upon adoption, we will use the modified-prospective and the straight-line method.

determined that, during the Relevant Period, we applied incorrect measurement dates in our accounting for certain stock options.

Based on the available facts and circumstances surrounding our stock option granting practices, we adopted a methodology for determining the most likely or no later than revised measurement dates. We believe the application of this methodology indicated the most likely or no later than date when the number of options granted to each recipient was approved and the exercise price and number of shares were known with finality. When there was not conclusive documentation or evidence of an earlier date, we relied upon the filing date of the Form 10-Q or 10-K, whichever is applicable, as the date in which an authorized approver would have reviewed the diluted EPS calculation which included the awards. During our review, we also identified errors in accounting for stock option awards where we did not appropriately account for modifications and circumstances in which we did not appropriately account for awards as variable. The correction of all of these errors resulted in additional cumulative stock-based compensation charges on a pre-tax basis of approximately $5.2 million for the nine year period ended March 31, 2005 and an additional $0.6 million for the fiscal year ended March 31, 2006.

Table of Contents

We adopted a methodology for determining the most likely appropriate accounting measurement dates for all stock option grants. We reviewed all available documentation and considered all facts and circumstances for each award and attempted to identify the date at which the award was most likely authorized and approved and the recipient, number of shares and price were approved and determined with finality. As such, we adopted the following framework for determining the revised historical measurement dates of our employee stock option grants and have applied this framework based on the facts, circumstances and availability of the documentation for each grant.

*Step 1*

We reviewed, as available, the documents noted below for sufficient evidence that the approval and terms of the stock options were determined with finality:

1. Board meeting minutes, resolutions and written consent actions;
2. Compensation Committee and SIC meeting minutes and resolutions;
3. offer letters signed by an authorized approver and the recipient and stating the number of shares and exercise price;
4. internal communications from an authorized approver stating the recipient, number of shares and exercise price;
5. executed acquisition agreements stating the number of shares and the option price;
6. historical stock prices as reflected on Nasdaq to determine when stock price based performance vesting occurred;
7. public filings as they relate to awards granted in connection with the IPO; and
8. all stock option plans in place over the Relevant Period.

We reviewed minutes, consents, resolutions, offer letters and other corporate records for the purpose of validating their accuracy, and at no time determined that any of the records were altered or appeared to have not occurred as recorded. While we considered the above documents in order, all documents and all facts and circumstances were considered when determining the revised measurement date. Measurement dates for approximately 52.3% of the total number of grants made during the Relevant Period were determined based on the documentation listed in Step 1 above. In instances where the above documentation was not available or provided ambiguous information, we proceeded to Step 2.

*Step 2*

If after review of the available documents as listed in Step 1, there was insufficient documentation to select the date at which the recipient, number of shares and price were determined with finality, we attempted to select the most likely date at which the terms were determined with finality. In considering the most likely date, we considered all available documentation and all facts and circumstances.

In addition to the documents listed in Step 1, we examined the following documents:

1. all internal and external communications including emails, offer letters, memos, faxes, letters and handwritten notes;
2. acquisition agreements that do not contain recipients, exercise price and number of shares;
3. outside stock option administrator transaction data (e.g. data from First Union, Wachovia, or AST);
4. management practice regarding the annual non-employee director grants; and
5. stock option agreements hand dated or not hand dated.

In conjunction with all available documentation, we considered the following facts and circumstances:

1. our stock option granting practices;
2. acquisition dates;
3. new hires start dates;
4. effective dates of non-employee director appointments to the Board;
5. our stock performance; and
6. all other available information.

Selecting the date at which the most likely granting actions occurred with finality required a significant amount of judgment. While we considered all the documents and facts in the order noted above, the level of reliance on each type of document depended on the facts and circumstances surrounding each award. In some instances, we grouped awards based on similar characteristics and similar underlying facts and circumstances. In these instances, we treated all of the grouped awards in a uniform manner. Measurement dates for approximately 40.1% of the total number of grants made during the Relevant Period were determined based on the documentation listed in Step 2 above.

Table of Contents

*Step 3*

If there was insufficient evidence, after reviewing all available documentation and all facts and circumstances listed in Step 1 and Step 2, to select a specific date at which the recipient, number of shares and price were approved and determined with finality, we used the earliest of the dates below. We believe that the required granting actions would have occurred with finality 'no later than' at each of the following dates:

1. stock option agreement signed by a member of the SIC and hand dated by the optionee unless other facts and circumstances exist that present ambiguity as to the accuracy of the hand date;
2. the legible 'run date' of the stock option administrator report; and
3. subsequent Form 10-Q or 10-K filing date. As of this date and pursuant to our stock option granting process, an authorized approver would have

approved awards, we calculated the stock-based compensation and the awards in accordance with the stock option administration software. Quarterly reports were run from the stock option administration software and reconciled to the general ledger and the stock registrar's reports and the EPS calculation. This reconciliation resulted in the stock-based compensation and the EPS disclosures, which included the awarded shares as filed in the Form 10-Q or Form 10-K.

Measurement dates for approximately 7.6% of the total number of grants made during the Relevant Period were determined based on the documentation listed in Step 3 above.

However, we acknowledge that many of the revised measurement date conclusions are dependent on the facts and circumstances of each stock option grant and involved the application of significant judgment. Because determining the revised measurement date is subjective and uncertain, we performed a sensitivity analysis to determine the impact of using alternate revised measurement dates for grants for which determining the appropriate measurement date involved significant judgment.

To perform the sensitivity analysis, we established the earliest possible date at which the grants terms could have been approved and could have been determined with finality and the latest possible date at which the grants terms were approved and determined with finality. Within this date range, we selected the lowest stock price and the highest stock price to establish the range of compensation expense. Our sensitivity analysis determined that the total incremental compensation expense that we previously determined could be reduced by $2.8 million or increased by $5.0 million for the nine year period ended March 31, 2005 on a pre-tax basis. The additional (less) cumulative stock-based compensation during the Relevant Period under each category of our framework based upon the low and high closing prices during those periods is as follows:

| Framework Categories | Low | High |
|---|---|---|
| Step 1 | $ - | $ - |
| Step 2 | (870,668) | 3,156,001 |
| Step 3 | (1,925,718) | 1,806,641 |
| | $ (2,796,386) | $ 4,962,642 |

54

Table of Contents

The amount of additional (less) cumulative stock-based compensation by fiscal year from 2001 through 2005 under steps two and three of our framework based upon the low and high closing prices during those periods is as follows:

| | Step 2 | | | | | |
|---|---|---|---|---|---|---|
| | 2001 and prior | 2002 | 2003 | 2004 | 2005 | Total |
| Low | $ (198,472) | (90,053) | (204,033) | (251,223) | (126,887) | $ (870,668) |
| High | $ 428,692 | 595,642 | 981,429 | 903,790 | 246,448 | $ 3,156,001 |

| | Step 3 | | | | | |
|---|---|---|---|---|---|---|
| | 2001 and prior | 2002 | 2003 | 2004 | 2005 | Total |
| Low | $ (582,611) | (389,136) | (515,293) | (437,595) | (1,083) | $ (1,925,718) |
| High | $ 898,554 | 280,926 | 357,863 | 269,218 | 80 | $ 1,806,641 |

We believe our methodology based on the best evidence available results in the most likely measurement dates for our stock option grants.

**RESULTS OF OPERATIONS**

We have included below a discussion of our operating results and significant items which explain the material changes in our operating results during the last three years. All comparative statements and historical financial information discussed is based on the restated financial statements for the periods presented prior to the fiscal year ended March 31, 2006.

**The Year Ended March 31, 2006 Compared to the Year Ended March 31, 2005**

*Revenues.* We generated total revenues during the year ended March 31, 2006 of $647.3 million compared to revenues of $575.8 million for the year ended March 31, 2005, an increase of 12.4%. This increase is primarily the result of increased sales of product and services. Our revenues are composed of sales, lease revenues, and fee and other income, and may vary considerably from period to period.

Sales revenue, which includes sales of product and services, and sales of leased equipment, increased 21.6% to $584.8 million during the year ended March 31, 2006, as compared to $481.0 million in the prior fiscal year.

Sales of product and services are generated primarily through our technology sales business unit subsidiaries. Sales of product and services consist primarily of sales of new equipment and service engagements. Many customers purchase from us using a contract vehicle known as a Master Purchase Agreement ("MPA") in which the terms and conditions of our relationship are stipulated. Some MPAs contain pricing arrangements. However, the MPAs do not contain purchase volume commitments and most have 30 day termination for convenience clauses. In addition, many of our customers place orders using purchase orders without a MPA in place. There is no guarantee that our sales of product and services volume can be maintained or increased.

Sales of product and services increased 21.2% to $583.1 million as compared to the prior fiscal year and represented 90.1% of total revenue for the year ended March 31, 2006. The increase was a result of higher sales within our technology sales business unit subsidiaries primarily due to organic growth within our existing customer base.

A substantial portion of our sales of product and services are from sales of Hewlett Packard and CISCO products, which represented approximately 28.0% and 22.0% of sales, respectively, for the year ended March 31, 2006.

Included in the sales of product and services in our technology sales business unit are certain service revenues that are bundled with sales of equipment and are integral to the successful delivery of such equipment. Our service engagements are generally governed by Statements of Work or Master Service Agreements. They are primarily fixed fee, however, some agreements are time and materials or estimates. We realized a gross margin on sales of product and services of 10.0% for both fiscal years ended March 31, 2006 and 2005. Our gross margin on sales of product and services is affected by the mix and volume of products sold and competitive pressure in the marketplace.

55

Table of Contents

We also recognize revenue from the sale of leased equipment. During the year ended March 31, 2006 sales of leased equipment were $1.7 million and we recognized a gross margin of 2.2% on these sales. During the year ended March 31, 2005 there were no sales of leased equipment. The revenue and gross margin recognized on sales of leased equipment can vary significantly depending on the nature and timing of the sale, as well as the timing of any debt funding recognized in accordance with SFAS No. 125, "*Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities,*" as amended by SFAS No. 140, "*Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities.*"

Lease revenues increased 6.1% to $49.2 million for the year ended March 31, 2006, compared with $46.3 million for the prior fiscal year. Our net investment in leased assets was $205.8 million as of March 31, 2006, a 9.0% increase from $188.9 million as of March 31, 2005. The increase in lease revenue is predominately due to an increase in our operating lease portfolio.

For the year ended March 31, 2006, fee and other income was $13.4 million, a decrease of 72.4% over the prior fiscal year. Fee and other income includes revenues from adjunct services and fees, including broker and agent fees, support fees, warranty reimbursements, monetary settlements arising from disputes and litigation, and interest income. The decrease in fee and other income in the year ended March 31, 2006 is primarily attributable to a $37.0 million settlement of our patent-infringement litigation against Ariba, Inc. during the year ended March 31, 2005. On February 12, 2005, we settled the patent-infringement suit through a mutual settlement and license agreement, and received the settlement as of March 31, 2005. Our fee and other income contains earnings from certain transactions which are in our normal course of business but there is no guarantee that future transactions of the same nature, size or profitability will occur. Our ability to consummate such transactions, and the timing thereof, may depend largely upon factors outside the direct control of management. The earnings from these types of transactions in a particular period may not be indicative of the earnings that can be expected in future periods.

*Costs and Expenses.* During the year ended March 31, 2006, cost of sales, product and services increased 21.3% to $525.0 million as compared to $432.8 million in the prior fiscal year. This increase corresponds to the increase in sales of product and services of 21.2% from March 31, 2005 to March 31, 2006, primarily due to an increase in sales from our technology sales business unit.

A significant reduction in cost of sales is generated through vendor consideration programs provided by manufacturers. The programs are generally governed by our reseller authorization level with the manufacturer. The authorization level we achieve and maintain governs what types of product we can resell as well as such items as pricing received, funds provided for the marketing of these products and other special promotions. These authorization levels are achieved by us through sales volume, certifications held by sales executives or engineers and/or contractual commitments by us. The authorizations are costly to maintain and these programs continually change and there is no guarantee of future reductions of costs provided by these vendor consideration programs. We currently maintain the following authorization levels with our major manufacturers:

| Manufacturer | Manufacturer Authorization Level |
|---|---|
| Hewlett Packard | HP Platinum/VPA (National) |
| Cisco Systems | Cisco Gold DVAR (National) |
| Microsoft | Microsoft Gold (National) |
| Sun Microsystems | Sun iForce Strategic Partner (National) |
| IBM | IBM Platinum (National) |
| Lenovo | Lenovo Platinum (National) |
| Network Appliance, Inc. | NetApp Platinum (Elite) |
| Citrix Systems, Inc. | Citrix Gold (National) |

56

*Table of Contents*

Direct lease costs increased 45.9% to $16.7 million for the year ended March 31, 2006, as compared to $11.4 million for the prior fiscal year. The largest component of direct lease costs is depreciation expense for operating leased equipment. Our investment in operating leases increased 56.1% as of March 31, 2006 as compared to the prior fiscal year.

Professional and other fees for the year ended March 31, 2006 decreased 28.9% as compared to the prior fiscal year, primarily due to a decrease in expenses related to our pursuit of patent-infringement litigation. For the year ended March 31, 2006, we recorded $2.6 million in legal fees seeking to enforce our patents against SAP America, Inc. and SAP AG, which was less than the expense incurred during the fiscal year ended March 31, 2005 related to our patent infringement litigation against Ariba, Inc.

Salaries and benefit expenses increased 14.7% to $62.3 million for the year ended March 31, 2006, as compared to the prior fiscal year. The increase is due in part to an increase in the number of employees and the subsequent increase in employee benefit costs. We employed 637 people as of March 31, 2005 compared to 680 people as of March 31, 2006. In addition, share-based compensation expense was $621 thousand and $(20) thousand for the years ended March 31, 2006 and March 31, 2005, respectively.

General and administrative expenses increased 1.9% to $18.6 million for the year ended March 31, 2006 as compared to the prior fiscal year. The increase is largely due to expenses relating to higher sales volume and depreciation costs for new property and equipment acquisitions.

For the year ended March 31, 2006, we accrued for a settlement of litigation by GMAC against us of $6.0 million and a judgment for BoA against us of $3.0 million, $0.9 million of legal fees and $0.2 million of interest, or a total of $4.1 million related to the BoA judgment. The GMAC settlement occurred in July 2006 and the BoA judgment occurred in February 2007.

Interest and financing costs increased 23.4% to $7.3 million for the year ended March 31, 2006 as compared to the prior fiscal year. This is primarily due to an increasing non-recourse debt portfolio and increasing debt rates on new financings. Non-recourse notes payable increased 11.4% to $128.0 million for the year ended March 31, 2006 as compared to the prior fiscal year.

*Provision for Income Taxes.* Our provision for income taxes decreased to a benefit of $0.5 million for the year ended March 31, 2006 from an expense of $17.9 million for the prior fiscal year, due primarily to lower earnings. Our effective income tax rates for the years ended March 31, 2006 and 2005 were 51.1% and 41.1%, respectively.

*Net Earnings.* The foregoing resulted in a 102.0% decrease in net earnings for the year ended March 31, 2006, as compared to the prior fiscal year. The decrease is primarily due to the fees received from the settlement of our patent-infringement litigation against Ariba, Inc. of $37.0 million in the year ended March 31, 2005, and the accrual of a settlement of litigation against us by GMAC and a verdict judgment against us by BoA aggregating $10.1 million in the year ended March 31, 2006. The GMAC settlement occurred in July 2006 and the BoA judgment occurred in September 2006.

Both basic and fully diluted earnings (loss) per common share were $(0.06) for the year ended March 31, 2006, as compared to $2.89 and $2.73, respectively, for the year ended March 31, 2005, based on weighted average common shares outstanding, basic and diluted, of 8,347,727 and 8,347,727, respectively, for 2006 and 8,898,296 and 9,409,119, respectively, for 2005.

**The Year Ended March 31, 2005 Compared to the Year Ended March 31, 2004**

*Revenues.* We generated total revenues during the year ended March 31, 2005 of $575.8 million compared to revenues of $330.6 million for the year ended March 31, 2004, an increase of 74.2%. This increase is primarily attributable to increased revenues from the sales of product and services from the IT reseller due, in part, from increased demand from customers. Our revenues are composed of sales of product and services, lease revenues, and fee and other income, and may vary considerably from period to period.

The majority of sales of product and services are generated through our technology business unit subsidiaries. Sales of used and/or off-lease equipment are also generated from our brokerage and re-marketing activities. For the year ended March 31, 2005, we experienced an increase in customer demand for IT products in a very competitive economy. The increase was a result of increased sales within our existing customer base and from customers obtained through recent acquisitions. For the year ended March 31, 2005, sales of product and services increased 79.5% to $481.0 million, a result of increased technology sales through our subsidiaries as compared to March 31, 2004.

Table of Contents

We realized a gross margin on sales of product and services of 10.0% for the year ended March 31, 2005, as compared to 11.8% for the year ended March 31, 2004.

Lease revenues decreased 9.6% to $46.3 million for the year ended March 31, 2005, compared with $51.3 million for the prior fiscal year. Our net investment in leased assets was $188.9 million as of March 31, 2005, a 1.8% increase from $185.5 million as of March 31, 2004.

For the year ended March 31, 2005, fee and other income was $48.5 million, an increase of 325.1% over the prior fiscal year. Fee and other income includes sales of our software, hosting fees of our software, term licenses of our software, other services relating to our software, monetary settlements arising from disputes and litigation, revenues from adjunct services and fees, including broker and agent fees, support fees, warranty reimbursements, and learning center revenues generated by our technology business unit subsidiaries. The increase in fee and other income in the year ended March 31, 2005 is primarily attributable to a $37.0 million settlement of our patent-infringement litigation against Ariba, Inc. On February 12, 2005, we settled the patent-infringement suit through a mutual settlement and license agreement, and received the settlement as of March 31, 2005. Our fee and other income contains earnings from certain transactions which are in our normal course of business but there is no guarantee that future transactions of the same nature, size or profitability will occur. Our ability to consummate such transactions, and the timing thereof, may depend largely upon factors outside the direct control of management. The earnings from these types of transactions in a particular period may not be indicative of the earnings that can be expected in future periods.

*Costs and Expenses.* Our direct lease costs increased 8.4% during the year ended March 31, 2005, as compared to the prior fiscal year. The largest component of direct lease costs is depreciation expense of leased equipment. The investment in operating leases increased 60.7% as of March 31, 2005 as compared to March 31, 2004.

Professional and other fees increased 154.5% for the year ended March 31, 2005 over the prior fiscal year, and was primarily the result of $3.1 million in legal fees related to the patent infringement litigation against Ariba, Inc. In addition, we incurred expenses related to Manchester Technologies, Inc. for professional services rendered by a transition team and 65 people (prior Manchester Technologies, Inc. employees) that were to be hired in a subsequent period.

Salaries and benefit expenses increased 28.3% during the year ended March 31, 2005, as compared to the prior fiscal year. The increase is a combination of a 24% increase in employees, due in part to the acquisition of Manchester Technologies, Inc., higher sales commissions attributed to higher sales volume, performance bonuses related to the Ariba patent-infringement suit, and a normal increase in payroll and benefit expenses.

General and administrative expenses increased 24.8% for the year ended March 31, 2005 over the prior fiscal year. The increase is largely due to higher sales volume which in turn created a larger bad debt and inventory allowance. In addition, these expenses increased due to an increase in the number of offices and employees, due in part to the Manchester Technologies, Inc. acquisition.

Interest and financing costs incurred by us for the year ended March 31, 2005 decreased 14.8% as compared to the year ended March 31, 2004, and relate to interest costs on our indebtedness. This is attributed to a combination of our decreasing non-recourse debt portfolio and a reduction in our weighted average interest rate on new lease-related non-recourse debt. (See "—Liquidity and Capital Resources"). Payment for interest costs on the majority of non-recourse and certain recourse notes are typically remitted directly to the lender by the lessee.

*Provision for Income Taxes.* Our provision for income taxes increased to $17.9 million for the year ended March 31, 2005 from $6.6 million for the year ended March 31, 2004, reflecting an effective income tax rate of 41.1% and 41.2%, respectively.

Table of Contents

*Net Earnings.* The foregoing resulted in a 170.8% increase in net earnings for the year ended March 31, 2005, as compared to the prior fiscal year.

Basic and fully diluted earnings per common share were $2.89 and $2.73, respectively, for the year ended March 31, 2005, as compared to $1.02 and $0.95, respectively, for the year ended March 31, 2004, based on weighted average common shares outstanding, basic and diluted, of 8,898,296 and 9,409,119, respectively, for 2005 and 9,333,388 and 9,976,822, respectively, for 2004.

## LIQUIDITY AND CAPITAL RESOURCES

During the year ended March 31, 2006, we used cash flows from operations of $38.2 million, and used cash flows from investing activities of $32.5 million. Cash flows provided by financing activities amounted to $52.5 million. The effect of exchange rate changes during the fiscal year provided cash flows of $86,211. The net effect of these cash flows was a net decrease in cash and cash equivalents of $18.2 million during the fiscal year 2006. During this same period, our total assets increased $13.8 million, primarily as the result of increases in our accounts receivable and investment in leases and leased equipment. Our net investment in direct financing lease equipment decreased $1.0 million, or 0.6% and operating lease equipment increased $17.9 million, or 56.1%, respectively, during the fiscal year. Our cash and cash equivalents balance as of March 31, 2006 was $20.7 million as compared to $38.9 million as of March 31, 2005.

Our debt financing activities provide approximately 80% to 100% of the purchase price of the equipment we purchased for lease to our customers. Any balance of the purchase price (our equity investment in the equipment) must generally be financed by cash flow from our operations, the sale of the equipment leased to third parties, or other internal means. Although we expect that the credit quality of our leases and our residual return history will continue to allow us to obtain such financing, no assurances can be given that such financing will be available, at acceptable terms, or at all. The financing necessary to support our leasing activities has principally been provided by non-recourse and recourse borrowings. Historically, we have obtained recourse and non-recourse borrowings from banks and finance companies. Non-recourse financings are loans whose repayment is the responsibility of a specific customer, although we may make representations to the lender regarding the specific contract or have ongoing loan servicing obligations. Under a non-recourse loan, we borrow from a lender an amount based on the present value of the contractually committed lease payments under the lease at a fixed rate of interest, and the lender secures a lien on the financed assets. When the lender is fully repaid from the lease payment, the lien is released and all further rental or sale proceeds are ours. We are not liable for the repayment of non-recourse loans unless we breach our representations in the loan agreements. The lender assumes the credit risk of each lease, and their only recourse, upon default by the lessee, is against the lessee and the specific equipment under lease. Each

transaction is specifically approved in advance by RJL. In addition to financing the fixed-term, our securitized non-recourse debt portfolio increased 11.4% to $128.0 million as compared to the prior fiscal year.

Whenever desirable and possible, we arrange for equity investment financing which includes selling assets including the residual portions to third parties and financing the equity investment on a non-recourse basis. We generally retain customer control and operational services, and have minimal residual risk. We usually preserve the right to share in remarketing proceeds of the equipment on a subordinated basis after the investor has received an agreed-to return on their investment.

Accounts payable—equipment represents equipment costs that have been placed on a lease schedule, but for which we have not yet paid. The balance of unpaid equipment cost can vary depending on vendor terms and the timing of lease originations. As of March 31, 2006, we had $7.7 million of unpaid equipment cost, as compared to $8.4 million as of March 31, 2005.

Accounts payable—trade increased 35.8% from $14.2 million as of March 31, 2005 to $19.2 million as of March 31, 2006. This increase is due to a rise in sales of product and services and, consequently, an increase in cost of goods sold, product and services from our technology business unit.

Accounts payable—floor plan increased 41.6% from $33.0 million as of March 31, 2005 to $46.7 million as of March 31, 2006. This increase is primarily due to a rise in sales of product and services from our technology business unit that we transacted through our floor plan facility with GE Commercial Distribution Finance Corporation ("GECDF").

59

Accrued expenses and other liabilities includes deferred income and amounts collected and payable, such as sales taxes and lease rental payments due to third parties. As of March 31, 2006, we had $33.3 million of accrued expenses and other liabilities, a decrease of 19.8% for the year as compared to the prior fiscal year. As of March 31, 2005, we had approximately $13.0 million in accrued expenses and other liabilities from payments received by a customer for an early buyout of leases in which the payment was not forwarded to the investor until the following quarter.

Based on past performance and current expectations, we believe that our cash and cash equivalents, available borrowings under our credit facilities and cash generated from operations will satisfy our working capital needs, capital expenditures, stock repurchases, commitments, acquisitions and other liquidity requirements associated with our existing operations through at least the next 12 months.

Credit Facility — Leasing Business

Working capital for our leasing business is provided through a credit facility which is currently contractually scheduled to expire on July 10, 2009.  On September 26, 2005, we terminated our $45 million credit facility and simultaneously entered into a new $35 million credit facility.  Participating in this facility are Branch Banking and Trust Company ($15 million) and National City Bank ($20 million) as agents.  The ability to borrow under this facility is limited to the amount of eligible collateral at any given time.  The credit facility has full recourse to us and is secured by a blanket lien against all of our assets such as chattel paper (including leases), receivables, inventory and equipment, and the common stock of all wholly owned subsidiaries.

The credit facility contains certain financial covenants and certain restrictions on, among other things, our ability to make certain investments, and sell assets or merge with another company. Borrowings under the credit facility bear interest at London Interbank Offered Rates ("LIBOR") plus an applicable margin or, at our option, the Alternate Base Rate ("ABR") plus an applicable margin. The ABR is the higher of the agent bank's prime rate or Federal Funds rate plus 0.5%. The applicable margin is determined based on our recourse funded debt ratio and can range from 1.75% to 2.50% for LIBOR loans and from 0.0% to 0.25% for ABR loans. As of March 31, 2006, we had an outstanding balance of $6.0 million on the facility, as recorded in recourse notes payable on our Consolidated Balance Sheets.

In general, we use the National City Bank facility to pay the cost of equipment to be put on lease, and we repay borrowings from the proceeds of: (1) long-term, non-recourse, fixed rate financing which we obtain from lenders after the underlying lease transaction is finalized or (2) sales of leases to third parties. The loss of this credit facility could have a material adverse effect on our future results as we may have to use this facility for daily working capital and liquidity for our leasing business. The availability of the credit facility is subject to a borrowing base formula that consists of inventory, receivables, purchased assets, and lease assets. Availability under the credit facility may be limited by the asset value of the equipment purchased by us or by terms and conditions in the credit facility agreement. If we are unable to sell the equipment or unable to finance the equipment on a permanent basis within a certain time period, the availability of credit under the facility could be diminished or eliminated. The credit facility contains covenants relating to minimum tangible net worth, cash flow coverage ratios, maximum debt to equity ratio, maximum guarantees of subsidiary obligations, mergers and acquisitions and asset sales. Other than as detailed below, we were in compliance with these covenants as of June 30, 2007.

The National City Bank facility requires the delivery of our Audited and Unaudited Financial Statements, and pro-forma financial projections, by certain dates.  We have not delivered the following documents as required by Section 5.1 of the facility: (a) annual Audited Financial Statements for the year ended March 31, 2006; (b) "Projections" for our fiscal year ended March 31, 2007; and (c) quarterly Unaudited Financial Statements for the quarters ended June 30, 2006, September 30, 2006, and December 31, 2006.  We entered into the following amendments which have extended the delivery date requirements for these documents: a First Amendment dated July 11, 2006, a Second Amendment dated July 28, 2006, a Third Amendment dated August 30, 2006, a Fourth Amendment dated September 27, 2006, a Fifth Amendment dated November 15, 2006, a Sixth Amendment dated January 11, 2007, a Seventh Amendment dated March 12, 2007, and an Eighth Amendment dated June 27, 2007.  As a result of the amendments, the agents agreed, *inter alia*, to extend to our revolving credit facility in the maximum aggregate principal amount of $35 million through August 31, 2007.

60

Credit Facility — Technology Business

Our subsidiary, *e*Plus Technology, inc., has a financing facility from GECDF to finance its working capital requirements for inventories and accounts receivable. There are two components of this facility: (1) a floor plan component and (2) an accounts receivable component. As of March 31, 2006, the facility agreement had an aggregate limit of the two components of $75 million, and the accounts receivable component had a sub-limit of $20 million. Effective June 29, 2006, the facility with GECDF was amended to increase the total credit facility limit to $85 million and the accounts receivable facility sub-limit to $30 million. In addition, the amendment temporarily increased the total credit facility limit to $100 million during the period from June 26, 2006 through September 21, 2006. Effective June 20, 2007, the facility with GECDF was again amended to temporarily increase the total credit facility limit to $100 million during the period from June 19, 2007 through August 15, 2007. On August 2, 2007, the period was extended from August 15, 2007 to September 30, 2007.  Other than during the temporary increase periods described above, the total credit facility limit is $85 million.

Availability under the GECDF facility may be limited by the asset value of equipment we purchase and may be further limited by certain covenants and terms and conditions of the facility. We were in compliance with, or had obtained applicable waivers for, these covenants as of March 31, 2006.

The facility provided by GECDF requires a guaranty of up to $10.5 million by *e*Plus inc.  The guaranty requires *e*Plus inc to file financial statements with the SEC, and we have not filed the required financial statements.  However, GECDF has waived this requirement through September 30, 2007.  The loss of the GECDF credit facility could have a material adverse effect on our future results as we currently rely on this facility and its components for daily working capital and liquidity for our technology sales business and as an operational function of our accounts payable process.

Floor Plan Component

The traditional business of *e*Plus Technology, inc. as a seller of computer technology, related peripherals and software products is financed through a floor plan component in which interest expense for the first thirty- to forty-five days, in general, is not charged. The floor plan liabilities are recorded as accounts payable—floor plan on our Consolidated Balance Sheets, as they are normally repaid within the thirty- to forty-five day time-frame and represent an assigned accounts payable originally generated with the manufacturer/distributor. If the thirty- to forty-five day obligation is not paid timely, interest is then assessed at stated contractual rates.

The respective floor plan component credit limits and actual outstanding balances were as follows:

| Maximum Credit Limit at March 31, 2005 | Balance as of March 31, 2005 | Maximum Credit Limit at March 31, 2006 | Balance as of March 31, 2006 |
|---|---|---|---|
| $ 75,000,000 | $ 32,978,262 | $ 75,000,000 | $ 46,689,029 |

Accounts Receivable Component

Included within the floor plan component, *e*Plus Technology, inc. has an accounts receivable component from GECDF, which is a revolving line of credit. At the due date of the invoices financed on the floor plan component, the invoices are paid by the accounts receivable component. The balance on the accounts receivable component is then reduced by payments from our customers into a lockbox and our available cash. The outstanding balance under the accounts receivable component is recorded as recourse notes payable on our Consolidated Balance Sheets.

Table of Contents

The respective accounts receivable component credit limits and actual outstanding balances were as follows:

| Maximum Credit Limit at March 31, 2005 | Balance as of March 31, 2005 | Maximum Credit Limit at March 31, 2006 | Balance as of March 31, 2006 |
|---|---|---|---|
| $ 15,000,000 | $ 6,263,471 | $ 20,000,000 | $ 0 |

Performance Guarantees

In the normal course of business, we may provide certain customers with performance guarantees, which are generally backed by surety bonds. In general, we would only be liable for the amount of these guarantees in the event of default in the performance of our obligations. We are in compliance with the performance obligations under all service contracts for which there is a performance guarantee, and we believe that any liability incurred in connection with these guarantees would not have a material adverse effect on our Consolidated Statements of Operations.

**CONTRACTUAL OBLIGATIONS**

The impact that our contractual obligations as of March 31, 2006 are expected to have on our liquidity and cash flow in future periods is as follows:

| | | | Payments Due by Period | | | |
|---|---|---|---|---|---|---|
| | | Total (3) | Less than 1 year | 1–3 years | 3–5 years | More than 5 years |
| Non-recourse notes payable (1) | $ | 127,973,456 | $66,488,393 | $52,917,171 | $8,428,670 | $139,222 |
| Recourse notes payable | | 6,000,000 | 6,000,000 | - | - | - |
| Operating lease obligations (2) | | 7,341,323 | 2,369,963 | 3,557,110 | 1,414,250 | - |
| Total | $ | 141,314,779 | $74,858,356 | $56,474,281 | $9,842,920 | $139,222 |

(1)     Non-recourse notes payable obligations in which the specific lease receivable payments have been assigned to the lender.
(2)     Rent obligations.
(3)     Loan amounts include principal payments only.

**OFF-BALANCE SHEET ARRANGEMENTS**

As part of our ongoing business, we do not participate in transactions that generate relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. As of March 31, 2006, we are not involved in any unconsolidated special purpose entity transactions.

**ADEQUACY OF CAPITAL RESOURCES**

The continued implementation of our business strategy will require a significant investment in both resources and managerial focus. In addition, we may selectively acquire other companies that have attractive customer relationships and skilled sales forces. We may also acquire technology companies to expand and enhance the platform of bundled solutions to provide additional functionality and value-added services. As a result, we may require additional financing to fund our strategy implementation and potential future acquisitions, which may include additional debt and equity financing.

Table of Contents

For the periods presented herein, inflation has been relatively low and we believe that inflation has not had a material effect on our results of operations.

**ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Although a substantial portion of our liabilities are non-recourse, fixed interest rate instruments, we are reliant upon lines of credit and other financing facilities which are subject to fluctuations in interest rates. These instruments, which are denominated in U.S. Dollars, were entered into for other than trading purposes and, with the exception of amounts drawn under the National City Bank and GE Distribution Finance Corporation (formerly Deutsche Financial Services Corporation) facilities, bear interest at a fixed rate. Because the interest rate on these instruments is fixed, changes in interest rates will not directly impact our cash flows. Borrowings under the National City facility bear interest at a market-based variable rate, based on a rate selected by us and

determined at the time of borrowing. Borrowings under the commitment at March 12/21/2007 bear interest at a variable rate. Due to the relatively short nature of the interest rate periods, we do not expect our operating results or cash flow to be materially affected by changes in market interest rates. As of March 31, 2006, the aggregate fair value of our recourse borrowings approximated their carrying value.

During the year ended March 31, 2003, we began transacting business in Canada. As such, we have entered into lease contracts and non-recourse, fixed interest rate financing denominated in Canadian Dollars. To date, Canadian operations have been insignificant and we believe that potential fluctuations in currency exchange rates will not have a material effect on our financial position.

## ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

See the Consolidated Financial Statements and Schedules listed in the accompanying "Index to Financial Statements and Schedules."

## ITEM 9.  CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

## ITEM 9A.  CONTROLS AND PROCEDURES

### Background of Restatement

As previously disclosed, our CEO received a letter, dated June 20, 2006, from a stockholder raising concerns about 450,000 options awarded in 2004 to our four senior officers.  On June 21, 2006, our CEO forwarded the letter to the Chairman of the Audit Committee.  On June 23, 2006, the Audit Committee commenced a voluntary investigation of the issues raised concerning the 2004 Options.  Subsequently, the Audit Committee Investigation was expanded to cover all our stock option grants since our IPO in 1996 and the historical practices related to stock option grants.  The Audit Committee retained independent legal counsel, who in turn retained forensic accountants, to assist in the Investigation.

With the assistance of independent counsel, the Audit Committee obtained and reviewed corporate books and records relating to option grants since our IPO, including relevant stock option plans, option agreements, minutes and written consents of our Board and Compensation Committee, relevant public filings and other available documentation.  In addition, independent counsel for the Audit Committee reviewed a large volume of potentially relevant emails and electronic documents and interviewed 28 individuals, many on multiple occasions.  The Audit Committee's independent counsel developed an exhaustive search term list, which was applied to electronic data retrieved.  Approximately 79 gigabytes of electronic data was located and reviewed.  The Audit Committee met frequently throughout the course of its Investigation.

On August 11, 2006, we filed a Form 8-K which disclosed that based on its review and assessment, the Audit Committee preliminarily concluded that the appropriate measurement dates for determining the accounting treatment for certain stock options we granted differ from the recorded measurement dates used in preparing our Consolidated Financial Statements.  The Audit Committee further determined that certain stock option grants or modifications of stock option grants that were not in accordance with our stock-based compensation plans should have been accounted for using variable plan accounting for the duration of the options. As a result, non-cash stock-based compensation expense should have been recorded with respect to these stock option grants.  Accordingly, it was further disclosed that we would restate our previously issued financial statements for the fiscal years ended March 31, 2004 and 2005, as well as previously reported interim financial information, to reflect additional non-cash charges for stock-based compensation expense and the related tax effects in certain reported periods.  We further disclosed that for the above-stated reasons, certain of our prior financial statements and the related reports from our independent registered public accountants, earnings statements and press releases, and similar communications issued by us should no longer be relied upon.

63

The Audit Committee Investigation, and our internal review, identified certain errors in the ways in which we accounted for certain option grants.  We concluded that we (1) used incorrect measurement dates for the accounting of certain stock options, (2) had not properly accounted for certain modifications of stock options, and (3) had incorrectly accounted for certain stock options that required the application of the variable accounting method. We determined revised measurement dates for those option grants with incorrect measurement dates and recorded stock-based compensation expense to the extent that the fair market value of our stock on the revised measurement date exceeded the exercise price of the stock option, in accordance with APB 25 and related FASB interpretations.  Additionally, we restated both basic and diluted weighted average shares outstanding for changes in measurement dates resulting from the Investigation.  The combination of recording stock-based compensation expense and restating our weighted average shares outstanding have resulted in restated basic and diluted EPS.

We adopted a methodology for determining the most likely appropriate accounting measurement dates for all stock option grants.  We reviewed all available documentation and considered all facts and circumstances for each award and attempted to identify the date at which the award was most likely authorized and approved and the recipient, number of shares and price were determined with finality.

### Disclosure Controls and Procedures

Management, under the supervision and with the participation of our CEO and Chief Financial Officer ("CFO"), evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) promulgated under the Exchange Act), as of the end of the period covered by this report. Based on that evaluation, which included the findings of our Audit Committee as part of its review of our historical stock option granting practices and the adjustments to our Consolidated Financial Statements resulting from that review and classification errors in our Consolidated Statements of Cash Flows, our CEO and CFO have concluded that our disclosure controls and procedures as of March 31, 2006 were not effective at the reasonable assurance level due to the existence of material weaknesses in our internal control over financial reporting. Specifically, we did not maintain effective controls over the determination of the accounting measurement dates for our granting of stock option awards, modifications of stock options awards and the classification of certain cash flows.

To address these control weaknesses, we performed additional analysis and other procedures in order to prepare our Consolidated Financial Statements in accordance with U.S. GAAP.

### Restatement for Stock Option Grants

In making this determination, we concluded that our controls over the application of accounting policies related to the determination of the measurement date of stock options were ineffective to ensure that these policies complied with U.S. GAAP. Specifically, the deficiency in our controls over the application of our stock option accounting policies failed to identify errors in our financial statements, which resulted in adjustments to our Consolidated Financial Statements. A detailed discussion of the correction of these errors and the impact of the adjustment to our Consolidated Financial Statements is included in the "Explanatory Note" immediately preceding Part I, Item 1, "Business" in this Form 10-K and in Note 2, "Restatement of Consolidated Financial Statements" to our Consolidated Financial Statements.

64

Management is committed to remediation of the control deficiencies that constitute the material weaknesses described above by implementing changes to our internal control over financial reporting. For stock option grants, management has implemented improvements in our internal control over financial reporting suggested as a result of the Audit Committee Investigation into stock option granting practices, with the exception of adopting a new Long-Term Incentive Plan, which we plan to present to shareholders in our next proxy statement. In addition, management has established procedures to consider the ongoing effectiveness of both the design and operation of our internal control over financial reporting.

We have implemented a number of significant changes and improvements in our internal control over financial reporting since March 31, 2006. Based on the Stock Option Grant Policy and Procedure Recommendations adopted by our Board, our CEO and CFO have taken the responsibility to implement changes and improvements in our internal control over financial reporting and remediate the control deficiencies that gave rise to the material weaknesses. Specifically, these changes include:

- We now require that all option grants be effective and priced as of the date approved or at a predetermined date certain in the future, in accordance with the applicable plan and the terms of the grant.

- The SIC was discontinued and all decisions regarding stock options will be made by the Compensation Committee or the full Board.

- Each option grant shall be approved at an in-person or telephonic meeting of the Compensation Committee or full Board. Option grants shall not be approved by unanimous written consent.

- We now require systematic authorization for option grants to ensure that all option transactions adhere to our plans and stated policies. All such transactions must be accurately reflected in our books and records and have appropriate supporting documentation. Determinations of the Compensation Committee and/or the Board regarding options must be implemented in an accurate and timely manner.

- We have established a policy to issue options only during a specified window each year, immediately after release of the Form 10-K for the prior year or after quarterly earnings reports, with narrow exceptions for new employees and other special circumstances as determined by the Compensation Committee or the Board.

- Each option granted must specify all material terms of any options granted, including date of grant, exercise price, vesting schedule, duration, breakdown of ISOs versus non-qualified stock options, and any other terms the Compensation Committee or the Board deems appropriate.

- All Forms 4 must be filed within two business days of any grant.

- Option agreements for executive officers must be in the form on file with the SEC.

- All option agreements must be signed contemporaneously with each grant.

- The Compensation Committee will in its discretion engage independent outside counsel to obtain legal advice on issues that are significant and not ministerial rather than relying on company counsel for advice on such matters.

- The Compensation Committee must be advised of the accounting and reporting impact of each grant.

- We will strengthen our Internal Audit function by: (i) having the Internal Audit function report directly to the Audit Committee; (ii) implementing appropriate enhancements to our independent monitoring of financial controls, including specifically the monitoring of stock options and compensation issues; and (iii) implementing appropriate additional compliance training for our employees and management.

Table of Contents

- Our general counsel must review all proposed grants to ensure that all legal requirements have been met; and

- We shall adopt a new long-term incentive plan to effectuate these recommendations. We will ensure that the new plan is accurately described in public filings.

**Restatement of Consolidated Statements of Cash Flows**

In addition, we concluded that our controls over the application of accounting policies related to preparing our Consolidated Statements of Cash Flows were ineffective to ensure that these policies complied with U.S. GAAP. Specifically, the deficiency in our controls over the preparation of our Consolidated Statements of Cash Flows failed to identify errors in our financial statements, which resulted in adjustments to our Consolidated Financial Statements. A detailed discussion of the correction of these errors and the impact of the adjustment to our Consolidated Financial Statements is included in the "Explanatory Note" immediately preceding Part I, Item 1, "Business" in this Form 10-K. The restatement of our Consolidated Balance Sheet as of March 31, 2005 and our Consolidated Statements of Cash Flows for the years ended March 31, 2005 and 2004 were for the following reasons:

We use floor planning agreements for dealer financing of products purchased from distributors and resold to end-users. Historically, we classified the cash flows from our floor plan financing agreements in operating activities in our Consolidated Statements of Cash Flows. We previously treated the floor plan facility as an outsourced accounts payable function, and, therefore, considered the payments made by our floor plan facility as cash paid to suppliers under Financial Accounting Standards No. 95, "*Statement of Cash Flows*."

We have now determined that when an unaffiliated finance company remits payments to our suppliers on our behalf, we should show this transaction as a financing cash inflow and an operating cash outflow. In addition, when we repay the financing company, we should present this transaction as a financing cash outflow. As a result, we have restated the accompanying fiscal year 2005 and 2004 Consolidated Statements of Cash Flows to correct this error.

The restatement also includes a separate line item on the Consolidated Balance Sheets for the accounts payable related to our floor plan financing agreements which had previously been included in accounts payable—trade and a restatement of payments made by our floor plan facility to our suppliers from cash flows provided by operating activities to cash flows provided by financing activities.

Also, payments made by our lessees directly to third-party, non-recourse lenders were previously reported on our Consolidated Statements of Cash Flows as repayments of non-recourse debt in the financing section and a decrease in our investment in leases and leased equipment—net in the operating section. As these payments were not received or disbursed by us, management determined that these amounts should not be shown as cash used in financing activities and cash provided by operating activities on our Consolidated Statements of Cash Flows. Rather, these payments are now disclosed as a non-cash financing activity on our Consolidated Statements of Cash Flows.

In addition, certain condition were included in a trust account on our consolidated balance sheets. Cash flows from the line of credit investor for credit losses and changes in accounts receivable, both of which are in the operating section.  See the impact of corrections in Note 2, "Restatement of Consolidated Financial Statements" to our Consolidated Financial Statements contained elsewhere in this document.

We have discussed the accounting restatement described above with the Audit Committee of the Board. We are working with the Audit Committee to identify and implement corrective actions, where required, to improve the effectiveness of our internal control over financial reporting and to remediate the control deficiencies that gave rise to the material weakness.  Specifically, these changes include enhancements of systems, accounting and review procedures and communications among our staff.

Table of Contents

**Change in Internal Control over Financial Reporting**

There have not been any changes in our internal control over financial reporting during the quarter ended March 31, 2006, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**ITEM 9B.  OTHER INFORMATION**

None.

Table of Contents

**PART III**

**ITEM 10.  DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT**

**Directors and Executive Officers**

The following table sets forth the name, age and position, as of July 31, 2007, of each person who was an executive officer, director or significant employee with *e*Plus on July 31, 2007.

| NAME | AGE | POSITION | CLASS |
|---|---|---|---|
| Phillip G. Norton | 63 | Director, Chairman of the Board, President and Chief Executive Officer | III |
| Bruce M. Bowen | 55 | Director and Executive Vice President | III |
| Terrence O'Donnell. | 63 | Director | II |
| Milton E. Cooper, Jr. | 68 | Director | II |
| Irving R. Beimler | 60 | Director | II |
| Lawrence S. Herman. | 63 | Director | I |
| C. Thomas Faulders, III. | 57 | Director | I |
| Eric D. Hovde | 43 | Director | I |
| Steven J. Mencarini | 52 | Senior Vice President and Chief Financial Officer | |
| Kleyton L. Parkhurst | 44 | Senior Vice President and Treasurer | |

The business experience during the past five years of each director and executive officer of *e*Plus is described below.

*Phillip G. Norton* joined us in March 1993 and has served since then as our Chairman of the Board and CEO.  Since September 1996, Mr. Norton has also served as our President.  Mr. Norton is a 1966 graduate of the U.S. Naval Academy.

*Bruce M. Bowen* founded our company in 1990 and served as our President until September 1996.  Since September 1996, Mr. Bowen has served as our Executive Vice President, and from September 1996 to June 1997 also served as our CFO.  Mr. Bowen has served on our Board since our founding.  He is a 1973 graduate of the University of Maryland and in 1978 received a Masters of Business Administration from the University of Maryland.

*Terrence O'Donnell* joined our Board in November 1996 upon the completion of our IPO.  For the past five years, Mr. O'Donnell has been the Executive Vice President and General Counsel of Textron, Inc. and a partner with the law firm of Williams & Connolly LLP in Washington, D.C.  Mr. O'Donnell has practiced law since 1977, and from 1989 to 1992 served as General Counsel to the U.S. Department of Defense.  Mr. O'Donnell presently also serves as a director of IGI, Inc., an American Stock Exchange company.  Mr. O'Donnell is a 1966 graduate of the U.S. Air Force Academy and received a Juris Doctor from Georgetown University Law Center in 1971.

Table of Contents

*Milton E. Cooper, Jr.* joined our Board in November 2003.  Mr. Cooper served with Computer Sciences Corporation ("CSC") from September 1984 until his retirement in May 2001, first as Vice President, Business Development and then (from January 1992) as President, Federal Sector.  Before joining CSC, Mr. Cooper served in marketing and general management positions with IBM Corporation, Telex Corporation, and Raytheon Company.  He also serves on the Board of Directors and the Compensation Committee of L-1 Identity Solutions, a NYSE-traded company, and serves on the Board of Directors, the Audit Committee, and the Compensation Committee of Applied Signal Technology, Inc. and on the Board of Directors and Compensation Committee of Racemi, Inc.  Mr. Cooper is a 1960 graduate of the United States Military Academy.  He served as an artillery officer with the 82nd Airborne Division before leaving active duty in 1963.

*Irving R. Beimler* joined our Board in November 2006.  Mr. Beimler has been with the Hovde Group (defined below) since November 1997.  Currently, he is serving as Portfolio Manager of Hovde Private Equity Advisors LLC.  He has served as a senior officer, Interim President and Chief Executive Officer and a

Board Member Oath; Berufsakademie Wurttemberg. In this capacity he serves as a first member of SunWest Bank's Advisory Board. He is a graduate of the State University of New York at Geneseo.

*Lawrence S. Herman* joined our Board in March 2001. Mr. Herman has been with BearingPoint, Inc. since June 1967 and is one of BearingPoint's most senior managing directors, responsible for managing the strategy and emerging markets in the company's state and local government practice. During his career, Mr. Herman has specialized in developing, evaluating, and implementing financial and management systems and strategies for state and local governments around the nation. He has directed systems integration projects for state and local governments, and several statewide performance and budget reviews for California, North Carolina, South Carolina, Louisiana, Oklahoma, and others, resulting in strategic fiscal and technology plans. He is considered to be one of the nation's foremost state budget and fiscal planning experts. Mr. Herman received his B.S. degree in Mathematics and Economics from Tufts University in 1965 and his Masters of Business Administration in 1967 from Harvard Business School.

*C. Thomas Faulders, III* joined our Board in July 1998. Mr. Faulders has been the President and Chief Executive Officer of the University of Virginia Alumni Association since 2005. Prior to that, Mr. Faulders served as the Chairman and Chief Executive Officer of LCC International, Inc. from 1999 to 2005 and as Chairman of Telesciences, Inc., an information services company, from 1998 to 1999. From 1995 to 1998, Mr. Faulders was Executive Vice President, Treasurer, and Chief Financial Officer of BDM International, Inc., a prominent systems integration company. Mr. Faulders is a member of the Board of Advisors of Morgan Franklin and the Board of Trustees of Randolph College. He is a 1971 graduate of the University of Virginia and in 1981 received a Masters of Business Administration from the Wharton School of the University of Pennsylvania.

*Eric D. Hovde* joined our Board in November 2006. In 1987, Mr. Hovde founded, and is the Chief Executive Officer, Managing Member and Chairman of, Hovde Capital Advisors LLC, Hovde Private Equity Advisors LLC, and Hovde Financial, Inc., respectively (the "Hovde Group"). The Hovde Group is focused exclusively on the financial services industry and provides its clients with investment banking, asset management and merchant banking services. Mr. Hovde has also served as a director on numerous bank and thrift boards and currently serves as the Chairman of Sunwest Bank in Orange County, California. Mr. Hovde is also the co-founder and a trustee of the Eric D. and Steven D. Hovde Foundation, an organization that actively supports clinical research in search of a cure for Multiple Sclerosis and charitable relief in devastated areas around the world. Mr. Hovde received his degrees in Economics and International Relations from the University of Wisconsin. He is licensed with the NASD as a registered representative and general securities principal.

*Steven J. Mencarini* joined us in June 1997 as Senior Vice President and CFO. Prior to joining us, Mr. Mencarini was Controller of the Technology Management Group of CSC. Mr. Mencarini joined CSC in 1991 as Director of Finance and was promoted to Controller in 1996. Mr. Mencarini is a 1976 graduate of the University of Maryland and received a Masters of Taxation from American University in 1985.

*Kleyton L. Parkhurst* joined us in May 1991 as Director of Finance. Mr. Parkhurst has served as Secretary or Assistant Secretary and Treasurer since September 1996. In July 1998, Mr. Parkhurst was made Senior Vice President for Corporate Development. Mr. Parkhurst is currently responsible for all of our mergers and acquisitions, investor relations, and marketing. Mr. Parkhurst is a 1985 graduate of Middlebury College.

69

*Table of Contents*

Each of our executive officers is chosen by the Board and holds his or her office until his or her successor shall have been duly chosen and qualified or until his or her death or until he or she shall resign or be removed as provided by the Bylaws.

**Audit Committee**

The Audit Committee of the Board is responsible for selecting, appointing, overseeing, reviewing and approving the fees of our independent public accountants, monitoring and reviewing the quality and activities of our internal and external audit functions, monitoring the adequacy of our operating and internal controls as reported by management and the external or internal auditors, assessing the independent auditor's qualifications and independence, and reviewing our periodic reports filed with the SEC. The members of the Audit Committee during the 2006 fiscal year were Terrence O'Donnell (Chairman), C. Thomas Faulders, III, Lawrence S. Herman, and Milton E. Cooper, Jr. Each member of the Audit Committee is independent in accordance with the published listing requirements of Nasdaq. In addition, the Board has determined that C. Thomas Faulders III qualifies as an "Audit Committee Financial Expert" as defined in regulations issued by the SEC. This designation is a disclosure requirement of the SEC related to Mr. Faulders' experience and understanding with respect to certain accounting and auditing matters. The designation does not impose upon Mr. Faulders any duties, obligations or liability that are greater than are generally imposed on him as a member of the Audit Committee and the Board, and his designation as an audit committee financial expert pursuant to this SEC requirement does not affect the duties, obligations or liability of any other member of the Audit Committee or the Board. The Board has also determined that each Audit Committee member has sufficient knowledge in reading and understanding our financial statements to serve on the Audit Committee.

**Stockholder Nominations**

It is the policy of the Nominating and Corporate Governance Committee to consider properly submitted stockholder nominations for membership on the Board. Any stockholder nomination must comply with our Bylaws. The notice must be in writing and delivered to our Corporate Secretary, *e*Plus inc., 13595 Dulles Technology Drive, Herndon, Virginia 20171-3413, no later than 90 days in advance of the Annual Meeting or, if later, the seventh day following the first public announcement of the Annual Meeting. The notice must set forth: (i) the name and address of the stockholder who intends to make the nomination and of the person or persons to be nominated; (ii) a representation that the stockholder is a holder of record of our stock entitled to vote at the Annual Meeting and intends to appear in person or by proxy at the Annual Meeting and nominate the person or persons specified in the notice; (iii) a description of all arrangements or understandings between the stockholder and each nominee or any other person or persons (naming such person or persons) pursuant to which the nomination or nominations are to be made by the stockholder; (iv) such other information regarding each nominee proposed by such stockholder as would be required to be included in a proxy statement filed pursuant to the proxy rules of the SEC had the nominee been nominated, or intended to be nominated, by the Board; and (v) the consent of each nominee to serve as a director if so elected. In addition, the stockholder making such nomination shall promptly provide any other information reasonably requested by us.

In evaluating such nominations, the Nominating and Corporate Governance Committee seeks to achieve a balance of knowledge, experience, and capability on the Board. Furthermore, any member of the Board must have the highest personal ethics and values and have experience at the policy-making level of business, and should be committed to enhancing stockholder value.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires our officers, directors, and persons who own more than ten percent of a registered class of our equity securities to file reports of securities ownership and changes in such ownership with the SEC and Nasdaq. Officers, directors, and greater-than-ten-percent stockholders are required by SEC regulations to furnish us with copies of all Section 16(a) forms that they file.

Based solely upon a review of Forms 3, Forms 4, and Forms 5 furnished to us pursuant to Rule 16a-3 under the Exchange Act, we believe that all such forms required to be filed pursuant to Section 16(a) of the Exchange Act during the fiscal year ended March 31, 2006 were timely filed, as necessary, by the officers, directors, and security holders required to file such forms, with following exceptions: Mr. Parkhurst was late in filing a Form 4 in connection with the exercise of 1,000 options on March 8, 2006; Mr. Eric Hovde and Mr. Steven Hovde were late in filing Forms 4 on June 17, 2005 with respect to the indirect purchase of 6,900 shares of our common stock; Mr. Eric Hovde and Mr. Steven Hovde were late in filing Forms 4 on August 31, 2005 with respect

to the indirect purchase of 11,076 shares, and on common stock by Mr. Faulder on October 12, 2004, on each date in the aggregate on October 17, 2005 and Mr. Herman on October 12, 2005, in each case, in connection with the grant of 10,000 options to purchase shares of our common stock.

70

Table of Contents

## Code of Ethics

We have a code of ethics that applies to all of our employees, including our principal executive officer, principal financial officer, principal accounting officer and our Board.  The Standard of Conduct and Ethics for Employees, Officers and Directors of *e*Plus inc. is available on our website at www.
*e*Plus.com/ethics. We will disclose on our website any amendments to or waivers from any provision of the Standard of Conduct and Ethics that applies to any of the directors or officers.

## ITEM 11.  EXECUTIVE COMPENSATION

### Summary Compensation Table

The following table provides certain summary information concerning the compensation earned, for services rendered in all capacities to us, by our CEO and certain other of our executive officers (collectively, the "Named Executive Officers") for the fiscal years ended March 31, 2004, 2005, and 2006.

| | | Annual Compensation | | | Long-Term Compensation | |
|---|---|---|---|---|---|---|
| Name and Principal Position | Fiscal Year | Salary | Bonus/ Commission | Securities Underlying Options (#) | | All Other Compensation |
| Phillip G. Norton | 2006 | $   375,000 | $          - | - | $ | 1,500(2) |
| Chairman, Chief Executive | 2005 | 343,750 | 175,000 | 300,000(1) | | 1,440 |
| Officer, and President | 2004 | 250,000 | - | - | | 1,320 |
| Bruce M. Bowen | 2006 | $   300,000 | $          - | - | $ | 188,700(3) |
| Director and | 2005 | 281,250 | 137,500 | 50,000(1) | | 127,560 |
| Executive Vice President | 2004 | 225,000 | - | - | | 5,895 |
| Steven J. Mencarini | 2006 | $   225,000 | $          - | - | $ | 74,580(4) |
| Chief Financial Officer and | 2005 | 225,000 | 130,000 | 50,000(1) | | 50,160 |
| Senior Vice President | 2004 | 215,000 | - | - | | 1,320 |
| Kleyton L. Parkhurst | 2006 | $   214,584 | $    29,167 | - | $ | 74,580(5) |
| Senior Vice President, Assistant | 2005 | 200,000 | 335,000 | 50,000(1) | | 50,160 |
| Secretary, and Treasurer | 2004 | 200,000 | 43,141 | - | | 1,320 |

(1)     On May 11, 2007, we and each of Messrs. Norton, Bowen, Parkhurst and Mencarini entered into separate stock option cancellation agreements pursuant to which options to purchase 300,000 shares, 50,000 shares, 50,000 shares and 50,000 shares, respectively, were cancelled.
(2)     All amounts reported represent our employer 401(k) plan matching contributions
(3)     Includes $4,500 of country-club dues, $1,500 of our employer 401(k) matching contributions, and $182,700 paid by us in connection with the Supplemental Benefit Plan, which is a nonqualified deferred compensation plan.

71

Table of Contents

(4)     Includes $1,500 of our employer 401(k) matching contribution and $73,080 of compensation related to the Supplemental Benefit Plan, which is a nonqualified deferred compensation plan.
(5)     Includes $1,500 of our employer 401(k) matching contribution and $73,080 paid by us in connection with the Supplemental Benefit Plan, which is a nonqualified deferred compensation plan.

### Option Grants in Last Fiscal Year

There were no options granted to the Named Executive Officers during fiscal year 2006.

### Aggregated Option/SAR Exercises and Fiscal Year-End Option Values

The following table sets forth information regarding the value of unexercised options held by the Named Executive Officers at the end of fiscal year 2006.

| | | | Number of Securities Underlying Unexercised Options at Fiscal Year-End | | Value of Unexercised In-the-Money Options at Fiscal Year-End($)(2) | |
|---|---|---|---|---|---|---|
| Name | Number of Shares Acquired On Exercise | Value Realized ($)(1) | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Phillip G. Norton(3) | 87,424 | 423,889 | 277,576 | 240,000 | 1,559,804 | 769,950 |
| Bruce M. Bowen(3) | 15,000 | 80,203 | 140,000 | 40,000 | 819,750 | 134,400 |
| Steven J. Mencarini(3) | 12,000 | 85,704 | 105,700 | 40,000 | 412,586 | 134,400 |
| Kleyton L. Parkhurst(3) | 38,097 | 292,573 | 211,903 | 40,000 | 1,167,000 | 134,400 |

(1)     The value realized as shown represents the difference between the fair market value of the common stock on the date of exercise, based on the closing price as quoted on The Nasdaq Global Market, and the exercise price of the option.
(2)     Represents the difference between $14.23 per share, which was the closing price on March 31, 2006 as quoted on The Nasdaq Global Market, and the exercise price of the option.
(3)     Includes options to purchase 300,000 shares, 50,000 shares, 50,000 shares and 50,000 shares of Messrs. Norton, Bowen, Parkhurst and Mencarini, respectively, which were cancelled pursuant to separate stock option cancellation agreements entered into by us and each of the executive officers on May 11, 2007.

**Employment Contracts and Termination of Employment and Change in Control Arrangements**

*Employment Agreements*

We have entered into employment agreements with Phillip G. Norton and Bruce M. Bowen, each effective as of September 1, 1996, and with Kleyton L. Parkhurst and Steven J. Mencarini, effective as of October 31, 2003. Each of Messrs. Norton's and Bowen's employment agreements provided for an initial term of three years, and is subject to an automatic one-year renewal at the expiration thereof unless we or the employee provides notice of an intention not to renew at least thirty (30) days prior to expiration. Each of Messrs. Parkhurst's and Mencarini's employment agreements provided for an initial term of two years, and is subject to an automatic one-year renewal at the expiration thereof unless we provide at least six months' prior notice of termination or the employee resigns for any reason. On May 1, 2007, we timely provided six months' notice to Mr. Parkhurst of non-renewal of his agreement. The notice did not otherwise affect Mr. Parkhurst's employment with us. The employment agreements require us to pay severance to Messrs. Parkhurst and Mencarini if we terminate their respective employment during the term of the agreements other than for cause or disability, or if the respective executive resigns for good reason (as defined in the agreements).

72

Table of Contents

The current annual base salaries for fiscal year 2008 ($400,000 in the case of Phillip G. Norton; $300,000 in the case of Bruce M. Bowen; $225,000 in the case of Kleyton L. Parkhurst; and $300,000 in the case of Steven J. Mencarini) are in effect and each employee may be eligible for commissions or performance bonuses. The Compensation Committee determines bonuses for Messrs. Norton, Bowen, Mencarini and Parkhurst. Messrs. Norton and Mencarini's bonuses are based on our performance and individual performance. Mr. Bowen's bonus is based on our performance, individual performance and the performance of our leasing divisions. Mr. Parkhurst's bonus is based on metrics which have been set by the Compensation Committee.

Under the employment agreements, each receives certain other benefits, including medical, insurance, death and long-term disability benefits, employer 401(k) contributions, and reimbursement of employment-related expenses. Mr. Bowen's country-club dues are paid by us. In the fiscal year ended March 31, 2006, the amount of these dues totaled $4,500. The employment agreements of Messrs. Norton and Bowen contain a covenant not to compete on the part of each, whereby, in the event of a voluntary termination of employment, upon expiration of the term of the agreement, or upon the termination of employment by us for cause, each is subject to restrictions on acquiring, consulting with, or otherwise engaging in or assisting in the providing of capital needs for competing business activities or entities within the United States for a period of one year after the date of such termination or expiration of the term of the employment agreement.

We maintain key-man life insurance on Mr. Norton in the amount of $11 million.

*Supplemental Benefit Plans*

On February 28, 2005, our Board approved the adoption of separate *e*Plus inc. Supplemental Benefit Plans for each of Messrs. Bowen, Mencarini and Parkhurst. The plans are unfunded and nonqualified and are designed to provide the participants with a cash benefit that is payable only upon the earlier to occur of (i) death, (ii) termination of employment or (iii) the expiration of the plans. Each plan terminates on August 11, 2014. Under the terms of the plans, the participants or their beneficiaries have only the right to receive a single lump-sum cash distribution upon the occurrence of one of the triggering events described above. Under the terms of the plans, the participants do not have a right to accelerate payments of the benefits payable under the plans. If a participant is terminated for cause (as defined in each plan) prior to the expiration of the respective plan, we will have no further obligation under the respective plan and the affected participant will not be entitled to any payments under such plan. In connection with the adoption of the plans, we have established a grantor trust to which we have transferred assets intended to be used for the benefit of the participants. Through the date of distribution of plan benefits, the assets of such trusts will remain subject to the claims of our creditors and the beneficiaries of the trusts shall have standing with respect to the trusts' assets not greater than that of our general unsecured creditors.

**Director Compensation**

Directors who are also employees of *e*Plus do not currently receive any compensation for service as members of the Board. The general policy of the Board is that compensation for independent directors should be a mix of cash and equity-based compensation. During the first quarter of the fiscal year ended March 31, 2006, each outside director received $500 for each Board meeting. Beginning July 1, 2005, each outside director has received cash payments of $8,750 per quarter. During the year ended March 31, 2006, each outside director received a grant of options to purchase 10,000 shares of common stock. All directors are also reimbursed for their out-of-pocket expenses incurred to attend Board or Committee meetings.

**Compensation Committee Interlocks and Insider Participation**

The members of the Compensation Committee during the fiscal year 2006 are C. Thomas Faulders III (Chairman), Terrence O'Donnell, Lawrence S. Herman, and Milton E. Cooper, Jr. None of the members of the Compensation Committee was our employee or former employee. During fiscal year 2006, none of the executive officers of *e*Plus served on the compensation committee of another entity or any other committee of the board of directors performing similar functions of another entity.

73

Table of Contents

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

**Stock Ownership**

Except as set forth below, the following table sets forth certain information as of July 31, 2007 with respect to: (1) each director; (2) each Named Executive Officer; (3) all executive officers and directors of *e*Plus as a group; and (4) all persons known by us to be the beneficial owners of more than five percent of the outstanding shares of our common stock.

| Name of Beneficial Owner(1) | Number of Shares Beneficially Owned (2) | Percentage of Shares Outstanding |
|---|---|---|
| Phillip G. Norton (3) | 2,216,000 | 26.4 |
| Bruce M. Bowen (4) | 711,400 | 8.5 |
| Steven J. Mencarini (5) | 79,500 | 1.0 |
| Kleyton L. Parkhurst (6) | 153,000 | 1.8 |
| C. Thomas Faulders, III (7) | 83,507 | 1.0 |
| Terrence O'Donnell (8) | 90,000 | 1.1 |
| Milton E. Cooper, Jr. (11) | 30,000 | * |
| Lawrence S. Herman (9) | 47,500 | * |

| Irving R. Beimler | - | * |
| All directors and executive officers as a group (10 Individuals) | 4,692,236 | 52.0 |
| | | |
| Dimensional Fund Advisors Inc. (12)<br>1299 Ocean Avenue, 11th Floor<br>Santa Monica, CA 90401 | 681,488 | 8.3 |
| | | |
| Heartland Advisors, Inc. (13)<br>789 North Water Street<br>Milwaukee, WI 53202 | 439,859 | 5.3 |

\*     Less than 1%

(1)    The business address of Messrs. Norton, Bowen, Mencarini, Parkhurst, Faulders, O'Donnell, Cooper, Herman, Hovde and Beimler is 13595 Dulles Technology Drive, Herndon, Virginia, 20171-3413.

(2)    A person is deemed to be the beneficial owner of securities that can be acquired by such person within 60 days of July 31, 2007 upon exercise of options or warrants. Each beneficial owner's percentage ownership is determined by assuming that options or warrants that are held by such person (but not by any other person) and that are exercisable within 60 days of July 31, 2007 have been exercised. The ownership amounts reported for persons who we know own more than 5% of its common stock are based on the Schedules 13D and 13G and Forms 4 and 5 filed with the SEC by such persons, unless we have reason to believe that the information contained in those filings is not complete or accurate.

(3)    Includes 2,040,000 shares held by J.A.P. Investment Group, L.P., a Virginia limited partnership, of which J.A.P., Inc., a Virginia corporation, is the sole general partner. The limited partners are: Patricia A. Norton, the spouse of Mr. Norton, trustee for the benefit of Phillip G. Norton, Jr., u/a dated as of July 20, 1983; Patricia A. Norton, the spouse of Mr. Norton, trustee for the benefit of Andrew L. Norton, u/a dated as of July 20, 1983; Patricia A. Norton, trustee for the benefit of Jeremiah O. Norton, u/a dated as of July 20, 1983; and Patricia A. Norton. Patricia A. Norton is the sole stockholder of J.A.P., Inc. Also includes 175,000 shares of common stock issuable to Mr. Norton under options that are exercisable within 60 days of July 31, 2007. Mr. Norton holds 1,000 shares individually.

(4)    Includes 421,400 shares held by Mr. and Mrs. Bowen, as tenants by the entirety, and 160,000 shares held by Bowen Holdings LLC, a Virginia limited liability company composed of Mr. Bowen and his three children, for which shares Mr. Bowen serves as manager. Also includes 130,000 shares of common stock issuable to Mr. Bowen under options that are exercisable within 60 days of July 31, 2007.

74

(5)    Includes 79,500 shares of common stock issuable to Mr. Mencarini under options that are exercisable within 60 days of July 31, 2007.
(6)    Includes 140,000 shares of common stock issuable to Mr. Parkhurst under options that are exercisable within 60 days of July 31, 2007.
(7)    Includes 83,507 shares of common stock issuable to Mr. Faulders under options that are exercisable within 60 days of July 31, 2007.
(8)    Includes 90,000 shares of common stock issuable to Mr. O'Donnell under options that are exercisable within 60 days of July 31, 2007.
(9)    Includes 47,500 shares of common stock issuable to Mr. Herman under options that are exercisable within 60 days of July 31, 2007.
(10)   Of the 1,265,129 shares beneficially owned by Eric D. Hovde, 28,559 shares are owned directly; Eric D. Hovde is the managing member ("MM") of Hovde Capital, L.L.C., the general partner to Financial Institution Partners II, L.P., which owns 328,719 shares; Eric D. Hovde is the MM of Hovde Capital Limited IV LLC, the general partner to Financial Institution Partners IV, L.P., which owns 51,970 shares; Eric D. Hovde is the MM of Hovde Capital, Ltd., the general partner to Financial Institution Partners III, L.P., which owns 234,876 shares; Eric D. Hovde is the MM of Hovde Capital IV, LLC, the general partner to Financial Institution Partners, L.P., which owns 432,720 shares; Eric D. Hovde is the MM to Hovde Capital Offshore LLC, the management company to Financial Institution Partners, Ltd., which owns 118,020 shares; Eric D. Hovde is the MM of Hovde Acquisition II, L.L.C., which owns 30,000 shares; Eric D. Hovde is the trustee to The Hovde Financial, Inc. Profit Sharing Plan and Trust, which owns 19,000 shares; Eric D. Hovde is the trustee to The Eric D. and Steven D. Hovde Foundation, which owns 21,265 shares.
(11)   Includes 30,000 shares of common stock issuable to Mr. Cooper under options that are exercisable within 60 days of July 31, 2007.
(12)   The information as to Dimensional Fund Advisors is derived from a Schedule 13G/A filed with the SEC on February 9, 2007. Dimensional Fund Advisors reports that it is an investment advisor registered under Section 203 of the Investment Advisors Act of 1940, furnishes investment advice to four investment companies registered under the Investment Company Act of 1940, and serves as investment manager to certain other commingled group trusts and separate accounts (the "Funds"). In its role as investment advisor or manager, Dimensional possesses investment and/or voting power over our securities that are owned by the Funds, and may be deemed to be the beneficial owner of our shares held by the Funds. However, Dimensional disclaims beneficial ownership of all securities reported in its Schedule 13G/A.
(13)   The information as to Heartland Advisors is derived from a Schedule 13G filed with the SEC on February 12, 2007. Heartland Advisors reports that it is an investment advisor registered with the SEC, and that it may be deemed to be the beneficial owner of our shares of common stock by virtue of its investment discretion and voting authority granted by certain of its clients. However, Heartland Advisors disclaims beneficial ownership of all securities reported in its Schedule 13G.

75

## Equity Compensation Plan Information

The following table provides information about our common stock that may be issued upon the exercise of options, warrants, and rights under all of our existing equity compensation plans as of March 31, 2006, including the *e*Plus inc. Amended and Restated 1998 Long-Term Incentive Plan, Amended and Restated Incentive Stock Option Plan, Amended and Restated Outside Director Stock Option Plan, and Amended and Restated Nonqualified Stock Option Plan.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants, and rights(1) | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in first column) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 1,999,911 | $     9.93 | 188,326 |
| Equity compensation plans not approved by security holders | - | - | - |
| Total | 1,999,911 | $     9.93 | 188,326 |

(1)    Includes options to purchase 300,000 shares, 50,000 shares, 50,000 shares and 50,000 shares of Messrs. Norton, Bowen, Parkhurst and Mencarini, respectively, which were cancelled pursuant to separate stock option cancellation agreements entered into by us and each of the executive officers on May 11, 2007.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

**Lease with Related Party**

We lease certain space from a third party during the months of March 2, 2006, which amount to approximately $2,000 from Phillip G. Norton, our Chairman, President, and CEO. All leases with related parties are approved in advance by our Board.

**Indemnification Agreements**

We have entered into separate but substantially identical indemnification agreements with each of our directors and executive officers, and we expect to enter into similar indemnification agreements with persons who become directors or executive officers in the future. The indemnification agreements provide that we will indemnify the director or officer against any expenses or liabilities incurred in connection with any proceeding in which the director or officer may be involved as a party or otherwise, by reason of the fact that the director or officer is or was a director or officer of *e*Plus or by reason of any action taken by or omitted to be taken by the director or officer while acting as an officer or director of *e*Plus. However, we are only obligated to provide indemnification under the indemnification agreements if:

(1)  the director or officer was acting in good faith and in a manner the director or officer reasonably believed to be in our best interests, and, with respect to any criminal action, the director or officer had no reasonable cause to believe the director's or officer's conduct was unlawful;

(2)  the claim was not made to recover profits made by the director or officer in violation of Section 16(b) of the Exchange Act or any successor statute;

(3)  the claim was not initiated by the director or officer;

(4)  the claim was not covered by applicable insurance; or

Table of Contents

(5)  the claim was not for an act or omission of a director of *e*Plus from which a director may not be relieved of liability under Section 102(b)(7) of the Delaware General Corporation Law.

Each director and officer has undertaken to repay us for any costs or expenses we paid if it is ultimately determined that the director or officer is not entitled to indemnification under the indemnification agreements.

**Future Transactions**

All material transactions between us and our officers, directors, or other affiliates must be approved by a majority of the disinterested members of our Board, and be on terms no less favorable to us than could be obtained from unaffiliated third parties.

**ITEM 14.  PRINCIPAL ACCOUNTING FEES AND SERVICES**

The following table shows the fees we were billed for the audit and other services provided by Deloitte & Touche LLP for fiscal year 2006 and 2005.

|  | 2006 | 2005 |
|---|---|---|
| Audit Fees | $ 3,010,400 | $ 532,000 |
| Audit-Related Fees | - | 8,000 |
| Tax Fees | - | - |
| All Other Fees | - | - |
| Total | $ 3,010,400 | $ 540,000 |

*Audit Fees.*  The approximate aggregate fees to be charged by Deloitte & Touche LLP for professional services rendered for the audit of our annual financial statements for the fiscal year ended March 31, 2006 and for the reviews of the financial statements included in our Quarterly Reports on Form 10-Q for that fiscal year were $3,010,400.  Included in this amount is $2,410,400 related to the restatement of the Consolidated Financial Statements.  The aggregate fees charged by Deloitte & Touche LLP for professional services rendered for the audit of our annual financial statements for the fiscal year ended March 31, 2005 and for the reviews of the financial statements included in our Quarterly Reports on Form 10-Q for that fiscal year were $532,000.

*Audit-Related Fees.*  Fees billed by Deloitte & Touche LLP for audit-related services rendered for Sarbanes-Oxley Act, Section 404 advisory services for the fiscal year ended March 31, 2005 were $8,000.  There were no audit-related fees billed for the fiscal year ended March 31, 2006.

*Tax Fees.*  There were no fees billed by Deloitte & Touche LLP for tax-related services rendered for the fiscal years ended March 31, 2006 or 2005.

*All Other Fees.*  There were no other fees billed in the last two fiscal years for professional services rendered by Deloitte & Touche LLP.

There were no non-audit related services provided by Deloitte & Touche LLP during the last two fiscal years.  The Audit Committee pre-approves all auditing services (which may entail providing comfort letters in connection with securities underwriting), and all non-audit services provided to us by Deloitte & Touche LLP, subject to a de minimis exception as set forth by the SEC.

Table of Contents

**PART IV**

**ITEM 15.  EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

**(a)(1) Financial Statements**

The Consolidated Financial Statements listed in the accompanying Index to Financial Statements and Schedules are filed as a part of this report and incorporated herein by reference.

**(a)(2) Financial Statement Schedule**

None. Financial Statement Schedules are omitted because they are not required, inapplicable or the required information is shown in the Consolidated Financial Statements or Notes thereto.

**(b) Exhibit List**

| 2.1 | Asset Purchase Agreement between *e*Plus inc. and ProcureNet, Inc. dated as of May 4, 2001 (Incorporated herein by reference to Exhibit 2.1 to our Current Report on Form 8-K filed on May 18, 2001). |
| 2.2 | Agreement and Plan of Reorganization by and among SourceOne Computer Corporation, Robert Nash, Donna Nash, R. Wesley Jones, the shareholders of SourceOne Computer Corporation, *e*Plus inc. and *e*Plus Technology, inc., dated as of October 2, 2001 (Incorporated herein by reference to Exhibit 2 to our Current Report on Form 8-K filed on October 12, 2001). |
| 2.3 | Asset Purchase and Sale Agreement by and between *e*Plus Technology, Inc., Elcom Services Group, Inc., Elcom, Inc., and Elcom International, Inc., dated March 25, 2002 (Incorporated herein by reference to Exhibit 2 to our Current Report on Form 8-K filed on April 5, 2002). |
| 2.4 | Amendment to Asset Purchase and Sale Agreement by and between *e*Plus Technology, Inc., Elcom Services Group, Inc., Elcom, Inc., and Elcom International, Inc., dated March 29, 2002 (Incorporated herein by reference to Exhibit 2.1 to our Current Report on Form 8-K filed on April 5, 2002). |
| 2.5 | Asset Purchase Agreement by and between *e*Plus Technology, inc. and Manchester Technologies, Inc., dated May 28, 2004 (Incorporated herein by reference from Exhibit 2.1 to our Current Report on Form 8-K filed on May 28, 2004). |
| 3.1.1 | Certificate of Incorporation of *e*Plus, filed on August 27, 1996 (Incorporated herein by reference to Exhibit 3.1 to our Quarterly Report on Form 10-Q for the period ended December 31, 2002). |
| 3.1.2 | Certificate of Amendment of Certificate of Incorporation of *e*Plus, filed on September 30, 1997 (Incorporated herein by reference to Exhibit 3.2 to our Quarterly Report on Form 10-Q for the period ended December 31, 2002). |
| 3.1.3 | Certificate of Amendment of Certificate of Incorporation of *e*Plus, filed on October 19, 1999 (Incorporated herein by reference to Exhibit 3.3 to our Quarterly Report on Form 10-Q for the period ended December 31, 2002). |
| 3.1.4 | Certificate of Amendment of Certificate of Incorporation of *e*Plus, filed on May 23, 2002 (Incorporated herein by reference to Exhibit 3.4 to our Quarterly Report on Form 10-Q for the period ended December 31, 2002). |

*Table of Contents*

| 3.1.5 | Certificate of Amendment of Certificate of Incorporation of *e*Plus, filed on October 1, 2003 (Incorporated herein by reference to Exhibit 3.5 to our Quarterly Report on Form 10-Q for the period ended September 30, 2003). |
| 3.2.1 | Bylaws of *e*Plus, as amended to date (Incorporated herein by reference to Exhibit 3.5 to our Quarterly Report on Form 10-Q for the period ended December 31, 2002). |
| 3.2.2 | Amendment to Bylaws dated November 20, 2006 (Incorporated herein by reference to Exhibit 3.2 to our Current Report on Form 8-K filed on November 27, 2006). |
| 3.2.3 | Amendment to Bylaws dated June 12, 2007 (Incorporated herein by reference to Exhibit 3.2 to our Current Report on Form 8-K filed on June 15, 2007). |
| 4 | Specimen Certificate of Common Stock (Incorporated herein by reference to Exhibit 4.1 to our Registration Statement on Form S-1 (File No. 333-11737) originally filed on September 11, 1996). |
| 10.1 | Form of Indemnification Agreement entered into between *e*Plus and its directors and officers (Incorporated herein by reference to Exhibit 10.5 to our Registration Statement on Form S-1 (File No. 333-11737) originally filed on September 11, 1996). |
| 10.2* | Form of Employment Agreement between *e*Plus and Phillip G. Norton (Incorporated herein by reference to Exhibit 10.7 to our Registration Statement on Form S-1 (File No. 333-11737) originally filed on September 11, 1996). |
| 10.3* | Form of Employment Agreement between *e*Plus and Bruce M. Bowen (Incorporated herein by reference to Exhibit 10.8 to our Registration Statement on Form S-1 (File No. 333-11737) originally filed on September 11, 1996). |
| 10.4* | Form of Employment Agreement between *e*Plus and Kleyton L. Parkhurst (Incorporated herein by reference to Exhibit 10.4 to our Current Report on Form 8-K filed on December 2, 2003). |
| 10.5* | Form of Employment Agreement between *e*Plus and Steven J. Mencarini (Incorporated herein by reference to Exhibit 10.5 to our Current Report on Form 8-K filed on December 2, 2003). |
| 10.6* | 1997 Employee Stock Purchase Plan (Incorporated herein by reference to Exhibit 10.25 to our Quarterly Report on Form 10-Q for the period ended September 30, 1997). |
| 10.7 | Amended and Restated 1998 Long-Term Incentive Plan (Incorporated herein by reference to Exhibit 10.8 to our Quarterly Report on Form 10-Q for the period ended September 30, 2003). |
| 10.8 | Form of Irrevocable Proxy and Stock Rights Agreement (Incorporated herein by reference to Exhibit 10.11 to our Registration Statement on Form S-1 (File No. 333-11737) originally filed on September 11, 1996). |
| 10.9 | Credit Agreement dated September 23, 2005 between *e*Plus inc. and its subsidiaries named therein and National City Bank as Administrative Agent (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on September 28, 2005). |
| 10.10 | First Amendment to the Credit Agreement dated July 11, 2006 between *e*Plus inc. and National City Bank and Branch Banking and Trust Company of Virginia (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on July 13, 2006). |

*Table of Contents*

| 10.11 | Second Amendment to the Credit Agreement dated July 28, 2006 between *e*Plus inc. and National City Bank and Branch Banking and Trust Company of Virginia (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on August 3, 2006). |
| 10.12 | Third Amendment to the Credit Agreement dated August 30, 2006 between *e*Plus inc. and National City Bank and Branch Banking and Trust Company of Virginia (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on September 6, |

| 10.13 | Fourth Amendment to the Credit Agreement dated September 27, 2006 between *e*Plus inc. and National City Bank and Branch Banking and Trust Company of Virginia (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on October 3, 2006). |
|---|---|
| 10.14 | Waiver dated September 27, 2006 by National City Bank and Branch Banking and Trust Company of Virginia (Incorporated herein by reference to Exhibit 10.2 to our Current Report on Form 8-K filed on October 3, 2006). |
| 10.15 | Fifth Amendment to the Credit Agreement dated November 15, 2006 between *e*Plus inc. and National City Bank and Branch Banking and Trust Company of Virginia (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on November 17, 2006). |
| 10.16 | Sixth Amendment to the Credit Agreement dated January 11, 2007 between *e*Plus inc. and National City Bank and Branch Banking and Trust Company of Virginia (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on January 12, 2007). |
| 10.17 | Seventh Amendment to the Credit Agreement dated March 12, 2007 between *e*Plus inc. and National City Bank and Branch Banking and Trust Company of Virginia (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on March 15, 2007). |
| 10.18 | Eighth Amendment to the Credit Agreement dated June 27, 2007 between *e*Plus inc. and National City Bank and Branch Banking and Trust Company (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on June 29, 2007). |
| 10.19 | Business Financing Agreement dated August 31, 2000 between GE Commercial Distribution Finance Corporation (as successor to Deutsche Financial Services Corporation) and *e*Plus Technology, inc. (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on November 17, 2005). |
| 10.20 | Agreement for Wholesale Financing dated August 21, 2000 between GE Commercial Distribution Finance Corporation (as successor to Deutsche Financial Services Corporation) and *e*Plus Technology, inc. (Incorporated herein by reference to Exhibit 10.2 to our Current Report on Form 8-K filed on November 17, 2005). |
| 10.21 | Paydown Addendum to Business Financing Agreement between GE Commercial Distribution Finance Corporation (as successor to Deutsche Financial Services Corporation) and *e*Plus Technology, inc. (Incorporated herein by reference to Exhibit 10.3 to our Current Report on Form 8-K filed on November 17, 2005). |
| 10.22 | Addendum to Business Financing Agreement and Agreement for Wholesale Financing dated February 12, 2001 between GE Commercial Distribution Finance Corporation (as successor to Deutsche Financial Services Corporation) and *e*Plus Technology, inc. (Incorporated herein by reference to Exhibit 10.4 to our Current Report on Form 8-K filed on November 17, 2005). |

80

*Table of Contents*

| 10.23 | Addendum to Business Financing Agreement and Agreement for Wholesale Financing dated April 3, 2003 between GE Commercial Distribution Finance Corporation and *e*Plus Technology, inc. (Incorporated herein by reference to Exhibit 10.5 to our Current Report on Form 8-K filed on November 17, 2005). |
|---|---|
| 10.24 | Amendment to Business Financing Agreement and Agreement for Wholesale Financing, dated March 31, 2004 between GE Commercial Distribution Finance Corporation and *e*Plus Technology, inc. (Incorporated herein by reference to Exhibit 10.6 to our Current Report on Form 8-K filed on November 17, 2005). |
| 10.25 | Amendment to Business Financing Agreement and Agreement for Wholesale Financing, dated June 24, 2004 between GE Commercial Distribution Finance Corporation and *e*Plus Technology, inc. (Incorporated herein by reference to Exhibit 10.7 to our Current Report on Form 8-K filed on November 17, 2005). |
| 10.26 | Amendment to Business Financing Agreement and Agreement for Wholesale Financing dated August 13, 2004 between GE Commercial Distribution Finance Corporation and *e*Plus Technology, inc. (Incorporated herein by reference to Exhibit 10.8 to our Current Report on Form 8-K filed on November 17, 2005). |
| 10.27 | Amendment to Business Financing Agreement and Agreement for Wholesale Financing dated November 14, 2005 between GE Commercial Distribution Finance Corporation and *e*Plus Technology, inc. (Incorporated herein by reference to Exhibit 10.9 to our Current Report on Form 8-K filed on November 17, 2005). |
| 10.28 | Limited Guaranty dated June 24, 2004 between GE Commercial Distribution Finance Corporation and *e*Plus inc. (Incorporated herein by reference to Exhibit 10.10 to our Current Report on Form 8-K filed on November 17, 2005). |
| 10.29 | Collateral Guaranty dated March 30, 2004 between GE Commercial Distribution Finance Corporation and *e*Plus Group, inc. (Incorporated herein by reference to Exhibit 10.11 to our Current Report on Form 8-K filed on November 17, 2005). |
| 10.30 | Amendment to Collateralized Guaranty dated November 14, 2005 between GE Commercial Distribution Finance Corporation and *e*Plus Group, inc. (Incorporated herein by reference to Exhibit 10.12 to our Current Report on Form 8-K filed on November 17, 2005). |
| 10.31 | Agreement Regarding Collateral Rights and Waiver between GE Commercial Distribution Finance Corporation and National City Bank, as Administrative Agent, dated March 24, 2004 (Incorporated herein by reference to Exhibit 10.13 to our Current Report on Form 8-K filed on November 17, 2005). |
| 10.32 | Amendment to Business Financing Agreement and Agreement for Wholesale Financing dated June 29, 2006 between GE Commercial Distribution Finance and *e*Plus Technology, inc. (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on July 13, 2006). |
| 10.33 | Amendment to Agreement for Wholesale Financing and Business Financing Agreement dated June 20, 2007 between GE Commercial Distribution Finance Corporation and *e*Plus Technology, inc. (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on June 25, 2007). |

81

*Table of Contents*

| 10.34 | Amendment to Agreement for Wholesale Financing and Business Financing Agreement dated August 2, 2007 between GE Commercial |
|---|---|

distribution from QUALCOMM and ePlus Group, inc. (incorporated herein by reference to Exhibit 4.5 to our Current Report on Form 8-K filed on August 7, 2007).

| | |
|---|---|
| 10.35 | Agreement for Wholesale Financing between Deutsche Financial Services Corporation and *ePlus* Technology of PA, inc., dated February 12, 2001 (Incorporated herein by reference to Exhibit 5.1 to our Current Report on Form 8-K filed on March 13, 2001). |
| 10.36 | Business Financing Agreement between Deutsche Financial Services Corporation and *ePlus* Technology of PA, inc., dated February 12, 2001 (Incorporated herein by reference to Exhibit 5.2 to our Current Report on Form 8-K filed on March 13, 2001). |
| 10.37 | Addendum to Business Financing Agreement and Agreement for Wholesale Financing between Deutsche Financial Services Corporation and *ePlus* Technology of PA, inc., dated February 12, 2001 (Incorporated herein by reference to Exhibit 5.3 to our Current Report on Form 8-K filed on March 13, 2001). |
| 10.38 | Limited Guaranty for *ePlus* Technology of PA, inc. to Deutsche Financial Services Corporation by *ePlus* inc., dated February 12, 2001 (Incorporated herein by reference to Exhibit 5.4 to our Current Report on Form 8-K filed on March 13, 2001). |
| 10.39 | Agreement for Wholesale Financing between Deutsche Financial Services Corporation and *ePlus* Technology of NC, inc., dated February 12, 2001 (Incorporated herein by reference to Exhibit 5.6 to our Current Report on Form 8-K filed on March 13, 2001). |
| 10.40 | Addendum to Agreement for Wholesale Financing between *ePlus* Technology of NC, inc. and Deutsche Financial Services Corporation, dated February 12, 2001 (Incorporated herein by reference to Exhibit 5.7 to our Current Report on Form 8-K filed on March 13, 2001). |
| 10.41 | Addendum to Agreement for Wholesale Financing between *ePlus* Technology of NC, inc. and Deutsche Financial Services Corporation, dated February 12, 2001 (Incorporated herein by reference to Exhibit 5.8 to our Current Report on Form 8-K filed on March 13, 2001). |
| 10.42 | Addendum to Business Financing Agreement and Agreement for Wholesale Financing between *ePlus* Technology, inc. and Deutsche Financial Services Corporation, dated February 12, 2001, amending the Business Financing Agreement and Wholesale Financing Agreement, dated August 31, 2000 (Incorporated herein by reference to Exhibit 5.9 to our Current Report on Form 8-K filed on March 13, 2001). |
| 10.43 | Deed of Lease by and between *ePlus* inc. and Norton Building I, LLC dated as of December 23, 2004 (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on December 27, 2004). |
| 10.44* | *ePlus* inc. Supplemental Benefit Plan for Bruce M. Bowen (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on March 2, 2005). |
| 10.45* | *ePlus* inc. Supplemental Benefit Plan for Steven J. Mencarini (Incorporated herein by reference to Exhibit 10.2 to our Current Report on Form 8-K filed on March 2, 2005). |
| 10.46* | *ePlus* inc. Supplemental Benefit Plan for Kleyton L. Parkhurst (Incorporated herein by reference to Exhibit 10.3 to our Current Report on Form 8-K filed on March 2, 2005). |

Table of Contents

| | |
|---|---|
| 10.47* | *ePlus* inc. Form of Supplemental Benefit Plan Participation Election Form (Incorporated herein by reference to Exhibit 10.4 to our Current Report on Form 8-K filed on March 2, 2005). |
| 10.48* | Incentive Option Agreement under the *ePlus* inc. Amended and Restated 1998 Long-Term Incentive Plan by and between *ePlus* and Phillip G. Norton (Incorporated herein by reference to Exhibit 10.1 to our Current Report on Form 8-K filed on February 10, 2005). |
| 10.49* | Incentive Option Agreement under the *ePlus* inc. Amended and Restated 1998 Long-Term Incentive Plan by and between *ePlus* and Bruce M. Bowen (Incorporated herein by reference to Exhibit 10.2 to our Current Report on Form 8-K filed on February 10, 2005). |
| 10.50* | Incentive Option Agreement under the *ePlus* inc. Amended and Restated 1998 Long-Term Incentive Plan by and between *ePlus* and Kleyton L. Parkhurst (Incorporated herein by reference to Exhibit 10.3 to our Current Report on Form 8-K filed on February 10, 2005). |
| 10.51* | Incentive Option Agreement under the *ePlus* inc. Amended and Restated 1998 Long-Term Incentive Plan by and between *ePlus* and Steven J. Mencarini (Incorporated herein by reference to Exhibit 10.4 to our Current Report on Form 8-K filed on February 10, 2005). |
| 10.52* | Non-Qualified Stock Option Agreement under the *ePlus* inc. Amended and Restated 1998 Long-Term Incentive Plan by and between *ePlus* and Phillip G. Norton (Incorporated herein by reference to Exhibit 10.5 to our Current Report on Form 8-K filed on February 10, 2005). |
| 10.53* | Form of Incentive Option Agreement under the *ePlus* inc. Amended and Restated 1998 Long-Term Incentive Plan (Incorporated herein by reference to Exhibit 10.6 to our Current Report on Form 8-K filed on February 10, 2005). |
| 10.54* | Form of Non-Qualified Stock Option Agreement under the *ePlus* inc. Amended and Restated 1998 Long-Term Incentive Plan (Incorporated herein by reference to Exhibit 10.7 to our Current Report on Form 8-K filed on February 10, 2005). |
| 21 | Subsidiaries of *ePlus* |
| 31.1 | Rule 13a-14(a) and 15d-14(a) Certification of the Chief Executive Officer of *ePlus* inc. |
| 31.2 | Rule 13a-14(a) and 15d-14(a) Certification of the Chief Financial Officer of *ePlus* inc. |
| 32 | Section 1350 certification of the Chief Executive Officer and Chief Financial Officer of *ePlus* inc. |
| * | Indicates a management contract or compensatory plan or arrangement. |

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or Section 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

/s/ PHILLIP G. NORTON
By: Phillip G. Norton, Chairman of the Board,
President and Chief Executive Officer
Date: August 15, 2007

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

/s/ PHILLIP G. NORTON
By: Phillip G. Norton, Chairman of the Board,
President, Chief Executive Officer (Principal Executive Officer)
Date: August 15, 2007

/s/ BRUCE M. BOWEN
By: Bruce M. Bowen, Director and Executive
Vice President
Date: August 15, 2007

/s/ STEVEN J. MENCARINI
By: Steven J. Mencarini, Senior Vice President,
Chief Financial Officer (Principal Financial and Accounting Officer)
Date: August 15, 2007

/s/ C. THOMAS FAULDERS, III
By: C. Thomas Faulders, III, Director
Date: August 15, 2007

/s/ TERRENCE O'DONNELL
By: Terrence O'Donnell, Director
Date: August 15, 2007

/s/ LAWRENCE S. HERMAN
By: Lawrence S. Herman, Director
Date: August 15, 2007

/s/ MILTON E. COOPER, JR.
By: Milton E. Cooper, Jr., Director
Date: August 15, 2007

84

Table of Contents

/s/ ERIC D. HOVDE
By: Eric D. Hovde, Director
Date: August 15, 2007

/s/ IRVING R. BEIMLER
By: Irving R. Beimler, Director
Date: August 15, 2007

85

Table of Contents

*e*Plus inc. AND SUBSIDIARIES
**INDEX TO FINANCIAL STATEMENTS AND SCHEDULES**

| | PAGE |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of March 31, 2005 (Restated) and 2006 | F-3 |
| Consolidated Statements of Operations for the Years Ended March 31, 2004 (Restated), 2005 (Restated), and 2006 | F-4 |
| Consolidated Statements of Cash Flows for the Years Ended March 31, 2004 (Restated), 2005 (Restated), and 2006 | F-5 |
| Consolidated Statements of Stockholders' Equity for the Years Ended March 31, 2004 (Restated), 2005 (Restated), and 2006 | F-7 |
| Notes to Consolidated Financial Statements | F-8 |

F-1

Table of Contents

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
*e*Plus inc.
Herndon, Virginia

We have audited the accompanying consolidated balance sheets of *e*Plus inc. and subsidiaries (the "Company") as of March 31, 2005 and 2006, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three fiscal years in the period ended March 31, 2006. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of *e*Plus inc. and subsidiaries as of March 31, 2005 and 2006, and the results of their operations and their cash flows for each of the three fiscal years in the period ended March 31, 2006, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 2 to the consolidated financial statements, the accompanying consolidated financial statements for the fiscal years ended March 31, 2004 and 2005 have been restated.

/s/ Deloitte & Touche LLP

McLean, Virginia
August 14, 2007

F-2

Table of Contents

## *e*Plus inc. AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS

| | As of March 31, 2005 As Restated (1) | As of March 31, 2006 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 38,851,714 | $ 20,697,373 |
| Accounts receivable—net | 93,555,462 | 103,059,617 |
| Notes receivable | 114,708 | 329,775 |
| Inventories | 2,116,855 | 2,292,266 |
| Investment in leases and leased equipment—net | 188,856,279 | 205,773,701 |
| Property and equipment—net | 6,647,781 | 5,629,367 |
| Other assets | 3,859,791 | 10,038,040 |
| Goodwill | 26,125,212 | 26,125,212 |
| TOTAL ASSETS | $ 360,127,802 | $ 373,945,351 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **LIABILITIES** | | |
| Accounts payable—equipment | $ 8,352,375 | $ 7,732,760 |
| Accounts payable—trade | 14,168,287 | 19,235,381 |
| Accounts payable—floor plan | 32,978,262 | 46,689,029 |
| Salaries and commissions payable | 771,487 | 4,123,547 |
| Accrued expenses and other liabilities | 41,586,185 | 33,346,250 |
| Income taxes payable | - | 103,981 |
| Recourse notes payable | 6,264,897 | 6,000,000 |
| Non-recourse notes payable | 114,838,994 | 127,973,456 |
| Deferred tax liability | 7,841,612 | 165,200 |
| Total Liabilities | 226,802,099 | 245,369,604 |
| **COMMITMENTS AND CONTINGENCIES (Note 9)** | - | - |
| **STOCKHOLDERS' EQUITY** | | |
| Preferred stock, $.01 par value; 2,000,000 shares authorized; none issued or outstanding | - | - |
| Common stock, $.01 par value; 25,000,000 shares authorized; 10,807,392 issued and 8,581,492 outstanding at March 31, 2005; and 11,037,213 issued and 8,267,223 outstanding at March 31, 2006 | 108,074 | 110,372 |
| Additional paid-in capital | 70,044,108 | 72,810,569 |
| Treasury stock, at cost, 2,225,900 and 2,769,990 shares, respectively | (22,887,881) | (29,983,925) |
| Deferred compensation expense | (37,532) | (24,976) |
| Retained earnings | 85,898,269 | 85,376,831 |
| Accumulated other comprehensive income—foreign currency translation adjustment | 200,665 | 286,876 |
| Total Stockholders' Equity | 133,325,703 | 128,575,747 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 360,127,802 | $ 373,945,351 |

(1) See Note 2, "Restatement of Consolidated Financial Statements."

**See Notes to Consolidated Financial Statements.**

F-3

*Table of Contents*

**ePlus inc. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

|  | Year Ended March 31, | | |
| --- | --- | --- | --- |
|  | 2004 | 2005 | 2006 |
|  | As Restated (1) | As Restated (1) |  |
| **REVENUES** |  |  |  |
| Sales of product and services | $ 267,898,937 | $ 480,970,082 | $ 583,067,922 |
| Sales of leased equipment | - | - | 1,727,131 |
|  | 267,898,937 | 480,970,082 | 584,795,053 |
| Lease revenues | 51,253,518 | 46,343,797 | 49,160,555 |
| Fee and other income | 11,405,033 | 48,484,643 | 13,362,624 |
|  | 62,658,551 | 94,828,440 | 62,523,179 |
| TOTAL REVENUES (2) | 330,557,488 | 575,798,522 | 647,318,232 |
| **COSTS AND EXPENSES** |  |  |  |
| Cost of sales, product and services | 236,283,350 | 432,838,188 | 524,966,743 |
| Cost of sales, leased equipment | - | - | 1,689,832 |
|  | 236,283,350 | 432,838,188 | 526,656,575 |
| Direct lease costs | 10,560,586 | 11,444,821 | 16,695,143 |
| Professional and other fees | 3,700,795 | 9,417,010 | 6,695,837 |
| Salaries and benefits | 42,348,686 | 54,334,997 | 62,307,819 |
| General and administrative expenses | 14,630,731 | 18,253,106 | 18,603,447 |
| Litigation settlement and judgment | - | - | 10,175,697 |
| Interest and financing costs | 6,894,784 | 5,876,869 | 7,250,200 |
|  | 78,135,582 | 99,326,803 | 121,728,143 |
| TOTAL COSTS AND EXPENSES (3) | 314,418,932 | 532,164,991 | 648,384,718 |
| Earnings (loss) before provision for income taxes | 16,138,556 | 43,633,531 | (1,066,486) |
| Provision for (benefit from) income taxes | 6,646,604 | 17,927,856 | (545,048) |
| NET EARNINGS (LOSS) | $ 9,491,952 | $ 25,705,675 | $ (521,438) |
| NET EARNINGS (LOSS) PER COMMON SHARE—BASIC | $ 1.02 | $ 2.89 | $ (0.06) |
| NET EARNINGS (LOSS) PER COMMON SHARE—DILUTED | $ 0.95 | $ 2.73 | $ (0.06) |
| WEIGHTED AVERAGE SHARES OUTSTANDING—BASIC | 9,333,388 | 8,898,296 | 8,347,727 |
| WEIGHTED AVERAGE SHARES OUTSTANDING—DILUTED | 9,976,822 | 9,409,119 | 8,347,727 |

(1) See Note 2, "Restatement of Consolidated Financial Statements."
(2)  Includes amounts from related parties of $302,968, $37,990 and $2,459 for the fiscal years ended March 31, 2004, 2005 and 2006, respectively.
(3)  Includes amounts to related parties of $443,065, $520,711 and $908,830 for the fiscal years ended March 31, 2004, 2005 and 2006, respectively.

**See Notes to Consolidated Financial Statements.**

F-4

*Table of Contents*

**ePlus inc. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

|  | Year Ended March 31, | | |
| --- | --- | --- | --- |
|  | 2004 | 2005 | 2006 |
|  | As Restated (1) | As Restated (1) |  |
| **Cash Flows From Operating Activities:** |  |  |  |
| Net earnings (loss) | $ 9,491,952 | $ 25,705,675 | $ (521,438) |
| Adjustments to reconcile net earnings (loss) to net cash provided by (used in) operating activities: |  |  |  |
| Depreciation and amortization | 10,487,439 | 12,784,225 | 17,162,002 |
| Reserves for credit losses | 222,698 | 774,964 | 765,304 |
| Provision for inventory losses | - | 68,334 | 18,037 |
| Tax benefit of stock options exercised | - | 156,972 | 497,800 |
| Impact of stock-based compensation | 578,813 | (62,439) | 442,338 |
| Deferred taxes | 5,293,197 | (533,917) | (7,676,412) |
| Payments from lessees directly to lenders—operating leases | (2,311,971) | (3,699,261) | (6,900,863) |
| Loss on disposal of property and equipment | 904,579 | 350,866 | 273,481 |
| Loss (gain) on disposal of operating lease equipment | 2,122,180 | (159,477) | (985,587) |
| Changes in: |  |  |  |

| | | | |
|---|---|---|---|
| Accounts receivable—net | | | (10,652,139) |
| Notes receivable | 1,112 | (62,722) | (215,067) |
| Inventories | 473,420 | (1,285,441) | (193,448) |
| Investment in leases and leased equipment—net | (23,499,147) | (11,188,270) | (23,752,529) |
| Other assets | 59,987 | 1,009,820 | (6,178,248) |
| Accounts payable—equipment | 4,968,748 | (1,536,960) | (566,129) |
| Accounts payable—trade | (1,860,562) | 3,612,975 | 5,067,094 |
| Salaries and commissions payable, accrued expenses and other liabilities | (496,085) | 27,157,035 | (4,783,895) |
| Net cash provided by (used in) operating activities | (6,316,790) | 10,748,865 | (38,199,699) |
| | | | |
| **Cash Flows From Investing Activities:** | | | |
| Proceeds from sale of operating lease equipment | 452,127 | 1,202,550 | 1,962,517 |
| Purchase of operating lease equipment | (19,592,804) | (22,036,259) | (31,993,009) |
| Proceeds from sale of property and equipment | - | 19,825 | 10,985 |
| Purchases of property and equipment | (2,801,030) | (4,641,325) | (2,512,408) |
| Cash used in acquisitions, net of cash acquired | (1,601,632) | (5,000,000) | - |
| Net cash used in investing activities | (23,543,339) | (30,455,209) | (32,531,915) |

F-5

Table of Contents

*e*Plus inc. AND SUBSIDIARIES
**CONSOLIDATED STATEMENTS OF CASH FLOWS — Continued**

| | Year Ended March 31, | | |
|---|---|---|---|
| | 2004 | 2005 | 2006 |
| | As Restated (1) | As Restated (1) | |
| **Cash Flows From Financing Activities:** | | | |
| Borrowings: | | | |
| Non-recourse | $ 77,904,696 | $ 64,630,667 | $ 79,460,310 |
| Repayments: | | | |
| Non-recourse | (46,242,498) | (43,617,834) | (35,160,251) |
| Write-off of non-recourse debt due to bankruptcy | 7,181 | (91,393) | - |
| Write-off of non-recourse debt due to settlement | - | (191,519) | - |
| Purchase of treasury stock | (9,681,762) | (5,694,995) | (7,096,044) |
| Proceeds from issuance of capital stock, net of expenses | 1,436,033 | 685,804 | 1,841,177 |
| Net borrowings on floor plan financing | 6,478,576 | 11,341,185 | 13,710,767 |
| Net (repayments) borrowings on lines of credit | (2,730,435) | 6,259,034 | (264,897) |
| Net cash provided by financing activities | 27,171,791 | 33,320,949 | 52,491,062 |
| | | | |
| **Effect of Exchange Rate Changes on Cash** | 59,259 | 82,098 | 86,211 |
| | | | |
| **Net (Decrease) Increase in Cash and Cash Equivalents** | (2,629,079) | 13,696,703 | (18,154,341) |
| | | | |
| **Cash and Cash Equivalents, Beginning of Year** | 27,784,090 | 25,155,011 | 38,851,714 |
| | | | |
| **Cash and Cash Equivalents, End of Year** | $ 25,155,011 | $ 38,851,714 | $ 20,697,373 |
| | | | |
| **Supplemental Disclosures of Cash Flow Information:** | | | |
| Cash paid for interest | $ 3,794,273 | $ 2,490,376 | $ 2,725,997 |
| Cash paid for income taxes | $ 1,067,972 | $ 16,262,145 | $ 6,956,163 |
| | | | |
| **Schedule of Noncash Investing and Financing Activities:** | | | |
| Liabilities assumed in purchase transactions | $ 811,657 | $ 1,875,202 | $ - |
| Purchase of property and equipment included in accounts payable | $ 55,559 | $ 380,508 | $ 319,560 |
| Payments from lessees directly to lenders | $ 30,112,415 | $ 23,748,131 | $ 31,047,601 |

(1) See Note 2, "Restatement of Consolidated Financial Statements."


**See Notes to Consolidated Financial Statements.**

F-6

Table of Contents

*e*Plus inc. AND SUBSIDIARIES
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

| | Common Stock | | Additional Paid-in Capital | Treasury Stock | Deferred Compensation Expenses | Retained Earnings | Accumulated Other Comprehensive Income | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | Shares | Par Value | | | | | | |
| Balance, April 1, 2003 (as previously reported) | 9,451,651 | $ 105,400 | $62,905,727 | $ (7,511,124) | $ - | $54,057,732 | $ 59,308 | $109,617,043 |
| Cumulative effect of restatement on prior years | - | - | 4,700,905 | - | (392,565) | (3,357,090) | - | 951,250 |
| | | | | | | | | |
| Balance, April 1, 2003 (as restated) | 9,451,651 | 105,400 | 67,606,632 | (7,511,124) | (392,565) | 50,700,642 | 59,308 | 110,568,293 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Issuance of shares for option exercise | 177,107 | 1,772 | 1,434,261 | - | - | - | - | 1,436,033 |
| Effect of share-based compensation (as restated) | - | - | 241,205 | - | 337,608 | - | - | 578,813 |
| Purchase of treasury stock | (688,800) | - | - | (9,681,762) | - | - | - | (9,681,762) |
| Comprehensive income, net of tax: | | | | | | | | |
| Net earnings (as restated) | - | - | - | - | - | 9,491,952 | - | 9,491,952 |
| Foreign currency translation adjustment | - | - | - | - | - | - | 59,259 | 59,259 |
| Total comprehensive income (as restated) | - | - | - | - | - | 9,491,952 | 59,259 | 9,551,211 |
| Balance, March 31, 2004 (as restated) | 8,939,958 | 107,172 | 69,282,098 | (17,192,886) | (54,957) | 60,192,594 | 118,567 | 112,452,588 |
| Issuance of shares for option exercise | 90,150 | 902 | 684,902 | - | - | - | - | 685,804 |
| Tax benefit of exercised stock options | - | - | 156,972 | - | - | - | - | 156,972 |
| Effect of share-based compensation (as restated) | - | - | (79,864) | - | 17,425 | - | - | (62,439) |
| Purchase of treasury stock | (448,616) | - | - | (5,694,995) | - | - | - | (5,694,995) |
| Comprehensive income, net of tax: | | | | | | | | |
| Net earnings (as restated) | - | - | - | - | - | 25,705,675 | - | 25,705,675 |
| Foreign currency translation adjustment | - | - | - | - | - | - | 82,098 | 82,098 |
| Total comprehensive income (as restated) | - | - | - | - | - | 25,705,675 | 82,098 | 25,787,773 |
| Balance, March 31, 2005 (as restated) | 8,581,492 | 108,074 | 70,044,108 | (22,887,881) | (37,532) | 85,898,269 | 200,665 | 133,325,703 |
| Issuance of shares for option exercise | 229,821 | 2,298 | 1,838,879 | - | - | - | - | 1,841,177 |
| Tax benefit of exercised stock options | - | - | 497,800 | - | - | - | - | 497,800 |
| Effect of share-based compensation | - | - | 429,782 | - | 12,556 | - | - | 442,338 |
| Purchase of treasury stock | (544,090) | - | - | (7,096,044) | - | - | - | (7,096,044) |
| Comprehensive income, net of tax: | | | | | | | | |
| Net loss | - | - | - | - | - | (521,438) | - | (521,438) |
| Foreign currency translation adjustment | - | - | - | - | - | - | 86,211 | 86,211 |
| Total comprehensive income (loss) | - | - | - | - | - | (521,438) | 86,211 | (435,227) |
| Balance, March 31, 2006 | 8,267,223 | $ 110,372 | $72,810,569 | $(29,983,925) | $ (24,976) | $85,376,831 | $ 286,876 | $128,575,747 |

**See Notes to Consolidated Financial Statements.**

F-7

Table of Contents

*e*Plus inc. AND SUBSIDIARIES
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**As of and For the Years Ended March 31, 2004, 2005, and 2006**

## 1. ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

BASIS OF PRESENTATION — Effective October 19, 1999, MLC Holdings, Inc. changed its name to *e*Plus inc. ("*e*Plus"). Effective January 31, 2000, *e*Plus inc.'s wholly-owned subsidiaries MLC Group, Inc., MLC Federal, Inc., MLC Capital, Inc., PC Plus, Inc., MLC Network Solutions, Inc. and Educational Computer Concepts, Inc. changed their names to *e*Plus Group, inc., *e*Plus Government, inc., *e*Plus Capital, inc., *e*Plus Technology, inc., *e*Plus Technology of NC, inc. and *e*Plus Technology of PA, inc., respectively. Effective March 31, 2003, *e*Plus Technology of NC, inc. and *e*Plus Technology of PA, inc. were merged into *e*Plus Technology, inc.

ASSET PURCHASES — On October 10, 2003, we purchased certain assets and liabilities from Digital Paper Corporation. In the transaction, we acquired all of Digital Paper's intellectual property, including its DigitalPaper XE, ViewMark, DocPak, docQuest, DirectSight, DigitalPaper Wireless and Idocs software, rights to several Digital Paper patents and trademarks, including the Digital Paper name, and several of Digital Paper's customers and key personnel. The purchase price included $1.6 million in cash and the assumption of certain liabilities of approximately $0.8 million.

On May 28, 2004, we purchased certain assets and assumed certain liabilities of Manchester Technologies, Inc. for total consideration of $7.0 million. The purchase was made by *e*Plus Technology, inc., a wholly-owned subsidiary of *e*Plus inc. The purchase price included $5.0 million in cash and the assumption of certain liabilities of approximately $2.0 million. The acquisition has enhanced our IT reseller and professional services business. Approximately 125 former Manchester Technologies, Inc. personnel were hired by us as part of the transaction and are located in three established offices in metropolitan New York, South Florida and Baltimore.

PRINCIPLES OF CONSOLIDATION — The Consolidated Financial Statements include the accounts of *e*Plus inc. and its wholly-owned subsidiaries. All significant intercompany balances and transactions have been eliminated.

REVENUE RECOGNITION. We record our general sales and product sales in accordance with the criteria described in Staff Accounting Bulletin ("SAB") No. 104, "*Revenue Recognition,*" issued by the staff of the Securities and Exchange Commission (the "SEC"). Under SAB No. 104, sales are recognized when the title and risk of loss are passed to the customer, there is persuasive evidence of an arrangement for sale, delivery has occurred and/or services have been rendered, the sales price is fixed and determinable and collectibility is reasonably assured. Using these tests, the vast majority of our sales represent product sales recognized upon delivery; however, we make an adjustment for our sales that have FOB Shipping Point terms.

From time to time, in the sales of product and services, we may enter into contracts that contain multiple elements. Sales of services currently represent a small percentage of our sales. For services that are performed in conjunction with product sales and are completed in our facilities prior to shipment of the product, sales for both the product and services are recognized upon shipment. Sales of services that are performed at customer locations are recorded as sales of product or services when the services are performed. If the service is performed at a customer location in conjunction with a product sale or other service sale, we recognize the sale in accordance with SAB No. 104 and Emerging Issues Task Force ("EITF") 00-21 "*Accounting for Revenue Arrangements with Multiple Deliverables.*" Accordingly, in an arrangement with multiple deliverables, we recognize sales for delivered items only when all of the following criteria are satisfied:

- the delivered item(s) has value to the client on a stand-alone basis;

- there is objective and reliable evidence of the fair value of the undelivered item(s); and

- if the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in our control.

F-8

Table of Contents

We sell certain third-party service contracts and software assurance or subscription products for which we evaluate whether the subsequent sales of such services should be recorded as gross sales or net sales in accordance with the sales recognition criteria outlined in SAB No. 104, EITF 99-19, "*Reporting Revenue Gross as a Principal versus Net as an Agent*" and FASB Technical Bulletin 90-1, "*Accounting for Separately Priced Extended Warranty and Product Contracts.*" We must determine whether we act as a principal in the transaction and assume the risks and rewards of ownership or if we are simply acting as an agent or broker. Under gross sales recognition, the entire selling price is recorded in sales of product and services and our costs to the third-party service provider or vendor is recorded in cost of sales, product and services. Under net sales recognition, the cost to the third-party service provider or vendor is recorded as a reduction to sales resulting in net sales equal to the gross profit on the transaction and there are no cost of sales.

In accordance with EITF 00-10, "*Accounting for Shipping and Handling Fees and Costs,*" we record freight billed to our customers as sales of product and services and the related freight costs as a cost of sales, product and services.

We receive payments and credits from vendors, including consideration pursuant to volume sales incentive programs, volume purchase incentive programs and shared marketing expense programs. Vendor consideration received pursuant to volume sales incentive programs is recognized as a reduction to costs of sales, product and services in accordance with EITF Issue No. 02-16, "*Accounting for Consideration Received from a Vendor by a Customer (Including a Reseller of the Vendor's Products).*" Vendor consideration received pursuant to volume purchase incentive programs is allocated to inventories based on the applicable incentives from each vendor and is recorded in cost of sales, product and services, as the inventory is sold. Vendor consideration received pursuant to shared marketing expense programs is recorded as a reduction of the related selling and administrative expenses in the period the program takes place only if the consideration represents a reimbursement of specific, incremental, identifiable costs. Consideration that exceeds the specific, incremental, identifiable costs is classified as a reduction of cost of sales, product and services.

We are the lessor in a number of transactions and these transactions are accounted for in accordance with Statement of Financial Accounting Standards ("SFAS") No. 13, "*Accounting for Leases.*" Each lease is classified as either a direct financing lease, sales-type lease, or operating lease, as appropriate. Under the direct financing and sales-type lease methods, we record the net investment in leases, which consists of the sum of the minimum lease payments, initial direct costs (direct financing leases only), and unguaranteed residual value (gross investment) less the unearned income. The difference between the gross investment and the cost of the leased equipment for direct finance leases is recorded as unearned income at the inception of the lease. The unearned income is amortized over the life of the lease using the interest method. Under sales-type leases, the difference between the fair value and cost of the leased property plus initial direct costs (net margins) is recorded as revenue at the inception of the lease. For operating leases, rental amounts are accrued on a straight-line basis over the lease term and are recognized as lease revenue. SFAS No. 140, "*Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities,*" establishes criteria for determining whether a transfer of financial assets in exchange for cash or other consideration should be accounted for as a sale or as a pledge of collateral in a secured borrowing. Certain assignments of direct finance leases we make on a non-recourse basis meet the criteria for surrender of control set forth by SFAS No. 140 and have therefore been treated as sales for financial statement purposes.

Sales of leased equipment represent revenue from the sales of equipment subject to a lease in which we are the lessor. If the rental stream on such lease has non-recourse debt associated with it, sales revenue is recorded at the amount of consideration received, net of the amount of debt assumed by the purchaser. If there is no non-recourse debt associated with the rental stream, sales revenue is recorded at the amount of gross consideration received, and costs of sales is recorded at the book value of the lease. Sales of equipment represents revenue generated through the sale of equipment sold primarily through our technology business unit.

Lease revenues consist of rentals due under operating leases and amortization of unearned income on direct financing and sales-type leases. Equipment under operating leases is recorded at cost and depreciated on a straight-line basis over the lease term to our estimate of residual value.

F-9

Table of Contents

We assign all rights, title, and interests in a number of our leases to third-party financial institutions without recourse. These assignments are accounted for as sales since we have completed our obligations as of the assignment date, and we retain no ownership interest in the equipment under lease.

Revenue from sales of procurement software is recognized in accordance with the Statement of Position ("SOP") 97-2, "*Software Revenue Recognition,*" as amended by SOP 98-4, "*Deferral of the Effective Date of a Provision of SOP 97-2, Software Revenue Recognition*" and SOP 98-9, "*Modification of SOP 97-2, Software Revenue Recognition, With Respect to Certain Transactions.*" We recognize revenue when all the following criteria exist: when there is persuasive evidence that an arrangement exists, delivery has occurred, no significant obligations by us with regard to implementation remain, the sales price is determinable and it is probable that collection will occur. Our accounting policy requires that revenue earned on software arrangements involving multiple elements be allocated to each element on the relative fair values of the elements and recognized when earned. Revenue relative to maintenance and support is recognized ratably over the maintenance term (usually one year) and revenue allocated to training, implementation or other services is recognized as the services are performed.

Revenue from hosting arrangements is recognized in accordance with EITF 00-3, "*Application of AICPA Statement of Position 97-2 to Arrangements That Include the Right to Use Software Stored on Another Entity's Hardware.*" Hosting arrangements that are not in the scope of SOP 97-2 require that allocation of the portion of the fee allocated to the hosting elements be recognized as the service is provided.

Amounts charged for our Procure+ service are recognized as services are rendered. Amounts charged for the Manage+ service are recognized on a straight-line basis over the contractual period for which the services are provided. Fee and other income results from: (1) income from events that occur after the

RESIDUALS — Residual values, representing the estimated value of equipment at the termination of a lease, are recorded in our Consolidated Financial Statements at the inception of each sales-type or direct financing lease as amounts estimated by management based upon its experience and judgment. Unguaranteed residual values for sales-type and direct financing leases are recorded at their net present value and the unearned income is amortized over the life of the lease using the interest method. The residual values for operating leases are included in the leased equipment's net book value.

We evaluate residual values on an ongoing basis and record any downward adjustment, if required. No upward revision of residual values is made subsequent to lease inception.

RESERVES FOR CREDIT LOSSES — The reserves for credit losses (the "reserve") is maintained at a level believed by management to be adequate to absorb potential losses inherent in our lease and accounts receivable portfolio. Management's determination of the adequacy of the reserve is based on an evaluation of historical credit loss experience, current economic conditions, volume, growth, the composition of the lease portfolio, and other relevant factors. The reserve is increased by provisions for potential credit losses charged against income. Accounts are written off or written down when the loss is both probable and determinable, after giving consideration to the customer's financial condition, the value of the underlying collateral and funding status (i.e., discounted on a non-recourse or recourse basis).

CASH AND CASH EQUIVALENTS — Cash and cash equivalents include funds in operating accounts as well as money market funds.

INVENTORIES — Inventories are stated at the lower of cost (weighted average basis) or market.

PROPERTY AND EQUIPMENT — Property and equipment are stated at cost, net of accumulated depreciation and amortization. Depreciation and amortization are computed using the straight-line method over the estimated useful lives of the related assets, which range from three to ten years.

Table of Contents

CAPITALIZATION OF COSTS OF SOFTWARE FOR INTERNAL USE — We have capitalized certain costs for the development of internal use software under the guidelines of SOP 98-1, "*Accounting for the Costs of Computer Software Developed or Obtained for Internal Use.*" Approximately $740,183, $322,837 and $412,656 of internal use software were capitalized during the years ended March 31, 2006, 2005, and 2004, respectively, which is included in the accompanying Consolidated Balance Sheets as a component of property and equipment.

CAPITALIZATION OF COSTS OF SOFTWARE TO BE MADE AVAILABLE TO CUSTOMERS — In accordance with SFAS No. 86, "*Accounting for Costs of Computer Software to be Sold, Leased, or Otherwise Marketed,*" software development costs are expensed as incurred until technological feasibility has been established. At such time such costs are capitalized until the product is made available for release to customers. For the years ended March 31, 2006, 2005 and 2004, respectively, costs of $115,900, $11,600 and $1,850,948 were capitalized for software to be made available to customers.

INTANGIBLE ASSETS — In June 2001, the Financial Accounting Standards Board ("FASB") issued SFAS No. 141, "*Business Combinations.*" SFAS No. 141 requires that the purchase method of accounting be used for all business combinations transacted after June 30, 2001. SFAS No. 141 also specifies criteria that intangible assets acquired in a business combination must be recognized and reported separately from goodwill. In May 2004, we acquired certain assets and liabilities of Manchester Technologies, Inc. The excess of the cost over the fair value of net tangible assets acquired was assigned to identifiable intangible assets and goodwill utilizing the purchase method of accounting. The final determination of the purchase price allocation was based on the fair values of the assets and liabilities assumed, including acquired intangible assets. This determination was made by management through various means, including obtaining a third-party valuation of identifiable intangible assets acquired and an evaluation of the fair value of other assets and liabilities acquired.

Effective January 1, 2002, we adopted SFAS No. 142, "*Goodwill and Other Intangible Assets,*" which eliminates amortization of goodwill and intangible assets that have indefinite useful lives and requires annual tests of impairment of those assets. SFAS No. 142 also provides specific guidance about how to determine and measure goodwill and intangible asset impairments, and requires additional disclosures of information about goodwill and other intangible assets.

Further, SFAS No. 142 requires us to perform an impairment test at least on an annual basis at any time during the fiscal year, provided the test is performed at the same time every year. We perform the impairment test as of September 30th of each year and follow the two-step process prescribed in SFAS No. 142 to test our goodwill for impairment under the transitional goodwill impairment test. The first step is to screen for potential impairment, while the second step measures the amount of the impairment, if any.

IMPAIRMENT OF LONG-LIVED ASSETS — We review long-lived assets, including property and equipment, for impairment whenever events or changes in circumstances indicate that the carrying amounts of the assets may not be fully recoverable. If the total of the expected undiscounted future cash flows is less than the carrying amount of the asset, a loss is recognized for the difference between the fair value and the carrying value of the asset.

FAIR VALUE OF FINANCIAL INSTRUMENTS — The carrying value of our financial instruments, which include cash and cash equivalents, accounts receivable, accounts payable and other accrued expenses, approximates fair value due to their short maturities.

TREASURY STOCK — We account for treasury stock under the cost method and include treasury stock as a component of stockholders' equity.

INCOME TAXES — Deferred income taxes are accounted for in accordance with SFAS No. 109, "*Accounting for Income Taxes.*" Under this method, deferred income tax assets and liabilities are determined based on the temporary differences between the financial statement reporting and tax bases of assets and liabilities, using tax rates currently in effect. Future tax benefits, such as net operating loss carryforwards, are recognized to the extent that realization of these benefits is considered to be more likely than not.

ESTIMATES — The preparation of financial statements in conformity with accounting principles generally accepted in the United States ("U.S. GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Table of Contents

RECLASSIFICATIONS — Certain liabilities that had been included in accounts payable—trade have been reclassified to accrued expenses and other liabilities in the March 31, 2004 and 2005 Consolidated Financial Statements to conform to the March 31, 2006 presentation. In addition, certain personal property taxes have been eliminated from investment in leases and leased equipment—net and accounts payable—equipment.

COMPREHENSIVE INCOME — Comprehensive income consists of net income (loss) and foreign currency translation adjustments and is presented in the accompanying Consolidated Statements of Stockholders' Equity. For the years ended March 31, 2006 and 2005, accumulated other comprehensive income increased $86,211 and $82,098 respectively, resulting in total comprehensive income of $(435,227) and $25,787,773, respectively.

EARNINGS PER SHARE (AS RESTATED) — Earnings per share ("EPS") have been calculated in accordance with SFAS No. 128, "*Earnings per Share.*" In accordance with SFAS No. 128, basic EPS amounts were calculated based on weighted shares outstanding of 9,333,388 in fiscal year 2004, as restated, 8,898,296 in fiscal year 2005, as restated, and 8,347,727 in fiscal year 2006. Diluted EPS amounts were calculated based on weighted average shares outstanding and potentially dilutive common stock equivalents of 9,976,822 in fiscal year 2004, as restated, 9,409,119 in fiscal year 2005, as restated, and 8,347,727 in fiscal year 2006. For 2006, 609,795 shares have been excluded from the computation of diluted earnings per share as the inclusion of these shares would have been anti-dilutive. Additional shares included in the diluted EPS calculations are attributable to incremental shares issuable upon the assumed exercise of stock options and other common stock equivalents. Both basic and diluted EPS and weighted average shares outstanding have been restated for changes in measurement dates resulting from the Audit Committee Investigation (as defined in Note 2, "Restatement of Consolidated Financial Statements").

STOCK-BASED COMPENSATION — As of March 31, 2006, we had four stock-based employee compensation plans, which are described in Note 12, "Benefit and Stock Option Plans." We account for those plans under the recognition and measurement principles of Accounting Principles Board Opinion No. 25, "*Accounting for Stock Issued to Employees*" ("APB 25"), and related interpretations issued by the FASB. The following table illustrates the effect on net income and EPS if we had applied the fair value recognition provisions of SFAS No. 123, "*Accounting for Stock-Based Compensation,*" as amended by SFAS No. 148, "*Accounting for Stock-Based Compensation — Transition and Disclosure,*" to stock-based employee compensation:

| | Year Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2004 | | 2005 | | 2006 | |
| | As Restated (1) | | As Restated (1) | | | |
| Net earnings (loss), as reported | $ | 9,491,952 | $ | 25,705,675 | $ | (521,438) |
| Add: APB 25 intrinsic value of stock-based compensation, net of tax | | 340,342 | | (36,777) | | 216,303 |
| Less: SFAS No. 123 stock-based compensation expense, net of tax | | (2,056,245) | | (1,135,491) | | (513,961) |
| Net earnings (loss), pro forma | $ | 7,776,049 | $ | 24,533,407 | $ | (819,096) |
| | | | | | | |
| Basic earnings (loss) per share, as reported | $ | 1.02 | $ | 2.89 | $ | (0.06) |
| Basic earnings (loss) per share, pro forma | $ | 0.83 | $ | 2.76 | $ | (0.10) |
| Diluted earnings (loss) per share, as reported | $ | 0.95 | $ | 2.73 | $ | (0.06) |
| Diluted earnings (loss) per share, pro forma | $ | 0.78 | $ | 2.61 | $ | (0.10) |

(1) See Note 2, "Restatement of Consolidated Financial Statements."

RECENT ACCOUNTING PRONOUNCEMENTS — In December 2004, the FASB issued SFAS No. 123 (revised 2004), "*Share-Based Payment,*" or SFAS No. 123R. SFAS No. 123R replaces SFAS No 123, "*Accounting for Stock-Based Compensation,*" and supersedes APB 25, "*Accounting for Stock Issued to Employees,*" and subsequently issued stock option related guidance. This statement focuses primarily on accounting for transactions in which an entity obtains employee services in share-based transactions. It also addresses transactions in which an entity incurs liabilities in exchange for goods or services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. Entities will be required to measure the cost of employee services received in exchange for an award of equity instruments based on the grant date fair value of the award (with limited exceptions). That cost will be recognized over the period during which an employee is required to provide services in exchange for the award (usually the vesting period). The grant-date fair value of employee share options and similar instruments will be estimated using option-pricing models. If an equity award is modified after the grant date, incremental compensation expense will be recognized in an amount equal to the excess of the fair value of the modified award over the fair value of the original award immediately before the modification. We are required to apply SFAS No. 123R to all awards granted, modified, or settled as of the beginning of the annual fiscal reporting period that begins after June 15, 2005. We are also required to use either the modification-prospective method or modified-retrospective method. Under the modification-prospective method we must recognize compensation expense for all awards subsequent to adopting the standard and for the unvested portion of previously granted awards outstanding upon adoption. Under the modified-retrospective method, we must restate our previously issued financial statements to recognize the amounts we previously calculated and reported on a pro forma basis, as if the prior standard had been adopted. Under both methods, we are permitted to use either the straight-line or an accelerated method to amortize the cost as an expense for awards with graded vesting. The standard permits and encourages early adoption. We have commenced our analysis of the impact of SFAS No. 123R, but have decided not to early adopt. We will use the modified-prospective and the straight-line method. We are currently evaluating the impact that SFAS No. 123R will have on our results of operations and our financial position.

---

Table of Contents

In May 2005, the FASB issued SFAS No. 154, "*Accounting Changes and Error Corrections — A Replacement of APB Opinion No. 20 and FASB Statement No. 3.*" SFAS No. 154 requires retrospective application, or the latest practical date, as the preferred method to report a change in accounting principle or correction of an error. SFAS No. 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. While the adoption of SFAS No. 154 did not have a material impact on our Consolidated Financial Statements, the restatement disclosures included herein comply with the provisions of the standard.

In June 2006, the FASB issued FASB Interpretation No. 48, "*Accounting for Uncertainty in Income Taxes — An Interpretation of FASB Statement No. 109*" ("FIN 48"). The interpretation clarifies the accounting for uncertainty in income taxes recognized in a company's financial statements in accordance with SFAS No. 109, "*Accounting for Income Taxes.*" Specifically, the pronouncement prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. The interpretation also provides guidance on the related derecognition, classification, interest and penalties, accounting for interim periods, disclosure and transition of uncertain tax positions. The interpretation is effective for us on April 1, 2007. We are assessing FIN 48 and have not determined the impact that the adoption of FIN 48 will have on our Consolidated Financial Statements. We do, however, expect to record a cumulative effect adjustment to our fiscal 2008 balance of beginning retained earnings and that adjustment may be material.

During September 2006, the SEC released SAB No. 108, "*Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements.*" SAB No. 108 requires a registrant to quantify all misstatements that could be material to financial statement users under both the "rollover" and "iron curtain" approaches. If either approach results in quantifying a misstatement that is material, the registrant must adjust its financial statements. SAB No. 108 is applicable for our fiscal year 2007. The adoption of SAB No. 108 is not expected to have a material impact on our Consolidated Financial Statements.

In September 2006, the FASB issued SFAS No. 157, "*Fair Value Measurements.*" SFAS No. 157 defines fair value, establishes a framework for measuring fair value in accordance with U.S. GAAP and expands disclosures about fair value measurements. SFAS No. 157 applies under other accounting pronouncements that require or permit fair value measurements. SFAS No. 157 does not require any new fair value measurements. SFAS No. 157 is effective for our fiscal year 2009. At this time, we do not believe the adoption of SFAS No. 157 will have a material impact on our results of operations or financial position.

In February 2007, the FASB issued SFAS No. 159, "*The Fair Value Option for Financial Assets and Financial Liabilities—Including an Amendment of FASB Statement No. 115*." SFAS No. 159 gives companies an opportunity to use fair value measurements in financial reporting and permits entities to measure many financial instruments and certain other items at fair value. SFAS No. 159 is effective for fiscal years beginning after November 15, 2007. We are currently evaluating the impact that SFAS No. 159 will have on our financial condition and results of operations.

F-13

Table of Contents

## 2. RESTATEMENT OF CONSOLIDATED FINANCIAL STATEMENTS

As a result of the errors discussed below, we have restated our Consolidated Balance Sheet as of March 31, 2005 and the related Consolidated Statements of Operations, Cash Flows and Stockholders' Equity, including related disclosures for each of the fiscal years ended March 31, 2005 and 2004.

**Restatement for Historical Stock Option Grants**

*Restated Accounting for Historical Stock Option Grants*

In response to a letter received by our Chief Executive Officer, the Audit Committee, with the assistance of outside legal counsel and forensic accountants, commenced an investigation (the "Audit Committee Investigation" or "Investigation") into our historical practices related to stock options, including a review of option grant measurement dates. Prior to April 1, 2006, we accounted for all of our employee and director-based compensation awards under APB 25 and provided the required disclosures in accordance with SFAS No. 123.

In connection with the Audit Committee Investigation, we performed a review of stock option grants recorded for financial reporting purposes. Based on the individual facts and circumstances, we concluded that the exercise price for a number of option grants from our initial public offering ("IPO") in 1996 were below the fair market value of our common stock on the revised measurement date of the grant. This resulted from certain option grant dates having been established prior to the completion of all the final granting actions necessary for those grants. In some cases, the exercise price and date of the grant was determined with hindsight to provide a more favorable exercise price for such grants at quarterly or monthly low stock prices. The grants in question included grants made to newly hired employees, annual director grants, grants made to employees in connection with an acquisition, and discretionary grants made to officers, non-employee and employee directors, and rank and file employees. Applying the revised measurement dates to the impacted stock option grants resulted in a stock-based compensation charge if the fair market value of our common stock as of the revised measurement date exceeded the exercise price of the option grant, in accordance with APB 25.

Based on the facts and circumstances, we concluded that we (1) used incorrect measurement dates for the accounting of certain stock options, (2) had not properly accounted for certain modifications of stock options, and (3) had incorrectly accounted for certain stock options that required the application of the variable accounting method.

We determined revised measurement dates for those option grants with incorrect measurement dates and recorded stock-based compensation expense to the extent that the fair market value of our stock on the revised measurement date exceeded the exercise price of the stock option, in accordance with APB 25 and related FASB interpretations. Additionally, we restated both basic and diluted weighted average shares outstanding for changes in measurement dates resulting from the Investigation. The combination of recording stock-based compensation expense and restating our weighted average shares outstanding has resulted in restated basic and diluted EPS.

We adopted a methodology for determining the most likely appropriate accounting measurement dates for all stock option grants. We reviewed all available documentation and considered all facts and circumstances for each award and attempted to identify the date at which the award was most likely authorized and approved and the recipient, number of shares and price were approved and determined with finality. As such, we adopted the following framework for determining the revised historical measurement dates of our employee stock option grants and have applied this framework based on the facts, circumstances and availability of the documentation for each grant.

F-14

Table of Contents

*Step 1*

We reviewed, as available, the documents noted below for sufficient evidence that the approval and terms of the stock options were determined with finality:

1. Board of Directors ("Board") meeting minutes, resolutions and written consent actions;
2. Compensation Committee and SIC meeting minutes and resolutions;
3. offer letters signed by an authorized approver and the recipient and stating the number of shares and exercise price;
4. internal communications from an authorized approver stating the recipient, number of shares and exercise price;
5. executed acquisition agreements stating the number of shares and the option price;
6. historical stock prices as reflected on Nasdaq to determine when stock price based performance vesting occurred;
7. public filings as they relate to awards granted in connection with the IPO; and
8. all stock option plans in place since our IPO in 1996 through August 10, 2006 (the "Relevant Period").

We reviewed minutes, consents, resolutions, offer letters and other corporate records for the purpose of validating their accuracy, and at no time determined that any of the records were altered or appeared to have not occurred as recorded. While we considered the above documents in order, all documents and all facts and circumstances were considered when determining the revised measurement date. In instances where the above documentation was not available or provided ambiguous information, we proceeded to Step 2.

*Step 2*

If after review of the available documents as listed in Step 1, there was insufficient documentation to select the date at which the recipient, number of shares and price were determined with finality, we attempted to select the most likely date at which the terms were determined with finality. In considering the most likely date, we considered all available documentation and all facts and circumstances.

In addition to the documents listed in Step 1, we examined the following documents:

1. all internal and external communications including emails, offer letters, memos, faxes, letters and handwritten notes;
2. acquisition agreements that do not contain recipients, exercise price and number of shares;
3. outside stock option administrator transaction data (e.g. data from First Union, Wachovia, or AST);
4. management practice regarding the annual non-employee director grants; and
5. stock option agreements hand dated or not hand dated.

1. our stock option granting practices;
2. acquisition dates;
3. new hires start dates;
4. effective dates of non-employee director appointments to the Board;
5. our stock performance; and
6. all other available information.

Selecting the date at which the most likely granting actions occurred with finality required a significant amount of judgment.  While we considered all the documents and facts in the order noted above, the level of reliance on each type of document depended on the facts and circumstances surrounding each award.  In some instances, we grouped awards based on similar characteristics and similar underlying facts and circumstances.  In these instances, we treated all of the grouped awards in a uniform manner.

F-15

Table of Contents

*Step 3*

If there was insufficient evidence, after reviewing all available documentation and all facts and circumstances listed in Step 1 and Step 2, to select a specific date at which the recipient, number of shares and price were approved and determined with finality, we used the earliest of the dates below.  We believe that the required granting actions would have occurred with finality 'no later than' at each of the following dates.

1. stock option agreement signed by a member of the SIC and hand dated by the optionee unless other facts and circumstances exist that present ambiguity as to the accuracy of the hand date.
2. the legible 'run date' of the stock option administrator report; and
3. subsequent Form 10-Q or 10-K filing date.  As of this date and pursuant to our stock option granting process, an authorized approver would have approved the awards which would have resulted in the administration of the awards to include input into the stock option administration software.  Quarterly reports were run from the stock option administration software and reconciled to the general ledger and the stock registrar's reports and the EPS calculation.  This reconciliation resulted in the stock-based compensation and the EPS disclosure, which included the awarded shares as filed in the Form 10-Q or Form 10-K.

We also determined that we should have recorded stock-based compensation expense associated with the modification of certain stock option grants which resulted in the application of variable accounting under FASB Interpretation No. 44, "Accounting for Certain Transactions Involving Stock Compensation."  The modified grants included certain grants made to newly hired employees, annual director grants, grants made to employees in connection with an acquisition, and discretionary grants made to officers, employee directors, and rank and file employees.  For these grants, documentation exists that supports the completion of all the final granting actions necessary for an original grant and measurement date.  However, certain of the the terms of the awards were subsequently modified.

*Income and Payroll Tax Related Matters*

In certain instances where a revised measurement date was applied to those stock options classified as incentive stock options ("ISO"), in accordance with United States tax rules it had the effect of disqualifying the ISO tax treatment of those stock options, causing those stock options to be recharacterized as non-qualified options.  For purposes of assessing the tax impact of the accounting change, we concluded that the grant date for tax purposes is the same as the measurement date for financial reporting purposes.  The recharacterization of the ISOs to non-qualified status resulted in a failure to withhold certain employee payroll taxes and consequently we have recorded an adjustment to salaries and benefits, along with an adjustment to interest and financing costs for penalties and interest, based on the period of exercise.  In subsequent periods in which the liabilities were legally extinguished due to statutes of limitations, the payroll taxes, interest and penalties were reversed, and recognized as a reduction in the related functional expense category in our consolidated statements of operations.  The fluctuations in the table below for payroll taxes and related penalties are the result of:  (1) the timing of stock option exercises, and (2) the reversals of expenses previously recorded due to the expiration of these statutes of limitations.

In addition, we have recorded a net income tax benefit of approximately $2.0 million in connection with the stock-based compensation related expense during the period from fiscal years 1997 to 2005.  This tax benefit has resulted in an increase of our deferred tax assets for all affected stock options prior to the exercise or cancellation of the related options.  Upon exercise or cancellation of the underlying options, the excess or deficiency in deferred tax assets is written-off to either expense or additional paid-in capital in the period of exercise or cancellation.

The table below under "—Restatement Adjustments for Historical Option Grants" shows income tax benefits recorded in relation to the non-cash stock-based compensation adjustments.

*Restatement Adjustments for Historical Option Grants*

With the completion of the Audit Committee Investigation, previously discussed, we determined that errors had occurred in the accounting for share-based compensation. Specifically, we determined that 661 of the total 759 individual grants made from our IPO through August 10, 2006 used incorrect measurement dates or were modified in such a way as to cause variable plan accounting.  We recorded pre-tax compensation expense of $5.2 million in the aggregate over the fiscal years March 31, 1997 through March 31, 2005, as presented in the table below.

F-16

Table of Contents

The following table presents the adjustments of the restatement on a year-by-year basis.

| Fiscal Year | Share-Based Compensation Expense | Payroll Tax Due On Options | Payroll Withholding Tax Penalty On Exercises | Income Tax Provision (Benefit) Related to Share-Based Compensation and Payroll Taxes | Total Adjustments, Net of Tax |
|---|---|---|---|---|---|
| (in thousands) | | | | | |
| 1997 | $ 81 | $ - | $ - | $ (31) | $ 50 |
| 1998 | 137 | - | - | (53) | 84 |
| 1999 | 149 | - | - | (57) | 92 |

| | | | | | |
|---|---|---|---|---|---|
| 2000 | | 661 | 58 | 22 | 346 | 1,087 |
| 2001 | | 990 | 57 | 12 | (364) | 695 |
| 2002 | | 1,602 | - | - | (622) | 980 |
| 2003 | | 465 | 34 | 8 | (138) | 369 |
| Cumulative effect on April 1, 2003 opening retained earnings | | 4,386 | 659 | 141 | (1,829) | 3,357 |
| 2004 | | 810 | 213 | 48 | (409) | 662 |
| 2005 | | (20) | (503) | (104) | 209 | (418) |
| **Total** | $ | **5,176** | $ **369** | $ **85** | $ **(2,029)** | $ **3,601** |

The following table reconciles net earnings and retained earnings As Previously Reported to As Restated (in thousands):

| | | Net Earnings for the Year Ended March 31, | | Retained Earnings as of March 31, | |
|---|---|---|---|---|---|
| | | 2004 | 2005 | 2004 | 2005 |
| As Previously Reported | $ | 10,154 | $25,288 | $64,211 | $89,499 |
| Total change in net earnings and retained earnings | | (662) | 418 | (4,019) | (3,601) |
| As Restated | $ | 9,492 | $25,706 | $60,192 | $85,898 |

## Summary of the Restatement — Other Items

In addition to the stock option errors described above, we have also restated our Consolidated Balance Sheet as of March 31, 2005 and our Consolidated Statements of Cash Flows for the years ended March 31, 2005 and 2004 for the following reasons:

We use floor planning agreements for dealer financing of products purchased from distributors and resold to end-users. Historically, we classified the cash flows from our floor plan financing agreements in operating activities in our Consolidated Statements of Cash Flows. We previously treated the floor plan facility as an outsourced accounts payable function, and, therefore, considered the payments made by our floor plan facility as cash paid to suppliers under Financial Accounting Standards No. 95, "*Statement of Cash Flows.*"

We have now determined that when an unaffiliated finance company remits payments to our suppliers on our behalf, we should show this transaction as a financing cash inflow and an operating cash outflow.  In addition, when we repay the financing company, we should present this transaction as a financing cash outflow. As a result, we have restated the accompanying fiscal years 2005 and 2004 Consolidated Financial Statements to correct this error.

The restatement also includes a separate line item on our Consolidated Balance Sheets for the accounts payable related to our floor plan financing agreements which had previously been included in accounts payable—trade.

F-17

Table of Contents

Also, payments made by our lessees directly to third-party, non-recourse lenders were previously reported on our Consolidated Statements of Cash Flows as repayments of non-recourse debt in the financing section and a decrease in our investment in leases and leased equipment—net in the operating section. As these payments were not received or disbursed by us, management determined that these amounts should not be shown as cash used in financing activities and cash provided by operating activities on our Consolidated Statements of Cash Flows.  Rather, these payments are now disclosed as a non-cash financing activity on our Consolidated Statements of Cash Flows.

In addition, certain corrections were made for errors noted on our Consolidated Statements of Cash Flows between the line items reserve for credit losses and changes in accounts receivable, both of which are in the operating section.

## Impact of the Restatement

The following tables present the effects of the restatement on our previously issued Consolidated Balance Sheet as of March 31, 2005, Consolidated Statements of Operations for the years ended March 31, 2005 and 2004 and the Consolidated Statements of Cash Flows for the years ended March 31, 2005 and 2004 (in thousands, except per share data):

| | | | Adjustments | | | |
|---|---|---|---|---|---|---|
| Consolidated Balance Sheet March 31, 2005 | | As Previously Reported | Stock-based Compensation and Tax Impact | Floor Plan | Other | As Restated |
| Assets | | | | | | |
| Cash and cash equivalents | $ | 38,852 | $ - | $ - | $ - | $ 38,852 |
| Accounts receivable—net | | 93,555 | - | - | - | 93,555 |
| Notes receivable | | 115 | - | - | - | 115 |
| Inventories | | 2,117 | - | - | - | 2,117 |
| Investment in leases and leased equipment—net | | 189,469 | - | - | (613) | 188,856 |
| Property and equipment—net | | 6,648 | - | - | - | 6,648 |
| Other assets | | 3,860 | - | - | - | 3,860 |
| Goodwill | | 26,125 | - | - | - | 26,125 |
| **Total Assets** | $ | 360,741 | $ - | $ - | $ (613) | $ 360,128 |
| | | | | | | |
| **Liabilities and Stockholders' Equity** | | | | | | |
| Accounts payable—equipment | $ | 8,965 | $ - | $ - | $ (613) | $ 8,352 |
| Accounts payable—trade | | 55,333 | - | (32,978) | (8,187) | 14,168 |
| Accounts payable—floor plan | | - | - | 32,978 | - | 32,978 |
| Salaries and commissions payable | | 771 | - | - | - | 771 |
| Accrued expenses and other liabilities | | 32,946 | 454 | - | 8,187 | 41,587 |
| Recourse notes payable | | 6,265 | - | - | - | 6,265 |
| Non-recourse notes payable | | 114,839 | - | - | - | 114,839 |
| Deferred tax liability | | 9,520 | (1,678) | - | - | 7,842 |
| **Total Liabilities** | | 228,639 | (1,224) | - | (613) | 226,802 |
| | | | | | | |
| Common stock | | 108 | - | - | - | 108 |
| Additional paid-in capital | | 65,182 | 4,863 | - | - | 70,045 |
| Treasury stock | | (22,888) | - | - | - | (22,888) |

|  | (38) |  |  |  |  |
|---|---|---|---|---|---|
| Deferred compensation expense | (38) |  |  |  |  |
| Retained earnings | 89,499 | (3,601) | - | - | 85,898 |
| Accumulated other comprehensive income | 201 | - | - | - | 201 |
| **Total Stockholders' Equity** | 132,102 | 1,224 | - | - | 133,326 |
| **Total Liabilities and Stockholders' Equity** | $ 360,741 | $ - | $ - | $ (613) | $ 360,128 |

F-18

*Table of Contents*

| **Consolidated Statements of Operations** | As Previously Reported | Adjustments | | As Restated |
|---|---|---|---|---|
| | | Stock-based Compensation and Tax Impact | Other | |
| **Year Ended March 31, 2004** | | | | |
| **Revenues:** | | | | |
| Sales of product and services | $ 267,899 | $ - | $ - | $ 267,899 |
| Lease revenues | 51,254 | - | - | 51,254 |
| Fee and other income | 11,405 | - | - | 11,405 |
| Total Revenues | 330,558 | - | - | 330,558 |
| **Costs and Expenses:** | | | | |
| Cost of sales, product and services | 236,283 | - | - | 236,283 |
| Direct lease costs | 10,561 | - | - | 10,561 |
| Professional and other fees | 3,701 | - | - | 3,701 |
| Salaries and benefits | 41,325 | 1,024 | - | 42,349 |
| General and administrative expenses | 14,631 | - | - | 14,631 |
| Interest and financing costs | 6,847 | 47 | - | 6,894 |
| Total Costs and Expenses | 313,348 | 1,071 | - | 314,419 |
| **Earnings Before Provision for Income Taxes** | 17,210 | (1,071) | - | 16,139 |
| Provision for income taxes | 7,056 | (409) | - | 6,647 |
| **Net Earnings** | $ 10,154 | $ (662) | $ - | $ 9,492 |
| **Net Earnings Per Share:** | | | | |
| Basic | $ 1.09 | $ (0.07) | $ - | $ 1.02 |
| Diluted | $ 1.02 | $ (0.07) | $ - | $ 0.95 |
| **Shares Used in Computing Net Earnings Per Share:** | | | | |
| Basic | 9,332,324 | 1,064 | - | 9,333,388 |
| Diluted | 9,976,458 | 364 | - | 9,976,822 |
| **Year Ended March 31, 2005** | | | | |
| **Revenues:** | | | | |
| Sales of product and services | $ 480,970 | $ - | $ - | $ 480,970 |
| Lease revenues | 46,344 | - | - | 46,344 |
| Fee and other income | 48,485 | - | - | 48,485 |
| Total Revenues | 575,799 | - | - | 575,799 |
| **Costs and Expenses:** | | | | |
| Cost of sales, product and services | 432,774 | - | 64 | 432,838 |
| Direct lease costs | 11,509 | - | (64) | 11,445 |
| Professional and other fees | 9,417 | - | - | 9,417 |
| Salaries and benefits | 54,858 | (523) | - | 54,335 |
| General and administrative expenses | 18,253 | - | - | 18,253 |
| Interest and financing costs | 5,981 | (104) | - | 5,877 |
| Total Costs and Expenses | 532,792 | (627) | - | 532,165 |
| **Earnings Before Provision for Income Taxes** | 43,007 | 627 | - | 43,634 |
| Provision for income taxes | 17,719 | 209 | - | 17,928 |
| **Net Earnings** | $ 25,288 | $ 418 | $ - | $ 25,706 |
| **Net Earnings Per Share:** | | | | |
| Basic | $ 2.84 | $ 0.05 | $ - | $ 2.89 |
| Diluted | $ 2.68 | $ 0.05 | $ - | $ 2.73 |
| **Shares Used in Computing Net Earnings Per Share:** | | | | |
| Basic | 8,898,112 | 184 | - | 8,898,296 |
| Diluted | 9,433,250 | (24,131) | - | 9,409,119 |

F-19

*Table of Contents*

| **Consolidated Statements of Cash Flows** | As Previously Reported | Adjustments | | | | As Restated |
|---|---|---|---|---|---|---|
| | | Stock-Based Compensation | Floor Plan | Lessee Payments to Lenders | Other | |
| **Year Ended March 31, 2004** | | | | | | |
| **Cash Flows From Operating Activities:** | | | | | | |
| Net earnings | $ 10,153,741 | $ (661,789) | $ - | $ - | $ - | $ 9,491,952 |
| Depreciation and amortization | 10,487,439 | - | - | - | - | 10,487,439 |
| Reserves for credit losses | 1,731,325 | - | - | - | (1,508,627) | 222,698 |
| Impact of stock-based compensation | - | 578,813 | - | - | - | 578,813 |
| Deferred taxes | 5,293,197 | - | - | - | - | 5,293,197 |
| Payments from lessees directly to lenders—operating leases | (2,645,589) | - | - | 333,618 | - | (2,311,971) |

| | | | | | | |
|---|---|---|---|---|---|---|
| Loss on disposal of property and equipment | 904,579 | - | - | - | - | 904,579 |
| Loss on disposal of operating lease equipment | 2,122,180 | - | - | - | - | 2,122,180 |
| Changes in accounts receivable—net | (14,261,777) | - | - | - | 1,508,627 | (12,753,150) |
| Changes in notes receivable | 1,112 | - | - | - | - | 1,112 |
| Changes in inventories | 473,420 | - | - | - | - | 473,420 |
| Changes in investment in leases and leased equipment—net | (2,653,444) | - | - | (20,234,256) | (611,447) | (23,499,147) |
| Changes in other assets | 59,987 | - | - | - | - | 59,987 |
| Changes in accounts payable—equipment | 4,357,301 | - | - | - | 611,447 | 4,968,748 |
| Changes in accounts payable—trade | 6,226,285 | - | (6,478,576) | - | (1,608,271) | (1,860,562) |
| Changes in salaries and commissions payable, accrued expenses and other liabilities | (2,187,332) | 82,976 | - | - | 1,608,271 | (496,085) |
| Net cash provided by (used in) operating activities | 20,062,424 | - | (6,478,576) | (19,900,638) | - | (6,316,790) |

**Cash Flows From Investing Activities:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Proceeds from sale of operating lease equipment | 452,127 | - | - | - | - | 452,127 |
| Purchase of operating lease equipment | (19,592,804) | - | - | - | - | (19,592,804) |
| Purchases of property and equipment | (2,801,030) | - | - | - | - | (2,801,030) |
| Cash used in acquisitions, net of cash acquired | (1,601,632) | - | - | - | - | (1,601,632) |
| Net cash used in investing activities | (23,543,339) | - | - | - | - | (23,543,339) |

**Cash Flows From Financing Activities:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrowings: | | | | | | |
| Non-recourse | 77,904,696 | - | - | - | - | 77,904,696 |
| Repayments: | | | | | | |
| Non-recourse | (66,143,136) | - | - | 19,900,638 | - | (46,242,498) |
| Write-off of non-recourse debt due to bankruptcy | 7,181 | - | - | - | - | 7,181 |
| Purchase of treasury stock | (9,681,762) | - | - | - | - | (9,681,762) |
| Proceeds from issuance of capital stock, net of expenses | 1,436,033 | - | - | - | - | 1,436,033 |
| Net borrowings on floor plan financing | - | - | 6,478,576 | - | - | 6,478,576 |
| Net repayments on lines of credit | (2,730,435) | - | - | - | - | (2,730,435) |
| Net cash provided by financing activities | 792,577 | - | 6,478,576 | 19,900,638 | - | 27,171,791 |

**Effect of Exchange Rate Changes on Cash** | 59,259 | | | | | 59,259

**Net Decrease in Cash and Cash Equivalents** | (2,629,079) | | | | | (2,629,079)

**Cash and Cash Equivalents, Beginning of Year** | 27,784,090 | | | | | 27,784,090

**Cash and Cash Equivalents, End of Year** | $ 25,155,011 | $ - | $ - | $ - | $ - | $ 25,155,011

**Year Ended March 31, 2005**

**Cash Flows From Operating Activities:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Net earnings | $ 25,287,623 | $ 418,052 | $ - | $ - | $ - | $ 25,705,675 |
| Depreciation and amortization | 12,784,225 | - | - | - | - | 12,784,225 |
| Reserves for credit losses | (515,843) | - | - | - | 1,290,807 | 774,964 |
| Provision for inventory losses | - | - | - | - | 68,334 | 68,334 |
| Tax benefit of stock options exercised | 156,972 | - | - | - | - | 156,972 |
| Impact of stock-based compensation | - | (62,439) | - | - | - | (62,439) |
| Deferred taxes | (533,917) | - | - | - | - | (533,917) |
| Payments by lessees directly to lenders—operating leases | (4,275,789) | - | - | 576,528 | - | (3,699,261) |
| Loss on disposal of property and equipment | 350,866 | - | - | - | - | 350,866 |
| Gain on disposal of operating lease equipment | (159,477) | - | - | - | - | (159,477) |
| Changes in accounts receivable—net | (41,052,707) | - | - | - | (1,290,807) | (42,343,514) |
| Changes in notes receivable | (62,722) | - | - | - | - | (62,722) |
| Changes in inventories | (1,217,107) | - | - | - | (68,334) | (1,285,441) |
| Changes in investment in leases and leased equipment—net | 8,351,695 | - | - | (20,048,870) | 508,905 | (11,188,270) |
| Changes in other assets | 1,009,820 | - | - | - | - | 1,009,820 |
| Changes in accounts payable—equipment | (1,028,055) | - | - | - | (508,905) | (1,536,960) |
| Changes in accounts payable—trade | 23,140,604 | - | (11,341,185) | - | (8,186,444) | 3,612,975 |
| Changes in salaries and commissions payable, accrued expenses and other liabilities | 19,326,204 | (355,613) | - | - | 8,186,444 | 27,157,035 |
| Net cash provided by (used in) operating activities | 41,562,392 | - | (11,341,185) | (19,472,342) | - | 10,748,865 |

**Cash Flows From Investing Activities:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Proceeds from sale of operating lease equipment | 1,202,550 | - | - | - | - | 1,202,550 |
| Purchase of operating lease equipment | (22,036,259) | - | - | - | - | (22,036,259) |
| Proceeds from sale of property and equipment | 19,825 | - | - | - | - | 19,825 |
| Purchases of property and equipment | (4,641,325) | - | - | - | - | (4,621,325) |
| Cash used in acquisitions, net of cash acquired | (5,000,000) | - | - | - | - | (5,000,000) |
| Net cash used in investing activities | (30,455,209) | - | - | - | - | (30,455,209) |

**Cash Flows From Financing Activities:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrowings: | | | | | | |
| Non-recourse | 64,630,667 | - | - | - | - | 64,630,667 |
| Repayments: | | | | | | |
| Non-recourse | (63,090,176) | - | - | 19,472,342 | - | (43,617,834) |
| Write-off of non-recourse debt due to bankruptcy | (91,393) | - | - | - | - | (91,393) |
| Write-off of non-recourse debt due to settlement | (191,519) | - | - | - | - | (191,519) |
| Purchase of treasury stock | (5,694,995) | - | - | - | - | (5,694,995) |
| Proceeds from issuance of capital stock, net of expenses | 685,804 | - | - | - | - | 685,804 |
| Net borrowings on floor plan financing | - | - | 11,341,185 | - | - | 11,341,185 |

| | | | | | |
|---|---|---|---|---|---|
| Net borrowings on lines of credit | | | | | 6,259,034 |
| Net cash provided by financing activities | 2,507,422 | - | 11,341,185 | 19,472,342 | - | 33,320,949 |
| Effect of Exchange Rate on Cash | 82,098 | - | - | - | - | 82,098 |
| Net Increase in Cash and Cash Equivalents | 13,696,703 | - | - | - | - | 13,696,703 |
| Cash and Cash Equivalents, Beginning of Year | 25,155,011 | - | - | - | - | 25,155,011 |
| Cash and Cash Equivalents, End of Year | $ 38,851,714 | $ - | $ - | $ - | $ - | $ 38,851,714 |

F-20

Table of Contents

## 3. INVESTMENTS IN LEASES AND LEASED EQUIPMENT—NET

Investments in leases and leased equipment—net consists of the following:

| | As of | |
|---|---|---|
| | March 31, 2005 As Restated (1) | March 31, 2006 |
| | (In Thousands) | |
| Investment in direct financing and sales-type leases—net | $ 156,906 | $ 155,910 |
| Investment in operating lease equipment—net | 31,950 | 49,864 |
| | $ 188,856 | $ 205,774 |

(1)  See Note 2, "Restatement of Consolidated Financial Statements."

*INVESTMENT IN DIRECT FINANCING AND SALES-TYPE LEASES—NET*

Our investment in direct financing and sales-type leases—net consists of the following:

| | As of | |
|---|---|---|
| | March 31, 2005 As Restated (1) | March 31, 2006 |
| | (In Thousands) | |
| Minimum lease payments | $ 150,526 | $ 149,200 |
| Estimated unguaranteed residual value (2) | 23,794 | 23,804 |
| Initial direct costs, net of amortization (3) | 1,850 | 1,763 |
| Less: Unearned lease income | (16,208) | (15,944) |
| Reserve for credit losses | (3,056) | (2,913) |
| Investment in direct finance and sales-type leases—net | $ 156,906 | $ 155,910 |

(1) See Note 2, "Restatement of Consolidated Financial Statements."
(2) Includes estimated unguaranteed residual values of $801 and $1,451 as of March 31, 2005 and 2006, respectively, for direct financing leases which have been sold and accounted for under SFAS No. 140.
(3) Initial direct costs are shown net of amortization of $2,387 and $1,786 as of March 31, 2005 and 2006, respectively.

Future scheduled minimum lease rental payments as of March 31, 2006 are as follows (in thousands):

| Year ending March 31, | | |
|---|---|---|
| | 2007 | $ 77,652 |
| | 2008 | 44,757 |
| | 2009 | 17,714 |
| | 2010 | 5,286 |
| | 2011 | 2,374 |
| | 2012 and after | 1,417 |
| Total | | $ 149,200 |

Our net investment in direct financing and sales-type leases is collateral for non-recourse and recourse equipment notes. See Note 7, "Recourse and Non-Recourse Notes Payable."

F-21

Table of Contents

*INVESTMENT IN OPERATING LEASE EQUIPMENT—NET*

Investment in operating lease equipment—net primarily represents equipment leased for two to four years and leases that are short-term renewals on month-to-month status. The components of the net investment in operating lease equipment are as follows:

| | As of | |
|---|---|---|
| | March 31, 2005 | March 31, 2006 |
| | (In Thousands) | |
| Cost of equipment under operating leases | $ 45,453 | $ 71,786 |
| Less: Accumulated depreciation and amortization | (13,503) | (21,922) |
| Investment in operating lease equipment—net | $ 31,950 | $ 49,864 |

Future scheduled minimum lease rental payments as of March 31, 2006 are as follows (in thousands):

| Year ending March 31, | | |
|---|---|---|
| | 2007 | $ 16,505 |
| | 2008 | 12,164 |
| | 2009 | 8,513 |
| | 2010 | 3,994 |

| | | | |
|---|---|---|---|
| Total | | $ | 41,955 |

## 4. RESERVES FOR CREDIT LOSSES

As of March 31, 2004, 2005 and 2006, activity in our reserves for credit losses are as follows (in thousands):

| | Accounts Receivable | Lease-Related Assets | Total |
|---|---|---|---|
| Balance April 1, 2003 | $ 3,346 | $ 3,407 | $ 6,753 |
| Bad debts expense | 23 | 24 | 47 |
| Recoveries | (12) | - | (12) |
| Write-offs | (1,773) | (285) | (2,058) |
| Balance March 31, 2004 | 1,584 | 3,146 | 4,730 |
| Bad debts expense | 1,131 | - | 1,131 |
| Recoveries | (350) | - | (350) |
| Write-offs | (406) | (90) | (496) |
| Balance March 1, 2005 | 1,959 | 3,056 | 5,015 |
| Bad debts expense | 1,033 | - | 1,033 |
| Recoveries | (308) | - | (308) |
| Write-offs | (624) | (143) | (767) |
| Balance March 31, 2006 | $ 2,060 | $ 2,913 | $ 4,973 |

F-22

Table of Contents

## 5. PROPERTY AND EQUIPMENT

Property and equipment consists of the following:

| | As of March 31, | |
|---|---|---|
| | 2005 | 2006 |
| | (In Thousands) | |
| Furniture, fixtures and equipment | $ 7,364 | $ 6,330 |
| Vehicles | 155 | 148 |
| Capitalized software | 6,411 | 6,757 |
| Leasehold improvements | 1,894 | 2,155 |
| Less: Accumulated depreciation and amortization | (9,176) | (9,761) |
| Property and equipment—net | $ 6,648 | $ 5,629 |

For the years ended March 31, 2005 and 2006, depreciation expense on property and equipment was $2,916 and $3,185, respectively.

## 6. GOODWILL

As of March 31, 2006 and 2005 we had goodwill of $26.1 million. We have determined goodwill had not been impaired and that no potential impairment existed, based on testing performed on September 30, 2004 and 2005.

There was no change in the carrying amount of goodwill for the year ended March 31, 2006. The change in the carrying amount of goodwill for the year ended March 31, 2005 is as follows (in thousands):

| | Financing Business Unit | Technology Sales Business Unit | Total |
|---|---|---|---|
| Goodwill, April 1, 2004 | $ 4,029 | $ 16,214 | $ 20,243 |
| Goodwill acquired during the period | - | 5,882 | 5,882 |
| Goodwill, March 31,2005 | $ 4,029 | $ 22,096 | $ 26,125 |

## 7. RECOURSE AND NON-RECOURSE NOTES PAYABLE

Recourse and non-recourse obligations consist of the following:

| | As of March 31, | |
|---|---|---|
| | 2005 | 2006 |
| | (In Thousands) | |
| GE Commercial Distribution Finance Corporation– Recourse accounts receivable component of our credit facility bearing interest at prime less 0.5% (7.25% at March 31, 2006) with a maximum balance of $20,000,000. Either party may terminate with 90 days' advance notice. | $ 6,263 | $ - |
| National City Bank – Recourse credit facility of $35,000,000 expiring on July 21, 2009. At our option, carrying interest rate is either LIBOR rate plus 175–250 basis points, or the Alternate Base Rate of the higher of prime, or federal funds rate plus 50 basis points, plus 0–25 basis points of margin. The interest rate at March 31, 2006 was 7.75%. | - | 6,000 |
| Recourse vehicle note with variable interest rate | 2 | - |
| Total recourse obligations | $ 6,265 | $ 6,000 |
| Non-recourse equipment notes secured by related investment in leases with interest rates ranging from 2.53% to 9.05% | $ 114,839 | $ 127,973 |

F-23

Table of Contents

Principal and interest payments on the recourse and non-recourse notes payable are generally due monthly in amounts that are approximately equal to the total payments due from the lessee under the leases that collateralize the notes payable. Under recourse financing, in the event of a default by a lessee, the lender has recourse against the lessee, and the equipment serving as collateral, and us. Under non-recourse financing, in the event of a default by a lessee, the lender generally only has recourse against the lessee, and the equipment serving as collateral, but not against us.

There are two components of the GE Commercial Distribution Finance Corporation ("GECDF") credit facility: (1) a floor plan component and (2) an accounts receivable component. As of March 31, 2006, the facility agreement had an aggregate limit of the two components of $75 million, and the accounts receivable component had a sub-limit of $20 million. Effective June 29, 2006, the facility with GECDF was amended to increase the total credit facility limit to $85 million and the accounts receivable facility sub-limit to $30 million. In addition, the amendment temporarily increased the total credit facility limit to $100 million during the period from June 26, 2006 through September 21, 2006. Effective June 20, 2007, the facility with GECDF was again amended to temporarily increase the total credit facility limit to $100 million during the period from June 19, 2007 through August 15, 2007. On August 2, 2007, the period was extended from August 15, 2007 to September 30, 2007. Other than during the temporary increase periods described above, the total credit facility limit is $85 million.

Availability under the GECDF facility may be limited by the asset value of equipment we purchase and may be further limited by certain covenants and terms and conditions of the facility. We were in compliance with, or had obtained applicable waivers for, these covenants as of March 31, 2006.

The facility provided by GECDF requires a guaranty of up to $10.5 million by ePlus inc. The guaranty requires ePlus inc. to file financial statements with the SEC, and we have not filed the required financial statements. However, GECDF has waived this requirement through September 30, 2007. The loss of the GECDF credit facility could have a material adverse effect on our future results as we currently rely on this facility and its components for daily working capital and liquidity for our technology sales business and as an operational function of our accounts payable process.

Borrowings under our $35 million line of credit from National City Bank are subject to and in compliance with certain covenants regarding minimum consolidated tangible net worth, maximum recourse debt to net worth ratio, cash flow coverage, and minimum interest expense coverage ratio. The borrowings are secured by our assets such as leases, receivables, inventory, and equipment. Borrowings are limited to our collateral base, consisting of equipment, lease receivables and other current assets, up to a maximum of $35 million. In addition, the credit agreement restricts, and under some circumstances prohibits, the payment of dividends.

The National City Bank facility requires the delivery of our Audited and Unaudited Financial Statements, and pro-forma financial projections, by certain dates. We have not delivered the following documents as required by Section 5.1 of the facility: (a) annual Audited Financial Statements for the year ended March 31, 2006; (b) "Projections" for our fiscal year ended March 31, 2007; and (c) quarterly Unaudited Financial Statements for the quarters ended June 30, 2006, September 30, 2006, and December 31, 2006. We entered into the following amendments which have extended the delivery date requirements for these documents: a First Amendment dated July 11, 2006, a Second Amendment dated July 28, 2006, a third Amendment dated July 30, 2006, a Fourth Amendment dated September 27, 2006, a Fifth Amendment dated November 15, 2006, a Sixth Amendment dated January 11, 2007, a Seventh Amendment dated March 15, 2007, and an Eighth Amendment dated June 27, 2007. As a result of the amendments, the agents agreed, *inter alia*, to extend the revolving credit facility in the maximum aggregate principal amount of $35 million through August 31, 2007.

F-24

Table of Contents

Recourse and non-recourse notes payable as of March 31, 2006, mature as follows:

| | | | Recourse Notes Payable | Non-Recourse Notes Payable |
|---|---|---|---|---|
| | | | (In Thousands) | |
| Year ending March 31, | | 2007 | $ 6,000 | $ 66,488 |
| | | 2008 | - | 37,975 |
| | | 2009 | - | 14,942 |
| | | 2010 | - | 7,119 |
| | | 2011 | - | 1,310 |
| | 2012 and after | | - | 139 |
| | Total | | $ 6,000 | $ 127,973 |

## 8. RELATED PARTY TRANSACTIONS

Prior to April 1, 2001, we sold leased equipment to MLC/CLC LLC, a joint venture in which we have a 5% ownership interest. We recognized $302,968, $37,990, and $2,459 for the years ended March 31, 2004, 2005 and 2006, respectively, for accounting and administrative services provided to MLC/CLC LLC.

We lease certain office space from an entity controlled by an individual, director, stockholder, and officer of the company. During the years ended March 31, 2004, 2005, and 2006, rent paid to the related parties was $440,845, $517,936, and $907,165 respectively.

## 9. COMMITMENTS AND CONTINGENCIES

We lease office space and certain office equipment for the conduct of our business. Rent expense relating to these operating leases was $2,048,201, $2,649,483, and $2,537,755 for the years ended March 31, 2004, 2005, and 2006, respectively. As of March 31, 2006, the future minimum lease payments are due as follows:

| | | | (In Thousands) |
|---|---|---|---|
| Year Ending March 31, | | 2007 | $ 2,370 |
| | | 2008 | 2,027 |
| | | 2009 | 1,530 |
| | | 2010 | 1,151 |
| | | 2011 | 263 |
| | Total | | $ 7,341 |

*Litigation*

We were a defendant in four lawsuits (two including a cross-complaint filed against Cyberco Holdings, Inc. ("Cyberco")), which were perpetrating a fraud related to leases that were assigned to various lenders and were non-recourse to us. Two of the suits have been resolved, and two are pending.

In one of the lawsuits, filed on January 4, 2005, an underlying lender, GMAC Commercial Finance, L.L.C. ("GMAC"), sought approximately $10,646,230.  On July 24, 2006, we settled the case for a $6,000,000 payment by us to GMAC, which we have recorded in the year ended March 31, 2006.

In the second lawsuit, which was filed on May 10, 2005, another underlying lender, Banc of America Leasing and Capital, LLC ("BoA") sought repayment from *e*Plus Group, inc. of approximately $3,062,792 plus interest and attorneys' fees.  The case went to trial, and a final judgment in favor of BoA was entered on February 6, 2007.  We have recorded $4,081,697, representing $3,025,000 verdict, $871,232 in attorneys' fees and $185,465 in interest and other costs in the year ended March 31, 2006.

F-25

Table of Contents

The third non-bankruptcy lawsuit was filed on November 3, 2006 by BoA against *e*Plus inc., seeking to enforce a guaranty in which *e*Plus inc. guaranteed *e*Plus Group, inc.'s obligations to BoA relating to the Cyberco transaction.  *e*Plus Group has already paid to BoA the judgment in the second lawsuit referenced above.  *e*Plus inc. is vigorously defending their suit.  We cannot predict the outcome of the suit against *e*Plus inc. We believe a loss is not probable, and we have not accrued for this matter.

In the bankruptcy adversary proceeding, which was filed on December 7, 2006, Cyberco's bankruptcy trustee is seeking approximately $775,000 as alleged preferential transfers.  Discovery has commenced.  We cannot predict the outcome of this litigation.  We dispute that we are liable, believe we have strong defenses to the claims and intend to vigorously defend against them.  We believe a loss is not probable, and we have not accrued for this matter.

On December 11, 2006, *e*Plus inc. and SAP America, Inc. and its German parent, SAP AG (collectively, "SAP") entered into a Patent License and Settlement Agreement (the "Agreement") to settle a patent lawsuit between the companies which we filed on April 20, 2005.  Under the terms of the Agreement, we will license to SAP our existing patents, together with those developed and/or acquired by us within the next five years, in exchange for a one-time cash payment to us of $17,500,000, which was paid by SAP on January 16, 2007.  In addition, SAP has agreed not to pursue legal action against us for patent infringement as to any of our current lines of business on any of SAP's patents for a period of five years.  The Agreement also provides for general release, indemnification for its violation, and dismisses the existing litigation with prejudice.  We recognized the revenue for the Agreement in the quarter ended December 31, 2006 in fee and other income on the Consolidated Statements of Operations.

On January 18, 2007, a shareholder derivative action related to stock option practices was filed in the United States District Court for the District of Columbia.  The complaint names *e*Plus inc. as nominal defendant, and personally names eight individual defendants who are directors and/or executive officers of *e*Plus.  The complaint alleges violations of federal securities law and state law claims for breach of fiduciary duty, waste of corporate assets and unjust enrichment.  We are currently preparing a response to the plaintiff's amended complaint.  No amount has been accrued for this matter.

We are also engaged in other ordinary and routine litigation incidental to our business. While we cannot predict the outcome of these various legal proceedings, management believes that a loss is not probable and no amount has been accrued for these matters.

*Regulatory and Other Legal Matters*

As discussed in more detail in Note 2, "Restatement of Consolidated Financial Statements," in June 2006, the Audit Committee commenced an investigation of stock option grants by us since our IPO in 1996. In August 2006, the Audit Committee voluntarily contacted and advised the staff of the SEC of its Investigation and the Audit Committee's preliminary conclusion that a restatement will be required. The SEC opened an informal inquiry and we are cooperating with the staff.  No amount has been accrued for this matter.

We are currently engaged in a dispute with the government of the District of Columbia ("DC") regarding personal property taxes on property we financed for our customers.  DC is seeking approximately $508,000, plus interest and penalties, relating to property we financed for our customers.  We believe the tax is owed by our customers, and are seeking resolution in DC's Office of Administrative Hearings.  We cannot predict the outcome of this matter.  While management does not believe this matter will have a material effect on its financial condition and results of operations, resolution of this dispute is ongoing.

F-26

Table of Contents

## 10. INCOME TAXES

A reconciliation of income taxes computed at the statutory federal income tax rate of 35% to the provision for income taxes included in the Consolidated Statements of Operations is as follows:

| | For the Year Ended March 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2005 | 2006 |
| | | (In Thousands) | |
| | As Restated | As Restated | |
| Statutory federal income tax rate | 35% | 35% | 35% |
| Income tax expense computed at the U.S. statutory federal rate | $ 5,646 | $ 15,288 | $ (356) |
| State income tax expense—net of federal benefit | 925 | 2,094 | 163 |
| Change in state rate and estimate | - | (57) | (1,230) |
| Change in valuation allowance | - | - | 606 |
| Meals and entertainment expense | 61 | 134 | 170 |
| Non-taxable interest income | (11) | (13) | (34) |
| Fines and penalties | 22 | (28) | 31 |
| Officers' life insurance premiums | 8 | 8 | 41 |
| Other | (4) | 502 | 64 |
| Provision for (benefit from) income taxes | $ 6,647 | $ 17,928 | $ (545) |
| Effective income tax rate | 41.2% | 41.1% | 51.1% |

The components of the provision for income taxes are as follows:

| | For the Year Ended March 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2005 | 2006 |
| | | (In Thousands) | |
| | As Restated | As Restated | |

| Current: | | | | | |
|---|---|---|---|---|---|
| Federal | $ | (172) | $ | 15,010 | $ | 6,753 |
| State | | 1,713 | | 3,206 | | 260 |
| Foreign | | - | | - | | 159 |
| Total current expense | | 1,541 | | 18,216 | | 7,172 |
| | | | | | |
| Deferred: | | | | | |
| Federal | | 5,371 | | (303) | | (6,940) |
| State | | (265) | | 15 | | (777) |
| Total deferred expense (benefit) | | 5,106 | | (288) | | (7,717) |
| | | | | | |
| Provision for (benefit from) income taxes | $ | 6,647 | $ | 17,928 | $ | (545) |

F-27

Table of Contents

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of our deferred tax assets and liabilities as of March 31 were as follows:

| | As of March 31, | |
|---|---|---|
| | 2005 | 2006 |
| | (In Thousands) | |
| | As Restated | |
| Deferred Tax Assets: | | |
| Accrued vacation | $ 451 | $ 820 |
| Allowance for bad debts | 684 | 786 |
| Reserve for credit losses | 1,781 | 1,157 |
| Investment in partnership | 634 | 589 |
| Delinquent rent reserve | 329 | 1,821 |
| State net operating loss carryforward | 188 | 627 |
| Basis difference in fixed assets | 1,125 | 785 |
| Capital loss carryforward | 173 | 167 |
| Lawsuit settlement and judgment reserve | - | 3,077 |
| Book compensation on discounted stock options | 1,530 | 1,596 |
| Payroll tax—stock options | 147 | 197 |
| Other accruals and reserves | 347 | 890 |
| Gross deferred tax assets | 7,389 | 12,512 |
| Less: valuation allowance | (188) | (794) |
| Net deferred tax assets | 7,201 | 11,718 |
| | | |
| Deferred Tax Liabilities: | | |
| Basis difference in operating lease items | (13,144) | (9,637) |
| Basis difference in tax deductible goodwill | (1,199) | (1,640) |
| Other deferred tax liabilities | (700) | (606) |
| Total deferred tax liabilities | (15,043) | (11,883) |
| | | |
| Net deferred tax liabilities | $ (7,842) | $ (165) |

The net change in the valuation allowance during the year ended March 31, 2006 was an increase of $605,988. The valuation allowance resulted from management's determination, based on available evidence, that it was more likely than not that the capital loss carryover deferred tax asset balance of $167,070 and state net operating loss deferred tax asset balance of $626,657 will not be realized.

## 11. STOCK REPURCHASE

On September 20, 2001, our Board authorized the repurchase of up to 750,000 shares of its outstanding common stock with a purchase limitation of $5,000,000 over a period of time ending no later than September 20, 2002. On October 4, 2002, another stock repurchase program previously authorized by our Board became effective. This program authorized the repurchase of up to 3,000,000 shares of our outstanding common stock over a period of time ending no later than October 3, 2003 and is limited to a cumulative purchase amount of $7,500,000. On October 1, 2003, another stock purchase program was authorized by our Board. This program authorized the repurchase of up to 3,000,000 shares of our outstanding common stock over a period of time ending no later than September 30, 2004 and is limited to a cumulative purchase amount of $7,500,000. On May 6, 2004, our Board approved an increase, from $7,500,000 to $12,000,000, for the maximum total cost of shares that could be purchased, which expired September 30, 2004. From October 1, 2004 to November 16, 2004, there were no stock repurchase authorizations. On November 17, 2004, another stock purchase program was authorized by our Board. This program authorized the repurchase of up to 3,000,000 shares of our outstanding common stock over a period of time ending no later than November 17, 2005 and was limited to a cumulative purchase amount of $7,500,000. On March 2, 2005, our Board approved an increase, from $7,500,000 to $12,500,000, for the maximum total cost of shares that could be purchased, which expired November 17, 2005. On November 18, 2005, the Board authorized a new stock repurchase program of up to 3,000,000 shares with a cumulative purchase limit of $12,500,000. During the years ended March 31, 2004, 2005, and 2006, we repurchased 688,800, 448,616, and 544,090 shares of our outstanding common stock for a total of $9,681,763, $5,694,994, and $7,096,045. Since the inception of our initial repurchase program on September 20, 2001, as of March 31, 2006, we had repurchased 2,769,990 shares of our outstanding common stock at an average cost of $10.82 per share for a total of $29,983,925. As of March 31, 2006, a maximum purchase amount of $10,756,072 and up to 768,950 shares are available under the stock repurchase program which expired November 17, 2006.

F-28

Table of Contents

## 12. BENEFIT AND STOCK OPTION PLANS

*Contributory 401(k) Profit Sharing Plan*

We provide our employees with a contributory 401(k) profit sharing plan. To be eligible to participate in the plan, employees must be at least 21 years of age and have completed a minimum service requirement. Employer contribution percentages are determined by us and are discretionary each year. To date, the employer contributions are vested when they are paid by us to the plan. Our expense for the plan was $247,040, $212,310 and $305,671 for the years ended March 31, 2004, 2005 and 2006, respectively.

*Stock Option Plans*

We issued only incentive and non-qualified stock option awards and, except as noted below, each grant was issued under one of the following five plans: (1) the 1996 Stock Incentive Plan (the "1996 SIP"), (2) Amendment and Restatement of the 1996 Stock Incentive Plan (the "Amended SIP") (collectively the "1996 Plans"), (3) the 1998 Long-Term Incentive Plan (the "1998 LTIP"), (4) Amendment and Restatement of the 1998 Stock Incentive Plan (2001) (the "Amended LTIP (2001)") or (5) Amendment and Restatement of the 1998 Stock Incentive Plan (2003) (the "Amended LTIP (2003)"). Sections of note are detailed below. All the stock option plans require the use of the previous trading day's closing price when the grant date falls on a date the stock was not traded.

In addition, at the IPO, there were 245,000 options issued that were not part of any plan, but issued under various employment agreements.

*1996 Stock Incentive Plan*

The allowable number of outstanding shares under this plan was 155,000. On September 1, 1996, the Board adopted this plan, and it was effective on November 8, 1996 when the SEC declared our Registration Statement on Form S-1 effective in connection with our IPO on November 20, 1996. The 1996 SIP is comprised of an Incentive Stock Option Plan, a Nonqualified Stock Option Plan, and an Outside Director Stock Option Plan. Each of the components of the 1996 Plans provided that options would only be granted after execution of an Option Agreement. Except for the number of options awarded to directors, the salient provisions of the 1996 SIP are identical to the Amended SIP, which is more fully described below.

With regard to director options, the 1996 Outside Director Stock Option Plan provided for 10,000 options to be granted to each non-employee director upon completion of the IPO, and 5,000 options to be granted to each non-employee director on the anniversary of each full year of his or her service as a director of *e*Plus. As with the other components of the 1996 Plans, the director options would be granted only after execution of an Option Agreement.

F-29

*Table of Contents*

*Amendment and Restatement of 1996 Stock Incentive Plan*

The 1996 SIP was amended via an Amendment and Restatement of 1996 Stock Incentive Plan. The primary purpose of the amendment was to increase the aggregate number of shares allocated to the plan by making the shares available a percentage (20%) of total shares outstanding rather than a fixed number.

The Amended SIP also provided for an employee stock purchase plan, and permitted the Board to establish other restricted stock and performance-based stock awards and programs. The Amended SIP was adopted by the Board and became effective on May 14, 1997, subject to approval at the annual shareholders' meeting that fall. The Amended SIP was adopted by shareholders at the annual meeting on September 30, 1997.

*1998 Long-Term Incentive Plan*

The 1998 LTIP was adopted by the Board on July 28, 1998, which is its effective date, and approved by the shareholders on September 16, 1998. The allowable number of shares under the 1998 LTIP are 20% of the outstanding shares, less shares previously granted and shares purchased through our employee stock purchase program. The 1998 LTIP shares many characteristics of the earlier plans. It continues to specify that options shall be priced at not less than fair market value. The 1998 LTIP consolidated the preexisting plans and made the Compensation Committee of the Board responsible for its administration. In addition, the 1998 LTIP eliminated the language of the 1996 Plans that "options shall be granted only after execution of an Option Agreement." Thus, while the 1998 LTIP does require that grants be evidenced in writing, the writing is not a condition precedent to the grant of the award.

Another change to note is the modification of the LTIP as it relates to options awarded to directors. Under the 1998 LTIP, instead of being awarded on the anniversary of the director's service, the options are to be automatically awarded the day after the annual shareholders meeting to all directors in service as of that day. It also permits for discretionary option awards to directors.

*Amended and Restated 1998 Long-Term Incentive Plan*

Minor amendments were made to the 1998 LTIP on April 1, April 17 and April 30, 2001. The amendments change the name of the plan from the 1998 Long-Term Incentive Plan to the Amended and Restated 1998 Long-Term Incentive Plan referred to herein as Amended LTIP (2001). In addition, provisions were added "to allow the Compensation Committee to delegate to a single board member the authority to make awards to non-Section 16 insiders, as a matter of convenience," and to provide that "no option granted under the Plan may be exercisable for more than ten years from the date of its grant."

The Amended LTIP (2001) was amended on July 15, 2003 by the Board and approved by the stockholders on September 18, 2003 referred to herein as Amended LTIP (2003). Primarily, the amendment modified the aggregate number of shares available under the plan to 3,000,000. Although the language varies somewhat from earlier plans, it permits the Board or Compensation Committee to delegate authority to a committee of one or more directors who are also officers of the corporation to award options under certain conditions. The Amended LTIP (2003) replaced all the prior plans, is our current plan and covers option grants for employees, executives and outside directors.

As of March 31, 2006, a total of 2,811,674 shares of common stock have been reserved for issuance upon exercise of options granted under the Amended LTIP (2003).

F-30

*Table of Contents*

The exercise price of options granted under the plans (except for the employee stock purchase plan, discussed above) differs from the fair market value of our stock on the date of grant in some cases. Options granted under the plan have various vesting schedules with vesting periods ranging from one to five years. The weighted average fair value of options granted during the years ended March 31, 2006, 2005 and 2004 is as follows:

| Weighted Average Fair Value of Options Granted | 2006 | | 2005 | | 2004 | |
|---|---|---|---|---|---|---|
| | Shares | Weighted Average Exercise Price | Shares | Weighted Average Exercise Price As Restated | Shares | Weighted Average Exercise Price As Restated |
| Below fair market value on grant date | - | $ - | - | $ - | 2,000 | $ 7.14 |
| At fair market value on grant date | - | - | 40,000 | 10.75 | 60,000 | 11.20 |
| Above fair market value on grant date | 80,000 | 12.92 | 460,000 | 11.06 | - | - |

A summary of stock option activity during the three years ended March 31, 2006 is as follows:

| | Number of Shares<br>As Restated | Exercise Price Range<br>As Restated | Weighted Average Exercise Price<br>As Restated |
|---|---|---|---|
| Outstanding, April 1, 2003 | 1,972,918 | 6.23–$$21.25 | $ 9.13 |
| Options granted | 63,000 | 7.14–$$15.25 | $ 9.86 |
| Options exercised | (177,907) | 6.24–$$12.25 | $ 8.05 |
| Options forfeited | (85,329) | 6.86–$$17.38 | $ 10.57 |
| Outstanding, March 31, 2004 | 1,772,682 | 6.23–$$21.25 | $ 9.19 |
| Exercisable, March 31, 2004 | 1,550,265 | | |
| | | | |
| Outstanding, April 1, 2004 | 1,772,682 | 6.23–$$21.25 | $ 9.19 |
| Options granted | 500,000 | 10.75–$$15.16 | $ 11.08 |
| Options exercised | (89,300) | 6.24–$$13.00 | $ 7.32 |
| Options forfeited | (19,700) | 6.86–$$17.38 | $ 11.22 |
| Outstanding, March 31, 2005 | 2,163,682 | 6.23–$$21.25 | $ 9.66 |
| Exercisable, March 31, 2005 | 1,645,882 | | |

| | Number of Shares | Exercise Price Range | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding, April 1, 2005 | 2,163,682 | 6.23–$$21.25 | $ 9.66 |
| Options granted | 80,000 | 12.73–$$13.11 | $ 12.91 |
| Options exercised | (229,821) | 6.40–$$11.50 | $ 10.01 |
| Options forfeited | (13,950) | 6.86–$$21.25 | $ 17.11 |
| Outstanding, March 31, 2006 | 1,999,911 | 6.23–$$17.38 | $ 9.93 |
| Exercisable, March 31, 2006 | 1,559,411 | | |

F-31

Table of Contents

Additional information regarding options outstanding as of March 31, 2006 is as follows:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Options Outstanding | Weighted Average Exercise Price Per Share | Weighted Average Contractual Life Remaining | Options Exercisable | Weighted Average Exercise Price Per Share |
| $6.23-$9.00 | 1,063,504 | $ 7.66 | 3.8 | 1,063,004 | $ 7.66 |
| $9.01-$13.50 | 725,400 | $ 11.24 | 4.4 | 285,400 | $ 11.10 |
| $13.51-$17.38 | 211,007 | $ 16.91 | 5.0 | 211,007 | $ 16.91 |
| $6.23-$17.38 | 1,999,911 | $ 9.93 | 4.5 | 1,559,411 | $ 9.54 |

Effective April 1, 1996, we adopted SFAS No. 123, as amended by SFAS No. 148. We have the option of either (1) continuing to account for stock-based employee compensation plans in accordance with the guidelines established by APB 25, "*Accounting for Stock Issued to Employees*," while providing the disclosures required under SFAS No. 123, or (2) adopting SFAS No. 123 accounting for all employee and non-employee stock compensation arrangements. We opted to continue to account for our stock-based awards using the intrinsic value method in accordance with APB 25 and make the appropriate disclosures as required by SFAS No. 123.

Under SFAS No. 123, the fair value of stock-based awards to employees is derived through the use of option pricing models that require a number of subjective assumptions. Our calculations were made using the Black-Scholes option-pricing model with the following weighted average assumptions:

| | For the Year Ended March 31, | | |
|---|---|---|---|
| | 2004<br>As Restated (1) | 2005<br>As Restated (1) | 2006 |
| Options granted under the Incentive Stock Option Plan: | | | |
| Expected life of option | 5 years | 5 years | 5 years |
| Expected stock price volatility | 71.68% | 71.77% | 48.08% |

| | | | |
|---|---|---|---|
| Expected dividend yield | 0% | 0% | 0% |
| Risk-free interest rate | 2.96% | 3.46% | 4.15% |

(1) See Note 2, "Restatement of Consolidated Financial Statements."

Included in the accounts receivable balance of $103.1 million as of March 31, 2006 was $711,679 of receivables due from our third-party agent broker for stock options exercised late in March 2006. Cash receipts relating to these receivables were collected between April 1, 2006 and April 17, 2006.

## 13. FAIR VALUE OF FINANCIAL INSTRUMENTS

The following disclosure of the estimated fair value of our financial instruments is in accordance with the provisions of SFAS No. 107, "*Disclosures About Fair Value of Financial Instruments.*" The valuation methods we used are set forth below.

The accuracy and usefulness of the fair value information disclosed herein is limited by the following factors:

— These estimates are subjective in nature and involve uncertainties and matters of significant judgment and therefore cannot be determined with precision. Changes in assumptions could significantly affect the estimates.

— These estimates do not reflect any premium or discount that could result from offering for sale at one time our entire holding of a particular financial asset.

F-32

Table of Contents

— SFAS No. 107 excludes from its disclosure requirements lease contracts and various significant assets and liabilities that are not considered to be financial instruments.

Because of these and other limitations, the aggregate fair value amounts presented in the following table do not represent the underlying value. We determine the fair value of notes payable by applying an average portfolio debt rate and applying such rate to future cash flows of the respective financial instruments. The fair value of cash and cash equivalents is determined to equal the book value.

The carrying amounts and estimated fair values of our financial instruments are as follows (in thousands):

| | As of March 31, 2005 | | As of March 31, 2006 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Assets: | | | | |
| Cash and cash equivalents | $ 38,852 | $ 38,852 | $ 20,697 | $ 20,697 |
| Notes receivable | 115 | 115 | 330 | 330 |
| Liabilities: | | | | |
| Non-recourse notes payable | 114,839 | 114,760 | 127,973 | 128,412 |
| Recourse notes payable | 6,265 | 6,265 | 6,000 | 6,000 |

## 14. SEGMENT REPORTING

We manage our business segments on the basis of the products and services offered. Our reportable segments consist of our traditional financing business unit and technology sales business unit. The financing business unit offers lease-financing solutions to corporations and governmental entities nationwide. The technology sales business unit sells information technology equipment and software and related services primarily to corporate customers on a nationwide basis. The technology sales business unit also provides Internet-based business-to-business supply chain management solutions for information technology and other operating resources. We evaluate segment performance on the basis of segment net earnings.

Both segments utilize our proprietary software and services throughout the organization. Sales and services and related costs of e-procurement software are included in the technology sales business unit. Income relative to services generated by our proprietary software and services are included in the financing business unit.

The accounting policies of the segments are the same as those described in Note 1, "Organization and Summary of Significant Accounting Policies." Corporate overhead expenses are allocated on the basis of employee headcount. Certain items have been reclassified for the years ended March 31, 2004 and 2005 to conform to the March 31, 2006 presentation.

F-33

Table of Contents

| | Financing Business Unit | Technology Sales Business Unit | Total |
|---|---|---|---|
| Year ended March 31, 2004 (as restated) | | | |
| Sales of product and services | $ 3,321,050 | $ 264,577,887 | $ 267,898,937 |
| Lease revenues | 51,253,518 | - | 51,253,518 |
| Fee and other income | 4,589,846 | 6,815,187 | 11,405,033 |
| Total revenues | 59,164,414 | 271,393,074 | 330,557,488 |
| Cost of sales | 2,822,985 | 233,460,365 | 236,283,350 |
| Direct lease costs | 10,560,586 | - | 10,560,586 |
| Selling, general and administrative expenses | 22,345,349 | 38,334,863 | 60,680,212 |
| Segment earnings | 23,435,494 | (402,154) | 23,033,340 |
| Interest and financing costs | 6,707,061 | 187,723 | 6,894,784 |
| Earnings before income taxes | $ 16,728,433 | $ (589,877) | $ 16,138,556 |
| Assets | $ 237,510,312 | $ 55,570,227 | $ 293,080,539 |
| Year ended March 31, 2005 (as restated) | | | |
| Sales of product and services | $ 3,738,045 | $ 477,232,037 | $ 480,970,082 |
| Lease revenues | 46,343,797 | - | 46,343,797 |

| | | | |
|---|---|---|---|
| Fee and other income | 872 | 170 | 48,484,643 |
| Total revenues | 52,553,714 | 523,244,808 | 575,798,522 |
| Cost of sales | 3,633,824 | 429,204,364 | 432,838,188 |
| Direct lease costs | 11,444,821 | - | 11,444,821 |
| Selling, general and administrative expenses | 21,469,082 | 60,536,031 | 82,005,113 |
| Segment earnings | 16,005,987 | 33,504,413 | 49,510,400 |
| Interest and financing costs | 5,402,616 | 474,253 | 5,876,869 |
| Earnings before income taxes | $ 10,603,371 | $ 33,030,160 | $ 43,633,531 |
| Assets | $ 255,163,872 | $ 104,963,930 | $ 360,127,802 |

Year ended March 31, 2006

| | | | |
|---|---|---|---|
| Sales of product and services | $ 3,951,300 | $ 579,116,622 | $ 583,067,922 |
| Sales of leased equipment | 1,727,131 | - | 1,727,131 |
| Lease revenues | 49,160,555 | - | 49,160,555 |
| Fee and other income | 1,616,019 | 11,746,605 | 13,362,624 |
| Total revenues | 56,455,005 | 590,863,227 | 647,318,232 |
| Cost of sales | 5,598,250 | 521,058,325 | 526,656,575 |
| Direct lease costs | 16,695,143 | - | 16,695,143 |
| Selling, general and administrative expenses | 31,241,677 | 66,541,123 | 97,782,800 |
| Segment earnings | 2,919,935 | 3,263,779 | 6,183,714 |
| Interest and financing costs | 6,843,196 | 407,004 | 7,250,200 |
| Earnings (loss) before income taxes | $ (3,923,261) | $ 2,856,775 | $ (1,066,486) |
| Assets | $ 259,948,452 | $ 113,996,899 | $ 373,945,351 |

F-34

Table of Contents

**15. QUARTERLY DATA — RESTATED AND UNAUDITED**

Condensed quarterly financial information is as follows (amounts in thousands, except per share amounts).

| Year Ended March 31, 2005 | | | | | |
|---|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Annual Amount |
| **As Previously Reported** | | | | | |
| Sales | $ 91,969 | $ 138,065 | $133,729 | $117,207 | $480,970 |
| Total revenues | 106,698 | 153,186 | 147,650 | 168,265 | 575,799 |
| Cost of sales | 82,161 | 123,343 | 120,893 | 106,377 | 432,774 |
| Total costs and expenses | 103,012 | 149,702 | 144,912 | 135,167 | 532,793 |
| Earnings before provision for income taxes | 3,686 | 3,484 | 2,738 | 33,098 | 43,006 |
| Provision for income taxes | 1,511 | 1,428 | 1,123 | 13,656 | 17,718 |
| Net earnings | 2,175 | 2,055 | 1,616 | 19,442 | 25,288 |
| Net earnings per common share—Basic | $ 0.24 | $ 0.23 | $ 0.18 | $ 2.21 | $ 2.84 |
| Net earnings per common share—Diluted | $ 0.23 | $ 0.22 | $ 0.17 | $ 2.06 | $ 2.68 |
| **Adjustments** | | | | | |
| Sales | $ - | $ - | $ - | $ - | $ - |
| Total revenues | - | - | - | | - |
| Cost of sales | - | - | - | 64 | 64 |
| Total costs and expenses | (886) | 34 | 164 | 60 | (628) |
| Earnings (loss) before provision for income taxes | 886 | (34) | (164) | (60) | 628 |
| Provision for (benefit from) income taxes | 306 | (12) | (64) | (20) | 210 |
| Net earnings (loss) | 580 | (22) | (100) | (40) | 418 |
| Net earnings (loss) per common share—Basic | $ 0.07 | $ - | $ (0.01) | $ - | $ 0.05 |
| Net earnings (loss) per common share—Diluted | $ 0.06 | $ - | $ (0.01) | $ - | $ 0.05 |
| **As Restated** | | | | | |
| Sales | $ 91,969 | $ 138,065 | $133,729 | $117,207 | $480,970 |
| Total revenues | 106,698 | 153,186 | 147,650 | 168,265 | 575,799 |
| Cost of sales | 82,161 | 123,343 | 120,893 | 106,441 | 432,838 |
| Total costs and expenses | 102,126 | 149,736 | 145,076 | 135,227 | 532,165 |
| Earnings before provision for income taxes | 4,572 | 3,450 | 2,574 | 33,038 | 43,634 |
| Provision for income taxes | 1,817 | 1,416 | 1,059 | 13,636 | 17,928 |
| Net earnings | 2,755 | 2,033 | 1,516 | 19,402 | 25,706 |
| Net earnings per common share—Basic | $ 0.31 | $ 0.23 | $ 0.17 | $ 2.21 | $ 2.89 |
| Net earnings per common share—Diluted | $ 0.29 | $ 0.22 | $ 0.16 | $ 2.06 | $ 2.73 |

F-35

Table of Contents

| Year Ended March 31, 2006 | | |
|---|---|---|
| | First Quarter | Second Quarter |
| | | Third Quarter |
| **As Previously Reported** | | |
| Sales | $ 134,870 | $ 159,409 | $ 146,385 |
| Total revenues | 149,804 | 174,243 | 163,073 |
| Cost of sales | 122,107 | 143,742 | 131,734 |
| Total costs and expenses | 147,624 | 171,018 | 161,037 |
| Earnings before provision for income taxes | 2,180 | 3,225 | 2,036 |

| | | | | | |
|---|---:|---|---:|---|---:|
| Provision for income taxes | | | | 1,306 | 628 |
| Net earnings | 1,297 | | 1,919 | | 1,211 |
| Net earnings per common share—Basic | $ 0.15 | $ | 0.23 | $ | 0.15 |
| Net earnings per common share—Diluted | $ 0.14 | $ | 0.21 | $ | 0.14 |
| | | | | | |
| **Adjustments** | | | | | |
| Sales | $ - | $ | - | $ | - |
| Total revenues | - | | - | | - |
| Cost of sales | - | | - | | - |
| Total costs and expenses | (5) | | 278 | | 220 |
| Earnings (loss) before provision for income taxes | 5 | | (278) | | (220) |
| Provision for (benefit from) income taxes | 2 | | (108) | | (84) |
| Net earnings (loss) | 3 | | (170) | | (136) |
| Net loss per common share—Basic | $ - | $ | (0.02) | $ | (0.02) |
| Net loss per common share—Diluted | $ - | $ | (0.02) | $ | (0.02) |

**Year Ended March 31, 2006**

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Annual Amount |
|---|---:|---:|---:|---:|---:|
| | As Restated | As Restated | As Restated | | |
| Sales | $ 134,870 | $ 159,409 | $ 146,385 | $ 144,131 | 584,795 |
| Total revenues | 149,804 | 174,243 | 163,073 | 160,198 | 647,318 |
| Cost of sales | 122,107 | 143,742 | 131,734 | 129,074 | 526,657 |
| Total costs and expenses | 147,619 | 171,296 | 161,257 | 168,213 | 648,385 |
| Earnings (loss) before provision for income taxes | 2,185 | 2,947 | 1,816 | (8,014) | (1,066) |
| Provision for (benefit from) income taxes | 885 | 1,198 | 741 | (3,369) | (545) |
| Net earnings (loss) | 1,300 | 1,749 | 1,075 | (4,645) | (521) |
| Net earnings (loss) per common share—Basic | $ 0.15 | $ 0.21 | $ 0.13 | $ (0.58) | $ (0.06) |
| Net earnings (loss) per common share—Diluted | $ 0.14 | $ 0.19 | $ 0.12 | $ (0.54) | $ (0.06) |

F-36

Table of Contents

| | Year Ended March 31, 2005 | | | |
|---|---:|---:|---:|---:|
| | June 30, 2004 | September 30, 2004 | December 31, 2004 | March 31, 2005 |
| **As Previously Reported** | | | | |
| Assets: | | | | |
| Cash and cash equivalents | $ 8,756 | $ 14,108 | $ 18,687 | $ 38,852 |
| Accounts receivable—net | 70,488 | 99,211 | 109,254 | 93,555 |
| Notes receivable | 86 | 350 | 144 | 115 |
| Inventories | 3,591 | 5,865 | 3,760 | 2,117 |
| Investment in leases and leased equipment—net | 180,510 | 198,733 | 183,816 | 189,469 |
| Other assets | 36,215 | 35,428 | 38,673 | 36,633 |
| Total assets | $ 299,646 | $ 353,695 | $ 354,334 | $ 360,741 |
| | | | | |
| Liabilities: | | | | |
| Accounts payable | $ 51,312 | $ 78,508 | $ 64,968 | $ 64,298 |
| Salaries and commissions payable | 483 | 1,022 | 1,111 | 771 |
| Recourse notes payable | 2,404 | 18,005 | 16,128 | 6,265 |
| Non-recourse notes payable | 103,848 | 109,382 | 125,186 | 114,839 |
| Other liabilities | 28,240 | 31,117 | 29,671 | 42,466 |
| Total liabilities | 186,287 | 238,034 | 237,064 | 228,639 |
| Stockholders' equity | 113,359 | 115,661 | 117,270 | 132,102 |
| Total liabilities and stockholders' equity | $ 299,646 | $ 353,695 | $ 354,334 | $ 360,741 |
| | | | | |
| **Adjustments** | | | | |
| Assets: | | | | |
| Cash and cash equivalents | $ - | $ - | $ - | $ - |
| Accounts receivable—net | - | - | - | - |
| Notes receivable | - | - | - | - |
| Inventories | - | - | - | - |
| Investment in leases and leased equipment—net | (1,214) | (1,120) | (1,100) | (613) |
| Other assets | - | - | - | - |
| Total assets | $ (1,214) | $ (1,120) | $ (1,100) | $ (613) |
| | | | | |
| Liabilities: | | | | |
| Accounts payable | $ (4,880) | $ (7,211) | $ (7,187) | $ (8,799) |
| Salaries and commissions payable | - | - | - | - |
| Recourse notes payable | - | - | - | - |
| Non-recourse notes payable | - | - | - | - |
| Other liabilities | 2,393 | 4,847 | 4,811 | 6,962 |
| Total liabilities | (2,487) | (2,364) | (2,376) | (1,837) |
| Stockholders' equity | 1,273 | 1,244 | 1,276 | 1,224 |
| Total liabilities and stockholders' equity | $ (1,214) | $ (1,120) | $ (1,100) | $ (613) |
| | | | | |
| **As Restated** | | | | |
| Assets: | | | | |
| Cash and cash equivalents | $ 8,756 | $ 14,108 | $ 18,687 | $ 38,852 |
| Accounts receivable—net | 70,488 | 99,211 | 109,254 | 93,555 |
| Notes receivable | 86 | 350 | 144 | 115 |

| | | | | |
|---|---:|---:|---:|---:|
| Inventories | 1,991 | 2,665 | 3,763 | 2,117 |
| Investment in leases and leased equipment—net | 179,296 | 197,613 | 182,716 | 188,856 |
| Other assets | 36,215 | 35,428 | 38,673 | 36,633 |
| Total assets | $ 298,432 | $ 352,575 | $ 353,234 | $ 360,128 |
| | | | | |
| Liabilities: | | | | |
| Accounts payable | $ 46,432 | $ 71,297 | $ 57,781 | $ 55,499 |
| Salaries and commissions payable | 483 | 1,022 | 1,111 | 771 |
| Recourse notes payable | 2,404 | 18,005 | 16,128 | 6,265 |
| Non-recourse notes payable | 103,848 | 109,382 | 125,186 | 114,839 |
| Other liabilities | 30,633 | 35,964 | 34,482 | 49,428 |
| Total liabilities | 183,800 | 235,670 | 234,688 | 226,802 |
| Stockholders' equity | 114,632 | 116,905 | 118,546 | 133,326 |
| Total liabilities and stockholders' equity | $ 298,432 | $ 352,575 | $ 353,234 | $ 360,128 |

F-37

Table of Contents

| | Year Ended March 31, 2006 | | |
|---|---:|---:|---:|
| | June 30, 2005 | September 30, 2005 | December 31, 2005 |
| **As Previously Reported** | | | |
| Assets: | | | |
| Cash and cash equivalents | $ 22,233 | $ 15,875 | $ 17,416 |
| Accounts receivable—net | 106,434 | 121,618 | 120,003 |
| Notes receivable | 346 | 87 | 151 |
| Inventories | 2,966 | 3,905 | 3,672 |
| Investment in leases and leased equipment—net | 196,412 | 208,627 | 205,819 |
| Other assets | 35,966 | 36,134 | 35,796 |
| Total assets | $ 364,357 | $ 386,246 | $ 382,857 |
| | | | |
| Liabilities: | | | |
| Accounts payable | $ 76,524 | $ 69,549 | $ 79,567 |
| Salaries and commissions payable | 655 | 3,542 | 4,728 |
| Recourse notes payable | 6,413 | 27,309 | 7,000 |
| Non-recourse notes payable | 116,964 | 125,002 | 134,411 |
| Other liabilities | 30,999 | 27,375 | 26,025 |
| Total liabilities | 231,555 | 252,777 | 251,731 |
| Stockholders' equity | 132,802 | 133,469 | 131,126 |
| Total liabilities and stockholders' equity | $ 364,357 | $ 386,246 | $ 382,857 |
| | | | |
| **Adjustments** | | | |
| Assets: | | | |
| Cash and cash equivalents | $ - | $ - | $ - |
| Accounts receivable—net | - | - | - |
| Notes receivable | - | - | - |
| Inventories | - | - | - |
| Investment in leases and leased equipment—net | (607) | (465) | (514) |
| Other assets | - | - | - |
| Total assets | $ (607) | $ (465) | $ (514) |
| | | | |
| Liabilities: | | | |
| Accounts payable | $ (7,504) | $ (4,974) | $ (6,492) |
| Salaries and commissions payable | - | - | - |
| Recourse notes payable | - | - | - |
| Non-recourse notes payable | - | - | - |
| Other liabilities | 5,683 | 3,232 | 4,649 |
| Total liabilities | (1,821) | (1,742) | (1,843) |
| Stockholders' equity | 1,214 | 1,277 | 1,329 |
| Total liabilities and stockholders' equity | $ (607) | $ (465) | $ (514) |

| | Year Ended March 31, 2006 | | | |
|---|---:|---:|---:|---:|
| | June 30, 2005 As Restated | September 30, 2005 As Restated | December 31, 2005 As Restated | March 31, 2006 |
| Assets: | | | | |
| Cash and cash equivalents | $ 22,233 | $ 15,875 | $ 17,416 | $ 20,697 |
| Accounts receivable—net | 106,434 | 121,618 | 120,003 | 103,060 |
| Notes receivable | 346 | 87 | 151 | 330 |
| Inventories | 2,966 | 3,905 | 3,672 | 2,292 |
| Investment in leases and leased equipment—net | 195,805 | 208,162 | 205,305 | 205,774 |
| Other assets | 35,966 | 36,134 | 35,796 | 41,792 |
| Total assets | $ 363,750 | $ 385,781 | $ 382,343 | $ 373,945 |
| | | | | |
| Liabilities: | | | | |
| Accounts payable | $ 69,020 | $ 64,575 | $ 73,075 | $ 73,657 |
| Salaries and commissions payable | 655 | 3,542 | 4,728 | 4,124 |
| Recourse notes payable | 6,413 | 27,309 | 7,000 | 6,000 |
| Non-recourse notes payable | 116,964 | 125,002 | 134,411 | 127,973 |
| Other liabilities | 36,682 | 30,607 | 30,674 | 33,615 |
| Total liabilities | 229,734 | 251,035 | 249,888 | 245,369 |
| Stockholders' equity | 134,016 | 134,746 | 132,455 | 128,576 |

*Table of Contents*

## 16. LEGAL SETTLEMENT

On February 7, 2005, Ariba, Inc. was found liable by a jury for willfully infringing three U.S. patents held by us. On February 12, 2005, we settled the patent-infringement suit through a mutual settlement and license agreement (the Settlement Agreement"). The Settlement Agreement provided that we receive, by March 31, 2005, a total of $37.0 million for the license of our patents. We have no future obligations under the Settlement Agreement. The following table shows the line items on the Consolidated Statement of Operations that were impacted by the settlement in the quarter ended March 31, 2005:

| | |
|---|---:|
| Fee and other income | $ 37,000,000 |
| Professional and other fees | (3,060,792) |
| Salaries and benefits | (908,000) |
| Net amount realized before income taxes | $ 33,031,208 |

The salaries and benefits costs were due to performance bonuses awarded to employees as a result of the settlement proceedings.

## 17. ACQUISITION

On May 28, 2004, we purchased certain assets and assumed certain liabilities of Manchester Technologies, Inc. for total consideration of $7.0 million. The purchase was made by *e*Plus Technology, inc., a wholly-owned subsidiary of *e*Plus inc. The purchase price included $5.0 million in cash and the assumption of certain liabilities of approximately $2.0 million. Approximately 125 former Manchester Technologies, Inc. personnel were hired by us as part of the transaction and are located in three established offices in metropolitan New York, South Florida and Baltimore.

The acquisition is being accounted for using the purchases method of accounting in accordance with SFAS No. 141, *"Business Combinations"* whereby the total cost of the acquisition has been allocated to tangible and intangible assets acquired and the liabilities assumed based upon their fair values at the effective date of the acquisition. During the quarter ended March 31, 2005, the allocation was completed. The following table summarizes the estimated fair values of the assets acquired and liabilities assumed at the date of acquisition (in thousands):

| | |
|---|---:|
| Accounts receivable | $ 939 |
| Property and equipment | 91 |
| Other assets | 41 |
| Other assets—intangible | 94 |
| Goodwill | 5,882 |
| Accrued expenses and other liabilities | (2,047) |
| Cash paid | $ 5,000 |

## 18. SUBSEQUENT EVENT

Effective at the opening of business on July 20, 2007, our common stock was delisted from The Nasdaq Global Market due to non-compliance with financial statement reporting requirements. Specifically, in determining to delist our common stock, Nasdaq cited the delay of more than one year from the final due date for the filing of our fiscal year 2006 Annual Report on Form 10-K with the SEC. In order for us to be eligible to be relisted on Nasdaq, all requisite periodic reports must be filed with the SEC, including: this Form 10-K; the three Forms 10-Q for the quarters ended June 30, 2006, September 30, 2006 and December 31, 2006; the fiscal year 2007 Form 10-K; and the Form 10-Q for the quarter ended June 30, 2007.

EXHIBIT 21

Subsidiaries of *e*Plus

*e*Plus Group, inc., a Commonwealth of Virginia corporation, a wholly-owned subsidiary

*e*Plus Technology, inc., a Commonwealth of Virginia corporation, a wholly-owned subsidiary

*e*Plus Government, inc., a Commonwealth of Virginia corporation, a wholly-owned subsidiary

*e*Plus Capital, inc., a Commonwealth of Virginia corporation, a wholly-owned subsidiary

*e*Plus Content Services, inc., a Commonwealth of Virginia corporation, a wholly-owned subsidiary

*e*Plus Systems, inc., a Commonwealth of Virginia corporation, a wholly-owned subsidiary

*e*Plus Canada Company, registered in Canada, a wholly-owned subsidiary of *e*Plus Capital, inc.

*e*Plus Document Systems, inc., a Commonwealth of Virginia corporation, a wholly-owned subsidiary

*e*Plus Information Holdings, inc., a Commonwealth of Virginia corporation, a wholly-owned subsidiary of *e*Plus Technology, inc.

*e*Plus Government Services, inc., a Commonwealth of Virginia corporation, a wholly-owned subsidiary

*e*Plus Jamaica, inc., a Commonwealth of Virginia corporation, a wholly-owned subsidiary of *e*Plus Group, inc.

*e*Plus Iceland, inc., a Commonwealth of Virginia corporation, a wholly-owned subsidiary of *e*Plus Group, inc.

**CERTIFICATION**

I, Phillip G. Norton, certify that:

1. I have reviewed this annual report on Form 10-K of *e*Plus inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 15, 2007

 /s/ PHILLIP G. NORTON
Phillip G. Norton
Chief Executive Officer

EXHIBIT 31.2

**CERTIFICATION**

I, Steven J. Mencarini, certify that:

1.  I have reviewed this annual report on Form 10-K of *e*Plus inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 15, 2007

  /s/ STEVEN J. MENCARINI
Steven J. Mencarini
Chief Financial Officer

**CERTIFICATION**
**PURSUANT TO 18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO SECTION 906 OF THE**
**SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of *e*Plus inc. on Form 10-K for the year ended March 31, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), we, Phillip G. Norton and Steven J. Mencarini, Chief Executive Officer and Chief Financial Officer, respectively, hereby certify, pursuant to 18 U.S.C. section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that to our best knowledge and belief:

(a) the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(b) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of *e*Plus.

Dated: August 15, 2007

 /s/ PHILLIP G. NORTON
Phillip G. Norton
Chief Executive Officer

 /s/ STEVEN J. MENCARINI
Steven J. Mencarini
Chief Financial Officer

EXHIBIT 2

1

FORM 10-K

SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

{ X } ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934
For the fiscal year ended March 31, 1998
--------------

OR

{ } TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the transition period from        to       .
------    ------

Commission file number: 0-28926
-------

MLC HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

Delaware                        54-1817218
--------                        ----------
(State or other jurisdiction of    (I.R.S. Employer
incorporation or organization)    Identification No.)

11150 SUNSET HILLS RD., SUITE 110, RESTON, VA 20190-5321
-------------------------------------------------------
(Address, including zip code, of principal offices)

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (703) 834-5710
--------------

Securities registered pursuant to Section 12(b) of the Act:
Title of each class        Name of each exchange on which registered
None
----

Securities registered pursuant to Section 12(g) of the Act:
COMMON STOCK, $0.01 PAR VALUE
-----------------------------

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days. Yes { X } No {  }

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. { X }

The aggregate market value of the voting stock held by non-affiliates of the

Company, computed by reference to the price at which the stock was sold as of June 17, 1998 was $28,294,718.

     The number of shares of Common Stock outstanding as of June 17, 1998, was 6,082,005.

2

### DOCUMENTS INCORPORATED BY REFERENCE

The following documents are incorporated by reference into the following parts
of this Form 10-K:

| Document | Part |
| --- | --- |
| Portions of the Company's definitive Proxy Statement to be filed with the Securities and Exchange Commission within 120 days after the Company's fiscal year end. | Part III |

2

3

PART I

ITEM 1.  BUSINESS

THE COMPANY

MLC Holdings, Inc. ("MLC Holdings" or the "Company") was formed in 1996 and is a Delaware corporation which, pursuant to a reorganization effected September 1, 1996, serves as the holding company for MLC Group, Inc. ("MLC Group") and other subsidiaries. All references to the "Company" shall be deemed to include and refer to MLC Holdings and its subsidiaries, including MLC Group. The Company engages in no other business other than serving as the parent holding company for MLC Group, MLC Network Solutions, Inc., ("MLC Network Solutions"), MLC Federal, Inc., MLC Capital, Inc., MLC Integrated, Inc. ("MLCI", formerly known as Educational Computer Concepts, Inc. or "ECCI") and MLC Leasing, S.A. de C.V., (a wholly owned subsidiary of MLC Group and MLC Network Solutions, based in Mexico City, Mexico). MLC/GATX Leasing Corporation is a 50% owned investment of MLC Group. MLC Group has a 5% membership interest in MLC/CLC LLC and serves as its manager. Both MLC Capital, Inc. and MLC Leasing, S.A. de C.V. did not conduct any business during the year ended March 31, 1998.

On July 24, 1997, the Company, through a new wholly owned subsidiary, MLC Network Solutions which was incorporated on July 14, 1997, entered into an Agreement and Plan of Merger with Compuventures. Compuventures was merged into MLC Network Solutions effective July 24, 1997. The outstanding shares of Compuventures Common Stock were converted into 260,978 shares, valued at $3,384,564, of MLC Holdings Common Stock. Compuventures is a value-added reseller of PC's and related network equipment and software products and provides various support services to its customers from facilities located in Greenville, Raleigh and Wilmington, North Carolina. The merger was accounted for as a pooling of interests.

MLCI was acquired on September 29, 1997 through the merger of MLC Acquisitions Corporation, a newly formed corporation wholly owned by MLC Holdings, which was incorporated on September 2, 1997, into ECCI with ECCI being the surviving entity and being renamed MLC Integrated, Inc. MLCI currently conducts a network services and software and PC reselling business from its sole location in Pottstown, Pennsylvania. MLC Holdings effectively exchanged 498,998 shares of its Common Stock, valued at $7,092,000, for all of the outstanding stock of ECCI. This transaction was also accounted for as a pooling of interests.

MLC Federal, Inc. was incorporated on September 17, 1997 to handle business servicing the Federal government marketplace.

On October 22, 1997, the Company formed MLC Leasing, S.A. de C.V., a wholly owned subsidiary of MLC Group and MLC Network Solutions based in Mexico City, Mexico. To date, no business has been conducted through the subsidiary.

The Company's principal executive office is located at 11150 Sunset Hills Road, Suite 110, Reston, Virginia 20190-5321 and its telephone number at such address is (703) 834-5710. The Company's 179 full time and 11 part time employees operate through fourteen offices, including

3

4

its principal executive offices and regional sales offices which are located in the following metropolitan and suburban areas: Pottstown and West Chester, Pennsylvania (both are Philadelphia suburban locations); Dallas and Austin, Texas; Sacramento and San Diego California; Greenville, Wilmington and Raleigh (2 offices), North Carolina; Richmond, Virginia; Pittsburgh, Pennsylvania; and Atlanta, Georgia. The Company also has an arrangement with an independent contractor who works primarily for the Company from Columbus, Ohio.

GENERAL

The Company specializes in leasing and financing information technology assets, providing network services, software and PCs, providing system design and upgrades, hardware maintenance, on-site technical support, relocation services and providing asset management services to commercial customers with annual sales revenue of between $10 million and $500 million ("middle market customers"), select Fortune 1000 firms, federal, state and local governments and vendors. The assets leased or sold by the Company include personal computers and peripherals, client server systems, networks, mid-range and mainframe computer equipment, telecommunications equipment and software. The Company also leases and finances equipment, software and services through relationships with vendors, equipment manufacturers and systems integrators. MLC Network Solutions and MLCI were acquired to provide a wide range of information technology ("IT") services and solutions to middle market organizations. The Company offers its clients a single source for a comprehensive range of services, including procurement of software, PC and communication equipment, desktop systems maintenance and support, strategic planning and management consulting, integration and installation of IT systems, training and continuing education. The Company will focus on marketing its comprehensive IT offerings to middle market organizations, which typically spend from $250 thousand to $25 million annually on their IT needs. The IT service industry has evolved into a highly fragmented environment with a small number of large, national service providers and a large number of small- and medium-sized service providers, usually with a regional focus. Large IT service providers typically address the IT needs of large organizations with substantial IT requirements for a wide range of services, whereas smaller IT service firms provide specialized services of limited scope. Consequently, middle market organizations rely on multiple, often specialized, smaller IT service providers to help implement and manage their systems. The Company believes that a single-source IT service provider will help middle market organizations reduce cost and management complexity and increase the quality and compatibility of IT solutions. As part of its strategy, the Company intends to leverage its high-level services to foster long-term relationships with clients and to implement technology strategies in order to achieve the clients' desired IT solutions. The Company also believes it can increase its revenues from existing clients by cross-selling its services. Another key element of the Company's strategy is the expansion of service offerings and the addition of new businesses in order to offer new and existing clients access to a more complete range of services. The Company also will operate with a decentralized management structure to provide focus on superior client service and foster a motivating environment for its various subsidiaries, and will seek to acquire additional companies to strengthen its core competencies, to offer complementary services and to facilitate its expansion into new regions.

The Company seeks to differentiate itself from its competitors by offering its customers asset management services and asset trading capabilities, which may be customized to meet the client's desires. The Company believes that its ability and willingness to personalize its relationships and customize its services to meet the specific financial and managerial needs of

4

5

each customer enable it to compete effectively against larger equipment leasing and finance companies. The Company further believes that, by providing asset management services and asset trading capabilities as well as other services to its customers, it has a competitive advantage over smaller competitors which lack the resources and expertise to provide such services.

The Company's asset trading activity involves the purchase and resale of previously owned information technology equipment. By offering asset trading capabilities, the Company is able to develop and maintain knowledge of current market trends and values which enables the Company to predict more accurately residual values when pricing leasing transactions, dispose efficiently of off-lease equipment and offer customers a way to dispose of or acquire previously owned information technology equipment. Asset management services, which are offered primarily to enhance customer service, is a general term used to describe the provision of asset inventory and tracking services, software and record keeping programs to customers. The asset management services provided by the Company allow the customers to better track their information technology assets. The asset management services include a software system maintained by the Company which generates reports and allows customers to dial up and receive information on a real time basis, thus better utilizing their assets.

The Company, for the fiscal year ended March 31, 1998, had two significant relationships. The loss of either of these two relationships would have a material effect to the future results of the organization. The first is a lease customer, Sprint Communications Company and Affiliates, which represented approximately 37% of the lease volume generated for the year ended March 31, 1998. This represents the largest single lessee of the Company. The second significant relationship is with MLC/CLC, LLC, of which Cargill Leasing Corporation owns 95% and the Company owns the remaining 5%. The Company sold approximately $44.8 million of commercial lease volume to the equity joint venture entity.

The Company's management team is led by Phillip G. Norton, Chairman of the Board, President, and Chief Executive Officer, Bruce M. Bowen, founder of the Company, a Director and Executive Vice President, Thomas B. Howard, Jr., Vice President and Chief Operating Officer, Steven J. Mencarini, Senior Vice President and Chief Financial Officer, and Kleyton L. Parkhurst, Secretary and Treasurer, each of whom has extensive experience in the leasing and finance industries.

INDUSTRY OVERVIEW

The Company believes that its market is undergoing rapid changes and expansion which present significant opportunities for growth. The primary structural changes in the market are the result of customer end-users, technology and vendor distribution and marketing trends.

Customer End-Users -- Commercial. The equipment leasing industry in the United States is a significant factor in financing capital expenditures of businesses. According to research by the Equipment Leasing Association of America ("ELA"), using United States Department of Commerce data, approximately $180 billion of the $593 billion of business investment in equipment in 1997 was acquired through leasing. The ELA estimates that 80% of all U.S. businesses use leasing or financing to acquire capital assets.

Leasing enables a company to obtain the equipment it needs, while preserving cash flow and receiving favorable accounting and tax treatment. Leasing, particularly through operating leases,

5

6

also provides a lessee with greater flexibility than ownership in the event it outgrows the equipment or requires upgrades of its equipment to higher performance levels. As more customers become aware of the economic benefits of leasing, they often turn to independent leasing companies. Independent lessors, such as the Company, offer tailored financing and can deliver financing for mixed systems from different vendors.

Management believes the fastest growing market segment of the leasing industry is information technology leasing. These assets include computers, telecommunication equipment, software, integration services and client server equipment.

Customer End-Users - Government. The Company believes that state and local governments have realized that information technology can provide tremendous gains in productivity and a decrease in overall costs. However, state and local governments are increasingly limited by budgetary constraints in their efforts to acquire goods and services; therefore, leasing is more favorable since it allows the immediate use of the asset while the cost is incurred over the asset's useful life. Moreover, leasing may facilitate the timely acquisition of equipment when compared to the lengthy process and many levels of approval necessary for bond referendums. An additional obstacle facing state and local governments in the upcoming years is the shift in program responsibility from the federal government to the state and local governments. The Company believes that this shift will require more information technology investment by state and local governments.

Technology Trends. A major trend toward using client server networks in corporate applications began in the late 1980s. This trend was driven by the proliferation of personal computers as personal computers changed from stand-alone units which accommodated one or two specialized functions to a multi-application unit and the development of networking applications that distribute computer power to the desktop. Client server computing provides an alternative to the highly centralized, mainframe and mini-computer systems that connect multiple terminals to a central processor and which were the mainstay of the computing world until this decade. The transition from the mainframe to the personal computer has enabled smaller corporations to utilize more extensively information technology and telecommunications equipment in the operation of their businesses. In addition, as technology increasingly changes, companies are more frequently acquiring and upgrading information technology and telecommunications equipment.

Vendor Distribution and Marketing. As hardware manufacturers face increasing competition, many manufacturers have sought greater control over their installed equipment base, and have entered into joint ventures with third-party financing sources to provide captive financing services. Under these arrangements, the third-party financing source (such as the Company) provide various levels of origination, administrative, servicing, and remarketing services, to complement or to replace a vendor's sales, marketing, administrative, or financing capabilities. The Company believes it has developed a vendor model which satisfies the new requirements of equipment vendors while providing an opportunity to earn a satisfactory return on the vendor's business. In addition, the Company can originate and control its own portfolio of non-vendor equipment leases using the vendor-program origination infrastructure, and such portfolio will remain the property of the Company and outside the scope of the vendor model.

6

*Filing Date: 03/31/98*

7

## STRATEGY

Based on industry trends and the Company's historical results, the Company will continue to implement and improve upon a three-pronged strategy designed to increase its customer base by: (i) providing continuing superior customer service while marketing to middle market and select Fortune 1000 end-users of information technology equipment and assets; (ii) purchasing companies or assets of companies in key regional markets with pre-existing customer bases; and (iii) further developing vendor leasing programs. Through its marketing strategy, the Company emphasizes cross selling to the different groups of clients and attempts to reach the maximum number of potential end-users.

While the Company is pursuing and intends to continue to pursue the forgoing strategies, there can be no assurance that the Company will be able to successfully implement such strategies. The Company's ability to implement these strategies may be limited by a number of factors.

End-User Marketing Focus. The Company's target customers include middle market and select Fortune 1000 firms which are significant users of information technology and telecommunications equipment and other assets, which also may need other services provided by the Company, such as asset management. By targeting a potential customer base that is broader than just the Fortune 1000 companies, the Company believes that there is less competition from the larger equipment finance companies, as their marketing forces are typically more focused on Fortune 1000 customers. The ability to identify and establish customer relationships with such firms will be critical to the Company's strategy. There can be no assurance that the Company will be able to successfully locate such customers.

Acquisition of Related Companies. The Company believes that significant opportunities to expand its target customer base in key regional markets can be realized through the acquisition of strategically selected companies in related lines of business. The Company's acquisition strategy will focus on acquiring new customers in the top 50 regional markets in the country. The Company believes that it can successfully acquire companies and maintain and expand customer relationships by providing acquired companies with a lower cost of capital, additional cross-selling opportunities and financial structuring expertise. In addition, the Company can provide the owners of privately-held companies with an opportunity to realize their company's value. The Company believes that decentralized marketing and centralized operations, along with other operating synergies, will make it successful in lowering the operational costs while expanding the customer base of each firm it acquires. The ability to identify and acquire such firms on prices and terms that are attractive to the Company and which avoid dilution of earnings for existing stockholders is crucial to the successful implementation of this strategy. In addition, after consummating any acquisition, the Company must be able to successfully integrate the acquired business with the Company to achieve the cost savings and marketing benefits sought by the Company. There is, however, no assurance that the Company will be able to successfully acquire such companies, or, if acquired, successfully implement the foregoing strategy.

Vendor Focus. Over the last several years, major manufacturers of information technology and telecommunications equipment have moved away from providing financing to end-user customers through captive finance organizations and have increasingly joint ventured their equipment financing function to independent leasing companies and financing companies. From the perspective of the large end-user of information technology and telecommunications equipment, outsourcing equipment financing can simplify and centralize the financing of

Filing Date: 03/31/98

7

8

multiple products from different vendors, particularly as most captive finance organizations will service only their manufacturer's products. Through its participation in vendor marketing programs, the Company leverages its marketing efforts by utilizing the sales force of the vendor. The vendor's sales organization provides the Company access to an extensive and diversified end-user customer base while saving the Company the cost of establishing these independent customer relationships. The Company uses its relationships with these vendors and end-users to create new customer relationships to which other products and services of the Company can be marketed directly. The ability to successfully establish such vendor and end-user relationships is essential to the successful implementation of this strategy.

LEASING, FINANCING AND SALES ACTIVITIES

The Company is in the business of selling, leasing and financing equipment and assets. Although the majority of the transactions are leases, the use of the phrase "lease," "leases," "leasing" or "financing" may refer to transactions involving: equipment leases; conditional sales contracts; installments purchase contracts; software and services contracts; municipal and federal government contracts; notes; operating leases; customer agreements; direct financial leases; receivables; factoring; tax exempt leases; true leases; leases with option to purchase; leases to purchase; vendor agreements; sales-type leases; leveraged leases; computer leases; capital leases; private label agreements; financing agreements; or energy management contracts.

Business Development. The Company conducts its business development efforts through its marketing staff of both employees and independent representatives which includes 57 individuals located in thirteen regional offices and the Company's principal executive office. The Company believes that one of its major strengths is its professional and dedicated sales organization and back office organization which gives it the ability to customize its programs to meet its customers' specific objectives.

Products and Services. The information technology and communications equipment that the Company presently purchases for lease or re-sale includes: (i) personal computers; (ii) laser printers; (iii) telecommunication controllers; (iv) tape and disk products; (v) file servers; (vi) mid-range computers; and (vii) mainframe computers. The software and services financed by the Company include off-the-shelf products and applications, database products, utilities and specific application products.

The services and support provided by the Company include: (i) custom lease and financing payment streams and structures; (ii) asset sales and trade-ins; (iii) upgrade and add-on leasing and financing; (iv) renewal and re-marketing; (v) personalized invoicing; (vi) network, acquisition and installation planning and (vii) asset management and reporting.

Lease Terms and Conditions. Substantially all of the Company's lease transactions are net leases with a specified non-cancelable lease term. These non-cancelable leases have a "hell-or-high-water" provision which requires the lessee to make all lease payments regardless of any lessee dissatisfaction with its equipment. A net lease requires the lessee to make the full lease payment and pay any other expenses associated with the use of equipment, such as maintenance, casualty and liability insurance, sales or use taxes and personal property taxes.

Re-marketing. In anticipation of the expiration of the initial term of a lease, the Company initiates the re-marketing process for the related equipment. The Company's goal is to maximize

8

9

revenues by: (i) re-marketing the equipment in place either by (a) re-leasing it
to the initial lessee, (b) renting on a month-to-month basis or (c) selling it
to the initial lessee; (ii) selling or leasing the equipment to a different
customer; or (iii) selling the equipment to equipment brokers or dealers. The
results of the re-marketing process significantly impact the degree of
profitability of a lease transaction. Procedures and obligations of the Company
and its vendors with respect to re-marketing are defined through the Company's
equipment purchase and re-marketing agreements with vendors. To assist the
Company in its re-marketing efforts, the Company sometimes provides incentives
to vendors and their sales personnel through payment of a re-marketing fee and a
sharing of residual profits where appropriate.

The re-marketing process is intended to enable the Company to recover its equity
investment in the re-marketed equipment (i.e., the purchase price of the
equipment, less the debt obtained to finance the purchase of such equipment) and
enables the Company to receive additional proceeds.

Numerous factors, many of which are beyond the control of the Company, may have
an impact on the Company's ability to re-lease or re-sell equipment on a timely
basis. Among the factors are general market conditions, regulatory changes,
variations in the supply or cost of comparable equipment and technological
improvements that lead to the risk of technological obsolescence. In particular,
the computer and telecommunications industries have been characterized by
significant and rapid technological advances. The equipment owned and leased by
the Company is subject to rapid technological obsolescence, which is typical of
information technology and telecommunications equipment. Furthermore, decreases
in the manufacturer's pricing for equipment may adversely affect the market
value of such equipment under lease. Changes in values or systems and components
may require the Company to liquidate its inventory of certain products at
significant markdowns and write down the residual value of its leased assets,
which may result in substantial losses. Further, the value of a particular used
piece of equipment may vary greatly depending upon its condition and the degree
to which any custom configuration of the equipment must be altered before reuse.

At the inception of each lease, the Company has historically estimated a
residual value for the leased equipment based on the terms of the related lease
and which will permit the transaction to be financed or sold by means of
external, generally nonrecourse, sources. This estimate is approved by the
Company's investment committee, which acts by a signature process instead of
conducting formal meetings. A decrease in the market value of such equipment at
a rate greater than the rate expected by the Company, whether due to rapid
technological obsolescence or other factors, would adversely affect the residual
values of such equipment. Any such loss which is considered by management to be
permanent in nature would be recognized in the period of impairment in
accordance with Statement of Financial Accounting Standard ("SFAS") No. 13,
"Accounting for Leases." Consequently, there can be no assurance that the
Company's estimated residual value for equipment will be realized.

PROCESS CONTROL AND ADMINISTRATIVE SYSTEMS

The Company has developed and maintains an administration system and controls,
featuring a series of checks and balances. The Company's system helps protect
against entering into lease transactions that may have undesirable economics or
unacceptable levels of risk, without impeding the flow of business activity or
preventing its sales organization from being creative and responsive to the
needs of vendors and customers.

9

10

Due in part to the Company's strategy of focusing on a few equipment categories, the Company generally has extensive product knowledge, historical re-marketing information and experience. This knowledge assists the Company in setting and adjusting, on a timely basis, the residual values it assumes on each lease financing. Prior to the Company entering into any lease agreement, each transaction is evaluated based on the Company's pre-determined standards in each of the following areas:

Residual Value. Residual value guidelines for the equipment leased by the Company are established and reviewed by the Company's investment committee, which also approves the residual value recorded for specific transactions. The investment committee typically acts by a signature process instead of conducting formal meetings. The investment committee also must approve the pricing, including residual values, for all transactions involving $100,000 or more in product value. The investment committee is composed of the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, and the Treasurer of the Company, and each person has various levels of signing and co-signing authorities.

Structure Review. Every transaction is reviewed by the Director of Contracts, and if necessary, one or more of the following persons: the Chief Operating Officer, the Chief Executive Officer, the Executive Vice President, and/or the Treasurer. The reviews are made to ensure that the transaction meets the minimum profit expectations of the Company and that the risks associated with any unusual aspects of the lease have been determined and factored into the economic analysis.

Documentation Review. Once the Company commits to a lease transaction, its contract administrators initiate a process of systematically preparing and gathering relevant lease information and lease documentation. The contract administrators are also responsible for monitoring the documentation through the Company's home office documentation and review process. Every transaction into which the Company enters is reviewed by the Director of Contracts of the Company and, if necessary, the Company's outside attorneys to identify any proposed lease modifications or other contractual provisions that may introduce risks in a transaction which the Company has not anticipated.

Credit Review. Every transaction into which the Company enters is reviewed by the Company's Senior Credit Analyst, Treasurer and Chief Operating Officer of the Company to determine whether the lease payment stream can be financed on a nonrecourse basis, or must be financed through partial or total recourse borrowing, and that the financial condition of the lessee meets the Company's credit standards.

FINANCING

The business in which the Company is engaged is a capital intensive business. The Company's business involves both the leasing and the financing of assets. The leasing business is characterized by ownership of the assets residing with the Company or its assigns. The financing business is characterized by the beneficial ownership of assets residing with the asset user or customer. Several different types of financing, each of which is described below, are important to the conduct of the Company's leasing and financing business.

10

11

The typical lease transaction requires both nonrecourse debt and an equity investment by the Company at the time the equipment is purchased. The typical financing transaction is dependent upon the nonrecourse financing described below. The Company's equity investment in the typical lease transaction generally ranges between 5% and 20% of the equipment cost (but sometimes ranges as high as 35%). The balance of the equipment cost, or the nonrecourse debt portion, is typically financed with a lender on a nonrecourse basis to the Company. The Company's equity investment must come from: (i) internally generated funds originated by proceeds from sale of securities or retained earnings (ii); equity investments from third parties (MLC/CLC LLC); or (iii) recourse borrowings. Accordingly, the Company's ability to successfully execute its business strategy and to sustain its growth is dependent, in part, on its ability to obtain each of the foregoing types of financing for both senior debt and equity investment.

Information relating to the sources of each of such sources of financing for equipment acquisitions are as follows:

Nonrecourse Financing. The credit standing of the Company's customers must be of such a quality as to allow the Company to finance most of its leasing or financing transactions on a nonrecourse basis. Under a nonrecourse loan, the Company borrows an amount equal to the committed lease payments under the financed lease, discounted at a fixed interest rate. The lender is entitled to receive the payments under the financed lease in repayment of the loan, and takes a security interest in the related equipment but has no recourse against the Company except for the specific items financed under each agreement. The Company retains ownership of such equipment, subject to the lender's security interest. The Company is not liable for the repayment of nonrecourse loans unless the Company breaches certain limited representations and warranties in the loan agreements. The lender assumes the credit risk of each such lease, and its only recourse, upon a default under a lease, is against the lessee and the equipment which is being leased thereunder.

Interest rates under this type of financing are negotiated on a transaction-by-transaction basis and reflect the financial condition of the lessee, the term of the lease and the amount of the loan. Effective January 1, 1997, the Company adopted SFAS No. 125, "Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities." This Standard was effective for transactions occurring after December 31, 1996, and establishes new criteria for determining whether a transfer of financial assets in exchange for cash or other consideration should be accounted for as a sale or as a pledge of collateral in a secured borrowing. Certain assignments of direct finance leases made on a nonrecourse basis by the Company after December 31, 1996 meet the criteria for surrender of control set forth by SFAS 125 and have therefore been treated as sales for financial statement purposes and the net proceeds less the book value of the asset surrendered are recorded net on the income statement. As the new pronouncement was not retroactive to transactions prior to this date, the current balance of outstanding nonrecourse borrowings represent transactions that did not qualify for this accounting treatment. As of March 31, 1998, the Company had aggregate outstanding nonrecourse borrowings of approximately $13 million.

The Company's objective is to enter into leasing or financing transactions with creditworthy customers whose credit standing will permit the Company to finance such leases with banks or other financial institutions on a nonrecourse basis to the Company. The Company's customers which do not have a credit rating of Baa or better generally are creditworthy non-rated

11

12

companies that may be publicly or privately owned. The Company has had success in meeting this objective in the past, but there is no assurance that banks or other financial institutions will be willing or able to continue to finance the Company's lease transactions on a nonrecourse basis, that the Company will continue to be able to attract customers that meet the credit standards for nonrecourse financing required by the Company's financing sources or that those standards will not change in the future.

The Company's personnel in charge of the financing function are responsible for maintaining a diversified list of qualified nonrecourse debt sources so that the financing of transactions is not impaired by a lack of competitively priced nonrecourse debt. The Company receives nonrecourse financing from many different sources, offering various terms and conditions. These debt sources include regional commercial banks, money-center banks, finance companies, insurance companies and financial intermediaries.

Government Financing. The Company also originates tax-exempt state and local lease transactions in which the interest income is exempted from federal income taxes, and to some degree, certain state income taxes. The Company assigns its tax-exempt leases to institutional investors, banks and investment banks which can utilize tax-free income, and has a number of such entities which regularly purchase the transactions.

Leasing Assignment Financing. Access to nonrecourse financing is also important to the Company's lease sales revenue and fee income. The Company enters into many transactions involving government leases which it immediately assigns, syndicates or sells, on a nonrecourse basis to third parties and books any gain from the transaction as sales or fee income.

The Company may utilize the public debt securities market in the future to provide a portion of the nonrecourse debt it requires. The Company believes that its utilization of the public debt securities markets is likely to reduce the Company's effective interest cost for its nonrecourse debt and to provide for a more efficient financing arrangement, than is presently provided by its existing financing arrangements, to fund its nonrecourse borrowing requirements. See "Item 7, Management's Discussion and Analysis of Results of Operations, Financial Condition, Liquidity and Capital Resources - Financial Condition, Liquidity and Capital Resources."

Equity Joint Ventures. Through MLC/CLC LLC, the Company has a formal joint venture arrangement with an institutional investor which provides the equity investment financing for certain of the Company's transactions. Cargill Leasing Corporation, an unaffiliated investor which owns 95% of MLC/CLC LLC, is a subsidiary of Cargill, Incorporated, a privately held business in Minnetonka, Minnesota. Cargill, Inc. has been reported by Forbes Magazine to be one of the largest privately owned companies in the United States. Cargill Leasing Corporation has been in the equipment leasing and financing business for over ten years. As privately held companies, neither Cargill, Inc. or Cargill Leasing Corporation makes financial information available to the public and neither company issues an annual report to the general public. Cargill, Inc. has released the following financial data for its fiscal year ended May, 1997 as reported in Forbes Magazine issue of December, 1997: sales were $56 billion, operating income was $3.2 billion and net income was $814 million. MLC/CLC LLC provided approximately $44.8 million of the Company's leased equipment sales of $50.4 million or 88.9% for the year ended March 31, 1998. For the year ended March 31, 1997, out of leased equipment sales of $21.6 million, MLC/CLC LLC represented $16.9 million or 78.2%. On June 4, 1998 Firstar Corporation and Cargill, Incorporated, jointly announced that they had signed a definitive agreement by which Firstar

Filing Date: 03/31/98

12

13

Corporation will purchase 100 percent of the common stock of Cargill Leasing Corporation. The transaction is expected to close in the third quarter of calendar 1998, subject to review and approval by the Office of the Comptroller of the Currency and the Federal Trade Commission. It is expected that Cargill Leasing Corporation will have assets of approximately $625 million at the closing. Firstar Corporation is a $20 billion bank holding company which is publicly traded on the NYSE under the symbol "FSR". For the fiscal year 1998, of the Company's total revenue, approximately 37.8% was attributable to sales of lease transactions to MLC/CLC LLC as compared to the prior year when the sales represented 19.6% of total revenue. Transactions involving the use or placement of equity from this joint venture require the consent of the relevant joint venture partner, and if financing from those sources were to be withheld or were to become unavailable, it would limit the amount of equity available to the Company and may have a material adverse effect upon the Company's business, financial condition and results of operations. At this point in time, the Company is unable to determine the effects of the planned acquisition of Cargill Leasing by Firstar Corporation.

Equity Capital and Internal Financing. Occasionally the Company finances leases and related equipment internally, rather than with financing provided by lenders. These internal lease financings typically occur in cases where the financed amounts, terms, collateral, or structures are not attractive to lenders, or where the credit rating of the lessee is not acceptable to lenders. The Company also temporarily finances selected leases internally, generally for less than 90 days, until outside nonrecourse financing is obtained. The amount of equity capital available is a major element in the amount of lease asset portfolio of which the Company can retain ownership on its balance sheet. The Company would prefer to expand its retained portfolio through generating the necessary financial resources to support the required lease equity investment that it currently obtains through the equity joint ventures. The additional capital resources may be obtained through alternative recourse and nonrecourse debt or a secondary stock and/or debt offering. The Company has no commitments for such financing and there is no assurance that the additional lease equity funds will be either available or realized.

Recourse Financing and Bank Lines of Credit. The Company relies on recourse borrowing in the form of revolving lines of credit for working capital to acquire equipment to be resold in its value added reseller businesses, trading operation and to acquire equipment for leases and, to a lesser extent, the Company uses recourse financing for long term financing of leases.

On June 5, 1997, the Company entered into a $15,000,000 committed recourse line of credit with First Union National Bank, N.A., successor by merger on April 28, 1998 to CoreStates Bank, N.A. (the "First Union Facility"). The facility was amended by Amendment No. 1, dated September 5, 1997, which increased the commitment from $15,000,000 to $25,000,000, and increased the sublimit for Eligible Leases with Investment Grade Leases to $15,000,000 from $10,000,000. The facility was further amended by Amendment No. 2 dated December 19, 1997 which incorporated participation in the line by Riggs Bank, N.A. and Bank Leumi USA each in the amount of $5,000,000, and extended the facility to December 19, 1998. The Company is currently in discussions with the bank to increase the line to $35,000,000, raise the inventory sublimit to $5,000,000 from $1,000,000, and extend the facility one year from the date of the amendment. Borrowings under the First Union Facility bear interest at LIBOR + 110 basis points, or, at the Company's option, Prime minus one percent. On June 10, 1997, the Company terminated its previous recourse line of credit with First Union Bank of Virginia, N.A. , repaid all amounts outstanding, and made its first borrowing under the First Union Facility in the

13

14

amount of $7,500,000. The First Union Facility is made to MLC Group and guaranteed by MLC Holdings. The First Union Facility is secured by certain of the Company's assets such as chattel paper (including leases), receivables, inventory, and equipment. The availability of the line is subject to a borrowing base which consists of inventory, receivables, purchased assets, and leases. As of March 31, 1998, the balance on the First Union Facility was $12,750,000. There can be no assurance that the Company will be able to renew, extend or replace this credit facility and a failure to renew, extend or replace the facility would have a material adverse effect upon the Company's business, financial condition and results of operations.

The Company's newly acquired subsidiaries, MLC Network Solutions (acquired July 24, 1997) and MLCI (acquired September 29, 1997), both have separate credit sources to finance their working capital requirements for inventories and accounts receivable, which the Company has guaranteed. Their traditional business as value-added resellers of PC's and related network equipment and software products is financed through agreements known as "floor planning" financing where interest expense for the first thirty days is charged to the supplier/distributor but not the reseller. These floor plan liabilities are recorded under accounts payable as they are normally repaid within the 30 day time frame as they represent an assigned accounts payable originally generated with the supplier/distributor. If the 30 day obligation is not timely liquidated, interest is then assessed at stated contractual rates. As of March 31, 1998 MLC Network Solutions has floor planning availability of $1,350,000 through Deutsche Financial, Inc. and $225,000 from IBM Credit Corporation. The outstanding balances to these respective suppliers were $1,120,320 and $29,160 as of March 31, 1998. MLCI has floor planning availability of $1,500,000 from FINOVA Capital Corporation, $750,000 through IBM Credit Corporation, and $100,000 through Deutsche Financial, Inc. The outstanding balances to these respective suppliers were $698,738, $104,011 and $0 as of March 31, 1998. MLCI additionally has a line of credit in place, expiring on July 31, 1998, with PNC Bank, N.A. to provide an asset based credit facility. The line has a maximum credit limit of $2,500,000 and interest is based on the bank's prime rate. As of March 31, 1998, there was no balance outstanding.

Availability under the revolving lines of credit may be limited by the asset value of equipment purchased by the Company and may be further limited by certain covenants and terms and conditions of the facilities. See "Item 7, Management's Discussion and Analysis of Operations, Financial Condition, Liquidity and Capital Resources - Financial Condition, Liquidity and Capital Resources."

Partial Recourse Borrowing Facilities. On March 12, 1997, the Company finalized and executed documents establishing a $10,000,000 credit facility agreement (the "Heller Facility"), with Heller Financial, Inc. ("Heller"), a Delaware corporation. Under the terms of the Heller Facility, a maximum amount of $10,000,000 is available to the Company, provided, that each draw is subject to the approval of Heller. The Heller Facility is evidenced by a Loan and Security Agreement dated as of January 31, 1997 (the "Loan Agreement") and a First Amendment to Loan and Security Agreement (the "Amendment") dated as of March 12, 1997 (although the Loan Agreement is dated effective January 31, 1997, all documents were executed concurrently in March, 1997). On March 12, 1998, the commitment of Heller to fund additional advances under the line was allowed by the Company to expire, and the Company and Heller are currently negotiating the terms of a revised Heller Facility, although there can be no assurance that the Company will negotiate acceptable terms and conditions for further advances. The primary purpose of the Heller Facility was for the permanent fixed-rate discounting of rents for commercial leases of information technology assets with the Company's middle-market

MLC HOLDINGS INC
Filing Date: 03/31/98

14

15

customers. As of March 31, 1998, the balance on this account was $1,205,528. Each advance under the facility bears interest at an annual rate equal to the sum of the weekly average U.S. Treasury Constant Maturities for a Treasury Note having approximately an equal term as the weighted average term of the contracts subject to the advance, plus an index ranging from 1.75% to 3.00%, depending on the amount of the advance and the credit rating (if any) of the lessee. The Heller Facility contains a number of covenants binding on the Company and is a limited recourse facility, secured by a first-priority lien in the contracts and chattel paper relating to each advance, the equipment subject to such contracts, a 10% cross-collateralized first loss guarantee, and all books, records and proceeds pertaining thereto. The Heller Facility is made to MLC Group and guaranteed by MLC Holdings. As compared to a committed line of credit, lending under the Heller Facility is in Heller's sole discretion, and is further subject to MLC Group's compliance with certain conditions and procedures.

DEFAULT AND LOSS EXPERIENCE

Until the fiscal year ended March 31, 1998, when the Company incurred a $17,350 credit loss, the Company had not taken any write-offs due to credit losses with respect to lease transactions since inception. The Company currently has a consolidated reserve for credit losses on leases and accounts receivable of $142,097. The Company believes that its reserve for credit losses is adequate at March 31, 1998.

COMPETITION

The Company believes it competes on the basis of price, responsiveness to customer needs, flexibility in structuring lease transactions, relationships with its vendors and knowledge of its vendors' products. The Company has found it most effective to compete on the basis of providing a high level of customer service and by structuring custom relationships with vendors and lease transactions that meet the needs of its vendors and customers. Other important elements that affect the Company's competitiveness are the high degree of knowledge and competence of its key employees, specifically relating to information technology and telecommunications equipment and operating lease financing. The Company competes in the information technology and telecommunications equipment leasing and financing market with bank-affiliated lessors, captive lessors and other independent leasing or financing companies. The Company's product and market focus often limits direct competition with many of these types of companies. Bank affiliated lessors typically do not directly compete in the operating lease segment of the leasing industry. Captive leasing companies, such as IBM Credit Corporation, typically finance only their parent Company's products. The Company competes directly with various independent leasing companies, such as El Camino Resources, Ltd., Comdisco, Inc., and Leasing Solutions, Inc. Many of the Company's competitors have substantially greater resources and capital and longer operating histories. The Company faces substantial competition in connection with the purchase, sale and lease of new and used computer systems, computer peripheral equipment, upgrades and parts. Among its competitors are numerous national and regional companies selling, leasing and financing the same or equivalent products. Many of these competitors are well established, have substantially greater financial, marketing, technical and sales support than the Company and have established reputations for success in the purchase, sale and lease of computer-related products. In addition, many computer manufacturers may sell or lease directly to the Company's customers, and the Company's continued ability to compete effectively may be affected by the policies of such manufacturers. The Company also faces competition from other financial services firms such as

15

16

investment banking firms which underwrite municipal bonds to finance large
municipal acquisitions, national finance companies which finance equipment in
the government and commercial sectors, banks which finance local customers and
also engage in lease transactions to obtain favorable tax benefits, as well as
other financial intermediaries similar to the Company which may focus
specifically on geography, asset-type or customer profiles. There can be no
assurance that the Company will be able to compete successfully or that it will
maintain profitability in the future.

EMPLOYEES

As of March 31, 1998, the Company had 179 full time employees and 11 part time
employees. The Company has assigned its employees to the following functional
areas, with the number of employees in each area indicated in parentheses:
administrative and operations (24); sales and marketing (57); asset management
(9); contracts (18); accounting (18); technical support (53); executive (5);
finance (3); and operations (3). No employees of the Company are represented by
a labor union. The Company believes that its relations with its employees are
good.

ITEM 2.  PROPERTIES

The Company has fourteen leased office facilities with an aggregate of
approximately 40,255 square feet of office space under lease. The Company's four
largest offices are its principal executive office which is approximately 6,625
square feet at 11150 Sunset Hills Road, Suite 110, Reston, Virginia 20190,
MLCI's sole location, a 16,200 square foot facility, located in Pottstown, PA,
and MLC Network Solutions's two main locations in Greenville and Wilmington, NC
which are 5,719 and 4,460 square feet respectively. The other regional offices
in Austin, TX, San Diego, CA, Dallas, TX; Sacramento, CA; Pittsburg and West
Chester, PA; Atlanta, GA; Richmond, VA; and Raleigh, NC comprise a total of
7,251 square feet. As of March 31, 1998, the aggregate monthly rent under all of
the Company's office leases was approximately $46,014. The Reston office lease
expires on November 19, 1998 and the Company believes it will be able to either
renew its current lease or obtain other office space in the same general area.

ITEM 3.  LEGAL PROCEEDINGS

The Company is not involved in any legal proceedings, and is not aware of any
pending or threatened legal proceedings that would have a material adverse
effect upon the Company's business, financial condition, results of operations
or cash flows.

ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

16

17

PART II

ITEM 5.  MARKET FOR REGISTRANT'S COMMON EQUITY AND RELATED STOCK-HOLDER
MATTERS

MARKET INFORMATION

The Company's Common Stock has traded on the Nasdaq National Market since
November 20, 1996 under the symbol "MLCH." The following table sets forth the
range of high and low closing sale prices for the Common Stock for the period
November 20, 1996 through March 31, 1998, by quarter.

| Quarter Ended | High | Low |
| ------------- | ---- | --- |
| December 31, 1996* | $10.25 | $ 8.75 |
| March 31, 1997 | $14.50 | $ 9.37 |
| June 30, 1997 | $14.00 | $10.75 |
| September 30, 1997 | $14.75 | $12.75 |
| December 31, 1997 | $14.75 | $11.75 |
| March 31, 1998 | $13.75 | $11.75 |

*For the period November 20, 1996 to December 31, 1996.

On June 19, 1998 the closing price of the Common Stock was $13.00 per share. On
June 17, 1998, there were 36 shareholders of record of the Company's Common
Stock. Management believes there are over 400 beneficial holders of the
Company's Common Stock and has been advised that there are individual
participants holding approximately 22% of the outstanding Common Stock pursuant
to security position listings furnished by Cede & Company, New York, New York,
registered clearing agency and depository.

DIVIDENDS

The Company has never paid a cash dividend to stockholders and the current
policy of the Company's Board of Directors is to retain the earnings of the
Company for use in the business. In addition, the FirstUnion Facility prohibits
the Company from paying any dividends. Therefore, the payment of cash dividends
on the Common Stock is unlikely in the foreseeable future. Any future
determination concerning the payment of dividends will depend upon the
elimination of these restrictions and the absence of similar restrictions in
other agreements to which the Company is a party, the Company's financial
condition, the Company's results of operations and any other factors deemed
relevant by the Board of Directors.

RECENT SALES OF UNREGISTERED SECURITIES

On July 24, 1997, the Company, through a new wholly owned subsidiary, MLC
Network Solutions which was incorporated on July 14, 1997, entered into an
Agreement and Plan of Merger with Compuventures. Compuventures was merged into
MLC Network Solutions effective July 24, 1997. The outstanding shares of
Compuventures Common Stock were

17

18

converted into 260,978 shares, valued at $3,384,564, of MLC Holdings Common Stock. This transaction was accounted for as a pooling of interests.

MLCI was acquired on September 29, 1997 through the merger of MLC Acquisitions Corporation, a newly formed corporation wholly owned by MLC Holdings, which was incorporated on September 2, 1997, into ECCI with ECCI being the surviving entity and being renamed MLC Integrated, Inc. MLCI currently conducts a network services and software and PC reselling business from its sole location in Pottstown, Pennsylvania. MLC Holdings effectively exchanged 498,998 shares of its Common Stock, valued at $7,092,000, for all of the outstanding stock of ECCI. This transaction was also accounted for as a pooling of interests.

On July 1, 1997, the Company issued 161,329 shares of stock to a single investor in a private placement for cash consideration of $2,000,000 (a per share price of $12.40). The stock was priced, per a Stock Purchase Agreement dated June 18, 1997, at a per share price equal to one-twentieth (1/20) of the sum of the closing price per share of the Company's Common Stock as reported on the NASDAQ National Market at the close of each of the last twenty business days immediately prior to the closing date (June 4 to July 1), multiplied by (.95).

All of the above shares were issued pursuant to an exemption from registration under Section 4(2) of the Securities Act of 1933.

18

19

ITEM 6.  SELECTED FINANCIAL DATA

The selected consolidated financial data set forth below should be read in
conjunction with the Consolidated Financial Statements of the Company and
related Notes thereto and the information included under "Item 7, Management's
Discussion and Analysis of Results of Operations, Financial Condition, Liquidity
and Capital Resources - As of and For the Years Ended March 31, 1996, 1997 and
1998" and "Item 1, Business."


MLC HOLDINGS, INC. AND SUBSIDIARIES
SELECTED CONSOLIDATED FINANCIAL DATA
(Dollar amounts in thousands, except per share data)

|  | YEAR ENDED MARCH 31, | | | | |
|---|---|---|---|---|---|
|  | 1994 | 1995 | 1996 | 1997 | 1998 |
| **STATEMENTS OF EARNINGS** | | | | | |
| Revenue: | | | | | |
| Sales of equipment | $ 43,262 | $ 50,471 | $ 47,591 | $ 52,167 | $ 47,419 |
| Sales of leased equipment | 5,940 | 9,958 | 16,318 | 21,634 | 50,362 |
| Lease revenues | 1,957 | 3,245 | 5,928 | 9,909 | 14,882 |
| Fee and other income | 1,046 | 690 | 1,877 | 2,503 | 5,779 |
| Total revenues | 52,205 | 64,364 | 71,714 | 86,213 | 118,442 |
| Costs and Expenses: | | | | | |
| Cost of sales of equipment | 37,924 | 44,157 | 38,782 | 42,180 | 37,423 |
| Cost of sales of leased equipment | 5,698 | 9,463 | 15,522 | 21,667 | 49,669 |
| Direct lease costs | 344 | 841 | 2,697 | 4,761 | 5,409 |
| Professional and other costs | 628 | 657 | 709 | 577 | 1,073 |
| Salaries and benefits | 4,590 | 5,679 | 6,682 | 8,241 | 10,357 |
| General and administrative expenses | 1,781 | 1,673 | 2,040 | 2,286 | 3,694 |
| Interest and financing costs | 512 | 1,111 | 1,702 | 1,649 | 1,837 |
| Nonrecurring acquisition costs | – | – | – | – | 250 |
| Total costs and expenses | 51,477 | 63,581 | 68,134 | 81,361 | 109,712 |
| Earnings before provision for income taxes and extraordinary item | 728 | 783 | 3,580 | 4,852 | 8,730 |
| Provision for income taxes | 59 | 198 | 881 | 1,360 | 2,691 |
| Net earnings before extraordinary item | 669 | 585 | 2,699 | 3,492 | 6,039 |
| Extraordinary gain (1) | – | – | 117 | – | – |
| Net earnings | $ 669 | $ 585 | $ 2,816 | $ 3,492 | $ 6,039 |
| Net earnings per common share, before extraordinary item | 0.15 | 0.13 | 0.59 | 0.67 | 1.00 |
| Extraordinary gain per common share | – | – | 0.03 | – | – |
| Net earnings per common share - Basic | $ 0.15 | $ 0.13 | $ 0.62 | $ 0.67 | $ 1.00 |
| Pro forma net earnings (2) | $ 545 | $ 529 | $ 2,389 | $ 3,133 | $ 5,426 |
| Pro forma net earnings per common share - Basic | $ 0.12 | $ 0.12 | $ 0.52 | $ 0.60 | $ 0.90 |

```
Weighted average shares outstanding - Basic        4,380,270  4,383,490   4,572,635  5,184,261  6,031,088
```

(1)  The extraordinary gain in fiscal 1996 was the result of an insurance
     settlement for a fire at a subsidiary of the Company.

(2)  Pro forma net earnings as if companies which were subchapter S corporations
     prior to their business combination with the Company, which were accounted
     for under the pooling of interests method, had been subject to federal
     income tax throughout the periods presented.

19

20

ITEM 6.  SELECTED FINANCIAL DATA - CONTINUED


MLC HOLDINGS, INC. AND SUBSIDIARIES
SELECTED CONSOLIDATED FINANCIAL DATA
(Dollar amounts in thousands, except per share data)

|  | | AS OF MARCH 31, | | | |
|  | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|
| **BALANCE SHEETS** | | | | | |
| **Assets:** | | | | | |
| Cash and cash equivalents | $ 1,632 | $ 276 | $ 651 | $ 6,654 | $ 18,684 |
| Accounts receivable | 3,384 | 4,852 | 4,526 | 8,846 | 16,383 |
| Notes receivable | 87 | 37 | 92 | 2,154 | 3,802 |
| Inventories | 1,692 | 1,294 | 965 | 1,278 | 1,214 |
| Investment in direct financing and sales type leases, net | 10,146 | 12,124 | 16,273 | 17,473 | 32,496 |
| Investment in operating lease equipment, net | 164 | 1,874 | 10,220 | 11,065 | 7,296 |
| Other assets | 374 | 587 | 1,935 | 741 | 2,137 |
| All other assets | 553 | 672 | 522 | 813 | 1,184 |
| Total assets | $ 18,032 | $ 21,716 | $ 35,184 | $ 49,024 | $ 83,196 |
| **Liabilities:** | | | | | |
| Accounts payable - equipment | $ 1,092 | $ 3,014 | $ 4,973 | $ 4,946 | $ 21,284 |
| Accounts payable - trade | 1,970 | 1,890 | 2,215 | 3,007 | 6,865 |
| Salaries and commissions payable | 280 | 316 | 153 | 672 | 390 |
| Recourse notes payable | 3,113 | 2,597 | 2,106 | 439 | 13,037 |
| Nonrecourse notes payable | 8,116 | 10,162 | 18,352 | 19,705 | 13,028 |
| All other liabilities | 1,113 | 936 | 2,153 | 3,778 | 5,048 |
| Total liabilities | 15,684 | 18,915 | 29,952 | 32,547 | 59,652 |
| Total stockholders' equity | 2,348 | 2,801 | 5,232 | 16,477 | 23,544 |
| Total liabilities and stockholders' equity | $ 18,032 | $ 21,716 | $ 35,184 | $ 49,024 | $ 83,196 |

20

ITEM 7.  MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS,
FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES - AS OF AND FOR THE YEARS
ENDED MARCH 31, 1996, 1997 AND 1998

The following discussion and analysis of results of operations and financial
condition of the Company should be read in conjunction with the Consolidated
Financial Statements and the related Notes thereto included elsewhere in this
report.

Certain statements contained herein are not based on historical fact, but are
forward-looking statements that are based upon numerous assumptions about future
conditions that may not occur. Actual events, transactions and results may
materially differ from the anticipated events, transactions, or results
described in such statements. The Company's ability to consummate such
transactions and achieve such events or results is subject to certain risks and
uncertainties. Such risks and uncertainties include, but are not limited to, the
existence of demand for and acceptance of the Company's services, economic
conditions, the impact of competition and pricing, results of financing efforts
and other factors affecting the Company's business that are beyond the Company's
control. The Company undertakes no obligation and does not intend to update,
revise or otherwise publicly release the result of any revisions to these
forward-looking statements that may be made to reflect future events or
circumstances.

The Company's results of operations are susceptible to fluctuations for a number
of reasons, including, without limitation, differences between estimated
residual values and actual amounts realized related to the equipment the Company
leases. Operating results could also fluctuate as a result of the sale by the
Company of equipment in its lease portfolio prior to the expiration of the lease
term to the lessee or to a third party. Such sales of leased equipment prior to
the expiration of the lease term may have the effect of increasing revenues and
net earnings during the period in which the sale occurs, and reducing revenues
and net earnings otherwise expected in subsequent periods.

REVENUE RECOGNITION AND LEASE ACCOUNTING

The Company's principal line of business is the leasing, financing and sale of
equipment. The manner in which these lease finance transactions are
characterized and reported for accounting purposes has a major impact upon the
Company's reported revenue, net earnings and the resulting financial measures.
Lease accounting methods significant to the Company's business are discussed
below.

The Company classifies its lease transactions, as required by the Statement of
Financial Accounting Standards No. 13, Accounting for Leases ("FASB No. 13") as:
(i) direct financing; (ii) sales-type; or (iii) operating leases. Revenues and
expenses between accounting periods for each lease term will vary depending upon
the lease classification.

For financial statement purposes, the Company includes revenue from all three
classifications in lease revenues, and costs related to these leases in direct
lease costs.

Direct Financing and Sales-Type Leases. Direct financing and sales-type leases
transfer substantially all benefits and risks of equipment ownership to the
customer. A lease is a direct financing or sales-type lease if the
creditworthiness of the customer and the collectibility of lease

22

payments are reasonably certain and it meets one of the following criteria: (i) the lease transfers ownership of the equipment to the customer by the end of the lease term; (ii) the lease contains a bargain purchase option; (iii) the lease term at inception is at least 75% of the estimated economic life of the leased equipment; or (iv) the present value of the minimum lease payments is at least 90% of the fair market value of the leased equipment at inception of the lease.

Direct finance leases are recorded as investment in direct finance leases upon acceptance of the equipment by the customer. At the inception of the lease, unearned lease income is recorded which represents the amount by which the gross lease payments receivable plus the estimated residual value of the equipment exceeds the equipment cost. Unearned lease income is recognized, using the interest method, as lease revenue over the lease term.

Sales-type leases include a dealer profit (or loss) which is recorded by the lessor at the inception of the lease. The dealer's profit (or loss) represents the difference, at the inception of the lease, between the fair value of the leased property and its cost or carrying amount. The equipment subject to such leases may be obtained in the secondary marketplace, but most frequently is the result of releasing the Company's own portfolio. This profit (or loss) which is recognized at lease inception, is included in net margin on sales-type leases. For equipment sold through the Company's value added re-seller subsidiaries, the dealer margin is presented in equipment sales revenue and cost of equipment sales. Interest earned on the present value of the lease payments and residual value is recognized over the lease term using the interest method and is included as part of the Company's lease revenue.

Operating Leases. All leases that do not meet the criteria to be classified as direct financing or sales-type leases are accounted for as operating leases. Rental amounts are accrued on a straight line basis over the lease term and are recognized as lease revenue. The Company's cost of the leased equipment is recorded on the balance sheet as investment in operating lease equipment and is depreciated on a straight-line basis over the lease term to the Company's estimate of residual value. Revenue, depreciation expense and the resulting profit for operating leases are recorded evenly over the life of the lease.

As a result of these three classifications of leases for accounting purposes, the revenues resulting from the "mix" of lease classifications during an accounting period will affect the profit margin percentage for such period with such profit margin percentage generally increasing as revenues from direct financing and sales-type leases increase. Should a lease be financed, the interest expense declines over the term of the financing as the principal is reduced.

Residual Values. Residual values represent the Company's estimated value of the equipment at the end of the initial lease term. The residual values for direct financing and sales-type leases are recorded in investment in direct financing and sales-type leases, on a net present value basis. The residual values for operating leases are included in the leased equipment's net book value and are recorded in investment in operating lease equipment. The estimated residual values will vary, both in amount and as a percentage of the original equipment cost, and are recorded in investment in operating lease equipment, depending upon several factors, including the equipment type, manufacturer's discount, market conditions and the term of the lease.

The Company evaluates residual values on an ongoing basis and records any required changes in accordance with FASB No. 13. Residual values are affected by equipment supply and demand

22

23

and by new product announcements and price changes by manufacturers. In accordance with generally accepted accounting principles, residual values can only be adjusted downward.

The Company seeks to realize the estimated residual value at lease termination through: (i) renewal or extension of the original lease; (ii) sale of the equipment either to the lessee or the secondary market; or (iii) lease of the equipment to a new user. The difference between the proceeds of a sale and the remaining estimated residual value is recorded as a gain or loss in lease revenues when title is transferred to the lessee, or, if the equipment is sold on the secondary market, in equipment sales revenues and cost of equipment sales when title is transferred to the buyer. The proceeds from any subsequent lease are accounted for as lease revenues at the time such transaction is entered into.

Initial Direct Costs. Initial direct costs related to the origination of sales-type, direct finance or operating leases are capitalized and recorded as part of the investment in direct financing and sales-type leases, net or as operating lease equipment, net and are amortized over the lease term.

Sales. Sales revenue includes the following types of transactions: (i) sales of new and/or used equipment which is not subject to any type of lease; (ii) sales of equipment subject to an existing lease, under which the Company is lessor, including any underlying financing related to the lease; and (iii) sales of off-lease equipment to either the original lessee or to a new user.

Other Sources of Revenue. Fee and other income results from (i) income events that occur after the initial sale of a financial asset such as escrow/prepayment income, (ii) remarketing fees, (iii) brokerage fees earned for the placement of financing transactions and (iv) interest and other miscellaneous income. These revenues are included in fee and other income on the Company's statements of earnings.

RESULTS OF OPERATIONS

REVENUES

During the three years ended March 31, 1998, the Company experienced growth in total revenues reflecting an increased volume of leasing and equipment sale transactions. Total revenues for fiscal year 1998 were $118.4 million, as compared to $86.2 and $71.7 million in fiscal years 1997 and 1996, respectively. Total revenues are comprised of equipment sales, revenue from the sales of leased equipment, lease revenues, and fee and other income.

Equipment sales revenue is generated through the sale of new and used equipment via the Company's equipment brokerage and re-marketing activities and through its recently acquired valued added re-seller ("VAR") subsidiaries. Equipment sales were $47.4 million in fiscal year 1998, as compared to $52.2 and $47.6 million in fiscal years 1997 and 1996, respectively. Changes in the cost of equipment sales have been consistent with changes in equipment sale revenue, and reflect a margin on equipment sales of 18.5%, 19.1% and 21.1%.

Revenue from the sales of leased equipment increased 132.8% to $50.4 million in fiscal 1998, as compared to $21.6 million in fiscal year 1997. Leased equipment sales revenue was $16.3 million in fiscal 1996. Historically, the Company has sold a significant portion of the leases it originates to one of its two institutional equity partners, MLC/CLC, LLC and MLC/GATX Limited Partnership I. As a result, historical increases equipment sales revenue are a direct

23

24

result of increased lease originations. During fiscal year 1998, sales to MLC/CLC, LLC accounted for 88.9% of leased equipment sales revenue, a component of the Company's total revenues. Sales to the Company's equity partners requires the consent of the relevant joint venture partner. While management expects the continued availability of equity financing through its joint venture partners or other sources, should such financing unexpectedly become limited or unavailable, it could have a material adverse effect upon the Company's business, financial condition and results of operations until other financing arrangements are secured.

Cost of leased equipment sales represents the book value of equipment sold which was subject to a lease under which the Company is lessor. The revenues from leased equipment sales, as well as the related cost of sales, can vary significantly depending on the nature and timing of the sale of the equipment, as well as the nature and timing of any sale of the lease's rental stream. For example, a lower margin, or a loss on the equity portion of a lease is often offset by lease earnings and/or a gain recognized under SFAS No. 125. Additionally, leases which have been debt funded prior to equity sale will result in lower sales and cost of sales amounts, although the net earnings on the transaction will be the same as had the rental stream been sold after the equity sale.

Lease revenues increased to $14.9 million in fiscal 1998, as compared to $9.9 and $5.9 million in fiscal years 1997 and 1996, respectively. These increases are directly attributable to the Company's increased volume of lease transactions and reflects the Company's higher average investment in direct financing leases and operating lease equipment. In addition, lease revenues reflect the gains and losses from the sale of certain financial assets, primarily lease rental streams, to outside parties on terms that qualify for treatment as a sale under Statement of Financial Accounting Standard No. 125, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities," which became effective January 1, 1997.

Fee and other income reflects the Company's revenues from adjunct services and fees relating to the Company's lease portfolio, as well as fees and other income generated by the Company's VAR subsidiaries including support fees, warranty reimbursements, and learning center revenues. Fee and other income accounted for 4.9%, 2.9% and 2.6% of total revenues during the fiscal years 1998, 1997 and 1996, respectively. The increase in fee and other income is largely attributable to an increased volume of fees relating to the Company's lease portfolio and fees earned by the Company for the management of leases which it has sold to an equity partner. Included in fee and other income are certain transactions which, while in the normal course of business, for which there can be no guarantee of future transactions of the same nature, size or profitability. The Company's ability to consummate such transactions, and the timing thereof, may depend largely on factors outside the control of management, and as such, earnings from these transactions in one period may not be indicative of earnings that can be expected in future periods.

EXPENSES

Direct lease costs include expenses directly attributable to the Company's lease portfolio, the largest being depreciation on the Company's investment operating lease equipment. During fiscal year 1998, direct lease costs were $5.4 million, as compared to $4.8 and $2.7 million in fiscal years 1997 and 1996, respectively. The majority of leases the Company originated in fiscal 1998 were direct financing leases, as compared to primarily operating leases in the past. If the Company continues to originate primarily direct financing type leases in the future,

24

25

depreciation on operating lease equipment will diminish as the Company's operating lease portfolio matures.

Professional and other costs amounted to $1.1 million during fiscal year 1998, as compared to $0.6 and $0.7 million during fiscal years 1997 and 1996, respectively. The increase during the three year period is primarily attributable to increases in the volume of broker fees the Company pays on certain lease transactions, and the increased legal and professional fees associated with the Company's securities being traded in the public market since November, 1996.

Salaries and benefits and general and administrative expenses both increased during the three years ended March 31, 1998. Increases in these expenses are related primarily to the increased number of personnel required to service the increased volume of leasing and equipment sale transactions during the three year period. Salaries and benefits and general and administrative expenses accounted for 11.9%, 12.2% and 12.2% of total revenues during fiscal years 1998, 1997 and 1996, respectively.

Interest and financing costs reflect interest on recourse and nonrecourse lease related debt, operating lines of credit, floor planning agreements in place at the Company's VAR subsidiaries and other obligations of the Company. These costs amounted to $1.8, $1.6 and $1.7 million in fiscal years 1998, 1997 and 1996, respectively.

The Company recognizes as income tax expense the amount of estimated tax due on current period's income, whether that tax is to be paid currently or in the future. The provision for taxes was 30.8%, 28.0% and 24.6% of earnings before income taxes and extraordinary items for the fiscal years 1998, 1997 and 1996, respectively. The lower provision for income taxes, as compared to earnings before tax and extraordinary items is the result of earnings from the Company's VAR subsidiaries which prior to their combination with the Company were sub-chapter S corporations. As such, the provision for income tax for the three fiscal years ended March 31, 1998 relates only to earnings of the Company, exclusive of VAR earnings generated prior to their business combinations.

The Company's net earnings and net earnings per common share increased in each of the fiscal years 1998, 1997, and 1996. Net earnings were $6.0, $3.5, and $2.8 million in the fiscal years 1998, 1997 and 1996, respectively. These increases are a result of the fluctuations in revenues and expenses discussed in the above paragraphs.

FINANCIAL CONDITION, LIQUIDITY AND CAPITAL RESOURCES

During the two year period ended March 31, 1998, the Company improved its financial condition and available capital resources in several significant ways First, stockholders' equity increased from $5.2 million at the beginning of fiscal 1997 to $23.5 million at March 31, 1998, partially the result of the Company's initial public offering and a private placement of the Company's common stock. Second, the Company expanded its ability to finance its lease transactions through the formation of an equity joint venture, MLC/CLC, LLC. Finally, the Company's available lines of credit used for short term lease financing increased from $5 million to $25 million, in addition to amounts available to the Company's VAR subsidiaries through floor planning agreements. All of these factors have allowed the Company to support the higher levels of sales and leasing activity reflected in its financial statements.

25

26

The Company's total assets increased 69.7% to $83.2 million as of March 31, 1998 as compared to $49.0 million in total assets as of March 31, 1997.

The Company's cash and cash equivalents represented 22.5% and 13.6% of total assets as of March 31, 1998 and 1997, respectively. The increase in cash in the current year as compared to the prior year is a result of a large volume of fundings from the sale of lease receivables which were received near the balance sheet date. The Company's cash balances are invested in overnight, interest bearing investments.

The largest component of the Company's assets is its investment in direct financing and sales type leases and investment in operating lease equipment. These assets represent 47.8% and 58.2% of total assets as of March 31, 1998 and 1997, respectively. The Company's investment in direct financing leases and operating lease equipment amounted to $39.8 and $28.5 million at the end of fiscal years 1998 and 1997, respectively, reflecting an increased lease transaction volume. The size and composition of the Company's lease portfolio may vary depending nature and volume of new leases originated, as well as the nature and timing of sales of lease rental streams and sale of equipment underlying the leases.

As of March 31, 1998 and 1997, the Company had $3.8 and $2.2 million in notes receivable, respectively. The majority of these notes are receivable from the Company's joint venture equity partner and related to the rental stream on leases attached to equipment which was sold to the equity partner. The vast majority of these notes receivable are paid off with the proceeds of a non-recourse funding secured on behalf of the joint venture 30 to 90 days subsequent to an equity sale. In the event that a rental stream is not funded on behalf of the joint venture partner, the Company will continue to receive the rental payments from the lessee.

The Company's liabilities are composed primarily of amounts due to vendors for equipment to be placed on lease, recourse lines of credit, and nonrecourse debt associated with the Company's lease portfolio.

As of March 31, 1998 amounts due to vendors for inventory and general expenses ("Accounts Payable - trade") and amounts due to vendors for equipment which will be placed on lease ("Accounts Payable - equipment") totaled $28.1 million, as compared to $8.0 million at March 31, 1997. The increase is primarily attributable to an increase in amounts payable for equipment to be placed on lease reflecting the Company's higher lease transaction volume.

Recourse notes payable amounted to $13.0 and $0.4 million as of March 31, 1998 and 1997 respectively. The increase represents an increased amount due under the Company's lines of credits. Nonrecourse notes payable decreased to $13.0 million at March 31, 1998 from $19.7 million as of March 31, 1997. The decrease is the result of the current portfolio of nonrecourse notes being paid down. Additionally, the majority of nonrecourse debt notes originated during the current fiscal year qualified for sale treatment under SFAS No. 125, resulting in a significantly decreased amount of nonrecourse debt additions than in the prior fiscal year.

To date, the financing necessary to support the Company's leasing and financing activities has been provided principally from nonrecourse and recourse borrowings from money center banks, regional banks, insurance companies, finance companies and financial intermediaries. Payments under the Company's borrowings and the maturities of its long-term borrowings are typically structured to match the payments due under the leases securing the borrowings.

26

27

In order to take advantage of the most favorable long-term financing arrangements available to it, the Company often finances equipment purchases and the related leases on an interim basis with short-term, recourse debt, and accumulates such leases until it has a sufficient transaction size (either with a single lessee or a portfolio of lessees) to warrant obtaining long-term financing for such leases either through nonrecourse borrowings or a sale transaction. Such interim financing is usually obtained through the Company's operating lines of credit or partial-recourse warehouse lines.

Borrowings under the operating lines of credit are generally secured by lease receivables and the underlying equipment financed under the facility. Availability under the revolving lines of credit may be limited by the asset value of equipment purchased by the Company and may be further limited by certain covenants and terms and conditions of the facilities. At March 31, 1998, there was $12,750,000 outstanding under the Company's operating lines of credit.

ADEQUACY OF CAPITAL RESOURCES

The Company's current working capital; lines of credit, if maintained, and its expected access to the public and private debt securities markets (including financings for its equity investment in leases) and its estimated cash flow from operations are anticipated to provide adequate capital to fund the Company's operations, including acquisitions and financings under its relationships with vendors, for at least the next 12 months. Although no assurances can be given, the Company expects to be able to maintain, renew, or replace its existing short-term lines of credit and to continue to have access to the public and private securities markets, both for debt and for equity financings.

THE YEAR 2000 ISSUE

The Company has identified all significant internal software and hardware applications that will require modifications to ensure Year 2000 compliance. Internal and external resources are being used to make the required modifications and test Year 2000 compliance. The modification process of all significant applications and operational systems is substantially complete. The Company plans on completing the process of modifying all significant applications by December 31, 1998. The total cost to the Company of these Year 2000 compliance activities has not been and is not anticipated to be material to its financial position, results of operations or cash flows in any given year.

ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

None.

ITEM 8.   FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

See accompanying Table of Contents to Financial Statements and Schedule on page F-1.

ITEM 9.   CHANGES IN AND DISAGREEMENTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

27

28

PART III

Except as set forth below, the information required by Items 10, 11, 12 and 13
is incorporated by reference from the Company's definitive Proxy Statement to be
filed with the Securities and Exchange Commission pursuant to Regulation 14A not
later than 120 days after the close of the Company's fiscal year.

ITEM 10.  DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

The following table sets forth the name, age and position with the Company of
each person who is an executive officer, director or significant employee.

| NAME | AGE | POSITION | CLASS |
| ---- | --- | -------- | ----- |
| Phillip G. Norton**......................54 | | Chairman of the Board, President and Chief Executive Officer | III |
| Thomas B. Howard, Jr.....................51 | | Vice President and Chief Operating Officer | |
| Bruce M. Bowen...........................46 | | Director and Executive Vice President | III |
| Steven J. Mencarini......................42 | | Senior Vice President and Chief Financial Officer | |
| Terrence O'Donnell.......................53 | | Director | II |
| Carl J. Rickertsen.......................37 | | Director | II |
| Kleyton L. Parkhurst.....................35 | | Secretary and Treasurer | |
| William G. Garner........................40 | | President, MLC Network Solutions | |
| Vincent M. Marino........................40 | | President, ECCI | |
| Kevin M. Norton**........................42 | | Vice President of Brokerage Operations | |
| William J. Slaton........................50 | | Vice President of Marketing | |
| Thomas K. McNamara.......................52 | | Vice President | |

**Phillip G. Norton, Kevin M. Norton and Patrick J. Norton, Jr. are brothers.
All references to a Mr. Norton contained herein refer to Mr. Phillip G. Norton
unless otherwise indicated.

28

29

PART IV

ITEM 14.  EXHIBITS, FINANCIAL STATEMENT SCHEDULES, AND REPORTS ON FORM 8-K

(a)(1) FINANCIAL STATEMENTS

The financial statements listed in the accompanying Index to Financial
Statements and Schedule are filed as a part of this report and incorporated
herein by reference.

(a)(2) FINANCIAL STATEMENT SCHEDULE

The financial statement schedule listed in the accompanying Index to Financial
Statements and Schedules are filed as a part of this report and incorporated
herein by reference.

(b) REPORTS ON FORM 8-K

None

(c)    EXHIBITS


| Exhibit Number | Description |
|---|---|
| 2.1(4) | Agreement and Plan of Merger dated July 24, 1997, by and among MLC Holdings, Inc., MLC Network Solutions, Inc., Compuventures of Pitt County, Inc., and the Stockholders of Compuventures of Pitt County, Inc. |
| 2.2(5) | Agreement and Plan of Merger dated September 29, 1997 by and among MLC Holdings, Inc., MLC Acquisition Corp., Educational Computer Concepts, Inc. and the Stockholders of Educational Computer Concepts, Inc. |
| 3.1(5) | Certificate of Incorporation of the Company, as amended |
| 3.2(1) | Bylaws of the Company |
| 4.1(1) | Specimen certificate of Common Stock of the Company |
| 10.1(1)* | 1996 Stock Incentive Plan (see 10.21 below for amended version) |
| 10.2(1)* | 1996 Outside Directors Stock Option Plan (see 10.23 below for amended version) |
| 10.3(1)* | 1996 Nonqualified Stock Option Plan (see 10.24 below for amended version) |
| 10.4(1)* | 1996 Incentive Stock Option Plan (see 10.22 below for amended version) |
| 10.5(1) | Form of Indemnification Agreement entered into between the Company and its directors and officers. |
| 10.6(1) | Lease dated July 14, 1993 for principal executive office located in Reston, Virginia, together with amendment thereto dated March 18, 1996 |
| 10.7(1)* | Form of Employment Agreement between the Registrant and Philip G. |

```
                 Norton

10.8(1)*    Form of Employment Agreement between the Registrant and Bruce M.
            Bowen

10.9(1)*    Form of Employment Agreement between the Registrant and William J.
            Slaton

10.10(1)*   Form of Employment Agreement between the Registrant and Kleyton L.
            Parkhurst

10.11(1)    Form of Irrevocable Proxy and Stock Rights Agreement
```

29

30

| Exhibit Number | Description |
|---|---|
| 10.12(1) | First Amended and Restated Business Loan and Security Agreement by and between the Company and First Union Bank of Virginia, N.A. |
| 10.13(1) | Loan Modification and Extension Agreement by and between the Company and First Union National Bank of Virginia, N.A. |
| 10.14(1) | Credit Agreement by and Between the Company and NationsBanc Leasing Corporation |
| 10.15(1) | Loan Modification and Extension Agreement |
| 10.16(2) | Text of Loan and Security Agreement dated January 31, 1997 between MLC Group, Inc. and Heller Financial, Inc. |
| 10.17(2) | Text of First Amendment to Loan and Security Agreement dated March 12, 1997 between MLC Group, Inc. and Heller Financial, Inc. |
| 10.18(3) | Credit Agreement dated as of June 5, 1997, by and between MLC Group, and CoreStates Bank, N.A. |
| 10.19(3)* | Form of Employment Agreement between the Registrant and Thomas B. Howard, Jr. |
| 10.20(3)* | Form of Employment Agreement between the Registrant and Steven J. Mencarini |
| 10.21(5)* | MLC Master Stock Incentive Plan |
| 10.22(5)* | Amended and Restated Incentive Stock Option Plan |
| 10.23(5)* | Amended and Restated Outside Director Stock Option Plan |
| 10.24(5)* | Amended and Restated Nonqualified Stock Option Plan |
| 10.25(5)* | 1997 Employee Stock Purchase Plan |
| 10.26(5) | Amendment No. 1 dated September 5, 1997 to Credit Agreement dated June 5, 1997 between MLC Group, Inc. and CoreStates Bank, N.A. |
| 21.1(6) | Subsidiaries of the Company |
| 23.1 | Consent of Deloitte & Touche LLP |
| 23.2 | Consent of Herbein & Company, Inc. |
| 27.1 | Financial Data Schedule |
| 99.1(6) | Independent Auditor's Report of Herbein & Company, Inc. as to ECCI |

```
       31
-------------------
```

* Indicates a management contract or compensatory plan or arrangement.

(1)  Incorporated herein by reference to the indicated exhibit filed as part of
the Registrant's Registration Statement on Form S-1 (No. 333-11737).

(2)  Incorporated herein by reference to Exhibits 5.1 and 5.2 filed as part of
the registrant's Form 8-K filed March 28, 1997.

(3)  Incorporated herein by reference to the indicated exhibit filed as part of
the registrant's Form 10-K filed on June 30, 1997.

(4)  Incorporated herein by reference to the indicated exhibit filed as part of
the registrant's Form 8-K filed on August 8, 1997.

(5)  Incorporated herein by reference to the indicated exhibit filed as part of
the registrant's Form 10-Q filed on November 14, 1997.

(6)  Incorporated herein by reference to the indicated exhibit filed as part of
the Registrant's Registration Statement on Form S-1 (No. 333-44335).

32

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange
Act of 1934, the registrant has duly caused this report to be signed on its
behalf by the undersigned, thereunto duly authorized.

                    MLC Holdings, Inc.

                    /s/ PHILLIP G. NORTON
                    ---------------------------------------------------
                    By: Phillip G. Norton, Chairman of the Board,
                    President and Chief Executive Officer
                    Date: June 26, 1998

Pursuant to the requirements of the Securities Exchange Act of 1934, this report
has been signed by the following persons on behalf of the registrant and in the
capacities and on the dates indicated.

                    /s/ PHILLIP G. NORTON
                    ---------------------------------------------------
                    By: Phillip G. Norton, Chairman of the Board,
                    President and Chief Executive Officer
                    Date: June 26, 1998


                    /s/ STEVEN J. MENCARINI
                    ---------------------------------------------------
                    By: Steven J. Mencarini, Senior Vice President
                    and Chief Financial Officer
                    Date: June 26, 1998


                    /s/ THOMAS B. HOWARD
                    ---------------------------------------------------
                    By: Thomas B. Howard, Vice President and
                    Chief Operating Officer
                    Date: June 26, 1998


                    /s/ BRUCE M. BOWEN
                    ---------------------------------------------------
                    By: Bruce M. Bowen, Director and Executive
                     Vice-President
                    Date: June 26, 1998


                    /s/ KLEYTON L. PARKHURST
                    ---------------------------------------------------
                    By: Kleyton L. Parkhurst, Secretary and Treasurer
                    Date: June 26, 1998


                    /s/ TERRENCE O'DONNELL
                    ---------------------------------------------------

                    30

33

```
By: Terrence O'Donnell, Director
Date: June 26, 1998

/s/ CARL J. RICKERTSEN
-------------------------------------------------
By: Carl J. Rickertsen, Director
Date: June 26, 1998
```

31

34

MLC HOLDINGS, INC. AND SUBSIDIARIES

INDEX TO FINANCIAL STATEMENTS AND SCHEDULES

| | PAGE |
| --- | --- |
| Independent Auditors' Report | F-2 |
| Consolidated Balance Sheets as of March 31, 1997 and 1998 | F-3 |
| Consolidated Statements of Earnings for the Years Ended March 31, 1996, 1997, and 1998 | F-4 |
| Consolidated Statements of Stockholders' Equity for the Years Ended March 31, 1996, 1997 and 1998 | F-5 |
| Consolidated Statements of Cash Flows for the Years Ended March 31, 1996, 1997 and 1998 | F-6 - F-7 |
| Notes to Consolidated Financial Statements | F-8 - F-23 |
| SCHEDULE | |
| II-Valuation and Qualifying Accounts for the Three Years Ended March 31, 1996, 1997 and 1998. | S-1 |

F-1

35

INDEPENDENT AUDITORS' REPORT


To the Board of Directors and Stockholders of
MLC Holdings, Inc.
Reston, Virginia

We have audited the consolidated balance sheets of MLC Holdings, Inc. and
subsidiaries as of March 31, 1998 and 1997, and the related consolidated
statements of earnings, stockholders' equity, and cash flows for each of the
three years in the period ended March 31, 1998. Our audits also included the
financial statement schedule listed in the Index at Item 14(a)(2). These
financial statements and financial statement schedule are the responsibility of
the Company's management. Our responsibility is to express an opinion on the
financial statements based on our audits. The consolidated financial statements
give retroactive effect to the merger of MLC Holdings, Inc., ECC Integrated,
Inc. and Compuventures of Pitt County, Inc., which have been accounted for as a
pooling of interests as described in Note 1 to the consolidated financial
statements. We did not audit the statements of earnings, stockholders' equity,
and cash flows of ECC Integrated, Inc. for the year ended March 31, 1996, which
statements reflect total revenues of $15,291,164 for the year ended March 31,
1996. Those statements were audited by other auditors whose report has been
furnished to us, and our opinion, insofar as it relates to the amounts included
for ECC Integrated, Inc. for 1996, is based solely on the report of such other
auditors.

We conducted our audits in accordance with generally accepted auditing
standards. Those standards require that we plan and perform the audit to obtain
reasonable assurance about whether the financial statements are free of material
misstatement. An audit includes examining, on a test basis, evidence supporting
the amounts and disclosures in the financial statements. An audit also includes
assessing the accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement presentation.
We believe that our audits and the report of the other auditors provide a
reasonable basis for our opinion.

In our opinion, based on our audits and the report of the other auditors, the
consolidated financial statements referred to above present fairly, in all
material respects, the financial position of MLC Holdings, Inc. and subsidiaries
as of March 31, 1998 and 1997, and the results of their operations and their
cash flows for each of the three years in the period ended March 31, 1998 in
conformity with generally accepted accounting principles. Also, in our opinion,
based on our audits, such financial statement schedule, when considered in
relation to the basic consolidated financial statements taken as a whole,
presents fairly in all material respects the information set forth therein.


/s/ DELOITTE & TOUCHE LLP

McLean, Virginia
June 22, 1998

                                    F-2

36

MLC HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

| | As of March 31, | |
| | 1997 | 1998 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 6,654,209 | $ 18,683,796 |
| Accounts receivable | 8,846,426 | 16,383,314 |
| Notes receivable (1) | 2,154,250 | 3,801,808 |
| Employee advances | 70,612 | 53,582 |
| Inventories | 1,278,144 | 1,213,734 |
| Investment in direct financing and sales type leases - net | 17,473,069 | 32,495,594 |
| Investment in operating lease equipment - net | 11,065,159 | 7,295,721 |
| Property and equipment - net | 740,744 | 1,131,512 |
| Other assets (2) | 740,925 | 2,136,554 |
| TOTAL ASSETS | $ 49,023,538 | $ 83,195,615 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **LIABILITIES** | | |
| Accounts payable - trade | $ 3,006,937 | $ 6,865,419 |
| Accounts payable - equipment | 4,946,422 | 21,283,582 |
| Salaries and commissions payable | 671,899 | 390,081 |
| Accrued expenses and other liabilities | 2,256,884 | 3,560,181 |
| Recourse notes payable | 439,004 | 13,037,365 |
| Nonrecourse notes payable | 19,705,060 | 13,027,676 |
| Deferred taxes | 590,000 | 1,487,000 |
| Income tax payable | 930,587 | – |
| Total Liabilities | 32,546,793 | 59,651,304 |
| | | |
| Commitments and contingencies (Note 7) | – | – |
| **STOCKHOLDERS' EQUITY** | | |
| Preferred stock, $.01 par value; 2,000,000 shares authorized; none issued or outstanding | – | – |
| Common stock, $.01 par value; 10,000,000 authorized at March 31, 1997; 25,000,000 authorized at March 31, 1998; 5,909,976 and 6,071,505 issued and outstanding at March31, 1997 and 1998, respectively | 59,100 | 60,715 |
| Additional paid-in capital | 9,346,214 | 11,460,331 |
| Retained earnings | 7,071,431 | 12,023,265 |
| Total Stockholders' Equity | 16,476,745 | 23,544,311 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 49,023,538 | $ 83,195,615 |

SEE NOTES TO CONSOLIDATED FINANCIAL STATEMENTS.

(1)  Includes amounts with related parties of $1,835,214 and $3,709,508 as of
     March 31, 1997 and 1998, respectively.

(2)  Includes amounts with related parties of $338,226 and $732,051 as of March
     31, 1997 and 1998, respectively.

F-3

37

MLC HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF EARNINGS

|  | Year Ended March 31, | | |
|---|---|---|---|
|  | 1996 | 1997 | 1998 |
| **REVENUES** | | | |
| Sales of equipment | $ 47,591,068 | $ 52,166,828 | $ 47,419,115 |
| Sales of leased equipment | 16,318,049 | 21,633,996 | 50,362,055 |
|  | 63,909,117 | 73,800,824 | 97,781,170 |
| Lease revenues | 5,928,228 | 9,908,469 | 14,882,420 |
| Fee and other income | 1,876,410 | 2,503,381 | 5,778,685 |
|  | 7,804,638 | 12,411,850 | 20,661,105 |
| TOTAL REVENUES  (1) | 71,713,755 | 86,212,674 | 118,442,275 |
| **COSTS AND EXPENSES** | | | |
| Cost of sales, equipment | 38,782,181 | 42,179,823 | 37,423,397 |
| Cost of sales, leased equipment | 15,522,469 | 21,667,197 | 49,668,756 |
|  | 54,304,650 | 63,847,020 | 87,092,153 |
| Direct lease costs | 2,696,627 | 4,761,227 | 5,409,338 |
| Professional and other fees | 709,350 | 576,855 | 1,072,691 |
| Salaries and benefits | 6,682,005 | 8,241,405 | 10,356,456 |
| General and administrative expenses | 2,039,970 | 2,285,878 | 3,694,309 |
| Nonrecurring acquisition costs | – | – | 250,388 |
| Interest and financing costs | 1,701,638 | 1,648,943 | 1,836,956 |
|  | 13,829,590 | 17,514,308 | 22,620,138 |
| TOTAL COSTS AND EXPENSES  (2) | 68,134,240 | 81,361,328 | 109,712,291 |
| EARNINGS BEFORE PROVISION FOR INCOME TAXES AND EXTRAORDINARY ITEM | 3,579,515 | 4,851,346 | 8,729,984 |
| PROVISION FOR INCOME TAXES | 881,000 | 1,360,000 | 2,690,890 |
| EARNINGS BEFORE EXTRAORDINARY ITEMS | 2,698,515 | 3,491,346 | 6,039,094 |
| EXTRAORDINARY GAIN | 117,044 | – | – |
| NET EARNINGS | $ 2,815,559 | $ 3,491,346 | $ 6,039,094 |
| NET EARNINGS PER COMMON SHARE, BEFORE EXTRAORDINARY ITEM | 0.59 | 0.67 | 1.00 |
| EXTRAORDINARY GAIN PER COMMON SHARE | 0.03 | – | – |

| | | | | | |
|---|---|---|---|---|---|
| NET EARNINGS PER COMMON SHARE - BASIC | $ | 0.62 | $ | 0.67 | $ | 1.00 |
| NET EARNINGS PER COMMON SHARE - DILUTED | $ | 0.62 | $ | 0.66 | $ | 0.98 |
| PRO FORMA NET EARNINGS (Note 8) | $ | 2,389,418 | $ | 3,133,436 | $ | 5,425,833 |
| PRO FORMA NET EARNINGS PER COMMON SHARE - BASIC | $ | 0.52 | $ | 0.60 | $ | 0.90 |
| PRO FORMA NET EARNINGS PER COMMON SHARE - DILUTED | $ | 0.52 | $ | 0.60 | $ | 0.88 |
| WEIGHTED AVERAGE SHARES OUTSTANDING - BASIC | | 4,572,635 | | 5,184,261 | | 6,031,088 |
| WEIGHTED AVERAGE SHARES OUTSTANDING - DILUTED | | 4,572,635 | | 5,262,697 | | 6,143,017 |

SEE NOTES TO CONSOLIDATED FINANCIAL STATEMENTS.

(1)  Includes amounts from related parties of $15,758,610, $21,051,453 and
     $46,710,190 for the fiscal years ended March 31, 1996, 1997, and 1998,
     respectively.

(2)  Includes amounts from related parties of $15,055,141, $20,566,924 and
     $44,831,701 for the fiscal years ended March 31, 1996, 1997, and 1998,
     respectively.

F-4

38

MLC HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

|  | Common Stock | | Treasury Stock | | Additional Paid-in Capital |
|---|---|---|---|---|---|
|  | Shares | Par Value | Shares | Cost |  |
| Balance March 31, 1995 | 4,386,658 | $ 44,960 | 109,389 | $ 5,854 | $    748,186 |
| Issuance of shares to owners | 370,059 | 3,701 | – | – | (3,701) |
| Purchase of treasury shares | (2,327) | – | 2,327 | 23,000 | – |
| Distributions to owners | – | – | – | – | – |
| Net earnings | – | – | – | – | – |
| Balance March 31, 1996 | 4,754,390 | 48,661 | 111,716 | 28,854 | 744,485 |
| Compensation to outside directors | – | – | – | – | 9,500 |
| Distributions to owners | – | – | – | – | – |
| Sale of common shares | 1,150,000 | 11,500 | – | – | 8,592,262 |
| Issuance of shares to owners | 5,586 | 56 | – | – | (56) |
| Retirement of treasury shares | – | (1,117) | (111,716) | (28,854) | 23 |
| Net earnings | – | – | – | – | – |
| Balance March 31, 1997 | 5,909,976 | 59,100 | – | – | 9,346,214 |
| Sale of common shares | 161,329 | 1,613 | – | – | 1,998,387 |
| Issuance of shares for option exercise | 200 | 2 | – | – | 1,748 |
| Compensation to outside directors | – | – | – | – | 113,982 |
| Distributions to owners | – | – | – | – | – |
| Net earnings | – | – | – | – | – |
| Balance, March 31, 1998 | 6,071,505 | $ 60,715 | – | $     – | $ 11,460,331 |

|  | Retained Earnings | TOTAL |
|---|---|---|
| Balance March 31, 1995 | $  2,013,994 | $  2,801,286 |
| Issuance of shares to owners | – | – |
| Purchase of treasury shares | – | (23,000) |
| Distributions to owners | (362,330) | (362,330) |
| Net earnings | 2,815,559 | 2,815,559 |
| Balance March 31, 1996 | 4,467,223 | 5,231,515 |
| Compensation to outside directors | – | 9,500 |
| Distributions to owners | (859,378) | (859,378) |
| Sale of common shares | – | 8,603,762 |
| Issuance of shares to owners | – | – |

```
    Retirement of treasury shares                  (27,760)                    -
    Net earnings                                  3,491,346            3,491,346


                                               ---------------      -----------------
Balance March 31, 1997                           7,071,431           16,476,745

    Sale of common shares                               -             2,000,000
    Issuance of shares for option exercise              -                 1,750
    Compensation to outside directors                   -               113,982
    Distributions to owners                      (1,087,260)          (1,087,260)
    Net earnings                                  6,039,094            6,039,094

                                               ===============      =================
Balance, March 31, 1998                        $ 12,023,265         $ 23,544,311
                                               ===============      =================
```

SEE NOTES TO CONSOLIDATED FINANCIAL STATEMENTS.


F-5

39

MLC HOLDINGS, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

|  | Year Ended March 31, | | |
|---|---|---|---|
|  | 1996 | 1997 | 1998 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net earnings | $ 2,815,559 | $ 3,491,346 | $ 6,039,094 |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | | |
| Depreciation and amortization | 2,199,722 | 3,650,248 | 4,628,272 |
| Abandonment of assets | 17,984 | 10,049 | – |
| Provision for credit losses | – | 66,000 | (1,000) |
| Extraordinary gain | (117,044) | – | – |
| (Loss) (Gain) on sale of operating lease equipment (1) | (323,422) | 83,754 | (55,881) |
| Impairment of operating lease residual values | – | 153,434 | – |
| Payments from leasees directly to lenders | (884,389) | (1,590,061) | (1,788,611) |
| Loss (Gain) on disposal of property and equipment | 4,489 | (9,124) | – |
| Deferred taxes | 623,000 | 121,000 | 897,000 |
| Compensation to outside directors - stock options | – | 9,500 | 113,982 |
| Changes in: | | | |
| Accounts receivable | 323,782 | (4,343,319) | (7,536,888) |
| Notes receivable (2) | (55,088) | (2,062,393) | (1,647,558) |
| Employee advances | (61,996) | 28,537 | 17,030 |
| Inventories | (813,491) | (400,046) | 64,410 |
| Other assets (3) | (342,209) | 457,169 | (893,959) |
| Accounts payable - equipment | 1,958,532 | (26,557) | 16,337,160 |
| Accounts payable - trade | 329,149 | 796,740 | 3,858,482 |
| Salaries and commissions payable, accrued expenses and other liabilities | 638,690 | 2,286,921 | 629,380 |
| Net cash provided by operating activities | 6,313,268 | 2,723,198 | 20,660,913 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Proceeds from sale of operating equipment | 1,383,677 | 4,992,050 | 726,714 |
| Purchase of operating lease equipment (4) | (13,919,193) | (24,800,360) | (2,065,079) |
| Increase in investment in direct financing and sales-type leases (5) | (17,169,201) | (6,825,873) | (18,833,704) |
| Proceeds from sale of property and equipment | 9,049 | 9,124 | 800 |
| Insurance proceeds received | 750,000 | 512,044 | – |
| Purchases of property and equipment | (301,039) | (266,061) | (1,032,243) |
| (Increase) Decrease in other assets (6) | (306,228) | 226,530 | (472,962) |
| Net cash used in investing activities | (29,552,935) | (26,152,546) | (21,676,474) |

F-6

40

MLC HOLDINGS INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS - CONTINUED

|  | Year Ended March 31, | | |
|---|---|---|---|
|  | 1996 | 1997 | 1998 |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Borrowings: | | | |
| Nonrecourse | 25,678,168 | 26,825,118 | 4,511,517 |
| Recourse | 67,103 | 220,768 | 174,894 |
| Repayments: | | | |
| Nonrecourse | (1,144,023) | (3,199,626) | (4,872,557) |
| Recourse | (231,273) | (434,867) | (307,819) |
| Repayments of loans from stockholders | (50,000) | (275,000) | (10,976) |
| Distributions to shareholders of combined companies | | | |
| prior to business combination | (362,330) | (859,378) | (1,087,260) |
| Proceeds from issuance of capital stock, net of expenses | – | 8,603,762 | 2,001,750 |
| Purchase of treasury stock | (23,000) | – | – |
| Proceeds (Repayments) from lines of credit | (252,098) | (1,448,370) | 12,635,599 |
| Net cash provided by financing activities | 23,682,547 | 29,432,407 | 13,045,148 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 442,880 | 6,003,059 | 12,029,587 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 208,270 | 651,150 | 6,654,209 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 651,150 | $ 6,654,209 | $ 18,683,796 |
| SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION: | | | |
| Cash paid for interest | $ 302,214 | $ 140,081 | $ 347,757 |
| Cash paid for income taxes | $ 202,864 | $ 315,137 | $ 2,681,867 |

SEE NOTES TO CONSOLIDATED FINANCIAL STATEMENTS.

(1)  Includes amounts (used by) provided by related parties of ($172,956),
     $3,930, and $(35,540) for the fiscal years ended March 31, 1996, 1997 and
     1998.

(2)  Includes amounts used by related parties of ($1,812,414) and $(1,897,094)
     for the fiscal years ended March 31, 1997 and 1998.

(3)  Includes amounts (used by) provided by related parties of ($398,034),
     $285,943, and $ 51,482 for the fiscal years ended March 31, 1996, 1997 and
     1998.

(4)  Includes amounts provided by related parties of $1,073,427, $2,707,213, and
     $935,737 for the fiscal years ended March 31, 1996, 1997 and 1998.

(5)  Includes amounts provided by (used by) related parties of $259,857,
     ($23,417), and $43,418,347 for the fiscal years ended March 31, 1996, 1997

and 1998.

(6)  Includes amounts (used by) provided by related parties of ($270,860),
     $73,338, ($473,621) for the fiscal years ended March 31, 1996, 1997 and
     1998.

F-7

41

MLC HOLDINGS, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
AS OF AND FOR THE YEARS ENDED MARCH 31, 1996, 1997, AND 1998

1.  ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Basis of Presentation - Effective September 1, 1996, MLC Holdings, Inc.,
(incorporated August 27, 1996) became the holding company for MLC Group, Inc.,
and MLC Capital, Inc. (MLC Holdings, Inc., together with its subsidiaries
collectively, "MLC" or the "Company"). The accompanying consolidated financial
statements include the accounts of the wholly owned subsidiary companies at
historical amounts as if the combination had occurred on March 31, 1995 in a
manner similar to a pooling of interest.

Business Combinations - On July 24, 1997, the Company, through a new wholly
owned subsidiary, MLC Network Solutions, Inc., issued 260,978 common shares,
valued at $3,384,564, in exchange for all outstanding common shares of
Compuventures of Pitt County, Inc. ("Compuventures"), a value-added reseller of
PC's and related network equipment and software products a provider of various
support services to its customers from facilities located in Greenville, Raleigh
and Wilmington, North Carolina. On September 29, 1997, the Company issued
498,998 common shares, valued at $7,092,000, in exchange for all outstanding
common shares of Educational Computer Concepts, Inc. (dba "ECC
Integrated")("ECCI"), a network systems integrator and computer reseller serving
customers in eastern Pennsylvania, New Jersey and Delaware. ECC Integrated
subsequently changed its name to MLC Integrated ("MLCI"). These business
combinations have been accounted for as pooling of interests, and accordingly,
the consolidated financial statements for periods prior to the combinations have
been restated to include the accounts and results of operations of the pooled
companies. See Note 12.

New Subsidiaries - On September 17, 1997, the Company established MLC Federal,
Inc., a wholly owned subsidiary of MLC Holdings, Inc. The new subsidiary will
concentrate on the origination of leases to federal, state, and local government
entities. On October 22, 1997, the Company formed MLC Leasing, S.A. de C.V., a
wholly owned subsidiary of MLC Group, Inc. and MLC Network Solutions, Inc.,
based in Mexico City, Mexico. To date, no business has been conducted through
MLC Leasing, S.A. de C.V.

All significant intercompany balances and transactions have been eliminated.

Revenue Recognition - The Company sells information technology equipment to its
customers and recognizes revenue from equipment sales at the time equipment is
accepted by the customer. The Company is the lessor in a number of its
transactions and these are accounted for in accordance with Statement of
Financial Accounting Standards ("SFAS") No. 13, "Accounting for Leases." Each
lease is classified as either a direct financing lease, sales-type lease, or
operating lease, as appropriate. Under the direct financing and sales-type lease
methods, the Company records the net investment in leases, which consists of the
sum of the minimum lease term payments, initial direct costs, and unguaranteed
residual value (gross investment) less the unearned income. The difference
between the gross investment and the cost of the leased

F-8

42

equipment for direct finance leases is recorded as unearned income at the
inception of the lease. The unearned income is amortized over the life of the
lease using the interest method. Under sales-type leases, the difference
between the fair value and cost of the leased property (net margins) is
recorded as revenue at the inception of the lease (sales type leases have not
been consumated during the three years ended March 31, 1998). The Company
adopted SFAS No. 125, "Accounting for Transfers and Servicing of Financial
Assets and Extinguishments of Liabilities" effective January 1, 1997. This
standard establishes new criteria for determining whether a transfer of
financial assets in exchange for cash or other consideration should be
accounted for as a sale or as a pledge of collateral in a secured borrowing.
Certain assignments of direct finance leases made on a nonrecourse basis by the
Company after December 31, 1996 meet the criteria for surrender of control set
forth by SFAS No. 125 and have therefore been treated as sales for financial
statement purposes. SFAS No. 125 prohibits the retroactive restatement of
transactions consummated prior to January 1, 1997 which would have otherwise
met the requirements of a sale under the standard.

Sales of leased equipment represents revenue from the sales of equipment
subject to a lease in which the Company is the lessor. If the rental stream on
such lease has non-recourse debt associated with it, sales revenue is recorded
at the amount of consideration received, net of the amount of debt assumed by
the purchaser. If there is no non-recourse debt associated with the rental
stream, sales revenue is recorded at the amount of gross consideration
received, and cost of sales is recorded at the book value of the lease.

Lease revenues consist of rentals due under operating leases and amortization of
unearned income on direct financing and sales-type leases. Equipment under
operating leases is recorded at cost and depreciated on a straight-line basis
over the lease term to the Company's estimate of residual value.

The Company assigns all rights, title, and interests in a number of its leases
to third-party financial institutions without recourse. These assignments are
accounted for as sales since the Company has completed its obligations at the
assignment date, and the Company retains no ownership interest in the equipment
under lease.

Residuals - Residual values, representing the estimated value of equipment at
the termination of a lease, are recorded in the financial statements at the
inception of each sales-type or direct financing lease as amounts estimated by
management based upon its experience and judgment. The residual values for
operating leases are included in the leased equipment's net book value.

The Company evaluates residual values on an ongoing basis and records any
required adjustments. In accordance with generally accepted accounting
principles, no upward revision of residual values is made subsequent to the
period of the inception of the lease. Residual values for sales-type and direct
financing leases are recorded at their net present value and the unearned
interest is amortized over the life of the lease using the interest method.

Reserve for Credit Losses - The reserve for credit losses (the "reserve") is
maintained at a level believed by management to be adequate to absorb potential
losses inherent in the Company's lease and accounts receivable portfolio.
Management's determination of the adequacy of the reserve is based on an
evaluation of historical credit loss experience, current economic conditions,
volume, growth, the composition of the lease portfolio, and other relevant
factors. The reserve is increased by provisions for potential credit losses
charged against income. Accounts are either written off or written down when the
loss is both probable and determinable, after giving consideration to the
customer's financial condition, the value of the underlying collateral and
funding status (i.e., discounted on a nonrecourse or recourse basis).

Cash and Cash Equivalents - Cash and cash equivalents include short-term

repurchase agreements with an original maturity of three months or less.

Inventories - Inventories are stated at the lower of cost (specific identification basis) or market.

F-9

43

Property and Equipment - Property and equipment are stated at cost, net of accumulated depreciation and amortization. Depreciation and amortization are computed using the straight-line method over the estimated useful lives of the related assets, which range from three to seven years.

Income Taxes - Deferred income taxes are accounted for in accordance with SFAS No. 109, "Accounting for Income Taxes." Under this method, deferred income tax liabilities and assets are based on the difference between financial statement and tax bases of assets and liabilities, using tax rates currently in effect. The Company acquired two companies which were accounted for under the pooling of interests method. Prior to their business combinations with the Company, the two companies had elected to be taxed under the provisions of Subchapter "S" of the Internal Revenue Code. Under this election, each company's income or loss was included in the taxable income of the stockholders. See Note 8.

Estimates - The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Reclassifications - Certain items have been reclassified in the March 31, 1996 and 1997 financial statements to conform to the March 31, 1998 presentation.

Initial Public Offering - During November and December 1996, MLC consummated an initial public offering ("the Offering") of 1,150,000 shares of its common stock including the over allotment. The Company received proceeds of $9.4 million (gross proceeds of $10.1 million less underwriters expense of $0.7 million), and incurred $0.8 million in expenses. Of the net proceeds of approximately $8.6 million, $0.3 million was used to repay outstanding stockholder loans and the related accrued interest and the balance of $8.3 million was used for general corporate purposes.

Earnings Per Share - Earnings per share have been calculated in accordance with SFAS No. 128, "Earnings per Share," issued in February, 1997 and effective beginning in fiscal year 1998. Earnings per share amounts for fiscal years prior to 1998 have been restated to comply with SFAS No. 128. Basic EPS amounts were calculated based on weighted average shares outstanding of 4,572,635 in fiscal 1996, 5,184,261 in fiscal 1997, and 6,031,088 in fiscal 1998. Diluted EPS amounts were calculated based on weighted average shares outstanding and common stock equivalents of 4,572,635 in fiscal 1996, 5,262,697 in fiscal 1997 and 6,143,017 in fiscal 1998. Additional shares included in the diluted EPS calculation are attributable to incremental shares issuable upon the assumed exercise of stock options.

2.  INVESTMENT IN DIRECT FINANCING AND SALES-TYPE LEASES

The Company's investment in direct financing and sales-type leases consists of the following components:

F-10

44

|                                               | As of March 31, | |
|                                               | 1997 | 1998 |
| --- | --- | --- |
|                                               | (In Thousands) | |
| Minimum lease payments                        | $   18,752 | $   29,968 |
| Estimated unguaranteed residual value         | 1,271 | 7,084 |
| Initial direct costs, net of amortization (1) | 1,237 | 760 |
| Less: Unearned lease income                   | (3,721) | (5,270) |
| Reserve for credit losses                     | (66) | (46) |
| Investment in direct finance and sales type leases, net | $   17,473 | $   32,496 |

(1) Initial direct costs are shown net of amortization of $1,299 and $1,592 at March 31, 1997
    and 1998, respectively.

Future scheduled minimum lease rental payments as of March 31, 1998 are as
follows:

|                              | (In Thousands) |
| --- | --- |
| Year ending March 31, 1999   | $   13,301 |
| 2000                         | 9,119 |
| 2001                         | 5,632 |
| 2002                         | 1,618 |
| 2003 and thereafter          | 298 |
|                              | $   29,968 |

The Company's net investment in direct financing and sales-type leases is
collateral for nonrecourse and recourse equipment notes. See Note 5.

3.   INVESTMENT IN OPERATING LEASE EQUIPMENT

Investment in operating leases primarily represents equipment leased for two to
three years. The components of the net investment in operating lease equipment
are as follows:

|                                             | As of March 31, | |
|                                             | 1997 | 1998 |
| --- | --- | --- |
|                                             | (In Thousands) | |
| Cost of equipment under operating leases    | $   14,519 | $   13,990 |
| Initial direct costs                        | 42 | 51 |
| Less: Accumulated depreciation and amortization | (3,496) | (6,745) |
| Investment in operating lease equipment, net | $   11,065 | $   7,296 |

F-11

45

As of March 31, 1998, future scheduled minimum lease rental payments are as
follows:

|  | (In Thousands) |
|---|---|
| Year ending March 31, 1999 | $    3,320 |
| 2000 | 1,496 |
| 2001 | 50 |
| 2002 | 5 |
|  | ---------- |
|  | $    4,871 |
|  | ========== |

Based on management's evaluation of estimated residual values included within
the Company's operating lease portfolio, certain recorded residuals were written
down to reflect revised market conditions. In accordance with SFAS No. 121,
"Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets To
Be Disposed Of," an impairment loss of $153,435 was recognized in the year ended
March 31, 1997. Impairment losses are reflected as a component of direct lease
costs in the accompanying consolidated statements of earnings.

4.  PROPERTY AND EQUIPMENT

Property and equipment consists of the following:

|  | As of March 31, | |
|---|---|---|
|  | 1997 | 1998 |
|  | (In Thousands) | |
| Furniture and fixtures | $      852 | $    1,157 |
| Vehicles | 142 | 138 |
| Capitalized software | 186 | 477 |
| Leasehold improvements | 23 | 24 |
| Less: Accumulated depreciation and amortization | (462) | (664) |
| Property and equipment, net | $      741 | $    1,132 |

5.  RECOURSE AND NONRECOURSE NOTES PAYABLE

Recourse and nonrecourse obligations consist of the following:

|  | As of March 31, | |
|---|---|---|
|  | 1997 | 1998 |
|  | (In Thousands) | |
| Recourse equipment notes secured by related investments in leases with varying interest rates ranging from 8.53% to 8.75% in fiscal 1997 and 1998 | $      269 | $      272 |
| Recourse line of credit with a maximum |  |  |

balance of $25,000,000, bearing interest at the

F-12

*MLC HOLDINGS INC*                                                    *Filing Date: 03/31/98*

46

| | | |
|---|---:|---:|
| LIBOR rate plus 1.1% or, at the Company's option, the prime rate less 100 basis points | – | 12,750 |
| Recourse line of credit with a maximum balance of $2,500,000 with an interest rate based on the prime rate | 110 | – |
| Term bank obligations with interest rates ranging from 8.25% to bank prime plus 75 basis points | 31 | 10 |
| Capitalized equipment lease debt with interest imputed at 9% | 4 | – |
| Loans from related parties with interest rates ranging from 8% to 10% | 25 | 5 |
| Total recourse obligations | $ 439 | $ 13,037 |
| Nonrecourse equipment notes secured by related investments in leases with interest rates ranging from 6.30% to 9.90% in fiscal 1997 and 6.30% to 9.99% in fiscal 1998 | $ 19,705 | $ 13,028 |

Principal and interest payments on the recourse and nonrecourse notes payable are generally due monthly in amounts that are approximately equal to the total payments due from the lessee under the leases that collateralize the notes payable. Under recourse financing, in the event of a default by a lessee, the lender has recourse against the lessee, the equipment serving as collateral, and the borrower. Under nonrecourse financing, in the event of a default by a lessee, the lender generally only has recourse against the lessee, and the equipment serving as collateral, but not against the borrower.

Borrowings under the Company's $25 million line of credit are subject to certain covenants regarding minimum consolidated tangible net worth, maximum recourse debt to worth ratio, and minimum interest expense coverage ratio. Borrowings are limited to the Company's collateral base, consisting of equipment, lease receivables and other current assets, up to a maximum of $25 million. In addition, the credit agreement restricts, and under some circumstances prohibits the payment of dividends.

Recourse and nonrecourse notes payable as of March 31, 1998, mature as follows:

F-13

47

| | Recourse Notes Payable | | Nonrecourse Notes Payable | |
|---|---|---|---|---|
| | (In Thousands) | | | |
| Year ending March 31, 1999 | $ | 12,950 | $ | 7,606 |
| 2000 | | 56 | | 4,322 |
| 2001 | | 31 | | 1,006 |
| 2002 | | – | | 94 |
| | $ | 13,037 | $ | 13,028 |

## 6.  RELATED PARTY TRANSACTIONS

The Company provided loans and advances to employees and/or stockholders, the balances of which amounted to $70,612 and $53,582 as of March 31, 1997 and 1998, respectively. Such balances are to be repaid from commissions earned on successful sales or financing arrangements obtained on behalf of the Company, or via scheduled payroll deductions.

As of March 31, 1997 and 1998, $72,000 and $85,020 was receivable from United Federal Leasing, which is owned in part by an individual related to a Company executive. As of March 31, 1997 and 1998, the Company had fully reserved for the receivable. During the year ended March 31, 1998, the Company recognized re-marketing fees of $561,000 from United Federal Leasing.

During the year ended March 31, 1996, the Company sold leased equipment to a company in which an employee/stockholder has a 45% ownership interest. Revenue recognized from the sales amounted to $1,300,448. The basis of the equipment sold was $1,271,729. At March 31, 1998, accrued expenses and other liabilities include $9,599 due to the related company. During the years ended March 31, 1997 and 1998, respectively, the Company recognized remarketing fees from the company amounting to $224,126 and $216,828.

During the years ended March 31, 1996 and 1997, the Company paid a stockholder $120,000 and $90,000, respectively, in exchange for the pledge of personal assets made to secure one of the Company's revolving line-of-credit agreements.

During the years ended March 31, 1996, 1997 and 1998, the Company sold leased equipment to MLC/GATX Limited Partnership I (the "Partnership"), which amounted to 18%, 4% and 0.3% of the Company's revenues, respectively. The Company has a 9.5% limited partnership interest in the Partnership and owns a 50% interest in the corporation that owns a 1% general partnership interest in the Partnership. Revenue recognized from the sales was $13,079,433, $3,452,902 and $406,159, and the basis of the equipment sold was $12,273,527, $3,309,186 and $372,306 during the years ended March 31, 1996, 1997 and 1998, respectively. Other assets include $209,691 due from, $75,981 and $136,664 due to the Partnership as of March 31, 1996, 1997 and 1998, respectively. Also reflected in other assets is the Company's investment balance in the Partnership, which is accounted for using the cost method, and amounts to $380,757, $226,835 and $132,351 as of March 31, 1996, 1997 and 1998, respectively. In addition, the Company received $122,111, $148,590 and $104,277 for the years ended March 31, 1996, 1997 and 1998, respectively, for accounting and administrative services provided to the Partnership.

F-14

48

During the years ended March 31, 1997 and 1998 the recoverability of certain capital contributions made by the Company to the Partnership was determined to be impaired. As a result, the Company recognized a write-down of its recorded investment balance of $195,897 and $105,719 to reflect the revised net realizable value. These write-downs are included in cost of sales in the accompanying consolidated statements of earnings.

During the years ended March 31, 1996, 1997 and 1998, the Company sold leased equipment to MLC/CLC LLC, a joint venture in which the Company has a 5% ownership interest, that amounted to 2%, 20%, and 38% of the Company's revenues, respectively. Revenue recognized from the sales was $1,256,518, $16,923,090 and $44,784,727, respectively. The basis for the equipment sold was $1,335,885, $16,917,840, and $44,353,676, respectively. Notes receivable includes $1,812,414 and $3,709,508 due from the partnership as of March 31, 1997 and 1998. Other assets reflects the investment in the joint venture of $168,259 and $736,364, as of March 31, 1997 and 1998, respectively, accounted for using the cost method. The Company receives an origination fee on leased equipment sold to the joint venture. In addition, the Company recognized $52,742 and $170,709 for the years ended March 31, 1997 and 1998 for accounting and administrative services provided to MLC/CLC LLC.

During the year ended March 31, 1997, the Company recognized $250,000 in broker fees for providing advisory services to a company which is owned in part by one of the Company's outside directors.

The Company leases certain office space from entities which are owned, in part, by exeutives of subsidiaries of the Company.  During the years ended March 31, 1996, 1997 and 1998, rent expense paid to these related parties was $132,111, $124,222 and $306,479, respectively.

The Company is reimbursed for certain general and administrative expenses by a company owned, in part, by an executive of a subsidiary of the Company. The reimbursements totaled $128,310, $176,075 and $81,119 for the years ended March 31, 1996, 1997 and 1998.

7.  COMMITMENTS AND CONTINGENCIES

The Company leases office space and certain office equipment for the conduct of its business. Rent expense relating to these operating leases was $396,829, $347,553 and $505,032 for the years ended March 31, 1996, 1997, and 1998, respectively. As of March 31, 1998, the future minimum lease payments are due as follows:

| | |
|---|---|
| Year ending March 31, 1999 | $    413,937 |
| 2000 | 270,876 |
| 2001 | 231,522 |
| 2002 | 232,780 |
| 2003 and thereafter | 469,509 |
| | ------------ |
| | $  1,618,624 |
| | ============ |

As of March 31, 1998, the Company has guaranteed $172,565 of the residual value for equipment owned by the MLC/GATX Limited Partnership I.

F-15

49

## 8.  INCOME TAXES

A reconciliation of income tax computed at the statutory Federal rate to the provision for income tax included in the consolidated statements of earnings is as follows:

|  | For the Year Ended March 31, | | |
|---|---|---|---|
|  | 1996 | 1997 | 1998 |
| Statutory Federal income tax rate | 34% | 34% | 34% |
| Income tax expense computed at the statutory Federal rate | $ 1,217,035 | $ 1,649,458 | $ 2,968,195 |
| Income tax expense based on the statutory Federal rate for subsidiaries which were Sub-S prior to their combination with the Company | (369,956) | (343,658) | (568,893) |
| State income tax expense, net of Federal tax | 24,643 | 48,641 | 250,692 |
| Non-taxable interest income | (79,342) | (33,023) | (35,350) |
| Non-deductible expenses | 88,620 | 38,582 | 76,246 |
| Provision for income taxes | $ 881,000 | $ 1,360,000 | $ 2,690,890 |
| Effective tax rate | 24.6% | 28.0% | 30.8% |

The components of the provision for income taxes are as follows:

|  | For the Year Ended March 31, | | |
|---|---|---|---|
|  | 1996 | 1997 | 1998 |
|  | (In Thousand) | | |
| Current: | | | |
| Federal | $ 231 | $ 1,152 | $ 1,669 |
| State | 27 | 87 | 125 |
|  | 258 | 1,239 | 1,794 |
| Deferred: | | | |
| Federal | 557 | 113 | 802 |
| State | 66 | 8 | 95 |
|  | 623 | 121 | 897 |
|  | $ 881 | $ 1,360 | $ 2,691 |

The components of the deferred tax expense (benefit) resulting from net temporary differences are as follows:

F-16

50

|                              | For the Year Ended March 31, | | |
|                              | 1996      | 1997      | 1998   |
|------------------------------|-----------|-----------|--------|
|                              | (In Thousands) | | |
| Alternative minimum tax      | $  (200)  | $   369   | $  18  |
| Lease revenue recognition    | 823       | (248)     | 797    |
| Other                        | –         | –         | 82     |
|                              | $   623   | $   121   | $ 897  |

Deferred income taxes reflect the net tax effects of temporary differences
between the carrying amounts of assets and liabilities for financial reporting
purposes and the amounts used for income tax purposes. The tax effects of items
comprising the Company's deferred tax liability consists of the following:

|                              | As of March 31, | |
|                              | 1997      | 1998      |
|------------------------------|-----------|-----------|
|                              | (In Thousands) | |
| Alternative minimum tax      | $    250  | $    232  |
| Lease revenue recognition    | (840)     | (1,637)   |
| Other                        | –         | (82)      |
|                              | $   (590) | $ (1,487) |

During the year ended March 31, 1998, the Company entered into business
combinations with companies which, prior to their combination with the Company,
had elected to be treated as Sub-chapter "S" ("Sub-S") corporations. As Sub-S
corporations, taxable income and losses were passed through the corporate entity
to the individual shareholders. These business combinations were accounted for
using the pooling of interests method. Therefore, the consolidated financial
statements do not reflect a provision for income taxes relating to the pooled
companies for the periods prior to their combination with the Company.

In accordance with Statement of Financial Accounting Standard No. 109,
"Accounting for Income Taxes," the following pro forma income tax information is
presented as if the pooled companies had been subject to federal income taxes
throughout the periods presented.

|                                      | For the Year Ended March 31, | | |
|                                      | 1996      | 1997      | 1998      |
|--------------------------------------|-----------|-----------|-----------|
| Net earnings before pro forma adjustment | $ 2,815,559 | $ 3,491,346 | $ 6,039,094 |
| Additional provision for income taxes    | (426,141)   | (357,910)   | (613,261)   |
| Pro forma net earnings               | $ 2,389,418 | $ 3,133,436 | $ 5,425,833 |

9.  NONCASH INVESTING AND FINANCING ACTIVITIES

The Company recognized a reduction in recourse and nonrecourse notes payable
(Note 5) associated with its direct finance and operating lease activities from
payments made directly by customers to the third-party lenders amounting to
$4,796,306, $4,214,444 and $5,258,955 for the years ended March 31, 1996, 1997,
and 1998, respectively. In addition, the Company realized a reduction in
recourse and nonrecourse notes payable from the sale of the associated assets
and

F-17

51

liabilities amounting to $11,550,446, $18,057,569 and $1,057,389 for the
years ended March 31, 1996, 1997, and 1998, respectively.

10.  BENEFIT AND STOCK OPTION PLANS

The Company provides its employees with contributory 401(k) profit sharing
plans. To be eligible to participate in the plan, employees must be at least 21
years of age and have completed a minimum service requirement. Full vesting in
the plans vary from after the fourth to the sixth consecutive year of plan
participation. Employer contributions percentages are determined by the Company
and are discretionary each year. The Company's expense for the plans was
$77,145, $56,291 and $80,291 for the years ended March 31, 1996, 1997 and 1998,
respectively.

The Company has established a stock incentive program (the "Master Stock
Incentive Plan")(formerly the 1996 Stock Incentive Plan prior to amendment and
restatement effective May 14, 1997 which has been adopted by the Board of
Directors and received on September 30, 1997 stockholder ratification) to
provide an opportunity for directors, executive officers, independent
contractors, key employees, and other employees of the Company to participate in
the ownership of the Company. The Master Stock Incentive Plan provides for the
award to eligible directors, employees, and independent contractors of the
Company, of a broad variety of stock-based compensation alternatives under a
series of component plans. These component plans include tax advantaged
incentive stock options for employees under the Incentive Stock Option Plan
(formerly the 1996 Incentive Stock Option Plan prior to amendment and
restatement effective May 14, 1997), formula length of service based
nonqualified options to nonemployee directors under the Outside Director Stock
Plan (formerly the 1996 Outside Director Stock Option Plan prior to amendment
and restatement effective May 14, 1997), nonqualified stock options under the
Nonqualified Stock Option Plan (formerly the 1996 Nonqualified Stock Option Plan
prior to amendment and restatement effective May 14, 1997), a program for
employee purchase of Common Stock of the Company at 85% of fair market value
under a tax advantaged Employee Stock Purchase Plan (approved by the Board of
Directors but which is not effective until stockholder ratification), as well as
other restrictive stock and performance based stock awards and programs which
may be established by the Board of Directors. The May 14, 1997 Amendments
increase the aggregate number of shares reserved for grant under all plans which
are a part of the Master Stock Incentive Plan to a floating number equal to 20%
of the issued and outstanding stock of the Company (after giving effect to pro
forma assumed exercise of all outstanding options and purchase rights). The
number that may be subject to options granted under the Incentive Stock Option
Plan is also further capped at a maximum of 4,000,000 shares to comply with IRS
requirements for a specified maximum. As of March 31, 1998 a total of 1,214,301
shares of common stock have been reserved for issuance upon exercise of options
granted under the Plan, which encompasses the following component plans:

      a)    the Amended and Restated Incentive Stock Option Plan ("ISO
            Plan"), under which 297,100 options are outstanding or have been
            exercised as of March 31, 1998;

      b)    the Amended and Restated Nonqualified Stock Option Plan
            ("Nonqualified Plan"), under which 265,000 options are
            outstanding as of March 31, 1998;

                                    F-18

52

    c)    the Amended and Restated Outside Director Stock Option Plan ("Outside Director Plan"), under which 50,000 are outstanding as of March 31, 1998;

    d)    the Employee Stock Purchase Plan ("ESPP") under which no shares have been issued as of March 31, 1998.

The exercise price of options granted under the Master Stock Incentive Plan is equivalent to the fair market value of the Company's stock on the date of grant, or, in the case of the ESPP, not less than 85% of the lowest fair market value of the Company's stock during the purchase period, which is generally six months. Options granted under the plan have various vesting schedules with vesting periods ranging from one to five years.

A summary of stock option activity during the two years ended March 31, 1998 is as follows:

|                              | Number of Shares | Exercise Price Range |
|------------------------------|------------------|----------------------|
| Outstanding, April 1, 1996   | –                | –                    |
| Options granted              | 353,800          | $6.40 - $10.75       |
| Options exercised            | –                | –                    |
| Options forfeited            | –                | –                    |
| Outstanding, March 31, 1997  | 353,800          |                      |
| Exercisable, March 31, 1997  | 66,250           |                      |
| Outstanding, April 1, 1997   | 353,800          | –                    |
| Options granted              | 277,200          | $10.75 - $13.25      |
| Options exercised            | (200)            | $8.75                |
| Options forfeited            | (18,900)         | $8.75 - $13.00       |
| Outstanding, March 31, 1998  | 611,900          |                      |
| Exercisable, March 31, 1998  | 199,540          |                      |

Additional information regarding options outstanding as of March 31, 1998 is as follows:

| Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|
| Number Outstanding | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price |
| 611,900 | 8.2 years | $9.58 | 199,540 | $8.81 |

Effective April 1, 1996, the Company adopted SFAS No. 123, "Accounting for Stock-Based Compensation." This Statement gave the Company the option of either (1) continuing to account for stock-based employee compensation plans in

accordance with the guidelines established by Accounting Principles Board ("APB") No. 25, "Accounting for Stock Issued to Employees" while providing the disclosures required under SFAS No. 123, or (2) adopting SFAS No. 123

F-19

53

accounting for all employee and non-employee stock compensation arrangements. The Company opted to continue to account for its stock-based awards using the intrinsic value method in accordance with APB No. 25. Accordingly, no compensation expense has been recognized in the financial statements for employee stock arrangements. Option grants made to non-employees, including outside directors, have been accounted for using the fair value method, which resulted in $9,500 and $113,982 in compensation expense during the years ended March 31, 1997 and 1998, respectively. The following table summarizes the pro forma disclosures required by SFAS No. 123 assuming the Company had adopted the fair value method for stock-based awards to employees as of the beginning of fiscal year 1997:

|  | Year Ended March 31, | |
|  | 1997 | 1998 |
| --- | --- | --- |
| Net earnings, as reported | $  3,491,346 | $  6,039,094 |
| Net earnings, pro forma | 3,198,669 | 5,345,456 |
| Basic earnings per share, as reported | $  0.67 | $  1.00 |
| Basic earnings per share, pro forma | 0.62 | 0.89 |
| Diluted earnings per share, as reported | $  0.66 | $  0.98 |
| Diluted earnings per share, pro forma | 0.61 | 0.87 |

Under SFAS No. 123, the fair value of stock-based awards to employees is derived through the use of option pricing models which require a number of subjective assumptions. The Company's calculations were made using the Black-Scholes option pricing model with the following weighted average assumptions:

|  | For the Year Ended March 31, | |
|  | 1997 | 1998 |
| --- | --- | --- |
| Options granted under the Incentive Stock Option Plan: | | |
| Expected life of option | 5 years | 5 years |
| Expected stock price volatility | 44.00% | 30.95% |
| Expected dividend yield | 0% | 0% |
| Risk-free interest rate | 5.81% | 5.82% |
| Options granted under the Nonqualified Stock Option Plan: | | |
| Expected life of option | 8 years | 8 years |
| Expected stock price volatility | 44.00% | 30.95% |
| Expected dividend yield | 0% | 0% |
| Risk-free interest rate | 6.05% | 5.62% |

F-20

54

## 11.  FAIR VALUE OF FINANCIAL INSTRUMENTS

The following disclosure of the estimated fair value of the Company's financial
instruments is in accordance with the provisions of SFAS No. 107, "Disclosures
About Fair Value of Financial Instruments." The valuation methods used by the
Company are set forth below.

The accuracy and usefulness of the fair value information disclosed herein is
limited by the following factors:

-   These estimates are subjective in nature and involved uncertainties
    and matters of significant judgment and therefore cannot be determined
    with precision. Changes in assumptions could significantly affect the
    estimates.

-   These estimates do not reflect any premium or discount that could
    result from offering for sale at one time the Company's entire holding
    of a particular financial asset.

-   SFAS No. 107 excludes from its disclosure requirements lease contracts
    and various significant assets and liabilities that are not considered
    to be financial instruments.

Because of these and other limitations, the aggregate fair value amounts
presented in the following table do not represent the underlying value of the
Company.

The carrying amounts and estimated fair values of the Company's financial
instruments are as follows:

|  | As of March 31, 1997 | | As of March 31, 1998 | |
| --- | --- | --- | --- | --- |
|  | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
|  | (In Thousands) | | | |
| **Assets:** | | | | |
| Cash and cash equivalents | $   6,654 | $   6,654 | $  18,684 | $  18,684 |
| **Liabilities:** | | | | |
| Nonrecourse notes payable | 19,705 | 19,752 | 13,028 | 12,973 |
| Recourse notes payable | 439 | 465 | 13,037 | 13,033 |

## 12.  BUSINESS COMBINATIONS

During the year ended March 31, 1998, the Company acquired Compuventures of Pitt
County, Inc. ("Compuventures") and Educational Computer Concepts, Inc. ("ECCI"),
both value added resellers of personal computers and related network equipment
and software products. These business combinations have been accounted for as
pooling of interests, and accordingly, the consolidated financial statements for
periods prior to the combinations have been restated to include the accounts and
results of operations of the pooled companies. The results of operations

F-21

55

previously reported by the Company and the pooled companies and the combined
amounts presented in the accompanying consolidated financial statements are
presented below.

|                       | For the Year Ended March 31, | | |
|                       | 1996      | 1997      | 1998      |
|-----------------------|-----------|-----------|-----------|
|                       | (In Thousands) | | |
| **Revenues:**         |           |           |           |
| MLC Holdings, Inc.    | $  42,634 | $  55,711 | $  77,178 |
| Pooled companies      |    29,080 |    30,502 |    41,264 |
| Combined              | $  71,714 | $  86,213 | $ 118,442 |
| **Net earnings:**     |           |           |           |
| MLC Holdings, Inc.    | $   1,610 | $   2,481 | $   3,785 |
| Pooled companies      |     1,205 |     1,010 |     2,254 |
| Combined              | $   2,815 | $   3,491 | $   6,039 |

F-22

56

## 13. CONDENSED QUARTERLY DATA - UNAUDITED

Condensed quarterly financial information is as follows (amounts in thousands,
except per share amounts). Adjustments reflect the results of operations of
business combinations accounted for under the pooling of interests method and
the reclassification of certain prior period amounts to conform with current
period presentation.

MLC HOLDINGS, INC. AND SUBSIDIARIES
CONDENSED QUARTERLY INFORMATION
(IN THOUSANDS)

| | FIRST QUARTER | | | SECOND QUARTER | | |
|---|---|---|---|---|---|---|
| | Previously Reported | Adjustments | Adjusted Amount | Previously Reported | Adjustments | Adjusted Amount |
| **Year Ended March 31, 1997** | | | | | | |
| Sales | $10,412 | $ 6,978 | $17,390 | $ 8,635 | $6,026 | $14,661 |
| Total revenues | 12,896 | 7,267 | 20,163 | 11,705 | 6,284 | 17,989 |
| Cost of sales | 9,894 | 5,649 | 15,543 | 8,250 | 4,563 | 12,813 |
| Total costs and expenses | 12,097 | 7,189 | 19,286 | 10,803 | 5,979 | 16,782 |
| Earnings before provision for income taxes | 799 | 78 | 877 | 902 | 305 | 1,207 |
| Provision for income taxes | 284 | – | 284 | 322 | – | 322 |
| Net earnings | 515 | 78 | 593 | 580 | 305 | 885 |
| Net earnings per common share | $ 0.13 | | $ 0.12 | $ 0.15 | | $ 0.19 |
| **Year Ended March 31, 1998** | | | | | | |
| Sales | $22,309 | $12,964 | $35,273 | $22,407 | $ – | $22,407 |
| Total revenues | 26,763 | 13,383 | 40,146 | 27,253 | (384) | 26,869 |
| Cost of sales | 21,858 | 10,034 | 31,892 | 19,773 | – | 19,773 |
| Total costs and expenses | 25,379 | 12,120 | 37,499 | 25,719 | (384) | 25,335 |
| Earnings before provision for income taxes | 1,384 | 1,263 | 2,647 | 1,534 | – | 1,534 |
| Provision for income taxes | 460 | – | 460 | 412 | – | 412 |
| Net earnings | 924 | 1,263 | 2,187 | 1,122 | – | 1,122 |
| Net earnings per common share | $ 0.18 | | $ 0.37 | $ 0.19 | | $ 0.19 |

| | THIRD QUARTER | | | FOURTH QUARTER | | |
|---|---|---|---|---|---|---|
| | Previously Reported | Adjustments | Adjusted Amount | Previously Reported | Adjustments | Adjusted Amount |
| **Year Ended March 31, 1997** | | | | | | |
| Sales | $ 8,435 | $8,106 | $16,541 | $15,836 | $9,373 | $25,209 |
| Total revenues | 11,800 | 8,345 | 20,145 | 19,747 | 8,169 | 27,916 |
| Cost of sales | 7,676 | 6,712 | 14,388 | 14,284 | 6,819 | 21,103 |
| Total costs and expenses | 10,810 | 7,957 | 18,767 | 18,597 | 7,929 | 26,526 |
| Earnings before provision for income taxes | 990 | 388 | 1,378 | 1,150 | 240 | 1,390 |

*MLC HOLDINGS INC*                                                    *Filing Date: 03/31/98*

| | | | | | | |
|---|---|---|---|---|---|---|
| Provision for income taxes | 349 | – | 349 | 405 | – | 405 |
| Net earnings | 641 | 388 | 1,029 | 745 | 240 | 985 |
| Net earnings per common share | $ 0.14 | | $ 0.19 | $ 0.14 | | $ 0.17 |
| Year Ended March 31, 1998 | | | | | | |
| Sales | $18,097 | $ – | $18,097 | $ – | $ – | $22,004 |
| Total revenues | 23,563 | (287) | 23,276 | – | – | 28,151 |
| Cost of sales | 15,625 | – | 15,625 | – | – | 19,802 |
| Total costs and expenses | 21,435 | (287) | 21,148 | – | – | 25,730 |
| Earnings before provision for income taxes | 2,128 | – | 2,128 | – | – | 2,421 |
| Provision for income taxes | 851 | – | 851 | – | – | 968 |
| Net earnings | 1,277 | – | 1,277 | – | – | 1,453 |
| Net earnings per common share | $ 0.21 | | $ 0.21 | $ – | | $ 0.24 |

F-23

57

SCHEDULE II

MLC HOLDINGS, INC. AND SUBSIDIARIES

VALUATION AND QUALIFYING ACCOUNTS
FOR THE THREE YEARS ENDED MARCH 31, 1996, 1997 AND 1998
(IN THOUSANDS)

|  | Column B Balance at beginning of period | Column C - Additions | | Column D Deductions | Column E Balance at end of year |
|---|---|---|---|---|---|
| Column A - Description |  | (1) Charged to costs and expenses | (2) Charged to other accounts |  |  |
| 1998 Allowances for doubtful accounts and credit losses | $ 143 | $ 56 | $ -- | $ 57 | $ 142 |
| 1997 Allowances for doubtful accounts and credit losses | $ 8 | $ 144 | $ -- | $ 9 | $ 143 |
| 1996 Allowances for doubtful accounts and credit losses | $ 4 | $ 15 | $ -- | $ 11 | $ 8 |

S-1

58

INDEX TO EXHIBITS

Exhibit
Number          Description

23.1      Consent of Deloitte & Touche LLP

23.2      Consent of Herbein & Company, Inc.

27.1      Financial Data Schedule

Filing Date: 03/31/98

```
      1
INDEPENDENT AUDITORS' CONSENT                                    EXHIBIT 23.1


We consent to the incorporation by reference in Registration Statement No.
333-21295 of MLC Holdings, Inc. on Form S-8 of our report dated June 22, 1998,
appearing in this Annual Report on Form 10-K of MLC Holdings, Inc. for the year
ended March 31, 1998.

/s/Deloitte & Touche LLP

McLean, Virginia

June 22, 1998


                              Page 1
```

```
     1
```
INDEPENDENT AUDITORS' CONSENT                                    EXHIBIT 23.2


We consent to the incorporation by reference in Registration Statement No.
333-21295 of MLC Holdings, Inc. on Form S-8 of our report dated October 24,
1997, appearing in this Annual Report on Form 10-K of MLC Holdings, Inc. for the
year ended March 31, 1998.


/s/ Herbein and Company, Inc.


Pottstown, Pennslyvania
June 29, 1998

```
<ARTICLE> 5
<MULTIPLIER> 1,000


<PERIOD-TYPE>                    12-MOS
<FISCAL-YEAR-END>                            MAR-31-1998
<PERIOD-START>                               APR-01-1997
<PERIOD-END>                                 MAR-31-1998
<CASH>                                            18,684
<SECURITIES>                                           0
<RECEIVABLES>                                     20,185
<ALLOWANCES>                                           0
<INVENTORY>                                        1,214
<CURRENT-ASSETS>                                       0
<PP&E>                                             1,132
<DEPRECIATION>                                         0
<TOTAL-ASSETS>                                    83,196
<CURRENT-LIABILITIES>                                  0
<BONDS>                                                0
<PREFERRED-MANDATORY>                                  0
<PREFERRED>                                            0
<COMMON>                                              61
<OTHER-SE>                                             0
<TOTAL-LIABILITY-AND-EQUITY>                      83,196
<SALES>                                           97,781
<TOTAL-REVENUES>                                 118,442
<CGS>                                             87,092
<TOTAL-COSTS>                                     22,620
<OTHER-EXPENSES>                                       0
<LOSS-PROVISION>                                       0
<INTEREST-EXPENSE>                                 1,837
<INCOME-PRETAX>                                    8,730
<INCOME-TAX>                                       2,691
<INCOME-CONTINUING>                                6,039
<DISCONTINUED>                                         0
<EXTRAORDINARY>                                        0
<CHANGES>                                              0
<NET-INCOME>                                       6,039
<EPS-PRIMARY>                                       1.00
<EPS-DILUTED>                                       0.98
```

EXHIBIT 3

United StatesSECURITIES AND EXCHANGE COMMISSIONWashington, D.C. 20549
FORM 8-K CURRENT REPORT Pursuant to Section 13 or 15(d) of the Securities
Exchange Act of 1934 Date of Report (Date of earliest event reported):
December 4, 2007 (November 29, 2007)
ePlus inc. (Exact name of registrant as specified in its charter)


| Delaware | 000-28926 | 54-1817218 |
|---|---|---|
| (State or other jurisdiction of | (Commission File Number) | (I.R.S. Employer |
| incorporation or organization) | | Identification No.) |


13595 Dulles Technology Drive, Herndon, VA 20171-3413(Address,
including zip code, of principal executive offices)
Registrant's telephone number, including area code: (703) 984-8400


Check the appropriate box below if the Form 8-K filing is intended
to simultaneously satisfy the filing obligation of the registrant under any of
the following provisions (see General Instruction A.2 below):
{   }   Written communications pursuant to Rule 425  under  the  Securities
Act (17 CFR 230.425)
{   }   Soliciting  material  pursuant to Rule 14a-12 under  the  Exchange
Act (17 CFR 240.14a-12)
{   }   Pre-commencement  communications pursuant  to Rule  14d-2(b)  under
the Exchange Act (17 CFR 240.14d-2(b))
{   }   Pre-commencement  communications  pursuant to  Rule 13e-4(c)  under
the Exchange Act (17 CFR 240.13e-4(c))


1
Item 1.01 Entry into a Material Definitive Agreement
On November 29, 2007, ePlus inc. ("ePlus" or "the Company"), and certain of its
subsidiaries, entered into a Tenth Amendment to Credit Agreement, dated
November 29, 2007, ("the Amendment") to a Credit Agreement dated September 23,
2005 ("Credit Agreement") with National City Bank, as Administrative Agent, and
Branch Banking and Trust Company of Virginia ("BB&T"). The Amendment grants the
Company a waiver until February 29, 2008 to deliver its audited financial
statements for fiscal year 2007 and its quarterly financial statements for the
periods ended June 30, 2007 and September 30, 2007.
In certain events of default, as set forth in the Credit Agreement and not
revised in the Amendment, the lenders may terminate the Credit Agreement and
accelerate the maturity of any amounts then owed under the Credit Agreement.
The foregoing description of the Amendment is qualified in its entirety by
reference to the Amendment, a copy of which is attached hereto as Exhibit 10.1
and incorporated herein by reference.
Item 9.01 Financial Statements and Exhibits
(c) The following exhibits are filed as part of this report:


Exhibit Number Exhibit Description
        10.1 Tenth Amendment to the Credit Agreement dated November 29, 2007
             among ePlus inc., its subsidiaries name therein and National
             City Bank and Branch Banking and Trust Company of Virginia


2
SIGNATURE
Pursuant to the requirements of the Securities Exchange Act of 1934, the
registrant has duly caused this report to be signed on its behalf by the
undersigned hereunto duly authorized.

```
                    ePlus inc.
                    By:/s/ Steven J. Mencarini
                    Steven J. Mencarini
Date: December 4, 2007 Chief Financial Officer
```

3

TENTH AMENDMENT TO CREDIT AGREEMENT

This TENTH AMENDMENT TO CREDIT AGREEMENT (the "Tenth Amendment") dated November 29, 2007, is by and among ePlus inc., a Delaware corporation ("ePlus"), the Subsidiaries of ePlus signatory hereto (including ePlus, each individually a "Borrower" and collectively, the "Borrowers"), the Banks signatory hereto (the "Banks"), and National City Bank, as Administrative Agent for the Banks (the "Administrative Agent").

BACKGROUND

A.  Pursuant to that certain Credit Agreement dated September 23, 2005, by and among the Borrowers, the Banks, and the Administrative Agent, as amended by a First Amendment to Credit Agreement, dated July 11, 2006, a Second Amendment dated July 28, 2006, a Third Amendment dated August 30, 2006, a Fourth Amendment dated September 27, 2006, a Fifth Amendment dated November 15, 2006, a Sixth Amendment dated January 11, 2007, a Seventh Amendment dated March 12, 2007, an Eighth Amendment dated June 27, 2007, and a Ninth Amendment, dated August 22, 2007 (as the same may be modified and amended from time to time, including by this Tenth Amendment, the "Credit Agreement"), the Banks agreed, inter alia, to extend to the Borrowers a revolving credit facility in the maximum aggregate principal amount of $35,000,000.

B.  The Borrowers did not (or will not) deliver the following documents as required by Section 5.1 of the Credit Agreement: (a) their 2007 annual audited financial statements required prior to July 31, 2007; and (b) Financial Statements (Quarterly), for the periods ending June 30, 2007 and September 30, 2007 (collectively, the "Waived Delivery Events"), which deliveries, to the extent otherwise required, were waived through November 30, 2007, pursuant to the Ninth Amendment, and have advised the Banks that they will be unable to deliver such items in the timeframe set forth in the Ninth Amendment (or the Credit Agreement).

C.  The Borrowers have requested an extension of the delivery date requirements for the Waived Delivery Events, and the waiver, in its entirety, of the required delivery of the 2007 Projections, to which the Banks are willing to agree, on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.  Definitions.

(a)  General Rule.  Except as expressly set forth herein, all capitalized terms used and not defined herein shall have the respective meanings ascribed thereto in the Credit Agreement.

(b)  Additional Definition.  The following additional definition shall be added to Article 1 of the Credit Agreement to read in its entirety as follows: "Tenth Amendment" means the Tenth Amendment to this Agreement dated November 29, 2007.

2.  Representations and Warranties.  Each Borrower hereby represents and warrants to the Administrative Agent and each Bank that, except as to the Waived Delivery Event, as to such Borrower:

(a)  Representations.  each of the representations and warranties of such Borrower contained in the Credit Agreement and/or the other Loan Documents are true, accurate and correct in all material respects on and as of the date hereof as if made on and as of the date hereof, except to the extent such representation or warranty was made as of a specific date;

(b)  Power and Authority.  (i) such Borrower has the power and authority under the laws of its jurisdiction of organization and under its organizational documents to enter into and perform this Tenth Amendment and any other documents which the Banks require such Borrower to deliver hereunder (this Tenth Amendment and any such additional documents delivered in connection with the Tenth Amendment are herein referred to as the "Amendment Documents"); (ii) such Borrower is in good standing in its jurisdiction of organization and each additional jurisdiction in which it is required to be so qualified; and (iii) all actions, corporate or otherwise, necessary or appropriate for the due execution and full performance by the Borrower of the Tenth Amendment have been adopted and taken and, upon their execution, the Credit Agreement, as amended by this Tenth Amendment will constitute the valid and binding obligations of the Borrower enforceable in accordance with their respective terms;

(c)  No Violations of Law or Agreements.  the making and performance of the Tenth Amendment will not violate any provisions of any law or regulation, federal, state, local, or foreign, or the organizational documents of such Borrower, or result in any breach or violation of, or constitute a default or require the obtaining of any consent under, any agreement or instrument by which such Borrower or its property may be bound;

(d)  No Default.  except as is waived hereby, no Default or Event of Default has occurred and is continuing; and

(e)  No Material Adverse Effect.  No Material Adverse Effect has occurred since September 23, 2005.

3.  Conditions to Effectiveness of Amendment.  This Tenth Amendment shall be effective upon the Administrative AgentR17;s receipt of the following, each in form and substance reasonably satisfactory to the Banks:

(a)  Tenth Amendment.  this Tenth Amendment, duly executed by the Borrowers and the Banks;

(b)  Consent and Waivers.  copies of any consents or waivers necessary in order for the Borrowers to comply with or perform any of its covenants, agreements or obligations contained in any agreement, which are required as a result of the BorrowersR17; execution of this Tenth Amendment, if any;(c)  Other Documents and Actions.  such additional agreements, instruments, documents, writings and actions as the Banks may reasonably request.

4.  Limited Consent; Ratification.    Subject to the terms and conditions of this Tenth Amendment, the Banks and Administrative Agent hereby consent to an extension of the delivery date for each of the deliveries described in the definition of the Waived Delivery Event, to a date not later than February 29, 2008.  Except as stated in the preceding sentence, the execution, delivery and performance of this Tenth Amendment shall not operate as a waiver of any right, power or remedy of the Administrative Agent or the Banks under the Credit Agreement or any Loan Document, or constitute a waiver of any provision thereof.  Except as expressly modified hereby, all terms, conditions and provisions of the Credit Agreement and the other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed by any Borrower. Nothing contained herein constitutes an
agreement or obligation by the Administrative Agent or any Bank to grant any further amendments to any of the Loan Documents.

5.  Acknowledgments.  To induce the Banks to enter into this Tenth Amendment, each Borrower acknowledges, agrees, warrants, and represents that:

(a)  Acknowledgment of Obligations; Collateral; Waiver of Claims. (i) the Loan Documents are valid and enforceable against, and all of the terms and conditions of the Loan Documents are binding on, the Borrowers; (ii) the liens and security interests granted to the Administrative Agent by the Borrowers pursuant to the Loan Documents are valid, legal and binding, properly recorded or filed and first priority perfected liens and security interests; and (iii) the Borrowers hereby waive any and all defenses, set-offs and counterclaims which they, whether jointly or severally, may have or claim to have against the Administrative Agent or any Bank as of the date hereof.

(b)  No Waiver of Existing Defaults.  Other than the Waived Delivery Event, no Default or Event of Default exists immediately before or immediately after giving effect to this Tenth Amendment.  Nothing in this Tenth Amendment nor any communication between the Administrative Agent, any Bank, any Borrower or any of their respective officers, agents, employees or representatives shall be deemed to constitute a waiver of (i) any Default or Event of Default arising as a result of the foregoing representation proving to be false or incorrect in any material respect; or (ii) any rights or remedies which the Administrative Agent or any Bank has against any Borrower under the Credit Agreement or any other Loan Document and/or applicable law, with respect to any such Default or Event of Default arising as a result of the foregoing representation proving to be false or incorrect in any material respect.

6.  Binding Effect.  This Tenth Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7.  Governing Law.  This Tenth Amendment and all rights and obligations of the parties hereunder shall be governed by and be construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania without regard to Pennsylvania or federal principles of conflict of laws.

8.  Headings.  The headings of the sections of this Tenth Amendment are

inserted for convenience only and shall not be deemed to constitute a part of
this Tenth Amendment.
9.   Counterparts.  This Tenth Amendment may be executed in any number of
counterparts with the same affect as if all of the signatures on such
counterparts appeared on one document and each counterpart shall be deemed an
original.

IN WITNESS WHEREOF, the Borrowers have caused this Tenth Amendment to Credit
Agreement to be executed under seal by their duly authorized officers, all as
of the day and year first written above. ePLUS inc. By: /s/ Kleyton L.
ParkhurstName: Kleyton L. ParkhurstTitle: Senior Vice President ePLUS Group,
inc. By: /s/ Kleyton L. ParkhurstName: Kleyton L. ParkhurstTitle: Senior Vice
President ePLUS Government, inc. By: /s/ Kleyton L. ParkhurstName: Kleyton L.
ParkhurstTitle: Senior Vice President ePLUS Capital, inc. By: /s/ Kleyton L.
ParkhurstName: Kleyton L. ParkhurstTitle: President

IN WITNESS WHEREOF, the Administrative Agent and the Banks have caused this
Tenth Amendment to Credit Agreement to be executed under seal by their duly
authorized officers, all as of the day and year first written above. NATIONAL
CITY BANK By: /s/ Michael J. Labrum
                    Name:  Michael J. LabrumTitle:  Senior Vice President
 BRANCH BANKING AND TRUST COMPANY (successor in interest by merger to Branch
Banking And Trust Company of Virginia) By: /s/ James E. Davis
                                  Name:  James E.
DavisTitle:  Senior Vice President

EXHIBIT 4

SCHEDULE 14A
(RULE 14a-101)

INFORMATION REQUIRED IN PROXY STATEMENT
SCHEDULE 14A INFORMATION

Proxy Statement Pursuant to Section 14(a) of the Securities
Exchange Act of 1934 (Amendment No. ____)

Filed by the Registrant                                    |X|
Filed by a Party other than the Registrant                 |_|

Check the appropriate box:
    |_|  Preliminary proxy statement        |_| Confidential, for use of the
    |X|  Definitive proxy statement             Commission only (as permitted
    |_|  Definitive additional materials        by Rule 14a-6(e)(2))
    |_|  Soliciting material under Rule 14a-12

                              ePlus inc.

--------------------------------------------------------------------------------
               (Name of Registrant as Specified in Its Charter)
--------------------------------------------------------------------------------
     (Name of Person(s) Filing Proxy Statement, if Other Than the Registrant)

Payment of filing fee (Check the appropriate box):
    |X|  No fee required.
    |_|  Fee  computed on table below per Exchange  Act Rules  14a-6(i)(1)  and
         0-11.
--------------------------------------------------------------------------------
         (1) Title of each class of securities to which transaction applies:
--------------------------------------------------------------------------------
         (2)  Aggregate number of securities to which transaction applies:
--------------------------------------------------------------------------------
         (3)  Per unit price or other underlying value of transaction  computed
              pursuant to Exchange Act Rule 0-11 (set forth the amount on which
              the filing fee is calculated and state how it was determined):
--------------------------------------------------------------------------------
         (4)  Proposed maximum aggregate value of transaction:
--------------------------------------------------------------------------------
         (5)  Total fee paid:
--------------------------------------------------------------------------------
    |_|  Fee paid previously with preliminary materials.
--------------------------------------------------------------------------------
    |_|  Check box if any part of the fee is offset as provided by Exchange Act
         Rule  0-11(a)(2)  and identify the filing for which the offsetting fee
         was paid  previously.  Identify  the previous  filing by  registration
         statement number, or the form or schedule and the date of its filing.
--------------------------------------------------------------------------------
         (1)  Amount Previously Paid:
--------------------------------------------------------------------------------
         (2)  Form, Schedule or Registration Statement No.:
--------------------------------------------------------------------------------
         (3)  Filing Party:
--------------------------------------------------------------------------------
         (4)  Date Filed:
--------------------------------------------------------------------------------

```
                        {EPLUS LOGO}
                  13595 Dulles Technology Drive
                  Herndon, Virginia 20171-3413
```

August 8, 2005

Dear Stockholder:

You are cordially  invited to attend the Annual Meeting of Stockholders of ePlus
inc. on September  22, 2005.  The Annual  Meeting will begin at 8:00 a.m.  local
time at the ePlus  Headquarters  Building  located  at 13595  Dulles  Technology
Drive, Herndon, Virginia 20171-3413.

The  formal  notice  of the  meeting  follows  on the  next  page.  In  addition,
information  regarding  each of the  matters you will be asked to vote on at the
Annual Meeting is contained in the attached Proxy Statement. We urge you to read
the Proxy Statement  carefully.  We first began mailing these proxy materials on
or about August 8, 2005 to all  stockholders  of record at the close of business
on July 25, 2005.  This  mailing  includes  the Proxy  Statement,  Proxy Card, a
return envelope, and the ePlus 2005 Annual Report.

It is important that you vote at the Annual Meeting.  Whether or not you plan to
attend in person,  we urge you to complete,  date,  and sign the enclosed  Proxy
Card and return it as promptly as possible in the accompanying  envelope. If you
are a stockholder  of record and attend the Meeting and wish to vote your shares
in person, even after returning your proxy, you may still do so.

We look forward to seeing you in Herndon, Virginia on September 22, 2005.

                              Very truly yours,


                              /s/ PHILLIP G. NORTON
                              ----------------------------
                              Phillip G. Norton, President
```

---

EPLUS INC.
NOTICE OF ANNUAL MEETING OF STOCKHOLDERS
To be held September 22, 2005

---

To the Stockholders of ePlus inc.:

The Annual Meeting of Stockholders of ePlus inc., a Delaware corporation, will be held on September 22, 2005, at the ePlus Headquarters Building, 13595 Dulles Technology Drive, Herndon, Virginia 20171-3413, at 8:00 a.m. local time for the purposes stated below:

    1.  To elect two Class III Directors, each to serve a term of three years and until their successors have been duly elected and qualified.

    2.  To ratify the appointment of Deloitte & Touche LLP as our independent auditors for our fiscal year ending March 31, 2006.

    3.  To transact such other business as may properly come before the Annual Meeting and any adjournment or postponement thereof.

Under the provisions of our Bylaws, and in accordance with Delaware law, the Board of Directors has fixed the close of business on July 25, 2005 as the Record Date for stockholders entitled to notice of and to vote at the Annual Meeting.

Whether or not you expect to be present at the Annual Meeting, please date and sign the enclosed Proxy Card and mail it promptly in the enclosed envelope to NATIONAL CITY BANK, Department 5352, Corporate Trust Operations, Post Office Box 92301, Cleveland, Ohio 44193-0900. If you submit your proxy and then decide to attend the Annual Meeting to vote your shares in person, you may still do so. Your proxy is revocable in accordance with the procedures set forth in this Proxy Statement.

                              By Order of the Board of Directors


                              /s/ ERICA S. STOECKER
                              ----------------------
August 8, 2005                Erica S. Stoecker
                              Corporate Secretary

TABLE OF CONTENTS

                                                                    Page
                                                                    ----
Information about ePlus inc...............................................................1

Information about the Annual Meeting..............................................1

Information about this Proxy Statement.........................................1

Information about Voting...................................................................2

Quorum Requirements.....................................................................2

Voting Requirements.......................................................................3

Voting Securities, Principal Holders thereof, and Management...................4

Directors and Executive Officers......................................................5

Compensation of Directors and Executive Officers............................15

Performance Graph.........................................................................19

Certain Transactions......................................................................20

Proposal 1:  Election of Class III Directors...............................22

Proposal 2:  Ratification of Appointment of Deloitte & Touche LLP as Independent
Auditors........................................................................................22

Other Proposed Action..................................................................23

Executive Sessions.........................................................................24

Stockholder Proposals and Submissions........................................24

Communications with the Board......................................................24

- i -

INFORMATION ABOUT EPLUS INC.

ePlus inc. has been in the business of selling, leasing, financing, and managing information technology and other assets for over 14 years. We have developed our Enterprise Cost Management model through development and acquisition of software, products, and business process services over the past seven years. The address of our principal executive office is 13595 Dulles Technology Drive Herndon, Virginia 20171-3413 and our telephone numbers at that address are (703) 984-8400 (local) and (888) 482-1122 (toll-free). Our website is located at www.eplus.com. The information on our website is not incorporated into this Proxy Statement.

INFORMATION ABOUT THE ANNUAL MEETING

Our Annual Meeting will be held on September 22, 2005 at 8:00 a.m. local time at the ePlus Headquarters Building, 13595 Dulles Technology Drive, Herndon, Virginia 20171-3413.

The Annual Meeting has been called to consider and take action on the following proposals:

1. To elect two Class III Directors, each to serve a term of three years and until their successors have been duly elected and qualified.

2. To ratify the appointment of Deloitte & Touche LLP as our independent auditors for our fiscal year ending March 31, 2006.

3. To transact such other business as may properly come before the Annual Meeting.

Our Board of Directors, or in the case of Proposal 2, the Audit Committee of our Board of Directors, has unanimously approved both of the proposals and recommends that you vote in favor of both of the proposals. All holders of record of our common stock at the close of business on July 25, 2005, the Record Date, will be entitled to vote at the Annual Meeting.

INFORMATION ABOUT THIS PROXY STATEMENT

We have sent you this Proxy Statement because ePlus' Board of Directors is soliciting your proxy to vote at the Annual Meeting. ePlus is bearing the cost of this proxy solicitation. If you own ePlus common stock in more than one account, such as individually and also jointly with your spouse, you may receive more than one set of these proxy materials. To assist us in saving money and to provide you with better stockholder services, we encourage you to have all of your accounts registered in the same name and address. You may do this by contacting our transfer agent, National City Bank, Victor LaTessa, at (216) 222-3579. This Proxy Statement contains information that we are required to provide to you under the rules of the Securities and Exchange Commission and is designed to assist you in voting your shares. On or about August 8, 2005, we began mailing these proxy materials to all stockholders of record as of the close of business on July 25, 2005.

-1-

## INFORMATION ABOUT VOTING

Stockholders can vote in person at the Annual Meeting or by proxy. To vote by proxy, please mail the enclosed Proxy Card in the enclosed envelope. Please sign and date your Proxy Card before mailing.

Each share of ePlus common stock is entitled to one vote on all matters presented at the Annual Meeting. If your shares are held in the name of a bank, broker, or other holder of record, you will receive instructions from the holder of record that you must follow in order for your shares to be voted. If your shares are not registered in your own name and you plan to attend the Annual Meeting and vote your shares in person, you should contact your broker or agent in whose name your shares are registered to obtain a broker's proxy card and bring it to the Annual Meeting in order to vote. If you vote by proxy, the individuals named on the card (your proxy holders) will vote your shares in the manner you indicate. You may specify whether your shares should be voted for none, one, or both of the nominees for Director and for, against, or abstaining from the other proposal. If you sign and return the card without indicating your instructions, your shares will be voted for:

- o    The election of both of the nominees for Class III Director; and

- o    The ratification of the appointment of Deloitte & Touche LLP as our independent auditors for the fiscal year ending March 31, 2006.

You may revoke or change your proxy at any time before it is voted by sending a written notice of your revocation to ePlus' Corporate Secretary, Erica S. Stoecker, at ePlus' principal executive office.

## QUORUM REQUIREMENTS

As of the Record Date, there were 8,482,892 shares of common stock outstanding, each of which is entitled to one vote. The holders of record of a majority of the shares of common stock entitled to vote at the Annual Meeting, present in person or by proxy, will constitute a quorum for the transaction of business at the Annual Meeting or any adjournment thereof. If a quorum is not present, the Annual Meeting may be adjourned until a quorum is obtained.

-2-

VOTING REQUIREMENTS

Proposal 1:  Election of Class III Directors

Assuming a quorum is present, the two nominees receiving the greatest number of affirmative votes of shares entitled to be voted for them at the Annual Meeting will be elected as Class III Directors. Stockholders are not entitled to cumulate votes in the election of Directors. All nominees have consented to serve as Directors, if elected. If any nominee is unable or unwilling to serve as a Director at the time of the Annual Meeting, the persons who are designated as proxies intend to vote, in their discretion, for such other persons, if any, as may be designated by the Board of Directors. As of the date of this Proxy Statement, the Board of Directors has no reason to believe that any of the persons named below will be unable or unwilling to serve as a nominee or as a Director if elected.

Proposal 2:  Ratification of Appointment of Deloitte & Touche LLP as Independent Auditors

To be approved, Proposal 2 requires the affirmative vote of the holders of at least a majority of the shares present in person or represented by proxy at the Annual Meeting and entitled to vote on the proposal.

Effect of Abstentions and Broker Non-Votes

Abstentions and broker non-votes will be counted only for the purpose of determining the existence of a quorum, but will not be counted as an affirmative vote for the purposes of determining whether a proposal has been approved. Therefore, an abstention or a broker non-vote will not have any effect on the votes for Proposal 1 but will have the effect of a vote against Proposal 2.

All signed proxies received will be voted in accordance with the choices specified on such proxies. Proxies will be voted in favor of a proposal if no contrary specification is made. All valid proxies obtained will be voted at the discretion of the Appointed Proxies with respect to any other business that may come before the Annual Meeting.

We may solicit proxies by use of the mails, in person, by telephone, e-mail, or other electronic communications. We will bear the cost of soliciting proxies in the accompanying form. We may reimburse brokerage firms and others for their expenses in forwarding proxy materials to the beneficial owners and soliciting them to execute the proxies.

-3-

VOTING SECURITIES, PRINCIPAL HOLDERS THEREOF, AND MANAGEMENT

Except as set forth below, the following table sets forth certain information as of July 25, 2005 with respect to: (1) each named executive officer (as defined below under "Compensation of Directors and Executive Officers - Summary Compensation Table"), Director, and Director nominee; (2) all executive officers and Directors of ePlus as a group; and (3) all persons known by ePlus to be the beneficial owners of more than five percent of the outstanding share of our common stock.

| Name of Beneficial Owner(1) | Number of Shares Beneficially Owned (2) | Percentage of Shares Outstanding |
|---|---|---|
| Phillip G. Norton (3)................................................. | 2,346,000 | 26.7 |
| Bruce M. and Elizabeth D. Bowen (4).................................. | 750,000 | 8.7 |
| Steven J. Mencarini (5)............................................. | 107,700 | 1.3 |
| Kleyton L. Parkhurst (6)............................................ | 253,000 | 2.9 |
| C. Thomas Faulders, III (7)......................................... | 73,507 | * |
| Terrence O'Donnell (8).............................................. | 90,000 | 1.0 |
| Milton E. Cooper, Jr. (12).......................................... | 20,000 | * |
| Lawrence S. Herman (9).............................................. | 37,500 | * |
| All Directors and named executive officers as a group (8 Individuals).. | 3,677,707 | 38.7 |
| Eric D. Hovde (10).................................................. | 1,153,069 | 13.6 |
| Putnam, LLC, Marsh & McLennan Companies, Inc., Putnam Investment Management, LLC, The Putnam Advisory Company, LLC (11).................................. | 1,005,250 | 11.9 |

*    Less than 1%

(1)  The business address of Messrs. Norton, Bowen, Mencarini, Parkhurst, Faulders, O'Donnell, Cooper, and Herman is 13595 Dulles Technology Drive, Herndon, 20171-3413. The business address of Mr. Hovde is 1826 Jefferson Place, NW, Washington, DC 20036. The business address of Putnam LLC is One Post Office Square, Boston, Massachusetts 02109.

(2)  Unless otherwise indicated and subject to community property laws where applicable, each of the stockholders named in this table has sole voting and investment power with respect to the shares shown as beneficially owned by such stockholder. A person is deemed to be the beneficial owner of securities that can be acquired by such person within 60 days from July 25, 2005, upon exercise of options or warrants. Each beneficial owner's percentage ownership is determined by assuming that options or warrants are held by such person (but not by any other person) and that are exercisable within 60 days from July 25, 2005, have been exercised. The ownership amounts reported for persons who we know own more than 5% of our common stock are based on the Schedules 13D and 13G and Forms 4 and 5 filed with the SEC by such persons, unless we have reason to believe that the information contained in those filings is not complete or accurate.

(3)  Includes 2,040,000 shares held by J.A.P. Investment Group, L.P., a Virginia limited partnership, of which J.A.P., Inc., a Virginia corporation, is the sole general partner. The limited partners are: Patricia A. Norton, the spouse of Mr. Norton, trustee for the benefit of Phillip G. Norton, Jr., u/a dated as of July 20, 1983; Patricia A. Norton, the spouse of Mr. Norton, trustee for the benefit of Andrew L. Norton, u/a dated as of July 20, 1983; Patricia A. Norton, trustee for the benefit of Jeremiah O. Norton, u/a dated as of July 20, 1983; and Patricia A. Norton. Patricia A. Norton is the sole stockholder of J.A.P., Inc. Also includes 305,000 shares of common stock issuable to Mr. Norton under options. Mr. Norton holds 1,000 shares individually.

(4)  Includes 445,000 shares held by Mr. and Mrs. Bowen, as tenants by the entirety, and 160,000 shares held by Bowen Holdings LLC, a Virginia limited-liability company composed of Mr. Bowen and his three children, for which shares Mr. Bowen serves as manager. Also includes 145,000 shares of common stock issuable to Mr. Bowen under options.

(5)  Includes 107,700 shares of common stock issuable to Mr. Mencarini under options.

(6)  Includes 240,000 shares of common stock issuable to Mr. Parkhurst under options.

-4-

(7)  Includes 73,507 shares of common stock issuable to Mr. Faulders under options.

(8)  Includes 90,000 shares of common stock issuable to Mr. O'Donnell under options.

(9)  Includes 37,500 shares of common stock issuable to Mr. Herman under options.

(10) Of the 1,153,069 shares beneficially owned by Eric D. Hovde, 32,824 shares are owned  directly; Eric
     D. Hovde is the  managing  member  (MM) of Hovde Capital, L.L.C., the  general partner to Financial
     Institution Partners II, L.P., which owns 328,719 shares; Eric D. Hovde is  the MM of Hovde Capital
     Limited IV LLC, the general partner to Financial Institution Partners IV, L.P., which owns  44,170
     shares; Eric D. Hovde is the MM of  Hovde Capital, Ltd., the general partner to Financial
     Institution Partners III, L.P., which owns 225,971 shares; Eric D. Hovde is the MM of Hovde  Capital
     IV, LLC, the general partner to Financial  Institution Partners, L.P., which owns 329,795  shares;
     Eric D. Hovde is  the MM to Hovde  Capital Offshore Ltd., the management company to Financial
     Institution Partners, Ltd., which  owns 125,590 shares; Eric D. Hovde is the MM of Hovde Acquisition
     II, L.L.C., which owns 30,000 Shares; Eric D. Hovde is the trustee  to The  Hovde  Financial,  Inc.
     Profit Sharing Plan and Trust, which owns 19,000 shares; Eric D. Hovde is the trustee to The Eric D.
     and Steven D. Hovde Foundation, which owns 17,000 shares.  This information was obtained from a Form
     4 signed by Eric D. Hovde dated July 6, 2005.

(11) The information as to Putnam, LLC, Marsh & McLennan Companies, Inc., Putnam  Investment  Management,
     LLC and The Putnam Advisory Company, LLC is derived from a Schedule  13G/A dated  February 11, 2005.
     The Schedule 13G/A states that Marsh & McLennan  Companies, Inc. has no voting  or dispositive power
     with respect to the 1,005,250  shares,  that Putnam,  LLC has  shared voting  power  with  respect to
     432,300  shares and shared dispositive  power with  respect to  all 1,005,250 shares,  that Putnam
     Investment Management, LLC has shared dispositive power with respect to 481,400 shares  and that The
     Putnam  Advisory  Company,  LLC has shared  voting  power  with respect to 432,300  shares and shared
     dispositive power with respect to 523,850 shares.

(12) Includes 20,000 shares of common stock issuable to Mr. Cooper under options.


### DIRECTORS AND EXECUTIVE OFFICERS

The  following  table sets forth the name,  age, and position with ePlus inc. of
each person who is an executive officer or Director.

| Name | Age | Position | Class |
|------|-----|----------|-------|
| Phillip G. Norton.................... | 61 | Chairman of the Board, President, and Chief Executive Officer | III |
| Bruce M. Bowen....................... | 53 | Director and Executive Vice President | III |
| Steven J. Mencarini.................. | 50 | Senior Vice President and Chief Financial Officer | |
| Kleyton L. Parkhurst................. | 42 | Senior Vice President, Assistant Secretary, and Treasurer | |
| Terrence O'Donnell................... | 61 | Director | II |
| Milton E. Cooper, Jr................. | 67 | Director | II |
| C. Thomas Faulders, III.............. | 55 | Director | I |
| Lawrence S. Herman................... | 61 | Director | I |

The business  experience  during  the  past  five  years of each  Director  and
executive officer of ePlus is described below.

Phillip  G.  Norton  joined us in March  1993 and has  served  since then as our
Chairman of the Board and Chief  Executive  Officer.  Since  September 1996, Mr.
Norton has also served as our  President.  Mr.  Norton is a 1966 graduate of the
U.S. Naval Academy.  Mr. Norton has been nominated by the Board of Directors for
re-election as a Class III Director at the 2005 Annual Meeting of Stockholders.

-5-

Bruce M. Bowen founded our company in 1990 and served as our President until September 1996. Since September 1996, Mr. Bowen has served as our Executive Vice President, and from September 1996 to June 1997 also served as our Chief Financial Officer. Mr. Bowen has served on our Board of Directors since our founding. He is a 1973 graduate of the University of Maryland and in 1978 received a Masters of Business Administration from the University of Maryland. Mr. Bowen has been nominated by the Board of Directors for re-election as a Class III Director at the 2005 Annual Meeting of Stockholders.

Steven J. Mencarini joined us in June of 1997 as Senior Vice President and Chief Financial Officer. Prior to joining us, Mr. Mencarini was Controller of the Technology Management Group of Computer Sciences Corporation, one of the nation's three largest information technology outsourcing organizations. Mr. Mencarini joined Computer Sciences Corporation in 1991 as Director of Finance and was promoted to Controller in 1996. Mr. Mencarini is a 1976 graduate of the University of Maryland and received a Masters of Taxation from American University in 1985.

Kleyton L. Parkhurst joined us in May 1991 as Director of Finance and served as our Secretary and Treasurer from September 1996 until September 2001. Since September 2001 Mr. Parkhurst has served as our Assistant Secretary and Treasurer. In July 1998, Mr. Parkhurst was made Senior Vice President for Corporate Development. Mr. Parkhurst is currently responsible for all of our mergers and acquisitions, investor relations, and marketing. Mr. Parkhurst is a 1985 graduate of Middlebury College.

Terrence O'Donnell joined our Board of Directors in November 1996 upon the completion of our initial public offering. Mr. O'Donnell is Executive Vice President and General Counsel of Textron, Inc. and a partner with the law firm of Williams & Connolly LLP in Washington, D.C. Mr. O'Donnell has practiced law since 1977, and from 1989 through 1992 served as General Counsel to the U.S. Department of Defense. Mr. O'Donnell presently also serves as a Director of IGI, Inc., an American Stock Exchange company. Mr. O'Donnell is a 1966 graduate of the U.S. Air Force Academy and received a Juris Doctor from Georgetown University Law Center in 1971.

Milton E. Cooper, Jr. joined us in November 2003. Mr. Cooper served with Computer Sciences Corporation (CSC) from September 1984 through May 2001, first as Vice President, Business Development and then (from January 1992) as President, Federal Sector. Before joining CSC, Mr. Cooper served in marketing and general management positions with IBM Corporation, Telex Corporation, and Raytheon Company. He is also Chairman of the Board of Directors of Identix, Inc., which is a NASDAQ-traded company, and serves on the Board of Directors, the Audit Committee, and the Compensation Committee of Applied Signal Technology, Inc. Mr. Cooper is a 1960 graduate of the United States Military Academy. He served as an artillery officer with the 82nd Airborne Division before leaving active duty in 1963.

C. Thomas Faulders, III joined our Board of Directors in July 1998. Mr. Faulders served as the Chairman and CEO of LCC International, Inc. from 1999 to 2005 and as Chairman of Telesciences, Inc., an information services company, from 1998 to 1999. From 1995 to 1998, Mr. Faulders was Executive Vice President, Treasurer, and Chief Financial Officer of BDM International, Inc., a prominent systems

-6-

integration company. Mr. Faulders is a member of the Board of Directors of United Defense Inc., Analex Corporation, and Universal Technology and Systems, Inc. He is a 1971 graduate of the University of Virginia and in 1981 received a Masters of Business Administration from the Wharton School of the University of Pennsylvania.

Lawrence S. Herman joined our Board of Directors in March 2001. Mr. Herman is one of BearingPoint's most senior Managing Directors and is responsible for managing the strategy and emerging markets in the company's state and local government practice. During his career, Mr. Herman has specialized in developing, evaluating, and implementing financial and management systems and strategies for state and local governments around the nation. Mr. Herman has been with BearingPoint for over thirty-eight years. He has directed systems integration projects for state and local governments, and several statewide performance and budget reviews for California, North Carolina, South Carolina, Louisiana, Oklahoma, and others, resulting in strategic fiscal and technology plans. He is considered to be one of the nation's foremost state budget and fiscal planning experts. Mr. Herman received his B.S. degree in Mathematics and Economics from Tufts University in 1965 and his Masters of Business Administration in 1967 from Harvard Business School.

Each executive officer of ePlus is chosen by the Board of Directors and holds his or her office until his or her successor shall have been duly chosen and qualified or until his or her death or until he or she shall resign or be removed as provided by the Bylaws.

Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires ePlus' officers, Directors, and persons who own more than ten percent of a registered class of ePlus' equity securities to file reports of ownership and changes in ownership of equity securities of ePlus with the SEC. Officers, Directors, and greater-than-ten-percent stockholders are required by SEC regulations to furnish ePlus with copies of all Section 16(a) forms that they file.

Based solely upon a review of Forms 3, Forms 4, and Forms 5 furnished to ePlus pursuant to Rule 16a-3 under the Exchange Act, ePlus believes that all such forms required to be filed pursuant to Section 16(a) of the Exchange Act were timely filed, as necessary, by the officers, Directors, and security holders required to file such forms, with the exception that Messrs. Cooper, Faulders, Herman, and O'Donnell were late in filing a Form 4 in connection with the grant of 10,000 options to each Director on September 15, 2004.

The Board of Directors

Our Board of Directors is divided into three classes: Class I, comprised of two Directors; Class II, comprised of two Directors; and Class III, comprised of two Directors. Subject to the provisions of the Bylaws, at each Annual Meeting of Stockholders, the successors to the class of Directors whose term is then expiring shall be elected to hold office for a term expiring at the third succeeding Annual Meeting of Stockholders. Messrs. Norton and Bowen, our Class III Directors, are standing for re-election at the 2005 Annual Meeting. Each Director holds office until his or her successor has been duly elected and qualified or until he or she has resigned or been removed in the manner provided in the Bylaws. The members of the three classes of Directors are as follows:

-7-

- o Class I

  C. Thomas Faulders, III
  Lawrence S. Herman

- o Class II

  Terrence O'Donnell
  Milton E. Cooper, Jr.

- o Class III

  Phillip G. Norton
  Bruce M. Bowen

The Class I Directors will stand for re-election at the Annual Meeting of Stockholders in 2006. The Class II Directors will stand for re-election at the Annual Meeting of Stockholders in 2007. The classification of the Board of Directors, with staggered terms of office, was implemented for the purpose of maintaining continuity of management and of the Board of Directors.

There are no material proceedings to which any Director, executive officer, or affiliate of ePlus, any owner of record or beneficially of more than five percent of any class of voting securities of ePlus, or any associate of any such Director, executive officer, affiliate of ePlus, or security holder is a party adverse to ePlus or any of its subsidiaries or has a material interest adverse to ePlus or any of its subsidiaries. Directors Milton E. Cooper, Jr., C. Thomas Faulders III, Lawrence S. Herman, and Terrence O'Donnell are independent as that term is defined under the rules of the National Association of Securities Dealers.

Director Compensation

Directors who are also employees of ePlus do not currently receive any compensation for service as members of the Board of Directors. During the fiscal year ending March 31, 2005, each outside Director received an annual grant of 10,000 stock options and $500 for each Board meeting. Beginning July 1, 2005, each outside Director receives $8,750 quarterly in cash compensation and an annual grant of 10,000 stock options. All Directors are reimbursed for their out-of-pocket expenses incurred to attend Board or committee meetings.

Meetings and Committees of the Board of Directors

The Board of Directors met nine times during the fiscal year ended March 31, 2005. In addition to meetings of the full Board, Directors also attended meetings of Board committees. No incumbent Director attended fewer than 75% of the total number of meetings held by the Board of Directors and the meetings of any committee on which the Director served. Directors are encouraged to attend

-8-

Annual Meetings of ePlus Stockholders. All six Directors attended last year's Annual Meeting. The Board of Directors has the following committees: the Audit Committee, the Compensation Committee, the Stock Incentive Committee, and the Nominating and Corporate Governance Committee.

Audit Committee

General. The Audit Committee of the Board of Directors is responsible for selecting ePlus' independent public accountants, monitoring and reviewing the quality and activities of ePlus' internal and external audit functions, monitoring the adequacy of ePlus' operating and internal controls as reported by management and the external or internal auditors, and reviewing ePlus' periodic reports filed with the Securities and Exchange Commission. The members of the Audit Committee as of March 31, 2005 were Terrence O'Donnell (Chairman), C. Thomas Faulders, III, Lawrence S. Herman, and Milton E. Cooper, Jr. Each member of the Audit Committee is independent as that term is defined under the rules of the National Association of Securities Dealers. In addition, the Board of Directors has determined that C. Thomas Faulders III qualifies as an "Audit Committee Financial Expert" as defined in regulations issued by the Securities and Exchange Commission. During the fiscal year ended March 31, 2005, four meetings of the Audit Committee were held.

Audit Committee Report. The Audit Committee is composed of four Directors, who are independent as defined under the rules of the National Association of Securities Dealers. The Committee operates under a written charter approved by the Board of Directors, which was included as Appendix A to ePlus' Proxy Statement for the 2004 Annual Meeting of Stockholders.

The Committee reviews ePlus' financial reporting process on behalf of the Board of Directors. In fulfilling its responsibilities, the Committee has reviewed and discussed the audited financial statements contained in our Annual Report on Form 10-K for the year ended March 31, 2005 with ePlus' management. Management is responsible for our financial statements and the financial-reporting process, including internal controls. The independent accountants are responsible for expressing an opinion on the conformity of those audited financial statements with accounting principles generally accepted in the United States of America.

The Audit Committee has discussed with the independent accountants the matters required to be discussed by Statement on Auditing Standards No. 61, Communication with Audit Committees, as amended. The Committee has discussed with the independent accountants the accountants' independence from ePlus and its management including the matters in the written disclosures provided to the Committee as required by Independence Standards Board Standard No. 1, Independence Discussions with Audit Committees. The Committee has also considered whether the provision of non-audit services by the independent accountants to ePlus is compatible with maintaining auditors' independence.

Based on the reviews and discussions referred to above, the Committee recommended to the Board of Directors, and the Board of Directors approved, that the audited financial statements be included in our Annual Report on Form 10-K

-9-

for the year ended March 31, 2005 for filing with the Securities and Exchange Commission.

                                        BY THE AUDIT COMMITTEE

                                        Terrence O'Donnell (Chairman)
                                        C. Thomas Faulders, III
                                        Lawrence S. Herman
                                        Milton E. Cooper, Jr.


Compensation Committee

General. The Compensation Committee of the Board of Directors is responsible for reviewing the salaries, benefits, and other compensation, including stock-based compensation, of Mr. Norton and Mr. Bowen, and making recommendations to the Board of Directors based on its review. The members of the Compensation Committee during the fiscal year ended March 31, 2005 were C. Thomas Faulders, III (Chairman), Terrence O'Donnell, Lawrence S. Herman, and Milton E. Cooper, Jr., all of whom were independent Directors as that term is defined under the rules of the National Association of Securities Dealers. Mr. Norton and Mr. Bowen, as Directors, do not vote on any matters affecting their personal compensation. Mr. Bowen and Mr. Norton are responsible for reviewing and establishing salaries, benefits, and other compensation, excluding stock-based compensation, for all other employees.

Compensation arrangements during our 2005 fiscal year were determined in accordance with the executive compensation policy set forth below. The Compensation Committee considers compensation paid to our executive officers to be deductible for purposes of Section 162(m) of the Internal Revenue Code.

Compensation Committee Report. The Compensation Committee of the Board of Directors has prepared the following report on our policies with respect to the compensation of executive officers for the fiscal year ended March 31, 2005. The compensation programs of ePlus are designed to align compensation with business objectives and performance, and to enable ePlus to attract, retain, and reward executives who contribute to the long-term success of ePlus.

The Compensation Committee believes that executive pay should be linked to performance. Therefore, ePlus provides an executive-compensation program which includes three principal elements: (1) base pay, (2) potential cash bonus, and (3) long-term incentive opportunities through the use of stock options.

Criteria for Determination of Executive Compensation. The role of the Compensation Committee is to review the compensation of Messrs. Norton, Bowen, Mencarini, and Parkhurst, who are the named executive officers. In determining each of the principal elements of each executive's compensation, as well as the overall compensation package thereof, the following criteria are considered by the persons responsible for recommending or approving such compensation: (1) the

                                        -10-

compensation awarded to executives with comparable titles and responsibilities to those of such executive by companies in our industry (or, to the extent information is not available, in comparable industries) whose revenues and earnings are comparable to those of ePlus, as reported by reliable independent sources; (2) the results of operations of ePlus during the past year, on an absolute basis and compared with ePlus' targeted results for such year as well as with the results of the comparable companies, as reported by reliable independent sources; (3) the performance of such executive during the past year, on an absolute basis and as compared with the performance targets set by ePlus for such executive for such year and the performance of the other executives of ePlus during such year; and (4) any other factor which the Compensation Committee determines to be relevant. The weight to be given to each of the foregoing criteria is determined by the Compensation Committee in the exercise of its reasonable judgment in accordance with the purposes of this executive compensation policy and may vary from time to time or from executive to executive. The Compensation Committee has also commissioned and relied upon an independent compensation study conducted by Wyatt Watson Worldwide, in which the compensation of ePlus executives was compared to those of thirteen other similarly situated companies.

On February 28, 2005 the Board of Directors approved the adoption of separate ePlus inc. Supplemental Benefit Plans (each a "Plan" and together, "the Plans") for each of (i) Bruce M. Bowen, Director and Executive Vice President (ii) Steven J. Mencarini, Senior Vice President and Chief Financial Officer and (iii) Kleyton L. Parkhurst, Senior Vice President, Assistant Secretary and Treasurer (the "Participants"). Each Plan is substantially similar. These supplemental benefit plans were developed in conjunction with the aforementioned independent study and designed to provide the named executives with a long-term incentive plan outside the Company's normal equity incentive plans. Mr. Norton did not participate in this benefit plan.

The Plans are unfunded and nonqualified and are designed provide the Participants with a cash benefit that is payable only upon the earlier to occur of (i) death, (ii) termination of employment or (iii) the expiration of the Plans. Each Plan terminates on August 11, 2014. Under the terms of the Plans, the Participants or their beneficiaries have only the right to receive a single lump sum cash distribution upon the occurrence of one of the triggering events described above. Under the terms of the Plans, the Participants do not have a right to accelerate payments of the benefits payable under the Plans. If a Participant is terminated for Cause (as defined in each Plan) prior to the expiration of the respective Plan, the Company will have no further obligation under such Plan and the affected Participant will not be entitled to any payments under such Plan. In connection with the adoption of the Plans, the Company will establish one or more grantor trusts to which it may transfer assets intended to be used for the benefit of the Participants. Through the date of distribution of Plan benefits, the assets of such trusts will remain subject to the claims of the Company's creditors and the beneficiaries of the trusts shall have standing with respect to the trusts' assets not greater than that of general unsecured creditors of the Company.

Chief Executive Officer Compensation. The executive compensation policy described above is applied in setting Mr. Norton's compensation. Mr. Norton generally participates in the same executive compensation plans and arrangements available to the other executives. Accordingly, his compensation also consists of an annual base salary, a potential annual cash bonus, and, potentially, long-term, equity-linked compensation in the form of stock options. The

-11-

Compensation Committee's general approach in establishing Mr. Norton's compensation is to be competitive with peer companies, but to have a large percentage of his target based upon objective performance criteria and targets established in our strategic plan.

Mr. Norton's compensation for the year ended March 31, 2005 included $343,750 in base salary. Mr. Norton's salary was based on the aforementioned independent compensation study and other factors, such as his importance to the Company, which the Compensation Committee considered relevant.

Section 162(m). Section 162(m) of the Internal Revenue Code imposes a $1 million cap, with certain exceptions, on the amount that a publicly-held corporation may deduct in any year for the compensation paid with respect to its five most highly compensated executive officers. The Amended and Restated 1998 Long-Term Incentive Plan, Amended and Restated Incentive Stock Option Plan, and the Amended and Restated Nonqualified Stock Option Plan have been approved by stockholders so that compensation attributable to stock options and certain other awards granted under such plans may be excluded from the $1 million cap. While the Compensation Committee cannot predict with certainty how ePlus' compensation tax deduction might be affected, the Compensation Committee tries to preserve the tax-deductibility of all executive compensation while maintaining flexibility with respect to ePlus' compensation programs as described in this report. The Compensation Committee believes that the Company will not be subject to any Section 162(m) limitations on the deductibility of compensation paid to the named executive officers for the fiscal year 2005.

During the fiscal year ended March 31, 2005, three meetings of the Compensation Committee were held.

BY THE COMPENSATION COMMITTEE

C. Thomas Faulders, III (Chairman)
Terrence O'Donnell
Lawrence S. Herman
Milton E. Cooper, Jr.

-12-

Stock Incentive Committee

The Stock Incentive Committee of the Board of Directors is authorized to award stock, and various stock options and rights and other stock-based compensation grants under the ePlus inc. Amended and Restated 1998 Long-Term Incentive Plan. The members of the Stock Incentive Committee during the fiscal year ended March 31, 2005 were Mr. Bowen and Mr. Norton. Except for formula plan grants to the outside Directors and grants that are approved by a majority of the disinterested members of the Board of Directors, no member of the Stock Incentive Committee or the Compensation Committee is eligible to receive grants under the ePlus inc. Amended and Restated 1998 Long-Term Incentive Plan. During the fiscal year ended March 31, 2005, no meetings of the Stock Incentive Committee were held.


Nominating and Corporate Governance Committee

The Nominating and Corporate Governance Committee assists the Board of Directors in fulfilling its oversight responsibilities under the Nasdaq Stock Market listing standards and Delaware law. This committee is authorized and designated for the purposes of: (1) identifying individuals qualified to serve on the Board of Directors and to select, or to recommend that the Board of Directors select, a slate of Director nominees for election by the stockholders of ePlus at each Annual Meeting of Stockholders of ePlus, in accordance with ePlus' Certificate of Incorporation and Bylaws and with Delaware law; and (2) evaluating, developing, and recommending to the Board of Directors a set of corporate governance policies and principles to be applicable to ePlus. Terrence O'Donnell, C. Thomas Faulders, III, Lawrence S. Herman, and Milton E. Cooper, Jr., all of whom are independent Directors as that term is defined under the rules of the National Association of Securities Dealers, were the members of the Nominating and Corporate Governance Committee as of March 31, 2005. During the fiscal year ended March 31, 2005, one meeting of the Nominating and Corporate Governance Committee was held.

It is the policy of the Nominating and Corporate Governance Committee to consider properly submitted stockholder nominations for membership on the Board of Directors. Any stockholder nomination must comply with the Bylaws of ePlus. The notice must be in writing and delivered to the Corporate Secretary not later than 90 days in advance of the Annual Meeting or, if later, the seventh day following the first public announcement of the Meeting. The notice must set forth: (i) the name and address of the stockholder who intends to make the nomination and of the person or persons to be nominated; (ii) a representation that the stockholder is a holder of record of stock of ePlus entitled to vote at such meeting and intends to appear in person or by proxy at the Meeting and nominate the person or persons specified in the notice; (iii) a description of all arrangements or understandings between the stockholder and each nominee or any other person or persons (naming such person or persons) pursuant to which the nomination or nominations are to be made by the stockholder; (iv) such other information regarding each nominee proposed by such stockholder as would be required to be included in a proxy statement filed pursuant to the proxy rules of the United States Securities and Exchange Commission had the nominee been nominated, or intended to be nominated, by the Board of Directors; and (v) the consent of each nominee to serve as a Director of ePlus if so elected. In

-13-

addition, the stockholder making such nomination shall promptly provide any other information reasonably requested by ePlus.

In evaluating such nominations, the Nominating and Corporate Governance Committee seeks to achieve a balance of knowledge, experience, and capability on the Board of Directors. Furthermore, any member of the Board of Directors must have the highest personal ethics and values and have experience at the policy-making level of business, and should be committed to enhancing stockholder value.

-14-

COMPENSATION OF DIRECTORS AND EXECUTIVE OFFICERS

Summary Compensation Table

The following table provides certain summary information concerning the compensation earned, for services rendered in all capacities to ePlus, by ePlus' Chief Executive Officer and certain other executive officers of ePlus, whom we refer to as the "named executive officers," for the fiscal years ended March 31, 2003, 2004, and 2005. Certain columns have been omitted from this summary compensation table, as they are not applicable.

| | | Annual Compensation | | | Long-Term Compensation | |
| | | | | | Securities Underlying | |
| Name and Principal Position | Fiscal Year | Salary | Bonus/ Commission | Options (#) | All Other Compensation |
| --- | --- | --- | --- | --- | --- |
| Phillip G. Norton | 2005 | $343,750(4) | $175,000 | 300,000(3) | $1,440(1) |
| Chairman, Chief Executive | 2004 | 250,000 | 150,000 | -- | 1,320(1) |
| Officer, and President | 2003 | 250,000 | 150,000 | -- | -- |
| | | | | | |
| Bruce M. Bowen | 2005 | 281,250(5) | 137,500 | 50,000(3) | 127,560(6) |
| Director and | 2004 | 225,000 | 100,000 | -- | 5,895(7) |
| Executive Vice President | 2003 | 225,000 | 100,000 | -- | 3,735(8) |
| | | | | | |
| Kleyton L. Parkhurst | 2005 | 200,000 | 335,000 | 50,000(3) | 50,160(9) |
| Senior Vice President, Assistant | 2004 | 200,000 | 52,894 | 30,000(2) | 1,320(1) |
| Secretary, and Treasurer | 2003 | 200,000 | 100,000 | -- | -- |
| | | | | | |
| Steven J. Mencarini | 2005 | 225,000 | 130,000 | 50,000(3) | 50,160(10) |
| Chief Financial Officer and | 2004 | 215,000 | 46,875 | -- | 1,320(1) |
| Senior Vice President | 2003 | 185,000 | 71,250 | 12,000(2) | -- |

(1)  All amounts reported represent ePlus' employer 401(k) plan matching contributions.

(2)  Stock options granted on June 28, 2002 under the ePlus Amended and Restated Long-Term Incentive Plan.

(3)  Stock options granted on November 16, 2004 under the ePlus Amended and Restated Long-Term Incentive Plan.

(4)  Difference represents an increase in annual salary from $250,000 to $375,000 effective July 1, 2004.

(5)  Difference represents an increase in annual salary from $225,000 to $300,000 effective July 1, 2004.

(6)  Includes $4,260 of country-club dues, $1,500 of ePlus' employer 401(k) matching contributions, and $121,800 of compensation related to the Supplemental Benefit Plan, which is a nonqualified deferred compensation plan.

(7)  Includes $1,320 of ePlus' employer 401(k) matching contribution and $4,575 of country-club dues.

(8)  Includes $3,735 of country-club dues.

(9)  Includes $1,440 of ePlus' employer 401(k) matching contribution and $48,720 of compensation related to the Supplemental Benefit Plan, which is a nonqualified deferred compensation plan.

(10) Includes $1,440 of ePlus' employer 401(k) matching contribution and $48,720 of compensation related to the Supplemental Benefit Plan, which is a nonqualified deferred compensation plan.

-15-

## Fiscal Year-End Option Values

The following table sets forth information regarding the value of unexercised options held by the named executive officers at the end of fiscal year 2005. The named executive officers did not exercise any options during fiscal year 2005.

| Name | Number of Securities Underlying Unexercised Options at Fiscal Year-End (#) | | Value of Unexercised In-the-Money Options at Fiscal Year-End($)(1) | |
|------|------------|--------------|------------|--------------|
|      | Exercisable | Unexercisable | Exercisable | Unexercisable |
| Phillip G. Norton.......... | 305,000 | 300,000 | $1,065,600 | $206,560 |
| Bruce M. Bowen............. | 145,000 | 50,000 | 497,150 | 40,000 |
| Kleyton L. Parkhurst....... | 225,000 | 65,000 | 823,600 | 110,500 |
| Steven J. Mencarini........ | 101,700 | 56,000 | 218,800 | 68,200 |

(1) Based on a last sale price of $11.67 per share as of the close of business on March 31, 2005.

## Equity Compensation Plan Information

The following table gives information about ePlus' common stock that may be issued upon the exercise of options, warrants, and rights under all of ePlus' existing equity compensation plans as of March 31, 2005, including the ePlus inc. Amended and Restated 1998 Long-Term Incentive Plan, Amended and Restated Incentive Stock Option Plan, Amended and Restated Outside Director Stock Option Plan, and Amended and Restated Nonqualified Stock Option Plan.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants, and rights | Weighted-average exercise price of outstanding options, warrants, and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column) |
|------|------------|------------|------------|
| Equity compensation plans approved by security holders...... | 2,166,182 | $9.43 | 283,341 |
| Equity compensation plans not approved by security holders...... | -- | -- | -- |
| Total............................ | 2,166,182 | $9.43 | 283,341 |

## Employment Contracts and Termination of Employment and Change in Control Arrangements

ePlus has entered into employment agreements with Phillip G. Norton and Bruce M. Bowen, each effective as of September 1, 1996, and with Kleyton L. Parkhurst and Steven J. Mencarini, effective as of October 31, 2003. Each of Messrs. Norton's and Bowen's employment agreements provided for an initial term of three years, and is subject to an automatic one-year renewal at the expiration thereof unless ePlus or the employee provides notice of an intention not to renew at least three months prior to expiration. Each of Messrs. Parkhurst's and Mencarini's employment agreements provided for an initial term of two years, and is subject

-16-

to an automatic one-year renewal at the expiration thereof unless ePlus provides at least six months' prior notice of termination or the employee resigns for any reason.

The current annual base salaries ($375,000 in the case of Phillip G. Norton; $300,000 in the case of Bruce M. Bowen; $200,000 in the case of Kleyton L. Parkhurst; and $225,000 in the case of Steven J. Mencarini) are in effect and each employee may be eligible for commissions or performance bonuses. The performance bonuses for Phillip G. Norton and Bruce M. Bowen are discretionary, based on the performance of ePlus and as approved by the Compensation Committee. The performance bonuses for Kleyton L. Parkhurst and Steven J. Mencarini are paid based upon performance criteria established by Phillip G. Norton and Bruce M. Bowen.

Under the employment agreements, each receives certain other benefits, including medical, insurance, death and long-term disability benefits, employer 401(k) contributions, and reimbursement of employment-related expenses. Mr. Bowen's country-club dues are paid by ePlus. In the fiscal year ended March 31, 2005, the amount of these dues totaled $4,260. The employment agreements of Messrs. Norton and Bowen contain a covenant not to compete on the part of each, whereby, in the event of a voluntary termination of employment, upon expiration of the term of the agreement, or upon the termination of employment by ePlus for cause, each is subject to restrictions on acquiring, consulting with, or otherwise engaging in or assisting in the providing of capital needs for competing business activities or entities within the United States for a period of one year after the date of such termination or expiration of the term of the employment agreement.

Under his original employment agreement, Phillip G. Norton was granted options to acquire 130,000 shares of common stock at a price per share equal to $8.75. These options have a ten-year term and became exercisable and vested in 25% increments over four years, ending on November 20, 1999. In February 1998, Mr. Norton was also granted options to purchase 25,000 shares of common stock at a price per share equal to $12.65; however, these options expired without being exercised on February 5, 2003. In August 1999, Mr. Norton was granted options to purchase 175,000 shares of common stock at a price per share equal to $7.75. In November 2004, Mr. Norton was granted options to purchase 258,200 shares of common stock at a price per share equal to $10.87 and 41,800 shares at a price per share equal to $11.96.

Under his original employment agreement, Bruce M. Bowen was granted options to acquire 15,000 shares of common stock at a price per share equal to $8.75. These options have a ten-year term and became exercisable and vested in 25% increments over four years, ending on November 20, 1999. In February 1998, Mr. Bowen was also granted options to purchase 15,000 shares of common stock at a price per share equal to $11.50 and in August 1999 was granted options to purchase 115,000 shares of common stock at a price per share equal to $7.75. In November 2004, Mr. Bowen was granted options to purchase 50,000 shares of common stock at a price per share equal to $10.87.

Under his original employment agreement, Kleyton L. Parkhurst was granted options to acquire 100,000 shares of common stock at a price per share equal to $6.40. These options have a ten-year term and became exercisable and vested in 25% increments over four years ending on November 20, 1999. In February 1998, Mr. Parkhurst was also granted options to purchase 10,000 shares of common stock

-17-

at a price per share equal to $11.50 and in September 1998 was granted options to purchase 50,000 shares of common stock at a price per share of $8.75. In August 1999, Mr. Parkhurst was granted options to purchase 20,000 shares of common stock at a price per share equal to $7.75 and in September 2000 was granted options to purchase 30,000 shares of common stock at a price per share equal to $17.375. In June 2002, Mr. Parkhurst was also granted 30,000 options to purchase common stock at a price per share equal to $6.97. In November 2004, Mr. Parkhurst was granted options to purchase 50,000 shares of common stock at a price per share equal to $10.87.

In connection with his original employment, Steven J. Mencarini was granted options to acquire 16,200 shares of common stock at a price per share equal to $12.75. These options have a ten-year term, and become exercisable and vest in 20% increments over five years at the end of each year of service, and are subject to acceleration upon certain conditions. In September 1997, Mr. Mencarini was also granted options to purchase 5,100 shares of common stock at a price per share equal to $13.25 and in December 1997 was granted options to purchase 9,400 shares of common stock at a price per share equal to $12.25. In February 1998, Mr. Mencarini was granted options to purchase 5,000 shares of common stock at a price per share equal to $11.50; in October 1998, he was granted options to purchase 25,000 shares of common stock at a price per share equal to $8.00; in August 1999 he was granted options to purchase 20,000 shares of common stock at a price per share equal to $7.75; in September 2000 he was granted options to purchase 10,000 shares of common stock at a price per share equal to $17.375; and in December 2000 he was granted options to purchase 5,000 shares of common stock at a price per share equal to $7.75. In June 2002, Mr. Mencarini was also granted 12,000 options to purchase common stock at a price per share equal to $6.97 per share. In November 2004, Mr. Mencarini was granted options to purchase 50,000 shares of common stock at a price per share equal to $10.87.

ePlus maintains key-man life insurance on Mr. Norton in the amount of $11 million.

Compensation Committee Interlocks and Insider Participation

For the year ended March 31, 2005, all decisions regarding executive compensation were made by the Compensation Committee with respect to Mr. Norton and Mr. Bowen. Compensation for other executives was made by the Committee, Mr. Norton, or Mr. Bowen consistent with Compensation Committee policy. The members of the Compensation Committee as of March 31, 2005 were C. Thomas Faulders III (Chairman), Terrence O'Donnell, Lawrence S. Herman, and Milton E. Cooper, Jr. None of the executive officers of ePlus currently serves on the compensation committee of another entity or any other committee of the board of directors of another entity performing similar functions.

-18-

PERFORMANCE GRAPH

The following graph shows the value as of March 31, 2005 of a $100 investment made on March 31, 2000 in ePlus' common stock (with dividends, if any, reinvested), as compared with similar investments based on (1) the value of the Nasdaq Stock Market Index (U.S.) (with dividends reinvested) and (2) the value of the Nasdaq financial index. The stock performance shown below is not necessarily indicative of future performance.

|                             | 3/01   | 3/02   | 3/03   | 3/04   | 3/05   |
|-----------------------------|--------|--------|--------|--------|--------|
| EPLUS INC.                  | 27.74  | 28.65  | 21.74  | 39.15  | 35.23  |
| NASDAQ STOCK MARKET (U.S.)  | 47.07  | 41.31  | 21.97  | 38.41  | 37.26  |
| NASDAQ FINANCIAL            | 106.28 | 129.20 | 117.54 | 167.48 | 171.63 |

-19-

## CERTAIN TRANSACTIONS

Advances and Loans to Employees

ePlus has in the past provided loans and advances to employees. Such balances are to be repaid from personal funds or commissions earned by the employees on successful sales or financing arrangements obtained on behalf of ePlus. Loans and advances to employees outstanding as of March 31, 2005 totaled $21,181. There were no loans or extensions of credit by ePlus or any ePlus subsidiary to any of the ePlus Directors or executive officers.

Leases with Related Parties

ePlus leases certain office space from related parties. During the year ended March 31, 2005, ePlus paid $517,936 in rent to an entity controlled by Phillip G. Norton, our Chairman, President, and Chief Executive Officer. All leases with related parties are approved in advance by the Board of Directors.

Indemnification Agreements

We have entered into separate but identical indemnification agreements with each of our Directors and executive officers, and we expect to enter into similar indemnification agreements with persons who become Directors or executive officers in the future. The indemnification agreements provide that ePlus will indemnify the Director or officer against any expenses or liabilities incurred in connection with any proceeding in which the Director or officer may be involved as a party or otherwise, by reason of the fact that the Director or officer is or was a Director or officer of ePlus or by reason of any action taken by or omitted to be taken by the Director or officer while acting as an officer or Director of ePlus. However, ePlus is only obligated to provide indemnification under the indemnification agreements if:

(1) The Director or officer was acting in good faith and in a manner the Director or officer reasonably believed to be in the best interests of ePlus, and, with respect to any criminal action, the Director or officer had no reasonable cause to believe the Director's or officer's conduct was unlawful;

(2) The claim was not made to recover profits made by the Director or officer in violation of Section 16(b) of the Exchange Act, as amended, or any successor statute;

(3) The claim was not initiated by the Director or officer;

(4) The claim was not covered by applicable insurance; or

(5) The claim was not for an act or omission of a Director of ePlus from which a Director may not be relieved of liability under Section 103(b)(7) of the DGCL. Each Director and officer has undertaken to repay ePlus for any costs or expenses paid by ePlus if it is ultimately determined that the Director or officer is not entitled to indemnification under the indemnification agreements.

-20-

Future Transactions

ePlus' policy requires that all material transactions between ePlus and its
officers, Directors, or other affiliates must be approved by a majority of the
disinterested members of the Board of Directors of ePlus, and be on terms no
less favorable to ePlus than could be obtained from unaffiliated third parties.

-21-

PROPOSAL 1

To Elect Two Class III Directors to Serve for Three Years and Until Their Respective Successors Have Been Duly Elected and Qualified.

The Board of Directors has concluded that the re-election of Phillip G. Norton and Bruce M. Bowen as Class III Directors is in the best interest of ePlus and recommends stockholder approval of the re-election of Phillip G. Norton and Bruce M. Bowen as Class III Directors. The remaining four Directors will continue to serve in their positions for the remainder of their terms. Biographical information concerning Mr. Norton and Mr. Bowen, and ePlus' other Directors, can be found under "Directors and Executive Officers."

Unless otherwise instructed or unless authority to vote is withheld, all signed proxies will be voted for the election of Phillip G. Norton and Bruce M. Bowen as Class III Directors. Although the Board of Directors of ePlus does not contemplate that such nominees will be unable to serve, if such a situation arises prior to the Annual Meeting, the persons named in the enclosed Proxy Card will vote for the election of such other person or persons as may be nominated by the Board of Directors.

Vote Required for Approval. The two persons receiving the greatest number of affirmative votes cast at the Annual Meeting will be elected as Class III Directors.

Board of Directors Recommendation. The Board of Directors unanimously recommends that you vote in favor of the election of Phillip G. Norton and Bruce M. Bowen as Class III Directors.


PROPOSAL 2

To Ratify the Appointment of Deloitte & Touche LLP as ePlus' Independent Auditors for ePlus' Fiscal Year Ending March 31, 2006.

Subject to stockholder ratification, the Audit Committee has reappointed the firm of Deloitte & Touche LLP as the independent auditors to examine ePlus' financial statements for the fiscal year ending March 31, 2006. Deloitte & Touche has audited ePlus' financial statements since the Company's inception. If the stockholders do not ratify this appointment, the Board of Directors and the Audit Committee will review the Audit Committee's future selection of independent registered public accounting firms.

Representatives of Deloitte & Touche are expected to attend the Annual Meeting and will have the opportunity to make a statement if they desire and to respond to appropriate questions.

Vote Required for Approval. The affirmative vote of the holders of at least a majority of the shares of common stock present in person or by proxy and entitled to vote at the Annual Meeting on the proposal will constitute approval of Proposal 2.

-22-

Audit Committee Recommendation. The Audit Committee unanimously recommends that you vote in favor of the ratification of the appointment of Deloitte & Touche LLP as independent auditors for the fiscal year ending March 31, 2006.

Fees Incurred by Deloitte & Touche LLP. The following table shows the fees paid or accrued by ePlus for the audit and other services provided by Deloitte & Touche LLP for fiscal 2005 and 2004.

|                    | 2005      | 2004      |
|--------------------|-----------|-----------|
| Audit Fees         | $517,000  | $409,000  |
| Audit-Related Fees | 8,000     | 21,000    |
| Tax Fees           | 0         | 0         |
| All Other Fees     | 0         | 0         |
| Total              | $525,000  | $430,000  |

AUDIT FEES. The aggregate fees to be charged by Deloitte & Touche LLP for professional services rendered for the audit of our annual financial statements for the fiscal year ended March 31, 2005 and for the reviews of the financial statements included in our Quarterly Reports on Form 10-Q for that fiscal year are $517,000. The aggregate fees charged by Deloitte & Touche LLP for professional services rendered for the audit of our annual financial statements for the fiscal year ended March 31, 2004 and for the reviews of the financial statements included in our Quarterly Reports on Form 10-Q for that fiscal year were $409,000 (of this amount, $59,000 was initially billed during the fiscal year ended March 31, 2005).

AUDIT-RELATED FEES. Fees billed by Deloitte & Touche LLP for audit-related services rendered for Sarbanes-Oxley Act, Section 404 advisory services for the fiscal year ended March 31, 2005 were $8,000. Fees billed by Deloitte & Touche LLP for audit-related services rendered for due-diligence services associated with acquisitions for the fiscal year ended March 31, 2004 were $21,000 (this amount was initially billed during the fiscal year ended March 31, 2005).

TAX FEES. There were no fees billed by Deloitte & Touche LLP for tax-related services rendered for the fiscal years ended March 31, 2005 or 2004.

ALL OTHER FEES. There were no other fees billed in the last two fiscal years for professional services rendered by Deloitte & Touche LLP.

There were no non-audit related services provided by Deloitte & Touche LLP during the last two fiscal years. The Audit Committee pre-approves all auditing services (which may entail providing comfort letters in connection with securities underwriting), and all non-audit services provided to ePlus by Deloitte & Touche LLP, subject to a de minimis exception as set forth by the SEC.

OTHER PROPOSED ACTION

The Board of Directors does not intend to bring any other matters before the Annual Meeting, nor does the Board of Directors know of any matters which other persons intend to bring before the Annual Meeting. If, however, other matters not mentioned in this Proxy Statement properly come before the Annual Meeting, the persons named in the accompanying Form of Proxy will vote thereon in accordance with the recommendation of the Board of Directors.

-23-

You should note that ePlus' Bylaws provide that in order for a stockholder to bring business before a Meeting or to make a nomination for the election of Directors, the stockholder must give written notice complying with the requirements of the Bylaws to the Secretary of ePlus not later than 90 days in advance of the Meeting or, if later, the seventh day following the first public announcement of the date of the Meeting.

<center>EXECUTIVE SESSIONS</center>

Executive sessions of non-management Directors are held, and any non-management Director can request that an executive session be scheduled at any time.

<center>STOCKHOLDER PROPOSALS AND SUBMISSIONS</center>

If any stockholder wishes to present a proposal for inclusion in the proxy materials to be solicited by the ePlus Board of Directors with respect to the next Annual Meeting of Stockholders, that proposal must be presented to ePlus' management prior to April 10, 2006.

In accordance with ePlus' Bylaws, for a stockholder proposal or nomination to be considered at a Meeting of Stockholders, the proposal must be submitted in writing to the Secretary of ePlus not less than 90 days in advance of such Meeting or, if later, the seventh day following the first public announcement of the date of such Meeting.

Whether or not you expect to be present at the Annual Meeting, please sign and return the enclosed Proxy Card promptly. Your vote is important. If you are a stockholder of record and attend the Annual Meeting and wish to vote in person, you may withdraw your proxy at any time prior to the vote.

<center>COMMUNICATIONS WITH THE BOARD</center>

Individuals may communicate with the Board of Directors of ePlus by sending correspondence to:

ePlus
Attn: Corporate Secretary
Mailstop 192
13595 Dulles Technology Drive
Herndon, VA 20171-3413

<center>-24-</center>

Communications that are intended for non-management Directors should be sent to the above address, to the attention of the Chairman of the Nominating and Corporate Governance Committee.

-25-

{FORM OF PROXY CARD}

Please fold and detach card at perforation before mailing
--------------------------------------------------------------------------------
THE SHARES  REPRESENTED BY ALL PROXIES RECEIVED WILL BE VOTED IN ACCORDANCE WITH
THE CHOICES SPECIFIED ON SUCH PROXIES. THE SHARES REPRESENTED BY A PROXY WILL BE
VOTED IN FAVOR OF A PROPOSAL IF NO  CONTRARY  SPECIFICATION  IS MADE.  ALL VALID
PROXIES  OBTAINED WILL BE VOTED AT THE DISCRETION OF THE APPOINTED  PROXIES WITH
RESPECT TO ANY OTHER BUSINESS THAT MAY COME BEFORE THE ANNUAL MEETING.

1.   To elect two Class III  Directors,  each to serve a term of three years and
     until their successors have been duly elected and qualified.

             TO VOTE FOR BOTH THE NOMINEES LISTED BELOW

     { } FOR BOTH THE NOMINEES LISTED BELOW        { } WITHHOLD AUTHORITY

     Phillip G. Norton                        Bruce M. Bowen

             OR TO VOTE FOR EACH NOMINEE SEPARATELY

     Phillip G. Norton        { } FOR         { } WITHHOLD AUTHORITY
     Bruce M. Bowen           { } FOR         { } WITHHOLD AUTHORITY

2.   To ratify the  appointment  of Deloitte & Touche LLP as ePlus'  independent
     auditors for ePlus' fiscal year ending March 31, 2006.

               { } FOR { } AGAINST { } ABSTAIN

PLEASE  MARK, SIGN,  AND RETURN  THIS PROXY CARD  PROMPTLY  USING THE  ENCLOSED
ENVELOPE.

ePlus inc.
c/o National City Bank
Corporate Trust Operations
Locator 5232
P.O. ox 92301
Cleveland, OH 44101-4301
------------------------

                   YOUR VOTE IS IMPORTANT

        Regardless of whether you plan to attend the Annual Meeting of
     Stockholders, you can be sure your shares are represented at the
     meeting by promptly returning your proxy in the enclosed envelope.

--------------------------------------------------------------------------------
           Please fold and detach card at perforation before mailing
--------------------------------------------------------------------------------
ePlus inc.            Annual Meeting of Stockholders Of             Proxy
                                ePlus inc.
                             September 22, 2005
              THE PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

The undersigned  hereby  appoints  Kleyton L. Parkhurst and Steven J. Mencarini,
and each or either of them,  proxies,  with power of  substitution,  to vote all
shares of the undersigned at the Annual Meeting of Stockholders of ePlus inc., a
Delaware corporation, to be held on September 22, 2005 at 8:00 a.m. at the ePlus
Headquarters  Building  located  at  13595 Dulles Technology Drive,  Herndon,
Virginia 20171-3413,  or at any adjournment thereof,  upon the matters set forth
in the Proxy  Statement for such  Meeting,  and in their  discretion,  upon such
other business as may properly come before the Meeting.

          Dated:_____, 2005

---

(Signature)

---

(Signature if held jointly)

NOTE: When shares are held by joint tenants, both should sign. Persons signing as Executor, Administrator, Trustee, etc. should so indicate. Please sign exactly as the name appears on the proxy.

EXHIBIT 5

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-K
{ X } ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934
For the fiscal year ended March 31, 2005
OR
{ } TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the transition period from to .

Commission file number: 0-28926

ePlus inc.

(Exact name of registrant as specified in its charter)

Delaware 54-1817218

(State or other jurisdiction of (I.R.S. Employer
incorporation or organization) Identification No.)

13595 Dulles Technology Drive, Herndon, VA 20171-3413
(Address, including zip code, of principal offices)

Registrant's telephone number, including area code: (703) 984-8400

Securities registered pursuant to Section
12(b) of the Act:
Title of each class Name of each exchange on which registered
None

Securities registered pursuant to Section
12(g) of the Act:
Common Stock, $0.01 par value

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days. Yes {X} No { }

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. {X}

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes { } No {X }

The aggregate market value of the common stock held by non-affiliates of the Company, computed by reference to the closing price at which the stock was sold as of September 30, 2004 was $44,912,525. The outstanding number of shares of common stock of the Company as of June 21, 2005, was 8,584,692.


                    DOCUMENTS INCORPORATED BY REFERENCE

The following documents are incorporated by reference into the indicated parts of this Form 10-K:

| Document | Part |
| --- | --- |
| Portions of the Company's definitive Proxy Statement to be filed with the Securities and Exchange Commission within 120 days after the Company's fiscal year end. | Part III |

2

CAUTIONARY LANGUAGE ABOUT FORWARD-LOOKING STATEMENTS

Certain statements contained in this Form 10-K, other periodic reports filed by the Company under the Securities Exchange Act of 1934, as amended, and any other written or oral statements made by or on behalf of the Company are "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Such statements are not based on historical fact, but are based upon numerous assumptions about future conditions that may not occur. Forward-looking statements are generally identifiable by the use of forward-looking words such as "may," "will," "should," "intend," "estimate," "believe," "expect," "anticipate," "project," and similar expressions. Readers are cautioned not to place undue reliance on any forward-looking statements made by or on behalf of the Company. Any such statement speaks only as the date the statement was made. Actual events, transactions and results may materially differ from the anticipated events, transactions, or results described in such statements. The Company's ability to consummate such transactions and achieve such events or results is subject to certain risks and uncertainties. Such risks and uncertainties include, but are not limited to the matters set forth below.

Although we have been in the business of financing since 1990 and selling information technology equipment since 1999, the Company expects to attain future revenue growth through its ePlus Enterprise Cost Management ("eECM") service offering. As a result, the Company will continue to encounter some of the challenges, risks, difficulties and uncertainties frequently encountered by early stage companies using new and unproven business models in new and evolving markets. Some of these challenges relate to the Company's ability to:

o increase the total number of users of eECM services;
o adapt to meet changes in its markets and competitive developments; and
o continue to update its technology to enhance the features and functionality of its products.

The Company cannot be certain that its business strategy will be successful or that it will successfully address these and other challenges, risks and uncertainties.

Over the longer term, the Company expects to derive a portion of its growth from eECM services, which is based on an unproven business model. The Company expects to incur increased expenses that may negatively impact profitability. The Company also expects to incur significant sales and marketing, research and development, and general and administrative expenses in connection with the development and expansion of this business. As a result, the Company may incur significant losses in its e-commerce offerings in the foreseeable future, which may have a material adverse effect on the future operating results of the Company as a whole.

The Company began operating its ePlusSuite services in November 1999 and updated to eECM offering in 2002. Broad and timely acceptance of the eECM services, which is critical to the Company's future success, is subject to a number of significant risks. These risks include:

o    significant enhancement of the features and services of eECM services is needed to achieve widespread commercial initial and continued acceptance of the system;

3

o   operating resource management and procurement on the Internet is an
    evolving market;

o   the system's ability to support large numbers of buyers and suppliers is
    unproven;

o   the pricing model may not be acceptable to customers;

o   if the Company is unable to develop and increase transaction volume on
    eECM, it is unlikely that it will achieve or maintain profitability in this
    business;

o   businesses that have made substantial up-front payments for enterprise
    resource planning (ERP) software or e-commerce solutions may be reluctant
    to replace their current solution and adopt the Company's solution;

o   the Company's ability to adapt to a new market that is characterized by
    rapidly changing technology, evolving industry standards, frequent new
    product announcements and established competition;

o   significant expansion of internal resources and external development costs
    are needed to support planned growth of the Company's eECM services.

4

PART I

ITEM 1.  BUSINESS

ePlus inc. CORPORATE STRUCTURE

ePlus inc. ("the Company" or "ePlus"), a Delaware corporation, was formed in 1996. The Company changed its name from MLC Holdings, Inc. to ePlus inc. on October 19, 1999. ePlus engages in no other business other than serving as the parent holding company for the following companies:

o    ePlus Group, inc. ("ePlus Group");
o    ePlus Technology, inc.;
o    ePlus Government, inc.;
o    ePlus Canada Company;
o    ePlus Capital, inc.;
o    ePlus Systems, inc.;
o    ePlus Content Services, inc.;
o    ePlus Document Systems, inc.;
o    ePlus Information Holdings, inc.; and
o    ePlus Government Services, inc.

On March 31, 2003, the former entities ePlus Technology of PA, inc. and ePlus Technology of NC, inc. were merged into ePlus Technology, inc. This combination created one national entity through which our information technology ("IT") reseller and technical support will conduct business. ePlus Systems, inc. and ePlus Content Services, inc. were incorporated on May 15, 2001 and are the entities that hold certain assets and liabilities originally acquired from ProcureNet, Inc. ePlus Capital, inc. owns 100 percent of ePlus Canada Company which was created on December 27, 2001 to transact business within Canada. ePlus Government, inc. was incorporated on September 17, 1997 to handle business servicing the Federal government marketplace, which includes financing transactions that are generated through government contractors. ePlus Document Systems, inc. was incorporated on October 15, 2003 and is the entity that holds certain assets and liabilities originally acquired from Digital Paper Corporation. On January 6, 2004, ePlus Information Holdings, inc. was incorporated; however, to date, the entity has conducted no business and has no employees or business locations. On April 2, 2004, ePlus Government Services, inc. was incorported; however, to date, the entity has conducted no business and has no employees or business locations. ePlus Group also has a 5% membership interest in MLC/CLC LLC and serves as its manager. On October 22, 1997, the Company formed MLC Leasing, S.A. de C.V., which is jointly owned by ePlus Group, inc. and ePlus Technology, inc., to provide a legal entity capable of conducting a leasing business in Mexico. To date, this entity has conducted no business and has no employees or business locations.

5

ACQUISITIONS

The Company has acquired the following material entities or assets since 2001.
The following is a summary of the acquisitions presented in chronological order.

| Date Acquired | Acquisition | Major Business Locations | Accounting Method | Consideration |
|---|---|---|---|---|
| May 28, 2004 | Certain assets and liabilities from Manchester Technologies, Inc. (merged into ePlus Technology, inc. upon acquisition; subsequently moved the consulting group to ePlus Systems, inc.) | Metro New York, South Florida and Baltimore | Purchase | $5,000,000 in cash plus the assumption of certain liabilities |
| October 10, 2003 | Certain assets and liabilities from Digital Paper Corporation (merged into ePlus Document Systems, inc. upon acquisition) | Herndon, VA | Purchase | $1,601,632 in cash plus the assumption of certain liabilities |
| March 29, 2002 | Certain assets and liabilities from Elcom International, Inc.'s IT fulfillment and professional service business (merged into ePlus Technology, inc. upon acquisition) | Boston, MA, Philadelphia, PA, San Diego, CA and New York, NY | Purchase | $2,150,000 in cash plus the assumption of certain liabilities |
| October 4, 2001 | SourceOne Computer Corporation (merged into ePlus Technology, inc. upon acquisition) | Campbell, CA | Purchase | 274,999 shares of common stock valued at $2,007,500 and $800,006 in cash |
| May 15, 2001 | Certain assets and liabilities from ProcureNet, Inc. (merged into newly created entities ePlus Systems, inc. and ePlus Content Services, inc.) | Avon, CT and Houston, TX | Purchase | 442,833 shares of common stock valued at $3,873,150 and $1,000,000 in cash plus the assumption of certain liabilities |

6

OUR BUSINESS

ePlus has developed its eECM model through development and acquisition of software, product sales, technology services, and business process services over the past five years. Our current offerings include IT sales and professional services, leasing and financing services, asset management software and services, procurement software, document management and distribution software and electronic catalog content management software and services. We have been in the business of selling, leasing, financing, and managing information technology and other assets for over ten years and have been providing software for over five years. We currently derive the majority of our revenues from IT product sales and leasing. We sell primarily by using our internal sales force and through vendor relationships to commercial customers, federal, state and local governments, and higher education institutions. We also lease and finance equipment, and supply software and services directly and through relationships with vendors, equipment manufacturers, and systems integrators.

ePlus eECM has positioned eECM to provide its comprehensive offering of products and services to our target market of middle-sized and larger businesses, governments, and institutions. Enterprise Cost Management is a multi-disciplinary approach for implementing, controlling, and maintaining cost savings throughout an organization, including the costs of purchasing, lifecycle management, and financing. It represents the continued evolution of our original offering of ePlusSuite e-commerce products.

The key elements of our business and our eECM solution are:

   o    IT Sales: We are an authorized reseller of leading IT hardware and software products and have technical support personnel to support sales and implementations.

   o    Financial Services: ePlus Financial Services offers a wide range of competitive and tailored financing options, including leases and financing for a wide variety of fixed assets.

   o    eProcurement: Procure+, our e-procurement software package, has sophisticated workflow, catalog management, and transaction management capabilities that provide customers with the tools to search, request, and acquire goods and services while instilling centralized control over enterprise purchases and processes.

   o    Supplier Enablement: Content+ is the catalog and content management software that contains over 500,000 pattern matching rules and 60,000 product classifications for content generation enabling customers to either use or provide enriched, parametrically searchable catalogs.

   o    Asset Management: Manage+ is our asset management software, which streamlines the tracking of a customer's assets and delivers valuable business intelligence for compliance, reporting, budgeting and planning.

7

o  Professional Services: We provide an array of network engineering, data storage design, and intrusion detection security management and monitoring, implementation and network imaging and maintenance services to support our customer base as part of our consolidated service offering.

o  Business Process Outsourcing: We provide outsourced services to augment the eECM solution for customers including payables processing, vendor management, contract compliance, invoice reconciliation, and document imaging.

o  Document Technology: Our product, DigitalPaper XE (Extended Enterprise), is a document management and distribution software product that provides fast, secure web access to documents in a collaborative environment. The software allows users to access large, complex and unstructured documents such as engineering drawings, facilities diagrams, blueprints and technical manuals across an enterprise's supply chain.

The procurement software products and services, asset management, document management software, and business process outsourcing are key functions of supporting and retaining customers for our sales and finance businesses. The Company has developed and acquired these products and services to distinguish ePlus from its competition by providing a comprehensive offering to customers. Our primary target customers are middle-market and larger companies in the United States of America and Canada, with annual revenues between $25 million and $1 billion. We believe there are over 60,000 target customers in this market. Our target customer has one or more of the following business characteristics that we believe qualify us as a preferred solution:

o  seeks a lower cost alternative to licensing enterprise software solutions while preserving the investment in legacy IT infrastructures;

o  will benefit from the cost savings and efficiency gains that can be obtained from a solution which integrates e-procurement, asset management, catalog content functionality, document management and distribution software, electronic bill presentment and payment and financing;

o  prefers to retain the flexibility to negotiate prices with designated vendors or buying exchanges;

o  wants to lower its total cost of ownership of fixed assets by re-designing business processes and proactively managing its fixed asset base over the life of the asset; and

o  seeks a comprehensive solution for its entire supply chain from selection, requisition, purchase, settlement, ownership, financing and disposal of assets.

8

BUSINESS SEGMENTS

See "Note 13 - SEGMENT REPORTING" in the attached consolidated financial statements. ePlus has two basic business segments. Our first segment is the financing business unit that consists of the equipment and financing business to both commercial and government-related entities and the associated business process outsourcing services. Our second segment is our technology sales business unit that includes all the technology sales and related services including procurement, asset management, and catalog software sales and services.

INDUSTRY BACKGROUND

Growth of the Internet as a Communications Channel for Efficient Business-to-Business Electronic Commerce

The Internet is the preferred channel for many business-to-business transactions for most organizations. In the intensely competitive business environment, businesses have increasingly adopted Internet-based software applications and related tools to streamline their business processes, lower costs, and make their employees more productive.

Traditional Areas of Business Process Automation

Businesses have traditionally attempted to reduce costs through the automation of internal processes. Similar efforts have been made to improve the procurement process for operating resources in which we specialize, which include information technology and telecommunications equipment, office equipment and professional services. The purchase and sale of these goods comprise a large portion of business-to-business transactions.

Many organizations continue to conduct procurement and management of operating resources through costly paper-based processes that require actions by many individuals both inside and outside the organization. Traditional processes also do not generally feature automated spending and procurement controls and, as a result, may fail to direct spending to preferred vendors and may permit spending on unapproved goods and services.

Many large companies have installed enterprise resource planning and supply chain automation systems and software to increase their procurement efficiency for operating resources. These systems are often complex and are designed for use by a relatively small number of sophisticated users. They may not provide the necessary inter-activity with the vendor. In addition, a variety of point-to-point solutions such as electronic data interchange have been developed. However, the expense and complexity associated with licensing, implementing and managing these solutions can make them unsuitable for all but the largest organizations.

9

Opportunity for Business-to-Business Enterprise Cost Management Solutions

We believe that an opportunity exists to provide an Internet-based Enterprise Cost Management solution either in-house or remotely hosted. Our end-to-end business process solutions integrate the procurement and management of assets with financing, fulfillment and other asset services. These solutions streamline processes within an organization and provide integrated access to third-party content, commerce and services. Our comprehensive approach also facilitates relationships with the customer's preferred vendors.

THE ePlus SOLUTION

ePlus provides information technology product sales, professional services, leasing and software in a solution it has branded as ePlus Enterprise Cost Management. The solution is designed to provide a suite of Internet-based business-to-business supply chain management solutions designed to improve productivity and enhance operating efficiency on a company-wide basis. eECM provides customers visibility and control of transactions and owned assets and, as a suite of integrated business applications, reduces redundancies throughout their process. The ePlus offering currently includes Internet-based applications for catalog content management, e-procurement, asset management, document imaging, document management and distribution, electronic bill presentment and payment and management of operating resources that can be integrated with financing and other asset services. In addition, our solution uses the Internet as a gateway between employees and third-party content, commerce and service providers. We believe our solution makes our customers' businesses more efficient, while providing better information to management.

ePlus allows customers to automate and customize their existing business rules and procurement processes using an Internet-based workflow tool. We offer customers a choice of Internet products on a licensed basis or as a remotely-hosted solution, which can reduce the up-front costs for customers, facilitate a quick adoption, and eliminate the need for customers to maintain and update software. We believe our solution can be implemented faster with fewer programmers or developers than many competing solutions.

STRATEGY

Our goal is to become a leading provider of Enterprise Cost Management services. The key elements of our strategy include the following:

Convert current and future customers to our services

We have an existing client base of approximately 2,700 customers, the vast majority of which are based in the United States. We believe our years of experience in developing supply chain management solutions, including financing, asset management and information technology sales and service, give us significant advantages over our competitors. Consequently, we believe we are well positioned to offer a comprehensive Enterprise Cost Management solution tailored to meet our customers' specific needs. We offer our software-based services through both a hosted version that can be obtained through a subscription fee basis or as a stand-alone product that can be licensed by the customer.

10

Expand our sales force and marketing activities

As of March 31, 2005, we had 211 employees in our sales and marketing function, which represents an increase compared to the previous year of 178 employees. We have expanded our presence in locations that have a high concentration of fast-growing middle and large market companies. We will continue to seek experienced sales personnel with established customer relationships and with backgrounds in hardware and software sales and supply chain management. We may also selectively acquire companies that have attractive customer relationships, skilled sales forces, or technology or services that may enhance our Enterprise Cost Management offerings.

Expand the functionality of our Internet-based solutions

We will continue to improve our Enterprise Cost Management offering to expand its functionality to serve our customers' needs. We intend to use the flexibility of our platform to offer additional products and services when economically feasible. As part of this strategy, we may also acquire technology companies to expand and enhance the platform of Enterprise Cost Management services to provide additional functionality and value added services.

DESCRIPTION OF ENTERPRISE COST MANAGEMENT ("eECM")

eECM consists of six basic service products that have either been internally developed or have been acquired and incorporated into our total business process. The eECM framework consists of Procure+, Manage+, ePlus Leasing, Content+, IT sales and service and business process outsourcing. These combined services and software offerings are integrated so that each component links with and shares information. Procure+, Manage+, and Content+ are the key parts of our software solution offerings and ePlus Leasing, strategic sourcing and business process outsourcing are the services provided by us.

Procure+ represents our software solutions that offer Internet-based procurement capabilities that enable companies to reduce their purchasing costs while increasing their overall supply chain efficiency. Cost reductions are achieved through user-friendly application functionality designed to reduce off-contract or unauthorized purchases, to automate unnecessary manual processes, and to improve leverage with suppliers. Procure+ is available as a stand-alone license or as a remotely-hosted solution under a subscription fee arrangement.

IMPLEMENTATION AND CUSTOMER SERVICE

We use a project management approach to the implementation of eECM solution with each new customer. Our team consists of implementation specialists, who are responsible for the customer evaluation and implementation of the solution, customer relationship managers who lead the customer's long-term support team, and the appropriate engineering staff members to provide technology services, if required, to the customer.

Our implementation of our solution is a multi-step process that requires, on average, approximately four to nine weeks and involves the following steps:

   o   We conduct an operational audit to understand the customer's business
       processes across multiple departments, existing enterprise resource
       planning and outsourced applications, future plans, procurement
       approval processes and business rules and internal control structure.

                                      11

o   We design a customized procurement, management and service program to
    fit the customer's organizational needs.

o   We implement an Internet-based Enterprise Cost Management system which
    can include: customer workflow processes and business rules using our
    graphical route-builder, custom catalogs linking to chosen vendors,
    including ePlus, custom reporting and querying, and data capture
    parameters for the Manage+ asset repository.

o   We beta test the site and train the customer's personnel.

o   We provide help desk, technological assistance, and remote network
    monitoring on a constant basis.

We provide Enterprise Cost Management as a service solution to our customers,
and the ongoing support of the customer and our commitment to the highest
possible customer satisfaction is fundamental to our strategy. We use a team
approach to providing customer care and assign each customer to a specific team
so that they are able to continue to interact with the same ePlus personnel who
have experience and expertise with the customer's specific business processes
and requirements.

TECHNOLOGY

General. Our Procure+ and Manage+ applications are fully standards-based,
designed for the Internet and built upon an underlying architecture that is
based on leading application frameworks. These frameworks provide access
security, load balancing, resource pooling, message queuing, distributed
transaction processing and reusable components and services.

Our applications are designed to be scalable, due to our multi-tiered
architecture employing thin client, multi-threaded application servers and
relational databases. Our applications are available to our customers over any
standard Internet browser without the need to download applets or executables.

We use a component-based application infrastructure composed of readily
configurable business rules, a workflow engine, advanced data management
capabilities and an electronic cataloging system. Each of these core elements
plays a crucial role in deploying enterprise-wide solutions that can capture a
customer's unique policies and processes and manage key business functions.

Business Rules. Our business rules engine allows Procure+ to be configured so
that our customers can effectively enforce their requisition approval policies
while providing flexibility so that the business rules can be edited and
modified as our customer's policies change. Users of the system are presented
with appropriate guidance to facilitate adherence to corporate policies. The
business rules dramatically reduce reworking of procedures, track and resolve
policy exceptions online and eliminate re-keying of data into back-end systems.
The business rules permit management by exception, in which items requiring
managerial attention are automatically routed.

12

Workflow Engine. Our workflow engine allows information to flow through the customer organization in a timely, secure and efficient manner. For example, in addition to incorporating policy-based business rules, it incorporates time-based standards to reroute purchase requisitions if the original recipient does not respond within the allocated performance time frame. Our application also provides e-mail notification to users of the status of a procedure or of events requiring attention, alteration and action, such as notifying the creator of a purchase requisition of its location in the purchasing cycle or notifying a manager of a requisition requiring attention.

Content Management. Our electronic catalog allows multiple vendor information to be linked to customized customer catalogs. Information can be updated when required by the customer.

Asset Management. Manage+ is based upon an RDBMS (relational database management system) that is designed to be scalable and can be easily customized to provide customer-specific fields and data elements.

Our Enterprise Cost Management product can be integrated with external systems such as enterprise resource planning systems, financial management systems, human resource systems (for user information and organizational structure) and project accounting systems. These interfaces allow for the exchange of data between systems. These integration processes can be scheduled according to the needs of our customers' information services and finance departments.

System Security. Our design allows for multiple layers of security through the use of defined users and roles, secured logins, digital certificates and encryption. We currently use security software to protect our internal network systems from unauthorized access. Our firewall is a comprehensive security suite providing access control, authentication, network address translation, auditing and state table synchronization.

RESEARCH AND DEVELOPMENT

Our software has been acquired from third-party vendors or has been developed by us. In earlier stages of our eECM development, we relied heavily on licensed software and outsourced development, but with the acquisition of the software products and the hiring of the employees obtained from the acquisition of ProcureNet, Inc. on May 15, 2001 and Digital Paper Corporation on October 10, 2003, much of our current software development is handled within the company. We have also outsourced certain programming tasks to a highly specialized offshore development company. We market both software that we own and software that we have obtained perpetual license rights and source code from a third party. Subject to certain exceptions, we generally retain the source code and intellectual property rights of the customized software.

To successfully implement our business strategy, we are providing both a hosted and stand-alone software functionality and related services that meet the demands of our customers and prospective customers. We expect that competitive factors will create a continuing need for us to improve and add to our Enterprise Cost Management offering. The addition of new products and services will also require that we continue to improve the technology underlying our applications. We intend to maintain our competitive advantage by focusing our current resources in maintaining our state-of-the-art programs.

13

SALES AND MARKETING

We focus our marketing efforts on achieving lead generation and converting our existing customer base to our eECM solution. The target market for our customer base is primarily middle and large market companies with annual revenues between $25 million and $1 billion. We believe there are over 60,000 potential customers in our target market. Our sales representatives are compensated primarily on a commission basis and we typically market to the senior financial officer or the senior information officer in an organization. To date, the majority of our customers have been generated from direct sales.

Our sales force is organized regionally in 33 office locations throughout the United States. See "Item 2. PROPERTIES" for additional office location information. As of March 31, 2005 our sales organization included 211 sales and sales support personnel.

INTELLECTUAL PROPERTY RIGHTS

Our success depends in part upon proprietary business methodologies and technologies that we have licensed and modified. We own certain software programs or have entered into software licensing agreements in connection with the development of our Enterprise Cost Management offering. We rely on a combination of copyright, trademark, service mark, and trade secret protection, confidentiality and nondisclosure agreements and licensing arrangements to establish and protect intellectual property rights. We seek to protect our software, documentation and other written materials under trade secret and copyright laws, which afford only limited protection.

We have three electronic sourcing systems patents and two document management patents in the United States. We also have patents in nine European countries, Mexico, and China. The three US patents for electronic sourcing systems have been determined to be valid and enforceable by a jury. However, we cannot provide any assurance that any patents, as issued, will prevent the development of competitive products or that our patents will not be successfully challenged by others or invalidated through administrative process or litigation. We also have the following registered service/trademarks: ePlus, ePlusSuite, Procure+, Manage+, Service+, Finance+, ePlus Leasing, International Computer Networks, Docpak, Simply Faster, Viewmark, Digital Paper, Intranetdocs, OneSource, Content+, eECM, and ePlus Enterprise Cost Management. We also have over twenty registered copyrights and additional common-law trademarks and copyrights.

Despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy aspects of our products or to obtain and use information that we regard as proprietary. Policing unauthorized use of our products is difficult, and while we are unable to determine the extent to which piracy of our software products exists, software piracy can be expected to be a persistent problem. Our means of protecting our proprietary rights may not be adequate and our competitors may independently develop similar technology, duplicate our products or design around our proprietary intellectual property.

14

## SALES ACTIVITIES AND FINANCING

We have been in the business of selling, leasing, financing, providing procurement, document management and asset management software and managing information technology and various other assets for over ten years and currently derive the majority of our revenues from such activities. We believe we can develop formal contractual arrangements with our current as well as new financing sources to provide equipment financing and leasing for our customers.

Sales. We are an authorized reseller of, or have the right to resell products and services from, over 400 manufacturers. Our largest manufacturer relationships include HP, IBM, Cisco, and Microsoft Corporation. Tech Data and Ingram Micro, Inc. are our largest distributors. We have multiple vendor authorizations in various IT disciplines to market specific products. Our flexible platform and customizable catalogs facilitate the addition of new vendors with little incremental effort. Using the distribution systems available, we usually sell products that are shipped from the distributors or suppliers directly to our customer location, which allows us to keep our inventory of any product to a minimum. The products we sell typically have payment account terms ranging from due upon delivery up to 60 days to pay, depending on the customer's credit and payment requirements.

Leasing and Financing. Our leasing and financing transactions generally fall into two categories: direct financing and operating leases. Direct financing transfers substantially all of the benefits and risks of equipment ownership to the customer. Operating leases consist of all other leases that do not meet the criteria to be direct financing or sales-type leases. Our lease transactions include true leases and installment sales or conditional sales contracts with corporations, non-profit entities and municipal and federal government contracts. Substantially all of our lease transactions are net leases with a specified non-cancelable lease term. These non-cancelable leases have a provision which requires the lessee to make all lease payments without offset or counterclaim. A net lease requires the lessee to make the full lease payment and pay any other expenses associated with the use of equipment, such as maintenance, casualty and liability insurance, sales or use taxes and personal property taxes. We primarily lease computers, associated accessories and software, communication related equipment, medical equipment, industrial related machinery and equipment, office furniture and general office equipment, transportation equipment, and other various business-related equipment.

In anticipation of the expiration of the initial term of a lease, we initiate the remarketing process for the related equipment. Our goal is to maximize revenues on the remarketing effort by either: (1) releasing or selling the equipment to the initial lessee; (2) renting the equipment to the initial lessee on a month-to-month basis; (3) selling or leasing the equipment to a different customer; or (4) selling the equipment to equipment brokers or dealers. The remarketing process is intended to enable us to recover or exceed the residual value of the leased equipment. Any amounts received over the estimated residual value less any commission expenses become profit margin to us and can significantly impact the degree of profitability of a lease transaction.

We aggressively manage the remarketing process of our leases to maximize the residual values of our leased equipment portfolio. To date, we have realized a premium over our original recorded residual assumption or the net book value.

15

Financing and Bank Relationships. We have a number of bank and finance company relationships that we use to provide working capital for all of our businesses and long-term financing for our lease financing businesses. Our finance department is responsible for maintaining and developing relationships with a diversified pool of commercial banks and finance companies with varying terms and conditions. See "Item 7, Management's Discussion and Analysis of Results of Operations, Financial Condition, Liquidity and Capital Resources."

Risk Management and Process Controls. It is our goal to minimize the financial risks of our balance sheet assets. To accomplish this goal, we use and maintain conservative underwriting policies and disciplined credit approval processes. We also have internal control processes, including contract origination and management, cash management, servicing, collections, remarketing and accounting. Whenever possible and financially prudent, we use non-recourse financing (which is limited to the underlying equipment and the specific lessee and not the Company's general assets) for our leasing transactions and we try to obtain lender commitments before acquiring the related assets.

When desirable, we manage our risk in assets by selling leased assets, including the residual portion of leases, to third parties rather than owning them. We try to obtain commitments for these asset sales before asset origination in a financing transaction. We also use agency purchase orders to procure equipment for lease to our customers as an agent, not a principal, and otherwise take measures to minimize our inventory. Additionally, we use fixed-rate funding and issue proposals that adjust for material adverse interest rate movements as well as material adverse changes to the financial condition of the customer.

We have an executive management review process and other internal controls in place to protect against entering into lease transactions that may have undesirable financial terms or unacceptable levels of risk. Our lease and sale contracts are reviewed by senior management for pricing, structure, documentation, and credit quality. Due in part to our strategy of focusing on a few types of equipment categories, we have product knowledge, historical re-marketing information and experience on the items that we lease, sell and service. We rely on our experience or outside opinions in the process of setting and adjusting our sale prices, lease rate factors and the residual values.

Default and Loss Experience. During the fiscal year ended March 31, 2005, we provided for $1,131,412 in credit losses and incurred actual credit losses of $496,975. During the fiscal year ended March 31, 2004 we provided for $46,663 in credit losses and incurred actual credit losses of $2,058,035.

16

## COMPETITION

The market for leasing, IT sales and services and software services is intensely competitive, subject to economic conditions and rapid change, and is significantly affected by new product introductions and other market activities of industry participants. We expect to continue to compete in all areas of business against local, regional and national firms. We compete directly with various leasing companies and bank leasing subsidiaries as well as captive finance companies. Many of these competitors are well established, have substantially greater financial, marketing, technical, and sales support than we do, and have established reputations for success in the purchase, sale and lease of computer-related products. In addition, many computer manufacturers may sell or lease directly to our customers, and our continued ability to compete effectively may be affected by the policies of such manufacturers.

The procurement software and electronic commerce market is in a constant state of change due to overall market acceptance and economic conditions. There are a number of companies developing and marketing business-to-business electronic commerce solutions targeted at specific vertical markets. Other competitors are also attempting to migrate their technologies to an Internet-enabled platform. Some of these competitors and potential competitors include enterprise resource planning system vendors and other major software vendors which are expected to sell their procurement and asset management products along with their application suites. These enterprise resource planning vendors have a significant installed customer base and have the opportunity to offer additional products to those customers as additional components of their respective application suites. We also face indirect competition from potential customers' internal development efforts and have to overcome potential customers' reluctance to move away from existing legacy systems and processes.

We believe that the principal competitive factors for business-to-business electronic commerce solutions are scalability, functionality, ease-of-use, ease-of-implementation, ability to integrate with existing legacy systems, experience in business-to-business supply chain management and knowledge of a business' asset management needs. We believe we can compete favorably with our competitors in these areas within our framework of eECM that consists of Procure+, Manage+, Content+, ePlus Leasing, strategic sourcing, document management software and business process outsourcing.

## EMPLOYEES

As of March 31, 2005, we employed 637 full-time and part-time employees who operated through approximately 33 office locations, including our principal executive offices and regional sales offices. No employees are represented by a labor union and we believe that we have a good relationship with our employees. The functional areas of our employees are as follows:

|                              | Number of Employees |
| ---------------------------- | ------------------- |
| Sales and Marketing          | 211                 |
| Technical Support            | 153                 |
| Administrative               | 176                 |
| Software and Implementations | 91                  |
| Executive                    | 6                   |

## U.S. SECURITIES AND EXCHANGE COMMISSION REPORTS

The Company's Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, and all amendments to those reports, filed with or furnished to the U.S. Securities and Exchange Commission, are available free of charge through the Company's internet website, www.eplus.com, as soon as reasonably practical after the Company has electronically filed such material with, or furnished it to, the SEC.

17

RISK FACTORS

**The Limited Operating History of Our E-Commerce Related Products and Services Makes It Difficult to Evaluate Our Business and Our Prospects**

Our eECM solution has had a limited operating history. Although we have been in the business of financing and selling information technology equipment since 1990, we will encounter some of the challenges, risks, difficulties and uncertainties frequently encountered by early-stage companies using new business models in evolving markets. Some of these challenges relate to our ability to:

o   increase the total number of users of our Enterprise Cost Management services;

o   adapt to meet changes in our markets and competitive developments;

o   hire sufficient personnel to accommodate the expected growth in our customer base; and

o   continue to update our technology to enhance the features and functionality of our suite of products.

We cannot be certain that our business strategy will be successful or that we will successfully address these and other challenges, risks and uncertainties.

**The Electronic Commerce Business-To-Business Solutions Market Is Highly Competitive and We Cannot Assure That We Will Be Able to Compete Effectively**

The market for Internet-based, business-to-business electronic commerce solutions is extremely competitive. We expect competition to intensify as current competitors expand their product offerings and new competitors enter the market. We cannot assure that we will be able to compete successfully against current or future competitors, or that competitive pressures faced by us will not harm our business, operating results or financial condition. In addition, the market for electronic procurement solutions is relatively new and evolving. Our strategy of providing an Internet-based electronic commerce solution may not be successful, or we may not execute it effectively. Accordingly, our solution may not be widely adopted by businesses.

Because there are relatively low barriers to entry in the electronic commerce market, competition from other established and emerging companies may develop in the future. Increased competition is likely to result in reduced margins, longer sales cycles and loss of market share, any of which could materially harm our business, operating results or financial condition. The business-to-business electronic commerce solutions offered by our competitors now or in the future may be perceived by buyers and suppliers as superior to ours. Many of our competitors have, and potential competitors may have, more experience developing Internet-based software and end-to-end purchasing solutions, larger technical staffs, larger customer bases, greater brand recognition and greater financial, marketing and other resources than we do. In addition, competitors may be able to develop products and services that are superior to our products and services, that achieve greater customer acceptance, or that have significantly improved functionality as compared to our existing and future products and services.

Costs to Protect Our Patents May Affect Our Earnings

The legal and associated costs to protect our patents may have a material adverse effect on our business, operating results and financial condition. We may deem it necessary to protect the Company's intellectual property rights and significant expenses could be incurred with no certainty of the results of these potential actions. Costs relative to lawsuits are usually expensed in the periods as they occur and there is no certainty of recouping any of the amounts expended, regardless of the outcome of any action.

18

If Our Products Contain Defects, Our Business Could Suffer

Products as complex as those used to provide our electronic commerce solutions often contain known and undetected errors or performance problems. Many serious defects are frequently found during the period immediately following introduction of new products or enhancements to existing products. Although we attempt to resolve all errors that we believe would be considered serious by our customers, our products are not error-free. Undetected errors or performance problems may not be discovered in the future and errors considered by us to be minor may be considered serious by our customers. This could result in lost revenues, delays in customer acceptance or unforeseen liability that would be detrimental to our reputation and to our business.

We May Not Be Able to Hire and Retain Sufficient Sales, Marketing and Technical Personnel That We Need to Succeed

To increase market awareness and sales of our offerings, we may need to expand our sales operations and marketing efforts in the future. Our products and services require a sophisticated sales effort and significant technical support. Competition for qualified sales, marketing and technical personnel fluctuates depending on market conditions and we might not be able to hire or retain sufficient numbers of such personnel to grow our business.

If We Are Unable to Protect Our Intellectual Property, Our Business Will Suffer

The success of our business strategy depends, in part, upon proprietary technology and other intellectual property rights. To date, we have relied primarily on a combination of copyright, trade secret and service mark laws and contractual provisions with our subcontractors to protect our proprietary technology. It may be possible for unauthorized third parties to copy certain portions of our products or reverse engineer or obtain and use information that we regard as proprietary. Some of our agreements with our customers and technology licensors contain residual clauses regarding confidentiality and the rights of third parties to obtain the source code for our products. These provisions may limit our ability to protect our intellectual property rights in the future that could seriously harm our business, operating results and financial condition. We cannot assure you that our means of protecting our intellectual property rights will be adequate. If any of these events happen, our business, operating results and financial condition could be harmed.

We Face Risks of Claims From Third Parties for Intellectual Property Infringement That Could Harm Our Business

Although we believe that our intellectual property rights are sufficient to allow us to market our existing products without incurring liability to third parties, we cannot assure you that our products and services do not infringe on the intellectual property rights of third parties.

19

In addition, because patent applications in the United States are not publicly disclosed until the patent is issued, we may not be aware of applications that have been filed which relate to our products or processes. We could incur substantial costs in defending ourselves and our customers against infringement claims. In the event of a claim of infringement, we and our customers may be required to obtain one or more licenses from third parties. We cannot assure you that such licenses could be obtained from third parties at a reasonable cost or at all. Defense of any lawsuit or failure to obtain any such required license could harm our business, operating results and financial condition. In addition, in certain instances, third parties licensing software to us have refused to indemnify us for possible infringement claims.

If We Publish Inaccurate Catalog Content Data, Our Business Could Suffer

Any defects or errors in catalog content data could harm our customers or deter businesses from participating in our offering, damage our business reputation, harm our ability to attract new customers and potentially expose us to legal liability. In addition, from time to time some participants in Enterprise Cost Management services could submit to us inaccurate pricing or other catalog data. Even though such inaccuracies are not caused by our work and are not within our control, such inaccuracies could deter current and potential customers from using our products and could harm our business, operating results and financial condition.

We Depend on Having Creditworthy Customers

Our leasing and technology sales business requires sufficient amounts of debt and equity capital to fund our equipment purchases. If the credit quality of our customer base materially decreases, or if we experience a material increase in our credit losses, we may find it difficult to continue to obtain the capital we require and our business, operating results and financial condition may be harmed. In addition to the impact on our ability to attract capital, a material increase in our delinquency and default experience would itself have a material adverse effect on our business, operating results and financial condition.

We May Not Be Able to Realize Our Entire Investment in the Equipment We Lease

We lease various types of equipment to customers through two distinct types of transactions: capital leases and operating leases. A capital lease passes substantially all of the risks and rewards of owning the related equipment to the customer. Lease payments during the initial term of a direct financing lease cover approximately 90% of the underlying equipment's cost at the inception of the lease. The duration of an operating lease, however, is shorter relative to the equipment's useful life. We bear a slightly greater risk in operating leases in that we may not be able to remarket the equipment on terms that will allow us to fully recover our investment.

At the inception of each lease, we estimate the fair market value of the item as a residual value for the leased equipment based on the terms of the lease contract. A decrease in the market value of such equipment at a rate greater than the rate we expected, whether due to rapid technological obsolescence or other factors, would adversely affect the residual values of such equipment. Any such loss, which is considered by management to be permanent in nature, would be recognized in the period of impairment in accordance with Statement of Financial Accounting Standard No. 13, "Accounting for Leases." Consequently, there can be no assurance that our estimated residual values for equipment will be realized. Our lease portfolio has recently expanded to new types of equipment under lease of which we may not experience the same residual realization economics.

20

We May Not Reserve Adequately for Our Credit Losses

We maintain a consolidated reserve for credit losses on finance receivables. Our consolidated reserve for credit losses reflects management's judgment of the loss potential. Our management bases its judgment on the nature and financial characteristics of our obligors, general economic conditions and our bad debt experience. It also considers delinquency rates and the value of the collateral underlying the finance receivables.

We cannot be certain that our consolidated reserve for credit losses will be adequate over time to cover credit losses in our portfolio because of unanticipated adverse changes in the economy or events adversely affecting specific customers, industries or markets. If our reserves for credit losses are not adequate, our business, operating results and financial condition may suffer.

Our Earnings May Fluctuate

Our earnings are susceptible to fluctuations for a number of reasons, including the seasonal and cyclical nature of our customers' procurement patterns. Our earnings will continue to be affected by fluctuations in our historical business, such as lower sales of equipment, increased direct marketing by manufacturers rather than through distributors, reductions in realized residual values, fluctuations in interest rates, and lower overall sales. In the event our revenues or earnings are less than the level expected by the market in general, such shortfall could have an immediate and significant adverse impact on our common stock's market price.

We Are Dependent Upon Our Current Management Team

Our operations and future success depend on the efforts, abilities and relationships of our Chairman, Chief Executive Officer and President, Phillip G. Norton; our founder and Executive Vice President, Bruce M. Bowen, who also serves as a director; Steven J. Mencarini, Senior Vice President and Chief Financial Officer; and Kleyton L. Parkhurst, Senior Vice President and Treasurer. The loss of any of these key management officers or personnel could have a material adverse effect on our business, operating results and financial condition. Each of these officers has an employment agreement with us. We also maintain key-man life insurance on Mr. Norton.

21

Our Disclosure Controls and Procedures and our Internal Controls over Financial Reporting may not be Effective to Detect all Errors or to Detect and Deter Wrongdoing, Fraud or Improper Activities in all Instances

Our management, including our Chief Executive Officer and Chief Financial Officer, cannnot ensure that our disclosure controls and procedures or our internal controls over financial reporting will prevent all errors and fraud. In designing our control systems, management recognizes that any control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance of achieving the desired control objectives. Further, the design of a control system must reflect the necessity of considering the cost-benefit relationship of possible controls and procedures. Because of inherent limitations in any control system, no evaluation of controls can provide absolute assurance that all control issues and instances of wrongdoing, if any, that may affect our operations have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, that breakdowns can occur because of simple error or mistakes and that controls may be circumvented by individual acts by some person, by collusion of two or more people or by management's override of the control. The design of any control system also is based in part upon certain assumptions about the likelihood of a potential future event, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Because of the inherent limitations in cost-effective control systems, misstatements due to error or wrongdoing may occur and not be detected. Over time, it is also possible that controls may become inadequate because of changes in conditions that could not be, or were not, anticipated at inception or at subsequent review of the control system.

Treating Stock Options and Employee Stock Purchase Plan Participation As a Compensation Expense Could Significantly Impair Our Ability to Maintain Profitability

The Financial Accounting Standards Board has begun requiring some companies to record compensation expense regarding stock options and participation in employee stock purchase plans. We grant stock options to our employees, officers and directors and we administered an employee stock purchase plan (ESPP) which ended December 31, 2002. Information on our stock option plan and ESPP, including the shares reserved for issuance under those plans, the terms of options granted, and the shares subject to outstanding stock options, is included in Note 11 of the Notes to Consolidated Financial Statements. The current Financial Accounting Standards Board guidance is that, effective for our fiscal year starting April 1, 2006, we will have to begin expensing stock options. When we are required to record an expense for our stock-based compensation plans, we could incur a significant compensation expense, and any such expense could significantly impair our ability to return to and maintain profitability on a GAAP basis. That impact on our ability to maintain profitability on a GAAP basis could have a material adverse effect on the market price of the Company's common stock.

22

Our Assessment As to the Adequacy of Our Internal Controls Over Financial
Reporting as Required by Section 404 of the Sarbanes-Oxley Act of 2002 May Cause
Our Operating Expenses to Increase. If We Are Unable to Certify the Adequacy of
Our Internal Controls and Our Independent Auditors Are Unable to Attest Thereto,
Investors Could Lose Confidence in the Reliability of Our Financial Statements,
Which Could Result in a Decrease in the Value of the Company's Common Stock.

As directed by Section 404 of the Sarbanes-Oxley Act of 2002, the Securities and
Exchange Commission adopted rules requiring public companies to include a report
of management on the company's internal control over financial reporting in
their annual reports on Form 10-K. We expect that these rules will first apply
to ePlus with respect to our fiscal year ending March 31, 2006. To comply with
the Sarbanes-Oxley Act and the SEC's new rules and regulations, we are
evaluating our internal control systems and taking remedial actions to allow
management to report on, and our independent auditors to attest to, our internal
control over financial reporting. As a result, we have incurred expenses, and
expect to incur additional expenses, and diversion of management's time and
attention, which may increase our operating expenses and impair our ability to
sustain profitability on a pro forma basis and achieve profitability on a GAAP
basis. While we are endeavoring to implement the requirements relating to
internal controls and all other aspects of Section 404 in a timely manner, there
can be no assurance that we will be able to maintain our schedule to complete
all assessment and testing in a timely manner and, if we do not, that we and our
independent auditors will have the resources available to complete necessary
assessment and reporting on internal controls on a timely basis. Further, we
cannot be certain that our testing of internal controls and resulting
remediation actions will yield adequate internal controls over financial
reporting as required by Section 404. If we are not able to implement the
requirements of Section 404 in a timely manner or with adequate compliance,
there could be an adverse reaction in the financial markets due to a loss of
confidence in the reliability of our financial statements, which could cause the
market price of the Company's common stock to decline.

23

ITEM 2.  PROPERTIES

The Company operates from 33 office  locations.  Our total leased square footage
is  approximately  166,277 square feet for which we incur rent of  approximately
$206,000  per month.  Some of our  companies  operate in shared  office space to
improve  sales,  marketing and cost  efficiency.  We do not own any real estate.
Some sales and technical  service  personnel  operate  from either  residential
offices or space that is  provided  for by  another  entity or are  located on a
customer site. The following table identifies our largest locations,  the number
of current  employees as of March 31, 2005,  the square  footage and the general
office functions.

| Location | Company | Employees | Square Footage | Function |
|----------|---------|-----------|----------------|----------|
| Herndon, VA | ePlus Group, inc.<br>ePlus Technology, inc.<br>ePlus Government, inc.<br>ePlus Document Systems, inc. | 253 | 50,232 | Corporate and subsidiary headquarters, sales office, technical support and warehouse |
| Robbinsville, NJ | ePlus Technology, inc. | 25 | 9,563 | Sales office and technical support |
| Pottstown, PA | ePlus Technology, inc. | 44 | 12,853 | Sales office, technical support and warehouse |
| Sunnyvale, CA | ePlus Technology, inc. | 32 | 11,200 | Sales office, technical support and warehouse |
| Wilmington, NC | ePlus Technology, inc. | 25 | 6,068 | Sales office and technical support |
| Raleigh, NC | ePlus Group, inc.<br>ePlus Technology, inc. | 27 | 8,638 | Sales office-shared and technical support |
| Avon, CT | ePlus Systems, inc. | 12 | 4,807 | Subsidiary headquarters, sales office and  technical development |
| Houston, TX | ePlus Content Services, inc. | 21 | 4,000 | Subsidiary headquarters, sales office and e-commerce catalog service center |
| Canton, MA | ePlus Technology, inc. | 28 | 6,228 | Sales office and technical support |
| New York, NY | ePlus Technology, inc. | 18 | 5,121 | Sales office and technical support |
| Elkridge, MD | ePlus Technology, inc. | 19 | 5,092 | Sales office and technical support |
| Boca Raton, FL | ePlus Technology, inc. | 6 | 3,214 | Sales office and technical support |
| Hauppauge, NY | ePlus Technology, inc. | 42 | 23,700 | Sales office and technical support |
| Pittsford, NY | ePlus Systems, inc. | 47 | 5,493 | Sales office and technical development |
| Other locations | | 38 | 10,068 | Sales offices and technical support |

The largest  location  is  Herndon, VA,  which has a lease  expiration  date of
December 31, 2009.

24

ITEM 3.  LEGAL PROCEEDINGS

The Company is involved in three lawsuits arising from four separate leasing schedules with a lessee named Cyberco Holdings, Inc. ("Cyberco"). The Cyberco principals were allegedly perpetrating a scam. Cyberco, related affiliates, and at least one principal are in Chapter 7 bankruptcy, and no future lease payments are expected. The first two lawsuits, both in the U.S.D.C. for the Southern District of New York, involve three of the schedules, which the Company had assigned on a non-recourse basis to GMAC Commercial Finance, LLC ("GMAC"). GMAC filed suit against the Company seeking repayment of the underlying non-recourse promissory note, which is approximately $10,646,000. The same day, ePlus filed suit against GMAC, Travelers Property Casualty Company of America ("Travelers") and Banc of America Leasing and Capital, LLC ("BoA"), seeking a declaratory judgment that any potential liability is covered by the Company's liability policy with Travelers, and that the Company has no liability to GMAC or BoA. The two cases have been administratively consolidated, and the Company subsequently dismissed BoA from the suit. The suits are proceeding between the Company, GMAC and Travelers, and are in the discovery phase. The Company continues to believe that it has no liability to GMAC, and that Travelers is responsible for the costs of defense and any potential judgment.

The third lawsuit, which stems from the remaining schedule between Cyberco and the Company, is between BoA and the Company in the Circuit Court for Fairfax County, Virginia. The Company sold the schedule to BoA under a Program Agreement. BoA seeks to recover its loss of approximately $3,063,000. The Company believes that it has no liability to BoA, and that Travelers is responsible for the costs of defense and any potential judgment.

ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

PART II

ITEM 5. MARKET FOR REGISTRANT'S  COMMON EQUITY,  RELATED STOCKHOLDER MATTERS AND
ISSUER'S PURCHASES OF EQUITY SERCURITIES

MARKET INFORMATION

Our common stock is quoted on the NASDAQ National Market System under the symbol
"PLUS." The following table sets forth the range of high and low sale prices for
our common  stock as quoted on the NASDAQ for the period  April 1, 2003  through
March 31, 2005, by quarter.

| Quarter Ended | High | Low |
|---------------|------|-----|
| June 30, 2003 | $10.99 | $7.13 |
| September 30, 2003 | $16.06 | $10.47 |
| December 31, 2003 | $16.17 | $10.55 |
| March 31, 2004 | $15.49 | $12.18 |
| June 30, 2004 | $12.98 | $9.97 |
| September 30, 2004 | $11.58 | $8.80 |
| December 31, 2004 | $12.80 | $9.32 |
| March 31, 2005 | $17.14 | $11.01 |

On June 14, 2005, the closing price of the common stock was $12.73 per share. On
June 22, 2005,  there were 182  shareholders  of record of our common stock.  We
believe there are over 400 beneficial holders of the Company's common stock.

DIVIDENDS

The Company has never paid a cash dividend to stockholders. We have retained our
earnings for use in the business. There is also a contractual restriction in our
ability to pay  dividends.  Our  National  City Bank credit  facility  restricts
dividends to 50% of net income accumulated after September 30, 2000.  Therefore,
the payment of cash dividends on our common stock is unlikely in the foreseeable
future. Any future determination concerning the payment of dividends will depend
upon the elimination of this restriction and the absence of similar restrictions
in other  agreements,  our financial  condition,  results of operations  and any
other factors deemed relevant by our Board of Directors.

PURCHASES OF OUR COMMON STOCK

The following table provides  information  regarding our purchases of ePlus inc.
Common Stock during the fiscal year ended March 31, 2005:

26

| Period | Total number of shares purchased (1) | Average price per share | Total number of shares purchased as part of publicly announced plans or programs | Maximum number of shares that may yet be purchased under the plans or programs |
|--------|------|------|------|------|
| April 1, 2004 through April 30, 2004 | 35,000 | $12.62 | 35,000 | – (2) |
| May 1, 2004 through May 31, 2004 | 4,000 | $12.69 | 4,000 | 394,268 (3) |
| June 1, 2004 through June 30, 2004 | – | $  – | – | 392,281 (4) |
| July 1, 2004 through July 31, 2004 | – | $  – | – | 456,826 (5) |
| August 1, 2004 through August 31, 2004 | – | $  – | – | 434,459 (6) |
| September 1, 2004 through September 30, 2004 | – | $  – | – | 417,336 (7) |
| October 1, 2004 through October 31, 2004 | – | $  – | – | – (8) |
| November 1, 2004 through November 30, 2004 | – | $  – | – | 677,997 (9) |
| December 1, 2004 through December 31, 2004 | 19,032 | $10.97 | 19,032 | 613,487 (10) |
| January 1, 2005 through January 31, 2005 | 101,224 | $12.21 | 101,224 | 493,581 (11) |
| February 1, 2005 through February 28, 2005 | 6,000 | $12.14 | 6,000 | 444,695 (12) |
| March 1, 2005 through March 31, 2005 | 283,360 | $13.01 | 283,360 | 583,898 (13) |

(1) All shares acquired were in open-market purchases.

(2) The share purchase authorization in place for the month ended April 30, 2004 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($7,500,000). As of April 30, 2004, the remaining authorized dollar amount to purchase shares was $0.

(3) The share purchase authorization in place for the month ended May 31, 2004 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,000,000). As of May 31, 2004, the remaining authorized dollar amount to purchase shares was $4,436,694 and, based on May's average price per share of $11.253, 394,268 represents the maximum shares that may yet be purchased.

(4) The share purchase authorization in place for the month ended June 30, 2004 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,000,000). As of June 30, 2004, the remaining authorized dollar amount to purchase shares was $4,436,694 and, based on June's average price per share of $11.310, 392,281 represents the maximum shares that may yet be purchased.

(5) The share purchase authorization in place for the month ended July 31, 2004 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,000,000). As of July 31, 2004, the remaining authorized dollar amount to purchase shares was $4,436,694 and, based on July's average price per share of $9.712, 456,826 represents the maximum shares that may yet be purchased.

(6) The share purchase authorization in place for the month ended August 31, 2004 had purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,000,000). As of August 31, 2004, the remaining authorized dollar amount to purchase shares was $4,436,694 and, based on August's average price per share of $10.212, 434,459 represents the maximum shares that may yet be purchased.

(7) The share purchase authorization in place for the month ended September 30, 2004 has purchase limitations on both the number of shares (3,000,000) as well as a total dollar cap ($12,000,000). As of September 30, 2004, the remaining authorized dollar amount to purchase shares was $4,436,694 and, based on September's average price per share of $10.631, 417,336 represents the maximum shares that may yet be purchased.

27

(8) No stock repurchase plan was in effect from October 1, 2004 through November 16, 2004.
(9) The share purchase authorization in place for the month ended November 30, 2004 has purchase limitations on
    both the number of shares (3,000,000) as well as a total dollar cap ($7,500,000). As of November 30, 2004,
    the remaining authorized dollar amount to purchase shares was $7,500,000 and, based on November's average
    price per share of $11.062, 677,997 represents the maximum shares that may yet be purchased.
(10)The share purchase authorization in place for the month ended December 31, 2004 has purchase limitations on
    both the number of shares (3,000,000) as well as a total dollar cap ($7,500,000). As of December 31, 2004,
    the remaining authorized dollar amount to purchase shares was $7,291,295 and, based on December's average
    price per share of $11.885, 613,487 represents the maximum shares that may yet be purchased.
(11)The share purchase authorization in place for the month ended January 31, 2005 has purchase limitations on
    both the number of shares (3,000,000) as well as a total dollar cap ($7,500,000). As of January 31, 2005,
    the remaining authorized dollar amount to purchase shares was $6,055,747 and, based on January's average
    price per share of $12.269, 493,581 represents the maximum shares that may yet be purchased.
(12)The share purchase authorization in place for the month ended February 28, 2005 has purchase limitations on
    both the number of shares (3,000,000) as well as a total dollar cap ($7,500,000). As of February 28, 2005,
    the remaining authorized dollar amount to purchase shares was $5,982,927 and, based on February's average
    price per share of $13.454, 444,695 represents the maximum shares that may yet be purchased.
(13)The share purchase authorization in place for the month ended March 31, 2005 has purchase limitations on
    both the number of shares (3,000,000) as well as a total dollar cap ($12,500,000). As of March 31, 2005,
    the remaining authorized dollar amount to purchase shares was $7,297,558 and, based on March's average price
    per share of $12.498, 583,898 represents the maximum shares that may yet be purchased.

The timing and expiration date of the stock repurchase authorizations are included in Note 1 to the Consolidated
Financial Statements.


EQUITY COMPENSATION PLAN INFORMATION

The following table provides information about ePlus' common stock that may be
issued upon the exercise of options, warrants, and rights under all of ePlus'
existing equity compensation plans as of March 31, 2005, including ePlus' 1998
Long Term Incentive Plan, Amended and Restated Incentive Stock Option Plan,
Amended and Restated Outside Director Stock Option Plan, Amended and Restated
Nonqualified Stock Option Plan, and the Employee Stock Purchase Plan.

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans |
|---|---|---|---|
| Equity compensation plans approved by security holders | 2,166,182 | $9.43 | 283,341 |
| Equity compensation plans not approved by security holders | - | - | - |
| Total | 2,166,182 | $9.43 | 283,341 |


ITEM 6.  SELECTED FINANCIAL DATA

The selected consolidated financial data set forth below should be read in
conjunction with the Consolidated Financial Statements of the Company and
related Notes thereto and the information included under "Item 7. Management's
Discussion and Analysis of Results of Operations, Financial Condition, Liquidity
and Capital Resources - As of and For the Years Ended March 31, 2003, 2004 and
2005" and "Item 1. Business."

28

ePLUS, INC. AND SUBSIDIARIES
SELECTED CONSOLIDATED FINANCIAL DATA
(Dollar amounts in thousands, except per share data)

| | Year Ended March 31, | | | | |
|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 |
| CONSOLIDATED STATEMENTS OF EARNINGS | | | | | |
| Revenues: | | | | | |
| Sales of product | $ 219,795 | $ 133,008 | $ 228,770 | $ 267,899 | $ 480,970 |
| Sales of leased equipment | 34,031 | 9,353 | 6,096 | – | – |
| Lease revenues | 42,694 | 48,850 | 50,520 | 51,254 | 46,344 |
| Fee and other income | 10,066 | 13,774 | 14,260 | 11,405 | 48,484 |
| Total revenues | 306,586 | 204,985 | 299,646 | 330,558 | 575,798 |
| Costs and Expenses: | | | | | |
| Cost of sales of product | 184,302 | 114,554 | 201,277 | 236,283 | 432,774 |
| Cost of sales of leased equipment | 33,329 | 9,044 | 5,892 | – | – |
| Direct lease costs | 16,535 | 9,579 | 6,582 | 10,561 | 11,509 |
| Professional and other costs | 3,363 | 2,718 | 3,188 | 3,701 | 9,417 |
| Salaries and benefits | 29,042 | 30,165 | 43,428 | 41,325 | 54,858 |
| General and administrative expenses | 10,507 | 12,193 | 14,499 | 14,631 | 18,253 |
| Interest and financing costs | 15,523 | 11,810 | 8,308 | 6,847 | 5,981 |
| Total costs and expenses | 292,601 | 190,063 | 283,174 | 313,348 | 532,792 |
| Earnings before provision for income taxes | 13,985 | 14,922 | 16,472 | 17,210 | 43,006 |
| Provision for income taxes | 5,667 | 6,010 | 6,760 | 7,056 | 17,718 |
| Net earnings | $ 8,318 | $ 8,912 | $ 9,712 | $ 10,154 | $ 25,288 |
| Net earnings per common share - Basic | $ 0.86 | $ 0.87 | $ 0.97 | $ 1.09 | $ 2.84 |
| Net earnings per common share - Diluted | $ 0.80 | $ 0.85 | $ 0.96 | $ 1.02 | $ 2.68 |
| Weighted average shares outstanding - Basic | 9,625,891 | 10,235,129 | 10,061,088 | 9,332,324 | 8,898,112 |
| Weighted average shares outstanding - Diluted | 10,383,467 | 10,458,235 | 10,109,809 | 9,976,458 | 9,433,250 |

29

ePLUS, INC. AND SUBSIDIARIES
SELECTED CONSOLIDATED FINANCIAL DATA
(Dollar amounts in thousands, except per share data)

|  | As of March 31, | | | | |
|---|---|---|---|---|---|
|  | 2001 | 2002 | 2003 | 2004 | 2005 |
| **CONSOLIDATED BALANCE SHEETS** | | | | | |
| **Assets:** | | | | | |
| Cash and cash equivalents | $ 24,534 | $ 28,224 | $ 27,784 | $ 25,155 | $ 38,852 |
| Accounts receivable | 57,627 | 41,397 | 38,385 | 51,189 | 93,555 |
| Notes receivable | 1,862 | 228 | 53 | 52 | 115 |
| Inventories | 2,651 | 872 | 1,373 | 900 | 2,117 |
| Investment in leases and leased equipment - net | 202,846 | 169,087 | 182,169 | 186,667 | 189,469 |
| Other assets | 21,347 | 39,188 | 29,177 | 30,239 | 36,632 |
| Total assets | $ 310,867 | $ 278,996 | $ 278,941 | $ 294,202 | $ 360,740 |
| **Liabilities:** | | | | | |
| Accounts payable - equipment | $ 9,227 | $ 3,899 | $ 5,636 | $ 9,993 | $ 8,965 |
| Accounts payable - trade | 17,764 | 14,223 | 25,914 | 32,141 | 55,333 |
| Salaries and commissions payable | 1,293 | 492 | 620 | 584 | 771 |
| Recourse notes payable | 8,876 | 4,660 | 2,736 | 6 | 6,265 |
| Non-recourse notes payable | 159,122 | 129,977 | 116,255 | 117,857 | 114,839 |
| Other liabilities | 22,678 | 19,456 | 18,163 | 22,037 | 42,465 |
| Total liabilities | 218,960 | 172,707 | 169,324 | 182,618 | 228,638 |
| Stockholders' equity | 91,907 | 106,289 | 109,617 | 111,584 | 132,102 |
| Total liabilities and stockholders' equity | $ 310,867 | $ 278,996 | $ 278,941 | $ 294,202 | $ 360,740 |

ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF RESULTS OF OPERATIONS, FINANCIAL
CONDITION, LIQUIDITY AND CAPITAL RESOURCES - AS OF AND FOR THE YEARS ENDED MARCH
31, 2003, 2004 AND 2005

The following discussion and analysis of results of operations and financial
condition of the Company should be read in conjunction with the Consolidated
Financial Statements and the related Notes included elsewhere in this report.

Our results of operations are susceptible to fluctuations for a number of
reasons, including, without limitation, customer demand for our products and
services, supplier costs, interest rate fluctuations and differences between
estimated residual values and actual amounts realized related to the equipment
we lease. Operating results could also fluctuate as a result of the sale of
equipment in our lease portfolio prior to the expiration of the lease term to
the lessee or to a third party. Such sales of leased equipment prior to the
expiration of the lease term may have the effect of increasing revenues and net
earnings during the period in which the sale occurs, and reducing revenues and
net earnings otherwise expected in subsequent periods.

30

We currently derive the majority of our revenue from sales and financing of information technology and other assets. We have expanded our product and service offerings under our ePlus Enterprise Cost Management model which represents the continued evolution of our original implementation of ePlus e-commerce products entitled ePlusSuite. The expansion to our eECM model is a framework that combines our IT sales and professional services, leasing and financing services, asset management software and services, procurement software, and electronic catalog content management software and services.

We expect to expand or open new sales locations and hire additional staff for specific targeted market areas in the near future whenever we can find both experienced personnel and qualified geographic areas.

As a result of our acquisitions and expansion of sales locations, the Company's historical results of operations and financial position may not be indicative of its future performance over time.

CRITICAL ACCOUNTING POLICIES

The manner in which lease finance transactions are characterized and reported for accounting purposes has a major impact upon reported revenue and net earnings. Lease accounting methods critical to our business are discussed below.

We classify our lease transactions, as required by Statement of Financial Accounting Standards (SFAS) No. 13, "Accounting for Leases," as: (1) direct financing; (2) sales-type; or (3) operating leases. Revenues and expenses between accounting periods for each lease term will vary depending upon the lease classification.

For financial statement purposes, we present revenue from all three classifications in lease revenues, and costs related to these leases in direct lease costs.

DIRECT FINANCING AND SALES-TYPE LEASES. Direct financing and sales-type leases transfer substantially all benefits and risks of equipment ownership to the customer. A lease is a direct financing or sales-type lease if the creditworthiness of the customer and the collectibility of lease payments are reasonably certain and it meets one of the following criteria: (1) the lease transfers ownership of the equipment to the customer by the end of the lease term; (2) the lease contains a bargain purchase option; (3) the lease term at inception is at least 75% of the estimated economic life of the leased equipment; or (4) the present value of the minimum lease payments is at least 90% of the fair market value of the leased equipment at the inception of the lease.

31

Direct financing leases are recorded as investment in direct financing leases upon acceptance of the equipment by the customer. At the commencement of the lease, unearned lease income is recorded which represents the amount by which the gross lease payments receivable plus the estimated residual value of the equipment exceeds the equipment cost. Unearned lease income is recognized, using the interest method, as lease revenue over the lease term.

Sales-type leases include a dealer profit or loss that is recorded by the lessor at the inception of the lease. The equipment subject to such leases may be obtained in the secondary marketplace or is the result of re-leasing our own portfolio. For equipment supplied from our technology sales business unit subsidiaries, the dealer margin is presented in equipment sales revenue. Interest earned on the present value of the lease payments and residual value is recognized over the lease term using the interest method and is included in our lease revenues.

OPERATING LEASES. All leases that do not meet the criteria to be classified as direct financing or sales-type leases are accounted for as operating leases. Rental amounts are accrued on a straight-line basis over the lease term and are recognized as lease revenue. Our cost of the leased equipment is recorded on the balance sheet as investment in leases and leased equipment and is depreciated on a straight-line basis over the lease term to our estimate of residual value. Revenue, depreciation expense and the resulting profit for operating leases are recorded on a straight-line basis over the life of the lease.

Lease revenues consist of rentals due under operating leases and amortization of unearned income on direct financing and sales-type leases. Equipment under operating leases is recorded at cost and depreciated on a straight-line basis over the lease term to the Company's estimate of residual value. We accrue items determined to be receivable at period end.

As a result of these three classifications of leases for accounting purposes, the revenues resulting from the "mix" of lease classifications during an accounting period will affect the profit margin percentage for such period and such profit margin percentage generally increases as revenues from direct financing and sales-type leases increase. Should a lease be financed, the interest expense declines over the term of the financing as the principal is reduced.

RESIDUAL VALUES. Residual values represent our estimated value of the equipment at the end of the initial lease term. The residual values for direct financing and sales-type leases are reported as part of the investment in direct financing and sales-type leases, on a net present value basis. The residual values for operating leases are included in the leased equipment's net book value and are reported in the investment in operating lease equipment. The estimated residual values will vary, both in amount and as a percentage of the original equipment cost, and depend upon several factors, including the equipment type, manufacturer's discount, market conditions and the term of the lease.

32

We evaluate residual values on an quarterly basis and record any required changes in accordance with SFAS No. 13, paragraph 17.d, in which impairments of residual value, other than temporary, are recorded in the period in which the impairment is determined. Residual values are affected by equipment supply and demand and by new product announcements by manufacturers. In accordance with accounting principles generally accepted in the United States of America, residual value estimates are adjusted downward when such assets are impaired.

We seek to realize the estimated residual value at lease termination through: (1) renewal or extension of the original lease; (2) sale of the equipment either to the lessee or on the secondary market; or (3) lease of the equipment to a new customer. The difference between the proceeds of a sale and the remaining estimated residual value is recorded as a gain or loss in lease revenues when title is transferred to the lessee, or, if the equipment is sold on the secondary market, in equipment sales revenues and cost of equipment sales when title is transferred to the buyer. For lease transactions subsequent to the initial term, our policy is to recognize revenues on an accrual basis based upon historical experience.

INITIAL DIRECT COSTS. Initial direct costs related to the origination of direct financing or operating leases are capitalized and recorded as part of the net investment in direct financing leases, or net operating lease equipment, and are amortized over the lease term.

SALES OF PRODUCT. Sales of product include the following types of transactions: (1) sales of new or used equipment which is not subject to any type of lease; (2) service revenue in our technology sales business unit; (3) sales of off-lease equipment to the secondary market; and (4) sales of third-party software. Sales of new or used equipment are recognized upon shipment and sales of off-lease equipment are recognized when constructive title passes to the purchaser. Service revenue is recognized as the related services are rendered.

SOFTWARE SALES AND RELATED COSTS. Revenue from sales of procurement software is recognized in accordance with the American Institute of Certified Public Accountants Statement of Position (SOP) 97-2, "Software Revenue Recognition", as amended by SOP 98-4, "Deferral of the Effective Date of a Provision of SOP 97-2," and SOP 98-9, "Modification of SOP 97-2 With Respect to Certain Transactions." We recognize revenue when all the following criteria exist: when there is persuasive evidence that an arrangement exists, delivery has occurred, no significant obligations by the Company with regard to implementation remain, the sales price is determinable, and it is probable that collection will occur. Our accounting policy requires that revenue earned and related costs incurred on software arrangements involving multiple elements be allocated to each element on the relative fair values of the elements and recognized when earned. Revenue related to maintenance and support is recognized ratably over the maintenance term (usually one year) and revenue allocated to training, implementation or other services is recognized as the services are performed. These revenues are included in fee and other income on our consolidated statement of earnings.

Revenue from hosting arrangements is recognized in accordance with Emerging Issues Task Force ("EITF") 00-3, "Application of AICPA Statement of Position 97-2 to Arrangements That Include the Right to Use Software Stored on Another Entity's Hardware." Hosting arrangements that are not in the scope of SOP 97-2 require that allocation of the portion of the fee allocated to the hosting elements be recognized as the service is provided.

SALES OF LEASED EQUIPMENT. Sales of leased equipment consist of sales of equipment subject to an existing lease, under which we are lessor, including any underlying financing related to the lease. Sales of equipment subject to an existing lease are recognized when constructive title passes to the purchaser.

33

OTHER SOURCES OF REVENUE. Amounts charged for Procure+, our e-procurement software package, are recognized as services are rendered. Amounts charged for the Manage+, our asset management software service, are recognized on a straight-line basis over the period the services are provided. Fee and other income results from: (1) income from events that occur after the initial sale of a financial asset; (2) re-marketing fees; (3) brokerage fees earned for the placement of financing transactions; (4) agent fees received from various manufacturers in the reseller business; and (5) interest and other miscellaneous income. Current-year fee and other income includes amounts from the favorable settlement of the Ariba lawsuit (see Note 15 to the Consolidated Financial Statements). These revenues are included in fee and other income in our consolidated statements of earnings.

RESERVE FOR CREDIT LOSSES. The reserve for credit losses is maintained at a level believed by management to be adequate to absorb potential losses inherent in the Company's lease and accounts receivable portfolio. As of March 31, 2004 and 2005, the Company's reserve for credit losses was $4.7 million and $5.0 million, respectively. The net decrease in the reserve during fiscal year 2004 was due to our decision to write off receivables that were fully reserved relative to amounts that were part of long-term bankruptcy claims against customers. The underlying receivables and respective allowances were not extinguished in our ledger until all possible claims and potential chances of recovery were exhausted. Currently, we have determined that this procedure of maintaining receivables with little or no chance of collection on the ledger with offsetting allowances has no material reporting benefit and we have policies in place to write off the receivables in a more expedient manner. Management's determination of the adequacy of the reserve is based on an evaluation of historical credit loss experience, current economic conditions, volume, growth, the composition of the lease portfolio, and other relevant factors. The reserve is increased by provisions for potential credit losses charged against income. Accounts are either written off or written down when the loss is both probable and determinable, after giving consideration to the customer's financial condition, the value of the underlying collateral and funding status (i.e., discounted on a non-recourse or recourse basis).

INVESTMENTS. The Company has a 5% membership interest in MLC/CLC LLC, a joint venture to which the Company sold leased equipment. MLC/CLC LLC stopped purchasing leased equipment prior to the year ended March 31, 2001. The Company's investment in MLC/CLC LLC was accounted for using the cost method.

CAPITALIZATION OF COSTS OF SOFTWARE FOR INTERNAL USE. The Company has capitalized certain costs for the development of internal-use software under the guidelines of SOP 98-1, "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use." During the years ended March 31, 2005 and 2004, respectively, $0.3 million and $0.4 million of costs for the development of software for internal use were capitalized. During the years ended March 31, 2005, and 2004, respectively, the Company had $1.2 million, net of amortization, of capitalized costs for the development of internal-use software. These capitalized costs are included in the accompanying consolidated balance sheets as a component of property and equipment - net.

CAPITALIZATION OF COSTS OF SOFTWARE TO BE MADE AVAILABLE TO CUSTOMERS. In accordance with SFAS No. 86, "Accounting for Costs of Computer Software to be Sold, Leased, or Otherwise Marketed," software development costs are expensed as incurred until technological feasibility has been established, at such time such costs are capitalized until the product is made available for release to customers. During the year ended March 31, 2004, $1.9 million of costs for the development of software available to customers were capitalized. There were no such costs capitalized during the year ended March 31, 2005. As of March 31, 2005, the Company had $0.6 million, net of amortization, of capitalized costs for the development of software available to customers as compared to $1.0 million, net of amortization, at March 31, 2004. These capitalized costs are included in the accompanying consolidated balance sheets as a component of other assets.

34

SHARE-BASED PAYMENT. In December 2004, the FASB issued SFAS No. 123 (revised 2004), "Share-Based Payment," or SFAS No. 123R. SFAS No. 123R replaces SFAS No. 123, "Accounting for Stock-Based Compensation," and supersedes APB Opinion No. 25, "Accounting for Stock Issued to Employees," and subsequently issued stock option related guidance. This statement establishes standards for the accounting for transactions in which an entity exchanges its equity instruments for goods or services, primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions. It also addresses transactions in which an entity incurs liabilities in exchange for goods or services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. We are required to apply SFAS No. 123R to all awards granted, modified or settled as of the beginning of the fiscal reporting period that begins after June 15, 2005. We have commenced our analysis of the impact of SFAS No. 123R, but have decided not to early adopt. We will most likely use the modified-prospective and the straight-line method. Accordingly, we have not determined the impact that the adoption of SFAS No. 123R will have on our financial position or results of operations.

RESULTS OF OPERATIONS

The Year Ended March 31, 2005 Compared to the Year Ended March 31, 2004

Total revenues generated by the Company during the year ended March 31, 2005 were $575.8 million compared to revenues of $330.6 million for the year ended March 31, 2004, an increase of 74.2%. This increase is primarily attributable to increased revenues from the sales of product from the IT reseller due, in part, from increased demand from customers. The Company's revenues are composed of sales, lease revenues, and fee and other income, and may vary considerably from period to period.

The majority of sales of product are generated through the Company's technology business unit subsidiaries. Sales of used and/or off-lease equipment are also generated from the Company's brokerage and re-marketing activities. For the year ended March 31, 2005, we experienced an increase in customer demand for IT products in a very competitive economy. The increase was a result of increased sales within the Company's existing customer base and from customers obtained through recent acquisitions. For the year ended March 31, 2005, equipment sales through the Company's technology business unit subsidiaries accounted for 99.2% of sales of product, compared to 98.8% for the prior fiscal year. For the year ended March 31, 2005, sales of product increased 79.5% to $481.0 million, a result of increased technology sales through the Company's subsidiaries.

The Company realized a gross margin on sales of product of 10.0% for the year ended March 31, 2005, as compared to 11.8% during the year ended March 31, 2004.

The Company's lease revenues decreased 9.6% to $46.3 million for the year ended March 31, 2005, compared with $51.3 million for the prior fiscal year. Our net investment in leased assets was $189.5 million at March 31, 2005, a 1.5% increase from $186.7 million at March 31, 2004.

35

For the year ended March 31, 2005, fee and other income was $48.5 million, an increase of 325.1% over the prior fiscal year. Fee and other income includes eECM revenues, revenues from adjunct services and management fees, including broker fees, support fees, warranty reimbursements, and learning center revenues generated by the Company's technology business unit subsidiaries. The increase in fee and other income in the year ended March 31, 2005 is primarily attributable to a $37 million settlement of its patent-infringement litigation against Ariba Inc. On February 12, 2005, the Company settled the patent-infringement suit through a mutal settlement and license agreement. As of March 31, 2005, the Company received a total of $37 million for the settlement. The Company's fee and other income contains earnings from certain transactions which are in the Company's normal course of business but there is no guarantee that future transactions of the same nature, size or profitability will occur. The Company's ability to consummate such transactions, and the timing thereof, may depend largely upon factors outside the direct control of management. The earnings from these types of transactions in a particular period may not be indicative of the earnings that can be expected in future periods.

The Company's direct lease costs increased 9.0% during the year ended March 31, 2005, as compared to the prior fiscal year. The largest component of direct lease costs is depreciation expense of leased equipment. The investment in operating leases has increased 60.7% in the current year.

Professional and other fees increased 154.5% for the year ended March 31, 2005 over the prior fiscal year, and was primarily the result of $3.1 million in legal fees related to the Ariba lawsuit and expenses that the Company incurred related to Manchester Technologies, Inc. for professional services rendered by 65 people (prior Manchester Technologies, Inc. employees) that were to be hired in a subsequent period and a transition team.

Salaries and benefit expenses increased 32.7% during the year ended March 31, 2005, as compared to the prior fiscal year. The increase is a combination of a 24% increase in employees, due in part to the acquisition of Manchester Technologies, Inc., higher sales commissions attributed to higher sales volume, performance bonuses related to the Ariba patent-infringement suit, and a normal increase in payroll and benefit expenses.

General and administrative expenses increased 24.8% for the year ended March 31, 2005 over the prior fiscal year. The increase is largely due to higher sales volume which in turn created a larger bad debt and inventory allowance, and an increase in the number of offices and employees, due in part to the Manchester Technologies, Inc. acquisition.

Interest and financing costs incurred by the Company for the year ended March 31, 2005 decreased 12.6%, and relate to interest costs on the Company's indebtedness. This is attributed to a combination of our decreasing non-recourse debt portfolio and a reduction in our weighted average interest rate on new lease-related non-recourse debt. (See "Liquidity and Capital Resources"). Payment for interest costs on the majority of non-recourse and certain recourse notes are typically remitted directly to the lender by the lessee.

The Company's provision for income taxes increased to $17.7 million for the year ended March 31, 2005 from $7.1 million for the prior fiscal year, reflecting an effective income tax rate of 41.0% and 41.2% respectively.

The foregoing resulted in a 149.0% increase in net earnings for the year ended March 31, 2005, as compared to the prior fiscal year.

Basic and fully diluted earnings per common share were $2.84 and $2.68 respectively for the year ended March 31, 2005, as compared to $1.09 and $1.02 respectively for the year ended March 31, 2004, based on weighted average common shares outstanding of 8,898,112 and 9,433,250 respectively for 2005 and 9,332,324 and 9,976,458 respectively for 2004.

The Year Ended March 31, 2004 Compared to the Year Ended March 31, 2003

Total revenues generated by the Company during the year ended March 31, 2004 were $330.6 million compared to revenues of $299.6 million for the year ended March 31, 2003, an increase of 10.3%. This increase is primarily attributable to increased revenues from the sales of product from the IT reseller due, in part, from increased demand from customers. The Company's revenues are composed of sales, lease revenues, and fee and other income, and may vary considerably from period to period.

Sales revenue, which includes sales of product and sales of leased equipment, increased 14.1% to $267.9 million during the year ended March 31, 2004, as compared to $234.9 million in the prior fiscal year.

The majority of sales of product are generated through the Company's technology business unit subsidiaries. Sales of used and/or off-lease equipment are also generated from the Company's brokerage and re-marketing activities. For the year ended March 31, 2004, we experienced an increase in customer demand for IT products despite an overall sluggish economy. The increase was a result of increased sales within the Company's existing customer base and from customers obtained through recent acquisitions. For the year ended March 31, 2004, equipment sales through the Company's technology business unit subsidiaries accounted for 98.8% of sales of product, compared to 99.1% for the prior fiscal year. For the year ended March 31, 2004, sales of product increased 17.1% to $267.9 million, a result of increased technology sales through the Company's subsidiaries.

The Company realized a gross margin on sales of product of 11.8% for the year ended March 31, 2004, as compared to 12% during the year ended March 31, 2003.

The Company also recognizes revenue from the sale of leased equipment. During the year ended March 31, 2004 there were no sales of leased equipment with the prior year having $6.1 million with a gross margin of 3.3%. In addition, the revenue and gross margin recognized on sales of leased equipment can vary significantly depending on the nature and timing of the sale, as well as the timing of any debt funding recognized in accordance with SFAS No. 125 "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities," as amended by SFAS No. 140 "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities-a replacement of FASB Statement No. 125."

37

The Company's lease revenues increased 1.5% to $51.3 million for the year ended March 31, 2004, compared with $50.5 million for the prior fiscal year. Our net investment in leased assets was $186.7 million at March 31, 2004, a 2.5% increase from $182.2 million at March 31, 2003.

For the year ended March 31, 2004, fee and other income was $11.4 million, a decrease of 20.0% over the prior fiscal year. Fee and other income includes eECM revenues, revenues from adjunct services and management fees, including broker fees, support fees, warranty reimbursements, and learning center revenues generated by the Company's technology business unit subsidiaries. The decrease in fee and other income in the year ended March 31, 2004 is a reflection of a $2.5 million settlement from one of the Company's equipment vendors received in the prior year. The Company's fee and other income contains earnings from certain transactions which are in the Company's normal course of business but there is no guarantee that future transactions of the same nature, size or profitability will occur. The Company's ability to consummate such transactions, and the timing thereof, may depend largely upon factors outside the direct control of management. The earnings from these types of transactions in a particular period may not be indicative of the earnings that can be expected in future periods.

The Company's direct lease costs increased 60.4% during the year ended March 31, 2004, as compared to the prior fiscal year. The largest component of direct lease costs is depreciation expense of leased equipment. The investment in operating leases has increased 126.5% in the current year.

Professional and other fees increased 16.1% for the year ended March 31, 2004 over the prior fiscal year, and was primarily the result of an increase in broker fees from an increase in sales of products and utilization of outside professional services.

Salaries and benefits expenses decreased 4.8% during the year ended March 31, 2004, as compared to the prior fiscal year. The decrease is the result of the reduction in the total number of employees and the consolidation of the IT resellers.

General and administrative expenses increased 0.9% over the prior fiscal year as the Company's general and administistive expenses remained similar to the prior year.

Interest and financing costs incurred by the Company for the year ended March 31, 2004 decreased 17.6%, and relate to interest costs on the Company's indebtedness. In addition to decreased borrowing under the Company's lines of credit, the Company's lease-related non-recourse debt portfolio increased insignificantly, but our weighted average interest rate on new lease-related non-recourse debt decreased during the years ended March 31, 2004 and 2003 (See "Liquidity and Capital Resources"). Payment for interest costs on the majority of non-recourse and certain recourse notes are typically remitted directly to the lender by the lessee.

38

The Company's provision for income taxes increased to $7.1 million for the year ended March 31, 2004 from $6.8 million for the prior fiscal year, reflecting an effective income tax rate of 41.0% in each year.

The foregoing resulted in a 4.5% increase in net earnings for the year ended March 31, 2004, as compared to the prior fiscal year.

Basic and fully diluted earnings per common share were $1.09 and $1.02 respectively for the year ended March 31, 2004, as compared to $0.97 and $0.96 respectively for the year ended March 31, 2003, based on weighted average common shares outstanding of 9,332,324 and 9,976,458 respectively for 2004 and 10,061,088 and 10,109,809 respectively for 2003.

LIQUIDITY AND CAPITAL RESOURCES

During the year ended March 31, 2005, the Company generated cash flows from operations of $41.6 million, and used cash flows from investing activities of $30.5 million. Cash flows provided by financing activities amounted to $2.5 million during the same period. The effect of exchange rate changes during the period provided cash flows of $82,098. The net effect of these cash flows was a net increase in cash and cash equivalents of $13.7 million during the year. During the same period, our total assets increased $66.5 million, primarily as the result of increases in our cash and accounts receivable. The Company's net investments in direct financing lease equipment decreased $9.3 million, or 5.6% and operating lease equipment increased $12.1 million, or 60.7%, respectively, during the period. The cash balance at March 31, 2005 was $38.9 million as compared to $25.2 million the prior year.

The Company's debt financing activities typically provide approximately 80% to 100% of the purchase price of the equipment purchased by the Company for lease to its customers. Any balance of the purchase price (the Company's equity investment in the equipment) must generally be financed by cash flow from its operations, the sale of the equipment leased to third parties, or other internal means. Although the Company expects that the credit quality of its leases and its residual return history will continue to allow it to obtain such financing, no assurances can be given that such financing will be available, at acceptable terms, or at all. The financing necessary to support the Company's leasing activities has principally been provided by non-recourse and recourse borrowings. Historically, the Company has obtained recourse and non-recourse borrowings from banks and finance companies. Non-recourse financings are loans whose repayment is the responsibility of a specific customer, although we may make representations and warranties to the lender regarding the specific contract or have ongoing loan servicing obligations. Under a non-recourse loan, we borrow from a lender an amount based on the present value of the contractually committed lease payments under the lease at a fixed rate of interest, and the lender secures a lien on the financed assets. When the lender is fully repaid from the lease payment, the lien is released and all further rental or sale proceeds are ours. We are not liable for the repayment of non-recourse loans unless we breach our representations and warranties in the loan agreements. The lender assumes the credit risk of each lease, and their only recourse, upon default by the lessee, is against the lessee and the specific equipment under lease. Each transaction is specifically approved and done solely at the lender's discretion.

During the year ended March 31, 2005, the Company's lease-related non-recourse debt portfolio decreased 2.6% to $114.8 million.

39

Whenever desirable and possible, the Company arranges for equity investment financing which includes selling assets including the residual portions to third parties and financing the equity investment on a non-recourse basis. The Company generally retains customer control and operational services, and has minimal residual risk. The Company usually preserves the right to share in remarketing proceeds of the equipment on a subordinated basis after the investor has received an agreed-to return on its investment.

The Company's "Accounts payable - equipment" represents equipment costs that have been placed on a lease schedule, but for which the Company has not yet paid. The balance of unpaid equipment cost can vary depending on vendor terms and the timing of lease originations. As of March 31, 2005, the Company had $9.0 million of unpaid equipment cost, as compared to $10.0 million at March 31, 2004.

Working capital for our leasing business is provided through a $45,000,000 credit facility expiring on July 21, 2006. Participating in this facility are Branch Banking and Trust Company ($15,000,000), Bank of America ($15,000,000) and National City Bank ($15,000,000), the agent. The ability to borrow under this facility is limited to the amount of eligible collateral at any given time. The credit facility has full recourse to the Company and is secured by a blanket lien against all of the Company's assets such as chattel paper (including leases), receivables, inventory, and equipment and including the common stock of all wholly-owned subsidiaries. The credit facility contains certain financial covenants and certain restrictions on, among other things, the Company's ability to make certain investments, and sell assets or merge with another company. Borrowings under the credit facility bear interest at London Interbank Offered Rates ("LIBOR") plus an applicable margin or, at our option, the Alternate Base Rate ("ABR") plus an applicable margin. The ABR is the higher of the Agent bank's prime rate or Federal Funds plus 0.5%. The applicable margin is determined based on our recourse funded debt ratio and can range from 1.75% to 2.50% for LIBOR loans and from 0.0% to 0.25% for ABR loans. As of March 31, 2005, the Company had no outstanding balance on the facility. In general, we use the National City Bank facility to pay the cost of equipment to be put on lease, and we repay borrowings from the proceeds of: (1) long-term, non-recourse, fixed rate financing which we obtain from lenders after the underlying lease transaction is finalized or (2) sales of leases to third parties. The loss of this credit facility could have a material adverse effect on our future results as we may have to use this facility for daily working capital and liquidity for our leasing business. The availability of the credit facility is subject to a borrowing base formula that consists of inventory, receivables, purchased assets, and lease assets. Availability under the credit facility may be limited by the asset value of the equipment purchased by us or by terms and conditions in the credit facility agreement. If we are unable to sell the equipment or unable to finance the equipment on a permanent basis within a certain time period, the availability of credit under the facility could be diminished or eliminated. The credit facility contains covenants relating to minimum tangible net worth, cash flow coverage ratios, maximum debt to equity ratio, maximum guarantees of subsidiary obligations, mergers and acquisitions and asset sales.

40

Floor Plan Credit Facility

The traditional business of ePlus Technology, inc. as a seller of computer technology and related peripherals and software products is financed through an agreement known as a floor plan credit facility in which interest expense for the first thirty to forty-five days, in general, is not charged but is paid by the supplier/distributor. The floor plan liabilities are recorded as accounts payable-trade, as they are normally repaid within the thirty to forty-five day time-frame and represent an assigned accounts payable originally generated with the supplier/distributor. If the thirty to forty-five day obligation is not paid timely, interest is then assessed at stated contractual rates.

The respective floor plan facility credit limits and actual outstanding balances were as follows:

| Floor Plan Supplier | Credit Limit at March 31, 2004 | Balance as of March 31, 2004 | Credit Limit at March 31, 2005 | Balance as of March 31, 2005 |
|---|---|---|---|---|
| GE Distribution Finance Corp. | $ 26,000,000 | $ 21,637,077 | $ 75,000,000 | $ 32,978,262 |

The limit is further defined as being $50,000,000 at all times other than during the Seasonal Uplift Period. The Seasonal Uplift Period is defined as August 1st through December 31st each calendar year. During the Seasonal Uplift Period, the limit increases to $75,000,000.

Accounts Receivable Facility

In addition to the floor plan component, ePlus Technology, inc. has an accounts receivable facility through GECDF. The accounts receivable facility was modified on August 18, 2004 from a limit of $15,000,000 to include a Seasonal Uplift Period as defined above to $20,000,000.

As of March 31, 2005 there was an outstanding balance of $6,263,471 on this facility. As of March 31, 2004, the maximum available that could be borrowed under the accounts receivable facility was $7,000,000 and there was no outstanding balance. Availability under the lines of credit may be limited by the asset value of equipment purchased by the Company and may be further limited by certain covenants and terms and conditions of the facilities. The Company was in compliance with said covenants as of March 31, 2005.

On June 28, 2004, the Company modified its credit facility agreement with GECDF to increase the credit limit to $50,000,000 from $26,000,000. The modification on August 18, 2004 also included a provision that during the Seasonal Uplift Period, the floor plan credit facility and the accounts receivable facility, in aggregate, could not exceed the $75,000,000 credit limit.

The facility provided by GECDF requires a guaranty of up to $10,500,000 by ePlus inc. The loss of the GECDF credit facility could have a material adverse effect on our future results as we currently rely on this facility and its components for daily working capital and liquidity for our technology sales business and operational accounts payable functions.

In the normal course of business, the Company may provide certain customers with performance guarantees, which are generally backed by surety bonds. In general, the Company would only be liable for the amount of these guarantees in the event of default in the performance of our obligations, the probability of which is remote in management's opinion. The Company is in compliance with the performance obligations under all service contracts for which there is a performance guarantee, and any liability incurred in connection with these guarantees would not have a material adverse effect on the Company's consolidated results of operations or financial position.

41

CONTRACTUAL OBLIGATIONS

The impact that our contractual obligations as of March 31, 2005 are expected to have on our liquidity and cash flow in future periods is as follows:

| | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
| | | Payments Due by Period | | | |
| Non-recourse notes payable (1) | $ 114,838,994 | $ 58,746,847 | $ 49,593,331 | $ 6,498,816 | $ – |
| Recourse notes payable | 6,264,897 | 6,264,897 | – | – | – |
| Operating lease obligations (2) | 6,760,124 | 1,866,923 | 2,859,829 | 2,033,372 | – |
| Purchase Obligations (3) | 192,667 | 192,667 | – | – | – |
| Total | $ 128,056,682 | $ 67,071,334 | $ 52,453,160 | $ 8,532,188 | $ – |

(1) Non-recourse notes payable obligations in which the specific lease receivable payments have been assigned to the lender.
(2) Rent obligations
(3) Telecommunications-related contracts

OFF-BALANCE SHEET ARRANGEMENTS

As part of our ongoing business, we do not participate in transactions that generate relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. As of March 31, 2005, we are not involved in any unconsolidated special purpose entity transactions.

ADEQUACY OF CAPITAL RESOURCES

The continued implementation of the Company's eECM business strategy will require a significant investment in both resources and managerial focus. In addition, the Company may selectively acquire other companies that have attractive customer relationships and skilled sales forces. The Company may also acquire technology companies to expand and enhance the platform of eECM to provide additional functionality and value added services. As a result, the Company may require additional financing to fund its strategy implementation and potential future acquisitions, which may include additional debt and equity financing.

ITEM 7A.  QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Although a substantial portion of the Company's liabilities are non-recourse, fixed interest rate instruments, the Company is reliant upon lines of credit and other financing facilities which are subject to fluctuations in interest rates. These instruments were entered into for other than trading purposes, are denominated in U.S. Dollars, and, with the exception of amounts drawn under the National City Bank and GE Distribution Finance Corporation (formerly Deutsche Financial Services Corporation) facilities, bear interest at a fixed rate. Because the interest rate on these instruments is fixed, changes in interest rates will not directly impact our cash flows. Borrowings under the National City and GE Distribution Finance Corporation facilities bear interest at a market-based variable rate, based on a rate selected by the Company and determined at the time of borrowing. Due to the relatively short nature of the interest rate periods, we do not expect our operating results or cash flow to be materially affected by changes in market interest rates. As of March 31, 2005, the aggregate fair value of our recourse borrowings approximated their carrying value.

42

During the year ended March 31, 2003, the company began transacting business in Canada. As such, the Company has entered into lease contracts and non-recourse, fixed interest rate financing denominated in Canadian Dollars. To date, Canadian operations have been insignificant and the Company believes that potential fluctuations in currency exchange rates will not have a material effect on its financial position.

ITEM 8.  FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

See the consolidated financial statements and Schedule listed in the accompanying Index to Financial Statements.

ITEM 9.  CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

ITEM 9A.  CONTROLS AND PROCEDURES

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of March 31, 2005. Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of March 31, 2005, our disclosure controls and procedures were effective to provide reasonable assurance that information relating to the company and its subsidiaries that we are required to disclose in the reports that we file or submit to the SEC is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.

During the last fiscal quarter covered by this annual report, there have been no changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

However, in February 2005, the Company determined that there was a material weakness in its internal control over financial reporting relating to a split payment lease transaction that had been incorrectly recorded during the quarter ended September 30, 2004. As a result, the Company restated its assets as of September 30, 2004, and its earnings for the three- and six-month periods ended September 30, 2004. Furthermore, the Company's management has determined not to enter into any more split payment financing arrangements until the Company's accounting processes can be revised to accurately record them.

43

PART III

Except as set forth below, the information required by Items 10, 11, 12, 13 and 14 is incorporated by reference from the Company's definitive Proxy Statement to be filed with the Securities and Exchange Commission pursuant to Regulation 14A not later than 120 days after the close of the Company's fiscal year.

ITEM 10.   DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT

The following table sets forth the name, age and position with the Company of each person who is an executive officer, director or significant employee.

| NAME | AGE | POSITION | CLASS |
| ---- | --- | -------- | ----- |
| Phillip G. Norton | 61 | Director, Chairman of the Board, President and Chief Executive Officer | III |
| Bruce M. Bowen | 53 | Director and Executive Vice President | III |
| Steven J. Mencarini | 49 | Senior Vice President and Chief Financial Officer | |
| Kleyton L. Parkhurst | 42 | Senior Vice President and Treasurer | |
| Terrence O'Donnell | 61 | Director | II |
| Lawrence S. Herman | 61 | Director | I |
| C. Thomas Faulders, III | 55 | Director | I |
| Milton E. Cooper | 66 | Director | II |

The Standard of Conduct and Ethics for Employees, Officers and Directors of ePlus inc. is available on our website at www.eplus.com/ethics. We will disclose on our website any amendments to or waivers from any provision of the Standard of Conduct and Ethics that applies to any of our directors or officers.

ITEM 11.   EXECUTIVE COMPENSATION

See introductory paragraph of this Part III.

ITEM 12.   SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

See introductory paragraph of this Part III.

ITEM 13.   CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

See introductory paragraph of this Part III.

ITEM 14.   PRINCIPAL ACCOUNTANTS AND FEES

See introductory paragraph of this Part III.

44

PART IV

ITEM 15.  EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a)(1) Financial Statements

The consolidated financial statements listed in the accompanying Index to
Financial Statements and Schedule are filed as a part of this report and
incorporated herein by reference.

(a)(2) Financial Statement Schedule

The financial statement schedule listed in the accompanying Index to Financial
Statements and Schedule are filed as a part of this report and incorporated
herein by reference.

(b) Exhibit List


| Exhibit No. | Exhibit Description |
| --- | --- |
| 2.1 | Asset Purchase Agreement between ePlus inc. and ProcureNet, Inc. dated as of May 4, 2001 (Incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed on May 18, 2001). |
| 2.2 | Agreement and Plan of Reorganization by and among SourceOne Computer Corporation, Robert Nash, Donna Nash, R. Wesley Jones, the shareholders of SourceOne Computer Corporation, ePlus inc. and ePlus Technology, inc., dated as of October 2, 2001 (Incorporated herein by reference to Exhibit 2 to the Company's Current Report on Form 8-K filed on October 12, 2001). |
| 2.3 | Asset Purchase and Sale Agreement by and between ePlus Technology, Inc., Elcom Services Group, Inc., Elcom, Inc., and Elcom International, Inc., dated March 25, 2002 (Incorporated herein by reference to Exhibit 2 to the Company's Current Report on Form 8-K filed on April 5, 2002). |
| 2.4 | Amendment to Asset Purchase and Sale Agreement by and between ePlus Technology, inc., Elcom Services Group, Inc., Elcom, Inc., and Elcom International, Inc., dated March 29, 2002 (Incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed on April 5, 2002). |
| 2.5 | Asset Purchase Agreement by and between ePlus Technology, inc. and Manchester Technologies, Inc., dated May 28, 2004 (incorporated herein by reference from Exhibit 2.1 to the Company's Current Report on Form 8-K filed on May 28, 2004). |

45

3.1     Certificate of Incorporation of the Company, filed on August 27, 1996 (Incorporated herein by reference to Exhibit 3.1 to the Company's Quarterly Report on Form 10-Q for the period ended December 31, 2002).

3.2     Certificate of Amendment of Certificate of Incorporation of the Company, filed on September 30, 1997 (Incorporated herein by reference to Exhibit 3.2 to the Company's Quarterly Report on Form 10-Q for the period ended December 31, 2002).

3.3     Certificate of Amendment of Certificate of Incorporation of the Company, filed on October 19, 1999 (Incorporated herein by reference to Exhibit 3.3 to the Company's Quarterly Report on Form 10-Q for the period ended December 31, 2002).

3.4     Certificate of Amendment of Certificate of Incorporation of the Company, filed on May 23, 2002 (Incorporated herein by reference to Exhibit 3.4 to the Company's Quarterly Report on Form 10-Q for the period ended December 31, 2002).

3.5     Certificate of Amendment of Certificate of Incorporation of the Company, filed on October 1, 2003 (Incorporated herein by reference to Exhibit 3.5 to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2003).

3.6     Bylaws of the Company, as amended to date (Incorporated herein by reference to Exhibit 3.5 to the Company's Quarterly Report on Form 10-Q for the period ended December 31, 2002).

4     Specimen Certificate of Common Stock (Incorporated herein by reference to Exhibit 4.1 to the Company's Registration Statement on Form S-1 (File No. 333-11737) originally filed on September 11, 1996).

10.1     Form of Indemnification Agreement entered into between the Company and its directors and officers (Incorporated herein by reference to Exhibit 10.5 to the Company's Registration Statement on Form S-1 (File No. 333-11737) originally filed on September 11, 1996).

10.2*     Form of Employment Agreement between the Company and Phillip G. Norton (Incorporated herein by reference to Exhibit 10.7 to the Company's Registration Statement on Form S-1 (File No. 333-11737) originally filed on September 11, 1996).

10.3*     Form of Employment Agreement between the Company and Bruce M. Bowen (Incorporated herein by reference to Exhibit 10.8 to the Company's Registration Statement on Form S-1 (File No. 333-11737) originally filed on September 11, 1996).

10.4*     Form of Employment Agreement between the Company and Kleyton L. Parkhurst (Incorporated herein by reference to Exhibit 10.4 to the Company's Current Report on Form 8-K filed on December 2, 2003).

10.5*     Form of Employment Agreement between the Company and Steven J. Mencarini (Incorporated herein by reference to Exhibit 10.5 to the Company's Current Report on Form 8-K filed on December 2, 2003).

46

10.6*     MLC Master Stock Incentive Plan (Incorporated herein by reference to Exhibit 10.21 to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 1997).

10.7*     Amended and Restated Incentive Stock Option Plan (Incorporated herein by reference to Exhibit 10.22 to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 1997).

10.8*     Amended and Restated Outside Director Stock Option Plan (Incorporated herein by reference to Exhibit 10.23 to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 1997).

10.9*     Amended and Restated Nonqualified Stock Option Plan (Incorporated herein by reference to Exhibit 10.24 to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 1997).

10.10*    1997 Employee Stock Purchase Plan (Incorporated herein by reference to Exhibit 10.25 to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 1997).

10.11     Amended and Restated 1998 Long-Term Incentive Plan (Incorporated herein by reference to Exhibit 10.8 to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2003).

10.12     First Amendment to Loan and Security Agreement dated March 12, 1997 between MLC Group, Inc. and Heller Financial, Inc. (Incorporated herein by reference to Exhibit 5.2 to the Company's Current Report on Form 8-K filed on March 28, 1997).

10.13     Form of Irrevocable Proxy and Stock Rights Agreement (Incorporated herein by reference to Exhibit 10.11 to the Company's Registration Statement on Form S-1 (File No. 333-11737) originally filed on September 11, 1996).

10.14     Amended and Restated Credit Agreement dated July 21, 2003 between ePlus inc. and its subsidiaries named therein and National City Bank, Inc., as Administrative Agent (Incorporated herein by reference to Exhibit 5.1 to the Company's Current Report on Form 8-K filed on July 25, 2003).

10.15     Business Financing Agreement dated September 8, 2000 between GE Commercial Distribution Finance Corporation (as successor to Deutsche Financial Services Corporation) and ePlus Technology, inc. (Incorporated herein by reference to Exhibit 5.1 to the Company's Current Report on Form 8-K filed on September 22, 2000).

10.16     Agreement for Wholesale Financing dated September 8, 2000 between GE Commercial Distribution Finance Corporation (as successor to Deutsche Financial Services Corporation) and ePlus Technology, inc. (Incorporated herein by reference to Exhibit 5.2 to the Company's Current Report on Form 8-K filed on September 22, 2000).

10.17     Paydown Addendum to Business Financing Agreement between GE Commercial Distribution Finance Corporation (as successor to Deutsche Financial Services Corporation) and ePlus Technology, inc. (Incorporated herein by reference to Exhibit 5.3 to the Company's Current Report on Form 8-K filed on August 18, 2004).

47



10.18    Amendment  to Business Financing Agreement and Agreement for  Wholesale Financing, dated  March 31, 2004
         between GE Commercial Distribution Finance Corporation  and ePlus Technology, inc. (Incorporated  herein
         by reference to Exhibit 5.1A to the Company's Current Report on Form 8-K filed on August 18, 2004).

10.19    Amendment  to Business Financing Agreement  and Agreement for  Wholesale Financing, dated  June 24, 2004
         between GE Commercial Distribution Finance Corporation and ePlus Technology, inc. (Incorporated  herein
         by reference to Exhibit 5.1B to the Company's Current Report on Form 8-K filed on August 18, 2004).

10.20    Amendment to Business Financing Agreement and Agreement  for Wholesale Financing  dated  August 17, 2004
         between GE Commercial Distribution Finance Corporation  and ePlus Technology, inc. (Incorporated  herein
         by reference to Exhibit 5.1C to the Company's Current Report on Form 8-K filed on August 18, 2004).

10.21    Limited Guaranty  dated June 4, 2004  between GE Commercial  Distribution Finance Corporation and  ePlus
         inc. (Incorporated herein by reference to Exhibit 5.4 to the Company's Current Report  on Form 8-K filed
         on August 18, 2004).

10.22    Collateral Guaranty  dated  March 31, 2004  between GE  Commercial Distribution Finance Corporation  and
         ePlus Group, inc. (Incorporated herein  by reference to Exhibit 5.5 to  the Company's Current  Report on
         Form 8-K filed on August 18, 2004).

10.23    Agreement Regarding Collateral Rights and Waiver between GE Commercial Distribution  Finance Corporation
         and National City Bank, as Administrative Agent, dated March 24, 2004 (Incorporated herein by  reference
         to Exhibit 5.6 to the Company's Current Report on Form 8-K filed on August 18, 2004).

10.24    Agreement  for Wholesale Financing between Deutsche Financial Services Corporation and ePlus  Technology
         of PA, inc., dated February 12, 2001 (Incorporated  herein by reference to Exhibit 5.1 to  the Company's
         Current Report on Form 8-K filed on March 13, 2001).

10.25    Business Financing Agreement between Deutsche Financial Services Corporation and ePlus Technology of PA,
         inc., dated February 12, 2001 (Incorporated herein  by reference to Exhibit 5.2 to the Company's Current
         Report on Form 8-K filed on March 13, 2001).

10.26    Addendum  to Business  Financing Agreement and Agreement  for Wholesale  Financing between  Deutsche
         Financial Services Corporation and ePlus Technology of PA, inc., dated  February 12, 2001  (Incorporated
         herein by reference to Exhibit 5.3 to the Company's Current Report on Form 8-K filed on March 13, 2001).

<div align="center">48</div>

10.27    Limited Guaranty for ePlus Technology of PA, inc. to Deutsche Financial Services Corporation by ePlus inc., dated February 12, 2001 (Incorporated herein by reference to Exhibit 5.4 to the Company's Current Report on Form 8-K filed on March 13, 2001).

10.28    Intercreditor Subordination Agreement between Deutsche Financial Services Corporation and IBM Credit Corporation and ePlus Technology of PA, inc., dated February 26, 2001 (Incorporated herein by reference to Exhibit 5.5 to the Company's Current Report on Form 8-K filed on March 13, 2001).

10.29    Agreement for Wholesale Financing between Deutsche Financial Services Corporation and ePlus Technology of NC, inc., dated February 12, 2001 (Incorporated herein by reference to Exhibit 5.6 to the Company's Current Report on Form 8-K filed on March 13, 2001).

10.30    Addendum to Agreement for Wholesale Financing between ePlus Technology of NC, inc. and Deutsche Financial Services Corporation, dated February 12, 2001 (Incorporated herein by reference to Exhibit 5.7 to the Company's Current Report on Form 8-K filed on March 13, 2001).

10.31    Addendum to Agreement for Wholesale Financing between ePlus Technology of NC, inc. and Deutsche Financial Services Corporation, dated February 12, 2001 (Incorporated herein by reference to Exhibit 5.8 to the Company's Current Report on Form 8-K filed on March 13, 2001).

10.32    Addendum to Business Financing Agreement and Agreement for Wholesale Financing between ePlus Technology, inc. and Deutsche Financial Services Corporation, dated February 12, 2001, amending the Business Financing Agreement and Wholesale Financing Agreement, dated August 31, 2000 (Incorporated herein by reference to Exhibit 5.9 to the Company's Current Report on Form 8-K filed on March 13, 2001).

10.33    Deed of Lease between CALEAST INDUSTRIAL INVESTORS, LLC (Landlord) and ePlus inc. (Tenant) (Incorporated herein by reference to Exhibit 10.30 to the Company's Annual Report on Form 10-K for the year ended March 31, 2002).

10.34    Deed of Lease by and between ePlus inc. and Norton Building I, LLC dated as of December 23, 2004 (Incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed on December 27, 2004).

10.35    ePlus inc. Supplemental Benefit Plan for Bruce M. Bowen (Incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed on March 2, 2005).

10.36    ePlus inc. Supplemental Benefit Plan for Steven J. Mencarini (Incorporated herein by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed on March 2, 2005).

10.37    ePlus inc.  Supplemental  Benefit Plan for  Kleyton L. Parkhurst  (Incorporated herein  by reference  to
         Exhibit 10.3 to the Company's Current Report on Form 8-K filed on March 2, 2005).

10.38    ePlus inc.  Form of  Supplemental  Benefit Plan  Participation  Election Form  (Incorporated  herein  by
         reference to Exhibit 10.4 to the Company's Current Report on Form 8-K filed on March 2, 2005).

10.39    Incentive Option Agreement under the ePlus inc. Amended  and Restated  1998 Long-Term Incentive Plan  by
         and between the Company and Phillip G. Norton (Incorporated  herein by reference to Exhibit 10.1 to  the
         Company's Current Report on Form 8-K filed on February 10, 2005).

10.40    Incentive Option Agreement  under the ePlus inc. Amended  and Restated 1998 Long-Term Incentive  Plan by
         and between  the Company and  Bruce M. Bowen  (Incorporated herein  by reference to Exhibit 10.2 to  the
         Company's Current Report on Form 8-K filed on February 10, 2005).

10.41    Incentive Option Agreement under  the ePlus inc. Amended  and Restated 1998 Long-Term Incentive Plan  by
         and between  the Company  and Kleyton L. Parkhurst (Incorporated  herein by reference to Exhibit 10.3 to
         the Company's Current Report on Form 8-K filed on February 10, 2005).

10.42    Incentive Option Agreement  under the ePlus inc. Amended and  Restated 1998 Long-Term Incentive Plan  by
         and between the Company and Steven J. Mencarini (Incorporated herein by reference to Exhibit 10.4 to the
         Company's Current Report on Form 8-K filed on February 10, 2005).

10.43    Non-Qualified Stock Option Agreement under the ePlus inc. Amended and Restated 1998 Long-Term  Incentive
         Plan by and between the Company and Phillip G. Norton  (Incorporated herein by reference to Exhibit 10.5
         to the Company's Current Report on Form 8-K filed on February 10, 2005).

10.44    Form of Incentive Option Agreement under  the ePlus inc. Amended  and Restated 1998  Long-Term Incentive
         Plan (Incorporated herein by reference to Exhibit 10.6 to the Company's Current Report on Form 8-K filed
         on February 10, 2005).

10.45    Form of Non-Qualified Stock Option Agreement  under the ePlus inc.  Amended and Restated 1998  Long-Term
         Incentive Plan (Incorporated herein by reference to Exhibit 10.7 to the Company's Current Report on Form
         8-K filed on February 10, 2005).

21       Subsidiaries of the Company

50

23          Consent of Deloitte & Touche LLP

31.1        Rule 13a-14(a) and 15d-14(a) Certification of the Chief Executive Officer of ePlus inc.

31.2        Rule 13a-14(a) and 15d-14(a) Certification of the Chief Financial Officer of ePlus inc.

32          Section 1350 certification of the Chief Executive Officer and Chief Financial Officer of ePlus inc.


    * Indicates a management contract or compensatory plan or arrangement.

51

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, this report
has been signed by the following  persons on behalf of the registrant and in the
capacities and on the dates indicated.

/s/ PHILLIP G. NORTON
----------------------------------------------------
By: Phillip  G. Norton, Chairman  of  the  Board,
    President and Chief Executive Officer
Date: June 29, 2005


/s/ BRUCE M. BOWEN
----------------------------------------------------
By: Bruce M. Bowen,  Director  and  Executive Vice
    President
Date: June 29, 2005


/s/ STEVEN J. MENCARINI
----------------------------------------------------
By: Steven  J. Mencarini, Senior Vice  President,
    Chief Financial Officer, Principal Accounting
    Officer
Date: June 29, 2005


/s/ C. THOMAS FAULDERS, III
----------------------------------------------------
By:  C. Thomas Faulders, III, Director
Date: June 29, 2005


/s/ TERRENCE O'DONNELL
----------------------------------------------------
By: Terrence O'Donnell, Director
Date: June 29, 2005


/s/ LAWRENCE S. HERMAN
----------------------------------------------------
By: Lawrence S. Herman, Director
Date: June 29, 2005


/s/ MILTON E. COOPER, JR.
----------------------------------------------------
By: Milton E. Cooper, Jr., Director
Date: June 29, 2005


52

ePlus inc. AND SUBSIDIARIES

INDEX TO FINANCIAL STATEMENTS AND SCHEDULES

|                                                                              | PAGE |
|------------------------------------------------------------------------------|------|
|                                                                              | ---- |
| Report of Independent Registered Public Accounting Firm                      | F-2  |
| Consolidated Balance Sheets as of March 31, 2004 and 2005                    | F-3  |
| Consolidated Statements of Earnings for the Years Ended March 31, 2003, 2004, and 2005 | F-4 |
| Consolidated Statements of Cash Flows for the Years Ended March 31, 2003, 2004, and 2005 | F-5 |
| Consolidated Statements of Stockholders' Equity for the Years Ended March 31, 2003, 2004, and 2005 | F-7 |
| Notes to Consolidated Financial Statements                                   | F-8  |
| SCHEDULE                                                                     |      |
| II-Valuation and Qualifying Accounts for the Years Ended March 31, 2003, 2004, and 2005 | S-1 |

F-1

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM


To the Board of Directors and Stockholders of
ePlus inc.
Herndon, Virginia

We have audited the accompanying consolidated balance sheets of ePlus inc. and subsidiaries ("the Company") as of March 31, 2004 and 2005, and the related consolidated statements of earnings, stockholders' equity, and cash flows for each of the three years in the period ended March 31, 2005. Our audits also included the financial statement schedule listed in the Index at Item 15(a)(2). These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on the consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company has determined it is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of ePlus inc. and subsidiaries as of March 31, 2004 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended March 31, 2005, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.


/S/ Deloitte & Touche LLP

McLean, Virginia
June 29, 2005

                                F-2

ePlus inc. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

|  | As of March 31, 2004 | As of March 31, 2005 |
|---|---|---|
| ASSETS |  |  |
| Cash and cash equivalents | $ 25,155,011 | $ 38,851,714 |
| Accounts receivable, net of allowance for doubtful accounts of $1,584,358 and $1,959,049 as of March 31, 2004 and 2005 respectively | 51,188,640 | 93,555,462 |
| Notes receivable | 51,986 | 114,708 |
| Inventories | 899,748 | 2,116,855 |
| Investment in leases and leased equipment – net | 186,667,141 | 189,468,926 |
| Property and equipment – net | 5,230,473 | 6,647,781 |
| Other assets | 4,765,782 | 3,859,791 |
| Goodwill | 20,243,310 | 26,125,212 |
| TOTAL ASSETS | $ 294,202,091 | $ 360,740,449 |
| LIABILITIES AND STOCKHOLDERS' EQUITY |  |  |
| LIABILITIES |  |  |
| Accounts payable – equipment | $ 9,993,077 | $ 8,965,022 |
| Accounts payable – trade | 32,140,670 | 55,332,993 |
| Salaries and commissions payable | 583,934 | 771,487 |
| Accrued expenses and other liabilities | 11,983,798 | 32,945,931 |
| Recourse notes payable | 5,863 | 6,264,897 |
| Non-recourse notes payable | 117,857,208 | 114,838,994 |
| Deferred tax liability | 10,053,226 | 9,519,309 |
| Total Liabilities | 182,617,776 | 228,638,633 |
| COMMITMENTS AND CONTINGENCIES (Note 8) | – | – |
| STOCKHOLDERS' EQUITY |  |  |
| Preferred stock, $.01 par value; 2,000,000 shares authorized; none issued or outstanding | – | – |
| Common stock, $.01 par value; 25,000,000 authorized, 10,717,242 issued and 8,939,958 outstanding at March 31, 2004; and 25,000,000 authorized, 10,807,392 issued and 8,581,492 outstanding at March 31, 2005 | $ 107,172 | $ 108,074 |
| Additional paid-in capital | 64,339,988 | 65,181,862 |
| Treasury stock, at cost, 1,777,284 and 2,225,900 shares respectively | (17,192,886) | (22,887,881) |
| Retained earnings | 64,211,474 | 89,499,096 |
| Accumulated other comprehensive income – Foreign currency translation adjustment | 118,567 | 200,665 |
| Total Stockholders' Equity | 111,584,315 | 132,101,816 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 294,202,091 | $ 360,740,449 |

See Notes to Consolidated Financial Statements.

F-3

ePlus inc. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF EARNINGS

|  | Year Ended March 31, | | |
|  | 2003 | 2004 | 2005 |
| REVENUES |  |  |  |
| Sales of product | $  228,769,966 | $  267,898,937 | $  480,970,082 |
| Sales of leased equipment | 6,095,830 | – | – |
|  | 234,865,796 | 267,898,937 | 480,970,082 |
| Lease revenues | 50,520,293 | 51,253,518 | 46,343,797 |
| Fee and other income | 14,260,057 | 11,405,033 | 48,484,643 |
|  | 64,780,350 | 62,658,551 | 94,828,440 |
| TOTAL REVENUES   (1) | 299,646,146 | 330,557,488 | 575,798,522 |
| COSTS AND EXPENSES |  |  |  |
| Cost of sales, product | 201,277,000 | 236,283,350 | 432,774,189 |
| Cost of sales, leased equipment | 5,891,789 | – | – |
|  | 207,168,789 | 236,283,350 | 432,774,189 |
| Direct lease costs | 6,582,409 | 10,560,586 | 11,508,820 |
| Professional and other fees | 3,188,046 | 3,700,795 | 9,417,010 |
| Salaries and benefits | 43,426,999 | 41,325,224 | 54,858,181 |
| General and administrative expenses | 14,499,261 | 14,630,731 | 18,253,106 |
| Interest and financing costs | 8,308,382 | 6,847,072 | 5,981,054 |
|  | 76,005,097 | 77,064,408 | 100,018,171 |
| TOTAL COSTS AND EXPENSES   (2) | 283,173,886 | 313,347,758 | 532,792,360 |
| Earnings before provision for income taxes | 16,472,260 | 17,209,730 | 43,006,162 |
| Provision for income taxes | 6,759,551 | 7,055,989 | 17,718,539 |
| NET EARNINGS | $   9,712,709 | $  10,153,741 | 25,287,623 |
| NET EARNINGS PER COMMON SHARE – BASIC | $       0.97 | $       1.09 | $       2.84 |
| NET EARNINGS PER COMMON SHARE – DILUTED | $       0.96 | $       1.02 | $       2.68 |
| WEIGHTED AVERAGE SHARES OUTSTANDING – BASIC | 10,061,088 | 9,332,324 | 8,898,112 |
| WEIGHTED AVERAGE SHARES OUTSTANDING – DILUTED | 10,109,809 | 9,976,458 | 9,433,250 |

(1)  Includes amounts from  related parties  of $145,926, $302,968  and $37,990 for the fiscal  years  ended
     March 31, 2003, 2004 and 2005, respectively.

(2)  Includes amounts to related  parties of $486,520,  $443,065 and  $520,711 for the  fiscal  years  ended
     March 31, 2003, 2004 and 2005, respectively.


See Notes to Consolidated Financial Statements.

<div align="center">F-4</div>

ePlus inc. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended March 31, | | |
|---|---|---|---|
| | 2003 | 2004 | 2005 |
| **Cash Flows From Operating Activities:** | | | |
| Net earnings | $ 9,712,709 | $ 10,153,741 | $ 25,287,623 |
| Adjustments to reconcile net earnings to | | | |
| net cash provided by operating activities: | | | |
| Depreciation and amortization | 4,510,705 | 10,487,439 | 12,784,225 |
| Provision for credit losses | 616,074 | 1,731,325 | (515,843) |
| Tax benefit of stock options exercised | – | – | 156,972 |
| Deferred taxes | 10,231,687 | 5,293,197 | (533,917) |
| Loss (Gain) on sale of operating lease equipment | 20,796 | 2,122,180 | (159,477) |
| Payments from lessees directly to lenders | (291,281) | (2,645,589) | (4,275,789) |
| Loss (Gain) on disposal of property and equipment | (47,562) | 904,579 | 350,866 |
| Changes in: | | | |
| Accounts receivable | 2,465,447 | (14,261,777) | (41,052,707) |
| Notes receivable | 174,816 | 1,112 | (62,722) |
| Inventories | (501,311) | 473,420 | (1,217,107) |
| Investment in leases and leased equipment-net | (19,761,290) | (2,653,444) | 8,351,695 |
| Other assets | 609,853 | 59,987 | 1,009,820 |
| Accounts payable – equipment | 1,736,777 | 4,357,301 | (1,028,055) |
| Accounts payable – trade | 10,809,400 | 6,226,285 | 23,140,604 |
| Salaries and commissions payable, accrued | | | |
| expenses and other liabilities | (5,348,826) | (2,187,332) | 19,326,204 |
| Net cash provided by operating activities | 14,937,994 | 20,062,424 | 41,562,392 |
| | | | |
| **Cash Flows From Investing Activities:** | | | |
| Proceeds from sale of operating equipment | 2,271,386 | 452,127 | 1,202,550 |
| Purchase of operating lease equipment | (11,627,961) | (19,592,804) | (22,036,259) |
| Proceeds from sale of property and equipment | – | – | 19,825 |
| Purchases of property and equipment | (1,549,190) | (2,801,030) | (4,641,325) |
| Cash used in acquisitions – net of cash acquired | – | (1,601,632) | (5,000,000) |
| Net cash used in investing activities | (10,905,765) | (23,543,339) | (30,455,209) |

F-5

ePlus inc. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS - Continued

|  | 2003 | 2004 | 2005 |
|---|---|---|---|
| Cash Flows From Financing Activities: | | | |
| Borrowings: | | | |
| Non-recourse | $ 80,997,406 | $ 77,904,696 | $ 64,630,667 |
| Repayments: | | | |
| Non-recourse | (78,130,384) | (66,143,136) | (63,090,176) |
| Pay-off of recourse debt due to settlement | (98,660) | – | – |
| Write-off of non-recourse debt due to bankruptcy | (1,996,596) | 7,181 | (91,393) |
| Write-off of non-recourse debt due to settlement | – | – | (191,519) |
| Purchase of treasury stock | (6,936,324) | (9,681,762) | (5,694,995) |
| Proceeds from issuance of capital stock - net of expenses | 492,718 | 1,436,033 | 685,804 |
| Repayments of lines of credit | 1,140,890 | (2,730,435) | 6,259,034 |
| Net cash provided by (used in) financing activities | (4,530,950) | 792,577 | 2,507,422 |
| Effect of Exchange Rate Changes on Cash | 59,308 | 59,259 | 82,098 |
| Net (Decrease) Increase in Cash and Cash Equivalents | (439,413) | (2,629,079) | 13,696,703 |
| Cash and Cash Equivalents, Beginning of Period | 28,223,503 | 27,784,090 | 25,155,011 |
| Cash and Cash Equivalents, End of Year | $ 27,784,090 | $ 25,155,011 | $ 38,851,714 |
| Supplemental Disclosures of Cash Flow Information: | | | |
| Cash paid for interest | $ 4,991,426 | $ 3,794,273 | $ 2,490,376 |
| Cash paid for income taxes | $ 4,459,405 | $ 1,067,972 | $ 16,262,145 |
| Schedule of Noncash Investing and Financing Activities: | | | |
| Liabilities assumed in purchase transactions | $ – | $ 811,657 | $ 1,875,202 |

See Notes To Consolidated Financial Statements.

F-6

ePlus inc. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

| | Common Stock | | Additional Paid-in Capital | Treasury Stock | Retained Earnings | Accumulated Other Comprehensive Income | TOTAL |
|---|---|---|---|---|---|---|---|
| | Shares | Par Value | | | | | |
| Balance, April 1, 2002 | 10,395,870 | $104,619 | $62,414,067 | $ (574,800) | $44,345,023 | $ – | $106,288,909 |
| Issuance of shares for option exercise | 39,850 | 398 | 271,487 | – | – | – | 271,885 |
| Issuance of shares to employees | 38,315 | 383 | 220,173 | – | – | – | 220,556 |
| Purchase of treasury stock | (1,022,384) | – | – | (6,936,324) | – | – | (6,936,324) |
| Subtotal | (944,219) | 781 | 491,660 | (6,936,324) | – | – | (6,443,883) |
| Net earnings | – | – | – | – | 9,712,709 | – | 9,712,709 |
| Foreign currency translation adjustment | – | – | – | – | – | 59,308 | 59,308 |
| Total comprehensive income | – | – | – | – | 9,712,709 | 59,308 | 9,772,017 |
| Balance, March 31, 2003 | 9,451,651 | 105,400 | 62,905,727 | (7,511,124) | 54,057,732 | 59,308 | 109,617,043 |
| Issuance of shares for option exercise | 177,107 | 1,772 | 1,434,261 | – | – | – | 1,436,033 |
| Purchase of treasury stock | (688,800) | – | – | (9,681,762) | – | – | (9,681,762) |
| Subtotal | (511,693) | 1,772 | 1,434,261 | (9,681,762) | – | – | (8,245,729) |
| Net earnings | – | – | – | – | 10,153,741 | – | 10,153,741 |
| Foreign currency translation adjustment | – | – | – | – | – | 59,259 | 59,259 |
| Total comprehensive income | – | – | – | – | 10,153,741 | 59,259 | 10,213,000 |
| Balance, March 31, 2004 | 8,939,958 | 107,172 | 64,339,988 | (17,192,886) | 64,211,473 | 118,567 | 111,584,314 |
| Issuance of shares for option exercise | 90,150 | 902 | 684,902 | – | – | – | 685,804 |
| Tax benefit of exercised stock options | – | – | 156,972 | – | – | – | 156,972 |
| Purchase of treasury stock | (448,616) | – | – | (5,694,995) | – | – | (5,694,995) |
| Subtotal | (358,466) | 902 | 841,874 | (5,694,995) | – | – | (4,852,219) |
| Net earnings | – | – | – | – | 25,287,623 | – | 25,287,623 |
| Foreign currency translation adjustment | – | – | – | – | – | 82,098 | 82,098 |
| Total comprehensive income | – | – | – | – | 25,287,623 | 82,098 | 25,369,721 |
| Balance, March 31, 2005 | 8,581,492 | $108,074 | $65,181,862 | $(22,887,881) | $89,499,096 | $ 200,665 | $132,101,816 |

See Notes to Consolidated Financial Statements.

F-7

ePlus inc. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
As of and For the Years Ended March 31, 2003, 2004, and 2005

## 1. ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

BASIS OF PRESENTATION - Effective October 18, 1999, MLC Holdings, Inc. changed its name to ePlus inc. ("ePlus" or the "Company"). Effective January 31, 2000, ePlus inc.'s wholly-owned subsidiaries MLC Group, Inc., MLC Federal, Inc., MLC Capital, Inc., PC Plus, Inc., MLC Network Solutions, Inc. and Educational Computer Concepts, Inc. changed their names to ePlus Group, inc., ePlus Government, inc., ePlus Capital, inc., ePlus Technology, inc., ePlus Technology of NC, inc. and ePlus Technology of PA, inc. respectively. Effective March 31, 2003, ePlus Technology of NC, inc. and ePlus Technology of PA, inc. were merged into ePlus Technology, inc.

PRINCIPLES OF CONSOLIDATION - The consolidated financial statements include the accounts of ePlus inc. and its wholly-owned subsidiaries. All significant intercompany balances and transactions have been eliminated.

ASSET PURCHASES - On October 10, 2003, the Company purchased certain assets and liabilities from Digital Paper Corporation. In the transaction, the Company acquired all of Digital Paper's intellectual property, including its DigitalPaper XE, ViewMark, DocPak, docQuest, DirectSight, DigitalPaper Wireless and Idocs software, rights to several Digital Paper patents and trademarks, including the Digital Paper name, and several of Digital Paper's customers and key personnel. The purchase price included $1.6 million in cash and the assumption of certain liabilities of approximately $0.8 million.

F-8

On May 28, 2004, ePlus purchased certain assets and assumed certain liabilities of Manchester Technologies, Inc. for total consideration of $7.0 million. The purchase was made by ePlus Technology, inc., a wholly-owned subsidiary of ePlus inc. The purchase price included $5.0 million in cash and the assumption of certain liabilities of approximately $2.0 million. The acquisition has enhanced the Company's IT reseller and professional services business. Approximately 125 former Manchester Technologies, Inc. personnel were hired by ePlus as part of the transaction and are located in three established offices in metropolitan New York, South Florida and Baltimore.

REVENUE RECOGNITION - The Company sells information technology equipment to its customers and recognizes revenue from equipment sales at the time equipment is shipped to the customer. The Company is the lessor in a number of its transactions and these are accounted for in accordance with Statement of Financial Accounting Standards ("SFAS") No. 13, "Accounting for Leases." Each lease is classified as either a direct financing lease, sales-type lease, or operating lease, as appropriate. Under the direct financing and sales-type lease methods, the Company records the net investment in leases, which consists of the sum of the minimum lease term payments, initial direct costs, and unguaranteed residual value (gross investment) less the unearned income. The difference between the gross investment and the cost of the leased equipment for direct finance leases is recorded as unearned income at the inception of the lease. The unearned income is amortized over the life of the lease using the interest method. Under sales-type leases, the difference between the fair value and cost of the leased property (net margins) is recorded as revenue at the inception of the lease. SFAS No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities," establishes criteria for determining whether a transfer of financial assets in exchange for cash or other consideration should be accounted for as a sale or as a pledge of collateral in a secured borrowing. Certain assignments of direct finance leases made on a non-recourse basis by the Company meet the criteria for surrender of control set forth by SFAS No. 140 and have therefore been treated as sales for financial statement purposes.

Sales of leased equipment represents revenue from the sales of equipment subject to a lease in which the Company is the lessor. If the rental stream on such lease has non-recourse debt associated with it, sales revenue is recorded at the amount of consideration received, net of the amount of debt assumed by the purchaser. If there is no non-recourse debt associated with the rental stream, sales revenue is recorded at the amount of gross consideration received, and costs of sales is recorded at the book value of the lease. Sales of equipment represents revenue generated through the sale of equipment sold primarily through the Company's technology business unit.

F-9

Lease revenues consist of rentals due under operating leases and amortization of unearned income on direct financing and sales-type leases. Equipment under operating leases is recorded at cost and depreciated on a straight-line basis over the lease term to the Company's estimate of residual value.

The Company assigns all rights, title, and interests in a number of its leases to third-party financial institutions without recourse. These assignments are accounted for as sales since the Company has completed its obligations at the assignment date, and the Company retains no ownership interest in the equipment under lease.

Revenue from sales of procurement software is recognized in accordance with the Statement of Position ("SOP") 97-2, "Software Revenue Recognition", as amended by SOP 98-4 "Deferral of the Effective Date of a Provision of SOP 97-2, Software Revenue Recognition" and SOP 98-9 "Modification of SOP 97-2, Software Revenue Recognition, With Respect to Certain Transactions." We recognize revenue when all the following criteria exist: when there is persuasive evidence that an arrangement exists, delivery has occurred, no significant obligations by the Company with regard to implementation remain, the sales price is determinable and it is probable that collection will occur. Our accounting policy requires that revenue earned on software arrangements involving multiple elements be allocated to each element on the relative fair values of the elements and recognized when earned. Revenue relative to maintenance and support is recognized ratably over the maintenance term (usually one year) and revenue allocated to training, implementation or other services is recognized as the services are performed.

Revenue from hosting arrangements is recognized in accordance with Emerging Issues Task Force ("EITF") 00-3, "Application of AICPA Statement of Position 97-2 to Arrangements That Include the Right to Use Software Stored on Another Entity's Hardware." Hosting arrangements that are not in the scope of SOP 97-2 require that allocation of the portion of the fee allocated to the hosting elements be recognized as the service is provided.

Amounts charged for the Company's Procure+ service are recognized as services are rendered. Amounts charged for the Manage+ service are recognized on a straight-line basis over the contractual period for which the services are provided. Fee and other income results from: (1) income from events that occur after the initial sale of a financial asset; (2) re-marketing fees; (3) brokerage fees earned for the placement of financing transactions; and (4) interest and other miscellaneous income. These revenues are included in fee and other income in our consolidated statements of earnings.

STATEMENT OF CASH FLOWS - In February 2005, the Securities and Exchange Commission published a letter clarifying that cash flows for finance receivables related to sales of the Company's products and services should be considered operating activities on the statement of cash flows. The Company historically reported cash flows from the financing of equipment related to direct financing and sales-type lease transactions as investing activities in the statement of cash flows. The Company revised its consolidated statements of cash flows to comply with the new SEC guidance. All intercompany transactions have been eliminated and, therefore, there are no intercompany cash flows reflected on the consolidated statements of cash flows. This reclassification did not change the total cash flow.

RESIDUALS - Residual values, representing the estimated value of equipment at the termination of a lease, are recorded in the consolidated financial statements at the inception of each sales-type or direct financing lease as amounts estimated by management based upon its experience and judgment. Residual values for sales-type and direct financing leases are recorded at their net present value and the unearned income is amortized over the life of the lease using the interest method. The residual values for operating leases are included in the leased equipment's net book value.

F-10

The Company evaluates residual values on an ongoing basis and records any required adjustments. In accordance with accounting principles generally accepted in the United States of America, no upward revision of residual values is made subsequent to lease inception.

RESERVE FOR CREDIT LOSSES - The reserve for credit losses (the "reserve") is maintained at a level believed by management to be adequate to absorb potential losses inherent in the Company's lease and accounts receivable portfolio. Management's determination of the adequacy of the reserve is based on an evaluation of historical credit loss experience, current economic conditions, volume, growth, the composition of the lease portfolio, and other relevant factors. The reserve is increased by provisions for potential credit losses charged against income. Accounts are either written off or written down when the loss is both probable and determinable, after giving consideration to the customer's financial condition, the value of the underlying collateral and funding status (i.e., discounted on a non-recourse or recourse basis).

CASH AND CASH EQUIVALENTS - Cash and cash equivalents include short-term repurchase agreements with an original maturity of three months or less.

INVENTORIES - Inventories are stated at the lower of cost (weighted average basis) or market.

PROPERTY AND EQUIPMENT - Property and equipment are stated at cost, net of accumulated depreciation and amortization. Depreciation and amortization are computed using the straight-line method over the estimated useful lives of the related assets, which range from three to ten years.

CAPITALIZATION OF COSTS OF SOFTWARE FOR INTERNAL USE - The Company has capitalized certain costs for the development of internal use software under the guidelines of SOP 98-1, "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use." Approximately $0.3 million and $0.4 million of internal use software was capitalized during the years ended March 31, 2005 and 2004 respectively, which is included in the accompanying consolidated balance sheets as a component of property and equipment.

F-11

CAPITALIZATION OF COSTS OF SOFTWARE TO BE MADE AVAILABLE TO CUSTOMERS - In accordance with SFAS No. 86, "Accounting for Costs of Computer Software to be Sold, Leased, or Otherwise Marketed," software development costs are expensed as incurred until technological feasibility has been established. At such time such costs are capitalized until the product is made available for release to customers. For the year ended March 31, 2004, $1.9 million of development costs have been capitalized. No such costs were capitalized during the year ended March 31, 2005.

INCOME TAXES - Deferred income taxes are accounted for in accordance with SFAS No. 109, "Accounting for Income Taxes." Under this method, deferred income tax assets and liabilities are based on the difference between financial statement and tax bases of assets and liabilities, using tax rates currently in effect.

ESTIMATES - The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

RECLASSIFICATIONS - Certain items have been reclassified in the March 31, 2003 and 2004 financial statements to conform to the March 31, 2005 presentation.

COMPREHENSIVE INCOME - Comprehensive income consists of net income and foreign currency translation adjustments and is presented in the accompanying consolidated statements of stockholders' equity. For the years ended March 31, 2005 and 2004, accumulated other comprehensive income decreased $82,098 and $59,259 respectively, resulting in total comprehensive income of $25,369,721 and $10,213,000 respectively.

EARNINGS PER SHARE - Earnings per share (EPS) have been calculated in accordance with SFAS No. 128, "Earnings per Share." In accordance with SFAS No. 128, basic EPS amounts were calculated based on weighted average shares outstanding of 10,061,088 in fiscal 2003, 9,332,324 in 2004, and 8,898,112 in 2005. Diluted EPS amounts were calculated based on weighted average shares outstanding and common stock equivalents of 10,109,809 in fiscal 2003, 9,976,458 in 2004, and 9,433,250 in 2005. Additional shares included in the diluted earnings per share calculations are attributable to incremental shares issuable upon the assumed exercise of stock options and other common stock equivalents.

STOCK-BASED COMPENSATION - As of March 31, 2005, the Company has four stock-based employee compensation plans, which are described more fully in Note 11. The Company accounts for those plans under the recognition and measurement principles of APB Opinion No. 25, "Accounting for Stock Issued to Employees," and related Interpretations issued by the Financial Accounting Standards Board. No stock-based employee compensation cost is reflected in net income, as all options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant. The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS No. 123, "Accounting for Stock-Based Compensation," as amended by SFAS No. 148, "Accounting for Stock-Based Compensation -- Transition and Disclosure," to stock-based employee compensation:

F-12

|                                               | Year Ended March 31, | | |
|                                               | 2003 | 2004 | 2005 |
| --------------------------------------------- | ----------- | ------------ | ------------ |
| Net earnings, as reported                     | $ 9,712,709 | $ 10,153,741 | $ 25,287,623 |
| Stock-based compensation expense              | (3,665,698) | (2,593,793)  | (1,145,665)  |
| Net earnings, pro forma                       | $ 6,047,011 | $ 7,559,948  | $ 24,141,958 |
|                                               |             |              |              |
| Basic earnings per share, as reported         | $0.97       | $1.09        | $2.84        |
| Basic earnings per share, pro forma            | $0.60       | $0.81        | $2.71        |
| Diluted earnings per share, as reported        | $0.96       | $1.02        | $2.68        |
| Diluted earnings per share, pro forma          | $0.60       | $0.76        | $2.56        |

STOCK REPURCHASE - On September 20, 2001, the Company's Board of Directors
authorized the repurchase of up to 750,000 shares of its outstanding common
stock for a maximum of $5,000,000 over a period of time ending no later than
September 20, 2002. On October 4, 2002, another stock repurchase program
previously authorized by the Company's Board of Directors became effective. This
program authorized the repurchase of up to 3,000,000 shares of the Company's
outstanding common stock over a period of time ending no later than October 3,
2003 and is limited to a cumulative purchase amount of $7,500,000. On October 1,
2003, another stock purchase program was authorized by the Company's Board of
Directors. This program authorized the repurchase of up to 3,000,000 shares of
the Company's outstanding common stock over a period of time ending no later
than September 30, 2004 and is limited to a cumulative purchase amount of
$7,500,000. On May 6, 2004, the Company's Board of Directors approved an
increase, from $7,500,000 to $12,000,000, for the maximum total cost of shares
that could be purchased, which expired September 30, 2004. From October 1, 2004
to November 16, 2004, there was no stock repurchase authorization. On November
17, 2004, another stock purchase program was authorized by the Company's Board
of Directors. This program authorized the repurchase of up to 3,000,000 shares
of the Company's outstanding common stock over a period of time ending no later
than November 17, 2005 and is limited to a cumulative purchase amount of
$7,500,000. On March 2, 2005, the Company's Board of Directors approved an
increase, from $7,500,000 to $12,500,000, for the maximum total cost of shares
that could be purchased.

During the years ended March 31, 2003, 2004, and 2005, the Company repurchased
1,022,384, 688,800, and 448,616 shares of its outstanding common stock for a
total of $6,936,324, $9,681,763, and $5,694,994. Since the inception of the
Company's initial repurchase program on September 20, 2001, as of March 31,
2005, the Company had repurchased 2,225,900 shares of its outstanding common
stock at an average cost of $10.28 per share for a total of $22,887,881.

RECENT ACCOUNTING PRONOUNCEMENTS - In December 2004, the FASB issued SFAS No.
123 (revised 2004), "Share-Based Payment," or SFAS No. 123R. SFAS No. 123R
replaces SFAS No. 123, "Accounting for Stock-Based Compensation," and supersedes
APB Opinion No. 25, "Accounting for Stock Issued to Employees," and subsequently
issued stock option related guidance. This statement establishes standards for
the accounting for transactions in which an entity exchanges its equity
instruments for goods or services, primarily on accounting for transactions in
which an entity obtains employee services in share-based payment transactions.
It also addresses transactions in which an entity incurs liabilities in exchange
for goods or services that are based on the fair value of the entity's equity
instruments or that may be settled by the issuance of those equity instruments.
Entities will be required to measure the cost of employee services received in
exchange for an award of equity instruments based on the grant date fair value

F-13

of the award (with limited exceptions). That cost will be recognized over the period during which an employee is required to provide service in exchange for the award (usually the vesting period). The grant-date fair value of employee share options and similar instruments will be estimated using option-pricing models. If an equity award is modified after the grant date, incremental compensation cost will be recognized in an amount equal to the excess of the fair value of the modified award over the fair value of the original award immediately before the modification. We are required to apply SFAS No. 123R to all awards granted, modified or settled as of the beginning of the fiscal reporting period that begins after June 15, 2005. We are also required to use either the modified-prospective method or modified-retrospective method. Under the modified-prospective method, we must recognize compensation cost for all awards subsequent to adopting the standard and for the unvested portion of previously granted awards outstanding upon adoption. Under the modified-retrospective method, we must restate our previously issued financial statements to recognize the amounts we previously calculated and reported on a pro forma basis, as if the prior standard had been adopted. Under both methods, we are permitted to use either the straight-line or an accelerated method to amortize the cost as an expense for awards with graded vesting. The standard permits and encourages early adoption. We have commenced our analysis of the impact of SFAS No. 123R, but have decided not to early adopt. We will most likely use the modified-prospective and the straight-line method. Accordingly, we have not determined the impact that the adoption of SFAS No. 123R will have on our financial position or results of operations.

2. INVESTMENTS IN LEASES AND LEASED EQUIPMENT - NET

Investments in leases and leased equipment - net consists of the following:

|  | As of March 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | (In Thousands) | |
| Investment in direct financing and sales-type leases - net | $ 166,790 | $ 157,519 |
| Investment in operating lease equipment - net | 19,877 | 31,950 |
|  | $ 186,667 | $ 189,469 |

INVESTMENT IN DIRECT FINANCING AND SALES-TYPE LEASES

The Company's investment in direct financing and sales-type leases consists of the following:

|  | As of March 31, | |
|---|---|---|
|  | 2004 | 2005 |
|  | (In Thousands) | |
| Minimum lease payments | $ 161,008 | $ 151,139 |
| Estimated unguaranteed residual value (1) | 25,025 | 23,794 |
| Initial direct costs - net of amortization (2) | 2,342 | 1,850 |
| Less: Unearned lease income | (18,439) | (16,208) |
| Reserve for credit losses | (3,146) | (3,056) |
| Investment in direct finance and sales-type leases - net | $ 166,790 | $ 157,519 |

F-14

(1) Includes estimated unguaranteed residual values of $605,970 and $801,025 as of March 31, 2004 and 2005, respectively, of direct financing leases that were sold under SFAS 140.

(2) Initial direct costs are shown net of amortization of $2,184 and $2,387 at March 31, 2004 and March 31, 2005, respectively.

Future scheduled minimum lease rental payments as of March 31, 2005 are as follows:

|                        |                 | (In Thousands) |
|------------------------|-----------------|---------------:|
| Year ending March 31,  | 2006            | $    76,733    |
|                        | 2007            |     47,192     |
|                        | 2008            |     19,903     |
|                        | 2009            |      3,704     |
|                        | 2010            |      1,953     |
|                        | 2011 and after  |      1,654     |
|                        | Total           | $   151,139    |

The Company's net investment in direct financing and sales-type leases is collateral for non-recourse and recourse equipment notes. See Note 6.

INVESTMENT IN OPERATING LEASE EQUIPMENT

Investment in operating leases primarily represents equipment leased for two to four years and leases that are short-term renewals on month-to-month status. The components of the net investment in operating lease equipment are as follows:

|                                                       | As of March 31, | |
|-------------------------------------------------------|----------------:|----------------:|
|                                                       | 2004            | 2005            |
|                                                       | (In Thousands)  | |
| Cost of equipment under operating leases              | $   27,985      | $   45,453      |
| Less: Accumulated depreciation and amortization       | (8,108)         | (13,503)        |
| Investment in operating lease equipment - net         | $   19,877      | $   31,950      |

Future scheduled minimum lease rental payments as of March 31, 2005 are as follows:

|                        |                 | (In Thousands) |
|------------------------|-----------------|---------------:|
| Year ending March 31,  | 2006            | $    11,617    |
|                        | 2007            |      9,609     |
|                        | 2008            |      6,422     |
|                        | 2009            |      4,055     |
|                        | 2010            |        743     |
|                        | 2011 and after  |        671     |
|                        | Total           | $    33,117    |

3. RESERVES FOR CREDIT LOSSES

As of March 31, 2004 and 2005, the Company's reserve for credit losses was $4,730,015 and $5,014,905, respectively.

The Company's reserves for credit losses are segregated between our accounts receivable and our investment in direct financing leases as follows (in

thousands):

F-15

|                              | Accounts Receivable | Investment in Direct Financing Leases | Total |
|------------------------------|--------------------:|--------------------------------------:|------:|
| Balance April 1, 2003        | $  3,346            | $  3,407                              | $  6,753 |
| Bad Debts Expense            | 23                  | 24                                    | 47    |
| Recoveries                   | (12)                | –                                     | (12)  |
| Write-offs and other         | (1,773)             | (285)                                 | (2,058) |
| Balance March 31, 2004       | 1,584               | 3,146                                 | 4,730 |
| Bad Debts Expense            | 1,131               | –                                     | 1,131 |
| Recoveries                   | (350)               | –                                     | (350) |
| Write-offs and other         | (406)               | (90)                                  | (496) |
| Balance March 31, 2005       | $  1,959            | $  3,056                              | $  5,015 |

Balances in "Write-offs and other" include actual write-offs and reclassifications from prior years.

4. PROPERTY AND EQUIPMENT

Property and equipment consists of the following:

|                                                    | As of March 31, |           |
|----------------------------------------------------|----------------:|----------:|
|                                                    | 2004            | 2005      |
|                                                    | (In Thousands)  |           |
| Furniture, fixtures and equipment                  | $  5,437        | $  7,364  |
| Vehicles                                           | 117             | 155       |
| Capitalized software                               | 6,119           | 6,411     |
| Leasehold improvements                             | 256             | 1,894     |
| Less:  Accumulated depreciation and amortization   | (6,699)         | (9,176)   |
| Property and equipment - net                       | $  5,230        | $  6,648  |

Certain property and equipment assets for the year ended March 31, 2004 are shown in different categories above than as previously reported.

5.  GOODWILL

As of March 31, 2005, the Company had goodwill, net of accumulated amortization, of $26.1 million, an increase of $5.9 million from March 31, 2004 as a result of the purchase of certain assets and liabilities of Manchester Technologies, Inc. As of March 31, 2004, the Company had goodwill, net of accumulated amortization, of $20.2 million which was subject to the transitional assessment provisions of SFAS No. 142. No goodwill amortization expense was recognized during the years ended March 31, 2003, 2004 and 2005.

As of March 31, 2004 and 2005, the Company has determined goodwill had not been impaired and that no potential impairment existed, based on testing performed as of September 30, 2003 and 2004.

F-16

Changes in the carrying amount of goodwill for the years ended March 31, 2004 and 2005 are as follows:

|                                        | Financing Business Unit | Technology Sales Business Unit | Total |
|----------------------------------------|------------------------:|-------------------------------:|------:|
| Goodwill (net), March 31, 2003         | $ 4,028,764 | $ 15,118,368 | $ 19,147,132 |
| Goodwill acquired during the period    | – | 1,089,272 | 1,089,272 |
| Other Adjustments during the period    | – | 6,906 | 6,906 |
| Goodwill (net), March 31, 2004         | 4,028,764 | 16,214,546 | 20,243,310 |
| Goodwill acquired during the period    | – | 5,881,902 | 5,881,902 |
| Goodwill(net), March 31,2005           | $ 4,028,764 | $ 22,096,448 | $ 26,125,212 |

## 6. RECOURSE AND NON-RECOURSE NOTES PAYABLE

Recourse and non-recourse obligations consist of the following:

|  | As of March 31, | |
|--|----:|----:|
|  | 2004 | 2005 |
|  | (In Thousands) | |
| Recourse line of credit bearing interest at prime (5.75% at March 31, 2005) less 0.5% with a maximum balance of $50,000,000, except during the seasonal uplift period in which the maximum balance increases to $75,000,000 | $ – | $ 6,263 |
| Recourse line of credit of $45,000,000 expiring on July 21, 2006. Carrying interest at the Company's option, either the LIBOR rate plus 175-250 basis points, or the alternate base rate of the higher of prime or federal funds rate plus 50 basis points plus 0-25 basis points. | – | – |
| Recourse vehicle note with variable interest rate | 6 | 2 |
| Total recourse obligations | $ 6 | $ 6,265 |
| Non-recourse equipment notes secured by related investments in leases with interest rates ranging from 2.39% to 11.0% in fiscal years 2004 and 2005 | $ 117,857 | $ 114,839 |

F-17

Principal and interest payments on the recourse and non-recourse notes payable are generally due monthly in amounts that are approximately equal to the total payments due from the lessee under the leases that collateralize the notes payable. Under recourse financing, in the event of a default by a lessee, the lender has recourse against the lessee, the equipment serving as collateral, and the Company. Under non-recourse financing, in the event of a default by a lessee, the lender generally only has recourse against the lessee, and the equipment serving as collateral, but not against the Company.

Borrowings under the Company's $45 million line of credit are subject to and in compliance with certain covenants regarding minimum consolidated tangible net worth, maximum recourse debt to net worth ratio, cash flow coverage, and minimum interest expense coverage ratio. The borrowings are secured by the Company's assets such as leases, receivables, inventory, and equipment. Borrowings are limited to the Company's collateral base, consisting of equipment, lease receivables and other current assets, up to a maximum of $45 million. In addition, the credit agreement restricts, and under some circumstances prohibits, the payment of dividends.

Recourse and non-recourse notes payable as of March 31, 2005, mature as follows:

|                              | Recourse Notes Payable | Non-recourse Notes Payable |
|------------------------------|------------------------|----------------------------|
|                              | (In Thousands)         |                            |
| Year ending March 31, 2006   | $    6,265             | $    58,747                |
| 2007                         | –                      | 36,218                     |
| 2008                         | –                      | 13,376                     |
| 2009                         | –                      | 4,609                      |
| 2010                         | –                      | 1,720                      |
| 2011 and after               | –                      | 169                        |
| Total                        | $    6,265             | $    114,839               |

## 7. RELATED PARTY TRANSACTIONS

Prior to April 1, 2001, the Company sold leased equipment to MLC/CLC LLC, a joint venture in which the Company has a 5% ownership interest. The Company recognized $145,962, $302,968, and $37,990 for the years ended March 31, 2003, 2004 and 2005 for accounting and administrative services provided to MLC/CLC LLC.

The Company leases certain office space from an entity controlled by an individual, director, stockholder and officer of the Company. During the years ended March 31, 2003, 2004, and 2005, rent expense paid to these related parties was $486,520, $443,065, and $520,711 respectively.

F-18

## 8. COMMITMENTS AND CONTINGENCIES

The Company leases office space and certain office equipment for the conduct of its business. Rent expense relating to these operating leases was $2,435,972, $2,048,201, and $2,649,483 for the years ended March 31, 2003, 2004, and 2005 respectively. As of March 31, 2005, the future minimum lease payments are due as follows:

|                          |      | (In Thousands) |
|--------------------------|------|---------------:|
| Year Ending March 31,    | 2006 | $    1,867     |
|                          | 2007 |      1,530     |
|                          | 2008 |      1,329     |
|                          | 2009 |      1,162     |
|                          | 2010 |        872     |
|                          |      | $    6,760     |

## 9. INCOME TAXES

A reconciliation of income taxes computed at the statutory federal income tax rate of 35% to the provision for income taxes included in the consolidated statements of earnings is as follows:

|                                                        | For the Year Ended March 31, | | |
|--------------------------------------------------------|--------:|--------:|---------:|
|                                                        | 2003    | 2004    | 2005     |
|                                                        | (In Thousands) | | |
| Statutory federal income tax rate                      | 35%     | 35%     | 35%      |
| Income tax expense computed at the U.S. statutory federal rate | $ 5,765 | $ 6,023 | $ 15,067 |
| State income tax expense - net of federal benefit      | 876     | 975     | 2,012    |
| Non-taxable interest income                            | (11)    | (11)    | (13)     |
| Non-deductible expenses                                | 130     | 69      | 194      |
| Other                                                  | –       | –       | 458      |
| Provision for income taxes                             | $ 6,760 | $ 7,056 | $ 17,718 |
| Effective income tax rate                              | 41.0%   | 41.0%   | 41.2%    |

F-19

The components of the provision for income taxes are as follows:

|  | For the Year Ended March 31, | | |
|  | 2003 | 2004 | 2005 |
|  | | (In Thousands) | |
| Current: | | | |
| Federal | $ (3,008) | $ 22 | $ 15,041 |
| State | (464) | 1,741 | 3,211 |
| Total current expense (benefit) | (3,472) | 1,763 | 18,252 |
| Deferred: | | | |
| Federal | 8,421 | 5,535 | (519) |
| State | 1,811 | (242) | (15) |
| Total deferred expense (benefit) | 10,232 | 5,293 | (534) |
| Provision for Income Taxes | $ 6,760 | $ 7,056 | $ 17,718 |

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets and liabilities as of March 31 were as follows:

|  | For the Year Ended March 31, | | |
|  | 2003 | 2004 | 2005 |
|  | | (In Thousands) | |
| Lease revenue recognition | $ (8,232) | $ (14,292) | $ (13,144) |
| Allowance for doubtful accounts and credit reserves | 3,322 | 3,565 | 2,794 |
| Other | 150 | 674 | 831 |
| Net Deferred Tax Liability | $ (4,760) | $ (10,053) | $ (9,519) |

On October 22, 2004, the President of the United States signed into law the American Jobs Creation Act of 2004. The Company is currently evaluating the impact of this new law on its operations and effective tax rate. In particular, the Company is evaluating the law's provisions relating to the phased-in deduction associated with pre-tax income from domestic production activities. This special deduction is 3% of qualifying income for years 2004 and 2005, 6% in years 2006 through 2009, and 9% thereafter.

F-20

10. NONCASH INVESTING AND FINANCING ACTIVITIES

The Company recognized a reduction in recourse and non-recourse notes payable (Note 6) associated with its direct finance and operating lease activities from payments made directly by customers to third-party lenders amounting to $14,287,124, $30,067,365 and $23,748,131 for the years ended March 31, 2003, 2004, and 2005, respectively. In addition, the Company realized a reduction in recourse and non-recourse notes payable from the sale of the associated assets and liabilities amounting to $12,453,541, $4,218,748 and $1,668,369 for the years ended March 31, 2003, 2004, and 2005 respectively.

11. BENEFIT AND STOCK OPTION PLANS

The Company provides its employees with contributory 401(k) profit sharing plans. To be eligible to participate in the plan, employees must be at least 21 years of age and have completed a minimum service requirement. Full vesting in the plans vary from after the fourth to the sixth consecutive year of plan participation. Employer contribution percentages are determined by the Company and are discretionary each year. The Company's expense for the plans was $235,394, $247,040 and $212,310 for the years ended March 31, 2003, 2004 and 2005, respectively.

The Company has established a stock incentive program (the "Master Stock Incentive Plan") to provide an opportunity for directors, executive officers, independent contractors, key employees, and other employees of the Company to participate in the ownership of the Company. The Master Stock Incentive Plan provides for awards to eligible directors, employees, and independent contractors of the Company, of a broad variety of stock-based compensation alternatives under a series of component plans. These component plans include tax advantaged incentive stock options for employees under the Incentive Stock Option Plan, formula length of service based nonqualified options to non-employee directors under the Outside Director Stock Plan, nonqualified stock options under the Nonqualified Stock Option Plan, a program for employee purchase of Common Stock of the Company at 85% of the fair market value under a tax advantaged Employee Stock Purchase Plan approved by the Board of Directors and effective September 16, 1998 and which ended December 31, 2002, as well as other restrictive stock and performance-based stock awards and programs which may be established by the Board of Directors. The number that may be subject to options granted under the Incentive Stock Option Plan is capped at a maximum of 3,000,000 shares. As of March 31, 2005, a total of 2,716,659 shares of common stock have been reserved for issuance upon exercise of options granted under the Plan, which encompasses the following component plans:

   a)   the Incentive Stock Option Plan ("ISO Plan"), under which 2,259,154 options are outstanding or have been exercised as of March 31, 2005;

   b)   the Nonqualified Stock Option Plan ("Nonqualified Plan"), under which 260,000 options are outstanding as of March 31, 2005;

F-21

c) the Outside Director Stock Option Plan ("Outside Director Plan"), under which 53,707 are outstanding or have been exercised as of March 31, 2005;

d) the Employee Stock Purchase Plan ("ESPP") under which 143,798 shares have been issued as of March 31, 2005.

The exercise price of options granted under the Master Stock Incentive Plan is equivalent to the fair market value of the Company's stock on the date of grant, or, in the case of the ESPP, not less than 85% of the lowest fair market value of the Company's stock during the purchase period, which is generally six months. Options granted under the plan have various vesting schedules with vesting periods ranging from one to five years. The weighted average fair value of options granted during the years ended March 31, 2003, 2004 and 2005 was $3.11, $5.26 and $5.82 per share respectively.

A summary of stock option activity during the three years ended March 31, 2005 is as follows:

|  | Number of Shares | Exercise Price Range | Weighted Average Exercise Price |
|---|---|---|---|
| Outstanding, April 1, 2002 | 2,180,585 | | |
| Options granted | 77,000 | $6.23 – $6.97 | $ 6.91 |
| Options exercised | (39,850) | $6.24 – $9.00 | $ 6.85 |
| Options forfeited | (216,547) | $6.24 – $17.38 | $ 10.35 |
| Outstanding, March 31, 2003 | 2,001,188 | | |
| Exercisable, March 31, 2003 | 1,450,718 | | |
| Outstanding, April 1, 2003 | 2,001,188 | | |
| Options granted | 78,000 | $7.14 – $15.25 | $ 10.10 |
| Options exercised | (177,957) | $6.24 – $12.25 | $ 8.06 |
| Options forfeited | (114,999) | $6.86 – $17.38 | $ 9.19 |
| Outstanding, March 31, 2004 | 1,786,232 | | |
| Exercisable, March 31, 2004 | 1,514,557 | | |
| Outstanding, April 1, 2004 | 1,786,232 | | |
| Options granted | 490,000 | $10.75 – $11.96 | $ 10.95 |
| Options exercised | (89,300) | $6.24 – $13.00 | $ 7.32 |
| Options forfeited | (20,750) | $6.86 – $17.38 | $ 12.26 |
| Outstanding, March 31, 2005 | 2,166,182 | | |
| Exercisable, March 31, 2005 | 1,648,382 | | |

F-22

Additional information regarding options outstanding as of March 31, 2005 is as follows:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Number Outstanding | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | Number Exercisable | Weighted Average Exercise Price | |
| 2,166,182 | 5.2 years | $11.70 | 1,648,382 | $9.34 | |

Effective April 1, 1996, the Company adopted SFAS No. 123, as amended by SFAS No. 148. The Company has the option of either (1) continuing to account for stock-based employee compensation plans in accordance with the guidelines established by APB Opinion No. 25, "Accounting for Stock Issued to Employees," while providing the disclosures required under SFAS No. 123, or (2) adopting SFAS No. 123 accounting for all employee and non-employee stock compensation arrangements. The Company opted to continue to account for its stock-based awards using the intrinsic value method in accordance with APB Opinion No. 25. Accordingly, no compensation expense has been recognized in the financial statements for employee stock arrangements.

| | Year Ended March 31, | | |
|---|---|---|---|
| | 2003 | 2004 | 2005 |
| Net earnings, as reported | $ 9,712,709 | $ 10,153,741 | $ 25,287,623 |
| Stock-based compensation expense | (3,665,698) | (2,593,793) | (1,145,665) |
| Net earnings, pro forma | $ 6,047,011 | $ 7,559,948 | $ 24,141,958 |
| | | | |
| Basic earnings per share, as reported | $0.97 | $1.09 | $2.84 |
| Basic earnings per share, pro forma | $0.60 | $0.81 | $2.71 |
| Diluted earnings per share, as reported | $0.96 | $1.02 | $2.68 |
| Diluted earnings per share, pro forma | $0.60 | $0.76 | $2.56 |

Under SFAS No. 123, the fair value of stock-based awards to employees is derived through the use of option pricing models that require a number of subjective assumptions. The Company's calculations were made using the Black-Scholes option-pricing model with the following weighted average assumptions:

| | For the Year Ended March 31, | | |
|---|---|---|---|
| | 2003 | 2004 | 2005 |
| Options granted under the Incentive Stock Option Plan: | | | |
| Expected life of option | 5 years | 5 years | 5 years |
| Expected stock price volatility | 46.02% | 39.76% | 59.49% |
| Expected dividend yield | 0% | 0% | 0% |
| Risk-free interest rate | 3.96% | 3.02% | 3.55% |

During the years ended March 31, 2003, 2004 and 2005, no options were granted under the Nonqualified Stock Option Plan or the Outside Director Stock Option Plan.

F-23

12. FAIR VALUE OF FINANCIAL INSTRUMENTS

The following disclosure of the estimated fair value of the Company's financial instruments is in accordance with the provisions of SFAS No. 107, "Disclosures About Fair Value of Financial Instruments." The valuation methods used by the Company are set forth below.

The accuracy and usefulness of the fair value information disclosed herein is limited by the following factors:

- These estimates are subjective in nature and involve uncertainties and matters of significant judgment and therefore cannot be determined with precision. Changes in assumptions could significantly affect the estimates.

- These estimates do not reflect any premium or discount that could result from offering for sale at one time the Company's entire holding of a particular financial asset.

- SFAS No. 107 excludes from its disclosure requirements lease contracts and various significant assets and liabilities that are not considered to be financial instruments.

Because of these and other limitations, the aggregate fair value amounts presented in the following table do not represent the underlying value of the Company. The Company determines the fair value of notes payable by applying an average portfolio debt rate and applying such rate to future cash flows of the respective financial instruments. The fair value of cash and cash equivalents is determined to equal the book value.

The carrying amounts and estimated fair values of the Company's financial instruments are as follows:

|  | As of March 31, 2004 | | As of March 31, 2005 | |
|  | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
|  | | (In Thousands) | | |
|---|---|---|---|---|
| Assets: | | | | |
| Cash and cash equivalents | $ 25,155 | $ 25,155 | $ 38,852 | $ 38,852 |
| Liabilities: | | | | |
| Non-recourse notes payable | 117,857 | 117,818 | 114,839 | 114,760 |
| Recourse notes payable | 6 | 6 | 6,265 | 6,265 |

F-24

13. SEGMENT REPORTING

The Company manages its business segments on the basis of the products and services offered. The Company's reportable segments consist of its traditional financing business unit and technology sales business unit. The financing business unit offers lease-financing solutions to corporations and governmental entities nationwide. The technology sales business unit sells information technology equipment and software and related services primarily to corporate customers on a nationwide basis. The technology sales business unit also provides Internet-based business-to-business supply chain management solutions for information technology and other operating resources. The Company evaluates segment performance on the basis of segment net earnings.

Both segments utilize the Company's proprietary software and services throughout the organization. Sales and services and related costs of e-procurement software are included in the technology sales business unit. Income relative to services generated by our proprietary software and services are included in the financing business unit.

The accounting policies of the segments are the same as those described in Note 1, "Organization and Summary of Significant Accounting Policies." Corporate overhead expenses are allocated on the basis of revenue volume, estimates of actual time spent by corporate staff, and asset utilization, depending on the type of expense.

F-25

|                                                  | Financing Business Unit | Technology Sales Business Unit | Total |
|--------------------------------------------------|------------------------:|-------------------------------:|------:|
| **Twelve months ended March 31, 2003**           |                         |                                |       |
| Sales of product                                 | $   2,007,743           | $   226,762,223                | $ 228,769,966 |
| Sales of leased equipment                        | 6,095,830               | –                              | 6,095,830 |
| Lease revenues                                   | 50,520,293              | –                              | 50,520,293 |
| Fee and other income                             | 10,190,392              | 4,069,665                      | 14,260,057 |
| Total Revenues                                   | 68,814,258              | 230,831,888                    | 299,646,146 |
| Cost of sales                                    | 9,391,356               | 197,777,433                    | 207,168,789 |
| Direct lease costs                               | 6,582,409               | –                              | 6,582,409 |
| Selling, general and administrative expenses     | 26,848,899              | 34,265,407                     | 61,114,306 |
| Segment earnings                                 | 25,991,594              | (1,210,953)                    | 24,780,641 |
| Interest expense                                 | 7,832,220               | 476,162                        | 8,308,382 |
| Earnings (loss) before income taxes              | $   18,159,374          | $   (1,687,114)                | $  16,472,260 |
| Assets                                           | $  226,238,171          | $   52,702,515                 | $ 278,940,686 |
| **Twelve months ended March 31, 2004**           |                         |                                |       |
| Sales of product                                 | $   3,321,050           | $   264,577,887                | $ 267,898,937 |
| Sales of leased equipment                        | –                       | –                              | – |
| Lease revenues                                   | 51,253,518              | –                              | 51,253,518 |
| Fee and other income                             | 4,589,846               | 6,815,187                      | 11,405,033 |
| Total Revenues                                   | 59,164,414              | 271,393,074                    | 330,557,488 |
| Cost of sales                                    | 2,822,985               | 233,460,365                    | 236,283,350 |
| Direct lease costs                               | 10,560,586              | –                              | 10,560,586 |
| Selling, general and administrative expenses     | 22,874,439              | 36,782,311                     | 59,656,750 |
| Segment earnings                                 | 22,906,404              | 1,150,398                      | 24,056,802 |
| Interest expense                                 | 6,692,271               | 154,801                        | 6,847,072 |
| Earnings (loss) before income taxes              | $   16,214,133          | $      995,597                 | $  17,209,730 |
| Assets                                           | $  238,631,864          | $   55,570,227                 | $ 294,202,091 |
| **Twelve months ended March 31, 2005**           |                         |                                |       |
| Sales of product                                 | $   3,738,045           | $   477,232,037                | $ 480,970,082 |
| Sales of leased equipment                        | –                       | –                              | – |
| Lease revenues                                   | 46,343,797              | –                              | 46,343,797 |
| Fee and other income                             | 2,471,872               | 46,012,771                     | 48,484,643 |
| Total Revenues                                   | 52,553,714              | 523,244,808                    | 575,798,522 |
| Cost of sales                                    | 3,569,825               | 429,204,364                    | 432,774,189 |
| Direct lease costs                               | 11,508,820              | –                              | 11,508,820 |
| Selling, general and administrative expenses     | 21,983,667              | 60,544,630                     | 82,528,297 |
| Segment earnings                                 | 15,491,402              | 33,495,814                     | 48,987,216 |
| Interest expense                                 | 5,450,537               | 530,517                        | 5,981,054 |
| Earnings before income taxes                     | $   10,040,865          | $   32,965,297                 | $  43,006,162 |
| Assets                                           | $  255,776,519          | $  104,963,930                 | $ 360,740,449 |

F-26

## 14. QUARTERLY DATA - UNAUDITED

Condensed quarterly financial information is as follows (amounts in thousands, except per share amounts). Adjustments reflect the reclassification of certain prior period amounts to conform to current period presentation.

|  | First Quarter | | | Second Quarter | | |
|---|---|---|---|---|---|---|
|  | Previously Reported | Adjustments | Adjusted Amount | Previously Reported | Adjustments | Adjusted Amount |
| **Year Ended March 31, 2004** |  |  |  |  |  |  |
| Sales | $ 65,296 | $    (3) | $ 65,293 | $ 70,380 | $    – | $ 70,380 |
| Total Revenues | 79,868 | (34) | 79,834 | 85,637 | – | 85,637 |
| Cost of Sales | 57,512 | (4) | 57,508 | 62,364 | – | 62,364 |
| Total Costs and Expenses | 76,086 | (33) | 76,053 | 81,071 | – | 81,071 |
| Earnings before provision for income taxes | 3,781 | – | 3,781 | 4,566 | – | 4,566 |
| Provision for income taxes | 1,478 | – | 1,478 | 1,861 | – | 1,861 |
| Net earnings | 2,303 | – | 2,303 | 2,705 | – | 2,705 |
| Net earnings per common share-Basic (1) | $  0.24 |  | $  0.24 | $  0.29 |  | $  0.29 |
| Net earnings per common share-Diluted (1) | $  0.24 |  | $  0.24 | $  0.27 |  | $  0.27 |
| **Year Ended March 31, 2005** |  |  |  |  |  |  |
| Sales | $ 91,969 | $    – | $ 91,969 | $138,065 | $    – | $138,065 |
| Total Revenues | 106,699 | – | 106,699 | 153,186 | – | 153,186 |
| Cost of Sales | 82,161 | – | 82,161 | 123,343 | – | 123,343 |
| Total Costs and Expenses | 103,012 | – | 103,012 | 149,702 | – | 149,702 |
| Earnings before provision for income taxes | 3,686 | – | 3,686 | 3,484 | – | 3,484 |
| Provision for income taxes | 1,511 | – | 1,511 | 1,428 | – | 1,428 |
| Net earnings | 2,175 | – | 2,175 | 2,055 | – | 2,055 |
| Net earnings per common share-Basic (1) | $  0.24 |  | $  0.24 | $  0.23 |  | $  0.23 |
| Net earnings per common share-Diluted (1) | $  0.23 |  | $  0.23 | $  0.22 |  | $  0.22 |

|  | Third Quarter | | | Fourth Quarter | | |
|---|---|---|---|---|---|---|
|  | Previously Reported | Adjustments | Adjusted Amount | Previously Reported | Adjustments | Adjusted Amount |
| **Year Ended March 31, 2004** |  |  |  |  |  |  |
| Sales | $ 63,325 | $    – | $ 63,325 | $ 68,901 | $    – | $ 68,901 |
| Total Revenues | 79,800 | – | 79,800 | 85,286 | – | 85,286 |
| Cost of Sales | 55,763 | – | 55,763 | 60,648 | – | 60,648 |
| Total Costs and Expenses | 75,478 | – | 75,478 | 80,746 | – | 80,746 |
| Earnings before provision for income taxes | 4,323 | – | 4,323 | 4,540 | – | 4,540 |
| Provision for income taxes | 1,729 | – | 1,729 | 1,988 | – | 1,988 |
| Net earnings | 2,594 | – | 2,594 | 2,552 | – | 2,552 |
| Net earnings per common share-Basic (1) | $  0.28 |  | $  0.28 | $  0.28 |  | $  0.28 |
| Net earnings per common share-Diluted (1) | $  0.26 |  | $  0.26 | $  0.26 |  | $  0.26 |
| **Year Ended March 31, 2005** |  |  |  |  |  |  |
| Sales | $133,729 | $    – | $133,729 | $117,208 | $    – | $117,208 |
| Total Revenues | 147,650 | – | 147,650 | 168,264 | – | 168,264 |
| Cost of Sales | 120,893 | – | 120,893 | 106,378 | – | 106,378 |
| Total Costs and Expenses | 144,912 | – | 144,912 | 135,166 | – | 135,166 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Earnings before provision for income taxes | 2,738 | – | 2,738 | 33,098 | – | 33,098 |
| Provision for income taxes | 1,123 | – | 1,123 | 13,656 | – | 13,656 |
| Net earnings | 1,616 | – | 1,616 | 19,442 | – | 19,442 |
| | ======== | ============= | ======== | ======== | ============= | ======== |
| Net earnings per common share-Basic (1) | $  0.18 | | $  0.18 | $  2.21 | | $  2.21 |
| | ======== | ============= | ======== | ======== | ============= | ======== |
| Net earnings per common share-Diluted (1) | $  0.17 | | $  0.17 | $  2.06 | | $  2.06 |
| | ======== | ============= | ======== | ======== | ============= | ======== |

(1) The sum of quarterly amounts may not equal the annual amount due to quarterly calculations being based on varying weighted average shares outstanding.

F-27

## 15. LEGAL SETTLEMENT

On February 7, 2005 Ariba, Inc. was found liable by a jury for willfully infringing three U.S. patents held by the Company. On February 12, 2005, the Company settled the patent-infringement suit through a mutual settlement and license agreement ("the Agreement"). The Agreement provided that the Company receive, by March 31, 2005, a total of $37 million for the license of its patents. The following table shows the line items on the Statement of Earnings that were impacted by the settlement in the quarter ended March 31, 2005.

| | |
|---|---:|
| Fee and other income | $ 37,000,000 |
| Professional and other fees | (3,060,792) |
| Salaries and benefits | (908,000) |
| Net amount realized before income taxes | $ 33,031,208 |

The increase in salaries and benefits was due to performance bonuses awarded to employees as a result of the settlement proceedings.

## 16. ACQUISITION

On May 28, 2004, ePlus purchased certain assets and assumed certain liabilities of Manchester Technologies, Inc. for total consideration of $7.0 million. The purchase was made by ePlus Technology, inc., a wholly-owned subsidiary of ePlus inc. The purchase price included $5.0 million in cash and the assumption of certain liabilities of approximately $2.0 million. Approximately 125 former Manchester Technologies, Inc. personnel were hired by ePlus as part of the transaction and are located in three established offices in metropolitan New York, South Florida and Baltimore.

The acquisition is being accounted for using the purchase method of accounting in accordance with the Statement of Financial Accounting Standards No. 141, "Business Combinations" ("SFAS 141"), whereby the total cost of the acquisition has been allocated to tangible and intangible assets acquired and the liabilities assumed based upon their fair values at the effective date of the acquisition. During the quarter ended March 31, 2005, the allocation was completed. The following table summarizes the estimated fair values of the assets acquired and liabilities assumed at the date of acquisition:

| | |
|---|---:|
| Accounts receivable | $ 939 |
| Property and equipment | 91 |
| Other assets | 41 |
| Other assets - intangible | 94 |
| Goodwill | 5,882 |
| Accrued expenses and other liabilities | (2,047) |
| Cash paid | $5,000 |

The following table reflects the results of the Company's operations on a pro-forma basis (unaudited) as if the acquisition had been completed on April 1, 2003 (in thousands, except for per-share data):

| | Pro Forma (Unaudited) Year Ended March 31, | |
|---|---:|---:|
| | 2004 | 2005 |
| Operating revenue | $ 449,466 | $ 601,605 |
| Net income | 12,069 | 25,010 |
| Net earnings per share - Basic | $1.29 | $2.81 |
| Net earnings per share - Diluted | $1.21 | $2.65 |

| | | |
|---|---|---|
| Weighted average shares outstanding - Basic | 9,332,324 | 8,898,112 |
| Weighted average shares outstanding - Diluted | 9,976,458 | 9,433,250 |

The pro-forma financial information (unaudited) is not necessarily indicative of the operating results that would have occurred had the acquisition been consummated as of the date indicated, nor are they indicative of future results.

F-28

SCHEDULE II

ePlus inc. AND SUBSIDIARIES

VALUATION AND QUALIFYING ACCOUNTS
For the years ended March 31, 2003, 2004, and 2005
(In Thousands)

| Description | Balance at beginning of period | Additions | | Deductions | Balance at end of period |
|---|---|---|---|---|---|
| | | (1) Charged to costs and expenses | Charged to other accounts | Write-offs | |
| 2005 Allowance for doubtful accounts and credit loss | $ 4,730 | $ 1,131 | ($   350) | ($   496) | $ 5,015 |
| 2004 Allowance for doubtful accounts and credit loss | $ 6,753 | $    47 | ($    12) | ($2,058) | $ 4,730 |
| 2003 Allowance for doubtful accounts and credit loss | $ 6,771 | $   616 | ($   494) | ($   140) | $ 6,753 |

S-1

                                                                    Exhibit 21

Subsidiaries of the Company
-------------------------------------

ePlus Group, inc., a Commonwealth of Virginia corporation, a wholly-owned
subsidiary

ePlus Technology, inc., a Commonwealth of Virginia corporation, a wholly-owned
subsidiary

ePlus Government, inc., a Commonwealth of Virginia corporation, a wholly-owned
subsidiary

ePlus Capital, inc., a State of Delaware corporation, a wholly-owned subsidiary

ePlus Content Services, inc., a Commonwealth of Virginia corporation, a
wholly-owned subsidiary

ePlus Systems, inc., a Commonwealth of Virginia corporation, a wholly-owned
subsidiary

ePlus Canada Company, registered in Canada, a wholly-owned subsidiary of ePlus
Capital, inc.

MLC Leasing, SA. de CV., registered in Mexico, a wholly-owned subsidiary of
ePlus Group, inc. and ePlus Technology, inc.

ePlus Document Systems, inc., a Commonwealth of Virginia corporation, a
wholly-owned subsidiary

ePlus Information Holdings, inc., a Commonwealth of Virginia corporation, a
wholly-owned subsidiary

ePlus Government Services, inc., a Commonwealth of Virginia corporation, a
wholly-owned subsidiary

Exhibit 23

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the  incorporation  by reference  in  Registration  Statement  No.
333-91909 of ePlus inc. on Form S-8 of our report dated June 29, 2005, appearing
in the  Annual  Report on Form 10-K of ePlus inc.  for the year ended  March 31,
2005.

/s/ Deloitte & Touche LLP

McLean Virginia
June 29, 2005

EXHIBIT 31.1

CERTIFICATION

I, Phillip G. Norton, certify that:

1.   I have reviewed this annual report on Form 10-K of ePlus inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of
     a material fact or omit to state a material fact necessary to make the
     statements made, in light of the circumstances under which such statements
     were made, not misleading with respect to the period covered by this
     report;

3.   Based on my knowledge, the financial statements, and other financial
     information included in this report, fairly present in all material
     respects the financial condition, results of operations and cash flows of
     the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officers and I are responsible for
     establishing and maintaining disclosure controls and procedures (as defined
     in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

     a)   Designed such disclosure controls and procedures, or caused such
          disclosure controls and procedures to be designed under our
          supervision, to ensure that material information relating to the
          registrant, including its consolidated subsidiaries, is made known to
          us by others within those entities, particularly during the period in
          which this report is being prepared;

     b)   Evaluated the effectiveness of the registrant's disclosure controls
          and procedures and presented in this report our conclusions about the
          effectiveness of the disclosure controls and procedures, as of the end
          of the period covered by this report based on such evaluation; and

     c)   Disclosed in this report any change in the registrant's internal
          control over financial reporting that occurred during the registrant's
          most recent fiscal quarter (the registrant's fourth fiscal quarter in
          the case of an annual report) that has materially affected, or is
          reasonably likely to materially affect, the registrant's internal
          control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on
     our most recent evaluation of internal control over financial reporting, to
     the registrant's auditors and the audit committee of the registrant's board
     of directors (or persons performing the equivalent functions):

     a)   All significant deficiencies and material weaknesses in the design or
          operation of internal control over financial reporting which are
          reasonably likely to adversely affect the registrant's ability to
          record, process, summarize and report financial information; and

     b)   Any fraud, whether or not material, that involves management or other
          employees who have a significant role in the registrant's internal
          control over financial reporting.

Date:  June 29, 2005


/s/ PHILLIP G. NORTON
---------------------
Phillip G. Norton
Chief Executive Officer

EXHIBIT 31.2

CERTIFICATION

I, Steven J. Mencarini, certify that:

1.  I have reviewed this annual report on Form 10-K of ePlus inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: June 29, 2005

/s/ STEVEN J. MENCARINI
-----------------------
Steven J. Mencarini
Chief Financial Officer

EXHIBIT 32

CERTIFICATION
PURSUANT TO 18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO SECTION 906 OF THE
SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of ePlus inc. (the "Company") on Form 10-K for the year ended March 31, 2005, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned hereby certify, pursuant to 18 U.S.C. section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that to the undersigned's best knowledge and belief:

(a) the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(b) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: June 29, 2005

                                    ePlus inc.
                                    ("Company")

                                    /S/ PHILLIP G. NORTON
                                    ------------------------
                                    Phillip G. Norton
                                    Chief Executive Officer

                                    /S/ STEVEN J. MENCARINI
                                    ------------------------
                                    Steven J. Mencarini
                                    Chief Financial Officer


A signed original of this written statement required by Section 906 has been provided to the Company and will be retained by the Company and furnished to the Securities and Exchange Commission or its staff upon request.

EXHIBIT 6

**FILED**

LOS ANGELES SUPERIOR COURT

OCT 11 2007

JOHN A. CLARKE, CLERK

BY ELMER SABALBURO DEPUTY

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

| | |
|---|---|
| IN RE: THQ, INC. DERIVATIVE LITIGATION | CASE NO. BC 357 600 RULING ON DEMURRER |

Hearing date: 9/11/07

Ruling date:  10/11/07

After considering the moving, opposing and reply papers and arguments made by counsel at the hearing, the court now rules as follows:

**Defendants' demurrer is OVERRULED.  Plaintiffs' and defendants' requests for judicial notice are GRANTED.**

Two plaintiffs, David Kukor and Gwyn Ramsey, bring four causes of action against nominal defendant THQ, Inc., a Delaware corporation with its principal executive offices in California, and Michael Haller, Brian Farrell, Fred Gysi, Jeffrey Lapin, Alison Locke, Tim Walsh, and Jack Sorensen, for:  1) Accounting; 2) breach of fiduciary duty; 3) unjust enrichment; and 4) rescission in connection with a stock option backdating scheme.  Ramsey filed her complaint on August 25, 2006.  Kukor filed his on December 8, 2006.  The complaints have been consolidated.

Defendants demur.

## I.    ALLEGED FACTS

The facts set forth in this order are taken from the well pleaded allegations of the Consolidated Shareholder Derivative Complaint, which the court presumes to be true for purposes of this demurrer.

Plaintiffs "were at all relevant times, shareholders of nominal defendant THQ." (Compl., ¶¶ 15, 85.)  The individual defendants served as officers and/or directors of THQ at various times from 1991 to the present.  Between 1996 and 2002 THQ granted stock options to executives and employees under a 1990 Stock Option Plan and a 1997 Stock Option Plan.  Some of the grants were approved by a Stock Option Committee, some by the board of directors, and some by a Compensation Committee.  Prior to April 1998 the stock option plans were supervised and administered by the Stock Option Committee.  After April 1998 they were supervised and administered by the Compensation Committee.

On eleven occasions between 1996 and 2002 the individual defendants (sometimes hereafter "officer defendants") received a total of 37 stock option grants.  With the exception of two grants made on January 2, 2001, to Farrell and Lapin, "each and every grant to the Officer Defendants from 1996 to 2002 was knowingly and deliberately backdated by the Stock Option Committee and the Compensation Committee with the knowledge and express approval of the other members of the Board." (Compl., ¶ 40, italics and bold typeface deleted.)  "[O]n at least 11 [sic: 10] dates, the reported grant date was incorrect, and THQ's stock price was at or near monthly lows and substantially below its monthly high.  In other words, these options were granted just after a drop in the stock price or just before a rise." (*Id.* at ¶ 41.)

Plaintiffs allege defendants colluded with one another to backdate stock options and to disseminate false financial statements and file false proxy statements to conceal the backdating.

At the time of the filing of the complaints THQ had six directors.  Plaintiffs do not allege they made pre-suit demand of these directors to seek redress for the alleged

wrongs, but rather that demand would have been futile because three of the directors,
Farrell, Burstein and Whims, are incapable of acting disinterestedly.  Plaintiffs allege
Farrell received stock option grants and Burstein and Whims made the grants and
"knowingly and deliberately backdated stock option grants" (compl., ¶ 90), and therefore
face personal liability.

## II.    CONTENTIONS

Defendants argue:  1) Plaintiffs inadequately alleged pre-suit demand futility; 2)
plaintiffs fail adequately to allege ownership of stock that would give them standing as
shareholders; 3) much of the action is time barred; 4) there are no particularized
allegations of wrongdoing; and 5) plaintiffs improperly set forth remedies as separate
causes of action.

## III.    DISCUSSION

### A.    Plaintiffs Adequately Allege that a Pre-Suit Demand Was Excused

The affairs of a corporation are managed by its directors, not its shareholders.
(*Aronson v. Lewis* (Del. 1984) 473 A.2d 805, 811.)  Therefore, a shareholder "seeking to
vindicate the interests of a corporation through a derivative suit must first demand action
from the corporation's directors" or demonstrate that demand is excused as futile.  (*In re
Silicon Graphics, Inc. Sec. Litig.* (9th Cir. 1999) 183 F.3d 970, 989.)  To allege demand
futility, a shareholder plaintiff must set forth specific facts that "create a reasonable doubt
that, as of the time the complaint is filed, the board of directors could have properly
exercised its independent and disinterested business judgment in responding to a
demand." (*Rales v. Blasband* (Del. 1993) 534 A.2d 927, 934 (*Rales*).)  Demand may be
futile where the interested and non-interested directors are evenly split. (*Beneville v.
York* (Del. Ch. 2000) 769 A.2d 80, 86.)  The inquiry is whether at least half of the board

-3-

faces a substantial likelihood of personal liability on the alleged claims. (*Rales*, at p. 934.)

1.    Farrell

Plaintiffs allege Farrell is not disinterested because he received backdated options. (Compl., ¶ 91.)

"Directorial interest exists whenever . . . a director . . . has received . . . a personal financial benefit from the challenged transaction which is not equally shared by the stockholders." (*Pogostin v. Rice* (Del. 1984) 480 A.2d 619, 624.)

Defendants argue the allegation that Farrell received backdated options is conclusory because it does not indicate when the grants were approved, who approved the backdating, or whether Farrell knew of the alleged backdating.  The argument is without merit.  Plaintiffs allege the dates on which Farrell received grants. (Compl., ¶¶ 39, 46, 48, 49, 51-54, 68, 91.)  Who approved the backdating and whether Farrell knew of it are irrelevant to whether he received a personal financial benefit from the challenged transactions.

2.    Whims and Burstein

Plaintiffs allege Whims and Burstein are not disinterested because they "knowingly and deliberately participated in and approved the backdating of option grants" and "knowingly and deliberately participated in and approved the Company's filing of false financial statements." (Compl., ¶ 91.)

"A director who approves the backdating of options faces at the very least a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violations of a shareholder-approved plan, no less) and yet satisfy his duty of loyalty." (*Ryan v. Gifford* (Del. Ch. 2007) 918 A.2d 341, 355.)

-4-

Defendants argue the allegation that Burstein and Whims "participated in and approved" the backdating of options is conclusory and has been rejected as a basis of demand futility in numerous cases. They also argue that the 1997 stock option plan permitted the compensation committee to delegate execution of option grants to THQ's senior executives, and Burstein and Whims may have so delegated the grants at issue here. The arguments are without merit.

First, plaintiffs do not allege only that Burstein and Whims "participated in and approved" the backdating of options, but also that they "knowingly and deliberately *backdated* stock option grants." (Compl., ¶ 90, italics added; see also *id*. at ¶¶ 39, 45-54, 68, 73, 88, 89, 91.) Second, the possibility that Burstein and Whims delegated execution of the option grants to THQ's executives is a speculation that contradicts well pleaded facts. Therefore, it cannot support the demurrer.

3.    Particularized Allegations of the Wrongdoing Itself

Defendants further argue plaintiffs make no particular allegations of any wrongdoing, specifically that they fail to allege how often and at what times the directors have granted stock options in the past. Defendants reason that without a broader picture that includes all stock options granted in the past, no pattern of wrongdoing can be inferred.

This argument has some merit in the abstract. It would be improper to cherry pick ten transactions, ignore other transactions, and argue the ten form a pattern. However, plaintiffs do not do this. Plaintiffs allege "100% of the discretionary grants to THQ's top executives . . . made from May 1996 to February 2002 preceded significant increases in THQ's stock price." (Compl., ¶ 3.) Plaintiffs thus allege they surveyed every grant to the officer defendants. When all transactions involving a discrete group (e.g., top executives) are examined, it is reasonable to infer that any reasonably apparent phenomenon exhibited by at least a majority of the transactions implies a pattern exists with respect to the group.

Even if a pattern can reasonably be inferred, defendants argue, the pattern here is not as plaintiffs characterize it because the gains made (or which could have been made) on allegedly backdated stock options are not as "significant" as plaintiffs allege.

According to tables included in the complaint, eight option dates preceded an immediate uptick in stock price. (See compl., ¶¶ 47-54.) Two other option dates preceded an uptick in price by only two or three days. (*Id.* at ¶¶ 45, 46.) No option date preceded a significant downturn in price. Defendants apparently invite this court to analyze the alleged transactions and determine as a matter of law whether the uptick in price immediately after each transaction was significant and whether the conglomeration of favorable grant dates forms a pattern that is "striking enough" to imply backdating.

The court is aware of no authority that would guide such an endeavor upon demurrer, and therefore refuses defendants' invitation at this time.

4.     Proof of Disinteredness

Defendants argue the board of directors demonstrated its disinterestedness by conducting an investigation into backdating in September 2006. The argument is without merit.

First, the test for disinterestedness is as of the date of the filing of the complaint. The purported investigation conducted by the board occurred after Ramsey filed her complaint on August 25, 2006. At any rate, though the adequacy and good faith of any investigation may constitute proof of disinterest, at this stage, the court is concerned with allegations, not proof. The court cannot determine as a matter of law at this time that defendants' investigation of backdating establishes their disinterest.

The court concludes plaintiffs adequately allege facts that raise a reasonable doubt as to whether a majority of board members was disinterested at the time the complaints were filed. Therefore, plaintiffs adequately allege pre-suit demand would have been futile and is therefore excused. Defendants' demurrer on this ground is overruled.

**B.    Plaintiffs Adequately Allege Standing**

Defendants object that plaintiffs do not allege their basis for standing to pursue this lawsuit.

Standing is governed exclusively by 8 Delaware Code section 327, which provides that:

> In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.

This section is to be liberally construed in situations where its primary purpose will not be frustrated thereby. (*Jones v. Taylor* (Del. Ch. 1975) 348 A.2d 188; *Brambles USA, Inc. v. Blocker* (D. Del. 1990) 731 F. Supp. 643.) "The provisions of this section are not inflexible standards, and a court of equity must examine carefully the particular circumstances of each case." (*Schreiber v. Carney* (Del. Ch. 1982) 447 A.2d 17.)

Here, plaintiffs allege they owned stock "at all relevant times." (Compl., ¶ 85.) Plaintiffs argue this allegation is insufficient as a matter of law. However, in support of the argument defendants cite only to an unpublished federal district court case, which itself cites only another an unpublished federal district court case that cites no authority supporting its conclusion. Allegation of the existence of a fact "at all relevant times" is a common practice in California pleading, and this court is aware of no California or Delaware authority that finds such pleading to be deficient. And under the authority of *Jones v. Taylor, supra*, the court is to interpret standing requirements liberally.

Therefore, defendants' demurrer on this ground is overruled.

**C.    Plaintiffs' Claims are not Facially Time Barred**

Defendants argue each of plaintiffs' claims has a 3-year limitations period (10 Del. C., § 8106), which begins to run at the time of the alleged wrongful act, even if the

plaintiffs are ignorant of their causes of action.  Defendants argue plaintiffs allege no

specific facts of fraudulent concealment or inability to discover their causes of action.

> A cause of action accrues at the moment of the wrongful act, even if the plaintiff is
> ignorant of the wrong . . . . unless some basis exists to toll the running of that
> statute. [Citation.]  The plaintiffs bear the burden of proving that tolling is
> available." [Citation.]  [¶]  Chancellor Chandler recently explained that "the
> limitations period is tolled until such time that persons of ordinary intelligence and
> prudence would have facts sufficient to put them on inquiry which, if pursued,
> would lead to the discovery of the injury." [Citation.]  The plaintiffs must
> therefore point to facts showing that they were not on inquiry notice . . . .

(*Fike v. Ruger* (Del. Ch. 1999) 754 A.2d 254, 260-261; see *Kahn v. Seaboard Corp.* (Del.

Ch. 1993) 625 A.2d 269, 275.)

"[W]here plaintiff alleges that defendants intentionally falsified public

disclosures, defendants may not rely on the statute of limitations as a defense until

plaintiff is placed on inquiry notice that such filings were fraudulent." (*Ryan v. Gifford*

(Del. Ch. 2007) 918 A.2d 341, 360; *Kahn v. Seaboard, supra*, at p. 275 ["Chancery has

long exercised a certain discretion in applying the statute of limitation in cases involving

fraud for example, even where affirmative acts of concealment have not been alleged."].)

Plaintiffs allege defendants fraudulently concealed their wrongdoing by

disseminating to shareholders and filing with the SEC annual proxy statements that

falsely reported the dates of stock option grants.  (Compl., ¶¶ 79-80.)  This allegation

suffices to indicate applicable limitations periods should be tolled.  Therefore,

defendants' demurrer on this ground is overruled.

## D.    Plaintiffs' Allegations are Sufficiently Particularized

Defendants argue the complaint lacks the specificity required under Delaware law.

Though the court recognizes that the distinctions between a conclusion and a fact,

and between an ultimate fact and an evidentiary fact, are sometimes unclear, it has found

the following to be a useful analytical guideline:  A conclusion is a theory of liability.  An

ultimate fact is that which raises an issue as to an element of a theory of liability.

Evidentiary facts are those that establish the existence of an ultimate fact. No level of particularity in pleading requires allegation of evidentiary facts. Rather, to make a particular factual allegation a plaintiff must basically state when a transaction occurred, who engaged in it, with whom, for what purpose and by what means. This is a notice requirement. As such, it is softened somewhat when pertinent facts are already known by the defendant. (See *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216.)

Plaintiffs have set forth the pertinent transactions in exhaustive detail, alleging dates of transactions, parties to them, the ramifications of each, and specific intent. The level of particularity demanded by defendants ventures into the realm of evidentiary facts and, frankly, indicates to this court that no amount of specificity would satisfy them.

The demurrer on this ground is overruled.

## E.    Plaintiffs Present Improper Causes of Action

Finally, defendants argue the causes of action for accounting, unjust enrichment and rescission of contracts granting stock options are improper because they set forth remedies, not theories of liability, and because no alleged facts justify the remedies.

The court agrees that these causes of action are actually requests for remedies rather than theories of liability, and thus constitute improper pleading. However, the court finds plaintiffs' one true cause of action, for breach of fiduciary duty, is adequately alleged, as are plaintiffs' standing and the requirements for alleging fraudulent concealment and equitable tolling. Thus the requests for accounting and restitution at least are proper. Nothing is lost by captioning these requests as causes of action and nothing gained by requiring a different format. If defendants wish to challenge plaintiffs' request for rescission they may do so by way of a motion to strike tailored specifically to that request.

Therefore, defendants' demurrer on this ground is overruled.

1    **In sum:**

2

3         **Defendants' demurrer is OVERRULED.  Plaintiffs' and defendants' requests**

4    **for judicial notice are GRANTED.**

5

6    IT IS SO ORDERED.

7

8    Dated:  10/11/07

9

10                                              Victoria Gerrard Chaney

11                                                        Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28