UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTOPHER DILORENZO, Derivatively on Behalf of EPLUS INC., | ) ) ) | Civil No. 07-CV-00144-RJL |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| PHILLIP G. NORTON, et al., | ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) | |
| EPLUS INC., a Delaware corporation, | ) ) | |
| Nominal Defendant. | ) ) | |
| | ) | |

NOTICE OF SUPPLEMENTAL AUTHORITIES IN FURTHER SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff Christopher Dilorenzo respectfully submits this Notice of Supplemental Authorities to apprise the Court of recent decisions in *In re Atmel Corp. Derivative Litig.*, No. C 06-4592 JF (HRL), 2008 WL 2561957 (N.D. Cal. June 25, 2008); *In re Affymetrix Derivative Litig.*, No. C 06-05353 JW, slip op. (N.D. Cal. Mar. 31, 2008); *Edmonds v. Getty*, 524 F. Supp. 2d 1267 (W.D. Wash. 2007); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164 (C.D. Cal. 2007) ("*Quest I*"); *Middlesex Ret. Sys. v. Quest Software, Inc.*, No. 06-6863 DOC (RNBx), slip op. (C.D. Cal. July 10, 2008) ("*Quest II*"); *Belova v. Sharp*, No. CV 07-299-MO, 2008 WL 700961 (D. Or. Mar. 13, 2008); *Weiss v. Swanson*, 948 A.2d 433 (Del. Ch. 2008); *Hall v. Children's Place Retail Stores, Inc.*, No. 07 Civ. 8252 (SAS), 2008 WL 2791526 (S.D.N.Y. July 18, 2008); and *Young v. Klaassan*, 948 A.2d 1152 (Del. Ch. 2008). Copies of these decisions are attached hereto as Exhibits 1-9.

### A.     *In re Atmel Corporation Derivative Litigation*

In *Atmel*, the court denied defendants' motion to dismiss for failure to adequately allege demand futility. 2008 WL 2561957, at *14. Using the standard for demand futility set forth in *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993), the court properly concluded the complaint's allegations were sufficient to raise a reasonable doubt as to the disinterestedness of the board of directors, and thus, excuse demand. *Atmel*, 2008 WL 2561957, at *5-*8. Citing *Conrad v. Blank*, 940 A.2d 28, 38 (Del. Ch. 2007), the court found that "a director's receipt of allegedly backdated options adequately raises a reasonable doubt as to a director's disinterestedness." *Atmel*, 2008 WL 2561957, at *6. Further, the court held that members of the compensation committee alleged to be responsible for backdating were interested because they faced a substantially likelihood of liability due to the fact that they awarded backdated options. *Id.* at *7 (citing *Ryan v. Gifford*, 918 A.2d 341, 355 (Del. Ch. 2007)).

The court also granted in part and denied in part defendants' motion to dismiss for failure to state a claim. *Id.* at *14. Specifically, the court denied defendants' motion as to the violations of §10(b),[1] breach of fiduciary duty, unjust enrichment, and corporate waste. *Id.* at *8-*13. For each claim, the court found that the same conduct establishing demand futility provided sufficient support for the allegations in plaintiffs' complaint. *Id.*

**B.     *In re Affymetrix Derivative Litigation***

In *Affymetrix*, the court denied defendants' motion to dismiss for failure to adequately allege demand futility. No. C 06-05353 JW, slip op. at 14. Similar to *Atmel*, the court found that a reasonable doubt exists as to the disinterestedness of directors who received backdated options under the *Rales* analysis. *Id.* at 12. Despite this showing of demand futility, the court held that plaintiffs failed to adequately plead continuous ownership in order to show standing. *Id.* at 13. Reasoning that this defect was curable, the court allowed plaintiffs leave to amend. *Id.* at 14.

**C.     *Edmonds v. Getty***

In *Edmonds*, the court found that demand was excused under the *Rales* test. 524 F. Supp. 2d at 1277-78. Initially, defendants attempted to dispute that backdating occurred, but the court expressly rejected their attack on the Merrill Lynch analysis for failing to state any reason why that analysis is improper. *Id.* at 1275. The court went on to reason that the plaintiff's allegations that some of the board members "accepted backdated options coupled with the allegations raising a reasonable inference that backdating occurred are sufficient to raise a reason to doubt these directors' disinterestedness and to suggest that they would have been incapable of impartially considering a demand." *Id.* at 1276. As to other board members, the court held that their approval

---

[1]     The *Atmel* court dismissed plaintiffs' §10(b) claim against one defendant because of a failure to plead specific knowledge of the backdating scheme. The court allowed plaintiffs leave to amend this claim.

of backdated options subjected them to a substantial likelihood of liability and raised a reasonable doubt as to their disinterestedness as well. *Id.*

### D.   *Quest I* and *Quest II*

In *Quest I*, the court allowed plaintiff's §10(b) claims against all but one of the defendants to proceed. 527 F. Supp. 2d at 1196. The court held that the complaint adequately alleged scienter because the "extremely fortunate dates give rise to a strong inference that backdating has occurred and that it was done intentionally." *Id.* at 1182. The court stated further that "[t]he fact that none of the option grant dates resulted in less-than-favorable results for Defendants also gives rise to a strong suggestion that the improper dating of options was intentional." *Id.* As for defendants' knowledge that backdating would have a material effect on the financial reports, the court reasoned that such a significant expense is "clearly material . . . regardless of whether it is compared to the overall market capitalization of the company or the company's annual net income." *Id.* at 1189. The court also explained that although the complaint did not set forth the unreported compensation for each individual year, "the magnitude of the unreported compensation expense, combined with the aforementioned Defendants' presence at the company during the time the unreported expense was accruing supports an inference of scienter." *Id.* In sum, the court concluded that:

> Given the extremely beneficial option grant dates, the Individual Defendants' respective executive positions in the Company, and the substantial number of shares awarded to the various Defendants during and before the Class Period, the Court finds that Plaintiff has sufficiently pled a "strong inference" that Defendants knew or were deliberately reckless in not knowing that the purported option grant dates were improper.

*Id.* at 1182.

In lieu of the court's decision in *Quest I* to dismiss plaintiff's §20A claims, plaintiff filed a second amended complaint. *Id.* at 1197. In *Quest II*, the court considered whether plaintiff had adequately pleaded scienter as to the misleading SEC filings. No. CV 06-6863 DOC (RNBx), slip op. at 6. The court concluded that the second amended complaint did "give rise to a strong inference

that Defendants knew, or were deliberately reckless in not knowing," that the filings were misleading. *Id.* To support this conclusion, the court reasoned that defendants' knowledge of the backdated options and the profits from those options made them "also aware that the financial statements they submitted to the SEC included figures, which were based in part, on those backdated options." *Id.* at 7. From this, the court held that "it is highly implausible that Defendants were not aware that their prolonged practice of backdating stock options would have a material and misleading effect on their public financial statements." *Id.* Further, the court found that defendants' significant violations of GAAP, knowledge of the stock incentive plan setting forth the proper options-granting practice, and initial denial of wrongdoing all supported a strong inference of scienter sufficient for a §10(b) claim. *Id.* at 7-9.

### E.   *Belova v. Sharp*

The court in *Belova* ultimately dismissed the plaintiffs' action for lack of standing. 2008 WL 700961, at *1. Despite this ruling, the court examined the remaining arguments contained in defendants' motions to dismiss and found that, with proper allegations of standing, the plaintiffs' claims would survive. *Id.* at *12. Specifically, the allegations of backdating were sufficient to support claims based on §10(b), §14(a), breach of fiduciary duties, corporate waste and unjust enrichment. *Id*. at *7-*10. The court also held that plaintiffs adequately plead demand futility by alleging that a majority of the board received backdated options. *Id.* at *11 (citing *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1002-03 (N.D. Cal. 2007)).

### F.   *Weiss v. Swanson*

Although *Weiss* involved "spring-loaded" and "bullet-dodged" options, the court's discussion is applicable to backdated options as well. 948 A.2d at 439. The court correctly found that demand was excused under the *Aronson* test because a majority of the board had received the challenged option grants. *Id.* at 441. Additionally, the court held that a reasonable doubt existed that the board's decisions were the result of a valid exercise of business judgment where "the directors

intended to violate the terms of stockholder-approved option plans." *Id.* The court also properly denied defendants' motion to dismiss as to plaintiff's claims for breach of fiduciary duty, unjust enrichment, and waste of corporate assets. *Id.* at 448-50. Significantly, the court found allegations that defendants who received options knew or should have known that the grants violated option plans were proper under the liberal pleading requirements of state claims. *Id.* at 449. Regarding plaintiff's unjust enrichment claim, the court reasoned that even unexercised options constituted unjust enrichment and "the court may still be able to fashion an appropriate remedy, such as repricing or rescinding the options." *Id.* at 450. The court further stated that options granted in violation of stockholder-approved option plans could be considered corporate waste since the options were "approved without any valid corporate purpose." *Id.*

## G. *Hall v. Children's Place Retail Stores, Inc.*

In *Hall*, the court denied defendants' motion to dismiss for failure to state a claim finding that the allegations in plaintiffs' complaint were sufficient to support a §10(b) claim. 2008 WL 2791526, at *1. Specifically, the admitted backdating scheme provided adequate support to plead falsity, scienter, and loss causation. *Id.* at *8-*11. Further, the court stated that defendants, as evidenced by their positions and certification of financial statements, "knew or had access to information showing that stock options had been backdated," and thus, plaintiffs had alleged facts giving rise to a reasonable inference of scienter. *Id.* at *9-*11.

## H. *Young v. Klaassan*

*Young* represents an emerging practice in backdating cases where plaintiffs are allowed access to special committee reports because defendants, in their dismissal briefs, relied on the findings of a committee authorized to investigate a company's options granting practices. 948 A.2d

at 1153-54.  The court held, as it has in the past,[2] that plaintiffs are entitled to limited discovery of "any documents that relate to the special committee' [sic] findings" where defendants have relied on those findings for their truth.  *Id.* at 1156.  The court reasoned that when defendants present documents in support of their motion, the proceeding is converted to a Rule 56 motion for summary judgment and plaintiffs must be allowed an opportunity for discovery regarding those documents. *Id.*

Plaintiff has alleged wrongdoing at ePlus Inc. nearly identical to that which occurred in the cases cited above:  the backdating of stock option grants followed by systematic attempts to hide such grants by repeatedly filing false and misleading shareholder reports and financial results with the SEC.  Plaintiff has also alleged demand futility under significantly similar circumstances as the cases cited above:  directors who granted and received backdated options.  In light of these recent authorities, and for all the reasons previously argued to the Court, plaintiff respectfully requests that this Court deny defendants' motion to dismiss.

DATED:  July 29, 2008                    CUNEO GILBERT & LaDUCA, LLP
                                         JONATHAN W. CUNEO (DC Bar # 939389)
                                         WILLIAM H. ANDERSON (DC Bar # 502380)


                                         s/ William H. Anderson
                                         WILLIAM H. ANDERSON

                                         507 C Street, N.E.
                                         Washington, DC  20002
                                         Telephone:  202/789-3960
                                         202/789-0489 (fax)

---

[2]     The court relied heavily upon its previous decision in *Fleischman v. Huang*, No. Civ.A.2497-CC, 2007 WL 2410386 (Del. Ch. Aug. 22, 2007).  There, the defendants "relied not upon the existence of the Audit Committee's Report, but upon its truth."  *Id.* at *1.  Defendants specifically asserted that "the complaint should fail because it did not address the ***findings*** of the Audit Committee."  *Id.* at *3 (emphasis in original).  The court found these findings to be in dispute, and thus, subject to limited discovery when relied upon by defendants.  *Id.*

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Avenue, NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
TRAVIS E. DOWNS III
KATHLEEN A. HERKENHOFF
BENNY C. GOODMAN III
MARY LYNNE CALKINS
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
AELISH M. BAIG
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Attorneys for Plaintiff

S:\CasesSD\Eplus Derivative\NOT00052987-Supp.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 29, 2008.

<u>s/ William H. Anderson</u>
WILLIAM H. ANDERSON

CUNEO GILBERT & LaDUCA, LLP
507 C Street, N.E.
Washington, DC 20002
Telephone: 202/789-3960
202/789-0489 (fax)
E-mail: wanderson@cuneolaw.com

# Mailing Information for a Case 1:07-cv-00144-RJL

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **William H. Anderson**
  wanderson@cuneolaw.com

- **Jonathan Watson Cuneo**
  jonc@cuneolaw.com

- **Jason J. Mendro**
  jmendro@gibsondunn.com

- **Francis Joseph Warin**
  fwarin@gibsondunn.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`

EXHIBIT 1

Slip Copy                                                                 Page 1

Slip Copy, 2008 WL 2561957 (N.D.Cal.), Fed. Sec. L. Rep. P 94,761
**2008 WL 2561957 (N.D.Cal.)**

H

In re Atmel Corp. Derivative Litigation
N.D.Cal.,2008.
Only the Westlaw citation is currently available.NOT
FOR CITATION
United States District Court, N.D. California,
San Jose Division.
In re ATMEL CORPORATION DERIVATIVE LITIG-
ATION.
**No. C 06-4592 JF (HRL).**

June 25, 2008.

Jessica Koren Nall, John L. Cooper, Farella Braun &
Martel LLP, San Francisco, CA, Brian Lawrence
Levine, Brian Lawrence Levine, Darryl Paul Rains,
Morrison & Foerster LLP, Palo Alto, CA, Todd L. Burl-
ingame, Morrison & Foerster LLP, Walnut Creek, CA,
James Lawrence Pagano, Law Offices of James L. Pa-
gano, San Jose, CA, Erin L. Bansal, Orrick, Karen Julie
Stambaugh, Michael David Torpey, Orrick Herrington
& Sutcliffe LLP, San Francisco, CA, W. Reece Bader,
Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA,
for Defendant.

Alan Roth Plutzik, Schiffrin Barroway Topaz &
Kessler, LLP, Walnut Creek, California, Kathryn Anne
Schofield, Bramson, Plutzik, Mahler & Birkhaeuser,
LLP, Walnut Creek, California, Marisa C. Livesay,
Rachele R. Rickert, Francis M. Gregorek, Rachele R.
Rickert, Betsy Carol Manifold, Francis M. Gregorek,
Wolf Haldenstein Adler Freeman & Herz LLP, San
Diego, California, Nichole T. Browning, for Movant.

ORDER [FN1] GRANTING IN PART AND DENYING
IN PART MOTIONS TO DISMISS FOR (1)FAILURE
TO COMPLY WITH FED. R. CIV. PRO. 23.1; AND
(2) FAILURE TO STATE A CLAIM UPON WHICH
RELIEF MAY BE GRANTED

FN1. This disposition is not designated for
publication and may not be cited.JEREMY FO-
GEL, District Judge.

**1. Procedural Background**

## I. BACKGROUND

*1 On July 27, 2006, Plaintiff James Juengling
("Juengling") filed a shareholder derivative complaint
against a number of the directors and officers of nomin-
al Defendant Atmel Corporation ("Atmel"). The com-
plaint alleged improper backdating of stock options and
asserted claims for: (1) breach of fiduciary duty; (2) vio-
lation of Section 10(b) of the Securities Exchange Act
and Rule 10b-5 promulgated thereunder; and (3) restitu-
tion/unjust enrichment. On October 4, 2006, the Court
consolidated the Juengling action with two other deriv-
ative actions [FN2] and appointed a leadership structure
for the consolidated action ("Plaintiffs").

> FN2. The plaintiff in *Noble v. Perlegos, et al.,*
> Case No. C 06-4973 JF brought claims for: (1)
> violation of Section 14(a) of the Exchange Act;
> (2) breach of fiduciary duty; (3) gross misman-
> agement; (4) waste of corporate assets; and (5)
> unjust enrichment and breach of the duty of
> loyalty.
>
> The plaintiff in *Kelley v. Perlegos, et al.,*
> Case No. C 06-4680 JF brought claims for:
> (1) breach of fiduciary duty; (2) violation of
> Section 10(b) of the Securities Exchange Act
> and Rule 10b-5 promulgated thereunder; and
> (3) restitution/unjust enrichment.

On November 3, 2006, Plaintiffs filed a consolidated
complaint which named eighteen individual defendants
("the Individual Defendants") who served as officers or
directors of Atmel. The consolidated complaint separ-
ated the Individual Defendants into two categories: the
"Option Recipient Defendants" (Gust Perlegos, Tsung-
Ching Wu ("Wu"), Kris Chellam ("Chellam"), Jack
Peckham ("Peckham"), Donald Colvin ("Colvin"),
Mike Sisois ("Sisois"), B. Jeffrey Katz ("Katz"), Fran-
cis Barton ("Barton"), Graham Turner ("Turner"), Bern-
ard Pruniaux ("Pruniaux"), and Steven Schumann
("Schumann")) and the "Director Defendants" (George
Perlegos, T. Peter Thomas ("Thomas"), Chaiho Kim

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

("Kim"), Pierre Fougere ("Fougere"), Norman Hall ("Hall"), David Sugishita ("Sugishita"), and Steven Laub ("Laub")). The consolidated complaint asserted eleven claims: (1) violation of § 10(b) and Rule 10b-5 of the Securities and Exchange Act (against the Individual Defendants); (2) violations of § 14(a) of the Securities Exchange Act (against the Individual Defendants); (3) violations of § 20(a) of the Securities Exchange Act (against Chellam, Barton, Wu and the Director Defendants); (4) accounting (against the Individual Defendants); (5) breach of fiduciary duty and/or aiding and abetting (against the Individual Defendants); (6) unjust enrichment (against the Option Recipient Defendants); (7) rescission (against the Option Recipient Defendants); (8) constructive fraud (against the Individual Defendants); (9) corporate waste (against the Individual Defendants); (10) breach of contract (against the Option Recipient Defendants); and (11) violation of California Corporations Code § 25402 (against the Individual Defendants, with the exception of Barton, Fougere, Kim, Laub and Sugishita). No demand was made upon Atmel's Board of Directors (the "Board") pursuant to Fed. R. Civ. Pro. 23.1. Plaintiffs alleged that such a demand would be futile.

On January 29, 2007, fifteen of the Individual Defendants filed a joint motion to dismiss for failure to state a claim upon which relief may be granted ("the Barton Motion"). Defendants Gust Perlegos and George Perlegos moved separately to dismiss and joined the Barton Motion with a limited exception ("Perlegos Motion"). Atmel also moved to dismiss for failure to make a demand ("Atmel Motion"). On January 30, 2007, Defendant Sisois moved to dismiss, joining the Barton Motion with limited exceptions ("Sisois Motion"). Plaintiffs filed an omnibus opposition to the four motions to dismiss.

**\*2** On July 16, 2007, the Court dismissed the consolidated complaint with leave to amend. The Court concluded that: Plaintiffs had not pled section 10(b) and Rule 10b-5 violations with the particularity required under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Specifically, it concluded that the consolidated complaint did not identify the roles each

defendant played in the alleged backdating scheme, nor did it allege facts giving rise to a strong inference of scienter on the part of each defendant.

The Court also concluded that Plaintiffs' section 14(a) claim was untimely because it was based on alleged false statements made more than three years prior to the filing of the original action. Accordingly, it held that any amended Section 14(a) claim must allege wrongful acts that occurred on or after July 27, 2003 and not later than one year after discovery of the violation. It advised Plaintiffs that greater specificity likely would strengthen the Section 14(a) claim considerably. Plaintiffs' Section 20(a) claim was dismissed for failure to state a predicate violation.

The Court concluded that Plaintiffs did not plead their fifth claim for breach of fiduciary duty with sufficient particularity, and that Plaintiffs' pleadings did not put the Individual Defendants, particularly the non-officer defendants, on notice as to how they were alleged to have violated their fiduciary duties. With respect to Plaintiffs' fourth and seventh claims, the Court held that Plaintiffs should identify accounting and rescission as remedies rather than as claims for relief, and dismissed Plaintiffs' constructive fraud claim, directing that the claim be restated as part of Plaintiffs' claim for breach of fiduciary duty. The Court also dismissed Plaintiffs' corporate waste claim, finding that Plaintiffs had failed to allege that the transaction at issue either served no purpose or was so completely bereft of consideration that it amounted to aa gift of corporate funds. It dismissed Plaintiffs' claim for breach of contract because Plaintiffs failed to allege which, if any, of the defendants entered into a binding contract that incorporated the terms of an option plan. Finally, the Court concluded that those portions of Plaintiffs' insider trading claims based on alleged sales prior to July 27, 2001 were time-barred and that none of the insider trading claims was pled with sufficient particularity. The Court held that all other state law claims were timely. Having thus dismissed all of the substantive claims in the consolidated complaint, the Court did not reach the issue of demand.

On August 21, 2007, Plaintiffs filed an Amended Con-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 2561957 (N.D.Cal.), Fed. Sec. L. Rep. P 94,761

**2008 WL 2561957 (N.D.Cal.)**

solidated Shareholder Derivative Complaint ("Amended Complaint"). The Amended Complaint, which contains more than 200 paragraphs of amended allegations, asserts claims against all of the Individual Defendants named in the consolidated complaint with the exception of Laub and Sugishita, who no longer are named. The Amended Complaint also adds one new Defendant, J. Michael Ross ("Ross"). The Amended Complaint asserts nine claims: (1) violation of § 10(b) and Rule 10b-5 of the Securities and Exchange Act (against George Perlegos, Gust Perlegos, Chellam, Ross, Hall, Thomas, Fougere, and Kim); (2) violations of § 14(a) of the Securities Exchange Act (against George Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere and Kim); (3) violations of § 20(a) of the Securities Exchange Act (against George Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere and Kim); (4) breach of fiduciary duty and/or aiding and abetting (against George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim); (5) unjust enrichment (against Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann); (6) constructive fraud (against George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim); (7) corporate waste (against all Individual Defendants); (8) breach of contract (against Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann); and (9) violation of California Corporation Code § 25402 (against Chellam, Hall, Gust Perlegos, George Perlegos and Thomas).

**\*3** Defendants have filed four new motions to dismiss: (1) George and Gust Perlegos move to dismiss for failure to state a claim upon which relief may be granted ("Perlegos' Motion"); (2) Individual Defendant Mike Sisois moves to dismiss for failure to state a claim upon which relief may be granted ("Sisois Motion"); (3) Individual Defendant J. Michael Ross moves to dismiss the amended complaint for failure to state a claim upon which relief may be granted ("Ross Motion"); and (4) Atmel moves to dismiss for failure to comply with the demand requirement pursuant to Fed. R. Civ. Pro. 23.1 ("Atmel Motion").

**2. Factual Background**

The Amended Complaint alleges that the Individual Defendants had the following relationships with Atmel:

| Defendant | Role with Atmel |
| --- | --- |
| George Perlegos | President, CEO,[3] & director from Atmel's inception in 1984 to August 2006. |
| Gust Perlegos | Executive VP Office of the President, 2001 to August 2006. |
| | Director, January 1985 to August 2006. |
| | Executive VP & GM, January 1996 to 2001. |
| | VP, GM January 1985 to January 1996. |
| Thomas | Director since December 1987. |
| | Member of the Compensation Committee & the Audit Committee since at least 1996. |
| Kim | Director & member of the Audit Committee since September 2002. |
| | Member of the Compensation Committee from September 2002 through 2003. |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 2561957 (N.D.Cal.), Fed. Sec. L. Rep. P 94,761

**2008 WL 2561957 (N.D.Cal.)**

| | |
|---|---|
| Fougere | Director, member of the Audit Committee, & member of the Compensation Committee since February 2001. |
| Hall | Director from August 1992 until in or about 2005. |
| | Member of the Compensation Committee from 1997 to 2004, & member of the Audit Committee from 1997 to 2003. |
| Wu | Executive VP, Office of the President since 2001. |
| | Director since 1985. |
| | Executive VP & GM, January 1996 to 2001. |
| | VP, Technology, January 1986 to January 1996. |
| Chellam | VP, Finance Administration, & CFO, September 1991 to July 1998. |
| Peckham | GM, ASIC Operations, January 1992 to 1998. |
| | VP, Sales, January 1986 to January 1992. |
| | Director of Sales, June 1985 to January 1986. |
| Colvin | VP, Finance, & CFO March 1998 to January 2003. |
| | CFO, Atmel Rousset S.A.1995 to 1998. |
| Sisois | VP, Planning & Information Systems, 1986 to August 2006. |
| | Director of Information Systems, February 1985 to 1986. |
| Katz | VP, Marketing, November 1998 to about 2005. |
| Barton | Executive VP & CFO, May 2003 to July 2005. |
| Turner | VP and GM, Microcontroller Segment since October 2001. |
| | Served in various positions since he joined the Company in 1989, including VP of European Operations from 1993 to October 2001. |
| Pruniaux | VP and GM, ASIC Segment since November 2001. |
| | CEO of Atmel Rousset S.A., May 1995 to November 2001. |
| Schumann | VP and GM, Non-Volatile Memory Segment since January 2002. |
| | Served in various positions since he joined the Company in 1985, including VP of Non-Volatile Memory Products from February 1996 to January 2002. |
| Ross | General Counsel from 1989 to August 2006. |
| | VP, General Counsel and Assistant Secretary until August 2006. |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 2561957 (N.D.Cal.), Fed. Sec. L. Rep. P 94,761
**2008 WL 2561957 (N.D.Cal.)**

FN3. CEO refers to Chief Executive Officer, CFO refers to Chief Financial Officer, VP refers to Vice President, and GM refers to General Manager.

**\*4** As summarized below, the Amended Complaint al-

leges that the Individual Defendants received thirty backdated option grants on fourteen separate dates:

| Recipient | Purported Grant Date | Shares | Share Price |
|---|---|---|---|
| Gust Perlegos | February 22, 1995 | 320,000 | $3.8516 |
| April 11, 1997 | 40,000 | $6.0938 | |
| | February 14, 2002 | 100,000 | $7.69 |
| | November 14, 2002 | 50,000 | $2.11 |
| Wu | February 22, 1995 | 320,000 | $3.8516 |
| | April 11, 1997 | 40,000 | $6.0938 |
| | February 14, 2002 | 100,000 | $7.69 |
| | November 14, 2002 | 100,000 | $2.11 |
| Chellam | February 4, 1994 | 128,000 | $2.29 |
| | February 22, 1995 | 80,000 | $3.8516 |
| | April 11, 1997 | 40,000 | $6.0938 |
| Peckham | February 4, 1994 | 160,000 | $2.29 |
| | February 22, 1995 | 80,000 | $3.8516 |
| | April 11, 1997 | 40,000 | $6.0938 |
| Colvin | February 12, 1999 | 20,000 | $3.6719 |
| | July 16, 1999 | 40,000 | $7.8281 |
| | November 17, 2000 | 40,000 | $12.125 |
| | September 17, 2001 | 100,000 | $7.12 |
| | November 14, 2002 | 50,000 | $2.11 |
| Sisois | June 11, 1999 | 40,000 | $5.9063 |
| | July 11, 2002 | 30,000 | $5.13 |
| | November 14, 2002 | 40,000 | $2.11 |
| Katz | July 16, 1999 | 10,000 | $7.8281 |
| Barton | April 30, 2003 | 500,000 | $1.81 |
| Turner | February 4, 1994 | 160,000 | $2.29 |
| | October 9, 1998 | 100,000 | $1.9844 |
| | July 16, 1999 | 40,000 | $7.8281 |
| Pruniaux | October 9, 1998 | 200,000 | $1.9844 |
| Schumann | February 22, 1994 | 192,000 | $3.8516 |
| | October 9, 1998 | 192,000 | $1.9844 |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 2561957 (N.D.Cal.), Fed. Sec. L. Rep. P 94,761
**2008 WL 2561957 (N.D.Cal.)**

The Amended Complaint also alleges the following. Between 1994 and 2006, Atmel adopted three stock option plans that were in effect at separate times-the 1986 Incentive Stock Option Plan, the 1996 Stock Plan and the 2005 Stock Plan (collectively, "the Plans"). The Individual Defendants violated the terms of the Plans by knowingly and deliberately backdating grants of stock options, making it appear as though the grants were made on dates when the market price of Atmel stock was lower than the market price on the actual grant date. The Individual Defendants also represented in proxy statements that the stock option grants carried an exercise price that was equal to the fair market value on the date of the grant.

On October 30, 2006, Atmel issued a press release reporting the preliminary conclusions of an Audit Committee responsible for investigating suspicions of backdating. The press release stated that "the actual measurement dates for certain stock options differed from the recorded measurement dates for such stock options" and that consequently, Atmel's prior financial statements were not reliable. On April 30, 2007, the Audit Committee issued a second press release reporting further findings of the investigation. The Audit Committee found that 93 of 112 stock option grants during the period from January 1, 1997 through August 3, 2006 included some options that were not issued on the date set forth in the company's stock option records. On May 1, 2007, Atmel announced that "[a]s a result of the measurement date errors identified in the Audit Committee's investigation, [Atmel] has determined that material stock-based compensation adjustments are required for measurement date errors in the period beginning in 1993 and continuing through January 2004."On June 8, 2007, Atmel filed its fiscal 2006 financial statements, stating that "[u]pon completion of that investigation, [Atmel] recorded additional aggregate non-cash stock-based compensation expenses for the period from 1993 through 2005, excluding payroll and income tax adjustments, of approximately $116 million."

## II. DISCUSSION

### 1. Demand Futility

**\*5** A derivative complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort."Fed.R.Civ.P. 23.1. The existence and satisfaction of a demand requirement is a substantive issue governed by state law.[FN4] *See Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 96-97, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). When the challenged decision is that of the board in place at the time of the filing of the complaint, failure to make demand may be excused if a plaintiff can raise a reason to doubt that a majority of the board is disinterested or independent or that the challenged acts were the product of the board's valid exercise of business judgment.*Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984); *see also Ryan v. Gifford,* 918 A.2d 341, 352 (Del.Ch.2007) (discussing *Aronson* ). However, "[w]here there is no conscious decision by the corporate board of directors to act or refrain from acting, the business judgment rule has no application."*Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993); *see also Ryan,* 918 A.2d at 352 (discussing *Rales* ). In such a situation, demand may be excused only if a plaintiff "can create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."*Id.* at 353 (citing *Rales,* 634 A.3d 933-34).

> FN4. The parties agree that Delaware law applies to the instant action because Ditech is incorporated in Delaware.

The parties dispute which board of directors should be examined for the purpose of determining demand futility. Atmel argues that Plaintiffs must establish a reasonable doubt that the board of directors in place on August 21, 2007, the filing date of the Amended Complaint, could have satisfied the *Rales* standard. Plaintiffs, on the other hand, argue that the *Rales* inquiry should be directed at the board that existed on July 27, 2006, when the original complaint in this action was filed.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 2561957 (N.D.Cal.), Fed. Sec. L. Rep. P 94,761
**2008 WL 2561957 (N.D.Cal.)**

Under Delaware law, plaintiffs generally are not required to make demand or re-plead futility after an action has commenced:

> When claims have been properly laid before the court and are in litigation, neither Rule 23.1 nor the policy it implements requires that a court decline to permit further litigation of those claims upon the replacement of the interested board with a disinterested one .... Such a change in control does not require a derivative plaintiff to present a demand to the new board, or to allege facts that would excuse demand as of the time a plaintiff elects to amend his pleadings.

*Harris v. Carter,* 582 A.2d 222, 231 (Del.Ch.1990). However, in *Braddock v. Zimmerman,* 906 A.2d 776 (Del.2006), the Supreme Court of Delaware recognized the following exception:

> [W]hen an amended derivative complaint is filed, the existence of a new independent board of directors is relevant to a Rule 23.1 demand inquiry only as to derivative claims in the amended complaint that are not already validly in litigation. Three circumstances must exist to excuse a plaintiff form making demand under Rule 23.1 when a complaint is amended after a new board of directors is in place: first the original complaint was well pleaded as a derivative action; second, the original complaint satisfied the legal test for demand excusal; and third, the act or transaction complained of in the amendment is essentially the same as the act or transaction challenged in the original complaint....

> **\*6** A complaint that is dismissed without prejudice but with express leave to amend is nevertheless a dismissed complaint. It constitutes a judicial determination that the original complaint was either not well pleaded as a derivative action or did not satisfied the legal test for demand excusal. Following such a dismissal, for purposes of a Rule 23.1 demand inquiry, the complaint is not validly in litigation.

*Id.* at 786.

Plaintiffs seek to distinguish *Braddock* on the basis that the original complaint in that case was dismissed for

failure to make demand, while in the instant case the Court dismissed Plaintiff's original complaint for failure to state a claim and deferred the issue of demand futility. The thrust of Plaintiff's argument is that a claim is not "validly in litigation" under *Braddock*'s first exception *only* if it was not well pleaded *as a derivative* claim, meaning a claim that otherwise is insufficiently pleaded remains validly in litigation. This is consistent with language in *Braddock* recognizing that it is not necessary to make demand or re-plead futility when a complaint is amended to add new facts relating to the acts or transactions alleged in the original pleading. *Id.* at 785 ("[A]n amendment or supplement to a complaint that elaborates upon facts relating to acts or transactions alleged in the original pleading, or asserts new legal theories of recovery based upon the acts or transactions that formed the substance of the original pleading, would not ... constitute a matter that would require a derivative plaintiff to bring any part of an amended or supplemental complaint to the board prior to filing ."). Accordingly, the Court will evaluate the futility of making demand on the board in place at the time the initial complaint was filed. That board consisted of eight members: George and Gust Perlegos, Wu, Fougere, Thomas, Kim, Sugishita and Laub.

Under Delaware law, courts may base a finding of reasonable doubt regarding disinterestedness on two types of allegations. First, "[d]irector interest exists whenever divided loyalties are present, or a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally share by the stockholders."*Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984) (citing *Aronson,* 473 A.2d at 812). Second, a plaintiff may plead specific facts showing that "the directors face a 'substantial likelihood' of personal liability, [so that] their ability to consider a demand impartially is compromised."*Ratter v. Bidzos,* No. Civ. A. 19700, 2003 WL 22284323 at *12 (Del.Ch. Oct.7, 2003).

Plaintiffs assert that Gust Perlegos and Wu are interested because they received backdated options. The Delaware Chancery Court has held that a director's receipt of allegedly backdated options adequately raises a

Slip Copy, 2008 WL 2561957 (N.D.Cal.), Fed. Sec. L. Rep. P 94,761
**2008 WL 2561957 (N.D.Cal.)**

reasonable doubt as to a director's disinterestedness because such directors "have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue their current holding or cause them to disgorge improperly obtained profits. This creates an unacceptable conflict that restricts them from evaluating the litigation properly."*Conrad v. Blank,* No. 2611-VCL, 2007 Del. Ch. LEXIS 130 at *24 (Del. Ch. Ct. Aug. 2, 2007). Plaintiffs have alleged that Gust Perlegos and Wu received 510,000 and 560,000 backdated stock options respectively, which provided them with a benefit that was not equally shared with Atmel shareholders. These allegations are sufficient to raise a reasonable doubt as to their disinterestedness.

**\*7** Plaintiffs contend further that Thomas, Kim and Fougere face a substantial likelihood of liability for approving backdated options. The Amended Complaint alleges that as members of the compensation committee, Thomas, Kim and Fougere were responsible for backdating because they "had the sole authority to choose the date and, in fact, did choose the date on which these stock options were granted," Amended Complaint ¶ 136, and further, that these defendants knew that the Plans required options to be priced at fair market value and intentionally violated those plans by approving backdated options. *Id.* at ¶¶ 100, 136-84.In *Ryan,* the Delaware Chancery Court considered the question of whether, for the purpose of determining demand futility, these same allegations were sufficient to establish that the defendants knowingly participated in a backdating scheme. The court found that these allegations established a substantial likelihood of liability. The court explained:

> It is difficult to understand how a plaintiff can allege that directors backdated options without simultaneously alleging that such directors knew that the options were being backdated. After all, any grant of options had to have been approved by the compensation committee, and that compensation committee can be reasonably expected to know that date of the options as well as the date on which they actually approve the grant.

*Ryan,* 918 A.2d at 335. In *Conrad,* the court applied this

reasoning to similar allegations and concluded that "for the purpose of the *Rales* analysis, the allegations of the complaint are sufficient to excuse demand on the members of the compensation committee, since they raise ... a reasonable inference the compensation committee members acted knowingly in awarding options priced at dates other than the actual dates of the grant."*Conrad,* 2007 Del. Ch. LEXIS 130 at * 30.

Atmel urges this Court to follow *Desimone v. Barrows,* 924 A.2d 908 (Del. Ch. Ct.2007). The court in *Desimone* posited several scenarios regarding a hypothetical compensation committee's approval of stock options, including a scenario in which a compensation committee approved a backdated option but did not know that doing so violated the terms of the applicable stock option plan. In contrast to its counterparts in *Ryan* and *Conrad,* the court in *Desimone* concluded that exclusive authority coupled with knowledge of the terms of the option agreement was not necessarily sufficient to establish liability. Instead, the court concluded only that this scenario presented "interesting questions about the culpability the compensation committee members have for harm caused to the corporation by the option grants."*Id.* at 933.

Atmel argues that *Desimone* precludes a finding that Plaintiffs have satisfied the demand futility pleading requirement. However, *Desimone* does not go so far as to hold that the allegations plead in *Ryan* are insufficient to establish demand futility. *Desimone* involved allegations distinguishable from those involved in *Ryan* and in the present case. As the court observed:

> **\*8** This case presents a different question than those involved in *Ryan*... which is whether corporate officials breached their fiduciary duties when they, despite having a express permission under stockholder-approved option plan to grant below-market options, represent to shareholders, markets and regulatory authorities that they are granting fair-market-value options when in fact they are secretly manipulating the exercise price of the option.

*Id.* at 908.Having considered all of the relevant authorities, this Court is satisfied that Plaintiffs have raised a

Slip Copy
Slip Copy, 2008 WL 2561957 (N.D.Cal.), Fed. Sec. L. Rep. P 94,761
**2008 WL 2561957 (N.D.Cal.)**

reasonable doubt as to whether Thomas, Kim and Fougere were disinterested.

### 2. Motions to Dismiss

For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Department of Corrections,* 66 F.3d 245, 248 (9th Cir.1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp,* 90 F.3d 386, 393 (9th Cir.1996). On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *North Star International v. Arizona Corporation Commission,* 720 F.2d 578, 581 (9th Cir.1983); *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986); *Beliveau v. Caras,* 873 F.Supp. 1393, 1395 (C.D.Cal.1995). However, under the "incorporation by reference" doctrine, the Court also may consider documents that are referenced extensively in the complaint and are accepted by all parties as authentic, even though the documents are not physically attached to the complaint. *In re Silicon Graphics, Inc. Securities Litigation,* 183 F.3d 970 (9th Cir.1999).

### a. Claim One: Violation of Section 10(b) and Rule 10b-5

Section 10(b) makes it unlawful

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person to use interstate commerce

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**\*9** 17 C.F.R. § 240.10b-5. In cases involving publicly-traded securities and purchases or sales in public securities markets, the elements of an action under Section 10(b) and Rule 10b-5 are: (1) 13 a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

Plaintiffs must meet two heightened pleading standards. Fed.R.Civ.P. 9(b) requires that "the circumstances constituting fraud ... be stated with particularity." The Ninth Circuit has explained that a "plaintiff must include statements regarding the time, place, and nature of the alleged fraudulent activities, and that mere conclusory allegations of fraud are insufficient." *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994). A plaintiff asserting fraud "must set forth an explanation as to why the statement or omission complained of was false or misleading." *Id.* (internal quotation marks omitted); *see also Yourish v. California Amplifier,* 191 F.3d 983, 992-93 (9th Cir.1999). The Private Securities Litigation Reform Act ("PSLRA") raises the pleading standard further:

> (1) Misleading statements and omissions

> In any private action arising under this chapter in which the plaintiff alleges that the defendant-

> (A) made an untrue statement of a material fact; or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4b(1)-(2).

### i. Compensation Committee Members

"[T]he pleading standard [that applies to a motion to dismiss] does not reach so high a bar as Rule 23.1."*Ryan*, 918 A.2d at 357.Accordingly, courts have held that where a plaintiff has alleged facts sufficient to prove demand futility they have also satisfied the burden under Rule 12(b)(6).*Id.* ("[W]here plaintiff alleges particularized facts sufficient to prove demand futility ... that plaintiff *a fortiori* rebuts the business judgment rule for the purpose of surviving a motion to dismiss pursuant to Rule 12(b)(6)."). For the reasons set forth above, the Court concludes that Plaintiffs sufficiently have alleged demand futility with respect to the members of the Compensation Committee named in this claim. Plaintiffs base their claim against the Compensation Committee on specific statements, and Plaintiffs have identified the time and place of the alleged violations.

### ii. George and Gust Perlegos

**\*10** Plaintiffs allege that George Perlegos established a

policy of backdating at Atmel and also that he attended all of the Compensation Committee meetings between 1994 and 2003, at which stock options were granted and that he participated in the backdating of those options. Plaintiffs also allege that Atmel has admitted in its own press release that George Perlegos "was aware of, and often directed, the backdating of stock option grants."According to the complaint, "evidence [of backdating] included handwritten notations from George Perlegos expressly directing stock administration employees to use prior Board meeting dates for many employees' stock option grants."Amended Complaint ¶ 198. These allegations meet the requirements of Rule 9(b) and the PSLRA.

Plaintiffs base their claim that Gust Perlegos participated in the alleged backdating scheme on the allegation that, as VP of Atmel with "broad knowledge" of the company, as well as and a recipient of backdated stock options, he must have known of the scheme and permitted it to occur. *See* Amended Complaint ¶¶ 138, 150. These allegations are insufficient to establish that Gust Perlegos knowingly received backdated options or that he played an active role in the alleged scheme. Accordingly, the Section 10(b) claim against Gust Perlegos will be dismissed with leave to amend.

### iii. Ross

Plaintiffs base many of their allegations against Ross on Atmel's press release dated April 30, 2007, which stated that Ross "handled communications with the Board of Directors regarding stock options and, during certain periods, supervised Atmel's stock administration department," Amended Complaint ¶¶ 17-18, and also concluded that Ross was aware of and participated in the backdating scheme and actually "directed stock administration employees to issue backdated stock option grants to employees and directed or permitted other actions to be taken contrary to the terms of Atmel's stock option plans."*Id.* at ¶¶ 21-22.According to the Amended Complaint, the Audit Committee also found that Ross was well aware that the practice of backdating was a violation of the option plans and that the grant date should be set at the date of board approval. The

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 2561957 (N.D.Cal.), Fed. Sec. L. Rep. P 94,761
**2008 WL 2561957 (N.D.Cal.)**

Audit Committee concluded that "the evidence indicated that Mike Ross lacked management integrity with respect to the stock option process."*Id.* at ¶ 55.Based on these statements and on Ross's position as general counsel at Atmel, Plaintiffs claim that Ross was aware of, and in several instances knowingly approved and participated in, the backdating of stock option grants. They further allege that he was involved in the dissemination of false and misleading financial statements.

While the basis of a Rule 10b-5 claim typically is either a false statement or material omission, 17 C.F.R § 240. 10b-5(b), the United States Supreme Court recently held that "conduct itself can be deceptive." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., --- U.S. ----, ----, 128 S.Ct. 761, 769, 169 L.Ed.2d 627(2008).* Plaintiffs allege that Ross exhibited deceptive conduct. Plaintiffs allege that Ross not only knew that the Board was falsifying the grant date of stock options in contravention of the company's shareholder-approved stock option plans but also personally directed the backdating in many instances, although this scheme had the purpose and effect of defrauding Atmel and its shareholders.

**\*11** The requisite state of mind for a section 10(b) claim is one of "deliberate recklessness." *In re Silicon Graphics, Inc. Sec. Litigation,* 183 F.3d 970, 975 (9th Cir.1999).* Recklessness satisfies the scienter requirement under section 10(b) if it reflects some degree of intentional or conscious misconduct. *Id.* at 977.Plaintiffs have alleged sufficiently that Ross acted with scienter. The Amended Complaint alleges that Ross assisted in the backdating scheme by directing the widespread and intentional backdating of stock option grants, colluding with other defendants to carry out a policy of backdating options, and receiving backdated options. The Amended Complaint also alleges that in order to conceal this misconduct, Ross caused Atmel to disseminate false financial statements and false proxy statements.

**b. Claim Three: Violation of Section 20(a)**

Section 20(a) provides that:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a)."To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator."*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir.1996). As discussed above, Plaintiffs adequately have pled a claim for primary violation of the securities laws against George Perlegos, Chellam, Hall, Thomas, Fougere and Kim.

Relying on PSLRA cases, Plaintiffs argue that to establish liability under Section 20(a) for exercising "control" over a primary violator they need only allege that each defendant had the status of control person. Post-PSLRA cases are clear that simply alleging a defendant's position within the company is insufficient. *See In re Splash Tech. Holdings, Inc. Sec. Litig.,* No. C 99-00109, 2000 WL 1727405 at *16 (N.D.Cal. Sept.29, 2000)* ("The mere fact that an individual is a director of a firm is not sufficient to show he is a control person of the firm."). Under the PSLRA, plaintiffs are required to "plead the circumstances of the control relationship with particularity."*Id.* at * 15.Because Plaintiffs have not met this pleading standard the third claim will be dismissed with leave to amend.

**c. Claim Four: Breach of Fiduciary Duty and/or Aiding and Abetting**

Plaintiffs allege that the Individual Defendants have breached their fiduciary duties by: (1) colluding with each other to backdate stock options; (2) colluding with each other to violate GAAP and section 162(m); (3) colluding with each other to produce and disseminate false financial statements to Atmel shareholders and the mar-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 2561957 (N.D.Cal.), Fed. Sec. L. Rep. P 94,761
**2008 WL 2561957 (N.D.Cal.)**

ket that improperly recorded and accounted for back-dated options grants and concealed the improper back-dating of stock options; and (4) colluding with each other to file false proxy statements, false financial statements, and false Form 4's in order to conceal the improper backdating of stock options. Because Plaintiffs' claim sounds in fraud, it must be alleged with particularity pursuant to Fed. R. Civ. Pro. 9(b).*In re Ditech Networks, Inc. Deriv. Litig.,* No. C 06-5157 JF, at 17 (N.D.Cal. July 16, 2007); *see also In re Atmel Corp.,* 2007 WL 2070299, at *9;*Perretta v. Prometheus Development Co., Inc.,* No. C05-02987 WHA, 2005 WL 3445627, at *5 (N.D.Cal. Dec.15, 2005) (applying Rule 9(b) to breach of fiduciary duty claim because "all of plaintiffs' claims sound in fraud"). Under Delaware law, "[t]he elements of a breach of fiduciary duty that must be proven by a preponderance of evidence by the plaintiff are: (I) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty."*Heller v. Kiernam,* No. 1483, 2002 Del. Ch. LEXIS 17, at *9 (Del. Ch. Feb. 27, 2002).

**\*12** Plaintiffs assert that they are not required to meet the heightened pleading standard of Rule 9(b). Relying on cases such as *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fraud,* 624 A.2d 1199, 1207 (Del.1993), Plaintiffs contend that a claim for breach of fiduciary duty that is pled "along side" a fraud claim need only meet the requirements of Rule 8. Here, however, the facts of Plaintiffs' claim for breach of fiduciary duty do sound in fraud. *See Zoran,* 2007 U.S. Dist. LEXIS 43402 at *74-75 ("Backdating is a form of fraud."). Accordingly, the claim must be pled to satisfy 9(b) which requires that Plaintiffs plead the "who what when and how" of the fraudulent conduct.

### i. George and Gust Perlegos and Members of the Compensation *Committee*

Again relying on *Desimone,* Defendants argue that Plaintiffs have not met the pleading requirement because Plaintiffs have not alleged adequately that Defendants knew that the options violated Atmel's stock option plans. For the reasons already set forth in its discussion of demand futility, the Court concludes that

*Desimone* is not controlling here. Accordingly, the claim for breach of fiduciary duty asserted against George Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere and Kim will not be dismissed.

### ii. Ross

The parties do not dispute that as General Counsel and Assistant Secretary of Atmel, Ross owed its shareholders a fiduciary duty. Plaintiffs allege that Ross breached his duty of loyalty to the company by knowingly approving of and participating in the backdating of several grant options to insiders, including himself, and by approving of and participating in the dissemination of false financial statements. Under Delaware law, allegations that suggest knowledge of backdating by an officer defendant who "also kept silent and concealed his knowledge in order to escape detection" constitute a "deception [which] is disloyal conduct in breach of his duty as a fiduciary."*Ryan v. Gifford,* 935 A.2d 258, 272 (Del.Ch.2007). Here, Ross is alleged to have done more than merely keep silent: he allegedly approved of and participated in the backdating and assisted in causing the dissemination of false financial statements. Plaintiffs allege that Ross intended to and did unduly benefit Defendants at the expense of Atmel. As the *Ryan* court held: "[t]he intentional violation of a shareholder approved stock option plan, coupled with fraudulent disclosures regarding the directors' purported compliance with that plan, constitute conduct that is disloyal to the corporation and is therefore an act in bad faith."*Ryan v. Gifford,* 918 A.2d 341, 358 (Del.Ch.2007).

### d. Claim Five: Unjust Enrichment

"The elements of a claim for unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."*Zoran Corp. Derivative Litig.,* 511 F.Supp.2d 986, 1018 (N.D.Cal.2007). None of the moving Defendants asserts that these requirement have not been met. Instead, Defendants argue that Plaintiffs can-

Slip Copy, 2008 WL 2561957 (N.D.Cal.), Fed. Sec. L. Rep. P 94,761

**2008 WL 2561957 (N.D.Cal.)**

not plead an unjust enrichment claim simply by asserting that individuals received backdated options; they must also plead, with specific supporting facts, that the recipients *knew* that they were not entitled to the options exercise price they received. However, Defendants cite no authority for this argument. FN5

> FN5. Defendants cite an unpublished New York opinion, *In re Comverse Tech., Inc.,* No. 601272/06 (N.Y. Aug. 14, 2007), as well as *Vredenburgh v. Jones,* 349 A.2d 22, 44 (Del.Ch.1975). Neither of these cases involves a claim for unjust enrichment.

**e. Claim Six: Constructive Fraud**

**\*13** In its order dated July 16, 2007, the Court instructed Plaintiffs to restate their constructive fraud claim as a claim for breach of fiduciary duty. Plaintiffs have ignored this portion of the Court's order. For the reasons set forth in the Court's previous order, Plaintiffs' sixth claim for constructive fraud will be dismissed without leave to amend.

**f. Claim Seven: Corporate Waste**

"The judicial standard for determination of corporate waste is well developed. Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade .... Such a transfer is in effect a gift."*Lewis v. Vogelstein,* 699 A.2d 327, 336 (Del. Ch. Ct.1997). A plaintiff must allege facts that, if true, establish that the defendant directors "authorized an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."*Glazer v. Zapata Corp.,* Del. Ch. 658 A.2d 176, 183 (1993).

**i. Director Defendants**

Plaintiffs have alleged sufficiently that the directors and officers of Atmel-George Perlegos, Gust Perlegos, Chellam, Ross, Hall, Thomas, Fougere, and Kim-

authorized a one-sided exchange. The Amended Complaint contains allegations of conduct that inured to the benefit of few and the detriment of many. Morever, Plaintiffs allege that certain directors and officers were unjustly enriched in the form of unjustified salaries, benefits, bonuses, stock option grants, and other emoluments of office. These enrichments came at the expense of Atmel, which rather than receiving any benefit from these payments suffered damages as a result. The Amended Complaint thus states a claim for corporate waste.

**ii. Option Recipient Defendants**

While Plaintiffs have alleged that the option recipients-Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruiaux, and Schumann-received the benefits of the one-sided exchange, they fail to cite any authority that as mere recipients these Defendants are liable for corporate waste. Accordingly, the claim against the option recipients will be dismissed with leave to amend.

**g. Claim Eight: Breach of Contact**

"In order to successfully plead a breach of contract, ... the aggrieved party must allege the making of the contract, the obligation thereby assumed, and the breach."*Goodrich v. E.F. Hutton Group, Inc.,* 542 A.2d 1200, 1203-04 (Del.Ch.1988)."Merely pleading that a breach of contract occurred, without alleging the existence of a contract, is not sufficient to state a valid claim."*Id.* at 1204.

Plaintiffs have alleged that when Defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann received backdated stock opinions these Defendants entered into invalid contracts with Atmel. Plaintiffs also state that because the options were backdated, they contained incorrect grant dates and improper exercise prices, which violated the terms of the Plans. These allegations are sufficient to state a claim for breach of contract.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 2561957 (N.D.Cal.), Fed. Sec. L. Rep. P 94,761
**2008 WL 2561957 (N.D.Cal.)**

### h. Claim Nine: Violation of California Corporation Code Section 25402

**\*14** The Court held previously that Plaintiffs' insider trading claim lacked the particularity required under Rule 9(b). To state a valid claim, Plaintiffs are required to "explain which true adverse facts each of the selling defendants knew, when each knew those facts, how they acquired the knowledge, or which sales were made when defendants were in possession of the information."*In re Verisign,* No, 06-4165, 2007 WL 2705221 at *45 (N.D. Cal. Sept 14, 2007). Plaintiffs have not amended their insider trading claim to address this deficiency.

Additionally, California Corporations Code section 25402 contains a five-year statute of limitations, and the Court concluded previously that no insider trading claim may be asserted under this provision for trades made prior to July 27, 2001. Three of the individuals against whom this claim is asserted are Chellam, Hall and Thomas. The latest that any of these Defendants is alleged to have held stock is August 31, 2000, more than six years prior to the filing of Plaintiffs' complaint. Amended Complaint ¶¶ 346-47, 350. Accordingly, the insider trading claims will be dismissed as to these Defendants without leave to amend. The insider trading claim against George and Gust Perlegos will be dismissed with leave to amend.

### i. Statute of Limitations

In its order dated July 16, 2007, the Court explained that Plaintiffs' § 10(b), and 20(a) claims were subject to a two year/five year period of repose and their § 14(a) claim was subject to a one year/three year scheme. The Court instructed Plaintiffs to omit from any Amended Complaint allegations that were time barred. Plaintiffs did not make such omissions. On its own motion, the Court will strike those portions of Plaintiffs' § 10(b) and § 20(a) claims based on options granted or Form 10-Ks issued before July 21, 2001, and those portions of Plaintiffs' § 14(a) claims based on proxy statements other than the March 30, 2004 statement.

### IV. ORDER

For the reasons stated above, IT IS HEREBY ORDERED that the motion to dismiss for failure to make demand is DENIED. The motions to dismiss for failure to state a claim are GRANTED in part and DENIED in part as set forth above. Any amended complaint must be filed within thirty (30) days of the date of this order.

N.D.Cal.,2008.
In re Atmel Corp. Derivative Litigation
Slip Copy, 2008 WL 2561957 (N.D.Cal.), Fed. Sec. L. Rep. P 94,761

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2

1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                                 SAN JOSE DIVISION

11                                         NO. C 06-05353 JW

12   In re Affymetrix Derivative Litigation      **ORDER GRANTING IN PART,**
                                                 **DENYING IN PART DEFENDANTS'**
13                                               **MOTIONS TO DISMISS WITH LEAVE**
                                                 **TO AMEND**
14   _____/

15                               **I.  INTRODUCTION**

16          This is a shareholders' derivative action brought on behalf of Nominal Defendant Affymetrix

17   Corporation ("Affymetrix," "Nominal Defendant," or the "Company") against current and former

18   officers and directors of the Company (collectively, "Individual Defendants").[1]  Plaintiffs allege that

19   the Individual Defendants engaged in a scheme to manipulate stock option grant dates so as to

20   maximize profits to themselves at the expense of the Company.

21          Presently before the Court is Nominal Defendant and Individual Defendants' various

22   Motions to Dismiss.[2]  The Court conducted a hearing on October 31, 2007.  Based on the papers

23

24   _____

25          [1]  The Individual Defendants are Stephen Fodor, Paul Berg, John Diekman, Edward Hurwitz,
     Vernon Loucks, Vernon Norviel, Kenneth Nussbacher, Richard Rava, Gregory Schiffman, Susan
     Siegel, David Singer, Ronald Verdoorn, and John Young.

26

27          [2]  (Defendants' Motion to Dismiss Amended Verified Consolidated Shareholder Derivative
     Complaint, hereafter, "Affymetrix Motion," Docket Item No. 53; Defendant Ron Verdoon's Notice
     and Motion to Dismiss Verified Amended Consolidated Shareholder Derivative Complaint,
28   hereafter, "Verdoorn Motion," Docket Item No. 51.)

United States District Court
For the Northern District of California

submitted to date and oral arguments of counsel, the Court GRANTS in part and DENIES in part

Nominal Defendant and Individual Defendants' Motions to Dismiss with leave to amend.

## II.  BACKGROUND

**A.    Factual Allegations**

In an Amended Consolidated Shareholder Derivative Complaint filed on April 2, 2004,[3]

Plaintiffs allege as follows:

Affymetrix is a Delaware corporation with its principal place of business in Santa

Clara, California.  (ACC ¶ 13.)  Affymetrix is engaged in the development, manufacture,

sale, and service of consumables and systems for genetic analysis in the life sciences and

clinical healthcare.  (Id.)

On July 31, 2006, Affymetrix announced it had been engaged in an internal review of

historical stock option grant practices from January 1, 1997 through May 31, 2006.  (Id. ¶

171.)  The Company reported that it had not identified any pattern or practice of backdating

options, and did not anticipate any adjustment to its financial results.  (Id.)  One week later,

on August 9, 2006, Affymetrix announced its review had uncovered documentation lapses

for certain options granted between 1997 and 1999 and that it would restate its financial

results.  (Id. ¶ 172.)  Affymetrix reiterated that it had not discovered any pattern or practice

of backdating.  (Id.)

On August 30, 2006, Affymetrix announced that it had completed its investigation

and determined that 97% of the documentation lapses occurred in July 1999.  (Id. ¶ 174.)

However, because of the vesting schedule of those grants, the Company would have to

restate its compensation expenses for 1998-2003.  (Id.)  The Company recorded additional

compensation expenses of $19.8 million for 1998-2002 and $1.7 million for 2003.  (Id.)  The

restatements also yielded a tax benefit of $8.3 million which was recorded for 2005.  (Id.)

---

[3]  (Verified Amended Consolidated Shareholder Derivative Complaint ¶ 13, hereafter
"ACC," Docket Item No. 42.)

2

United States District Court

For the Northern District of California

**B.     Stock Option Granting, Dating and Pricing**

A stock option granted to an employee of a corporation allows the employee to purchase at some future date a specified number of shares of corporate stock at a specified price, called the "exercise price." If the exercise price is the same as the market price of the stock on the date the option is granted, the option is said to be "at-the-money." Under Generally Accepted Accounting Principles ("GAAP"), a company that grants an option "at-the-money" is not required to record the grants as compensation expenses. On the other hand, if the exercise price of the option is less than the market price of the stock on the date the option is granted, the options is said to be "in-the-money." Under GAAP, the company must record a compensation expense for the "in-the-money" option grant, equal to the difference between the exercise price and the market price of the stock on the date the option is granted. Walter L. Lukken and James A. Overdahl, Financial Product Fundamentals: A Guide for Lawyers § 18:2 (5th ed. 2004).

**C.     Stock Option Backdating**

"Stock option backdating" is a phrase that describes a practice in which the record of the option grant deviates from the actual grant date. A stock option is said to have been "backdated" if it was actually granted on one date, but the option itself is dated and is "recorded" on the books of the company as granted on an earlier date. Backdating a stock option is not necessarily improper. Backdating may be improper, however, if the practice misleads shareholders. For example, if the grant date of a stock option to an employee is backdated to a date when the market price was lower than the market price on the actual grant date, the option would be "in-the-money." If the company does not record and report a compensation expense as required by GAAP, any subsequently issued financial statement would be misleading. See 6 Bromberg & Lowenfels on Securities Fraud § 17:1 (2d ed. 2007).

**D.     Procedural History**

On August 30, 2006, Irwin Berkowitz ("Berkowitz") filed the first shareholders' derivative complaint on behalf of Affymetrix. (See Docket Item No. 1.) On September 13, 2006, Samuel D.

United States District Court
For the Northern District of California

3

1    Powers ("Powers") filed a separate derivative action on behalf of Affymetrix alleging the same type

2    of misconduct and harm.  On November 20, 2006, the Court consolidated these actions.  (See

3    Docket Item No. 31.)  On January 10, 2007, Plaintiffs filed a Verified Consolidated Shareholder

4    Derivative Complaint.  (See Docket Item No. 33.)  On April 2, 2007, Plaintiffs filed an Amended

5    Verified Consolidated Shareholder Derivative Complaint ("Complaint").

6         The Complaint alleges the following eight causes of action: (1) Violation of § 10(b) and rule

7    10(b)(5) of the Exchange Act, against all Defendants; (2) Filing of false proxy statements in

8    violation of § 14(a) of the Exchange Act, against all Defendants; (3) Control person liability under §

9    20(a) of the Exchange Act, against Defendants Fodor, Hurwitz, Nussbacher, Schiffman, Berg,

10   Diekman, Loucks, Singer and Young; (4) A demand for accounting of allegedly fraudulent option

11   grants, against all Defendants; (5) Aiding and abetting the breach of fiduciary duties, against all

12   Defendants; (6) Unjust enrichment and restitution, against all Defendants; (7) Rescission, against all

13   Defendants; and (8) Breach of fiduciary duties for insider trading, against Defendants Berg,

14   Diekman, Fodor, Loucks, Schiffman, Siegel, Singer, and Young.

15        Presently before the Court are Nominal Defendant and Individual Defendants' various

16   motions to dismiss.

17                              **III.  STANDARDS**

18        Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against

19   a defendant for failure to state a claim upon which relief may be granted against that defendant.

20   Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient

21   facts alleged under a cognizable legal theory.  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699

22   (9th Cir. 1990); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-534 (9th Cir. 1984).

23   For purposes of evaluating a motion to dismiss, the court "must presume all factual allegations of the

24   complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  Usher v.

25   City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  Any existing ambiguities must be resolved

26   in favor of the pleading.  Walling v. Beverly Enters., 476 F.2d 393, 396 (9th Cir. 1973).

27

28                                        4

1    However, mere conclusions couched in factual allegations are not sufficient to state a cause

2  of action.  Papasan v. Allain, 478 U.S. 265, 286 (1986); see also McGlinchy v. Shell Chem. Co., 845

3  F.2d 802, 810 (9th Cir. 1988).  The complaint must plead "enough facts to state a claim for relief

4  that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. __ , 127 S. Ct. 1955, 1974

5  (2007).  Courts may dismiss a case without leave to amend if the plaintiff is unable to cure the defect

6  by amendment.  Lopez v. Smith, 203 F.3d 1122, 1129 (9th Cir. 2000).

7    Claims brought under section 10(b) of the Exchange Act and Rule 10b-5 must meet the

8  particularity requirements of Federal Rule of Civil Procedure 9(b).  In re Daou Sys., Inc. Sec. Litig.,

9  411 F.3d 1006, 1014 (9th Cir. 2005).  Rule 9(b) requires that "[i]n all averments of fraud or mistake,

10  the circumstances constituting fraud or mistake shall be stated with particularity."

11    Moreover, claims brought under section 10(b) and Rule 10b-5 must also meet the stringent

12  pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  To plead a

13  violation of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. §

14  240.10b-5, a plaintiff must allege (1) a material misrepresentation or omission of fact, (2) scienter,

15  (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5)

16  economic loss.  Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005).  The PSLRA amends the

17  Exchange Act to require that a private securities fraud litigation complaint "plead with particularity

18  both falsity and scienter."  In re Daou, 411 F.3d at 1014.  Specifically, a complaint alleging

19  securities fraud must "specify each statement alleged to have been misleading, the reason or reasons

20  why the statement is misleading, and if an allegation regarding the statement or omission is made on

21  information and belief, the complaint shall state with particularity all facts on which that belief is

22  formed."  15 U.S.C. § 78u-4(b)(1); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1085 (9th Cir.

23  2002).

24  //

25

26

27

28                                            5

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

### IV.  DISCUSSION

**A.    Statute of Limitations**

Defendants move to dismiss Plaintiffs' § 10(b) and § 14(a) claims on the ground that they are barred by the relevant statutes of limitation.  (Affymetrix Motion at 25-36.)  Since the statute of limitations periods differ for § 10(b) claims and § 14(a) claims, the Court considers each separately.

**1.    Limitations Period for § 10(b) Claims**

Defendants contend that any claims under § 10(b) arising from grants made prior to August 30, 2001 are barred by the relevant limitations periods.  (Affymetrix Motion at 30.)

If the expiration of the applicable statute of limitations is apparent from the face of the complaint, the defendant may raise a statute of limitations defense in a Rule 12(b)(6) motion to dismiss. Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir. 1980).  This is true even though expiration of the limitations period is an affirmative defense because Federal Rule of Civil Procedure Rule 9(f) "makes averments of time and place material for the purposes of testing the sufficiency of a complaint."  Suckow Borax Mines Consol. v. Borax Consol., 185 F.2d 196, 204 (9th Cir. 1950).

Under the Sarbanes-Oxley Act of 2002, the statute of limitations for a claim brought under § 10(b) is two years from the discovery of facts constituting the violation but no more than five years from the date of the violation.  28 U.S.C. 1658(b)(1)(2).[4]  The two-year statute of limitations is not subject to equitable tolling.  See Durning v. Citibank, Int'l, 990 F.2d 1133, 1136-37 (9th Cir. 1993). The five-year outer limitations period in a § 10(b) claim serves as a statute of repose[5] in lieu of equitable tolling.  See Lampf, 501 U.S. at 363 (construing the former statute, which imposed a one and three-year limitation).

---

[4]    In 2002, Congress passed the Sarbanes-Oxley Act extending the statute of limitations for Section 10(b) actions.  Pub.L. No. 107-204, 116 Stat. 745 (2002), codified in part at 28 U.S.C. § 1658(b).

[5]    "A statute of repose is a fixed, statutory cutoff date, usually independent of any variable, such as claimant's awareness of a violation."  Munoz v. Ashcroft, 339 F.3d 950, 957 (9th Cir. 2003) (citing Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363 (1991) ).

United States District Court

For the Northern District of California

1    In Section 10(b) claim proceeding under a theory that a loss is linked to the making of a false

2  representation, a plaintiff must show reliance on either: (1) an untrue statement of material fact; or

3  (2) a material omission by one who had a duty to disclose.  See 17 C.F.R. § 240.10b-5(b).  Such a

4  violation is considered to have occurred on the date that the false representation was made, not the

5  date of the conduct which gave rise the representation.  See Lampf, 501 U.S. at 364; In re Prudential

6  Ins. Co. of Am. Sales Practices Litig., 975 F. Supp. 584, 605 (D. N.J. 1996).  This is especially true

7  for a securities case based on a "fraud on the market" theory because proof that investors in the

8  market relied on an allegedly false representation is presumed only when the representation is

9  publically disclosed, e.g., through a financial statement such as a Form 10-K.[6]

10    Thus, the two-year statute of limitations period begins to run on one of the following two

11  dates: (1) the date the investor has actual notice that the representation is false; or (2) the date the

12  investor, with some form of reasonable diligence, would have been placed on inquiry notice.  See

13  Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 951 (9th Cir. 2005).  However,

14  the five-year statute of limitations period begins to run on the date of the false representation.  See

15  Lampf, 501 U.S. at 364; In re Prudential  975 F. Supp. at 605.  Each false representation may

16  constitute a separate violation of § 10(b); the five-year period begins to run with respect to each

17  violation when it occurs.  In re Zoran.Corp. Derivative Litigation, 511 F. Supp. 2d 986, 1014 (N.D.

18  Cal. 2007).  A plaintiff may not recover for reliance on representations made prior to the five-year

19  statute of limitations period under a theory of continuing wrong.  Id.

20    In this case, Plaintiffs allege § 10(b) claims using a fraud on the market theory.  (ACC ¶¶

21  208-13.)  Since this case involves allegedly secret backdating practices, which an ordinary investor

22  would not be expected to discover, the two-year statute of limitations period did not start to run until

23

24  _____

25    [6]  See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 128 S. Ct. 761, 769 (2008).  In the
   context of an options backdating case based on a fraud on the market theory, this means the
26  backdating of an option grant, in and of itself, does not give rise to the violation.  Rather, the
   violation occurs when a false representation concerning the option grant is publically disclosed
27  because it is only at that point that investors reliance may be presumed.  Cf. id.

28    7

United States District Court
For the Northern District of California

1   these practices were allegedly revealed on July 31, 2006.[7]  The first derivative action against

2   Affymetrix was filed on August 30, 2006 by Irwin Berkowitz which became the lead case in this

3   Consolidated Action.  (See Docket Item No. 1.)  Accordingly, the Court finds that the two-year

4   statute of limitations does not bar any of Plaintiffs' Section 10(b) claims.

5        The first three allegedly false representations upon which the Complaint is based are proxy

6   statements filed with the SEC on April 29, 1999, April 28, 2000, and April 30, 2001.  (Id. ¶ 59.)

7   Since the five-year statute of limitations period began on August 30, 2001, the Court finds that

8   Plaintiffs' Section 10(b) claims based on these statements are time barred.  The remainder of the

9   allegedly false representations are proxy statements filed after August 30, 2001.  Accordingly, the

10  Court finds the five-year statute of limitations does not bar any of Plaintiffs' Section 10(b) claims

11  with respect to these later filed statements.

12       **2.      Limitations Period for § 14(a) Claims**

13       The Court now proceeds to consider whether Plaintiffs' Section 14(a) claims are time barred.

14  The parties raise essentially identical issues with regard to the statute of limitations for § 14(a) as

15  they did for § 10(b).  (Affymetrix Motion at 30; Memorandum in Opposition to Dismiss Amend

16  Verified Consolidated Shareholder Derivative Complaint 34, hereafter, "Opposition," Docket Item

17  No. 62.)

18       Section 14(a) creates a cause of action for injury arising from the filing of a fraudulent proxy

19  statement. 15 U.S.C. § 78n(a).  For § 14(a) claims, the statute of limitations is one year from the

20  discovery of facts constituting the violation but no more than three years from the date of the

21  violation.  See Lampf, 501 U.S. at 363; Ceres Partners v. GEL Associates, 918 F.2d 349, 362-63 (2d

22  Cir. 1990).  The extended limitations period under Sarbanes-Oxley does not apply to § 14(a) claims

23  because, unlike § 10(b) claims, § 14(a) claims do not require scienter or a showing of fraudulent

24  intent.  See In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 196-97 (S.D. N.Y. 2003).

25

26       [7]  (ACC ¶¶ 52-55, 171.) See In re Zoran, 511 F. Supp. 2d at 1014 (finding that investors
    cannot detect secret backdating inside a company, so the two-year statute of limitations does not
27  apply).

28                                                8

1    For similar reasons to those set forth with respect to Plaintiffs' Section 10(b) claims, the

2    Court finds that the three-year statute of limitations bars Plaintiffs' Section 14(a) claims to the extent

3    they are based on false proxy statements filed with the SEC before August 30, 2003.

4    **B.    Demand Futility**

5    Defendants move to dismiss the entire Complaint on the ground that Plaintiffs lack standing

6    to bring a derivative action because they failed to make a pre-suit demand on the board of

7    Affymetrix.  (Affymetrix Motion at 13.)

8    Pursuant to the Federal Rules of Civil Procedure 23.1 and the corresponding Delaware

9    Chancery Court Rule 23.1, a plaintiff in a shareholders' derivative action must either allege that he

10    or she made a pre-suit demand upon the company's board of directors to pursue the corporate claim,

11    or allege that a majority of the directors are incapable of making an impartial decision regarding

12    such a claim.  Rales v. Blasband, 634 A.2d 927, 932 (Del. 1993).

13    The latter method, pursued in this case, requires a plaintiff create a reasonable doubt that:

14    "(1) the directors are disinterested and independent; and (2) the challenged transaction was

15    otherwise the product of a valid exercise of business judgment."  Id. at 930; Aronson v. Lewis, 473

16    A.2d 805, 814 (Del. 1984).  The two prong Aronson test is disjunctive.  "If a derivative plaintiff can

17    demonstrate a reasonable doubt as to the first or second prong of the Aronson test, then he has

18    demonstrated that demand would have been futile."  Seminaris v. Landa, 662 A.2d 1350, 1354 (Del.

19    Ch. 1995).  To satisfy the first prong of the Aronson test, a plaintiff may create a reasonable doubt as

20    to a director's disinterest by alleging particularized facts that the director has a financial interest in

21    the challenged transaction or that the director faces a "substantial likelihood of liability" resulting

22    from it.  Aronson, 473 A.2d at 814; Rales, 634 A.2d at 936.  Alternatively, a plaintiff may create a

23    reasonable doubt as to a director's independence by alleging particularized facts that suggest the

24    director is beholden to an interested director such that his or her "discretion would be sterilized."

25    Aronson, 473 A.2d at 814; Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845

26    A.2d 1040, 1050 (Del. 2004).  To satisfy the second prong of the Aronson test, a plaintiff must show

27

28                                                    9

**United States District Court**
For the Northern District of California

1  that the challenged transaction was not the product of a good faith exercise of the director's business

2  judgment.  Aronson, 473 A.2d at 814.

3        However, a court does not analyze demand futility under Aronson when the board did not

4  approve the challenged transaction.  For instance, when the board delegates its authority to approve

5  the challenged transaction to a committee under Delaware law, and the committee is comprised of

6  less than a majority of the board, the futility of a pre-lawsuit demand is analyzed under Rales.  See,

7  e.g., Conrad v. Blank, 2007 WL 2593540 at *14 (Del. Ch. 2007).  The Rales test excuses demand if

8  the plaintiff creates a reasonable doubt that a majority of the board, at the time the complaint is filed,

9  can exercise "its independent and disinterested business judgment in responding to the demand."

10  Rales, 634 A.2d at 933.  Similar to the Aronson test, a director is not considered disinterested if the

11  director "will receive a personal financial benefit from a challenged transaction that is not equally

12  shared by the stockholders."  Rales, 634 A.2d at 936.  The requisite doubt may also be shown by

13  alleging particularized facts that individual directors will be exposed to a substantial likelihood of

14  liability as a result of the derivative claim.  Id.

15        The reasonable doubt requirement forms a "sufficiently flexible and workable" standard,

16  allowing  the stockholder to obtain "'the keys to the courthouse' in an appropriate case where the

17  claim is not based on mere suspicions or stated solely in conclusory terms."  Beam, 845 A.2d at

18  1050.  While is true that directors are usually entitled to a presumption that they acted in the best

19  interests of the company, backdating options qualifies as one of those "rare cases [in which] a

20  transaction . . . cannot meet the test of business judgment."  Ryan v. Gifford, 918 A.2d 341, 355-56

21  (Del. Ch. 2007).

22        In this case, the board did not directly approve stock option grants; instead, it delegated the

23  responsibility to the compensation committee, which does not form a majority of the board.  (See,

24  e.g., ACC ¶¶ 184-193.)  Thus, the Court conducts its analysis under the Rales test.  At the time the

25  present case was filed, the Affymetrix Board was comprised of eight directors.  (Id. ¶ 188.)

26  However, the Court takes judicial notice under Federal Rule of Evidence 201that when Plaintiffs

27

28                                                    10

United States District Court

For the Northern District of California

1  filed the operative Complaint on April 2, 2007, there were nine directors.  (Motion, Exs. A, B.)

2  These directors were Defendants Fodor, Berg, Young, Diekman, Loucks, and Singer, and non-

3  parties Susan D. Desmond-Hellman, Robert H. Trice, and Robert P. Wayman.  Therefore, to prove

4  demand futility, Plaintiffs would have to show that, on April 2, 2007, five of the directors were not

5  disinterested with respect to this case.

6          **1.    Stock Options Backdating**

7          Since it affects the demand futility analysis in this case, the Court examines whether

8  Plaintiffs have adequately pleaded occurrences of stock option backdating.  Plaintiffs allege as

9  follows:

10              In direct violation of the nondiscretionary terms of the company's stock option plans,
   Affymetrix's directors, together with its top officers, granted millions of dollars of stock
11          options to themselves and other Affymetrix insiders.  (ACC ¶ 34.)  Moreover, as part of this
   scheme, Defendants granted stock options with exercise prices less than 100% of the fair
12          market value of Affymetrix common stock on the date of the grant.  (Id.)  The same
   analytical methods that have uncovered other backdating schemes yield the same result when
13          performed on Affymetrix's historical stock option granting practices.  (Id. ¶ 35.)
   Specifically, the statistics show that the market price of Affymetrix stock rose by at least
14          18% within the 20 days after date of each grant between 1998 and 2002.  (Id. ¶¶ 37-51.)
   Based on the analytical methods described above, this means 100% of the Affymetrix
15          discretionary options granted between 1998 and 2002 were backdated in violation of the
   company's stock option plans.  (Id. ¶ 36.)

16

17  These allegations state that the price of Affymetrix stock on the recorded grant dates was lower than

18  the price on the date that the stock was actually granted.  The Complaint goes on to outline the exact

19  dates of each grant and provides charts showing how the grant date provided statistically improbable

20  gains.  (Id. ¶¶ 37-51.)  The Delaware Court of Chancery has approved of the use of a statistical

21  methodology to support an allegation that stock options have been backdated.  Ryan, 918 A.2d at

22  354-55.  Accordingly, the Court finds that these allegations, along with the allegations in the

23  Complaint that describe backdating with lesser specificity, are sufficient to allege backdating for

24  purposes of showing demand futility.

25

26

27

28                                                    11

2.    **Receipt of Allegedly Backdated Options**

Plaintiffs contend that a reasonable doubt exists as to the disinterestedness of Defendants Fodor, Berg, Young, Diekman, Loucks, and Singer because they have received backdated stock options.  (Opposition at 5.)

The Delaware Court of Chancery has considered whether the receipt of backdated stock creates reasonable doubt as to the disinterestedness of a director under a <u>Rales</u> analysis.  <u>See</u> <u>Conrad</u>, 2007 WL 2593540.  The court found that directors who have received backdated options "have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue their current holdings or cause them to disgorge improperly obtained profits.  This creates an unacceptable conflict that restricts them from evaluating the litigation independently."  <u>Id.</u> at *18.  Courts in the Northern District of California applying Delaware law have also found that a director would be interested if he or she received backdated stock options.  <u>In re Zoran</u>, 511 F. Supp. 2d at 1003; <u>In re CNET Networks, Inc.</u>, 483 F. Supp. 947, 958 (N.D. Cal. 2007).

With respect to the six directors in question, Plaintiffs allege as follows:

> Fodor, Berg, Young, Diekman, Loucks and Singer all received improperly backdated stock options.  (ACC ¶ 189.)  On July 1, 1999 a total of 800,000 (split-adjusted) options were granted to four executives, including Affymetrix's founder, CEO, and director, Fodor.  (<u>Id.</u> ¶ 39.)  On June 30, 2001, a total of 50,000 options were granted to Affymetrix's directors, Berg, Diekman, Loucks, Singer and Young.  (<u>Id.</u> ¶ 43.)  Each of these grants were backdated.  (<u>Id.</u> ¶¶ 34-51.)

These allegations state that six of the nine directors received backdated options and are alone sufficient to create reasonable doubt as to the disinterestedness of these directors under <u>Conrad</u>. Since these directors constitute a majority of the board, the Court finds that Plaintiffs have sufficient pleaded demand futility.

Defendants contend that judicially noticeable facts show that grants to outside directors were made pursuant to an option plan that specified the grant date in advance, which would preclude backdating.  (Motion at 10.)  Defendants point to the "1996 Director's Plan," which provides for annual grants to outside directors on the date of the first meeting of the board immediately following each annual meeting of the shareholders.  (Motion, Ex. N.)  Defendants are correct that "[m]ere

United States District Court

For the Northern District of California

reliance on the numbers is not sufficient [to allege financial interest] when plaintiffs are confronted with a legitimate, judicially-noticeable explanation for the grant date." CNET Networks, 483 F. Supp. 2d at 960. However, the only evidence the Court could take judicial notice of is "1996 Director's Plan" and the dates of the shareholder meeting in each relevant year. Even if the Court were to do so, Defendants have not presented any judicially noticeable evidence that the grants were actually made at the first meeting of the board in accordance with the plan.[8] The Court declines to infer that the grants were properly made without this evidence, especially in light of Plaintiffs allegations that the stock option grants were not made in accordance with plans under which they were granted. (ACC ¶¶ 33-34.)

## C.    **Continuous Ownership**

In the alternative, Defendants move to dismiss the entire Complaint on the ground that Plaintiffs have failed to adequately plead that they have continuously owned Affymetrix stock. (Affymetrix Motion at 24.)

The Ninth Circuit reads Rule 23.1 to require that the derivative plaintiff: (1) was a shareholder at the time of the alleged wrongful acts; and (2) retain ownership of the stock for the duration of the lawsuit. Lewis v. Chiles, 719 F.2d 1044, 1047 (9th Cir. 1983). Thus, a derivative plaintiff has no standing to sue for misconduct that occurred prior to the time he became a shareholder of the corporation. Kona Enterprises, Inc. v. Estate of Bishop, 179 F.3d 767, 769 (9th Cir. 1999); see also In re Sagent Technology, Inc. Derivative Litig., 278 F. Supp. 2d 1079, 1096 (N.D. Cal. 2003).

In this case, Plaintiffs allege, "Plaintiffs Irwin Berkowitz, Samuel D. Powers, and Norman Boltz are, and were at all relevant times, shareholders of nominal Defendant Affymetrix." (ACC ¶ 12.) This statement is insufficient to plead continuous ownership because Plaintiffs have not alleged

---

[8] During oral argument, counsel for Plaintiffs contended that since the directors could choose to hold a board meeting at any time, they chose to hold their meeting when the stock price was at an historic low. If in fact, these grants were made at board meetings dates that were set in advance of or at the same time as the grant, then they may not be "backdated" as the Complaint alleges.

United States District Court

For the Northern District of California

1   when that they purchased the shares and whether they continue to hold them; similar conclusory

2   allegations have been rejected as insufficient for purposes of Rule 23.1.  See In re Computer

3   Sciences Derivative Litig., No. 06- 05288, 2007 WL 1321715 at *15 (C.D. Cal. March 26, 2007);

4   see also In re Omnivision Techs. Inc., No. 04-02297, 2004 U.S. Dist. LEXIS 22215 at *10-11, 16

5   (N.D. Cal. October 26, 2004).

6          Accordingly, the Court finds that Plaintiffs' Complaint fails to adequately plead standing as

7   required under Rule 23.1.  Since this defect in Plaintiffs' pleading is curable, the Court will grant

8   leave to amend.

9                                           **V.  CONCLUSION**

10         The Court GRANTS in part and DENIES in part Nominal Defendant and Individual

11  Defendants' various Motions to Dismiss with leave to amend.  Plaintiffs shall file an Amended

12  Complaint on or before **May 1, 2008**.

13         The Amended Complaint shall not allege § 10(b) violations based on representations made

14  prior to August 30, 2001 or § 14(a) violations based on representations made prior to August 20,

15  2003.  The Amended Complaint shall include specific pleading with respect to the Lead Plaintiffs'

16  purchases of Affymetrix shares and whether those shares have been continuously held.  Further, the

17  issue of demand futility with respect to Amended Complaint shall not be raised by motion to dismiss

18  absent a showing in accordance with Civil Local Rule 7-9.

19         The Court sets a Case Management Conference for **June 2, 2008 at 10 a.m.**  Pursuant to the

20  Civil Local Rules of Court, the parties shall file a Joint Case Management Conference on or before

21  **May 23, 2008.**

22

23  Dated: March 31, 2008                    _James Ware_____

24                                           JAMES WARE
                                             United States District Judge

25

26

27

28                                               14

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Alan R Plutzik aplutzik@bramsonplutzik.com
Alan Roth Plutzik aplutzik@bramsonplutzik.com
Angela Lucille Dunning adunning@cooley.com
Arthur Joseph Burke arthur.burke@dpw.com
Benny Copeline Goodman bennyg@csgrr.com
Eric L. Zagar ezagar@sbtklaw.com
Kathryn Anne Schofield kschofield@bramsonplutzik.com
Lawrence Timothy Fisher ltfisher@bramsonplutzik.com
Rajat Soni rajat.soni@dpw.com
Robin Winchester rwinchester@sbtklaw.com
Travis E. Downs travisd@csgrr.com

**Dated: March 31, 2008**                    **Richard W. Wieking, Clerk**


**By:   /s/ JW Chambers**
              **Elizabeth Garcia**
              **Courtroom Deputy**

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 3

LEXSEE 524 F SUPP 2D 1267

**RICHARD B. EDMONDS, Plaintiff, v. MARK H. GETTY, et al., Defendants.**

**CASE NO. C07-317JLR**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON**

*524 F. Supp. 2d 1267*; *2007 U.S. Dist. LEXIS 90249*; *Fed. Sec. L. Rep. (CCH) P94,533*

**December 5, 2007, Decided**
**December 5, 2007, Filed**

COUNSEL: **[\*\*1]** For Richard B Edmonds, on behalf of Getty Images Inc, Plaintiff: Clifford A Cantor, LEAD ATTORNEY, SAMMAMISH, WA; Lee D Rudy, Tara Kao, LEAD ATTORNEYS, SCHIFFRIN BARROWAY TOPAZ KESSLER LLP (PA), RADNOR, PA; Nichole Browning, LEAD ATTORNEY, SCHIFFRIN BARROWAY TOPAZ & KESSLER (CA), WALNUT CREEK, CA.

For Mark H Getty, James N Bailey, Andrew S Garb, Defendants: George E Greer, LEAD ATTORNEY, Lori Lynn Phillips, HELLER EHRMAN LLP, SEATTLE, WA.

For Jonathan D Klein, A.D. Albers, Jeff Beyle, M Lewis Blackwell, Richard R Ellis, Nick Evans-Lombe, John Z Ferguson, Jim Gurke, Elizabeth J Huebner, Scott A Miskimens, William O'Neill, Christopher H Sporborg, Sally Von Bargen, Defendants: George E Greer, LEAD ATTORNEY, Lori Lynn Phillips, HELLER EHRMAN LLP, SEATTLE, WA; Howard S Caro, LEAD ATTORNEY, HELLER EHRMAN LLP (SF), SAN FRANCISCO, CA.

For Getty Images Inc, Nominal Defendant, Defendant: Richard E Spoonemore, Stephen John Sirianni, LEAD ATTORNEYS, SIRIANNI YOUTZ MEIER & SPOONEMORE, SEATTLE, WA.

JUDGES: JAMES L. ROBART, United States District Judge.

OPINION BY: JAMES L. ROBART

OPINION

**[\*1268]** ORDER

Richard B. Edmonds filed this derivative action on behalf of nominal Defendant Getty Images, Inc. ("Getty Images") against certain members **[\*\*2]** of Getty Images' Board **[\*1269]** of Directors (the "Board") and certain executive officers. Mr. Edmonds alleges violations of *§ 10(b)* and *Rule 10b-5* of the Securities and Exchange Act; *§ 14(a)* of the Securities Exchange Act; and *§ 20(a)* of the Securities Exchange Act. Mr. Edmonds also alleges claims for breach of fiduciary duty and/or aiding and abetting; unjust enrichment; constructive fraud; corporate waste; and insider selling and misappropriation of information. Nominal Defendant Getty Images filed a motion to dismiss for failure to make a litigation demand under *Federal Rule of Civil Procedure 23.1* (Dkt. # 14). Mr. Edmonds then filed an amended complaint (Dkt. # 16). The court allowed Mr. Edmonds to file a Surreply (Dkt. # 22). Having considered the papers filed in support of and in opposition to the motion and having heard argument from counsel, for the reasons that follow, the court DENIES the motion. The court finds that demand was futile because there is reason to doubt that a majority of the directors at the time the complaint was filed could have properly exercised their independent and disinterested business judgment in responding to a demand.

**I. BACKGROUND**

On March 18, 2006, the *Wall* **[\*\*3]** *Street Journal* published an article entitled "The Perfect Payday" which suggested that backdating may have been rampant

524 F. Supp. 2d 1267, *1269; 2007 U.S. Dist. LEXIS 90249, **3;
Fed. Sec. L. Rep. (CCH) P94,533

throughout the 1990s up until 2002 when the Sarbanes-Oxley corporate reform act was enacted. Spoonemore Decl. (Dkt. # 19) Ex. A. Backdating occurs when a stock option's grant date is altered to an earlier date with a lower, more favorable price to the recipient. The article analyzed grants at several companies and determined that the odds of several grants all occurring on days in which the stock prices were very low were worse than winning the Powerball lottery. *Id.* The Securities and Exchange Commission ("SEC") began investigating several companies to determine whether the patterns uncovered were simply due to chance or whether the grants had been backdated. The article spawned litigation alleging backdating of stock options against some of the companies named in the article as well as others that were not named, like Getty Images, in courts throughout the country.

On November 9, 2006, in response to an informal inquiry by the SEC, Getty Images announced that it had undertaken an internal investigation of stock option grant practices. Spoonemore Decl. Ex. C. A Special **[**4]** Committee was formed and tasked with investigating Getty Images' stock option grant practices and related accounting for stock option grants. *Id.* The Committee included two independent members of the Board, Alan G. Spoon and Michael A. Stein, who were assisted by outside counsel, Orrick, Herrington & Sutcliffe. Spoonemore Decl. Ex. E.

On January 29, 2007, a case alleging improper accounting and disclosure of option grants entitled *Lopez v. Mark H. Getty, et al.,* was filed in King County, Washington. Mot. at 4. It is Getty Images' view that the claims in that case are "substantially similar" to the claims in this case. *Id.* On February 14, 2007, the Board converted the Special Committee into a Litigation Committee. Spoonemore Decl. Ex. J. Mr. Spoon and Mr. Stein continued on as members of the Committee. *Id.* The Special Litigation Committee was given the "power and authority to investigate, analyze and evaluate the derivative claims raised in the [*Lopez*] Litigation, to consider and determine whether prosecution of the derivative claims in the [*Lopez*] Litigation is in the best interests of the Company and its stockholders, and to determine the actions, if any, the Corporation should take **[**5]** with respect to the derivative claims **[*1270]** in the [*Lopez*] Litigation . . . ." Spoonemore Decl. Ex. J.

On March 2, 2007, Mr. Edmonds filed this lawsuit

(Dkt. # 1).

On April 16, 2007, a press release was issued that detailed the conclusions of the Committee. Spoonemore Decl. Ex. E. The Committee reviewed equity compensation grant practices and awards made by Getty Images between July 14, 1994 and November 1, 2006 which covered 8,164 grants made on 465 occasions. *Id.* The Committee "concluded that the evidence obtained and reviewed in its investigation did not establish any intentional wrongdoing by current employees, officers or directors of the Company . . . ." *Id.* However, the Committee

> determined that incorrect measurement dates for certain equity compensation awards made during the Relevant Period were used for financial accounting purposes and, as a result, the Company will restate its prior financial statements to correct the accounting for those awards. The use of incorrect measurement dates resulted from a number of reasons, including delays in the approval of awards, the absence of definitive documentation and modifications of previously awarded grants. The Special Committee also identified **[**6]** certain awards for which grant dates were selected retroactively. However, the Special Committee has concluded that the evidence does not establish that there was any intentional wrongdoing in connection with those awards. Nearly all of the grants for which the measurement dates are being changed (approximately 98% of the grants) were awarded in 2001 and earlier years. The Company anticipates that the restatement will involve total pre-tax, non-cash stock-based compensation expense of approximately $ 28 million to $ 32 million, of which approximately 95% will be expensed in 2002 and earlier years. Because these estimates are preliminary and we have not quantified all of the tax impacts, the net after tax amounts to be restated have not yet been determined by the Company.

*Id.* The Committee determined that it was necessary to

revise the measurement dates for 3,700 of the grants that were made on approximately 130 occasions. Spoonemore Decl. Ex. E. It noted that over half of the grants for which the measurement dates were being revised related to an all employee award in February 2000 given to all employees below the vice president level. *Id.*

The Special Committee recommended, and the Board **[**7]** adopted, the following changes "to improve the Company's equity compensation grant practices." *Id.* The recommendations included adding two additional independent directors to the Board; changing the membership of the audit and compensation committees; discontinuation of the equity compensation committee; enhancements to the oversight of Getty Images' corporate governance practices; charging senior management with ensuring that equity compensation policies and processes are appropriate and provide effective controls and that Getty Images' accounting for equity compensation is appropriate; moving certain of Getty Images' equity compensation administrative processes and functions from its human resources organization to the finance organization; and adopting a new equity compensation grant policy. Spoonemore Decl. Ex. E.

Getty Images points to one of the "significant" effects of the Committee's work as being its decision to restate certain financial statements.

> On June 13, 2007, Getty Images filed: (a) its Form 10-K for the fiscal year ending December 31, 2006; and (b) amended Quarterly Reports on Form **[*1271]** 10-Q/A for the quarters ending March 31, 2006 and June 30, 2006. These filings served **[**8]** to restate: (i) the consolidated financial statements for the fiscal years ending December 31, 2005 and 2004; (ii) selected consolidated financial data for fiscal years ending December 31, 2005, 2004, 2003, and 2002; and (iii) unaudited quarterly financial data for each quarter in its fiscal year ending December 31, 2005 and the first and second quarters of fiscal year 2006.

Mot. at 7; Spoonemore Decl. Exs. F, G.

## II. ANALYSIS

A shareholder seeking to bring a derivative action on behalf of a corporation must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile. *See Fed. R. Civ. P. 23.1.* The federal rules however do not establish the circumstances under which demand would be futile. *In re Silicon Graphics Inc., 183 F.3d 970, 989-90 (9th Cir. 1999).* Courts look to the law of the state of incorporation to determine whether demand in a particular case would have been futile. *Id. at 990.* Getty Images is a Delaware corporation and so the law of Delaware applies.

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of **[**9]** the corporation." *Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984) overruled on other grounds by Brehm v. Eisner, 746 A.2d 244, 254 (Del. 2000).* Delaware has two tests for determining whether demand is futile. The first, the "*Aronson* test," excuses a failure to make a demand where a plaintiff raises a reason to doubt that: (1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of the directors' valid exercise of business judgment. *Id. at 814.* "The essential predicate for the *Aronson* test is the fact that a *decision* of the board of directors is being challenged in the derivative suit." *Rales v. Blasband, 634 A.2d 927, 933 (Del. 1993).* The Delaware Supreme Court instructs that where the board that would consider the demand did not make the decision being challenged, that courts should apply a different test, the "*Rales* test." *Id. at 933-34.* Under *Rales,* "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business **[**10]** judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile." *Id. at 934.* Here, where the challenged transactions were not made by the Board, or even half of its members, *Rales* applies.

At the time the complaint was served, the Board consisted of the following directors: James N. Bailey, Andrew S. Garb, Mark H. Getty, Jonathan D. Klein, Alan G. Spoon, Christopher H. Sporborg and Michael A. Stein. Am. Compl. PP 23-37. In order to find that demand is excused in this case, the court would need to find that Mr. Edmonds' allegations raise a reasonable doubt that at

524 F. Supp. 2d 1267, *1271; 2007 U.S. Dist. LEXIS 90249, **10;
Fed. Sec. L. Rep. (CCH) P94,533

least four of these directors, a majority of the Board, could have properly exercised their independent and disinterested business judgment in evaluating a demand.

**A. Mr. Spoon and Mr. Stein**

Mr. Edmonds does not make any allegations that Mr. Spoon and Mr. Stein were not disinterested at the time the complaint was filed. The court finds that these directors were disinterested at the time the complaint was filed.

**[*1272] B. Mr. Getty, Mr. Klein, and Mr. Sporborg**

Mr. Edmonds alleges that Mr. Getty, Mr. Klein, and Mr. Sporborg received backdated stock options. Am. Compl. PP 25, **[**11]** 29, 33. At the pleading stage the question is whether the plaintiff has alleged circumstances from which it may be reasonably inferred that backdating as opposed to an innocent bookkeeping error occurred. *In re CNET Networks, Inc., 483 F. Supp. 2d 947, 956 (N.D. Cal. 2007).* "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales, 634 A.2d at 936.* "[D]irectors receiving backdated stock options receive a benefit *not* shared by stockholders. When purchasing the company's stock, the shareholders do not have the benefit of reaching back in time to buy their shares at [a] low-price point." *In re Zoran Corp., 511 F. Supp. 2d 986, 1002-03 (N.D. Cal. 2007)* (applying Delaware law). "Directors who are sued have a disabling interest for pre-suit demand purposes when the potential for liability is not a mere threat but instead may rise to a substantial likelihood." *Ryan v. Gifford, 918 A.2d 341, 355 (Del. Ch. 2007)* (quotation **[**12]** marks and citation omitted). Allegations that a board member accepted backdated options raise a reason to doubt the disinterestedness of the board and to suggest that they were incapable of impartially considering a demand. *Id. at 356; see also Zoran, 511 F. Supp. 2d at 1003 (N.D. Cal. 2007)* ("[I]f plaintiffs can plead with particularity that the directors received backdated grants, those directors will be considered interested.")

Mr. Edmonds alleges that 21 out of 25 discretionary grant dates from April 1999 to February 2002 were backdated. Am. Compl. P 114. Eight grants were made at

or near the lowest price of the fiscal year and fourteen were made at or near the lowest price of the fiscal quarter. *Id.* It is alleged that Mr. Getty received backdated options on October 22, 1999 (15,000 options at an exercise price of $ 19.07), April 28, 2000 (400,000 options at an exercise price of $ 30.32), May 24, 2000 (400,000 options at an exercise price of $ 28.63), March 30, 2001 (50,000 options at an exercise price of $ 16.85), and October 15, 2001 (50,000 options at an exercise price of $ 12.41); Mr. Klein received backdated options on October 22, 1999 (15,000 options at an exercise price of **[**13]** $ 19.07), April 28, 2000 (400,000 options at an exercise price of $ 30.32), May 24, 2000 (400,000 options at an exercise price of $ 28.63), March 30, 2001 (50,000 options at an exercise price of $ 16.85), May 7, 2001 (232,000 options at an exercise price of $ 25.43), June 26, 2001 (170,000 options at an exercise price of $ 25.43), and October 15, 2001 (50,000 options at an exercise price of $ 12.41); and Mr. Sporborg received a backdated option grant on July 23, 2001 (8,333 options at an exercise price of $ 15.80). Am. Compl. PP 25, 30, 33.

In *Ryan, 918 A.2d at 354,* a Delaware court found that the allegations in the complaint raised a reasonable doubt as to whether the challenged transactions were a valid exercise of business judgment. The *Ryan* court looked to the fact that "the terms of the stock option plans *required* that '[t]he exercise price of each option shall be not less than one hundred percent (100%) of the fair market value of the stock subject to the option on the date the option is granted.' The board had no discretion to contravene the terms of the stock option plans. Altering the actual date of the grant so as to affect the exercise price contravenes the plan." **[*1273]** *Id.* **[**14]** Second, the court examined plaintiff's allegations that every challenged option occurred during the lowest market price of the month or year in which it was granted. *Id.* The court noted that plaintiff further supported his allegations with "empirical evidence" that backdating occurred. Specifically, plaintiff used an analysis developed by Merrill Lynch [1] to determine that the average annualized return of 243% on option grants to management were nearly ten times higher than the 29% annualized market returns in the same period. *Id.* The court found that the "appearance of impropriety grows even more when one considers the fact that the board granted options, not at set or designated times, but by a sporadic method." *Id. at 355.* The court stated that, "[t]his timing by my judgment and by support of empirical data, seems too fortuitous to be mere coincidence." *Id at*

*354-55*. The court concluded: "Plaintiff here points to specific grants, specific language in option plans, specific public disclosures, and supporting empirical analysis to allege knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures. Such facts, in my opinion, provide sufficient **[**15]** particularity in the pleading to survive a motion to dismiss for failure to make demand pursuant to *Rule 23.1*." *Id. at 355*. The court also determined that if the case were analyzed under the *Rales* rather than the *Aronson* test that demand would have still been futile. *Id.*

> 1     The Merrill Lynch analysis examines the 20-day performance of each option grant reported in a company's proxy statements during the relevant period. Am. Compl. at P 183. Under the analysis a calculation of the annualized return of the option grants at 20 days after the grant is made, which is then compared with the company's overall annual return. *Id.*

Mr. Edmonds models his complaint after the complaint in *Ryan*. Mr. Edmonds alleges that: "Under the 1998 Plan, the exercise price of options must be 'no less than 100% of the Fair Market Value per share on the date of the grant,' where fair market value is defined as 'the average of the high and low prices of the Common Stock on such exchange or such quotation on the date set for valuation.'" Am. Compl. P 112. In other words, if backdated options were granted it would have been against the plan.

Mr. Edmonds next alleges that "21 out of 25 discretionary grant dates from April **[**16]** 1999 to February 2002 were backdated, and the pattern of grants was more than fortuitous -- eight were made at or near the lowest price of the fiscal year, and fourteen were made at or near the lowest price of the fiscal quarter." Am. Compl. P 114. For each of the challenged grants, Mr. Edmonds alleges the date on which the grant was awarded, to whom the options were awarded, and the number of options awarded. *See, e.g.,* Am. Compl. PP 125-128. Mr. Edmonds also provides graphs charting the grant date against the price for each grant for both the quarter in which the grant was issued and the fiscal year in which it was issued. *See, e.g.,* Am. Compl. P 128. While this evidence is not as compelling as the evidence in *Ryan* (that each grant was at the lowest price of the month or year in which it was granted) it does show that grants were made when stock prices were low. As the

court in *CNET* noted in response to an argument by defendants that not all grants fell on the lowest possible price of the relevant period: "This argument is like giving a bank robber credit for leaving some cash in the vault. Perhaps they did not want to make it too obvious by being too greedy. The simple fact that **[**17]** there were days close in time where the stock closed at an even lower price is not sufficient to defeat the **[*1274]** facts pleaded by plaintiffs." *483 F. Supp. 2d at 961*.

Using the analytical framework developed by Merrill Lynch, Mr. Edmonds alleges that for the options granted in 1999, the average 20-day return is 25.57% or 460.31% annualized as compared to a 176.26% annualized return to investors. Am. Compl. P 186. Mr. Edmonds alleges that applying the Merrill Lynch analysis for the option grants in 2000, the average 20-day return is 10.22% or 183.91% annualized as compared to a -34.03% annualized return to investors in 2000. Am. Compl. P 187. For the grants in 2001, the average 20-day return is 17.04% or 306.76% annualized, as compared to a -26.37% annualized return to investors in 2001. Am. Compl. P 188. Over the three year period the average annualized return to management on the option grants identified was 317% as compared to a 38.62% average annualized return to investors. Am. Compl. P 189.

Finally, Mr. Edmonds labels these grants as "discretionary" leading to the conclusion that they were not part of any overall plan setting forth at what time options were to be given. *See* Am. Compl. **[**18]** P 114. At oral argument counsel for Getty Images stated that these grants were not, in fact, issued pursuant to any overall plan.

Getty Images claims that Mr. Edmonds has failed to allege circumstances from which it may be reasonably inferred that backdating as opposed to innocent bookkeeping errors occurred. First, it attacks Mr. Edmond's use of the Merrill Lynch analysis. Getty Images points out that Merrill Lynch itself did not conclude that any of the companies its report examined actually backdated options. Reply at 7. In doing so, Getty Images stretches what the report actually says. In the report, Merrill Lynch merely emphasized that they were not taking any position on whether companies actually backdated options. Supp. Spoonemore Decl. (Dkt. # 19) Ex. N. Additionally, at the pleading stage, the plaintiff need not prove that backdating occurred but rather must only allege circumstances from which it may be

reasonably inferred that backdating as opposed to an innocent bookkeeping error occurred. *See CNET, 483 F. Supp. 2d at 956.*

Getty Images next argues that companies are more likely to issue grants when they perceive their stock to be undervalued. Reply at 8. Getty Images provides [**19] no evidence that this is the case here. Getty Images also asserts that many investors take the issuance of grants as a signal from the company that it believes its shares are undervalued. *Id.* Again, it is not clear from the papers filed by Getty Images whether this may have been the case here.

Getty Images also claims that the reliability of a 20-day analysis is suspect if the stock is volatile. *Id.* It argues, citing *In re PMC-Sierra, Inc., No. 06-05330, 2007 U.S. Dist. LEXIS 64879, 2007 WL 2427980, *3 (N.D. Cal. Aug. 22, 2007)*, that there is nothing magical about a 20-day window. Getty Images attached an Appendix to its motion showing that at least, for some periods its stock price was subject to large variations over 20, 30 and 40-day periods. Mot. at Appendix B. It argues that an examination of the stock price over a 40-day period demonstrates that no pattern of backdating exists. Reply at 10. Getty Images fails to explain in its papers why a 40-day period is better than a 20-day period or why its analysis is superior to or more reliable than the analysis employed by Mr. Edmonds. And, at oral argument, counsel for Getty Images conceded that the selection of a 40-day window was no better than the 20-day period. [**20] It also complains that the alleged pattern is driven by two grants made in a single month that resulted in a 1,500% gain. Reply at 9. Again, Getty Images fails to clearly and cogently explain or demonstrate [*1275] how this adversely affected the analysis. The court is not inclined to adopt Getty Images' analysis without an explanation of why it is superior to or more reliable than the analysis presented by Mr. Edmonds.

Lastly, Getty Images argues that external events *may* have a dramatic effect on a company's annualized returns. Reply at 9. Specifically, Getty Images points to the bursting of the Internet bubble and the events of September 11, 2001. *Id.* It states that grants awarded to officers and directors in early 2001 had significantly higher returns than the annualized returns to investors for that year. *Id.* Getty Images again fails to explain why this makes Mr. Edmonds' use of the Merrill Lynch analysis

here improper.

Getty Images also cites several cases, some of which are un-published and none of which are binding on this court, in which it was found that demand was not futile. These cases are all distinguishable on their facts. In *CNET*, the court refused to find demand excused where [**21] plaintiffs failed to plead facts about the full universe of options (as opposed to only those options granted at a low-point in price), when the options were granted, under what circumstances the options were granted or any facts regarding the board's role in granting the options. *483 F. Supp. 2d at 958.* In *In re Verisign, Inc., No. 06-4165, 531 F. Supp. 2d 1173, 2007 U.S. Dist. LEXIS 72341, 2007 WL 2705221, *15 (N.D. Cal. September 14, 2007)* the court would not excuse demand where the complaint contained "no particularized allegations stating which director or directors approved which grant, or when such grant was approved and how it was backdated-and no allegations showing how or why a particular director would know that the options were backdated." The court also noted that "while it is not clear from the [complaint] whether the Board approved the option grants, it appears that a majority of the current members of the Board were not directors at the time of the alleged backdating." *Id.* The court in *Desimone v. Barrows, 924 A.2d 908, 914, 920-21 (Del. Ct. 2007)* declined to find demand excused where, for at least some of the challenged options, there was no requirement that grants be priced at fair market value on the date of the [**22] grant and the complaint was devoid of any factual allegations on the key issues of who approved the employee grants and whether any of the directors knew that options were being backdated. In *In re Openwave Sys. Inc., 503 F. Supp. 2d 1341, 1351 (N.D. Cal. 2007)*, the court found that plaintiffs failed to "compare the average 20 day return on *all* reported stock option grants during the relevant period to the average 20 day return on Openwave stock during the period." The court concluded that the plaintiffs' allegations and statistical analyses were insufficient to allow a reasonable inference of backdating. *Id.* In *In re Linear Tech. Corp., No. 06-3290, 2006 U.S. Dist. LEXIS 90986, 2006 WL 3533024, *3 (N.D. Cal Dec. 7, 2006)*, the court found that demand was not futile stating: "[P]laintiffs provide no facts as to how often and at what times the Committee Defendants have granted stock options in the past, no 'pattern,' let alone a 'striking' one, is apparent. Moreover, plaintiffs have failed to allege facts as to how the asserted backdating affected the price the Officer Defendants ultimately paid for the stock, and,

Case 1:07-cv-00144-RJL    Document 26-4    Filed 07/29/2008    Page 8 of 9

Page 7

524 F. Supp. 2d 1267, *1275; 2007 U.S. Dist. LEXIS 90249, **22;
Fed. Sec. L. Rep. (CCH) P94,533

as a consequence, have failed to demonstrate, let alone with particularity, the Committee Directors' [**23] approval of the options harmed Linear." In *PMC-Sierra, 2007 U.S. Dist. LEXIS 64879, 2007 WL 2427980 at *4-6* the court found demand was not excused where plaintiff did not present an adequate statistical analysis to negate the prospect that the favorable grant dates were merely fortuitous, did not examine all options granted during the relevant period and failed to allege other facts raising an inference that backdating occurred. None of these deficiencies are present here.

[*1276] The court does not find Getty Images' arguments persuasive; instead, it adopts the reasoning in *Ryan* and finds that Mr. Edmonds alleged facts sufficient to reasonably infer that backdating rather than innocent bookkeeping errors occurred. The court also finds that Mr. Edmonds' allegations that Board members, Mr. Getty, Mr. Klein, and Mr. Sporborg accepted backdated options coupled with the allegations raising a reasonable inference that backdating occurred are sufficient to raise a reason to doubt these directors' disinterestedness and to suggest that they would have been incapable of impartially considering a demand. *See Ryan, 918 A.2d at 356; see also Zoran Corp., 511 F. Supp. 2d at 1003* ("[I]f plaintiffs can plead with particularity that the [**24] directors received backdated grants, those directors will be considered interested.")

## C. Mr. Bailey, Mr. Garb, and Mr. Sporborg

"[I]ntentional violation of a shareholder approved stock option plan, coupled with fraudulent disclosures regarding the directors' purported compliance with that plan, constitute conduct that is disloyal to the corporation and is therefore an act in bad faith." *Ryan, 918 A.2d at 358.* "A director who approves the backdating of options faces at the very *least* a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders . . . and yet satisfy his duty of loyalty. Backdating qualifies as one of those 'rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Id. at 355-56* (citing *Aronson, 473 A.2d at 815*). And as *Ryan* teaches "[d]irectors who are sued have a disabling interest for pre-suit demand purposes when the potential for liability is not a mere threat but instead may rise to a substantial likelihood." *Id. at 355*

[**25] (citation and quotation marks omitted).

Mr. Edmonds alleges that Mr. Bailey and Mr. Sporborg were members of the compensation committee from 1998 through 2006 and that Mr. Garb was the chairman of the compensation committee from 1998 through 2006. Am. Compl. P 98. Mr. Edmonds also alleges that during the relevant time period Mr. Bailey, Mr. Garb, and Mr. Sporborg had the authority to administer the stock option plans and grant stock options thereunder; were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of the grant; that they approved the challenged grants on a date after the reported grant date and knowingly used hindsight to select a favorable date; that they knew that backdating grants to a date with a lower price violated the 1998 stock plan; and that their backdating caused each of Getty Images' Form 10-K and Form 10-Q for the relevant period to materially understate Getty Images' compensation expense and materially overstate Getty Images' net income or materially understate its net loss. *See, e.g.,* Am. Compl. PP 125-127, 201. As in *Ryan,* Mr. Edmonds has alleged that: (1) the compensation committee had the [**26] authority to authorize the options [2] at issue and ensure that they were [*1277] issued at fair market value as of the date of the grant; (2) the committee did not comply with the stock option plan by granting backdated stock options; and (3) the compensation committee then falsely represented to shareholders that the company was complying with the plan by preparing and signing financial and proxy statements. This is enough at the pleading stage to demonstrate that the members of the compensation committee face a substantial likelihood of liability.

2   Mr. Edmonds acknowledges that the compensation committee was permitted to delegate its authority under the 1998 plan but its authority was limited as follows:

The Committee may, but need not, from time to time delegate some or all of its authority under the Plan to an Administrator consisting of one or more members of the Committee or of one or more officers of the Company; provided, however, that the Committee may not delegate its

authority (i) to grant Awards to Eligible Individuals (A) who are subject on the date of the grant to the reporting rules under *Section 16(a)* of the Exchange Act, (B) who are *Section 162(m)* Participants or (C) who are **[**27]** officers of the Company who are delegated authority by the Committee hereunder, or (ii) under *Sections 3(b)* and *17* of the Plan . . . . Nothing in the Plan shall be construed as obligating the Committee to delegate authority to an Administrator, and the Committee may at any time rescind the authority delegated to an Administrator appointed hereunder or appoint a new Administrator.

Am. Compl. P 111. Getty Images has not argued that the grants at issue were made by individuals other than those on the compensation committee.

Getty Images argues that Mr. Edmonds' allegations are mere conclusions and not specific facts. It claims: "No facts are pled tending to show that 'knowing hindsight' was used to select a 'favorable' date." Reply at 3. However, at the pleading stage it would be nearly impossible to plead "precisely what defendants knew about backdating . . . and exactly when they knew it." *CNET, 483 F. Supp. at 966*.

Citing *CNET, 483 F. Supp. 2d at 962-963* Getty Images argues that where there is an innocent explanation offered in addition to the more nefarious explanation that the court must accept the innocent explanation in the absence of other specific facts indicating fraud. Reply **[**28]** at 4. The court does not read *CNET* to suggest this proposition; rather, the court in *CNET* discussed the situation where a plaintiff sought to rely solely on the fact that the defendant corporation repriced its stock after an investigation, to argue that each instance of repricing was

an admission of fraud. *Id.* This is not the case here.

Getty Images also cites *Desimone* which dismissed a complaint for failure to make a demand because the plaintiff failed to plead "facts creating a rational inference that the directors knowingly approved backdated grants of options, realizing that the corporation would deceptively account for them to investors and regulatory authorities . . . ." *924 A.2d at 915*. Mr. Edmonds has made such allegations here. *See e.g.,* Am. Compl. PP 125-128, 201, 202.

The court is not persuaded by Getty Images' arguments. The court finds that the allegations in the complaint, if true, demonstrate that the members of the compensation committee face a substantial likelihood of liability. Because directors who are sued have a disabling interest for pre-suit demand purposes when the potential for liability is not a mere threat but instead rises to a substantial likelihood, the **[**29]** court finds that the allegations in the complaint have raised a reasonable doubt that, as of the time the complaint was filed, Mr. Bailey, Mr. Garb, and Mr. Sporborg could have properly exercised their independent and disinterested business judgment in responding to a demand.

## III. CONCLUSION

The court finds that Mr. Edmonds has pleaded particularized facts that create a reasonable doubt that, as of the time the complaint was filed, the Board could have properly exercised its independent and disinterested business judgment in responding to a demand. For the foregoing reasons the court DENIES Getty Images' **[*1278]** motion to dismiss for failure to make a litigation demand (Dkt. # 14).

DATED this 5th day of December, 2007.

/s/ James L. Robart

JAMES L. ROBART

United States District Judge

EXHIBIT 4

LEXSEE 527 F SUPP 2D 1164

**MIDDLESEX RETIREMENT SYSTEM v. QUEST SOFTWARE INC., VINCENT C. SMITH, M. BRINKLEY MORSE, MICHAEL J. LAMBERT, DOUGLAS GARN, DAVID M. DOYLE, JERRY MURDOCK, JR., AND KEVIN BROOKS**

**Case No. CV 06-6863 DOC (RNBx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*527 F. Supp. 2d 1164; 2007 U.S. Dist. LEXIS 84695*

**October 22, 2007, Decided**
**October 22, 2007, Filed; October 22, 2007, Docketed**

**COUNSEL:** [**1] For Middlesex Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff: Anthony D Green, Chet B Waldman, Marian P Rosner, Patricia I Avery, LEAD ATTORNEYS, Wolf Popper, New York, NY; Blake M Harper, Sarah Weber, LEAD ATTORNEYS, Hulett Harper Stewart, San Diego, CA.

For Quest Software Inc, Vincent C Smith, Brinkley Morse, Michael J Lambert, Kevin Brooks, David M Doyle, Douglas F Garn, Jerry Murdock, Jr, Defendants: Aaron F Olsen, Koji F Fukumura, LEAD ATTORNEYS, Cooley Godward Kornish, San Diego, CA.

**JUDGES:** PRESENT: THE HONORABLE DAVID O. CARTER, JUDGE.

**OPINION**

[*1168] CIVIL MINUTES - GENERAL

PROCEEDING (IN CHAMBERS): ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT.

Before the Court is Defendants Quest Software Inc., Vincent C. Smith, M. Brinkley Morse, Michael J. Lambert, Douglas F. Garn, David M Doyle, Jerry Murdock, Jr., and Kevin Brooks' Motion to Dismiss First Amended Complaint ("Defendants' Motion") Pursuant to

*Federal Rules of Civil Procedure 12(b)(6)* and *9(b)* and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *15 U.S.C. § 78u, et seq.* The Court finds the matter appropriate for decision without oral argument. [**2] *Fed. R. Civ. P. 78*; *Local R. 7-15*. Accordingly, the hearing set for September 10, 2007 was removed from the Court's calendar. After considering the moving, opposing, and replying papers, the Court hereby GRANTS IN PART AND DENIES IN PART Defendants' Motion and DISMISSES the specified portions of Plaintiff's First Amended Complaint ("FAC") WITHOUT PREJUDICE.

**I. BACKGROUND**

**A. The Parties**

Plaintiff Middlesex Retirement System ("Plaintiff") is a Massachusetts pension fund, established on December 2, 1911. Plaintiff is seeking class certification for all those persons or entities who purchased Quest securities ("the securities") during the period of November 9, 2001 through July 3, 2006 ("the Class Period"). Defendant Quest Software, Inc., ("Quest" or "the Company") is a California corporation that designs, develops, distributes, and supports software products that work with other software applications and database management systems. Quest's common stock was registered with the Securities [*1169] and Exchange Commission ("SEC") pursuant to the Exchange Act and traded on the NASDAQ National Market.

Defendant Vincent C. Smith ("Smith") has served as

Case 1:07-cv-00144-RJL    Document 26-5    Filed 07/29/2008    Page 3 of 24

Page 2

527 F. Supp. 2d 1164, *1169; 2007 U.S. Dist. LEXIS 84695, **2

Chairman of the Board of Directors of Quest ("the **[**3]** Board") since 1998, Chief Executive Officer ("CEO") since April 1997, and as a director since 1995. Smith signed each Form 10-K and 10-K405 during the Class Period. Pl.'s First Am. Compl. P 21. For the Form 10-Ks and 10-Qs issued from August 14, 2002 through the end of the Class Period, Smith signed the Certification of the CEO pursuant to Exchange Act *Rule 13A-14* and *15D-14*, as adopted pursuant to *§ 302* of the Sarbanes-Oxley Act of 2002 ("SOX"), and the Certification pursuant to *18 U.S.C. § 1350*, as adopted pursuant to *SOX § 906* ("*§ 1350* Certification"). *Id.* P 22 During the Class Period, Smith was granted at least 1,585,000 stock options, and sold at least 445,300 shares of Quest stock for proceeds of approximately $ 6,875,382.82. *Id.* PP 23-24.

Defendant M. Brinkley Morse ("Morse") served as Quest's Senior Vice President, Corporate Development from April 2005 until his resignation on or about November 24, 2006. Morse previously served as Vice President, Finance and Operations of the Company from January 2001 through May 2003, and as Chief Financial Officer from May 2003 through April 2005. Morse signed each Form 10-K and 10-K405 filed in years 2002 through 2005. Additionally, Morse **[**4]** signed the Certification of the CFO pursuant to Exchange Act *Rule 13A-14* and *15D-14* and the *§ 1350* Certification. *Id.* P 28. During the Class Period, Morse was granted at least 850,000 stock options. *Id.* P 30. Morse allegedly declined to be interviewed by the Special Committee for the Company's investigation into the stock option matters underlying the allegations in Plaintiff's FAC; Morse resigned instead. *Id.* P 27

Defendant Michael J. Lambert ("Lambert") served as Quest's Senior Vice President of Finance from November 2004 until April 2005, when he became the Company's Chief Financial Officer. Lambert is Quest's current CFO. Lambert signed the Form 10-K filed in 2006. For the Form 10-Ks and 10-Qs from May 10, 2005 through the end of the Class Period, Lambert signed the Certification of the CFO pursuant to Exchange Act *Rule 13A-14* and *15D-14* and the *§ 1350* Certification. *Id.* P 35.

Defendant Douglas F. Garn ("Garn") has served as Quest's President since February 2005. Garn previously served as Quest's Vice President, Worldwide Sales from January 1998 to January 2002, and returned to this position in January 2003 through February 2005. During the Class Period, Garn was granted at least **[**5]**

480,000 stock options and sold at least 65,000 shares of Quest stock for proceeds of approximately $ 983,700. *Id.* PP 39-40.

Defendant David M. Doyle ("Doyle") served as a Director of Quest from 1987 until June 2004. Doyle served as Quest's President until March 2003. [1] Doyle was a member of the Audit Committee of the Board of Directors ("the Audit Committee") from 1999 to 2001. Doyle signed each Form 10-K and 10-K405 filed in years 2002 through 2004. During the Class Period, Doyle was granted at least 100,000 stock options, and sold at least 1,974,543 shares of Quest stock for proceeds of approximately $ 26,679,352.74. *Id.* PP 45-46.

> 1   Plaintiff's FAC does not specify when Doyle started as Quest's President.

Defendant Jerry Murdock, Jr. ("Murdock") has been a Director of Quest since April 1999. Murdock was a member of the Compensation Committee of the Board of **[*1170]** Directors ("the Compensation Committee") from 1999 through February 2005. The Compensation Committee allegedly reviews and approves the compensation and benefits for the Company's executive officers and administers the Company's 1999 Stock Incentive Plan, under which the options at issue in this case were granted. *Id.* P 49. Murdock **[**6]** is currently a member of the Audit Committee, of which he was formerly the Chairman from 1999 through July 2005. In addition to signing each Form 10-K and 10-K405 filed by Quest during the Class Period, Murdock also signed the Audit Committee reports contained in the proxy statements filed by the Company with the SEC in years 2002 through 2005. During the Class Period, Murdock sold at least 202,274 shares of Quest stock for proceeds of approximately $ 2,189,454.29. *Id.* P 53.

Defendant Kevin Brooks ("Brooks") was Quest's Vice President and Corporate Controller (the Company's principal accounting officer) from September 2000 until October 20, 2006. On October 20, 2006 Brooks was reassigned in connection with Quest's Special Committee investigation of the stock option matters underlying the allegations in Plaintiff's FAC. *Id.* P 56. Brooks signed each Form 10-Q, 10-K, and 10-K405 filed during the Class Period. During the Class Period, Brooks was granted at least 40,000 stock options, and sold at least 57,620 shares of Quest stock for proceeds of approximately $ 891,691.87. *Id.* P 59.

527 F. Supp. 2d 1164, *1170; 2007 U.S. Dist. LEXIS 84695, **6

Defendants Smith, Morse, Lambert, Garn, Doyle, Murdock, and Brooks are collectively referred to as "Individual [**7] Defendants." Plaintiff alleges that, by virtue of their positions at Quest, the Individual Defendants had access to the adverse and undisclosed information about the operating results and financial condition of the Company. *Id.* P 63.

**B. Stock Options and Backdating**

Given the media attention and the numerous national scandals, there is widespread public awareness of various companies' backdating of stock options. Nevertheless, in the interest of thoroughness and a proper understanding of the scheme Plaintiff has alleged, the Court will briefly restate the nature of stock options and "backdating." A stock option gives an employee a right to buy company stock in the future at the price of the stock on the date of the grant. This price is referred to as the "exercise price" or the "strike price," and the date is referred to as the "measurement date." If the stock price rises, the options have value. The plan under which an option is granted will often have a time frame during which the option cannot be exercised; i.e., the person who holds the option cannot take advantage of the option for an amount of time defined by the option plan. Once this time has elapsed, the option is "vested" and [**8] can be exercised at will by the grantee. As described by U.S. District Judge William Alsup:

"Once exercisable, the options are worth the difference between the exercise price and the current market price. If the stock price falls, the options are worthless. Options with an exercise price equal to the stock's price as of the grant date are referred to as "at-the-money" options. Those with an exercise price lower than the stock's market price are referred to as "in-the-money" options.... For financial reporting purposes, companies granting in-the-money options have to recognize compensation expenses equal to the difference between the market price and the exercise price. No compensation costs need be recognized for at-the-money options, for the company does not forego any revenue by granting them. The motive for [*1171] backdating is to avoid a "hit to the earnings," i.e., a compensation

expense, while still awarding in-the-money options. Those responsible simply backdate the grants to a date where the stock price was attractively low and pretend that the grant was awarded on the earlier date rather than the real date. [This creates a "paper profit."] Since the paperwork shows that the exercise [**9] price is the same as the market price on the phony grant date, they pretend no need exists to recognize an expense...The company is in effect granting in-the-money options without recognizing the attendant compensation expense."

*In re Zoran Corp. Deriv. Litig. F. Supp. 2d , No. C 06-05503 WHA, 511 F. Supp. 2d 986, 2007 U.S. Dist. LEXIS 43402, 2007 WL 1650948, *2 (N.D. Cal. June 5, 2007).*

Through this process, the companies accrue a double benefit. First, companies are able to avoid reporting a higher compensation expense and paying the taxes associated therewith, thereby artificially inflating net income and the price of their stock. Second, those being granted options (often directors and management) can secretly inflate their own compensation using improper methods that are not disclosed to the company's shareholders or the public at large. *See* Pl.'s First Am. Compl. at P 83.

Since this backdating process has entered the public consciousness, more than "190 companies have either announced internal reviews of their own option practices for apparent backdating or been placed under state or federal investigation for the practice." *Id.* P 80. Once the Sarbanes-Oxley Act of 2002 ("SOX") and the resulting SEC rules became effective in August [**10] of 2002, stock option grants were required to be reported within two business days. *Id.* P 82. Previously, stock option grants were not required to be reported until after the end of the fiscal year. Thus prior to August 2002, a granting body could potentially grant the option, but then at the end of the fiscal year, before reporting the option and its corresponding grant date, look back on the stock's performance for the past year and change the measurement date of the stock to reflect the best price for the year. By only permitting a two day window between the granting of an option and the reporting of the option, SOX attempted to curtail the ability of companies to

Case 1:07-cv-00144-RJL    Document 26-5    Filed 07/29/2008    Page 5 of 24

Page 4

527 F. Supp. 2d 1164, *1171; 2007 U.S. Dist. LEXIS 84695, **10

engage in this backdating process. No longer could option-granting bodies look back over the past year and select the best date, post-SOX this "look back" period was restricted to two business days.

## C. Alleged Backdating at Quest

Plaintiff has provided a highly detailed time line documenting the alleged backdating that occurred at Quest. The Court does not make any determination regarding the ultimate validity or truth of Plaintiff's statements, but must nevertheless consider them true for purposes of this motion. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,    U.S.   , 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007)*; [**11] *Guerrero v. Gates, 442 F.3d 697, 703 (9th Cir. 2006).*

On June 9, 1999, the stockholders of Quest adopted the 1999 Stock Incentive Plan (the "1999 Plan") for Company employees. Plaintiff alleges that pursuant to the 1999 Plan, all of the options granted to Quest employees or non-employee Board members of the kind that are the subject of Plaintiff's FAC (the "incentive options") would have an exercise price per share not less than one-hundred percent (100%) of the fair market value per share of Quest common stock on the option grant date. Pl.'s First Am. Compl. P 88. Plaintiff further alleges that under "the [1999] Plan, (i) there would be no compensation expense to the Company, and (ii) there would be an incentive for the employee to do his or her part to increase the value of Quest stock [*1172] from the grant date so that the option would have value." *Id.* P 89. The Board's Compensation Committee administered the Plan pursuant to which the stock options at issue in Plaintiff's FAC were granted.

Plaintiff has made several allegations regarding option grants to the Individual Defendants. Quest issued approximately four [**12] million options in 2000. One of the recipients of these options was Defendant and then Vice President Garn, who received 80,000 option grants that reportedly had an exercise price based on the April 14, 2000 closing market price for Quest stock. According to Plaintiff, these grants were reported to have occurred on the very day that Quest's stock traded at its lowest price per share for that year. *Id.* P 6(a). Quest also issued over 8.9 million options during 2001, with exercise prices based on the March 28, 2001, April 4, 2001, and October 1, 2001 closing market prices for Quest stock.

Defendant and then-CFO Morse received 250,000 option grants based on the March 28, 2001 closing market price for Quest stock. One month later, Quest's stock price was trading 143.09% higher than the purported option grant date. Also in 2001, Defendant and CEO Smith received 300,000 option grants, Defendant Doyle received 100,000 option grants, Defendant Garn received 300,000 additional option grants, and Defendant Morse received an additional 100,000 option grants. Eyal M. Aronoff ("Aronoff"), a non-party to this suit, President of a company acquired by Quest, and Chief Technical Officer of Quest from [**13] September 2000 to June 3, 2003, received 200,000 option grants. All of these grants had exercise prices based on the April 4, 2001 closing market price for Quest stock. One month later, Quest's stock price had risen 123.16% from the April 2001 closing market price.

Later that same year, Defendant Smith received 485,000 option grants, Defendant Garn received 100,000 option grants, Defendant Morse received 300,000 option grants, Defendant Brooks received at least 20,000 option grants, and Aronoff received 550,000 option grants, all of which had reported exercise prices based on the October 1, 2001 closing market price for Quest stock. According to Plaintiff, these grants were reported to have occurred within two days of the lowest price per share for Quest's stock of that year. *Id.* P 6(b)(iii). In 2002, Defendant Smith received 800,000 option grants, Defendant Morse received 200,000 option grants, and Aronoff received 600,000 option grants, all of which had reported exercise prices based on the August 7, 2002 closing market price for Quest stock. These grants occurred within two days of, and three cents above, the lowest price per share for Quest stock for the first eight months of that [**14] year. *Id.* P 97.

In total, Defendant Smith received 1,585,000 option grants, Defendant Morse received 850,000 option grants, Defendant Doyle received 100,000 option grants, Defendant Garn received at least 480,000 option grants, Defendant Brooks received 40,000 option grants, and Aronoff received 1,350,000 option grants. Plaintiff alleges that all of these options were granted for prices below the fair market value of the Company's stock; yet the Company failed to establish a compensation expense. Plaintiff alleges that because of the difference between the exercise price and the market price on the actual dates the option grants should have been reported as compensation, the Company had lower earnings than those that were reported, and therefore Defendants'

527 F. Supp. 2d 1164, *1172; 2007 U.S. Dist. LEXIS 84695, **14

option granting practices have caused false and misleading financial reporting under GAAP.

**[*1173]** Under the Charter of Quest's Compensation Committee of the Board of Directors, the Compensation Committee has the responsibility of supervising the administration of the Company's 1999 Stock Incentive Plan. Defendant Murdock served on the Compensation Committee during the Class period and, Plaintiff alleges, approved or accepted the stock option **[**15]** grants. Under the Charter of Quest's Audit Committee of the Board of Directors, the Audit Committee had the responsibility of reviewing and consulting with management and the independent auditor regarding the quality, adequacy, and effectiveness of Quest's internal financial reporting controls. Additionally, Plaintiff alleges it was the Audit Committee's responsibility to review the financial statements issued during the relevant time period. Defendants Doyle and Murdock served on the Audit Committee and either approved or accepted the financial statements.

**D. False and Misleading Statements Made During the Class Period**

Plaintiff has alleged that Defendants either made, or caused to be made numerous false and misleading statements during the Class Period. *Id.* P 109. The crux of Plaintiff's assertion is that by pricing the options below the stock's fair market value on the actual grant date, Defendants were able to bring an instant paper profit to themselves and others (i.e., Aronoff). In turn, by failing to properly record the costs associated with the options in its financial statements, Quest's costs were understated, and its profits were overstated during the fiscal periods in which **[**16]** the options were granted. This further increased the profit to Defendants by artificially elevating the market price of Quest's stock. As Quest is a public company traded on the NASDAQ exchange, these overstatements were represented to shareholders and the public-at-large by way of various SEC-required forms, including Form 10-Qs and 10-Ks, among others.

**I. Form 10-Qs, 10-Ks, and 10-K405s**

Plaintiff alleges that each Form 10-Q, from the third quarter of fiscal 2001 through the end of fiscal 2004, was false and misleading as a result of Defendants Smith, Morse, and Brooks allowing Company employees to manipulate the **[*1174]** measurement dates of employee stock options to achieve the aforementioned effect of

creating a "paper profit." *Id.* P 113. Further, Plaintiff alleges that the collective actions of Defendants Quest, Smith, Morse, and Brooks caused the Company's financial statements to under-report charges to its stock-based compensation expense, which in turn inflated the Company's net income during the Class Period. *Id.* P 114. Specifically, Defendants Morse and Brooks both signed each Form 10-Q for the third quarter of fiscal 2001 through the end of fiscal 2004. Additionally, Defendants Smith **[**17]** and Morse both signed certifications for each Form 10-Q for the second quarter of fiscal 2002 through the end of fiscal 2004 pursuant to Exchange Act *Rule 13A-14* and *15D-14*, as adopted pursuant to *§ 302* of SOX, and *18 U.S.C. § 1350*, as adopted pursuant to *§ 906 of SOX* (hereinafter, the "SOX Certifications"). These signatures certified that the reports did not contain any untrue statements of material fact; and that the financial statements fairly presented in all material respects the financial condition, results of operations and cash flows of the Company. *See 18 U.S.C. § 1350(b).*

Plaintiff alleges that each Form 10-Q for the first quarter of fiscal 2005 through the first quarter of fiscal 2006 was false and misleading as a result of Defendants Smith, Brooks, and Lambert allowing Company employees to manipulate the measurement dates of employee stock options to achieve the aforementioned effect of creating a "paper profit." Id P 117. Defendants Lambert and Brooks both signed each Form 10-Q filed for the first quarter of fiscal 2005 through the first quarter of fiscal 2006. Defendants Smith and Lambert also each signed SOX Certifications for each Form 10-Q for the first quarter of fiscal **[**18]** 2005 through the first quarter of fiscal 2006.

Plaintiff also alleges that each Form 10-K or Form 10-K405 filed in years 2002 through 2005 was false and misleading. Specifically, the Form 10-K405 filed in 2002 and the Form 10-Ks filed in 2003 and 2004 were signed by Defendants Smith, Doyle, Morse, Brooks, and Murdock. The Form 10-K filed in 2005 was signed by Defendants Smith, Morse, Brooks, and Murdock. Additionally, Defendants Smith and Morse both signed SOX Certifications for each Form 10-K filed in years 2003 through 2005. Plaintiff also alleges that the Form 10-K filed with the SEC in 2006 was false and misleading. The Form 10-K filed in 2006 was signed by Defendants Smith, Lambert, Brooks, and Murdock. Defendants Smith and Lambert also signed the 2006 SOX

Case 1:07-cv-00144-RJL     Document 26-5     Filed 07/29/2008     Page 7 of 24

Page 6

527 F. Supp. 2d 1164, *1174; 2007 U.S. Dist. LEXIS 84695, **18

Certifications.

**ii. Proxy Statements & Form 4s**

Beyond the Form 10-Ks, 10-K405s, and 10-Qs, Plaintiff is alleging that various proxy statements also contained false or misleading statements. The proxy statement filed with the SEC on April 30, 2002 (the "2002 Proxy Statement") represented that the value of the Company's stock options was "calculated on the basis of the fair market value of [Quest's] Common Stock on the exercise date." **[**19]** *Id.* P 130. The 2002 Proxy Statement also disclosed the option grants to Defendants Smith, Garn, Doyle, Morse, and non-party Aronoff in 2001. The proxy statement filed with the SEC on April 30, 2003 (the "2003 Proxy Statement") stated that "the stock options granted in the last fiscal year were 'granted at an exercise price equal to the fair market value of Quest Common Stock on the grant date.'" *Id.* P 131. Plaintiff alleges that Defendants Smith, Morse, Doyle, Brooks, and Murdock caused the Company to file both the 2002 Proxy Statement and 2003 Proxy Statement.

In the 2002 Proxy Statement, the Compensation Committee stated that "[n]one of [their] executive officers received non-performance-based compensation in an amount exceeding the limit" in *Section 162(m) of the Internal Revenue Code*, which prohibits a federal income tax deduction to publicly held companies for compensation paid to certain executive officers, to the extent that compensation exceeds $ 1.0 million per covered officer in any fiscal year. Additionally, the Compensation Committee stated that it "does not anticipate that non-performance-based compensation to be paid to [Quest's] executive officers in 2002 will exceed" **[**20]** the limit in *Section 162(m)*. *Id.* P 133. Although Plaintiff has not provided quoted language from subsequent proxy statements, Plaintiff alleges that the Compensation Committee made similar statements in the 2003 Proxy Statement as well as the proxy statement filed with the SEC on May 19, 2004 (the "2004 Proxy Statement"). Defendant Murdock signed the Compensation Committee reports in the 2002, 2003, and 2004 Proxy Statements.

The proxy statements between 2002 through 2005 all contained statements by the Board's Audit Committee, recommending that the audited financial statements from the previous fiscal year be included in the Company's Annual Report on Form 10-K for that year. Thus, the Audit Committee was endorsing the prior financial statements. Defendant Murdock signed the Audit Committee reports in the 2002, 2003, and 2004 Proxy Statements. Quest **[*1175]** also filed a proxy statement with the SEC on July 11, 2005 (the "2005 Proxy Statement"); Defendant Murdock signed the Audit Committee report in this statement as well.

Plaintiff alleges that the 2002 through 2005 Proxy Statements contained additional misstatements, e.g., by not disclosing the compensation granted via the allegedly backdated **[**21]** options, the Summary Compensation Tables from the proxy statements failed to reflect the proper compensation awarded to Defendants. Specifically, Plaintiff alleges that the 2002 Proxy Statement failed to report the compensation of (1) Defendant Garn in 2000 as a result of his option grants in 2000; (2) Defendants Smith, Doyle, Garn, Morse, and non-party Aronoff, as a result of their option grants in fiscal year 2001; and (3) Defendants Smith, Morse, and non-party Aronoff, as a result of their option grants in 2002. *Id.* P 142. The amount of this unreported compensation is, according to Plaintiff, material.

Plaintiff alleges that the Company made additional similar material misstatements in the 2003, 2004, and 2005 Proxy Statements. As with the 2002 Proxy Statement, Plaintiff alleges that these misstatements were the result of the failure to disclose the compensation awarded via the option grants. *Id.* PP 142-44. From the 2003 Proxy Statement, Plaintiff alleges that Defendants failed to disclose the compensation given to (1) Defendants Smith, Doyle, Morse, and non-party Aronoff, as a result of the option grants received in 2001; and (2) Defendants Smith, Morse, and non-party Aronoff, as **[**22]** a result of the option grants received in 2002. *Id.* P 142. From the 2004 Proxy Statement, Plaintiff alleges that Defendants failed to disclose the compensation given to (1) Defendants Smith, Garn, and Morse, as a result of the option grants received in 2001; and (2) Defendants Smith and Morse in fiscal year 2002 as a result of the option grants received in 2002. *Id.* P 143. From the 2005 Proxy Statement, Plaintiff alleges that Defendants failed to disclose the compensation given to Defendants Smith and Morse in fiscal year 2002 as a result of options received in 2002. *Id.* P 144.

Plaintiff has also alleged that several Form 4s' filed by Defendants were false and misleading in that the forms failed to represent the actual dates on which the options were granted. Specifically, the Form 4s' filed by

Case 1:07-cv-00144-RJL    Document 26-5    Filed 07/29/2008    Page 8 of 24

Page 7

527 F. Supp. 2d 1164, *1175; 2007 U.S. Dist. LEXIS 84695, **22

Defendant Brooks on August 12, 2004, November 9, 2004, November 15, 2004, and February 8, 2005 were allegedly misleading. Additionally, the Form 4s' filed by Defendant Garn on December 12, 2005 and March 10, 2006 falsely represented the dates on which the options were granted.

### E. Reports of Backdating at Quest and Damage to Quest's Stock Price

In May 2006, reports of possible backdating at Quest [**23] began to emerge. On May 19, 2006, a Goldman Sachs research report revealed that Quest had "highly suspicious" stock option grant dates. The Goldman Sachs report stated that management had explained that the grant dates at issue "are tied to specific board meetings and were thus not chosen at a later date." *Id.* P 150 at 39:20-23. This report was published before trading began on May 19, 2006. During trading on May 19, Quest's stock price declined by 11.39%, from $ 15.98 per share to $ 14.16 per share. On May 22, 2006, after the close of trading, Quest issued a press release announcing the formation of a Special Committee (the "Special Committee") to investigate the stock option grant dates mentioned in the May 19, 2006 Goldman Sachs report. Quest's stock price dropped again to $ 13.32 per share. On June 1, 2006, Quest [*1176] announced that it had been contacted by the SEC regarding an informal inquiry relating to Quest's past stock option granting practices. Two weeks later, on June 14, 2006, Quest announced that H. John Dirks ("Dirks") was elected as a new director of Quest. The announcement also stated that Dirks would be a member of the Special Committee.

Before trading began on July 5, [**24] 2006, the Company issued a press release ("the July 5 Press Release") revealing that "the accounting measurement dates for many of the company's stock option grants awarded during the period from the fall of 1999 and into 2002 were actually obtained subsequent to the measurement dates used for financial reporting purposes." *Id.* P 157. Thus, Quest's statement was a clear admission that the Company had discovered instances of stock option backdating. Moreover, "the Special Committee [] determined, based on its preliminary analysis, that non-cash stock-based compensation expense should have been recorded . . . and that the amount of such additional expense is expected to be material." *Id.* The July 5 Press Release also stated that the financial statements and the related reports "for the

periods from 2000 through 2005 and for the quarter ended March 31, 2006 should no longer be relied upon." *Id.* P 158. The July 5 Press Release noted that any restatements made as a result of the discovered backdating of stock options "would have the effect of decreasing reported amounts of income from operations, net income, net income per share and retained earnings contained in" the financial statements [**25] filed from 2000 through the quarter ending March 31, 2006. *Id.* P 159.

Following the July 5 Press Release, the Company's stock dropped again to $ 12.86 per share at the end of trading on July 5, 2006. The drop in the Company's stock now totaled 20.10% since May 18, 2006, the last trading day before the Goldman Sachs report was released. Notably, Plaintiff stated in its FAC that this 20.10% drop in stock is not attributable to a general downturn in the market -- between May 19, 2006 and July 5, 2006, the NASDAQ National Market (the exchange on which Quest's stock is traded) was up 3.18%, and the Russell 2000 Technology Index was down 2.29%. Both of these numbers are minimal compared to the 20.10% drop suffered by Defendants' stock.

Quest did not file a Form 10-Q for the second quarter of 2006. Instead Quest filed a Form NT 10-Q on August 10, 2006, stating that it would file restated financial statements for the periods from 2000 through the quarter ended March 31, 2006 as soon as practicable after the completion of the Special Committee's investigation. *Id.* P 163. On August 17, 2006, Quest filed a Form 8-K stating that the failure to file a timely Form 10-Q had led NASDAQ to a determination [**26] that Quest would be delisted from the NASDAQ and that Quest had requested a hearing to review the decision. On October 26, 2006, Quest filed a Form 8-K reporting that Defendant Brooks had been reassigned from his role as Corporate Controller and Principal Accounting Officer of the Company as of October 20, 2006. The October 20, 2006 Form 8-K stated that the reassignment was "in connection with Quest's ongoing Special Committee investigation of stock option matters and was an interim decision pending completion of the Special Committee investigation and related restatement." *Id.* P 165. On November 24, 2006, Morse, then Quest's Senior Vice President of Corporate Development, resigned from Quest. The purported reason for Morse's departure was his refusal to cooperate with the Special Committee investigating the option granting procedures.

Case 1:07-cv-00144-RJL    Document 26-5    Filed 07/29/2008    Page 9 of 24

Page 8

527 F. Supp. 2d 1164, *1176; 2007 U.S. Dist. LEXIS 84695, **26

On January 15, 2007, Quest issued a press release that the Special Committee **[*1177]** had reported the findings of its investigation into the stock option dating practices. The Special Committee concluded that "accounting measurement dates for most of the stock option grants to employees from July 1998 to May 2002 differed from the recorded grant dates." *Id.* P 166. **[**27]** According to the Special Committee, the backdating of stock options ceased as soon as the Sarbanes-Oxley Act became effective. Additionally, the Company confirmed the need to restate some of the previously filed financial statements to properly "reflect the additional non-cash stock-based compensation expense that should have been recorded." *Id.* In this same press release the company confirmed its preliminary estimate of a non-cash stock-based compensation expense of $ 150 million through the period ending March 31, 2006. The Company further announced on January 15, 2007 that the Special Committee had directed the Company to reprice the ascertained offending stock options to an exercise price equal to the fair market value of the Company's common stock as of the corrected accounting measurement dates and to attempt to recover all or substantial portions of the after-tax gains the executive officers realized from the exercise of those stock options. Quest also announced that the NASDAQ Stock Market LLC has given Quest until September 17, 2007 to file all delinquent periodic reports necessary to regain compliance with the SEC periodic reporting requirements. *See* Stipulation and Order **[**28]** Re: Response and Briefing Schedule for Plaintiffs' Consolidated Am. Compl., *In re Quest Software, Inc. Deriv. Litig.,* SA CV 06-0751 DOC (RNBx), at 1:14-17.

**F. Quest's Violation of GAAP**

The financial statements filed throughout the Class Period were represented by Quest as having been prepared in accordance with GAAP. However, Plaintiff claims that these statements and public statements about the Company's financial condition violated GAAP and SEC rules by failing to properly report and disclose the Company's stock-based compensation expenses and net income during the Class Period. Moreover, the magnitude of Defendants' alleged GAAP violations are substantial -- currently estimated at $ 150 million. This estimate does not yet include the tax consequences or monetary tax obligations that will result from this additional expense and the effect on previous deductions taken under *Internal Revenue Code Section 162m.* Plaintiff has also alleged that, due to Quest's accounting errors, Quest presented its financial results and statements in a manner that violated numerous principles articulated by the Accounting Principles Board ("APB"). *See id.* at PP 178(a)-(g).

**G. Motive and Profit from the Misconduct**

Plaintiff **[**29]** has alleged that Defendants' motive for backdating the stock options was to profit from an artificially low purchase price on their stock purchases, and to further increase the profit by taking advantage of the artificially inflated stock price resulting from inflated net income reports. During the Class period, as noted by the respective From 4s': (1) Defendant Smith sold 445,300 shares for a total of $ 6,875,382.82; (2) Defendant Doyle sold 1,974,543 shares for a total of $ 27,679,352.74; (3) Defendant Garn sold 65,000 shares for a total of $ 983,700; (4) Defendant Murdock sold 202,274 shares for a total of $ 2,189,454.29; and (5) Defendant Brooks sold 57,620 shares for a total of $ 819,691.87. Collectively, Defendants Smith, Garn, Doyle, Murdock, and Brooks sold at least 2,744,737 shares of Quest stock during the Class Period for proceeds of approximately $ 38.5 million.

**[*1178] H. Procedural Background**

On March 26, 2007 Plaintiff filed its FAC. Plaintiff's FAC contains three claims against Quest and the Individual Defendants. Claim I is against Defendants Quest, Smith, Morse, Lambert, Doyle, Murdock, and Brooks for violation of *§ 10(b)* of the Exchange Act and SEC *Rule 10b-5* (securities fraud). **[**30]** Claim II is against Defendants Quest, Smith, Morse, Lambert, Garn, Doyle, Murdock, and Brooks for liability pursuant to *§20(a)* of the Exchange Act (control person liability). Claim III is against Defendants Smith, Brooks, Garn, Doyle, and Murdock for violation of *Section 20A* of the Exchange Act (insider trading).

Having recited the relevant facts and allegations, the Court will now turn to the applicable legal standard.

**II. LEGAL STANDARD**

Under *Federal Rule of Civil Procedure 12(b)(6),* a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. Once it has adequately stated a claim, a plaintiff may support the allegations in its complaint with any set

Case 1:07-cv-00144-RJL    Document 26-5    Filed 07/29/2008    Page 10 of 24

Page 9

527 F. Supp. 2d 1164, *1178; 2007 U.S. Dist. LEXIS 84695, **30

of facts consistent with those allegations. *Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1969, 167 L. Ed. 2d 929 (2007)*; *see Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990)* (stating that a complaint should be dismissed only when it lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory). Dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its **[**31]** claim that would entitle it to relief. *Bell Atlantic, 127 S. Ct. at 1968* (abrogating *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*).

The Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *Guerrero v. Gates, 442 F.3d 697, 703 (9th Cir. 2006)*; *Balistreri, 901 F.2d at 699*. Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment. *Jackson v. Carey, 353 F.3d 750, 758 (9th Cir. 2003)* (citing *Chang v. Chen, 80 F.3d 1293, 1296 (9th Cir. 1996)*); *Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000)*.

Additionally, fraud claims must be pled with more particularity than other claims. *Federal Rule of Civil Procedure 9(b)* provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b)*. "*Rule 9(b)* ensures that allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud **[**32]** charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985)*. *Rule 9(b)* therefore requires that allegations of fraud identify the parties to the misrepresentation such that each defendant is on notice of what specifically they are accused of. *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991)*.

Through the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress has imposed heightened pleading standards on securities fraud actions. *15 U.S.C. §§ 78u-4(b)(1), (2)*. "The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter." *In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1084 (9th Cir. 2002)* (citing *Ronconi v. Larkin,* **[*1179]** *253 F.3d 423, 429 (9th Cir. 2001)*). "The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'" *Id. at 1084-85* (citing *In re Silicon Graphics Sec. Litig., 183 F.3d 970, 973 (9th Cir. 1999)*). **[**33]** To meet this heightened pleading requirement, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id. at 1085* (citing *15 U.S.C. §§ 78u-4(b)(1)*).

The second requirement of the PSLRA is that the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* (citing *15 U.S.C. §§ 78u-4(b)(2)*) (emphasis added). The Ninth Circuit has interpreted the scienter pleading requirement as meaning that plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics, 183 F.3d at 974*. The *Silicon Graphics* Court further clarified that "recklessness only satisfies scienter under *§ 10(b)* to the extent that it reflects some degree of intentional or conscious misconduct." *Id. at 977*. The requisite recklessness must be an "extreme departure from the standards of ordinary care, **[**34]** and which presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it." *Id. at 984*. A plaintiff cannot proceed on pleadings averring scienter based on mere "motive and opportunity" but instead must "state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id. at 979*.

Recently, in *Tellabs v. Makor Issues & Rights, Ltd., U.S. , 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*, the Supreme Court elaborated on the PSLRA's "strong inference" standard for pleading scienter. Agreeing with the standard in the Ninth Circuit, the Court held that "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on *Rule 12(b)(6)* motions to dismiss . . . . The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

Case 1:07-cv-00144-RJL    Document 26-5    Filed 07/29/2008    Page 11 of 24

Page 10

527 F. Supp. 2d 1164, *1179; 2007 U.S. Dist. LEXIS 84695, **34

individual allegation, scrutinized in isolation, meets that standard." *Id. at 2509* (emphasis in original).

Under the PSLRA "when determining whether plaintiffs have shown a strong inference of scienter, the court must consider **[**35]** *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir. 2002)*. However, the "inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences' . . . . [T]he inference of scienter must be more than merely 'reasonable' or 'permissible'- it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, 127 S. Ct. at 2510*. Thus, a "complaint will survive. . . only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* (emphasis added).

## III. DISCUSSION

### A. Elements of Securities Fraud

The Securities and Exchange Act of 1934 prohibits "(1) the 'use or employ[ment] . . . of any . . . deceptive device,' **[*1180]** (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities and Exchange Commission 'rules and regulations.'" *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341, 125 S. Ct. 1627, 1630-31, 161 L. Ed. 2d 577 (2005)* (citing *15 U.S.C. § 78j(b)*). Securities **[**36]** and Exchange Commission *Rule 10b-5* makes it unlawful for any person, in connection with the purchase or sale of any security, to "make any untrue statement of a material fact" or to "omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *17 C.F.R. § 240.10b-5 (2004)*. "The courts have implied from these statutes and Rule a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura, 544 U.S. at 341* (citing *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730, 744, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 196, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976))*. In addition, "Congress has imposed statutory requirements on that private action." *Id.* The Supreme Court has enumerated the following elements of a cause of action for securities fraud arising under *section 10(b)* and *rule 10b-5*:

(1) *a material misrepresentation (or omission), see Basic Inc. v. Levinson, 485 U.S. 224, 231-232, 108 S. Ct. 978, 99 L. Ed. 2d 194, . . . (1988)*;

(2) *scienter, i.e.,* a wrongful state of mind, *see Ernst & Ernst, [425 U.S.] at 197, 199 . . .* ;

(3) *a connection* **[**37]** *with the purchase or sale of a security, see Blue Chip Stamps, [421 U.S.] at 730-731 . . .* ;

(4) *reliance,* often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation,' *see Basic, [485 U.S.] at 248-249 . . .* (nonconclusively presuming that the price of a publicly traded share reflects a material misrepresentation and that plaintiffs have relied upon that misrepresentation as long as they would not have bought the share in its absence);

(5) *economic loss, 15 U.S.C. § 78u-4(b)(4)*; and

(6) *'loss causation,' i.e.,* a causal connection between the material misrepresentation and the loss, [*15 U.S.C. § 78u-4(b)(4)*]; cf. T. Hazen, Law of Securities Regulation, §§ 12.11[1], [3] (5th ed.2002).

*Dura, 544 U.S. at 341* (emphasis in original).

Of the six elements Plaintiff must allege to state a claim for securities fraud under *§ 10-b*, Defendants only challenge the scienter element. *See* Defs.' Mem. of P. & A. in Supp. of Mot. to Dismiss First Am. Compl. 7:26-16:19 (hereinafter "Defs.' Mot."). Specifically, Defendants argue that Plaintiff has not pled scienter with the requisite degree of particularity required under the PSLRA. *Id.* at 8:1-3. Both **[**38]** the Ninth Circuit and the Supreme Court have directed that determinations regarding the sufficiency of the scienter allegations in a complaint should be not be made by scrutinizing "each allegation in isolation[,] but [by] assess[ing] all the allegations holistically." *Tellabs, 127 S. Ct. at 2511*.

Case 1:07-cv-00144-RJL    Document 26-5    Filed 07/29/2008    Page 12 of 24

Page 11

527 F. Supp. 2d 1164, *1180; 2007 U.S. Dist. LEXIS 84695, **38

Moreover, this "holistic determination" must be made by determining whether Plaintiff has "pled facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Id. at 2513* (emphasis added). Thus, for purposes of this order, the Court will analyze each of the relevant facts and allegations individually, and then weigh them in their totality to determine whether the scienter requirement has been sufficiently pled. For the reasons set forth below, the Court [**1181**] concludes that Plaintiff has sufficiently pled scienter.

It should be noted at the outset, however, that Defendants misapprehend the nature of the *Tellabs* decision and its effect on the PSLRA standard within the Ninth Circuit. Defendants claim in their Reply to Plaintiff's Opposition that the *Tellabs'* mandate that courts take "into account plausible opposing inferences" somehow elevates the PSLRA pleading [**39**] standard above the prior Ninth Circuit standard. *See* Defs.' Reply in Supp. of Mot. to Dismiss First Am. Compl. at 3:24-27, 4:8-10 (hereinafter "Defs.' Reply"). While the Supreme Court's holding in *Tellabs* requiring courts to consider "plausible opposing inferences" *may* have raised the standard in other circuits, in *Gompper*, cited in Defendant's own Motion at 7:13-14, 12:28, and 15:12, the Ninth Circuit held that "*all* reasonable inferences must be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper, 298 F.3d at 897* (emphasis in original). Moreover, the *Gompper* Court held that a court "should consider all the allegations in their entirety" to determine whether "the plaintiffs' complaint gives rise to the requisite inference of scienter." *Id.* In citing to *Gompper,* the *Tellabs'* Court held that the inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, *not* whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, 127 S. Ct. at 2509.* Thus, in *Tellabs* the Supreme Court explicitly approved the Ninth Circuit's *Gompper* standard. Given that the Ninth Circuit language is [**40**] virtually identical to the language in *Tellabs,* and the *Tellabs* court *cited to Gompper* in relation to this holding, Defendants' claim that *Tellabs* somehow elevated the pleading standard is incorrect and ironic given that Section II(A) of Defendants' Reply is entitled "Plaintiff Misapprehends the Pleading Standard."

**B. Backdated Stock Options**

The Court finds the backdated stock options and the concurrent practices of the option-granting employees are highly suspicious and concludes that both lean heavily toward a finding of scienter. Quest has admitted that "accounting measurement dates for most of the stock option grants to employees from July 1998 and May 2002 differed from the recorded grant dates." *See* Compl. P 166. Defendants argue that despite this admission, the backdated options are insufficient to plead scienter because the granting procedures are "highly technical," and the backdating is the result of "the complexity of accounting for equity-based compensation." Defs.' Mot. at 10:25-26 n. 5; Defs.' Reply at 10:5-6. Defendants' argument is unpersuasive.

The option grants at issue are those granted on April 14, 2000, March 28, 2001, April 4, 2001, October 1, 2001, August 6, 2002, [**41**] and August 7, 2002. The first date, April 14, 2000, was the lowest price for Quest stock in 2000. The March 28, 2001 stock price preceded one of the steepest rises in the trading history for Quest's common stock, a 143.09% rise over the next month. On April 4, 2001, one week after the March 28, 2001 option grants, Quest issued additional options. April 4, 2001 was the lowest stock price per share for the first six months of that year. As with the March 28, 2001 option grants, this stock price also preceded one of the steepest rises in trading history for Quest's common stock, a 123.16% rise over the next month. The options granted on October 1, 2001 were granted at a price that was within two trading days of the lowest stock price per share of Quest's stock in 2001. Indeed, the issue price was a mere three cents higher than the lowest price for the year; a marginal sum given the October 1, 2001 price of $ 10.74 per share for Quest's common stock. The option [**1182**] grants dated August 6, 2002 were within one day of the lowest price per share of Quest's stock for the first eight months of that year. One month later, Quest's stock price had risen 33.45%. Finally, options were also granted on [**42**] August 7, 2002. One month after this date, Quest's stock price had risen 34.94%. Plaintiff has not alleged any improper option granting dates after August 7, 2002; but instead has suggested that the lack of any additional dates from August 7, 2002 to the end of the class period (July 3, 2006) is a direct result of the option reporting provisions of SOX becoming effective at the end of August 2002. For an additional discussion of the Plaintiff's allegations regarding the ramifications of SOX, *see* Section II(B), *infra.*

At first glance, these extremely fortunate dates give

527 F. Supp. 2d 1164, *1182; 2007 U.S. Dist. LEXIS 84695, **42

rise to a strong inference that backdating has occurred and that it was done intentionally. The dates supplied in Plaintiff's FAC all appear to reflect either the lowest prices for a period exceeding six months, or are prices that immediately proceeded rapid increases in the price of Quest's stock. The fact that none of the option grant dates resulted in less-than-favorable results for Defendants also gives rise to a strong suggestion that the improper dating of options was intentional.

Moreover, to see the rather remarkable results of the "highly technical" accounting treatments, one need only look at the stock charts [**43] reproduced in Plaintiff's FAC. *See* Pl.'s First Am. Compl. 3:6-12, 4:7-14, and 5:1-8. When these stock charts reflecting Quest stock's price history are overlaid with demarcations reflecting the date of the option grants at issue (as has been done in Plaintiff's FAC), the presence of backdating becomes abundantly clear. The graphical representation lends substantial support to the notion that no amount of "highly technical" accounting treatments can obscure the obvious: that someone at Quest was engaging in substantial, prolonged, and *intentional* backdating of stock options. In the parlance of the *Tellabs* holding, the Court can definitively state that the inference that intentional backdating occurred at Quest is more "cogent and compelling" than any opposing inference offered by Defendant. Thus, in accordance with Ninth Circuit precedent, the question then becomes whether Plaintiff has adequately pled that Defendants' either knew of the backdating, or were deliberately reckless in not knowing of the backdating.

### C. Defendants' Knowledge of Backdated Options

The Court finds that Defendants either knew or were deliberately reckless in not knowing that the purported option grant dates were [**44] improper. Given the extremely beneficial option grant dates, the Individual Defendants' respective executive positions in the Company, and the substantial number of shares awarded to the various Defendants during and before the Class Period, the Court finds that Plaintiff has sufficiently pled a "strong inference" that Defendants knew or were deliberately reckless in not knowing that the purported option grant dates were improper. *See Gompper, 298 F.3d at 897*. Nevertheless, as the Court is required to consider *all* inferences, not just those that are beneficial to Plaintiff, the Court will now turn to Defendants' arguments. *See id.*

Defendants have argued in their moving papers that the method of accounting for options is "highly technical." Defs.' Mot. 10:23-28 n.5. Moreover, Defendants argue that Plaintiff has failed to allege that each Defendant knew that the accounting measurement date for any option grant differed from the grant date. In support of this argument, Defendants assert that the Individual Defendants "would have to know [*1183] that the process or methodologies that the Company used produced different accounting measurement and grant dates." *Id.* Here the Individual Defendants [**45] reaped substantial rewards as a result of the backdating, and thus they knew how favorable the option grant dates were, such that they didn't need to understand the process and methodology to know that the dates were improper.

Under these circumstances, the Court finds it highly improbable that a failure to comprehend the proper accounting treatment of stock options would so consistently benefit Defendants. Regardless of whether the accounting is "highly technical," it can not cause option grant dates to mysteriously fall on some of the lowest priced dates of 2000, 2001, and 2002 without someone's influence. Indeed, were such determinations as complex as Defendants argue, it would be expected that the option measurement dates would occasionally be detrimental to Defendants. When the absence of detrimental measurement dates is combined with the fact that Defendants were some of the primary beneficiaries of the backdated options, and also held key positions to control the measurement dates, the conclusion is that Defendants likely influenced the grant dates, and thus, likely knew of the improper backdating. Although "likely knew" is insufficient for purposes of the PSLRA, actual knowledge [**46] is not the only mental state that satisfies the PSLRA.

A strong showing of scienter can also be adequately pled if the complaint pleads "deliberate recklessness" in lieu of actual knowledge. *Silicon Graphics, 183 F.3d at 974*. Collectively, Defendants were the recipients of literally millions of option grants between 1998 and 2002. This fact, standing in isolation, is insufficient to establish "deliberate recklessness." However, Plaintiff's FAC specifies the precise number of options received by Defendants on the respective improper grant dates. *See* Pl.'s First Am. Compl. PP91-97. Indeed, it is simply incomprehensible that for such large option grants Defendants would not have been keenly aware of the option measurement date and the resulting value of the

Case 1:07-cv-00144-RJL    Document 26-5    Filed 07/29/2008    Page 14 of 24

Page 13

527 F. Supp. 2d 1164, *1183; 2007 U.S. Dist. LEXIS 84695, **46

option grants. Given that Defendants' respective positions on the Compensation Committee, Audit Committee, as CFOs, etc., would have given Defendants detailed knowledge of when the options were actually granted, and given that the Court has already found (in no small part because of the press release issued by Quest itself) that extensive backdating occurred, Plaintiff's FAC has adequately pled that Defendants would have known or were **[**47]** deliberately reckless in not knowing about the backdated options. Thus, Plaintiff has pled a strong inference of scienter. Although this inference of scienter is compelling, to survive at this stage the inference must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, 127 S. Ct. at 2510*.

Defendants argue that even if they were aware of the improper measurement dates of the options, this is not sufficient to demonstrate deliberate recklessness, as the Individual Defendants were not aware of the proper accounting treatments for option measurement dates. However, as previously stated, the Court finds that the measurement dates for determining when an option was effectively granted are not so complex as to cause confusion on the part of sophisticated public company executives. To be clear, the Court is *not* relying on a *de facto* rule that scienter is sufficiently pled if the option grants were given to those at the executive level within the company; nor is the Court relying on a *de facto* rule that option measurement date calculations are not inherently complex. Rather, the Court finds that the substantial number and value of the option **[**48]** grants **[*1184]** given to Defendants that consistently had measurement dates on either the lowest prices of the year or immediately proceeding rapid rises in the Company's stock, combined with Defendant's key positions relating to both the granting of and/or accounting for stock options gives rise to a compelling inference of either Defendants' actual knowledge or deliberate recklessness. [2]

  2  It is important to stress that the Court is not finding that Defendant's positions alone are sufficient to establish scienter. To do so would be contrary to established Ninth Circuit precedent. *See In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1087 (9th Cir. 2002)*. Instead the Court is only concluding that Defendants' positions, when combined with the relevant circumstances, suggests an inference of scienter. To be clear, it is

this combination with other particularized facts that may allow the Court to find that scienter has been adequately pled.

Plaintiff's allegations regarding Defendants' knowledge is further supported by the interplay between the effective date of the Sarbanes-Oxley Act and the timing of Defendants' use of improper measurement dates. Plaintiff has alleged that the last options to be **[**49]** backdated were those options for which the measurement date was changed to August 6 and 7, 2002. The reason, according to Plaintiff is the effective date of SOX. After August 30, 2002, the effective date of Sarbanes-Oxley § 403, stock option grants were required to be reported within two business days. Plaintiff alleges that § 403 meant that Defendants could no longer engage in the practice of looking back over the course of the fiscal year to choose the most beneficial dates as option measurement dates. *See* Pl.'s First Am. Compl. P 196. Defendant counters that an innocent explanation exists: Quest's option granting procedures did, in fact, involve a certain degree of hindsight, and the passage of SOX effectively prohibited these procedures. In light of the remarkably fortuitous option grant dates Plaintiff describes (*see id.* at 2:20-5:9 and 25:25-27:13), Defendants argument is highly implausible. As Defendant's argument is neither as cogent nor as compelling as Plaintiff's pleadings, the Court finds that Plaintiff has adequately pled that Defendants either had knowledge of or were deliberately reckless in the determination of stock option measurement dates.

**D. Defendants' Stock Sales**

The **[**50]** next issue is whether Defendants' stock sales can be considered "suspicious" to support a finding of scienter. Plaintiff has alleged that five of the seven individual Defendants (Smith, Brooks, Garn, Doyle, and Murdock) have sold, in total, at least 2,744,737 shares of Quest common stock during the Class Period for proceeds totaling approximately $ 38,547,581.72. Pl.'s First Am. Compl. P 191. At a glance, the rather substantial number of shares sold and the resulting proceeds suggest a possible motive for the backdating such that the stock sales support an inference of scienter. However, as Defendants have correctly noted, these facts alone, without qualification or explanation, are insufficient under Ninth Circuit precedent. "[I]nsider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to

Case 1:07-cv-00144-RJL    Document 26-5    Filed 07/29/2008    Page 15 of 24

Page 14

527 F. Supp. 2d 1164, *1184; 2007 U.S. Dist. LEXIS 84695, **50

maximize the personal benefit from undisclosed inside information." *Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001)* (quoting *In re Silicon Graphics, 183 F.3d at 986* (quoting *In re Apple Computer Sec. Litig., 886 F.2d 1109, 1117 (9th Cir. 1989))*. To make this determination, Courts must consider three relevant factors: "(1) the amount **[**51]** and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading **[*1185]** history." *Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001)*.

**i. Amount and Percentage of Shares Sold By Insiders**

Plaintiff has pled with particularity the amount of shares sold by the respective Defendants, but not the percentage. *See* Pl.'s First Am. Compl. pp. 52-61. Plaintiff has listed the precise number of shares sold, the dates on which the shares were sold, the price for which the shares were sold, and the resulting earnings by each Defendant. *Id.* Plaintiff has not, however, alleged what percentage of each Defendant's shares were sold.

Typically, courts consider the percentage of shares sold to determine whether insiders are taking advantage of insider knowledge regarding a scheme that will artificially inflate the company's price. *See generally, Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001)*. Thus, for the insiders to benefit from the artificially inflated stock prices, they must sell their stock before the scheme or "truth" becomes public and reduces the stock price. In prototypical cases of insider trading, the scheme is of **[**52]** a limited or relatively short duration; e.g., insiders knowingly misrepresenting upcoming financial reports, insiders with information of a planned, but unreleased disclosure that will have a dramatic negative effect on the Company's stock, etc. Thus, for the insiders to benefit from the scheme, they must act quickly to sell their stock before the scheme becomes public and lowers the stock price. In turn, for the insiders to maximize their benefit, the insiders will sell large percentages of their stock.

There is no such prototypical scenario here.[3] Rather, Defendants were engaged in backdating options for at least four years. As the alleged scheme took place over several years, there was no reason for Defendants to quickly sell large percentages of their shares. Indeed, if Defendants had been successful in maintaining this scheme, the public would not have become aware of the

improperly dated options. Moreover, large sales of stock options may have actually raised suspicion, thereby causing the scheme to be detected earlier.

3    Pre-SOX backdating schemes generally will not fit within this prototypical scenario.

Defendants also had no reason to believe that they needed to sell large percentages **[**53]** of their stock. Unlike insiders in other cases who know that the then-inside information will eventually be disclosed to the public, resulting in a drop in the stock price, and thus, requiring them to sell large portions of stock to maximize their profit, in this case it was not inevitable that the improperly-dated stock options would be revealed. Thus, the requirement that percentages be pled is only relevant when the insider is aware of the time that the inside information will be disclosed and there will be a resulting effect on the stock price. Assuming that the inside information will not be disclosed, the insider has no incentive to sell a large portion of his or her shares in order to maximize profit because the inside-information will not reach the marketplace, and thus will not have a negative effect on the stock price. Without a foreseeable negative impact on the stock price, large percentages of stock need not be sold to achieve a substantial profit.

Unlike in the prototypical scenario in which insiders would know the precise date of public disclosure, and could sell large portions of their stock before the disclosure, here the disclosure of Quest's backdating came without **[**54]** any forewarning to Defendants. In fact, Plaintiff alleges the eventual disclosure of the improperly-dated stock options was initially triggered **[*1186]** by the May 19, 2006 Goldman Sachs report that revealed Quest's "highly suspicious" stock option grant dates. It appears that Defendants did not know when or even if this report would be released; it is therefore unsurprising that Defendants did not sell large percentages of their stock before knowledge of Quest's backdating practices was disseminated through the market. Thus, the fact that Plaintiff has not alleged that Defendants sold large percentages of their stock is without consequence. Because Plaintiff has pled the amount of stock sales with the appropriate degree of specificity, and the amount is substantial enough to justify an inference of motive, this sub-factor leans in favor of finding the stock sales "suspicious."

**ii. Timing of the Sales**

527 F. Supp. 2d 1164, *1186; 2007 U.S. Dist. LEXIS 84695, **54

Plaintiff has pled with a sufficient degree of specificity precisely when Defendants sold shares of their stock. Traditionally, this factor, however, is not only concerned with the date on which the insider's shares were sold, but rather when the shares were sold in relation to the revelation of **[**55]** the inside-information. *See generally, Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001).* As previously described, the nature of Defendants' alleged scheme was such that there was no preordained date on which the allegations of improper backdating would be revealed with the resulting drop in stock price. The facts of this case do not lend themselves to analysis under this factor for two reasons. First, as previously stated, unlike the prototypical scenario where insiders are aware of the precise disclosure date for inside information, here Defendants were not aware of the date on which Quest's backdating practice would be revealed. Accordingly, Defendants' stock sales will not reflect large sales prior to the disclosure. Second, unlike the prototypical scenario, the nature of Defendants' scheme does not depend on timing; regardless of when the stock is sold, the fact that the stock was granted at such a relatively low price virtually guarantees Defendants will reap significant profits.

Nevertheless, if applied to the facts at hand, it is apparent that after the disclosure of Quest's backdating, Defendants were in a catch-22. If Defendants sold large quantities of their remaining shares **[**56]** shortly after the reports of backdating began to disseminate throughout the market, but before the negative impact of the revelations affected the stock, Defendants' actions would have caused a strong appearance of impropriety. If Defendants waited until after the disclosure to sell their shares over time, however, they would be forced to sell after the stock prices had declined. Accordingly, there was no positive action for Defendants to take once the backdating practice was made public. Thus, the fact that Plaintiff has not pled facts relating to the timing of Defendants sales' is of little significance and this factor neither weighs for nor against a finding of suspicious stock sales.

### iii. Whether the Sales were Consistent with the Insider's Prior Trading History

Plaintiff's FAC does not plead any of Defendants' pre-Class Period stock trading activity. The failure to plead this factor could be highly damaging to Plaintiff's assertion that the stock sales were "suspicious." Yet here

this factor is effectively moot. Plaintiff's Opposition notes that but for the five year statute of limitations, the Class Period would have began "with the commencement of public trading of Quest stock." **[**57]** Pl.'s Opp. to Defs.' Mem. of P. & A. in Supp. of Mot. to Dismiss FAC 17:14-15. This is due to the fact that Plaintiff alleges that option backdating began before the Company had gone public in 1999. *See id.* 17:11-17. Thus, the crux of Plaintiff's **[*1187]** argument is that because Defendants were backdating options during the *entire* pre-Class Period, the fact that Plaintiff has not demonstrated that the sales were consistent with Defendants' prior trading history is effectively meaningless as there is no trading period without the influence of backdated options with which to compare the sales. The Court finds this argument persuasive, and thus finds that this factor neither weighs for nor against a finding of suspicious stock sales.

### iv. Totality of Factors

Given that the first factor, "amount of shares sold" weighs in favor of a finding that the stock sales provided a motive for Defendants' backdating, and that the second and third factors neither weigh for nor against a finding of suspicious stock sales, the Court finds that the stock sales are "suspicious," and thus provide a possible motive for Defendants' actions. Nonetheless, as with several of the other circumstances mentioned, this determination **[**58]** standing alone is insufficient to establish scienter; further analysis is required.

### E. Departure and Reassignment of Quest Employees

While Plaintiff's allegations regarding Brooks' reassignment do not support a finding of scienter, the allegations about Morse's resignation lean heavily towards a finding of scienter. By Quest's own admission, Brooks was reassigned from his position as Quest's chief accounting officer in connection with the Special Committee's investigation. The reassignment of Brooks is not inherently suspicious. Given that Brooks' failure to properly account for the option grants resulted in a $ 150 million reduction in Quest's net income requiring Quest to restate several years of financial statements, it is not at all surprising that Brooks would be reassigned. The reassignment does not, however, require the conclusion that Brooks was either reckless or aware of the improperly dated option grants. It is just as plausible that Brooks was either negligent or grossly negligent -- neither of which are sufficient under the PSLRA and

Case 1:07-cv-00144-RJL    Document 26-5    Filed 07/29/2008    Page 17 of 24

Page 16

527 F. Supp. 2d 1164, *1187; 2007 U.S. Dist. LEXIS 84695, **58

Ninth Circuit precedent. Indeed, while the magnitude of the restated financial reports combined with Brooks' reassignment lends additional [**59] credence to the inference that Brooks was aware of the improperly dated options, it does not necessarily lead to the inference that Brooks' was reassigned due to impropriety. Accordingly, this circumstance is of little significance. *See DSAM Global Value Fund v. Altris Software*, 288 F.3d 385, 391 (9th Cir. 2002).

The departure of Morse is, however, far more troubling. Plaintiff has pled, and Defendants do not contest that Morse, the former CFO of Quest, refused to cooperate with the Special Committee, and instead chose to resign from Quest. Defendants have not offered any plausible alternative inferences. Instead, Defendants direct the Court to two cases: *In re Cornerstone Propane Partners, L.P., Sec. Litig.* 355 F. Supp. 2d. 1069 (N.D. Cal. 2005) and *In re Hypercom Corp. Sec. Litig.*, No. CV-05-0455-PHX-NVW, 2006 U.S. Dist. LEXIS 45482 (D. Ariz. July 5, 2006). Although unclear, Defendants appear to be arguing one of two theories. Either Defendants are arguing that these cases stand for the proposition that executive-level resignations without more do not *create or help to create* an inference of scienter, or Defendants are arguing that executive-level resignations *cannot* create an inference [**60] of scienter. *See* Defs.' Mot. 16:3-4. Regardless of which of these arguments Defendants are making, Defendants' reliance on both of these cases is misplaced.

The facts of *In re Cornerstone Propane Partners, L.P., Sec. Litig.* are too dissimilar to provide a useful analogy. In *Cornerstone* [*1188] the individual defendants either resigned or were terminated (the parties' claims differed) as a direct result of the company's corresponding need to restate financial results. Assuming for the moment that the individual defendants in that case resigned, they did not do so to avoid cooperating with the company's financial restatement process. Instead the *Cornerstone* court specifically stated that these resignations were "expected after restatements and other adverse business events." *In re Cornerstone*, 355 F. Supp. 2d at 1092. [**61] The court thus implied that resignations following financial restatements may be normal results of internal pressure, and, as such there is no suggestion of impropriety. This is not the case here. Morse did not resign because of internal pressure, but instead resigned specifically to avoid cooperating with the Special Committee -- a body created to investigate

potential impropriety.

The facts of *In re Hypercom Corp. Sec. Litig.* are also dissimilar. The plaintiffs in *Hypercom* alleged that the bare resignation by the company's former CFO was evidence of scienter. The *Hypercom* court gave little weight to this assertion because the CFO "was not fired for cause, and Hypercom did not publicly offer a reason . . . for his resignation." *In re Hypercom Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 45482, at *27. Such is not the case here. Plaintiff has pled, and Defendants have not denied that Morse refused to cooperate with the Special Committee and resigned. *See* Pl.'s FAC P 198. Thus, unlike the plaintiffs in *Hypercom*, Plaintiff here has offered a plausible, unchallenged, and highly suspicious reason for Morse's resignation from Quest.

Although the Court finds that the reassignment of Brooks does [**62] not lean towards a finding of scienter, Defendants have not offered any plausible argument to cause the reassignment of Brooks to lean away from a finding of scienter either. Therefore Brooks' reassignment is neutral. Nevertheless, the Court finds that Morse's resignation is highly suspicious. As such, this fact leans heavily towards a finding of scienter.

**F. Financial Statements**

In addition to the particularity requirement of the PSLRA, scienter is properly alleged when the complaint alleges both false statements and the defendants' involvement in the preparation of those statements. *See In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1023 (9th Cir. 2005). Further, "[t]he most direct way to show both that a statement was false when made and that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *In re Exodus Commc'ns Inc. Sec. Litig.*, No. C 01-2661 MMC, 160, 163, 2005 U.S. Dist. LEXIS 20222, 2005 WL 1869289, at *5 (N.D. Cal. Aug. 5, 2005) (citation omitted). Applied to option backdating, a "'general allegation' that a particular practice 'resulted in a false report of company earnings is not a sufficiently particular [**63] claim of misrepresentation'; rather, 'the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position.'" *2005 U.S. Dist. LEXIS 20222, [WL] at *15 (N.D. Cal. Aug. 5, 2005)* (citing *In re Daou at 1016, 1018*).

Case 1:07-cv-00144-RJL    Document 26-5    Filed 07/29/2008    Page 18 of 24

Page 17

527 F. Supp. 2d 1164, *1188; 2007 U.S. Dist. LEXIS 84695, **63

It has already been established for purposes of this motion that Defendants knew or were deliberately reckless in not knowing of the backdated option grants. Accordingly, in order to establish scienter, the question is whether Defendants knew or were deliberately reckless in not knowing that the backdated options would have a material effect on the financial reports. [*1189] Based upon the Special Committee's investigation, Plaintiff has pled that the total compensation expense that should have been reported as a result of the option grants is $ 150 million ("the total unreported expense"). The total unreported expense, $ 150 million, is clearly material. Such a large expense is material regardless of whether it is compared to the overall market capitalization of the company or the company's annual net income.

Although the total unreported expense is clearly material, it has not been stated with [**64] the requisite degree of particularity under the PSLRA. To properly determine the culpability of the Individual Defendants, the complaint must state what the unreported expense was for each individual year that improperly granted options were given. Without this fact, it is difficult to determine whether the Individual Defendants were deliberately reckless. For example, if a substantial portion of the total unreported expense was accrued in one specific year, then a determination of who was acting with deliberate recklessness will be different than if the total unreported expense accrued proportionally over numerous years. As stated by U.S. District Judge Patel,

> "Yet, by failing to provide any allegations of time frames by which defendants knew of facts that would undermine the truth of their public disclosures, plaintiffs have not alleged that defendants possessed the requisite mental state. As currently written, the complaint fails the particularity requirement, lacking clear allegations establishing who knew what and when."

*In re Cornerstone Propane Partners, 355 F. Supp. 2d 1069, 1082 (N.D. Cal. 2005).*

Nevertheless, Plaintiff has alleged that Defendants Smith, Morse, Doyle, Murdock, [**65] and Brooks were all present through, at least, a substantial portion of the relevant time period. These Defendants were present while backdating was taking place, and these Defendants

failed to report a compensation expense that, as of 2006, was estimated at $ 150 million. Thus, although the omission of a breakdown of the misstated amounts for each financial statement weakens the inference of scienter, the magnitude of the unreported compensation expense, combined with the aforementioned Defendants' presence at the company during the time the unreported expense was accruing supports an inference of scienter.

Under Ninth Circuit precedent, a "later statement may suggest that a defendant had a contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Read-Rite Corp Sec. Litig., 335 F.3d 843 (9th Cir. 2003)* (citing *Yourish v. Cal. Amplifier, 191 F.3d 983, 996-97 (9th Cir. 1999)).* Pursuant to *18 U.S.C. § 1350(a)*, several individual Defendants signed the SOX Certifications between 2002 and 2006. SOX Certifications require the CEO and CFO to sign a statement that certifies "that the periodic [**66] report containing the financial statements fully complies with the requirements of *section 13(a)* or *15(d)* of the Securities Exchange Act [o]f 1934 (*15 U.S.C. 78m* or *78o (d)*) and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer." *18 U.S.C. § 1350(b)*. For these certifications to have any substance, signatories to the certifications must be held accountable for the statements. *See Howard v. Everex, 228 F.3d 1057, 1061 (9th Cir. 2000)*. It would be wholly inappropriate to permit a signatory to evade liability because he/she did not prepare the financial report, as Defendants argue, on the ground that the signatory was unaware of the misstatements [*1190] made therein. To hold otherwise would effectively eviscerate the entire substance of *18 U.S.C. § 1350*, the purpose of which is to ensure that regardless of who prepared the statements, the signatories are attesting to their accuracy and reliability. Additionally, several Defendants also signed proxy forms and other publicly reported financial disclosures. The financial disclosures, proxy statements, and SOX Certifications are clearly "statements" [**67] for the purposes of establishing contemporaneous knowledge. Given that the Company is currently in the process of restating numerous financial reports, contemporaneous knowledge of the financial reports signed by the Individual Defendants can be inferred.

Second, Defendants were aware of the 1999 Plan that was operative during the period in which the improper

Case 1:07-cv-00144-RJL    Document 26-5    Filed 07/29/2008    Page 19 of 24

Page 18

527 F. Supp. 2d 1164, *1190; 2007 U.S. Dist. LEXIS 84695, **67

option grants were awarded. The 1999 Plan makes clear that all option grants are to be awarded at 100% of the fair market value as of the measurement date. The substantial unreported compensation expense indicates that the option grants clearly violated the 1999 Plan. Even if Defendants were not aware of the "highly technical" accounting treatment required for determining the option measurement dates, Defendants should have been aware of their own 1999 Stock Option Plan. Thus, Defendants were either unaware of the Plan, or disregarded it. Given the Defendants' respective positions and duties with respect to options, and the number of grants Defendants received under the 1999 Plan, if Defendants were not aware of the 1999 Plan, they would be deliberately reckless. Alternatively, if Defendants were aware of the Plan but disregarded [**68] it, then they are effectively admitting they knew that the options were being granted at less than fair market value in violation of the 1999 Plan, and thus were deliberately reckless in not recording a compensation expense. In either case, a strong suggestion of *at least* deliberate recklessness has been shown.

Defendants stress that there was a lack of knowledge of impropriety because all of the Company's financial statements were audited. Defs.' Reply at 10:11-13. The fact that the financial statements were audited is insufficient to negate a finding of knowledge or deliberate recklessness on the part of Defendants. Neither Defendants' Motion nor Reply states who performed the audits, whether the auditors were members of the board, whether the auditors were recipients of option grants, or whether auditing was done by an outside body hired by Quest. Plaintiff, however, has alleged that one of the members involved in the option backdating practices was also a member of the Audit Committee. To borrow from a colloquialism, this case presents a situation where the wolves were guarding the henhouse. Instead of protecting the company from reporting improper financial statements, those responsible [**69] for supervising and auditing the financial statements were the very same people facilitating and benefitting from Quest's financial improprieties.

There is, however, one exception. Plaintiff's allegations regarding Defendant Lambert are insufficient as currently pled. Plaintiff argues that the Individual Defendants' wrongdoing extends beyond the final backdated option grant date (August 7, 2002) because the Individual Defendants failed to disclose the compensation expense in financial statements filed after the backdating practices ceased. Plaintiff's theory thus requires that despite this knowledge the Individual Defendants were aware of the option backdating scheme such that after the backdating practice terminated, the Individual Defendants continued to fail to report the corresponding compensation expense. However, this theory can not readily be applied to Lambert.

[*1191] Lambert joined Quest in January 2004, nearly a year and a half after the last backdated option was granted. Even assuming that the Individual Defendants waited until the end of the 2002 fiscal year to report the last set of backdated options, this report would likely have been made no later than March 31, 2003, the date [**70] on which Quest filed its 2002 10-K. Thus the last backdated options would have been reported eight full months before Lambert became Quest's Senior Vice President of Finance. This extended period of time makes it unlikely that Lambert knew of the backdating practices that had taken place a year and a half before his arrival at Quest.

## G. Totality of Circumstances Regarding Plaintiff's 10b-5 Claim

Plaintiff has pled numerous particularized facts. Under *Tellabs* and *Gompper* the Court must consider these facts in their totality. Plaintiff's FAC has adequately pled the following facts that support a finding of scienter: (1) that backdating existed; (2) that Defendants had knowledge or were deliberately reckless in not knowing that the options were backdated; (3) that Defendants stock sales were highly suspicious; and (4) the departure of Quest's former CFO Morse was suspicious. Although lack of allegations regarding the resulting financial impact weigh against a finding of a strong inference of scienter, the Court finds that the abundance of facts supporting a strong inference of scienter substantially outweigh this minor defect. Accordingly, Defendants' motion to dismiss Plaintiff's 10b-5 [**71] claim is DENIED IN PART with respect to Defendants Quest, Smith, Morse, Doyle, Murdock, and Brooks ("10b-5 Defendants").

Regardless of the Court imputing recklessness, Plaintiff's FAC has failed to adequately plead why Lambert has been included as Defendant for Plaintiff's 10b-5 claim. Although he signed several financial statements, his tenure at Quest began a year and a half after the options backdating practice ceased. And, while

Case 1:07-cv-00144-RJL    Document 26-5    Filed 07/29/2008    Page 20 of 24

Page 19

527 F. Supp. 2d 1164, *1191; 2007 U.S. Dist. LEXIS 84695, **71

inferences can be made regarding the mental state of the other Individual Defendants, the allegations in Plaintiff's FAC are insufficient to allow such an inference as to Lambert. Accordingly, Defendants' Motion to dismiss Plaintiff's 10b-5 claim is GRANTED and DISMISSED WITHOUT PREJUDICE with respect to Defendant Lambert.

## H. Scheme Liability

The Court finds that Plaintiff has adequately alleged scheme liability. In their papers, Defendants have challenged the sufficiency of Plaintiff's allegations regarding Defendants' purpose in granting the backdated options and filing the subsequent incorrect financial statements. *See* Defs.' Mot. at 17:1-19. Specifically, Defendants argue that Plaintiff has not sufficiently pled that "Defendants' 'purpose' in undertaking **[**72]** these routing [sic, should likely be "routine"] corporate functions was to defraud shareholders." *Id.* at 17:20-21.

To properly allege scheme liability, a plaintiff must show that each defendant is a "primary violator;" there is no private cause of action for "aiding and abetting" a violation. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver N.A.*, 511 U.S. 164, 191, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994); *Simpson v. AOL Time Warner*, 452 F.3d 1040, 1048 (9th Cir. 2006). In the Ninth Circuit, "to be liable as a primary violator of *§ 10(b)* for participation in a 'scheme to defraud,' the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Id.* at 1048. Moreover, "it is not enough that a *transaction* in which defendant was involved **[*1192]** had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect." *Id.* (footnote omitted) (emphasis in original). Thus, the Ninth Circuit has held that "[i]f a defendant's conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false **[**73]** appearance of fact in the furtherance of a scheme to defraud, then the defendant is using or employing a deceptive device within the meaning of *§ 10(b)*." *Id. at 1050*. When determining whether a defendant is a primary violator, the Ninth Circuit has directed district courts to view the defendant's individual conduct in isolation. *Id.*

The scheme Plaintiff alleges is quite simple: the 10b-5 Defendants "caused Quest to issue false and/or misleading statements in its public filings, which led shareholders and the investing public to falsely believe that Quest's accounting was in compliance with GAAP and that Quest was only issuing stock options to its executives/directors in accordance with" the 1999 Plan. Pl.'s Opp'n 22:5-8. Plaintiff has further alleged that the 10b-5 Defendants' purpose in causing Quest to file misstated financial results was equally simple: "to conceal that Quest executives were receiving backdated options in clear violation of the [1999] Plan, and that Quest was failing to properly account" for the resulting compensation. Pl.'s Opp'n 22:19-20; *see also* Pl.'s First Am. Compl. PP 180-200. The question now becomes whether each 10b-5 Defendant's conduct had "the principal **[**74]** purpose and effect of creating a false appearance of fact in furtherance of the scheme."

The financial statements and SOX Certifications filed with the SEC during the class period were the primary method of perpetuating this scheme. The Court has already found that the 10b-5 Defendants either knew or were deliberately reckless in not knowing that options were being backdated and that this would result in material misstatements of financial results. *See* § III(F), *supra.* Accordingly, any 10b-5 Defendant who signed these financial disclosures or SOX certifications will be considered to have had the primary purpose of perpetuating the scheme by creating a false appearance of fact; i.e., Quest's inflated earnings. Thus, as 10b-5 Defendants Smith, Morse, Doyle, Brooks, and Murdock each signed financial disclosures or SOX certifications, they are all "primary violators." *See* § I(A), *supra.* Additionally, as financial statements can be attributed to Quest itself, Quest is also a "primary violator." *See Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (finding that a company can be a primary violator); *see also Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993).

To **[**75]** be clear, the Court is not finding that any signatory to a misstated financial statement or SOX certification necessarily has the purpose of concealing wrongdoing. Rather, it is signing false financial statements or SOX certifications *combined with* the fact that the Court has already found that Plaintiff has adequately pled the 10b-5 Defendants were deliberately reckless in not knowing of the materially adverse effect the option backdating practices would have on the financial statements that results in the Court's finding that 10b-5 Defendants are "primary violators" for purposes of

Case 1:07-cv-00144-RJL     Document 26-5     Filed 07/29/2008     Page 21 of 24

Page 20

527 F. Supp. 2d 1164, *1192; 2007 U.S. Dist. LEXIS 84695, **75

establishing scheme liability. As the 10b-5 Defendants are "primary violators" with purpose of defrauding shareholders by signing false financial disclosures and SOX Certifications, the Court finds that Plaintiff has adequately alleged scheme liability against the 10b-5 Defendants.

### [*1193] I. Plaintiff's § 20(a) Claim

Count II of Plaintiff's FAC alleges "control person liability" against Defendants Quest, Smith, Morse, Lambert, Doyle, Murdock, Brooks, and Garn. The Court finds that Plaintiff has sufficiently pled the § 20(a) Claim with respect to some defendants. To establish liability under § 20(a), plaintiff must [**76] show: "(1) a primary violation of federal securities laws. . . and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., 228 F.3d 1057, 1065 (9th Cir. 2000)* (citation omitted). Defendants make three arguments that address Plaintiff's § 20(a) claim. First, Defendants argue that Plaintiff has failed "to allege a cognizable *Rule 10b-5* claim against any defendant. . . ." Defs.' Mot. at 17:26-27. Second, Defendants argue that Plaintiff failed to plead with the requisite particularity that the Individual Defendants engaged in any culpable conduct. Finally, Defendants argue that Plaintiff has not plead with particularity a "primary violator," and that Plaintiff has not and cannot plead control over a "primary violator." As the Court has already found that Plaintiff has adequately alleged a *Rule 10b-5* claim against Quest, Smith, Morse, Doyle, Murdock, and Brooks, Defendants' first argument is effectively moot.

Defendants also argue that Plaintiff has "failed to plead facts with particularity supporting a strong inference that [the 10b-5 Defendants] engaged in any culpable conduct, further precluding liability under *Section 20(a)*." Defs.' [**77] Mot. 18:3-5. Simply stated, under Ninth Circuit precedent, "Plaintiff need not show that the defendant was a culpable participant in the violation, but defendant may assert a 'good faith' defense." *Howard, 228 F.3d at 1065* (quoting *Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990)*). As Plaintiff need not show culpability on the part of 10b-5 Defendants, Defendants' culpability and corresponding particularity arguments are properly asserted in its answer, not a 12(b)(6) motion.

Defendants' final argument is, however, still relevant. Plaintiff has made numerous claims regarding the actions of each individual defendant. Moreover,

Plaintiff has adequately alleged that the 10b-5 Defendants are also "primary violators." However, in Plaintiff's FAC, Plaintiff does not *explicitly* state who was controlled by whom, how they were controlled, or when the control existed. Nevertheless, in Plaintiff's Reply, Plaintiff directs the Court to three paragraphs of Plaintiff's FAC (PP 112, 116, 120) that Plaintiff purports adequately plead control liability. These three paragraphs all indicate that on various specified dates, 10b-5 Defendants "caused" Quest to file several misstated [**78] financial results. [4] Thus, Plaintiff alleges that Quest is a primary violator by virtue of the false financial statements filed during the Class Period; and that Defendants Smith, Morse, Doyle, Murdock, and Brooks are all properly included as control persons for their collective exercise of control over the primary violator Quest. *See Howard v. Everex Sys., 228 F.3d 1057, 1065 (9th Cir. 2000)*. Plaintiff has sufficiently pled: (1) a primary violator (Quest); (2) that Defendants' respective positions gave them control over the primary violator; and (3) via the financial statements, that Defendants exercised said control. Thus, the Court finds that Plaintiff [*1194] has properly alleged control person liability with regard to Defendants Smith, Morse, Doyle, Murdock, and Brooks.

> 4    These three paragraphs (PP 112, 116, 120) standing in isolation are insufficient under *Fed. R. Civ. Proc. 9(b)*. However, Plaintiff's FAC precisely specifies which financial statements are misstated, who signed the statements, and why the statements were false. *See* Pl.'s Reply at 23:19-21 n. 33. The this additional particularity is sufficient at this stage of the proceedings.

As previously stated in §§ III(F) and (G), *supra,* [**79] the factual scenario surrounding Lambert makes the appropriateness of his inclusion less clear. Plaintiff argues that the Individual Defendants' wrongdoing extends beyond the final backdated option grant date (August 7, 2002) because the Individual Defendants failed to disclose the compensation expense in financial statements filed after the backdating practices ceased. For Plaintiff to maintain its theory, it must be assumed that Individual Defendants were aware of the option backdating scheme, yet despite this knowledge, after the backdating practice terminated, the Individual Defendants continued to fail to report the corresponding compensation expense. However, for the same reasons discussed in § III(F), *supra,* this theory cannot be applied to Lambert.

Case 1:07-cv-00144-RJL     Document 26-5     Filed 07/29/2008     Page 22 of 24

Page 21

527 F. Supp. 2d 1164, *1194; 2007 U.S. Dist. LEXIS 84695, **79

Lambert joined Quest in January 2004, nearly a year and a half after the last backdated option was granted. Even assuming that the Individual Defendants waited until the end of the 2002 fiscal year to report the last set of backdated options, this report would likely have been made no later than March 31, 2003, the date on which Quest filed its 2002 10-K. Thus the last backdated options would have been reported eight full months before **[**80]** Lambert became Quest's Senior Vice President of Finance. This extended period of time makes it unlikely that Lambert knew of the backdating practices that had taken place a year and a half before his arrival at Quest. Nevertheless, to "'establish the liability of a controlling person, the plaintiff does not have the burden of establishing that person's scienter distinct from the controlled corporation's scienter.'" *Howard, 228 F.3d at 1065* (quoting *Arthur Children's Trust, 994 F.2d at 1398 (9th Cir. 1993))*. Thus, since Plaintiffs have sufficiently alleged Quest's liability, Lambert may still be properly included as a defendant in Plaintiff's § 20(a) claim at this early stage because of his control over Quest.

Nevertheless, a problem exists for Garn and Quest's control person liability. According to Plaintiff's FAC, Garn was a Vice President from January 1998 through January 2002, left the company for one year, returning as Vice President from January 2003 through February 2005. Garn has been the President of Quest since February 2005. Plaintiff did not allege, and it is difficult for the Court to determine how, as a Vice President, Garn was able to exercise control over the other 10b-5 **[**81]** Defendants when the other 10b-5 Defendants held positions of Vice President or higher; i.e., how can Garn exercise control over either his peer Vice Presidents or his supervisors. Moreover, Plaintiff has not alleged how Garn exercised control over Quest. In the three paragraphs of Plaintiff's FAC, Plaintiff has not alleged that Garn caused Quest to file any misstated financial statements. Thus, for Plaintiff to establish Garn's control person liability, Plaintiff must provide factual support that Garn was in a position to control a primary violator. Accordingly, Plaintiff's § 20(a) claim against Garn is DISMISSED WITHOUT PREJUDICE.

Plaintiff has also alleged control person liability against Quest. As currently pled, Plaintiff's FAC does not allege how Quest exercised control over any of the other primary violators. Indeed, it would be difficult to fathom how Quest could control any of the Individual Defendants. Accordingly, Plaintiff's § 20(a) claim against Quest is DISMISSED WITHOUT PREJUDICE.

## J. Plaintiff's § 20A Claim

Count III of Plaintiff's FAC alleges that Defendants Smith, Doyle, Murdock, **[*1195]** Brooks, and Garn are liable for insider trading in violation of *Section 20A* of the Exchange **[**82]** Act, codified in *15 U.S.C. § 78t-1*. Defendants have made three arguments related to this claim. The Court addresses these in turn.

Defendants' first argument is that Plaintiff has not alleged an independent violation of the securities laws, as required to plead a violation of *Section 20A*. This argument presupposes the granting of Defendants' Motion in its entirety. As the Court has already found that Plaintiffs have adequately pled a violation of *§ 10(b)* and *Rule 10b-5*, this argument is effectively moot.

Defendants' second argument is that Plaintiff has not alleged a claim for insider trading with particularity. Specifically, Defendants argue Plaintiff's pleadings are insufficient because they fail to describe what the non-public information was, how each Individual Defendant learned of the information, or whether the Individual Defendants traded on the basis of that information. Defs.' Mot. 19:16-18. To the contrary, Plaintiff has sufficiently alleged the precise non-public information; i.e., the details of the undisclosed backdating practices. Plaintiff has also sufficiently alleged how each Individual Defendant learned of the information; i.e., they were either the beneficiaries of **[**83]** the options or had oversight over the option granting process. Finally, Defendants' argument that Plaintiff needs to show that Individual Defendants traded on the basis of this information is inapplicable to option backdating schemes. Again, option backdating schemes are unlike the prototypical insider trading scenario wherein an insider is aware of information that has a preordained disclosure date, the insider is aware that the information will have an effect on the stock price on the disclosure date (i.e., will cause the stock to rise or fall), and the insider therefore trades before the disclosure date. Instead, in option backdating schemes, the information is never scheduled to be disclosed. As the information is never scheduled to be disclosed, the insider has no predetermined disclosure date before which the insider needs to execute his trades. Accordingly, it is improper to require Plaintiff to plead this requirement.

Defendants' final argument is that Plaintiff lacks

Case 1:07-cv-00144-RJL     Document 26-5     Filed 07/29/2008     Page 23 of 24

Page 22

527 F. Supp. 2d 1164, *1195; 2007 U.S. Dist. LEXIS 84695, **83

standing because, with the exception of Smith, Plaintiff did not trade "contemporaneously" with Defendants. The "contemporaneous" term required by *15 U.S.C. § 78t-1* is inherently vague. Moreover, Congress did not **[**84]** intend to precisely define "'contemporaneous as used in *§ 20A*, but instead apparently intended to adopt the definition 'which has developed through the case law.'" *Neubronner v. Milken, 6 F.3d 666, 669 n.5* (citing H.R.Rep. No. 910, 100 Cong., 2d Sess. 27 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6043, 6064). Unfortunately, thus far, the Ninth Circuit has not provided additional significant guidance. In *Neubronner*, the Ninth Circuit specifically refrained from determining the "exact contours of 'contemporaneous trading' . . ." *Neubronner, 6 F.3d at 670*. The Court in *Neubronner* did, however, explain that "the contemporaneous trading rule ensures that only private parties who have traded with someone who had an unfair advantage will be able to maintain insider trading claims." *Id.* The *Neubronner* Court also endorsed a Second Circuit holding that "noncontemporaneous traders to not require the protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of trading with someone who has superior access to information." *Id. at 669* (citing *Wilson v. Comtech Telecommunications Corp., 648 F.2d 88, 94-95 (2d Cir. 1981)*).

Defendants have also directed the court to several **[**85]** district court cases that Defendants claim stand for the proposition that *[*1196]* "'contemporaneous trading' requires plaintiffs asserting a Section 20A claim to have traded on the same day as defendants." Defs.' Mot. 20:14-15. The cases Defendants cite state that the underlying purpose behind *Section 20A*: to serve "as a proxy for the traditional requirement of contractual privity between plaintiffs and defendants." *In re AST Research Sec. Litig., 887 F. Supp. 231, 233 (C.D. Cal. 1995)*. Accordingly, the "contemporaneous" time frame between an insider's sale and a plaintiff's purchase is relatively short because it is possible that the plaintiff purchased the actual shares sold by the insider. As the time between the insider's sale and plaintiff's purchase increases, the likelihood that the shares purchased by the plaintiff are the same shares the insider sold decreases substantially.

This is not, however, the only interpretation of the purpose behind *Section 20A*. An examination of relevant cases in the Second Circuit reveals a different interpretation. [5] In *In re Am. Bus. Computers Corp. Sec.*

*Litig.,* the Court held that "the better rule with respect to standing seems to be that a class action **[**86]** may be maintained on behalf of all persons who purchased stock on an exchange during the period that defendants were selling that stock on the basis of insider information." *In re Am. Bus. Computers Corp. Sec. Litig., 1994 U.S. Dist. LEXIS 21467, 1994 WL 848690, *4 (S.D.N.Y. February 24, 1994)*. Given that the Ninth Circuit has explicitly declined to define the contours of the "contemporaneous" requirement, after examining various approaches, the Court follows the more persuasive rule, that of Judge Brieant in *Am. Bus. Computers Corp.*

> 5   The Second Circuit is examined because the case that the Ninth Circuit heavily relied upon for its *Neubronner* decision, *Wilson v. Comtech,* was a decision from the Second Circuit. Accordingly, district courts interpreting the Second Circuit's *Wilson* decision are helpful.

In this case, as a direct result of Individual Defendants' actions, Quest's stock was befouled from the very day of Quest's IPO. There was a cloud over Quest's stock from before the Company's IPO in 1999 through the release of the Goldman Sachs' May 19, 2006 report. Thus, applying the *Am. Bus. Computers Corp.* rule, any trading done by Plaintiff before the Goldman Sachs' report was contemporaneous with the Individual **[**87]** Defendants' stock sales. While Plaintiff has not alleged in its FAC, or an exhibit thereto, precisely when it purchased shares of Quest's stock, in another filing with the Court, Plaintiff specified the precise days when it purchased and sold Quest stock. *See* Dec. of Patricia I. Avery in Support of Mot. of Middlesex Retirement Sys. to be Appointed Lead Pl. and for Approval of Lead Pl.'s Selection of Counsel, Ex. A at 3. The dates provided show that Plaintiff traded on the same day as Smith, within eight days of Garn, and within three days of Brooks. Plaintiff is granted leave to amend to add allegations related to its purchase of Quest stock. Once Plaintiff does so, Defendants' Motion to dismiss Count III, insider trading will be deemed DENIED.

## IV. DISPOSITION

For the reasons set forth above, Defendants' Motion is hereby GRANTED IN PART and DENIED IN PART.

Defendants' Motion to Dismiss Plaintiff's first claim, securities fraud in violation of *§ 10(b)* and SEC *Rule 10b-5*, is DENIED with respect to Defendants Quest,

527 F. Supp. 2d 1164, *1196; 2007 U.S. Dist. LEXIS 84695, **87

Smith, Morse, Doyle, Murdock, and Brooks. However, Defendants' Motion to Dismiss Plaintiff's first claim, securities fraud in violation of *§ 10(b)* and SEC *Rule 10b-5*, is GRANTED **[\*\*88]** and the claim is DISMISSED WITHOUT PREJUDICE with respect to Defendant Lambert.

**[\*1197]** Defendants' Motion to dismiss Plaintiff's second claim, "control person liability" under *§ 20(a)* of the Exchange Act, is DENIED with respect to Defendants Smith, Morse, Doyle, Murdock, and Brooks; but the Motion is GRANTED and the claim is DISMISSED WITHOUT PREJUDICE with respect to Defendants Quest and Garn.

Finally, as to Defendants's Motion to Dismiss Plaintiff's third claim, insider trading under *Section 20A* of the Exchange Act, is HELD IN ABEYANCE pending Plaintiff's filing of an amended complaint. However, as

stated above, once Plaintiff adds allegations pertaining to its purchase of Quest's stock, Defendants Motion to dismiss Plaintiff's third claim will be deemed denied.

Plaintiff shall have until December 1, 2007 to file an amended complaint. This additional time is being allotted to allow Plaintiff sufficient time to examine Quest's revised financial reports that were due to NASDAQ by September 17, 2007. [6]

> 6 Additionally, when Plaintiff files its amended complaint, Plaintiff is directed to use either a legible fax or another method of transmission, as the copy provided to the Court was virtually unreadable.

The **[\*\*89]** Clerk shall serve this minute order on all parties to the action.

EXHIBIT 5

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

Case No.  CV 06-6863 DOC (RNBx)                                    Date: July 10, 2008

Title: MIDDLESEX RETIREMENT SYSTEM v. QUEST SOFTWARE, INC., VINCENT C. SMITH, M. BRINKLEY MORSE, MICHAEL J. LAMBERT, DOUGLAS F. GARN, DAVID M. DOYLE, JERRY MURDOCK, JR., AND KEVIN BROOKS

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

_____Kristee Hopkins_____                          _____Not Present_____
Courtroom Clerk                                            Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS: ATTORNEYS PRESENT FOR DEFENDANTS:

NONE PRESENT                                            NONE PRESENT

PROCEEDING (IN CHAMBERS): ***AMENDED*** ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT; (2) ORDERING DISCOVERY

        Before the Court is Defendants Quest Software, Inc., Vincent C. Smith, Michael J. Lambert, Douglas F. Garn, David M. Doyle, Kevin Brooks and Jerry Murdock, Jr.'s ("Defendants") Motion to Dismiss Second Amended Complaint ("Defendants' Motion").  The Court finds the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; Local R. 7-15.  After considering the moving, opposing, and replying papers, the Court hereby GRANTS IN PART AND DENIES IN PART Defendants' Motion.

## I.    BACKGROUND[1]

        Defendant Quest Software, Inc. ("Quest") develops and sells database management and

_____

        [1] This is merely a brief summary.  For an extensive recitation of the facts, *see Middlesex Retirement System v. Quest Software Inc.*, 527 F. Supp. 2d 1164 (C.D. Cal. 2007).

other software.  Defendants Smith, Morse, Lambert, Garn, Doyle, Murdock and Brooks were Quest officers and directors.[2]  Plaintiff Middlesex Retirement System ("Middlesex" or "Plaintiff"), a Massachusetts pension fund, alleges, and Quest concedes that it knowingly backdated stock options given to employees pursuant to what Quest calls its "bucket and best price" methodology.  Middlesex claims that this policy caused Quest's financial statements to be materially misleading in that they failed to accurately reflect Quest's compensation expenses.  Quest recently restated its financials to reflect additional compensation expenses of nearly $150 million.

Pursuant to the "bucket and best price" methodology, at the end of each month or each quarter, Quest would identify the date where its stock price was lowest during that period.  Quest issued every option for that month (from high-level executives to entry-level employees) "as of" that date.  Quest's Compensation Committee would then grant the options through Uniform Written Consents (UWCs), using the "as of" date.  This resulted in immediate profits to recipients of the difference between the price on the "as of" date and the then current price of Quest's stock.  The "bucket and best price" methodology allowed Quest to grant immediate compensation to employees without recognizing a compensation expense.

According to Plaintiff, this practice violated both Generally Accepted Accounting Principles ("GAAP") and Quest's own 1999 Stock Incentive Plan (the "1999 Plan").  Quest repeatedly asserted in public filings that its option granting procedure complied with GAAP and that it granted options at prices consistent with the 1999 Plan.

Plaintiff alleges that many of the individual defendants were directly responsible for these and other false SEC filings.  Defendants Smith, Morse, Lambert, Murdock, and Brooks, signed SEC filings incorporating financial information that did not account for the compensation expense created by the options.  Smith, Morse, and Brooks were responsible for the underlying financial reports that

---

[2] Defendant Vincent C. Smith ("Smith") has been the Chairman of Quest's Board of Directors since 1998, a director since 1995, and CEO since 1997.  Defendant M. Brinkley Morse ("Morse") served as Quest's Senior Vice President, Corporate Development from 2005, as Vice President, Finance and Operations from 2001 to 2003, and as CFO from 2003 to 2005.  Defendant Michael J. Lambert ("Lambert") served as Quest's Senior Vice President of Finance in 2004 and 2005 and as CFO from 2005.  Defendant Douglas F. Garn ("Garn") served as Quest's Vice President, Worldwide Sales from 1998 to 2005, and as President from 2005 on.  Defendant David M. Doyle ("Doyle") served as a Director from 1987 until 2004 and as President until 2003.  Doyle was a member of Quest's Audit Committee form 1999 to 2001.  Defendant Jerry Murdock, Jr. ("Murdock") has been an outside Director of Quest since April 1999.  He was a member of Quest's Compensation and Audit committees.  Defendant Kevin Brooks ("Brooks") served as Quest's Vice President and Corporate Controller from 2000 to 2006, when he was reassigned.

misstated the compensation expenses. Doyle and Murdock, as members of the Audit Committee certified those financials for proxy statements filed with the SEC. Additionally, as Chairman of the Audit Committee, Murdock signed reports to Quest's board stating that the Audit Committee had verified financial information later found misleading.

Many of these defendants also received the backdated options: Smith received at least 1,585,000, Morse received at least 850,000, Garn received at least 480,000, Doyle received at least 100,000, and Brooks received 40,000. And many of them sold the corresponding Quest stock during the relevant period, resulting in significant profits.

In a 2006 report, Goldman Sachs suggested that Quest's option grant dates were suspicious. Quest initially denied any backdating but set up a Special committee to investigate its option granting procedures. Defendant Morse refused to be interviewed in this investigation. The Special Committee found substantial backdating. Approximately four months later Morse resigned from his position at Quest. During the same period Brooks was reassigned from his position as Corporate Controller and Principal Accounting Officer.

Middlesex's Second Amended Complaint ("SAC") charges that Defendants Quest, Smith, Morse, Doyle, Murdock and Brooks committed securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 thereunder. It also charges that Defendants Smith, Morse, Lambert, Doyle, and Brooks are liable as control persons under § 20(a) of that Act. Finally, it charges that Defendants Smith, Brooks, Garn, Doyle and Murdock for insider trading under § 20A of that Act.

Quest and the Individual Defendants filed Motions to Dismiss the SAC for failure to state a claim under Federal Rule of Civil Procedure 12 (b)(6).

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. Once it has adequately stated a claim, a plaintiff may support the allegations in its complaint with any set of facts consistent with those allegations. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007); *see Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (stating that a complaint should be dismissed only when it lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory). Dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief. *Bell Atlantic*, 127 S. Ct. at 1968 (abrogating *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957)).

The Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir. 2006); *Balistreri*, 901 F.2d at 699. Dismissal

without leave to amend is appropriate only when the Court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003) (citing *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996)); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

Additionally, fraud claims must be pled with more particularity than other claims. Federal Rule of Civil Procedure 9(b) provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "Rule 9(b) ensures that allegations of fraud are specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir. 1985). Rule 9(b) therefore requires that allegations of fraud identify the parties to the misrepresentation such that each defendant is on notice of what specifically they are accused of. *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991).

Through the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress has imposed heightened pleading standards on securities fraud actions. 15 U.S.C. §§ 78u-4(b)(1), (2). "The PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir. 2002) (citing *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)). "The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'" *Id.* at 1084-85 (citing *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 973 (9th Cir. 1999)). To meet this heightened pleading requirement, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* at 1085 (citing 15 U.S.C. §§ 78u-4(b)(1)).

The second requirement of the PSLRA is that the complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* (citing 15 U.S.C. §§ 78u-4(b)(2)) (emphasis added). The Ninth Circuit has interpreted the scienter pleading requirement as meaning that plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics*, 183 F.3d at 974. The *Silicon Graphics* Court further clarified that "recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 977. The requisite recklessness must be an "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it." *Id.* at 984. A plaintiff cannot proceed on pleadings averring scienter based on mere "motive and opportunity" but instead must "state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Id.* at 979.

Recently, in *Tellabs v. Makor Issues & Rights, Ltd.*, __U.S.__, 127 S. Ct. 2499 (2007), the Supreme Court elaborated on the PSLRA's "strong inference" standard for pleading scienter. Agreeing with the standard in the Ninth Circuit, the Court held that "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss . . . . The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509 (emphasis in original).

Under the PSLRA "when determining whether plaintiffs have shown a strong inference of scienter, the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002). However, the "inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences' . . . . [T]he inference of scienter must be more than merely 'reasonable' or 'permissible'- it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 127 S. Ct. at 2510. Thus, a "complaint will survive. . . only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* (emphasis added).

## III.    DISCUSSION

### A.    Section 10(b) Claim Against Quest, Smith, Morse, Doyle, and Brooks

The Securities and Exchange Act of 1934 prohibits "(1) the 'use or employ[ment] . . . of any . . . deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities and Exchange Commission 'rules and regulations.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341, 125 S. Ct. 1627, 1630-31 (2005) (citing 15 U.S.C. § 78j(b)). Securities and Exchange Commission Rule 10b-5 makes it unlawful for any person, in connection with the purchase or sale of any security, to "make any untrue statement of a material fact" or to "omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5 (2004). "The courts have implied from these statutes and Rule a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura*, 544 U.S. at 341 (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 744, 95 S. Ct. 1917 (1975); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S. Ct. 1375 (1976)). In addition, "Congress has imposed statutory requirements on that private action." *Id.* A cause of action for securities fraud arising under section 10(b) and Rule 10b-5 includes the following elements: (1) a material misrepresentation (or omission); (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura*, 544 U.S. at 341 (citations omitted).

Defendants only challenge the scienter element. They argue that Plaintiff has not pled scienter with the particularity required under the PSLRA.

Scienter determinations should be not be made by scrutinizing "each allegation in isolation[,] but [by] assess[ing] all the allegations holistically." *Tellabs*, 127 S. Ct. at 2511; *see also In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999). A securities fraud complaint may rely on circumstantial evidence of scienter as long as that evidence meets the "strong inference" standard. *Id.* at 996. To qualify as strong, "an inference of scienter must be more than merely plausible or reasonable - it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, LTD.*, 127 S. Ct. 2499, 2504-05 (2007). "We must consider 'whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.'" *Nursing Home Pension Fund, Local 44 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) (quoting *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2002)).

In backdating cases, Plaintiffs must establish that Defendants knew or were deliberately reckless in not knowing that: a) backdating was occurring; and b) this backdating made public statements misleading. *Middlesex Retirement System v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1188 (C.D. Cal. 2007).

This Court previously found that allegations in the First Amended Complaint gave rise to a strong inference that Quest "was engaging in substantial, prolonged, and intentional backdating of stock options," and that "Defendants either knew or were deliberately reckless in not knowing that the purported option grant dates were improper." *Id.* at 1183. Indeed, Defendants have acknowleged that they were aware that Quest was intentionally backdating its stock options. Defendants refer to the methodology as "bucket and best price," which is a nicer way of saying "intentional backdating."

The Court must now determine whether Defendants had the requisite scienter as to the misleading SEC filings. When viewed holistically, the facts alleged in the SAC give rise to a strong inference that Defendants knew, or were deliberately reckless in not knowing, that Quest's SEC filings were misleading. *Tellabs, Inc. v. Makor Issues & Rights, LTD.*, 127 S. Ct. 2499, 2511 (2007) (Determinations regarding the sufficiency of the scienter allegations in a complaint should be not be made by scrutinizing "each allegation in isolation[,] but [by] assess[ing] all the allegations holistically."). This inference is at least as compelling as the inference that Defendants were merely negligent.

## 1.    Defendants' Knew of Quest's Intentional Backdating

Defendants' knowledge of intentional backdating of stock options supports a strong inference that Defendants knew their SEC filings were misleading. Defendants knew that they were backdating stock options and were certainly aware of the large profits they were reaping from those

options.  Defendants were also aware that the financial statements they submitted to the SEC included figures, which were based in part, on those backdated stock options.  Therefore, it is highly implausible that Defendants were not aware that their prolonged practice of backdating stock options would have a material and misleading effect on their public financial statements.

### 2.    Defendants Repeatedly Certified that Quest's Financial Statements Conformed with GAAP

Financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  *17 C.F.R. § 210.4-01(a)(1)*.  Significant GAAP violations, when described with particularity, may provide powerful indirect evidence of scienter.  *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000).

GAAP requires reporting of expenses associated with stock options to be in accordance with Accounting Principles Board Option No. 25, "Accounting for Stock Issued to Employees" ("APB 25").  According to APB 25, if an option had an exercise price lower than the fair market value of the stock as of the measurement date, the company would have to recognize a compensation expense for the option.  *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 955 (N.D. Cal. 2007).  The measurement date is the first date on which it is known both (1) the number of options that an individual employee is entitled to receive, and (2) the option or purchase price. *Id.*

Plaintiff's SAC alleges several occasions where Defendants certified that its financial statements conformed with GAAP and APB 25.  Quest's Form 10-Ks for 2002 through 2005 stated that "Quest records compensation expense for options to purchase the Company's common stock granted at below fair market value.  The expense equals the difference between the fair market value of the Company's common stock on the grant date and the exercise price of the stock options and is recognized ratably over the vesting period."  Pl.'s Second Am. Compl. ¶ 114.  These Form 10-Ks were signed by the individual defendants.  Moreover, a proxy statement filed with the SEC in 2003 represented that Quest's stock options granted in the last year were "granted at an exercise price equal to the fair market value of Quest Common Stock on the grant date."  Pl.'s Second Am. Compl. ¶ 133.  Defendants have conceded in their Restatement that Quest granted stock options at an exercise price lower than fair market value on the date of the grant and failed to record the appropriate compensation expense.  Therefore, the representations made that Quest conformed with GAAP were false.

Defendants' repeated certifications that Quest was in compliance with GAAP were "red flags," which give rise to a strong inference that Defendants either knew or were deliberately reckless in not knowing that their backdating and accounting procedures rendered Quest's financial statements misstated.  *See In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 144-45 (E.D. N.Y. 2008).  Defendants were repeatedly confronted with warnings that their SEC filings must conform with GAAP principles.  Defendants repeatedly certified that Quest recorded compensation expenses for stock options granted below market value.  *See Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1061 (9th

Cir. 2000) ("When a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the documents are true."). Nevertheless, Defendants continued to backdate their stock options without recording the appropriate compensation expense.

It is far too convenient for Defendants to now argue that they did not understand the accounting implications of intentional backdating. Defendants were given ample warning and opportunity to conform with GAAP and failed to do so. At the very least, Defendants' actions show deliberate recklessness.

Defendants argue that proper application of APB 25 is complex and therefore cannot support a strong inference of scienter. The Court disagrees. Although in some circumstances application of APB 25 may be unclear, there is no plausible interpretation of APB 25 that can justify Defendants' intentional backdating and failure to record compensation expenses. *See United States v. Reyes*, 2007 WL 1574540, *3 (N.D. Cal. May 30, 2007) ("Whatever ambiguity may exist in APB 25, it is not possible to construe the rule's language as permitting the deliberate retroactive selection of a particular grant date…"). Furthermore, Defendants' positions on the Compensation and Audit Committees of Quest's Board of Directors likely caused them to be familiar with APB 25. *See In re Comverse Technology, Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 143 (E.D. N.Y. 2008) (individual defendants "were members of the Compensation and Audit Committee of Comverse's Board of Directors and therefore likely had significant familiarity with the accounting rules applicable to stock options, including the requirement that the grant of in-the-money stock options reduce a company's income to the extent it confers an immediate paper profit upon recipients.") *See also In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 956 (N.D. Cal. 2007) (Although there are a few instances where a company could misapply APB 25 through sloppy accounting practices without rising to the level of fraud, "intentionally employing hindsight to adjust the grant date to an advantageously low price, or 'backdating,' is fraud.").

### 3. Defendants Were Aware of Quest's 1999 Stock Incentive Plan

On June 9, 1999, Quest stockholders adopted the 1999 Stock Incentive Plan (the "1999 Plan"). Pursuant to the 1999 Plan, all of the options granted to Quest employees or non-employee Board members would have an exercise price per share not less than 100% of the fair market value per share of Quest common stock on the option grant date. The Plan makes clear that one purpose for this is to ensure that Quest does not incur any compensation expense related to stock option granting.

Whether or not Defendants' intentional backdating violated the 1999 Plan, the policies of the 1999 Plan clearly constitute a "red flag." Defendants must have been aware of the 1999 Plan, which makes clear that options were not to be granted at an exercise price lower than fair market value on the option grant date to ensure that the Company would not incur any compensation expense. Thus,

if options were granted at a price lower than fair market value on the option grant date, the Company would be forced to incur compensation expense.

Because the 1999 Plan clearly describes the accounting implications of granting options at an exercise price lower than fair market value on the option grant date, Defendants either knew or were deliberately reckless in not knowing that their accounting procedures would render Quest's financial statements materially misstated.

### 4.    Defendants' Initially Denied Wrongdoing

Defendants argue that because their intentional backdating procedure, "bucket and best price methodology," was consistently applied across all ranks of Quest employees it was an innocent methodology devoid of scienter.  The Court is not persuaded.  It would make little sense if an intentional backdating scheme could be considered innocent simply because Defendants backdated in favor of all ranks of employees.  Indeed, intentionally backdating all stock options benefitted Quest's stock price by artificially raising its purported revenue.  In addition, Defendants received the largest blocks of backdated options and therefore gained significantly more from backdating than Quest's rank-and-file employees.

Moreover, Defendants initially denied wrongdoing.  When confronted with the Goldman Sachs report in May 2006, Defendants explained that the grant dates were tied to specific board meetings and were thus not chosen at a later date. Later that month, a report released by Stifel, Nicolaus & Company noted that Quest continued to suggest that "it did not believe that it had backdated options and that the majority of executive option grants were done following board meetings."  Pl.'s Second Am. Compl. ¶ 156.  This too supports a strong inference that Defendants knew that backdating rendered their financial documents misstated.

Defendants' denial of wrongdoing and their assertion that intentional backdating had not occurred strongly support an inference that Defendants knew the implications of intentional backdating. Defendants now admit that they were aware Quest had a practice of intentionally backdating. The fact that Defendants lied about their "bucket and best price" methodology indicates that they knew backdating rendered their financial statements misstated.  *See In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (Defendants denials of improper accounting when confronted with accusations from the media "indicate that [they] were either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial.").  *See also Rehm v. Eagle Fin. Corp.,* 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("defendant's attempts to mollify public doubt about Eagle's financial health by putting an optimistic and reassuring "spin" on otherwise damaging credit loss reports, shows that defendants acted with knowledge…").

### 5.    Defendant Morse's Resignation

This Court has already found that the manner by which Defendant Morse left Quest was "highly suspicious" and leaned "heavily towards a finding of scienter." *Middlesex Retirement System*, 527 F. Supp. 2d at 1188. Plaintiffs have pleaded, and Defendants do not contest that Morse, the former CFO of Quest, refused to cooperate with the Special Committee, and instead chose to resign from Quest.

Morse now contends that the Court cannot consider his resignation or refusal to cooperate with the Special Committee as evidence of scienter for two reasons. First, he claims that resignation can only be "part of the scienter puzzle" where it occurs close to the announcement of the restatement and is accompanied by punishment. Second, he argues that there are a number of innocuous explanations for this conduct. Neither of these arguments overcomes the strong inference to be drawn from Morse's suspicious resignation.

Several cases hold that resignation, by itself, does not give rise to a strong inference of scienter. *See e.g. In re Read-Rite Corp. Sec. Litig.*, 115 F. Supp. 2d 1181, 1184 (N.D. Cal. 2000); *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1093 (N.D. Cal. 2005) . A line of cases have held that terminations or resignations are "not part of the scienter puzzle" unless they occur at or near the time of a restatement and are accompanied by adverse actions against the individuals. *See In re Adaptive Broadband Sec. Litig.*, C 01-1092 SC, 2002 WL 989478, at *14 (N.D. Cal. April 2, 2002); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 347 (D.N. J. 2007).

However, the Court sees no reason to limit its consideration of Morse's resignation because it was not accompanied by an extraordinary punishment. While that fact may add to the inference of scienter, *In re McKeeson HBOC Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000), its absence does not preclude consideration of Morse's resignation. *See e.g. In re Nash Finch Co.*, 502 F. Supp. 2d 861, 882 (D. Minn. 2007); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n. 176 (S.D.N.Y. 2007) (resignations "although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud.")

Although Morse's resignation is not sufficient alone to raise a strong inference of scienter, it is highly probative of scienter. Adding to the suspicion are the facts that Morse himself received a substantial number of stock options, that he was in charge of drawing up the allegedly misleading financials, and that he refused to cooperate with the Special Committee's investigation. The innocent explanations he presents are not more compelling than the inference that he left Quest before his wrongdoing could be uncovered.[3]

---

[3] Morse challenges Plaintiff's allegations as to his individual scienter as well. The allegations against Morse, which the Court must take as true, are extensive: he was one of the largest recipients of backdated options, he was in charge of Quest's financials, he resigned under suspicious circumstances, etc. There is certainly sufficient evidence to raise a strong inference of his scienter independent of other Defendants including Quest.

Accordingly, the Court considers Morse's resignation as circumstantial evidence of scienter.

### 6. Totality of Allegations

Plaintiff pleaded numerous particularized facts which give rise to a strong inference that Defendants knew or were deliberately reckless in not knowing that intentional backdating rendered Quest's financial documents misstated: (a) Defendants knowingly and intentionally backdated its stock options; (b) Defendants repeatedly certified that Quest's filings conformed with GAAP and that no options were granted at an exercise price below fair market value; (c) Quest's 1999 Plan clearly identified the accounting implications of granting stock options below fair market value; (d) Defendants initially denied that backdating was occurring when they were aware that the company had been intentionally backdating its stock options; and (e) Morse's choice to resign rather than cooperate with the Special Committee was highly suspicious.

Taken in toto, the allegations asserted in Plaintiff's SAC support a strong inference that Defendants knew or were deliberately reckless in not knowing that their intentional backdating procedures rendered Quest's financial statements misstated.

Accordingly, Defendants Quest, Smith, Morse, Doyle, and Brooks' Motions to Dismiss the § 10(b) claim are hereby DENIED.

### B. Section 10(b) Claim Against Jerry Murdock, Jr.

Murdock was not an employee or insider of Quest. As an outside director he did not receive any of the stock options at issue. He argues that (1) he was not responsible for any false or misleading statements; and (2) that Plaintiffs have not properly pleaded his scienter.

### 1. False Statements

An individual is liable for a false statement where he makes, substantially participates in making, or is intricately involved in making, the statement. *Howard*, 228 F.3d at 1061 n.5 (citing *In re Software Toolworks Inc.*, 50 F.3d 615, 628-29 & n.3 (9th Cir. 1994)); *see also Central Bank of Denver, N.A. v. First Interstate Bank*, 511 U.S. 177-79, 114 S. Ct. 1439 (1994) (private cause of action under § 10(a) prohibits misstatements, not aiding and abetting misstatements).

Murdock claims that Plaintiff's has not properly alleged his responsibility for the false SEC filings. Some courts have found an outside director's signature on mandatory SEC filings insufficient. *See Wojtunik v. Kealy*, 294 F. Supp. 2d 1149, 1165 (D. Ariz. 2005); *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1241-42 (N.D. Cal. 1994) ("mere fact that outside director signed a group published document, does not make the director liable for the contents of that document"); *In re*

*Ross Sys. Sec. Litig.*, C 94-0017 DLJ, 1994 WL 583114, at *6 (N.D. Cal. July 21, 1994) (same). The same is true of allegations that an outside director sat on the committee that approved or accepted false statements. *In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1100 (N.D. Cal. 1994) (mere position on committee that had ability to prevent false filings is insufficient) *aff'd* 95 F.3d 922 (9th Cir. 1996); *Ross*, *supra*. (membership on Audit, Compensation, and Stock Option committees not sufficient). However, Plaintiff has pleaded more than Murdock's signature on misleading documents or his position on certain committees.

Plaintiff alleges that Murdock, as a member of Quest's Compensation Committee, was responsible for issuing the backdated options. The Compensation Committee was responsible for both overseeing Quest's stock option plan, and for issuing options to employees. Indeed, Murdock signed the UWCs that awarded the backdated options. These consents contained the "as of" dates, which were used as grant dates for accounting purposes. These allegations place Murdock at the very heart of the backdating.

Additionally, as a member of Quest's Audit and Compensation committees, Murdock was charged with certifying Quest's financials, reporting to Quest's board, and reviewing SEC filings. In these capacities he assured investors and board members that Quest's financials were accurate. He also made direct statements that Quest's options complied with APB No. 25.

Finally, although perhaps not dispositive, Murdock signed SEC filings and reports to Quest's board which contained false statements. As an outside director, Murdock is responsible for signing the very documents that are allegedly misleading. When a member of an Audit Committee signs an SEC filing, he or she is validating the financial statements in that filing. This signature is meaningless if a director can avoid responsibility by saying that he signed without actually verifying anything.

Accordingly, Plaintiff has pleaded sufficient participation for Murdock to be liable as a participant in Quest's false SEC filings.

### 2. Scienter

Murdock also contends that Plaintiff failed to adequately plead his scienter. For many of the reasons stated above, the Court finds that Plaintiff did plead facts sufficient to support a strong inference that Murdock knew, or was deliberately reckless in not knowing, that Quest made misleading statements to investors. Specifically, Plaintiff has identified Murdock's role in granting the options, certifying Quest's financials, and taking part in the preparation of SEC filings. If anyone had sufficient knowledge that something was amiss in Quest's financial statements, it was Murdock, the Chairman of Quest's Audit Committee. The Court merely pauses to address a number of specific issues he raises.

Murdock suggests that Plaintiff must plead "specific contemporaneous conditions known to the defendants that would strongly suggest that the defendants understood" that their conduct would

result in false statements. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1090-91 (9th Cir. 2002). He claims that his signature on certain documents is insufficient to establish his scienter. *See Hansen*, 527 F. Supp. 2d at 1159-60 (if a mere signature established scienter this would eviscerate the PSLRA). Additionally, he contends that his position on the Audit and Compensation committees cannot give rise to an inference of scienter. See *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) (position alone cannot establish scienter); *Weiss v. Amkor Technology, Inc.*, 527 F. Supp. 2d 938, 949 (D. Ariz. 2007); *In re Peerless Sys., Corp. Sec. Litig.*, 182 F. Supp. 2d 982, 993-94 (S.D. Cal. 2002) (collecting cases). Finally, he argues that he had no motive to commit fraud because he did not receive any backdated options.

Again, Quest's allegations go far beyond Murdock's position with Quest or his signature on certain documents. As noted, he signed the very UWCs that granted backdated options. These UWCs contained an "as of" date different from the date the UWC was signed. *In re Cabletron*, 311 F.3d 11, 39 (1st Cir. 2002) (that executive took part in the allegedly fraudulent activities relevant to scienter). At minimum, this should have raised an eyebrow or two on the Compensation Committee. After all, that committee was charged with administering Quest's Stock Option Plan, which prohibited just this sort of "creative accounting." In similar circumstances, the Eastern District of New York found a strong inference of scienter based in part on directors signing UWCs. *In re Converse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 142-144 (E.D.N.Y. 2008). In *Converse*, the court found as follows:

> Friedman, Oolie, and Hiram were members of the Compensation and Audit Committees of Comverse's Board of Directors and therefore likely had significant familiarity with the accounting rules applicable to stock options, including the requirement that the grant of in-the-money stock options reduce a company's income to the extent that it confers an immediate paper profit upon recipients. In addition, the terms of the incentive plans which Friedman, Oolie and Hiram were charged with administering, and which they presumably read, clearly indicated that they were not empowered to grant incentive stock options with an exercise price less than the closing price of a share of Comverse's stock on the date of grant, as published by NASDAQ. It is likely, therefore, that Friedman, Oolie and Hiram noticed that something was amiss when they signed the unanimous consent forms with the "as of [date]" lines that reflected purported grant dates 6-57 days in the past.

*In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 143 (E.D.N.Y. 2008) (internal citation and footnote omitted). The Court finds this reasoning persuasive. Murdock, a sophisticated business

person, should have at least investigated further when confronted with the UWCs that purported to date option grants far in the past.[4]

The other documents Murdock signed were SEC filings and reports to Quest's board. In these filings, Murdock assured the board and investors that nothing was wrong with Quest's financials. He did this at the same time that he was dating the option grants. Essentially, Murdock was charged with assuring that Murdock (and other directors) properly accounted for options.

Murdock was in a special position at Quest: he likely had more exposure to the option granting practices than any other individual defendant. As a consequence, he was uniquely situated to know that those practices were inappropriate. The fact that Murdock twice failed to recognize that the option grants were improper suggests that he knew they were improper and did nothing, or was deliberately reckless in failing to do something.

Although it would be helpful for Plaintiff to plead motive, the PSLRA has no such requirement. It is true that Murdock, unlike other Defendants, lacked a clear motive to reduce the exercise price of options. However, whether he would personally benefit is immaterial to his knowledge or recklessness as to Quest's false SEC filings. Any number of reasons might explain why Murdock signed off on Quest's option backdating: relationships with direct beneficiaries, a desire not to be seen as a problem, a devil-may-care nonchalance. It is not Plaintiff's responsibility to identify which of the myriad possible motivations was the one. It is sufficient to show strong circumstantial evidence that Murdock knew of the fraud.

Accordingly, Murdock's Motion to dismiss the § 10(b) claim against him is hereby DENIED.

## C. Section 20(a) Claim

Section 20(a) of the Securities and Exchange Act of 1934 creates secondary liability for securities fraud where a defendant controls the primary violator. 15 U.S.C. § 78t(a). To state a claim under § 20(a), Plaintiff need not allege that Defendants were "culpable participants" in the alleged fraud or that they actually controlled the misconduct. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Instead, Plaintiff must plead that (1) a primary violation of securities laws occurred and that (2) Defendants exercised actual power or control over Quest. *Id.* The burden then shifts to Defendants to establish a "good faith" defense – i.e. that they lacked scienter and took no part in the violation. *Id.*

---

[4]Although the Court does not address whether Murdock had a "duty to monitor" the dates of the options, *see Openwave*, 528 F. Supp. 2d at 250, it does find that the "as of" dates on the UWCs should have placed Murdock on notice that the grant dates of those options were suspicious.

As discussed above, Plaintiff has sufficiently pleaded a primary violation of the securities laws in the form of stock option backdating. Defendants do not presently raise a good faith defense. The only remaining question is whether Plaintiff has properly pleaded that the individual Defendants were "control persons."

Whether someone is a control person is an "intensely factual question" involving the degree of defendant's involvement in the day-to-day affairs of the primary violator and the specific violation. *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994); *see also Howard*, 1228 F.3d at 1067 n.13. Indeed, Plaintiff must plead that Defendants were "active in the day-to-day affairs" of Quest, or that they "exercised specific control" over the preparation of misleading documents. *Howard v. Hui*, 92-3742, 2001 WL 1159780, at *3 (N.D. Cal. September 24, 2001) (collecting cases); *cf.* 17 C.F.R. § 230.405 (control means "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.")

As the Court previously held, the fact-intensive control issue is particularly difficult to resolve at the motion to dismiss stage. None of the arguments raised here alter that conclusion.

With respect to Lambert, Defendants again contend that he cannot be a control person because he was not employed by Quest during the backdating. This does not immunize him. Plaintiff alleges that he took part in filing a number of false financial statements in the period leading up to the restatement. His knowledge that the statements were false is irrelevant as Plaintiff need not establish his scienter apart from Quest's scienter. *Howard*, 228 F.3d at 1065. Because he was directly involved in the alleged misstatements, his control has been properly alleged.

Murdock also claims that he was not involved in the day-to-day affairs of Quest or the specific misstatements at issue. Indeed, as an outside director and non-employee of Quest he likely had little control over Quest's regular activities. *See In re Syntex Corp. Sec. Litig.*, 855 F. Supp. 1086, 1100 (N.D. Cal. 1994); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, C 99-00109 SBA, 2000 WL 17227405, at * 15 (N.D. Cal. Sept. 29, 2000). Likewise, the Court cannot presume control based on Murdock's position on the Compensation and Audit Committees, although his position is "a sort of red light." *See Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1397 (9th Cir. 1993).

However, Plaintiff specifically alleged that Murdock, in his role on the Compensation and Audit Committees was responsible for both the backdated option grants and the false financial statements. As a result, although he was an outside director, Plaintiff has properly pleaded Murdock's control over the specific wrongful conduct – i.e. the false SEC filings.

Accordingly, Plaintiff has adequately pleaded control person liability under § 20(a). Defendants' Motions are hereby DISMISSED.

**D.    Section 20A Claim**

Defendants challenge Plaintiff's claim for violation of Section 20A of the Securities Exchange Act of 1934, 15 U.S.C. § 78t-1, on two grounds: 1) that Plaintiff lacks standing to bring this claim because it did not trade "contemporaneously" with Defendants; and 2) that Plaintiff has failed to state a claim for insider trading against some or all Defendants.

**1. Standing: Contemporaneous Trading**

Section 20A provides a private claim for insider trading.  Only individuals that traded "contemporaneously" with an insider have standing to sue under this section. 17 U.S.C. § 78t-1.  This requirement limits the private right of action to those who actually traded with someone who had an unfair advantage.  *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993) (citing *Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88 (2d Cir. 1981)); *Buban v. O'Brien*, C 94-0331 FMS, 1994 WL 324093, at *1 (N.D. Cal. June 22, 1994) ("The purpose of the 'disclose or abstain' rule is to protect only those who might actually have traded with insiders." (citing *Wilson*, *supra*)).  Otherwise, an insider who failed to disclose non-public information might be "liable to all the world" although far fewer investors were actually harmed by his or her fraud.  *Wilson*, 648 F.3d at 94.

Contemporaneous trading is a "circumstance constituting fraud" and must be pleaded with particularity under Fed. R. Civ. P. 9(b).  *Neubronner v. Milken*, *supra*.  Accordingly, the class representative must allege with specificity that it traded contemporaneously with defendants.  *Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511, 1523 (N.D. Cal. 1990).  It is insufficient that some class members traded contemporaneously as the lead plaintiff may not represent class members on claims it does not share.  *See La Mar v. H&B Novelty & Loan Co.*, 489 F.2d 461, 465-55 (9th Cir. 1973); *see also Alfus v. Pyramid Tech. Corp.*, *supra* (citing *La Mar*, *supra*).[5]

The "exact contours" of contemporaneous trading have never been defined.  *See Neubronner*, *supra*.  Some courts have confined "contemporaneous" to trades occurring the same day

---

[5] Plaintiff relies on *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 255-56, 256 n.11 (S.D.N.Y. 2007) for the proposition that it is sufficient for any class member to trade contemporaneously with Defendants.  However, as Defendants point out, *Openwave* is in conflict with *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1000-1002.  In *Brody*, the Ninth Circuit declined to disturb the trial court's decision to dismiss insider trading claims in a class action suit because the named plaintiffs did not trade contemporaneously with the defendant.  *Id.* at 1000.  By implication this suggests that the named plaintiffs must trade contemporaneously.  Additionally, even if it were enough that other members of the class traded contemporaneously with Defendants, the allegation that "Class members, including Lead Plaintiff, contemporaneously purchased Quest common stock . . ." would not be sufficient to satisfy Rule 9(b).

as the insider's trades. *See In re AST Research Sec. Litig.*, 887 F. Supp. 231-234 (C.D. Cal. 1995); *Backman v. Polaroid Corp.*, 540 F. Supp. 667, 670-71 (D. Mass. 1982) (purchase two trading days after insider sale is not contemporaneous). At least one case, purportedly following *Wilson*, held that trading is "contemporaneous" until disclosure of the non-public information. *In re Am. Bus. Computers Corp. Sec. Litig.*, MDL No. 913, 1994 WL 848690, at *4 (Feb. 24, 1994).[6] The Ninth Circuit has advised that trades must occur at "about the same time" to be contemporaneous. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1001 (9th Cir. 2002) (two month gap would "gut the contemporaneous trading rule's premise" that the plaintiff purchased securities from the defendant). Generally this has meant that the trades must occur within a few days of each other. *Alfus*, 745 F. Supp. at 1522.

Doyle last sold Quest stock in early 2004, nearly two years before Plaintiff purchased that stock. A two year delay is far beyond the bounds of "contemporaneous" trading. Murdock last sold Quest stock on March 9, 2005. Plaintiff first purchased Quest stock on November 28, 2005. The nearly nine-month delay also rules out "contemporaneous" trading. Accordingly, Plaintiff's insider trading claim cannot survive against Murdock.

However, the remaining Defendants did trade contemporaneously with Plaintiff. Smith sold on the same day as Plaintiff on January 24 and January 30, 2006 and May 5, 2006. Brooks sold one trading day before Plaintiff: Brooks sold on Friday, November 25, 2005 and Plaintiff Purchased on Monday, November 28, 2005. Finally, Garn sold stock on December 8, 2005 and Plaintiff purchased stock on December 16, 2008. This is a one-week (five trading day) difference. All of these purchases are within the bounds of "contemporaneous" trading.

### 2. Failure to State a Claim

To state a claim for insider trading a plaintiff must plead that a defendant committed an independent violation of securities laws. *Johnson v. Aljian*, 490 F.3d 778, 781 (9th Cir. 2007) ("Claims under Section 20A are derivative and therefore require an independent violation of the Exchange Act." (collecting cases)).

Plaintiff has adequately stated a claim against Defendants Smith, Morse, Lambert, Doyle, Murdock and Brooks for securities fraud under Rule 10b-5, and for control person liability under § 20(a). They have also adequately alleged that those defendants contemporaneously traded with

---

[6] The Court previously relied on *American Business Computers Corp.*, to hold that Plaintiffs did trade contemporaneously with Defendants. However, upon further briefing and consideration of additional authorities, that case appears to be the outer boundary of the contemporaneous trading requirement. This broad definition would permit the Court to hold that trades months apart were contemporaneous, a result inconsistent with binding authority.

Plaintiff on the basis of non-public information – i.e. Quest's backdating of stock options.  Therefore, Plaintiff has properly alleged a § 20A claim against those Defendants.

However, Plaintiff clearly excludes Defendant Garn from its claims under §§ 10(b) or 20(a) of the Securities Exchange Act.  Thus, Defendant Garn is not a "person who violate[d] any provision" of the Securities Exchange Act under § 20A.  Therefore, he cannot be liable for insider trading.  *See Johnson*, *supra*.

Accordingly, Defendants' Motions to Dismiss Plaintiff's § 20A claim are GRANTED as to Doyle, Murdock and Garn and DENIED as to all other Defendants.

## IV.    DEFENDANTS' MOTION FOR RECONSIDERATION

Defendants also moved for reconsideration of the Court's order compelling them to produce a Power Point presentation made to the SEC.  Rather than produce this presentation as ordered, Defendants asserted the PSLRA's stay of discovery where a Motion to Dismiss is pending.  *See* 15 U.S.C. § 78u-4(b)(3)(B).  In light of this decision, resolving all pending Motions to Dismiss, the PSLRA discovery stay is inapplicable and Defendants' Motion for Reconsideration is moot.

Defendants are hereby ORDERED to begin producing discovery immediately.  Quest SHALL produce the SEC presentation within seven (7) days.  Defendants are also ordered to make all mandatory disclosures and respond to all pending discovery requests within thirty (30) days.

## V.    DISPOSITION

Defendants' Motions to Dismiss are hereby DENIED, except that Plaintiff's § 20A claim is hereby DISMISSED against Defendants Doyle, Murdock and Garn.

Defendants' Motion for Reconsideration is hereby DENIED AS MOOT.  Defendants are hereby ORDERED to begin producing discovery posthaste.

The Clerk shall serve this minute order on all parties to the action.

EXHIBIT 6

Westlaw.

Slip Copy                                                                                       Page 1

Slip Copy, 2008 WL 700961 (D.Or.), Fed. Sec. L. Rep. P 94,605
**2008 WL 700961 (D.Or.)**

C
Belova v. Sharp
D.Or.,2008.

United States District Court,D. Oregon.
Svetlana BELOVA, Derivatively on Behalf of Triquint
Semiconductor, Inc., Plaintiff,
v.
Steven J. SHARP et al., Defendants,
andTriquint Semiconductor, Inc., a Delaware corpora-
tion, Nominal Defendant.
**No. CV 07-299-MO.**

March 13, 2008.

Gary I. Grenley, Paul H. Trinchero, Grenley Rotenberg
Evans Bragg & Bodie PC, Portland, OR, James I. Jac-
onette, Coughlin Stoia Geller Rudman & Robbins LLP,
San Diego, CA, for Plaintiff.

Claire Loebs Davis, Douglas W. Greene, Wilson
Sonsini Goodrich & Rosati, P.C., Seattle, WA, Douglas
J. Clark, Wilson Sonsini Goodrich & Rosati, P.C., Palo
Alto, CA, Kelley Moohr Kinney, Frohnmayer, Deather-
age, Pratt, et al., Medford, OR, James M. Barrett, Ater
Wynne, LLP, Portland, OR, for Defendants.

OPINION & ORDER

MOSMAN, District Judge.
*1 TriQuint Semiconductor, Inc., and the individual de-
fendants (collectively "defendants") each move to dis-
miss this consolidated shareholder derivative suit
brought by Svetlana Belova and Bradley Bullard (the
"shareholders") for failure to state a claim and failure to
make a pre-suit demand. Because the shareholders do
not adequately allege contemporaneous ownership, I
GRANT the Motions to Dismiss (# 20 & # 22) without
prejudice and with leave to amend. I also address the
other arguments for dismissal, making future motions to
dismiss unnecessary once the Complaint is properly
amended.

BACKGROUND

The defendants allegedly engaged in a scheme of stock
options backdating, diverting hundreds of millions of
dollars to TriQuint insiders. They also allegedly parti-
cipated in concealing the backdating and/or refusing to
assert TriQuint's legal rights. Based on this, the share-
holders allege violations of federal and state law, in-
cluding breaches of fiduciary duties, abuse of control,
fraud, corporate waste, unjust enrichment, and gross
mismanagement.[FN1]

> FN1. The shareholders allege a total of eleven
> claims for relief. *See* Compl. (# 15) ¶¶ 145-96.

Backdating is a form of fraud under federal and state
law. *See, e.g., In re Zoran Corp. Derivative Litig.,* 511
F.Supp.2d 986, 996-97 (N.D.Cal.2007) (discussing
backdating). Former Securities and Exchange Commis-
sion ("SEC") Chairman Harvey Pitt said:

> What's so terrible about backdating options grants?

> For one thing, it likely renders a company's proxy
> materials false and misleading. Proxies typically in-
> dicate that options are granted at fair market value.
> But if the grant is backdated, the options value isn't
> fair-at least not from the vantage point of the com-
> pany and its shareholders.

> For another, backdating means a corporate docu-
> ment used to permit access to corporate assets has
> been falsified.... Moreover, ... illegal insider trading
> may also have occurred.

> ... On the state level, backdating could involve a
> breach of fiduciary duty, a waste of corporate assets
> and even a usurpation of a corporate opportunity.

> ....

> Those who backdate options grants violate federal
> and state law. And those on whose watch this conduct
> occurs are also potentially liable: If they knew about
> the backdating, they're participants in fraudulent and
> unlawful conduct. If they didn't know about the back-
> dating, the question will be: Should they have done

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 700961 (D.Or.), Fed. Sec. L. Rep. P 94,605
**2008 WL 700961 (D.Or.)**

Page 2

more to discover it?

Compl. (# 15) ¶ 7 (quoting Harvey Pitt, *The Next Big Scandal,* Forbes, May 26, 2006, http://www.forbes.com/).

"A fundamental requirement of ... [TriQuint's] Stock Option Programs always has been that the exercise price for incentive stock options be not less than 100% of the fair market value per share on the date of the grant."*Id.* ¶ 50.Thus, based on the theories discussed by former Chairman Pitt, the shareholders allege:

> [D]efendants caused TriQuint to file false and misleading statements with the SEC, including proxy statements filed with the SEC which stated that the options granted by TriQuint carried with them an ex-

ercise price that was not less than the fair market value of TriQuint stock on the date of grant and issuance.[FN2]

> [FN2]. The shareholders identify specific proxy statements they believe were false and misleading. *Id.* ¶¶ 66-103.

**\*2** *Id.* ¶ 8 (emphasis omitted). Based on a statistical analysis, the shareholders allege the following option grants [FN3] to various defendants were backdated:

> [FN3].*See id.* ¶ 50.

| Grant Date | Recipient(s) | Approved By |
|---|---|---|
| 04/16/1998 | Fournier | Sharp, Gibson, Rhines |
| 12/02/1998 | Sharp, Fournier, Winn, Pye | Sharp, Gibson, Rhines |
| 10/18/1999 | Whitehurst | Sharp, Gibson, Rhines, Gary |
| 12/01/1999 | Kauser, Sharp, Cordner, Pye, Fournier, Welty | Sharp, Gibson, Rhines, Gary |
| 12/21/2000 | Sharp, Pye, Cordner, Fournier, Welty | Sharp, Gibson, Rhines, Gary |
| 04/04/2001 | Fournier, Cordner, Welty, Pye | Sharp, Gibson, Rhines, Gary |
| 12/21/2001 | Sharp, Pye, Cordner, Fournier, Welty, Link | Sharp, Gibson, Rhines, Gary |
| 04/29/2002 | Sharp | Sharp, Gibson, Rhines, Gary |

The shareholders allege their analysis of these grants "reveals that stock option grants were dated: (i) near or on the very day that TriQuint's stock price hit its low price for the month, quarter and/or year; and/or (ii) in advance of significant stock price increases."*Id.* ¶ 54.Furthermore, "[t]he odds of defendants 'fortuitously' choosing option grant dates year after year at historic low closing prices absent intentional manipulation are so extremely remote that backdating must have taken place."*Id.* Based on their statistical analysis of the option grants, the shareholders allege various violations of state and federal law. *See id.* ¶¶ 145-96.

The defendants filed a Motion to Dismiss the Verified Consolidated Shareholder Derivative Complaint for Failure to State a Claim (# 20), and nominal defendant TriQuint filed a Motion to Dismiss the Verified Consolidated Shareholder Derivative Complaint for Failure to Make a Pre-Suit Demand (# 22).

## DISCUSSION

**I.** *Standard of Review*

**A.** *12(b)(6) Motions to Dismiss*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 700961 (D.Or.), Fed. Sec. L. Rep. P 94,605

**2008 WL 700961 (D.Or.)**

A court should dismiss a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) if the complaint does not "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true."*Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1965 (2007) (citation omitted) (footnote omitted)."[C]onclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss."*Associated Gen. Contractors of Am. v. Metro. Water Dist. of So. Cal.,* 159 F.3d 1178, 1181 (9th Cir.1998). Furthermore, certain claims, such as those for fraud, must meet the heightened pleading standards of Federal Rule of Civil Procedure 9.[FN4] If a complaint is dismissed for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleadings was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."*Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995) (internal quotation marks omitted).

        FN4."In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."Fed.R.Civ.P. 9(b).

**B. *Shareholder Derivative Suits***

**\*3** Derivative actions are brought by a shareholder to enforce a corporation's rights when the corporation itself fails to enforce its rights. *See Daily Income Fund, Inc. v. Fox,* 464 U.S. 523, 528-34 (1984). Derivative suits are subject to the procedural requirements of Federal Rule of Civil Procedure 23.1. *See Greenspun v. Del E. Webb Corp.,* 634 F.2d 1204, 1208-10 (9th Cir.1980) (affirming dismissal of a derivative action for failure to comply with Rule 23.1).Rule 23.1 requires the complaint: (1) "allege that the plaintiff was a shareholder or member at the time of the transaction complained of"; and (2) "state with particularity ... any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and ... the reasons for not obtaining the action or not making the effort."Fed.R.Civ.P. 23.1(b).

Rule 23.1 does not establish the circumstances under

which demand would be futile. Instead, demand futility is determined under the law of the company's incorporating state-in this case, Delaware. *See In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 989-90 (9th Cir.1999) (citing *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 96 (1991)). Under Delaware law, a court limits its consideration to the particularized facts alleged in the complaint; the burden is thus more onerous than that required to withstand an ordinary motion to dismiss. *See Aronson v. Lewis,* 473 A.2d 805, 813-15 (Del.1984), *overruled on other grounds by Brehm v. Eisner,* 796 A.2d 244 (Del.2000)."Conclusory 'allegations of fact or law [which are] not supported by allegations of specific fact may not be taken as true.' " *Levine v. Smith,* 591 A.2d 194, 207 (Del.1991) (quoting *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988)).

**II. *The Shareholders' Standing***

Under Rule 23. 1, plaintiffs bringing derivative actions must have owned shares of the corporation at the time the challenged transaction took place.Fed.R.Civ.P. 23.1; *see also Kona Enters ., Inc. v. Estate of Bishop,* 179 F.3d 767, 769-79 (9th Cir.1999); *Lewis v. Chiles,* 719 F.2d 1044, 1047 (9th Cir.1983). A plaintiff's allegation of ownership must be sufficiently particularized. *See, e.g., In re Computer Sci. Corp. Derivative Litig.,* No. CV 06-05288 MRP, 2007 WL 1321715, at * 15 (C.D.Cal. Mar. 26, 2007) (holding that a complaint stating the plaintiffs owned stock "during the relevant period," was insufficient to allege contemporaneous ownership during the time period in which the questioned transactions occurred).

In this case, the shareholders do not allege with sufficient particularity that they owned TriQuint shares during the relevant time periods. The Complaint states they owned TriQuint stock at "times relevant." Compl. (# 15) ¶¶ 17-18, 106. This general allegation is not sufficiently particular and is, in fact, inaccurate by the shareholders' own admissions. In their response to the Motions to Dismiss, the shareholders state: "Ms. Belova has held her stock continuously since April 2000 and Mr. Bullard has held his stock ... continuously since

Slip Copy, 2008 WL 700961 (D.Or.), Fed. Sec. L. Rep. P 94,605
**2008 WL 700961 (D.Or.)**

January 1999."Consolidated Opp'n to Mots. to Dismiss (# 30) 36. These facts are not contained in the Complaint, and they are an admission that the shareholders did not own TriQuint stock when at least some of the grants were allegedly made. The shareholders argue this shortcoming does not merit dismissal. However, such varying allegations are "the precise reason why Plaintiffs must [particularly] allege contemporaneous ownership of ... stock during all periods relevant to the ... transactions."*In re Computer Sci.,* 2007 WL 1321715, at * 15;*see also, Zoran,* 511 F.Supp.2d at 1009-10 (discussing the contemporaneous ownership requirement); *Ryan v. Gifford,* 918 A.2d 341, 359 (Del. Ch.2007) (same).

***4** Based on the foregoing, I GRANT the Motions to Dismiss (# 20 & # 22) without prejudice and with leave to amend. An Amended Complaint is due by March 28, 2008. Because I assume the shareholders will file an Amended Complaint, I now address the defendants' other arguments for dismissal.

## III. *The Motions to Dismiss*

The defendants rely on the argument that the shareholders have not sufficiently alleged backdating. If the shareholders have not alleged backdating, then it is impossible for them to sufficiently allege the other purported violations of federal and state law.

### A. *Backdating*

The shareholders employed two analytical models to identify the eight options grants as backdated: (1) the Center for Financial Research and Analysis ("CFRA") methodology, and (2) the Merrill Lynch methodology. *See* Consolidated Opp'n to Mots. to Dismiss (# 30) 7-8; Compl. (# 15) ¶¶ 54-62. The CFRA methodology "individually analyzed ... stock options grants, looking for any options where the price on the grant date was within 105% of the ten-day or forty-day periodic low point in stock price and where the price range within that period was more than ten percent of the lowest stock price."*In re CNET Networks, Inc. S'holder Derivative Litig.,* 483 F.Supp.2d 947, 957 (N.D.Cal.2007)

(discussing and accepting the CFRA methodology). The Merrill Lynch methodology "compared annualized 20-day stock returns following option pricing events to the stock's calendar year annual return" to identify suspicious options pricing activities. *Conrad v. Blank,* ---A.2d ----, No. 2611-VCL, 2007 WL 4788447, at *8 n. 30 (Del. Ch. Sept. 7, 2007)* (discussing and accepting the Merrill Lynch methodology); *see also Ryan,* 918 A.2d at 355 n. 34 (same). Also, the shareholders point out that at least one court has accepted an *ad hoc* methodology, "not entirely revealed," to support a claim for backdating. *E.g., Zoran,* 511 F.Supp.2d at 1004-06 (discussing and accepting an unidentified methodology that identified grants at low points and calling the pattern "hugely suspicious").

The defendants argue the shareholders' analysis has many shortcomings. They argue:

(1) The shareholders have selectively chosen eight of at least twenty-two grants made to officers and directors between 1998-2002.

(2) The shareholders use their methodology inconsistently-they review TriQuint's stock price at 10- or 20-day intervals depending on when the facts suit them.

(3) Return analysis refutes backdating.

(4) The options were not granted at the year's low.

(5) The grants do not have the typical indicia of backdating, such as restated financial statements.

(6) The grants are not dated after a sharp drop or before a substantial rise.

*See* TriQuint's Memo. in Supp. of Mot. to Dismiss (# 23) 12-18. Additionally, the SEC has informally investigated TriQuint's stock options granting practices and decided not to take any enforcement action against TriQuint. *See* Supp. Decl. of Kelley M. Kinney (# 40), Ex. A.

***5** Despite the shortcomings of the shareholders' analysis, I draw reasonable inferences in their favor. *See, e.g.,*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

*Associated Gen. Contractors,* 159 F.3d at 1181. The many shortcomings listed above are subject to competing inferences, explained as follows:

(1) The shareholders do not need to allege that every grant has been backdated; they may select eight grants and allege that only those eight have been backdated.

(2) The shareholders' inconsistent use of their own methodology is the most troubling. It is unclear which use I should accept and which use I should reject. Despite this concern, for purposes of the Motions to Dismiss, I can reasonably infer backdating from the shareholders' Complaint.

(3) For purposes of the Motions to Dismiss, I need not consider how return analysis may or may not refute backdating-that is, I will not weigh the evidence or lack thereof.

(4) Lower stock prices on dates other than the grant dates do not necessarily indicate backdating did not occur. It may simply mean the backdating scheme is more sophisticated and more difficult to identify through statistical analyses.

(5) The lack of typical indicia of backdating may also indicate the defendants' scheme is more sophisticated than the average backdating scheme.

(6) The grants not being dated after a sharp drop or before a sharp rise may indicate the backdating scheme was more sophisticated than the average scheme.

(7) Finally, the SEC may have decided not to take any enforcement action against TriQuint for any number of reasons. Those reasons could include resources, internal policies, or the strength of the case. The SEC's inaction does not necessarily indicate backdating did not occur.

Based on the shareholders' analysis, I may reasonably infer backdating occurred for purposes of the Motions to Dismiss. "Given the choice between improbable good fortune and knowing manipulation of option grants, ...

[I] may reasonably infer the latter...."*See Ryan,* 918 A.2d at 355 n. 34. The shareholders have alleged a striking pattern in stock option grants at TriQuint, which may indicate backdating. The above-mentioned shortcomings and the SEC's recent decision not to take any enforcement action against TriQuint presumably will play a persuasive role in upcoming dispositive motions but have less of a role in the Motions to Dismiss.

**B.** *The § 10(b) Claim*

Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the "use or employ[ment] ... of any ... deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" SEC "rules and regulations." 15 U.S.C. § 78j(b). Rule 10b-5 forbids, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading."17 C.F.R. § 240. 10b-5(b). From this statute and Rule, courts have implied a private damages action, similar to common-law tort actions for deceit and misrepresentation. *See, e.g., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 196 (1976); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 744 (1975). The private action also has statutory requirements. *E.g.,*15 U.S.C. § 78u-4(b)(4) (discussing loss causation).

**\*6** A private action under § 10(b) and Rule 10b-5 has six basic elements. They are: (1) material misrepresentation or omission; (2) scienter-i.e., a wrongful state of mind; (3) connection with the purchase or sale of a security; (4) reliance-i.e., "transaction causation"; (5) economic loss; and (6) "loss causation"-i.e., a connection between the misrepresentation and the loss. *Dura Pharm ., Inc. v. Broudo,* 544 U.S. 336, 341-42 (2005).

First, the Complaint alleges TriQuint's filings misrepresented that options were granted with an exercise price at fair market value as of the date of the grant. *See* Compl. (# 15) ¶¶ 70, 73, 76, 82, 85, 88, 91, 94, 97, 113, 116, 119, 125, 128, 131, 134. Because these stock options were allegedly backdated, TriQuint's filings allegedly misrepresented material facts. For the same

reason, the Complaint also alleges TriQuint's financial statements were materially false and misleading. *See id.* ¶¶ 111, 112, 115, 118, 121, 124, 127, 130, 133.

Second, the Complaint alleges facts that give a strong inference of scienter. It alleges the defendants prepared or approved false and misleading public statements relating to the stock options in question. *See id.* ¶¶ 20-32."[S]cienter is properly alleged when the complaint alleges both false statements and the defendants' close involvement in the preparation of those statements ."*Zoran,* 511 F.Supp.2d at 1013 (citing *In re Daou Sys., Inc ., Sec. Litig.,* 411 F.3d 1006, 1022-24 (9th Cir.2005)). Furthermore, scienter is typically present in backdating schemes. *See, e.g., Ryan,* 918 A.2d at 355 n. 35 ("[I]t is difficult to understand how a plaintiff can allege that directors backdated options *without* simultaneously alleging that such directors *knew* that the options were being backdated.").

Third, the Complaint alleges the material misrepresentations or omissions occurred in connection with stock options. A stock option is a "sale under the securities laws because it is a contract to sell a security when the option is exercised."*Falkowski v. Imation Corp.,* 309 F.3d 1123, 1130-31 (9th Cir.2002) (finding that fraud with respect to employee stock option plans was " 'in connection with' the 'sale or purchase of a covered security' "); *see also*15 U.S.C. § 78c(a)(10) (defining "security" to include any "option"). The shareholders allege misrepresentations of the value and date of stock option grants, which necessarily are misrepresentations "in connection with" the purchase or sale of a security. *See Falkowski,* 309 F.3d at 1131.

Fourth, the Complaint alleges TriQuint relied on its financial and related statements when issuing stock. It allegedly increased authorized stock and granted options based on the allegedly false or misleading statements. *See* Compl. (# 15) ¶¶ 5, 9-10, 111-12, 115, 118, 121, 124, 127, 130, 133, 139, 141, 156.

Fifth, the Complaint alleges TriQuint suffered substantial economic harm because of the alleged backdating. *See id.* ¶¶ 8-12, 39-40, 139, 156.It also alleges the backdating wasted valuable corporate assets. *Id.*

*7 Sixth, the Complaint alleges loss causation because the alleged backdating scheme is necessarily connected to the alleged economic losses.*Id.* The economic losses discussed in the complaint flow from the alleged backdating scheme.

In sum, the shareholders sufficiently allege a § 10(b) claim because the Complaint, as a whole, alleges each of the six elements as to each defendant.

### C. *The § 14(a) Claim*

Section 14(a) prohibits the use of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."15 U.S.C. § 78j(b)."To state a claim under Section 14(a), a plaintiff must establish that '(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation, [rather than the particular defect in the solicitation materials], was an essential link in the accomplishment of the transaction.' " *Knollenberg v. Harmonic, Inc.,* 152 F. App'x. 674, 682 (9th Cir.2005) (alteration in original) (quoting *Atl. Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.,* 295 F.Supp.2d 75, 81-82 (D.D.C.2003)); *see also*15 U.S.C. § 78j(b); 17 C.F.R. § 240.14a-9. Furthermore, "[s]ection 14(a) 'lacks any reference to ... indicate a requirement of scienter.' Accordingly, negligence is sufficient to support a claim for a violation of Section 14(a)." *Knollenberg,* 152 F. App'x. at 682-83 (quoting *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1263 (N.D.Cal.2000)).

In this case, the shareholders have adequately alleged proxy statements contained misrepresentations relating to the allegedly backdated stock options. *See* Compl. (# 15) ¶¶ 66-98. Furthermore, the Complaint alleges TriQuint suffered economic harm because of the alleged backdating. *See id.* ¶¶ 8-12, 39-40, 139, 156.The shareholders' allegations also support an inference that the defendants were negligent because they did not discover or stop the alleged backdating scheme. *See Zoran,* 511 F.Supp.2d at 1016 (discussing similar allegations and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

concluding they "lead to the inference that the compensation committee neglected its duty and was thus negligent"). The key question thus becomes whether or not the shareholders allege the proxy statements are an essential link.

The Complaint alleges TriQuint shareholders voted in directors, authorized stock option plans, and authorized increasing the number of shares of stock because of the allegedly false proxy statements. *See* Compl. (# 15) ¶¶ 66-98. "If defendants had not falsely stated in ... proxy statements that stock options were being granted properly under the plans, and that directors were complying with the terms of the plans that the shareholders approved, shareholders would have voted those board members out, and the board members would no longer have had the means to grant more backdated stock options." *Zoran* 511 F.Supp.2d at 1016. The proxy statements are therefore an essential link, and the shareholders state a claim under § 14(a).

### D. *The State Law Claims*

#### 1. Duties of Loyalty and Care

**\*8** Under Delaware law, there are two fiduciary duties: loyalty and care. *See Stone ex rel. AmSouth Bancorporation v. Ritter,* 911 A.2d 362, 367 (Del.2006). A claim for a breach of these fiduciary duties sounds in fraud and must be pleaded with particularity as required by Federal Rule of Civil Procedure 9(b). *See Sachs v. Sprague,* 401 F.Supp.2d 159, 170 n. 15 (D.Mass.2005); *York Linings v. Roach,* No. 16622-NC, 1999 WL 608850, at \*2 (Del. Ch. July 28, 1999) (holding breaches of the duties of loyalty and care must be pleaded with particularity). To meet the heightened standard, a plaintiff must identify what is false or misleading, and why. *See Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir.2003). Furthermore, a plaintiff must rebut the presumption of the business judgment rule. *See, e.g., Aronson,* 473 A.2d at 812 ("The business judgment rule ... is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best in-

terests of the company."); *McKesson,* 126 F.Supp.2d at 1278 ("[T]he complaint must contain well-pleaded allegations to overcome the presumption that the directors' decisions were informed and reached in good faith.").

The Complaint alleges with particularity a breach of the duties of loyalty and care. The Complaint lists each defendant and discusses what he or she allegedly did to facilitate the backdating scheme and disseminate false information through SEC filings. *See* Compl. (# 15) ¶¶ 20-31. The Complaint, taken as a whole, also alleges each defendant acted in bad faith. "[An][i]ntentional violation of a shareholder approved stock option plan, coupled with fraudulent disclosures regarding the directors' purported compliance with that plan, constitute conduct that is ... an act in bad faith." *Ryan,* 918 A.2d at 358. It is difficult to fathom a situation where the deliberate violation of a shareholder approved stock option plan and false disclosures is anything but an act of bad faith in violation of the duties of loyalty and care. *See Zoran,* 511 F.Supp.2d at 1017.

The defendants argue they cannot be liable for a breach of the duty of care because TriQuint's charter has an exculpatory provision. If a company has adopted such a provision, its directors cannot be held liable for money damages for unintentional breaches of their fiduciary duties. *See, e.g., Aronson,* 473 A.2d at 813 n. 6 (discussing the authorities). However, the defendants' argument constitutes an affirmative defense that will not dispose of a matter at the pleading stage. *See Emerald Partners v. Berlin,* 726 A.2d 1215, 1223-24 (Del.1999) (holding the use of exculpatory provisions to shield directors from personal liabilities presents an affirmative defense, and the party asserting the defense bears the burden of establishing it). The shareholders thus state a claim for breach of the duty of care, but the defendants may establish their affirmative defense in the future.

#### 2. Insider Trading

**\*9** The defendants also argue the shareholders do not state a claim for insider trading. To state a claim for insider trading under Delaware law a plaintiff must allege

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 700961 (D.Or.), Fed. Sec. L. Rep. P 94,605

**2008 WL 700961 (D.Or.)**

(1) "the corporate fiduciary possessed material, nonpublic company information"; and (2) "the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information."*In re Oracle Corp. Derivative Litig.*, 867 A.2d 904, 934 (Del. Ch.2004), *aff'd*,872 A.2d 960 (Del.2005).

The shareholders allege certain defendants participated in the backdating scheme and sold their stock based on this material, non-public information. *See* Compl. (# 15) ¶¶ 99-101. The shareholders therefore state a claim for insider trading under Delaware law. *See Zoran*, 511 F.Supp.2d at 1018 (holding that plaintiffs stated a claim for insider trading when they alleged participation in a backdating scheme and subsequent sale of stocks).

**3. Corporate Waste**

To plead a claim for waste of corporate assets, a "plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests."*White v. Panic*, 783 A.2d 543, 554 n. 36 (Del.2001)."Directors are guilty of corporate waste, only when they authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration."*Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch.1993).

Because the shareholders adequately plead backdating, they state a claim for corporate waste. "Backdating is a form of fraud. In the face of such allegations, defendants simply cannot be said to have acted in the company's best interest. Accordingly, plaintiff has pled a claim for corporate waste under Delaware law."*Zoran*, 511 F.Supp.2d at 1019. The crux of the backdating allegation is that the decision to backdate "was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests."*See White*, 783 A.2d at 554 n. 36.

**4. Gross Mismanagement and Abuse of Control**

To state a cause of action for gross mismanagement, a plaintiff must plead facts showing that defendants were "recklessly uninformed" or acted "outside the bounds of reason." *Cincinnati Bell Cingular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, No. 13389, 1996 WL 506906, at *14 (Del. Ch. Sept. 3, 1996), *aff'd*,692 A.2d 411 (Del.1997). The shareholders allege the defendants participated in a backdating scheme and produced false proxy statements. Such conduct is either "recklessly uninformed" or "outside the bounds of reason." Therefore, the Complaint, taken as a whole, sufficiently alleges a claim for gross mismanagement and abuse of control.

**5. Claims for Accounting, Waste, Unjust Enrichment, and Recision**

**\*10** The defendants' brief states:

> Accounting, unjust enrichment and rescission are all equitable remedies. As discussed above, plaintiffs fail to adequately plead any of the claims that trigger these remedies. Thus, the Court should also dismiss these claims. *See Allegheny Gen. Hosp. v. Phillip Morris, Inc.*, 228 F.3d 429, 446-67 (3d Cir.2000) (dismissing unjust enrichment claim necessary when traditional tort claims were also dismissed); *McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869 (9th Cir.1994) (dismissing rescission claim where underlying claims dismissed).

Individual Defs.' Memo. in Supp. of Mot. to Dismiss (# 21) 22-23. Because this argument relies on me dismissing the other claims, it fails.

**E. *The Statutes of Limitations***

The defendants argue all of the shareholders' federal and state law claims are time barred. *See id.* at 11-13, 15-16, 23.The shareholders argue the applicable statutes of limitations have not run or were equitably tolled. *See* Consolidated Opp'n to Mots. to Dismiss (# 30) 54-59.

The statute of limitations for a § 10(b) claim is "two years from the discovery of facts constituting the viola-

Slip Copy, 2008 WL 700961 (D.Or.), Fed. Sec. L. Rep. P 94,605
**2008 WL 700961 (D.Or.)**

tion but no more than five years from the date of the violation."*Zoran,* 511 F.Supp.2d at 1013 (citing 28 U.S.C. § 1658(b)(1)(2)). The five year limitations period "serves as a statute of repose in lieu of equitable tolling."*Id.* at 1013-14 (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 363 (1991)). Because outsiders like the shareholders do not have "superpowers to detect secret backdating inside the company," the five year statute of limitations applies. *See id.* at 1014;*see also Ryan,* A.2d at 359. The shareholders argue the statute of limitations begins to run from the last alleged misrepresentation, but they are incorrect. *See Durning v. Citibank, Int'l,* 990 F.2d 1133, 1136 (9th Cir.1993) (rejecting a plaintiff's argument that the statue of limitations for an allegedly fraudulent offering of bonds was extended by continued fraud through the redemption of the bonds). The initial Complaint (# 1) in this case was filed on February 28, 2007, so the shareholders cannot base a § 10(b) claim on alleged backdating that occurred before February 28, 2002, regardless of when they first learned of the alleged backdating scheme.

The statute of limitations for § 14(a) "is one year from the discovery of the occurrences giving rise to the claim, but no later than three years from the date of the violation."*Zoran,* 511 F.Supp.2d at 1017. The analysis in the previous paragraph also applies here. Therefore, the three year statute of limitations applies, and the shareholders cannot base a § 14(a) claim on proxy statements filed before February 28, 2004, regardless of when they first learned of the alleged backdating scheme.

For the state law claims, the statute of limitations is three years.Del.Code Ann. tit. 10, § 8106; *see also Zoran,* 511 F.Supp.2d at 1019. Delaware courts often find that the statute of limitations is tolled when defendants engage in "fraud or concealment of the facts which would have disclosed" the wrongdoing. *Kahn v. Seaboard Corp.,* 625 A.2d 269, 276 (Del. Ch.1993); *see also Ryan,* 918 A.2d at 359-60 ("Inaccurate public representations as to whether directors are in compliance with shareholder-approved stock option plans constitute fraudulent concealment of wrongdoing sufficient to toll

the statute of limitations.") At this stage, therefore, the statute of limitations for the state law claims was tolled because of the alleged fraud or concealment.

## IV. *The Shareholders' Demand Futility Allegations are Sufficient*

**\*11** "A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile."*In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d at 989. "A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences."*Grobow,* 539 A.2d at 187. Here, the shareholders do not allege they made a demand on the board. They instead plead demand was excused because it would have been futile. "[A] court that is entertaining a derivative action ... must apply the demand futility exception as it is defined by the law of the State of incorporation."*Kamen,* 500 U.S. at 108-09. TriQuint is incorporated in Delaware, so Delaware law applies.

Delaware courts apply two tests for determining when demand is futile. If a derivative action challenges a board's affirmative decisions, then demand is excused if "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."*Aronson,* 473 A.2d at 814. A different test applies if the current directors failed to act. "[A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."*Rales v. Blasband,* 634 A.2d 927, 934 (Del.1993). Furthermore, the plaintiff must show that a majority of directors were interested or not independent. *See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040, 1046 (Del.2004).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 700961 (D.Or.), Fed. Sec. L. Rep. P 94,605
**2008 WL 700961 (D.Or.)**

The parties agree that the test outlined in *Aronson* applies. The shareholders allege: "Based upon the facts set forth throughout [the] ... Complaint ... a pre-filing demand upon the TriQuint Board ... is excused as futile."Compl. (# 15) ¶ 107. "Five of seven of TriQuint's directors engaged in backdating stock options and all approved false and misleading SEC filings."*Id.* ¶ 108 (providing a table). They also allege four of the seven board members engaged in some form of insider trading (based on the backdating scheme).*See id.* ¶¶ 101-09.As discussed above, the backdating scheme is not likely a valid exercise of business judgment. This leads to "a reasonable doubt ... that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."*See Aronson,* 473 A.2d at 814. The shareholders have therefore sufficiently alleged demand futility.[FN5] *See Zoran,* 511 F.Supp.2d at 1002-03 ("[D]emand is excused based on plaintiff's first theory-[all current board members received backdated stock options].").

FN5. As the *Zoran* court stated:

[D]irectors receiving backdated stock options receive a benefit *not* shared by stockholders.... [S]hareholders do not have the benefit of reaching back in time to buy their shares at low-price point. Furthermore, if a corporate decision will have a materially detrimental impact on the director, but not the corporation or its stockholders, a director can be considered interested. Thus, a decision now to correct the grant dates would have a detrimental impact on the directors by removing the financial benefit of the backdating. The director may be required to pay back the difference in price between the true grant date and the purported grant date. The directors may even face legal exposure. Accordingly, if ... the directors received backdated grants, those directors will be considered interested.

*Zoran,* 511 F.Supp.2d at 1002-03.

**CONCLUSION**

*12 Because the shareholders do not properly allege standing, I GRANT the defendants' Motions to Dismiss (# 20 and # 22) without prejudice and with leave to amend. Once an appropriately Amended Complaint is filed, the shareholders will have standing to pursue claims related to the transactions that occurred when they owned TriQuint stock. The Amended Complaint should also otherwise conform with the foregoing discussion to survive future Motions to Dismiss. The Amended Complaint is due March 28, 2008.[FN6]

FN6. I also DISMISS the Motion for Leave to File a Supplemental Exhibit (# 39) as moot.

IT IS SO ORDERED.

D.Or.,2008.
Belova v. Sharp
Slip Copy, 2008 WL 700961 (D.Or.), Fed. Sec. L. Rep. P 94,605

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 7

LEXSEE 948 A2D 433

**FREDERICK WEISS, Plaintiff, v. ROBERT H. SWANSON, JR., DAVID S. LEE, RICHARD M. MOLEY, THOMAS S. VOLPE, LEO T. McCARTHY, LOTHAR MAIER, PAUL COGHLAN, DAVID B. BELL, ROBERT C. DOBKIN, DONALD PAULUS, ALEXANDER McCANN, Defendants, and LINEAR TECHNOLOGY CORPORATION, Nominal Defendant.**

**C.A. No. 2828-VCL**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*948 A.2d 433*; *2008 Del. Ch. LEXIS 32*

**November 28, 2007, Submitted
March 7, 2008, Decided**

**DISPOSITION:**    The motion to dismiss was denied.

**COUNSEL:** [**1] Norman M. Monhait, Esquire, Jessica Zeldin, Esquire, ROSENTHAL MONHAIT & GODDESS, P.A., Wilmington, Delaware; Thomas G. Shapiro, Esquire, Edward F. Haber, Esquire, Michelle H. Blauner, Esquire, Robert E. Ditzion, Esquire, Ian McLoughlin, Esquire, SHAPIRO HABER & URMY LLP, Boston, Massachusetts, Attorneys for the Plaintiff.

William M. Lafferty, Esquire, John P. DiTomo, Esquire, MORRIS NICHOLS ARSHT & TUNNELL, LLP, Wilmington, Delaware; Douglas J. Clark, Esquire, Nicole M. Healy, Esquire, Cheryl W. Foung, Esquire, Dominique-Chantale Alepin, Esquire, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California, Attorneys for the Individual Defendants.

David A. Jenkins, Esquire, SMITH KATZENSTEIN & FURLOW, LLP, Wilmington, Delaware; Robert P. Haney, Jr., Esquire, COVINGTON & BURLING LLP, New York, New York; Sonya D. Winner, Esquire, Tammy Albarran, Esquire, Jason M. Zoladz, Esquire, COVINGTON & BURLING LLP, San Francisco, California, Attorneys for the Individual Defendants.

**JUDGES:** LAMB, Vice Chancellor.

**OPINION BY:** LAMB

**OPINION**

[*437] *MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

In this derivative action, the plaintiff challenges option grants made by directors pursuant to stockholder-approved option plans. According to the [**2] plaintiff, the board of directors adopted a policy of using material, inside information to time option grants, but never disclosed the practice. Specifically, the plaintiff alleges that the board of directors routinely granted options prior to quarterly earnings releases containing positive information, and after releases containing negative information. On this motion to dismiss for failure to adequately plead demand excusal and for failure to state a claim upon which relief can be granted, the court takes the particularized well-pleaded allegations of the complaint as true and draws all reasonable inferences in favor of the plaintiff. Applying that standard, the court concludes that the complaint adequately pleads a claim of breach of fiduciary duty against a majority of the company's board of directors based on the alleged issuance and receipt of options not authorized by the company's plans. Therefore, the motion to dismiss will be denied.

**I.**

A. The Parties

The plaintiff, Frederick Weiss, has been a stockholder of Linear Technology Corporation since January 12, 1996. Weiss brings this action derivatively on

948 A.2d 433, *437; 2008 Del. Ch. LEXIS 32, **2

behalf of Linear, the nominal defendant. Linear was founded in 1981 as a **[**3]** manufacturer of high performance linear integrated circuits, including high performance amplifiers, voltage references, battery chargers, and RF signal conditioning circuits.

The individual defendants are certain former and current Linear directors and **[*438]** officers. At the time the challenged option grants were approved, defendants Robert H. Swanson Jr., [1] David S. Lee, Richard M. Moley, Thomas S. Volpe, and Leo T. McCarthy (collectively, the "Director Defendants") constituted Linear's board of directors. Defendant Lothar Maier became a director in September 2005. [2] McCarthy left the board in November 2006, and Linear has since had a five-person board. At all relevant times, Lee, Moley, Volpe, and McCarthy constituted the Compensation Committee. The five named officers who allegedly received challenged option grants are Paul Coghlan, David B. Bell, Robert C. Dobkin, Donald Paulus, and Alexander McCann (collectively, the "Officer Defendants"). [3]

> 1   In addition to serving as a board member, Swanson was also Linear's chief executive officer from April 1999 until January 2005.
> 2   Maier served as Linear's chief operating officer from 2000 to January 2005, and became Linear's chief executive officer **[**4]** in January 2005.
> 3   The Officer Defendants did not assert an absence of personal jurisdiction over them in their motion to dismiss. Therefore, they have waived any such defense and submitted themselves to the jurisdiction of this court. *See* Del. Ch. Ct. R. 12(h).

B. Facts

Weiss filed his first complaint on March 23, 2007, and filed an amended derivative complaint on August 10, 2007 in response to a motion to dismiss filed on May 5, 2007. The defendants filed the pending motion to dismiss on September 19, 2007.

In his complaint, Weiss challenges 22 option grants the company made between July 1996 and July 2005 pursuant to three stockholder-approved option plans: the 1988 Stock Option Plan, the 1996 Incentive Stock Option Plan, and the 2005 Equity Incentive Plan. [4] The plans set out the general terms by which options may be granted. Notably, the plans authorize the board of directors to

approve grants made to directors. Thus, according to Weiss, the Director Defendants approved all option grants made to themselves. [5] Weiss also alleges that the plans authorize the Compensation Committee to approve option grants made to officers.

> 4   Although the complaint identifies three plans, the 1996 Plan **[**5]** is the one primarily at issue. The 2005 Equity Plan was not adopted by stockholders until November 2005, four months after the last challenged option grant was approved. *See infra* note 10. The 1988 Plan covers only the July 23, 1996 and October 16, 1996 option grants, *see id.,* because it was superceded by the 1996 Plan, which the stockholders approved in November 1996. Further, neither the 1988 Plan nor the 2005 Equity Plan are in the record before the court. Therefore, the court must accept Weiss's characterization of them as true. All references to a stockholder-approved option plan are to the 1996 Plan.
> 5   Because Maier became a director only after the last challenged option grant was authorized, he is alleged to have only received the option grants, not authorized them.

Under Linear's stockholder-approved option plans, the administrators are authorized to grant options as part of a compensation system designed to "attract and retain the best available personnel" and "to provide additional incentive to Employees, Directors, and Consultants." [6] Two types of options are authorized: incentive stock options designed to comply with *section 422 of the Internal Revenue Code of 1986*, and non-statutory **[**6]** stock options. All options Weiss challenges are non-statutory options. Paragraph 9 of the 1996 Plan provides:

> In the case of a Non-statutory Stock Option, the per Share exercise price shall be determined by the Administrator. **[*439]** In the case of a Non-statutory Stock Option intended to qualify as "performance-based compensation" within the meaning of *Section 162(m) of the Internal Revenue Code,* the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant. [7]

Thus, under the plans, the directors had full discretion to grant "in the money" options by setting exercise prices lower than the fair market value of Linear's stock price on the date of grant. The plans also provide that "[t]he date of grant of an Option shall be, for all purposes, the date on which the Administrator makes the determination granting such Option, or such other later date as is determined by the Administrator." [8]

6  1996 Plan P 1.

7  "Fair Market Value" is defined as the closing bid price for Linear's stock. Thus, the 1996 Plan requires options intended to qualify under *section 162(m) of the Internal Revenue Code* to have an exercise price equal to the closing price of Linear's [**7] stock on the date the options are granted. Under *section 162(m)*, compensation in excess of $ 1 million per year, including gains on stock options, paid to a corporation's five most highly compensated officers is tax deductible only if it is "performance-based," meaning it is given as an incentive for future performance, not as a reward for past performance. Options granted in the money allegedly do not meet this condition, and therefore are not eligible for treatment under *section 162(m)*.

8  1996 Plan P 13.

Weiss alleges that from July 1996 to June 2005, the directors granted options that violated the purposes, intent, spirit, and objectives of these plans. Specifically, Weiss alleges that the Director Defendants knew the company's quarterly earnings releases were highly anticipated by Linear investors, and that Linear's stock was dramatically affected by these announcements. [9] Weiss claims that the directors had advance knowledge of the contents of the quarterly earnings releases, and used this information to time each of the 22 challenged grants on terms favorable to the defendants. [10] According to the complaint, when the quarterly earnings release contained materially adverse information [**8] expected to drive down the market price of Linear's shares, the Director Defendants "bullet-dodged" the options, delaying their grant until after the release of the information. Conversely, when the quarterly earnings release contained material information expected to drive up the market price of Linear's shares, the Director Defendants allegedly "spring-loaded" the options, granting them just prior to the quarterly earnings release. Weiss also alleges that the Director Defendants never disclosed to

stockholders that they timed option grants in this manner.

9  In support of his allegations that the quarterly earnings releases had a material effect on Linear's stock price, Weiss cites to a 2006 report by Merrill Lynch comparing the annualized 20-day returns from the dates of Linear's management stock option grants with investor calendar year annual returns. Weiss contends that the Merrill Lynch report found that between 1997 and 2002, the defendants realized returns for their option grants that exceeded investor returns by an average of 396%.

10  Weiss identifies 40 earnings releases between 1996 and 2005, and alleges that public records indicate option grants occurred in connection with [**9] 28 of those releases. According to Weiss, 22 of those 28 grants were either "spring-loaded" or "bullet-dodged" in the manner described herein. The dates of the 22 grants are as follows: July 23, 1996, October 16, 1996, January 14, 1997, July 22, 1997, January 12, 1998, July 22, 1998, January 12, 1999, April 13, 1999, July 20, 1999, January 16, 2001, April 17, 2001, July 25, 2001, October 17, 2001, July 26, 2002, January 15, 2003, July 22, 2003, April 13, 2004, July 20, 2004, October 14, 2004, January 18, 2005, April 20, 2005, and July 27, 2005.

Weiss recognizes that granting and receiving spring-loaded and bullet-dodged [*440] options might be an appropriate exercise of business judgment in some circumstances. However, he asserts the Director Defendants' policy of timing options as alleged in this case was inconsistent with the expectations of the stockholders who approved the plans. Therefore, Weiss reasons, the defendants breached their fiduciary duties by authorizing, receiving, or (by abdication of duty) permitting grants not authorized by the stockholders. Weiss also contends that this timing policy harmed the corporation by artificially lowering the exercise price of the options, causing [**10] the company to receive too little money when the options are eventually exercised.

Weiss further alleges that the Director Defendants breached their fiduciary duties by causing Linear to issue the 1996 Proxy Statement, the 1998 Proxy Statement, the 2000 Proxy Statement, and the 2005 Proxy Statement without disclosing material information--namely, that options had been spring-loaded and bullet-dodged.

948 A.2d 433, *440; 2008 Del. Ch. LEXIS 32, **10

Finally, Weiss brings a waste claim against the Director Defendants, and a claim for unjust enrichment against all the defendants.

In response, the defendants assert that Weiss neither made demand nor adequately pleads reasons for demand excusal. The defendants also argue that the complaint fails to state a claim for breach of fiduciary duty. According to the defendants, the complaint is devoid of allegations that Linear's directors had material inside knowledge, or acted with the intent to circumvent the restrictions contained in the plans, both necessary elements of a breach of duty claim premised on the grant of spring-loaded and bullet-dodged options. The Officer Defendants further argue that the complaint fails to state a claim against them because mere receipt of timed options does **[**11]** not represent a breach of fiduciary duty. Finally, the defendants argue that claims relating to 14 of the 22 grants are time-barred.

For the reasons set forth below, the defendants' motion to dismiss will be denied.

## II.

### A. Demand Is Excused

*Aronson v. Lewis* provides the test for whether demand is excused where a majority of the board of directors that would consider demand also made the challenged decision. [11] According to the complaint, the Compensation Committee--three of whom remain on Linear's board--and Swanson approved all of the option grants now challenged. Because all four of these individuals currently serve on Linear's five-person board, Weiss alleges that a majority of the board of directors to consider demand also made the decision to approve the challenged transactions. Therefore, the standard articulated in *Aronson* applies in this case.

> 11   *See 473 A.2d 805, 814 (Del. 1984); see also Ryan v. Gifford, 918 A.2d 341, 353 (Del. Ch. 2007); Conrad v. Blank, 940 A.2d 28, 36 (Del. Ch. 2007).* In *Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993)*, the Delaware Supreme Court held that the *Aronson* test should not be applied where the board on which demand would be made did not make the business **[**12]** decision challenged in the litigation, a situation that arises in three main scenarios: (1) where the board made a business decision but a majority of the directors

who made the decision has since been replaced; (2) where the claim at issue does not arise from a business decision of the board; and (3) when a board of a different company made the challenged business decision. According to *Rales,* in those situations, demand is excused if the well-pleaded allegations of the complaint give rise to a reasonable doubt that the board can exercise "its independent and disinterested business judgment in responding to a demand." *Id. at 933-34.*

**[*441]** Under the *Aronson* test, demand is futile and excused where, in light of the particularized facts alleged, a reasonable doubt is created that (1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. [12] Demand is excused if a reasonable doubt exists as to either prong. [13]

> 12   *See Aronson, 473 A.2d at 814-15; see also Brehm v. Eisner, 746 A.2d 244, 256 (Del. 2000).*
> 13   *See Brehm, 746 A.2d at 256.*

The requirement of particularized facts means a "[p]laintiff's pleading **[**13]** burden [in the demand excused context] is . . . more onerous than that required to withstand a Rule 12(b)(6) motion." [14] At this stage in the proceedings, the court considers only the well-pleaded allegations of the complaint, [15] the documents incorporated into the complaint by reference, [16] and judicially-noticed facts. [17] The court draws all reasonable inferences from the complaint's allegations in the plaintiff's favor. [18] However, "only well-pleaded allegations of fact must be accepted as true; conclusory allegations of fact or law not supported by allegations of specific facts may not be taken as true." [19]

> 14   *Levine v. Smith, 591 A.2d 194, 207 (Del. 1991).*
> 15   *See, e.g., Desimone v. Barrows, 924 A.2d 908, 928 (Del. Ch. 2007); White v. Panic, 783 A.2d 543, 547 (Del. 2001).*
> 16   *See, e.g., Desimone, 924 A.2d at 928; Albert v. Alex. Brown Mgt. Servs., Inc., No. 762, 2005 Del. Ch. LEXIS 100, 2005 WL 1594085, at *12 (Del. Ch. June 29, 2005).*
> 17   *See Desimone, 924 A.2d at 928 (citing In re Gen. Motors (Hughes) S'holder Litig., 897 A.2d 162, 170 (Del. 2006)).*
> 18   *See, e.g., id.; White, 783 A.2d at 547 n.5.*
> 19   *Grobow v. Perot, 539 A.2d 180, 187 (Del.*

948 A.2d 433, *441; 2008 Del. Ch. LEXIS 32, **13

*1988).*

Here, demand is excused for two reasons. First, the particularized allegations **[**14]** of the complaint, taken as true, support a reasonable doubt that the challenged decisions were the result of a valid exercise of business judgment. Second, all five directors to consider demand received at least some of the challenged option grants and are therefore interested.

1. The Allegations In The Complaint Create A Reasonable Doubt That Approval Of The Option Grants Was A Valid Exercise Of Business Judgment

Although the defendants are correct that compensation decisions are typically protected by the business judgment rule, [20] the rule applies to the directors' grant of options pursuant to a stockholder-approved plan only when the terms of the plan at issue are adhered to. Thus, as the court held in *In re Tyson Foods, Inc. Consolidated Shareholder Litigation,* allegations in a complaint rebut the business judgment rule where they support an inference that the directors intended to violate the terms of stockholder-approved option plans. [21] Notably, the *Tyson* court **[*442]** also held that allegations such as those found in this complaint could support such an inference.

> 20   *See In re 3COM Corp. S'holders Litig, No. 16721, 1999 Del. Ch. LEXIS 215, 1999 WL 1009210, at *3 (Del. Ch. Oct. 25, 1999).*
> 21   The *Tyson* court **[**15]** that a claim of spring-loading or bullet-dodging rebutted the business judgment rule if (1) the plaintiff establishes that the challenged grants were given pursuant to an options plan, and (2) the plaintiff establishes that directors who approved the grants (a) possessed material non-public information soon to be released that would affect the company's share price, and (b) issued options with an intent to circumvent otherwise valid stockholder-approved restrictions upon the exercise price of the options. *See 919 A.2d 563, 593 & n.75 (Del. Ch. 2007)* (hereinafter, "*Tyson I*")

In *Tyson,* the plaintiff alleged that disinterested and independent members of the board breached their fiduciary duties when, pursuant to a stockholder-approved option plan, they granted spring-loaded options to the CEO of the company

without disclosing that they had done so. [22] Rather, "[a]ll SEC disclosures revealed the stated strike price to be the market price on the day of the grant." [23] The directors did not deny that they had granted spring-loaded options, but responded that the plan allowed them to grant such options. Specifically, they argued the plan gave them great discretion in granting options-including **[**16]** the ability to grant options rewarding past performance, [24] and there was no explicit restriction against spring-loading in the plan.

> 22   *See generally, Tyson I, 919 A.2d 563.*
> 23   *In re Tyson Foods, Inc. Consol. S'holder Litig., No. 1106, 2007 Del. Ch. LEXIS 120, 2007 WL 2351071, at *4 (Del. Ch. Aug. 15, 2007)* (hereinafter "*Tyson II*").
> 24   For instance, the plan allowed the directors to set a below fair market value exercise price.

The *Tyson* court denied relief to the directors on their motion for judgment on the pleadings. First, the court noted that "shareholders have a right to the full, unvarnished truth" in the area of executive compensation, and therefore directors, as fiduciaries, have a duty to disclose all material information when seeking stockholder approval of an option plan, or when disclosing an option grant. [25] Second, the court held that even though the plan gave the directors wide discretion in granting options and did not explicitly prohibit spring-loading, the existence of the spring-loading scheme was material information the directors had a duty to disclose. [26] Because the record before the court created a reasonable inference that the directors had not made this disclosure, the court denied the **[**17]** defendants' motion. Importantly, the *Tyson* court further held that it could infer from this lack of disclosure that the grants themselves had not been made in good faith, *i.e.* the directors intended to make grants that violated the option plan. [27]

> 25   *2007 Del. Ch. LEXIS 120, [WL] at *4 & n.18*; *In re 3COM, 1999 Del. Ch. LEXIS 215, 1999 WL 1009210, at *5.*
> 26   *See Tyson II, 2007 Del. Ch. LEXIS 120, 2007 WL 2351071, at *4* (holding that the nature of a spring-loading scheme "would constitute material information that the Tyson board of directors was obligated to disclose to investors . . .").
> 27   *See 2007 Del. Ch. LEXIS 120, [WL] at *5; see also Desimone, 924 A.2d at 930 n.80* (noting

that spring-loading "exploit[s] an interstitial gap in a manner that clearly deprive[s] the stockholders of the bargain they thought they had").

The *Tyson* court noted that it could have also reasonably inferred that the directors had made a business judgment that spring-loaded options neither harmed the company nor needed to be disclosed. However, on the defendants' motion for judgment on the pleadings, the court was obliged to give the "plaintiffs the benefit of every reasonable inference, not to give defendants the benefit of every doubt." [28] Therefore, the directors' decision to grant spring-loaded options was not [**18] entitled to the presumptions of the business judgment rule, at least at that stage of the proceedings.

> 28  *Tyson II,* 2007 Del. Ch. LEXIS 120, 2007 WL 2351071, at *5.

This case is substantially similar to *Tyson.* There is no dispute that the challenged options were granted pursuant to stockholder-approved option plans. Further, according to the complaint, the Director Defendants had access to the quarterly [*443] earnings releases before they became public and knew that the releases materially affected Linear's stock price. In addition, the allegations in the complaint, taken as true, support an inference that the releases did in fact materially affect Linear's stock price; Weiss notes the date of each relevant release, and then identifies Linear's stock price in the days following each release. Reading these allegations in a light most favorable to Weiss, it appears from the complaint that Linear's stock price increased in the days following a positive announcement, and decreased after a negative one. Additionally, Weiss alleges that, with 22 of 28 grants made in conjunction with quarterly earnings releases, the Director Defendants approved grants before positive releases and after negative releases. These particularized [**19] allegations support an inference that the Director Defendants granted spring-loaded and bullet-dodged options.

Under the court's reasoning in *Tyson,* then, the remaining questions are whether this alleged practice of timing options through spring-loading and bullet-dodging is material information, and, if so, whether it was disclosed. In considering the materiality of the Director Defendants' alleged practice of timing options, it is important to note that this court has yet to consider the precise allegations presented here. *Tyson* considered only

whether a practice of spring-loading is material information, and this court has had no occasion to consider whether a practice of bullet-dodging is material information directors have a duty to disclose. [29] Taking Weiss's allegations in this case as true, it is reasonable to infer that stockholders would consider the practice of timing options described in the complaint to be important in deciding whether to approve the option plans or to reelect board members. [30] In other words, the well-pleaded allegations in the complaint support an inference that the Director Defendants' alleged practice of granting spring-loaded and bullet-dodged options [**20] in conjunction with earnings releases was material information. Under *Tyson,* because the allegations of the complaint support an inference that the Director Defendants never disclosed this practice in the plans themselves, subsequent proxy statements, or SEC filings describing the option grants, the allegations in the complaint also give rise to an inference that the Director Defendants, in violation of their fiduciary duties, intended to circumvent the restrictions found in the plans.

> 29  Although the court in *Desimone* did not discuss the materiality of a practice of bullet-dodging, it did opine that waiting "until after . . . negative news is disclosed" to make "a discretionary grant of market-price options" is "the kind of situational business judgment, which traditional corporation law principles leave to disinterested directors." *924 A.2d at 945* (reasoning that "[i]t would be an odd compensation practice indeed to make a discretionary grant of market-price options when the board knows that the stock is actually worth less than the market price").
>
> 30  "Material facts are those facts for which 'there is a substantial likelihood that a reasonable person would consider [them] important [**21] in deciding how to vote.'" *O'Reilly v. Tramworld Healthcare, Inc.,* 745 A.2d 902, 916 (Del. Ch. 1999) (quoting *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del. 1985)); *see also Frank v. Arnelle,* No. 15642, 1998 Del. Ch. LEXIS 176, 1998 WL 668649, at *3 (Del. Ch. Sept. 16, 1998) (defining materiality as information "a reasonable stockholder would find . . . has altered the 'total mix' of information available.").

It bears noting that, unlike Tyson's disclosures, Linear's disclosures do not affirmatively state that all

948 A.2d 433, *443; 2008 Del. Ch. LEXIS 32, **21

options were granted with a fair market value strike price. Rather, based on the record properly before the court on this motion to dismiss, Linear's disclosures appear to be much [*444] more ambiguous about the options' strike prices. [31] Therefore, the inference of impropriety is somewhat weaker in this case than it was in *Tyson*. [32] Nonetheless, Weiss has alleged particularized facts creating a reasonable doubt that the option grants resulted from a valid exercise of business judgment, and demand will be excused.

31   For instance, the Compensation Committee Reports accompanying annual proxy statements state that the corporation retained the right to grant options that did not qualify for treatment under [**22] *section 162(m)*, indicating grants may have been issued in the money, *i.e.*, with a below fair market value strike price.

32   The defendants also argue that this case is distinguishable from *Tyson* because the SEC has ceased its investigation of the company. However, the allegations in this case involve whether the directors have violated their fiduciary duties, not federal securities law. *See Tyson I, 919 A.2d at 593*. Therefore, it is immaterial to this case that the SEC has ceased its investigation.

The defendants maintain that the information contained in the earnings reports was immaterial, and therefore the directors could not have spring-loaded or bullet-dodged options. In support of their position, the defendants contend that the stock price appears to react to the quarterly earnings releases as predicted only because Weiss cherry-picked option grants to create the impression of a pattern of manipulation. Specifically, the defendants point out that Weiss only challenges grants made to officers and directors, not rank and file employees. The defendants also note that Linear's stock price actually fell after the two earnings releases Weiss characterizes as "positive," [33] that Linear's [**23] stock rose a legally immaterial amount after six other releases, [34] offer up alternative explanations for why Linear's stock price changed after the earnings releases, [35] and argue that the April 13, 2004 and April 19, 2000 grants cannot be considered because, as SEC filings show, the allegations surrounding them are inaccurate. [36]

33   *See* Defs.' Rep. Br. 14.

34   Those grant dates are July 22, 2003 (.17% rise), October 12, 2004 (1% drop), January 18,

2005 (1.51% rise), July 20, 2004 (4.27% rise), July 22, 1997 (7.91% rise), and January 14, 1997 (8.38% rise). *See* Defs.' Op. Br. 25; Defs.' Rep. Br. 14.

35   *See* Defs.' Rep. Br. 15-16.

36   *See* Defs.' Op. Br. 26.

These arguments do not justify a different result on the pending motion. The facts regarding Linear's option grants to non-executive employees are all taken from outside of the complaint and are not found in documents properly before the court. Weiss says as much in his complaint, alleging he has not challenged option grants made to rank and file employees because those grants were not disclosed in public records, and therefore he does not know how or when those options were granted. The defendants' argument with regard to non-executive employee [**24] grants is inappropriate at this time.

Further, the defendants' quibbling with how the earnings reports affected Linear's stock price, even assuming such quibbles to be true, does not help them. Taking the defendants' assertions as true--that the stock price actually went down after two of the allegedly "positive" earnings releases and that two other grants should not be considered because Weiss's allegations as to them are inaccurate--means Linear's stock price reacted as expected to 18 of 22 quarterly earnings releases, albeit in very small amounts as to six of those 18. These allegations are sufficient to support [*445] an inference that the earnings reports were material to investors. [37]

37   Weiss also points to the 2006 Merrill Lynch report in order to establish that the earnings reports were material, thereby enabling the defendants to time option grants. In response, the defendants raise several objections to the methodology of the report and its application to this case. The court is unsure that such an attack is even appropriate on a motion to dismiss because the defendants' arguments seem to require reference to expert testimony. Still, the court's determination that the quarterly earnings [**25] releases are material is based not so much on the amount by which the market moved in response to each release, but the remarkable consistency with which the market allegedly responded to the quarterly earnings releases as expected. Thus, even without the Merrill Lynch report, the

complaint supports an inference that the quarterly earnings releases were material. Therefore, the court need not consider the defendants' argument regarding the Merrill Lynch report at this time.

Perhaps evidence will come to light establishing that the directors had no idea or opinion as to the effect of the earnings releases on Linear's stock price, or that they reasonably relied on competent experts and advisors in determining grant dates. The defendants might also produce evidence establishing that Weiss's methodology for measuring the effect of the quarterly earnings releases on Linear's stock price is flawed, or that his characterizations of the quarterly earnings releases are incorrect. But those factual determinations are for another day, and, at this stage of the litigation, the court must draw all reasonable inferences in favor of Weiss.

The defendants next argue that the plans authorized spring-loading [**26] and bullet-dodging, and that descriptions of the option grants in SEC filings adequately disclosed the Director Defendants' policy of timing option grants with material, non-public information. Specifically, the defendants point to language in the plans stating option grants would be used "to attract and retain the best available personnel." [38] Citing the Chancellor's opening remarks in *In re Walt Disney Company Derivative Litigation*, the defendants further argue that requiring more explicit disclosure would unfairly apply modern notions of corporate governance to decades old conduct. [39] According to the defendants, this is especially so here since no SEC regulations required disclosure of spring-loading and bullet-dodging at the time the grants were made, and Delaware courts look to SEC regulations when determining what disclosures are required.

38 The defendants cite similar language found in the Compensation Committee Reports accompanying annual proxy statements that states "the Committee believes that its primary responsibility is to provide a compensation program that will attract, retain and reward the executive talent necessary to the Company's success." As noted, the Compensation [**27] Committee Reports also contain what might be the clearest indication that the plans contemplated grants for past performance rather than future performance. They state that the corporation retained the right to grant options that did not

qualify for treatment under *section 162(m)*.

39    *See* Defs.' Op. Br. 15 (citing *In re Walt Disney Co. Deriv. Litig.*, *907 A.2d 693, 698 (Del. Ch. 2005)*, *aff'd*, *906 A.2d 27 (2006))*.

The language the defendants now identify as fulfilling their disclosure obligations is nearly identical to that the court rejected as insufficient in *Tyson*. There, the defendants argued that the plan itself disclosed the timing of option grants because "one of the stated purposes of the [Tyson option] Plan is to 'provide a means of obtaining, rewarding and retaining [] key personnel.'" [40] Noting that "shareholders [*446] have a right to the full, unvarnished truth" in the area of executive compensation, [41] the *Tyson* court rejected the sufficiency of the defendants' "sparse" disclosures [42] and "bare formalism concealed by a poverty of communication." [43]

40    *See* Outside Directors' Reply Brief in Support of their Motion for Judgment on the Pleadings on Count III of the Consolidated Complaint [**28] at 7 n.6, *In re Tyson, No. 1106, 2007 Del. Ch. LEXIS 120 (Del. Ch. June 29, 2007)*.
41    *Tyson II, 2007 Del. Ch. LEXIS 120, 2007 WL 2351071, at \*4 & n.18*.
42    *2007 Del. Ch. LEXIS 120, [WL] at \*5*.
43    *2007 Del. Ch. LEXIS 120, [WL] at \*3*.

In addition, the cases to which the defendants cite are inapposite. Those cases establish only that Delaware courts defer to SEC regulations regarding the technicalities of disclosures. For example, in *Lewis v. Vogelstein*, [44] the plaintiff asserted that a proxy statement seeking approval of an option plan was materially incomplete and misleading because it did not include an estimated present value of the option grants the directors might receive under the plan. The plaintiff asserted that the corporate directors had a duty to disclose the present value of future options as estimated by some option-pricing formula, such as the Black-Scholes option-pricing model. The *Lewis* court, recognizing that federal securities law did not require such disclosure, dismissed the plaintiff's claim. Noting that "[s]ignificant doubt exists whether . . . option-pricing models provide a sufficiently reliable estimate of the value of options," the court reasoned that it should defer to the SEC as to how option values should be disclosed because the question involved "technical judgments [**29] concerning what is feasible and helpful," not simply a "moral intuition that directors should be candid with shareholders." [45]

44  *699 A.2d 327 (Del. Ch. 1997).*
45  *Id. at 331-32.*

Similarly, in *Frank v. Arnelle,* [46] the plaintiff challenged a Dutch auction, alleging the offer circular disseminated to the stockholders omitted material facts. Specifically, the plaintiff alleged that on the weekend before the auction closed, a director decided to tender some of his shares. The company issued a press release disclosing this fact the following Monday morning. The plaintiff alleged that the corporation should have made disclosure through a supplemental mailing to stockholders rather than a press release. The *Frank* court rejected the plaintiff's claim, noting that "federal law establishes under what circumstances it is necessary to supplement the information in . . . federal filings and, more significantly, the manner in which such supplemental disclosure is to be disseminated." [47] This deference was especially necessary where "the plaintiff has not alleged any malfeasance on the part of the defendants." [48]

46  *1998 Del. Ch. LEXIS 1796, 1998 WL 668649.*
47  *1998 Del. Ch. LEXIS 1796, [WL] at *7.*
48  *1998 Del. Ch. LEXIS 1796, [WL] at *8.* In the defendants' final citation, *In re Wheelabrator Techs. Inc. S'holders Litig.,* No. 11495, 1990 Del. Ch. LEXIS 145, 1990 WL 131351, at *7 (Del. Ch. Sept. 6, 1990), **[**30]** the court found that the plaintiffs had "not shown why Delaware law should be held to require . . . disclosure" because the information was immaterial, not because of a lack of federal law requiring disclosure.

Requiring disclosure of the policy of timing option grants alleged in this complaint, however, does not rest merely on technicalities. Nor does this case implicate the *Disney* court's warning against applying "21st century notions of best practices" to decades-old conduct. [49] Rather, as the *Tyson* court concluded, the obligation to disclose the policy of timing option grants alleged in this complaint arises simply from a "moral intuition . . . that directors **[*447]** should be candid with shareholders" [50] and this court's well-established definition of materiality. [51] Such a determination is within the proper domain of fiduciary duty law, and requires reference only to well-established standards of fiduciary duty. The allegations in the complaint support an inference that the Director Defendants failed to meet those standards, and therefore a reasonable inference can be drawn that they

intended to circumvent restrictions implied in the plans.

49  *907 A.2d at 698.*
50  *Lewis, 699 A.2d at 332.*
51  *See,* **[**31]** *e.g., O'Reilly,* 745 A.2d at 916 (quoting *Rosenblatt,* 493 A.2d at 944); *see also Frank,* 1998 Del. Ch. LEXIS 176, 1998 WL 668649, at *3.

The defendants contend that the court should not draw this inference for three reasons. First, they argue that at the time the grants were made, they did not believe those grants violated the restrictions in the plans, in large part because the SEC did not prohibit spring-loaded or bullet-dodged options. Stated positively, the argument is that the Director Defendants made a business judgment that the option grants complied with the terms, spirit, and intent of the plans. Second, the Director Defendants argue they lacked an intent to circumvent the restrictions of the plans because they did not have a direct financial motive to do so. Third, the defendants maintain that all of the options had long vesting periods, meaning the grantee could not exercise the options until several years after they were granted. Thus, the defendants argue, the challenged option grants did not reward the grantees for past performance, but, rather, continued to provide the grantee an incentive to maintain and increase Linear's stock price. As a result, the defendants conclude, the option grants complied **[**32]** with the plans' underlying intent.

The defendants' first two arguments are inappropriate for resolution on a motion to dismiss. These arguments are asserted more by way of affirmative defenses based on facts outside the complaint than as challenges to the sufficiency of the complaint. Future proceedings may establish that the Director Defendants, reasonably relying on competent counsel, decided that the plans authorized spring-loading and bullet-dodging and that these practices were properly disclosed. There may also be evidence that the Director Defendants had valid business reasons for approving each option grant in the manner they did. But these are questions of fact unsuitable for determination on a motion to dismiss.

In addition, the *Tyson* court already rejected the defendants' argument regarding vesting as a basis for granting the defendants' motion for judgment on the pleadings. As that court noted, "recipients of options are generally unable to benefit financially from [options] until a vesting period has elapsed, and thus an option's

value to an executive or employee is of less immediate value than an equivalent grant of cash." [52] Thus, the *Tyson* court recognized that grants [**33] of in the money options can act as incentives for managers. Nonetheless, the *Tyson* court held that such grants may represent a breach of fiduciary duty if they are not disclosed to stockholders. [53] As discussed above, the allegations support an inference that the Director Defendants did not disclose the practices challenged in this case, and therefore the complaint must be read as giving rise to a reasonable inference that the directors intended to circumvent the restrictions of the plans. Accordingly, the complaint, taken as true, supports a reasonable doubt [*448] that the decision to award the challenged options was the result of a valid exercise of business judgment, and demand will be excused.

> 52 *Tyson I, 919 A.2d at 592 n.75.*
> 53 *See id.*

### 2. The Allegations In The Complaint Create A Reasonable Doubt That A Majority Of The Board To Consider Demand Is Disinterested

In the alternative, demand will be excused because all five directors to consider demand received at least some of the challenged option grants and are not disinterested. The defendants correctly cite two cases for the general rule that demand is not excused simply because directors receive compensation from the company or an executive [**34] of the company. [54] But those cases do not address the slightly different question presented here--whether demand is excused where the challenged decision is the directors' decision to award themselves compensation, and there are allegations supporting an inference that the decision breached fiduciary duties. This situation is governed by the court's ruling in *Conrad v. Blank,* which held:

> [Directors who have received challenged options] have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue their current holdings or cause them to disgorge improperly obtained profits. This creates an unacceptable conflict that restricts them from evaluating the litigation independently. [55]

Therefore, the board is interested and demand is excused on that independent ground.

> 54 *See A.R. DeMarco Enters., Inc. v. Ocean Spray Cranberries, Inc., No. 19133, 2002 Del. Ch. LEXIS 135, 2002 WL 31820970, at *5 (Del. Ch. Dec. 4, 2002); White v. Panic, 793 A.2d 356, 366 (Del. Ch. 2000), aff'd, 783 A.2d 543, 551 n.24 (Del. 2001).*
> 55 *Conrad, 940 A.2d at 38.*

The court notes one final reason to doubt whether the directors could properly consider demand. Linear's 2006 Form 10-K indicates [**35] that the company has conducted an internal investigation into its "historical option-granting practices" and concluded that there was "no evidence of fraud or misconduct of any kind in the Company's practices in granting stock options." Given the contrary inferences arising from the complaint, "the court questions how it is that the interests of the corporation are not, or at least do not appear to be, adverse to the interests of the individual defendants." [56]

> 56 *Id. at 37.*

### B. Failure To State A Claim

#### 1. Breach Of Fiduciary Duty

The defendants argue that the complaint fails to state a breach of fiduciary duty claim under Court of Chancery Rule 12(b)(6) as to the Director Defendants for approving the challenged grants. "[W]here [the] plaintiff alleges particularized facts sufficient to prove demand futility under the second prong of *Aronson,* that plaintiff *a fortiori* rebuts the business judgment rule for the purpose of surviving a motion to dismiss pursuant to Rule 12(b)(6)." [57] Therefore, the complaint states a . claim against the Director Defendants for breach of fiduciary duty as a result of approving the challenged option grants.

> 57 *Ryan, 918 A.2d at 357.*

The defendants also contend that [**36] the complaint fails to state a claim against the Director Defendants for breach of fiduciary duty in connection with improper disclosures. The defendants note that under Delaware law, improper disclosure leads to [*449] a breach of fiduciary duty only when the disclosure is made in connection with a request for stockholder action. [58] According to the defendants, Weiss has not identified

any specific stockholder action connected to the disclosures.

58   *See O'Reilly,* 745 A.2d at 920, 926, 927.

This argument clearly lacks merit. Weiss alleges that the Director Defendants omitted that they would grant spring-loaded and bullet-dodged options from both the 1996 proxy statement seeking stockholder approval of the 1996 option plan and the 1998 proxy statement seeking stockholder approval of an amendment to the 1996 plan increasing the number of shares of common stock reserved for issuance. Weiss also alleges that in connection with proxy solicitations seeking reelection to Linear's board of directors, the Director Defendants made statements giving the impression that they had implemented the option plans in accordance with the plans' terms, when in fact they implemented a policy of timing grants that [**37] was not authorized under the plans. Therefore, Weiss has adequately pleaded a claim against the Director Defendants for breach of fiduciary duty based upon improper disclosures. [59]

59   *See id.*

Weiss has also stated a claim against the Officer Defendants and Maier for receiving the challenged grants. Here, the complaint alleges that these individuals knew or, absent recklessness, should have known that the grants violated the stockholder-approved option plans. Under the liberal pleading standards of this court, this knowledge may be averred generally. [60] Such allegations, taken as true, support an inference that the Officer Defendants and Maier, via their receipt of the options, breached their fiduciary duties. [61]

60   *See* Del. Ch. Ct. R. 9. As this court said in *IOTEX Communications, Inc. v. Defries:*

> [W]here pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it.

*No. 15817, 1998 Del. Ch. LEXIS 236, 1998 WL*

914265, at *4 (Del. Ch. Dec. 21, 1998).* The allegations in this complaint [**38] meet this standard. The Officer Defendants were aware of the dates on which they received option grants, and the quarterly earnings reports are alleged to have been "a focus of attention at Linear." Compl. P 158. Construing all reasonable inferences to be drawn from the complaint in a light most favorable to Weiss, these allegations support an inference that the Officer Defendants knew or, absent recklessness, should have known that the option grants they received were spring-loaded or bullet-dodged.

61   The defendants object that Bell, McCann, and Paulus joined Linear only after many of the grants were made, and these individuals cannot be liable for breaches of duty that occurred before they joined the company. This is, of course, true, but it is no reason to dismiss the claims against them *in toto.*

### 2. Unjust Enrichment

The defendants further argue that Weiss has not stated a claim for unjust enrichment as to any defendant because Weiss has not explained how the alleged timing of option grants enriched grantees. This argument is wholly without merit. Weiss posits that timing option grants ensures that the exercise price of a grantee's option is lower than it otherwise would be. Thus, [**39] upon exercise of the option, the grantee receives more value, and the company less, than he should.

The defendants argue that they have not been unjustly enriched as to options that remain unexercised. However, as the court stated in *Ryan,* this fact [*450] alone does not lead to a conclusion that there is no reasonably conceivable set of circumstances under which the defendants might be unjustly enriched. Indeed, the defendants retain something of value--the challenged options--at the expense of the corporation. Nothing suggests that the defendants are prevented from exercising their options once they fully vest. Thus, "one can imagine a situation where [the defendants] exercise[] the options and benefit[] from the low exercise price." [62] Moreover, even if the defendants do not exercise any options at all, the court may still be able to fashion an appropriate remedy, such as repricing or rescinding the options. [63] Thus, the motion to dismiss the unjust enrichment claim will be denied.

948 A.2d 433, *450; 2008 Del. Ch. LEXIS 32, **39

62  *Ryan, 918 A.2d at 361.*
63  *See id.*

### 3. Waste

Waste has been defined as follows:

Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which **[**40]** any reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift. If, however, there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky. [64]

In *Desimone,* Vice Chancellor Strine stated that stock option manipulation could lead to a claim for waste. [65]

64  *Brehm, 746 A.2d at 263* (emphasis omitted).
65  *924 A.2d at 916.*

The defendants argue that Weiss has failed to plead a claim for waste because he does not allege that the defendants should not have received any options, only that the option grants were excessive by some unarticulated amount. The defendants mischaracterize Weiss's allegations. Weiss alleges that the defendants should not have received any of the timed options at all, and that the grants were approved without any valid corporate purpose. [66]

66  *See* Compl. P 202.

The court recognizes **[**41]** that a claim for waste must meet "an extreme test, very rarely satisfied by shareholder plaintiff." [67] However, in this case, the court cannot conclude that there is no reasonably conceivable set of facts under which Weiss could prove a claim of waste. Therefore, Weiss has pleaded a claim for waste.

67  *Zupnick v. Goizueta, 698 A.2d 384, 387 (Del. Ch. 1997).*

### C. The Claims Are Timely

The defendants contend that the statute of limitations of *10 Del. C. § 8106* bars those claims based on option grants that occurred more than three years before the complaint was filed. Further, the defendants assert that tolling doctrines do not apply to this case because the information necessary to put Weiss on notice of his claim was publicly available.

A statute of limitations at law does not bind the Court of Chancery, a court of equity, with respect to purely **[*451]** equitable claims. [68] However, in a case such as this, where the plaintiff seeks legal relief or this court has concurrent jurisdiction, the court applies the statute of limitations by analogy. [69] Typically, the statute of limitations begins to run when the cause of action accrues, not when the injury is discovered. [70] Still, even "in actions seeking **[**42]** damages or essentially legal relief" [71] this court "does not strictly apply statutes of limitations." [72] Rather, the running of the limitations period can be tolled in certain limited circumstances. [73]

68  *See Adams v. Jankouskas, 452 A.2d 148, 157 (Del. 1982).*
69  *See In re Dean Witter P'ship Litig., No. 14816, 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at *3 (Del. Ch. July 17, 1998), aff'd without opinion, 752 A.2d 441 (Del. 1999); see also Franklin Balance Sheet Inv. Fund v. Crowley, No. 888, 2006 Del. Ch. LEXIS 188, 2006 WL 3095952, at *6 (Del. Ch. Oct. 19, 2006)* (citing *Orloff v. Shulman, No. 852, 2005 Del. Ch. LEXIS 184, 2005 WL 3272355, at *10 (Del. Ch. Nov. 23, 2005)).*
70  *See Dean Witter, 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at *4.*
71  *Yaw v. Talley, No. 12882, 1994 Del. Ch. LEXIS 35, 1994 WL 89019, at *5 (Del. Ch. Mar. 2, 1994).*
72  *Franklin Balance Sheet, 2006 Del. Ch. LEXIS 188, 2006 WL 3095952, at *6* (citing *U.S. Cellular Inc. Co. of Allentown v. Bell Atl. Mobile Sys., Inc., 677 A.2d 497, 502 (Del. 1996)).*
73  *See Albert, 2005 Del. Ch. LEXIS 100, 2005 WL 1594085, at *12* (citing *Wal-Mart Stores v. AIG Life Ins. Co., 860 A.2d 312, 319 (Del. 2004)* (per curiam)).

948 A.2d 433, *451; 2008 Del. Ch. LEXIS 32, **42

Weiss asserts two separate theories to support a tolling of the statute of limitations in this case: fraudulent concealment and equitable tolling. Each of these doctrines permits tolling of the limitations [**43] period where "the facts underlying a claim [are] so hidden that a reasonable plaintiff could not timely discover them." [74] Weiss alleges that his claims are timely because the statute of limitations was tolled until at least after 2005.

74 *2005 Del. Ch. LEXIS 100, [WL] at \*18*; *Dean Witter, 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at \*5.*

Fraudulent concealment requires an affirmative act of concealment or "actual artifice" by a defendant that prevents a plaintiff from gaining knowledge of the facts. [75] Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary. [76] Underlying this doctrine is the idea that even an attentive and diligent investor may rely, in complete propriety, upon the good faith of fiduciaries. [77] If the limitations period is tolled under either of these theories, it is only tolled until a plaintiff discovers, or by exercising reasonable diligence should have discovered, his injury. [78] Thus, the limitations period begins to run when the plaintiff is objectively aware of the facts giving rise to the wrong, *i.e.* on inquiry notice. [**44] [79] It is Weiss's burden to plead specific facts to demonstrate that the statute of limitations was, in fact, tolled and that the Linear stockholders were not on inquiry notice of the derivative claims before August 10, 2004, the date three years before his complaint was filed. [80]

75 *Tyson I, 919 A.2d at 585*; *Albert, 2005 Del. Ch. LEXIS 100, 2005 WL 1594085, at \*19*; *Dean Witter, 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at \*5.*

76 *See Tyson I, 919 A.2d at 585*; *Albert, 2005 Del. Ch. LEXIS 100, 2005 WL 1594085, at \*19*; *Dean Witter, 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at \*6.*

77 *See Tyson I, 919 A.2d at 585*; *Dean Witter, 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at \*6* (quoting *Kahn v. Seaboard Corp., 625 A.2d 269, 275-76 (Del. Ch.1993)*).

78 *See Dean Witter, 1998 Del. Ch. LEXIS 133, 1998 WL 442456 at \*6.*

79 *See id.*

80 *See Tyson I, 919 A.2d at 585*; *Brady v. Pettinaro Enters., 870 A.2d 513, 524-25 (Del. Ch. 2005)*; *Dean Witter, 1998 Del. Ch. LEXIS 133, 1998 WL 442456 at \*6.*

[*452] Assuming the facts in the complaint to be true, Weiss has established that the doctrine of equitable tolling applies, and he was not on inquiry notice of injury before August 10, 2004. Weiss alleges that the Director Defendants knowingly granted spring-loaded and bullet-dodged options to executives and themselves while never publicly disclosing those practices. Weiss was "entitled to rely upon the competence [**45] and good faith of those protecting [his] interests," including with regard to administration of the plans. [81] Therefore, the application of equitable tolling is appropriate. [82]

81 *Tyson I, 919 A.2d at 590-91.*

82 Fraudulent concealment might also apply in this case if Weiss can show an intent on the Director Defendants' part to deceive stockholders. However, as noted, the inference of such intent in this case is weaker than in *Tyson* because, unlike in *Tyson,* Linear's disclosures do not affirmatively state that all options have been granted with a fair market value strike price. Without this affirmative act of concealment, it is more difficult to say on the record presently before the court that fraudulent concealment is appropriate. Because equitable tolling applies, however, the court need not address the issue further.

It would be inappropriate to infer, as the defendants argue, that Weiss was on inquiry notice of his claims simply because he could have pieced together the alleged practice of timing option grants from publicly available information. Here, unlike, the cases the defendants cite, the information needed to put Weiss on notice of his claims did not appear in one document. [83] [**46] In order to discover the alleged pattern of timing, Weiss would have had to cull through the company's Form 4s each time they were filed, [84] compare the grant dates of the options with the timing of the quarterly earnings releases, and then conduct a statistical analysis in order to uncover the alleged malfeasance. [85] Such an investigation is beyond "reasonable" diligence. [86]

83 *See Dean Witter, 1998 Del. Ch. LEXIS 133, 1998 WL 442456, at \*8* (rejecting a tolling argument where all the information necessary to

put the plaintiff on notice of his claim was found in one annual report); *Official Comm. of Unsecured Creditors, No. 20228, 2004 Del. Ch. LEXIS 122, 2004 WL 1949290, at *8 (Del. Ch. Aug. 24, 2004)* (dismissing a claim as time-barred where the allegedly wrongful payment of a bonus to a CEO was disclosed in a proxy statement); *In re USACAFES, L.P. Litig., No. 11146, 1993 Del. Ch. LEXIS 12, 1993 WL 18769, at *3-6 (Del. Ch. Jan. 21, 1993)* (rejecting a tolling argument where the challenged compensation practices were fully disclosed in the company's Form 10-Ks).

84   The court may consider these documents on a motion to dismiss. *See Tyson I, 919 A.2d at 585* (stating that on a motion to dismiss an action as untimely, the court may consider two types of evidence **[**47]** outside the complaint without converting the motion to dismiss into a motion for summary judgment: "(a) documents expressly referred to and relied upon in the complaint itself, and (b) documents that are required by law to be filed, and are actually filed, with federal or state officials").

85   This is true even if, as the defendants alleged, the quarterly earnings releases and the company's Form 4s were publicly released at roughly the same time. There is nothing in the Form 4s giving

any indication of a connection to the quarterly earnings release, or vice versa. Thus, taking the allegations of the complaint as true, nothing in one document would give Weiss a reason to look at the other.

86   *See id. at 590* (tolling the statute of limitations where, to discover the wrongdoing, the plaintiff would have to "sift through a proxy statement, on the one hand, and a year's worth of press clippings and other filings, on the other"): *see also Ryan, 918 A.2d at 360*.

In later proceedings, the defendants will have the opportunity to present evidence to show that Weiss was, in fact, on inquiry notice. For instance, the defendants "might establish that financial analysts, institutional investors, or academic **[**48]** researchers **[*453]** had published research suggesting that [Linear's] directors favorably timed option grants long before the consolidated complaint was filed." [87]

87   *Tyson I, 919 A.2d at 591*.

**IV.**

For the foregoing reasons, the defendants' motion to dismiss is DENIED. IT IS SO ORDERED.

EXHIBIT 8

Slip Copy                                                                Page 1
Slip Copy, 2008 WL 2791526 (S.D.N.Y.)
**2008 WL 2791526 (S.D.N.Y.)**

Hall v. The Children's Place Retail Stores, Inc.
S.D.N.Y.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Debra HALL, Individually and on Behalf of All
Others Similarly Situated, Plaintiffs,
v.
THE CHILDREN'S PLACE RETAIL STORES,
INC., Ezra Dabah & Susan Riley, Defendants.
**No. 07 Civ. 8252(SAS).**

July 18, 2008.

Samuel H. Rudman, Esq., David A. Rosenfeld,
Esq., Mario Alba, Jr., Esq., Coughlin Stoia Geller
Rudman & Robbins LLP, Melville, NY, Nathan M.
Jenkins, Esq., Jenkins & Carter, Reno, NV, for
Lead Plaintiff and the Class.
Jonathan D. Polkes, Esq., David R. Fertig, Esq.,
Weil, Gotshal & Manges LLP, Robert J. Jossen,
Esq., Michael J. Gilbert, Esq., Dechert LLP,
Richard P. Swanson, Esq., Arnold & Porter LLP,
New York, NY, for Defendants.

### *OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

*1 This putative class action is brought on behalf of
a class of shareholders of The Children's Place Re-
tail Stores, Inc. ("TCP" or the "Company") against
(1) TCP; (2) its Chief Executive Officer ("CEO"),
Ezra Dabah; and (3) its Chief Financial Officer
("CFO"), Susan Riley. Debra Hall and all other
similarly situated shareholders (the "Shareholders")
allege in the Consolidated Class Action Complaint
(the "Complaint") that defendants violated federal
securities laws in connection with the Company's
accounting for stock options in its financial state-
ments and its certifications of the adequacy of the
Company's internal controls. Plaintiffs further as-
sert that the defendants fraudulently misstated the
Company's financial statements by reporting artifi-
cially inflated financial results, failing to disclose

significant problems with a major business partner,
and knowingly violating the Company's internal
control policies. The defendants now move to dis-
miss the Complaint. For the reasons discussed be-
low, the motion is denied.

## I. BACKGROUND

### A. Facts[FN1]

> [FN1]. The facts summarized in this section
> are drawn from the Complaint ("Compl.")
> and are presumed to be true for the purpose
> of these motions.

During the period from March 9, 2006 through Au-
gust 23, 2007 (the "Class Period"), TCP operated as
a specialty retail company.[FN2] Throughout the
Class Period, the Company was registered with the
Securities and Exchange Commission ("SEC") pur-
suant to the Securities Exchange Act of 1934
("Exchange Act") and was traded on the NASDAQ
National Market ("NASDAQ").[FN3] Dabah served
as CEO of TCP throughout the Class
Period.[FN4] Riley served as Senior Vice President
and CFO of TCP from April 2006 until January
2007 and has been Executive Vice President of Fin-
ance and Administration of TCP since January
2007.[FN5]

> [FN2].*See* Compl. ¶ 16.
>
> [FN3].*See id.* ¶ 21.
>
> [FN4].*See id.* 117.
>
> [FN5].*See id.*

### 1. The Disney Stores Acquisition

In 2004, TCP entered into a License and Conduct of
Business Agreement ("License Agreement") with
the Walt Disney Company ("Disney") that provided
TCP with the exclusive right to operate the Disney

Store North America, a total of 313 retail operations (the "Disney Stores").[FN6] Pursuant to the License Agreement and in exchange for the sum of $101 million, TCP acquired the Disney Stores which sell Disney-related merchandise in malls and shopping centers throughout the country.[FN7] Under the License Agreement, TCP was obligated to maintain the "quality, appearance and presentation standards" of the Disney Stores.[FN8] In April of 2006, the License Agreement was amended, requiring TCP to: (1) completely remodel each Disney Store within a specified time after lease renewals; (2) completely remodel each Disney Store at least once every twelve years; and (3) completely remodel a minimum of 160 of the 313 acquired Disney Stores by January 1, 2009 ("Remodeling Initiative").[FN9] The Disney Franchise Board ("Franchise Board") regularly interacted with TCP and its subsidiary, Hoop, to ensure that the company complied with all terms of the License Agreement.[FN10]

> FN6. *See id.* ¶ 11.

> FN7. *See id.* ¶ 6.

> FN8. *See id.* ¶ 13.

> FN9. *See id.* ¶ 15.

> FN10. *See id.*

Seven confidential witnesses ("CW 1-7") have provided relevant information about the procedures and practices carried out by the Company during the Class Period.[FN11] Each CW was either an employee of the Company or worked closely with the Company, providing them with access to the information they have alleged in the Complaint.[FN12] According to CW 4, a long-time Disney Stores employee, the Franchise Board approval process was an integral element of the License Agreement.[FN13] Following the signing of the License Agreement and during the Class Period, TCP experienced ongoing problems and delays in developing merchandise to sell in the Disney Stores and in carrying out the Remodeling

According to CW 1, the Franchise Board frequently disapproved of the manner in which TCP was carrying out the design and remodeling of the Disney Stores, as well as the development and selection of Disney merchandise under the License Agreement.[FN15] "According to CW 5, many of Dabah's decisions created problems for Hoop ... because Dabah disregarded the desires and expectations of Disney, as set forth in the License Agreement and communicated by the Franchise Board."[FN16]

> FN11. *See id.* ¶ 29.

> FN12. *See id.*

> FN13. *See id.* ¶ 43.

> FN14. *See id.* ¶ 44.

> FN15. *See id.* ¶ 45.

> FN16. *id.* ¶ 46.

**\*2** During the Class Period, TCP regularly represented that its relationship with Disney was a positive one and that it was working closely with Disney to carry out the Remodeling Initiative.[FN17] However, according to CW 1, the Franchise Board continuously disapproved of store and merchandise designs, particularly relating to one "design theme" known as the Mickey Store format.[FN18] Fifty existing Disney Stores were scheduled to be remodeled to the Mickey Store Format within the first calendar year after the acquisition.[FN19] CW 2 confirmed that "Hoop executives regularly 'butted heads' with representatives of the Franchise Board."[FN20] Moreover, according to CW 5, Hoop did not conduct any maintenance or repair on any of the stores as required by the License Agreement.[FN21] At all times, TCP was aware of the problems Hoop was experiencing.[FN22] As of February 3, 2007, TCP had only remodeled thirty-two of the approximately 145 stores. As a result of its failure to meet certain deadlines and other violations of the License Agreement, TCP was "in breach of the License Agreement throughout 2006

and most of 2007."[FN23]In 2007, Disney notified TCP that it had committed one hundred and twenty breaches of the License Agreement.[FN24]As a consequence, TCP and Disney entered into a letter agreement (the "June Letter Agreement") that imposed new obligations on TCP.[FN25] In August 2007, TCP disclosed that it had fallen behind on its obligations under the June Letter Agreement and would likely miss upcoming deadlines.[FN26]As a result of the violation, Disney was free to terminate the License Agreement.[FN27]

FN17.*See id.* ¶ 47.

FN18.*See id.*

FN19.*See id.* ¶ 51.

FN20.*Id.* ¶ 47.

FN21.*See id.* ¶ 49.

FN22.*See id.* ¶ 50.

FN23.*Id.* ¶ 58.

FN24.*See id.* ¶ 59.

FN25.*See id.* ¶ 60.

FN26.*See id.* ¶ 62.

FN27.*See id.*

**2. TCP's Stock Option Grants and Financial Statements**

TCP granted stock options to its officers, directors, and employees pursuant to at least two stock option plans.[FN28]From 1997 through 2005, TCP engaged in the improper practice of backdating these stock options.[FN29]Stock option backdating involves intentionally altering the stock option grant dates to an earlier date when the stock's price was lower.[FN30]A key purpose of stock options is to give recipients an incentive to improve their employer's performance, including its stock price.[FN31]Backdating them so they carry a lower

exercise, or strike, price gives the recipient a "paper profit" right from the start.[FN32]The difference between the stock's current market price and the option's exercise price represents the amount of profit per share gained upon the exercise or the sale of the option.[FN33]For example, if a company grants options on May 22, when the stock's market price is twenty dollars, but records the grant date as April 22, when its market price was only fifteen dollars, the intrinsic value of the option would be the difference between its market price on May 22 and its strike price on April 22-five dollars.[FN34]

FN28.*See id.* ¶ 64.

FN29.*See id.* ¶ 63.

FN30.*See id.*

FN31.*See id.*

FN32.*See id.*

FN33.*See id.*

FN34.*See id.*

The Company's 2005 Form 10-K, filed with the SEC on or about April 12, 2006, falsely represented that the Company applied Accounting Principles Board No. 25, "Accounting for Stock Issued to Employees" ("APB 25") to its stock option grants.[FN35]The provisions of APB 25 mandate use of the intrinsic value method which determines an asset's true value regardless of its market price.[FN36] The 2005 Form 10-K stated that TCP uses the intrinsic value method under APB 25 to account for its stock option plans.[FN37]The Company has since disclosed that its APB 25 measurement dates were incorrect. The options were backdated, many times just before a sharp increase in the trading price of TCP stock, *i.e.,* the options were spring-loaded.[FN38]Spring-loaded options are granted immediately preceding a company announcement that is expected to have a positive result on the stock price.[FN39]The value of the options is spring-loaded because after they are granted there

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

is a high likelihood that the options will be "in the money," *i.e.*, the market price will be above the strike price."[FN40] Because positive news typically causes the market price of a company's stock to surge in value, timing an option grant to precede the public news release will allow the recipient to receive an immediate paper profit.[FN41] "Defendants have now admitted that certain option grant dates were set with a view towards upcoming disclosures."[FN42] TCP has now disclosed that "as a result of the Company's governance, internal financial reporting and other controls over the option grant process, the APB 25 measurement dates used by the Company for a significant portion of the stock options granted during the Review Period were incorrect."[FN43] The Company further represented that "[o]ptions granted under the [Stock Option] Plans have exercise prices established by the Compensation Committee [which] provided that the exercise price of incentive stock options may not be less than the fair market value of the underlying shares at the date of grant."[FN44] This statement, and all related statements, are materially false and misleading because TCP granted stock options to insiders at exercise prices that were below their fair market value on the grant date.[FN45] The options backdating scheme caused TCP's 2005 Form 10-K to materially understate the Company's compensation expense and overstate the Company's net income and earnings per share.[FN46] This was a violation of Generally Accepted Accounting Principles ("GAAP") standards, conventions and rules of financial accounting. TCP has restated its historical financial statements to record charges for compensation expenses. The Company stated that its "previously issued financial statements and other historical financial information and related disclosures for periods through the first quarter of fiscal should no longer be relied upon."[FN47]

> FN35. *See id.* ¶ 67.
>
> FN36. *Id.*
>
> FN37. *See id.* ¶ 70.

FN38. *See id.* ¶ 68.

FN39. *See id.*

FN40. *See id.*

FN41. *See id.*

FN42. *Id.*

FN43. *Id.* ¶ 69 (quoting 2007 Form 10-K).

FN44. *Id.* ¶ 66.

FN45. *See id.*

FN46. *See id.* ¶¶ 70-72.

FN47. *Id.* ¶ 73 (quoting 10/5/06 TCP press release).

**3. Internal Controls**

**\*3** The Shareholders allege that, throughout the Class Period, TCP suffered from internal control deficiencies.[FN48] Plaintiffs allege that Dabah admittedly violated the Company's internal control policies by pledging shares of his common stock as collateral for margin loans in his brokerage account during a black-out period.[FN49] Plaintiffs contend that this pledge amounted to a clandestine sale of stock and provided Dabah with a motive to conceal problems at the Company-to prevent a decrease in the price of TCP stock that might generate a margin call or a decrease in the amount of margin Dabah could borrow.[FN50]

> FN48. *See id.* ¶ 79.
>
> FN49. *See id.* ¶ 8.
>
> FN50. *See id.*

Furthermore, as discussed above, incorrect APB 25 measurement dates were used to backdate stock options and materially misstate financial statements. Nevertheless, Dabah and Riley repeatedly issued sworn Sarbanes-Oxley certifications attesting to the adequacy of the Company's internal controls.[FN51]

Specifically, on April 12, 2006, Dabah attested in the Company's Form 10-K that TCP possessed adequate internal controls.[FN52] Dabah and Riley also signed the Company's Forms 10-Q, which stated that the Company's disclosure controls and procedures were effective.[FN53] The Shareholders allege that the certifications were materially false and misleading when made because TCP did not maintain appropriate internal controls.[FN54]

> FN51. *See id.* ¶ 78.

> FN52. *See id.* ¶ 76.

> FN53. *See id.* ¶ 77.

> FN54. *See id.* ¶ 79.

**B. Procedural History**

On September 21, 2007, Debra Hall filed a complaint against TCP, Dabah, and Riley. Laborers Pension Trust Fund for Northern Nevada ("LPTF") moved to serve as Lead Plaintiff, and on December 17, 2007, the Court consolidated this action and appointed LPTF as Lead Plaintiff for the Class. The Consolidated Amended Class Action Complaint was filed on February 28, 2008.

**II. LEGAL STANDARD**

**A. Motion to Dismiss**

When deciding a motion to dismiss under Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[FN55] and "draw all inferences in the light most favorable to the non-moving party [ ]."[FN56] Nevertheless, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness."[FN57]

> FN55. *Bell Atl. Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1964 (2007). *Accord In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir.2007).

> FN56. *In re NYSE Specialists,* 503 F.3d at 95.

> FN57. *Id.* (quotation omitted).

In deciding a motion to dismiss, the court is not limited to the face of the complaint. The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[FN58]

> FN58. *ATSI Commc'ns v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

**1. Pleading Requirements**

"Federal Rule of Civil Procedure 8(a)(2) requires ... 'a short and plain statement of the claim showing that the pleader is entitled to relief.' "[FN59] To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[FN60] Although the complaint need not provide "detailed factual allegations,"[FN61] it must "amplify a claim with some factual allegations ... to render the claim *plausible.*"[FN62] The standard is no longer that a complaint can be dismissed only if there us "no set of facts" that plaintiff could prove "which would entitle him to relief."[FN63] Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' "[FN64]

> FN59. *Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 2200 (2007) (quoting Fed.R.Civ.P. 8(a)(2)).

> FN60. *See Bell Atl.,* 127 S.Ct. at 1970.

> FN61. *Id.* at 1964. *Accord ATSI,* 493 F.3d at 98 n. 2 (applying the standard of plausibility outside *Twombly's* anti-trust context).

FN62.*I qbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (emphasis in original).

FN63.*Bell Atl.,* 127 S.Ct. at 1969 (quoting *Conley v. Gibson,* 355 U.S. 45-46 (1957)).*Accord id.*("The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard ....").

FN64.*ATSI,* 493 F.3d at 98 (quoting *Bell Atl.,* 127 S.Ct. at 1965).

## 2. Securities Fraud

**\*4** "Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss."FN65.Those heightened pleading requirements are imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA").FN66."Private securities fraud actions must also meet the PSLRA's pleading requirements or face dismissal."FN67

FN65.*Id.* at 99.

FN66.*See* l5 U.S.C. § 78u-4(b).

FN67.*ATSI,* 493 F.3d at 99 (citing 15 U.S.C. § 78u-4(b)(3)(A)).

### a. Rule 9(b)

A complaint alleging securities fraud must satisfy Rule 9(b)'s requirement that "the circumstances constituting fraud ... be stated with particularity."FN68.This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."FN69.To comply with the requirements of Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were

"Allegations that are conclusory or unsupported by factual assertions are insufficient."FN71

FN68.Fed.R.Civ.P. 9(b).*Accord ATSI,* 493 F.3d at 99.

FN69.*ATSI,* 493 F.3d at 99 (citing *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir.2004)).

FN70.*Rombach,* 355 F.3d at 170 (quotation omitted).*Accord ATSI,* 493 F.3d at 99 (citing *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000)).

FN71.*ATSI,* 493 F.3d at 99.

### b. The PSLRA

The PSLRA requires plaintiffs to state with particularity "both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention to deceive, manipulate, or defraud."FN72.The PSLRA specifies that the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."FN73.The Supreme Court recently clarified the strong inference of scienter requirement in *Tellabs Inc. v. Makor Issues & Rights, Ltd.* There, the Court held that in order to determine whether scienter is adequately pled, courts must look at the complaint as a whole and "must take into account plausible opposing inferences."FN74."[A]n inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."FN75.The inference need not, however, be "irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the most plausible of competing inferences."FN76.The inquiry on a motion to dismiss is as follows: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"FN77."If the plaintiff alleges a false statement or omission, the PSLRA also requires that

'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' " FN78

FN72.*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S.Ct. 2499, 2504 (2007) (quotation omitted) (citing 15 U.S.C. § 78u-4(b) (l), (2)).

FN73.*Id.* (quoting 15 U.S.C. § 78u-4(b)(2)).

FN74.*Id.* at 2509.These plausible opposing inferences, however, may be based only on the complaint and other public documents on which Courts ordinarily rely in deciding a motion to dismiss, "while constantly assuming the plaintiff's allegations to be true."*Id.* at 2509, 2511-12.

FN75.*Id.* at 2504-05.

FN76.*Id.* at 2510 (citation omitted).

FN77.*Id.* at 2511.*Accord id.* at 2510 ("A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

FN78.*ATSI,* 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(l)).

**B. Exchange Act Violations**

**1. Section 10(b) and Rule 10b-5**

**\*5** In order to state a claim under Rule 10b-5 for misrepresentations, the "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon

which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."FN79With respect to the first element, the complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made." FN80"Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."FN81Once defendants choose to speak about their company, they undertake a duty "to speak truthfully and to make such additional disclosures as ... necessary to avoid rendering the statements misleading." FN82In situations "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." FN83Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." FN84

FN79.*Id.* at 105 (affirming the dismissal of plaintiffs' misrepresentations claims) (citing *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir.2005)).

FN80.*Rombach,* 355 F.3d at 172 (quotation omitted).*Accord In re Vivendi Universal, S.A. Sec. Litig.,* 381 F.Supp.2d 158, 182 (S.D.N.Y.2003) (holding that statements that a company was "financially solid" were actionable where defendants did not have a reasonable basis for them); *In re Oxford Health,* 187 F.R.D. 133, 140 (S.D.N.Y.1999) (holding that statements downplaying internal control problems were actionable because they misled investors into believing the problems were not as serious or extensive as they were).

FN81.*Novak,* 216 F.3d at 308 (citation omitted).

FN82.*In re Par Pharm., Inc. Sec. Litig.,* 733 F. Supp 668, 675 (S.D.N.Y.1990).*Ac-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

cord *In re Time Warner, Inc. Sec. Litig.,* 9 F.3d 259, 268 (2d Cir.1993) (holding that "[a] duty to disclose arises whenever secret information renders prior public statements materially misleading"); *Lapin v. Goldman Sachs Group, Inc.,* 506 F.Supp.2d 221, 237 (S.D.N.Y.2006) (holding that "upon choosing to speak one 'has a duty to be both accurate and complete' ") (quoting *Caiola v. Citibank, N.A.,* 295 F.3d 312, 331 (2d Cir.2002)); *In re Alstom SA Sec. Litig.,* 406 F.Supp.2d 433 (S.D.N .Y.2005) ("[O]mission is actionable when the failure to disclose renders a statement misleading.").

FN83.*Novak,* 216 F.3d at 309 (citation omitted).

FN84.*Id.* (citation omitted).*Accord Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir.2000) ("The fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness: People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage."(quotations omitted)).

Certain statements are protected by the PSLRA's safe harbor provision and the bespeaks caution doctrine. Under the PSLRA's safe harbor provision, forward-looking statements are deemed immaterial and non-actionable when they are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements."[FN85] However statements are not protected where defendants "had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality."[FN86] Similarly, under the judicially created bespeaks caution doctrine, "alleged misrepresentations ... are deemed immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language...."[FN87] Under the "truth-on-the-market" doctrine, information already known on the market is also immaterial.[FN88] Statements may also be deemed immaterial as merely vague expressions of optimism or puffery.[FN89] Lastly, pleadings based on fraud by hindsight are not actionable as a matter of law.[FN90]

FN85.15 U.S.C. § 78u-5(c)(1)(A).

FN86.*In re Nortel Networks Corp. Sec. Litig.,* 238 F.Supp.2d 613, 629 (S.D.N.Y.2003).*Accord Gabriel Capital, L.P. v. NatWest Fin., Inc.,* 122 F.Supp.2d 407, 419 (S.D.N.Y.2000) (observing that the bespeaks caution doctrine "does not apply where a defendant knew that its statement was false when made").

FN87.*Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir.2002).

FN88.*See Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 159 (2d Cir.2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality.").

FN89.*See In re NTL, Inc. Sec. Litig.,* 347 F.Supp.2d 15, 34 (S . D.N.Y.2004) ("Vague expressions of optimism, or puffery, are insufficient to support a claim for securities fraud.").

FN90.*See Caiafa v. Sea Containers, Ltd.,* 525 F.Supp.2d 398, 410-411 (S.D.N.Y.2007).

Scienter can be pled by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

circumstantial evidence of conscious misbehavior or recklessness."[FN91] "Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."[FN92] "[A]dmissions of misrepresentations, coupled with defendants' continuous intimate knowledge of company affairs is enough to adequately infer scienter."[FN93] Moreover, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."[FN94] "To prove liability against a corporation ... a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation."[FN95]

FN91. *ATSI,* 493 F.3d at 99 (citing *Ganino,* 228 F.3d at 168-69). *Accord In re Scottish Re Group Sec. Litig.,* 524 F.Supp.2d 370, 398 (S.D.N.Y.2007) (holding that plaintiffs adequately pleaded scienter because the allegations supported the inference that the company and the officers were at least reckless in not knowing that the financial statements were false and in failing to disclose internal control weaknesses); *In re eSpeed, Inc. Sec. Litig.,* 457 F.Supp.2d 266, 292 (S.D.N.Y.2006) (holding that plaintiffs must "specifically allege defendants' knowledge of facts or access to information contradicting their public statements").

FN92. *Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001) (describing "[i]nsufficient motives" as including "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation") (quotations omitted)).

FN93. *Stevelman v. Alias Res. Inc.,* 174 F.3d 79, 84-85 (2d Cir.1999).

FN94. *Kalnit,* 264 F.3d at 139. *Accord In re Openwave Sys. Sec. Litig.,* 528 F.Supp. 236, 250 (S.D.N.Y.2007) (holding that defendants' stock options "are 'concrete and personal' because they represent a species of compensation different from the one ordinarily accumulated by corporate officers and directors"); *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 939 (2d Cir.1984) (holding that "a pledge is a sale and purchase of a security under § 10(b)").

FN95. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* No. 06 Civ. 2902, 2008 WL 2521676, at *12 (S.D.N.Y. June 26, 2008).

**\*6** "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[FN96] Under this theory of scienter, a plaintiff must show that the defendant's conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[FN97] "Under certain circumstances, [courts] have found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."[FN98] Recklessness can be shown by "defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."[FN99]

FN96. *Kalnit,* 264 F.3d at 142.

FN97. *Id.* (quotation omitted).

FN98. *Novak,* 216 F.3d at 308. *Accord In re*

*Veeco Instruments, Inc., Sec. Litig.,* 235 F.R.D. 220, 232 (S.D.N.Y.2006) (holding that the scienter requirement was satisfied by identification of specific facts constituting strong circumstantial evidence of recklessness and allegations that defendants knew of or recklessly ignored a series of accounting improprieties).

FN99.*Novak,* 216 F.3d at 308.

Finally, in order to state a claim for securities fraud, a plaintiff must plead "both transaction causation (also known as reliance) and loss causation."FN100Transaction causation requires a plaintiff to demonstrate that " 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.' "FN101 Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic harm."FN102"To that end, the plaintiff's complaint must plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."FN103

FN100.*ATSI,* 493 F.3d at 106.

FN101.*Id.* (quoting *Lentell,* 396 F.3d at 172).

FN102.*Id.* at 106-07 (citing *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 346 (2005); *Lentell,* 396 F.3d at 172).*Accord Emergent Capital Inv. Mgmt. v. Stonepath Group, LLC,* 343 F.3d 189, 197 (2d Cir.2003).

FN103.*ATSI,* 493 F.3d at 107 (citing *Lentell,* 396 F.3d at 173).

**2. Control Person Liability: Section 20(a)**

In order to plead a prima facie case of control person liability under section 20(a), a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some

meaningful sense, a culpable participant in the controlled person's fraud."FN104"Allegations of control are not averments of fraud and therefore need not be pleaded with particularity."FN105Thus, " '[a]t the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard'" and " '[a]short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required.' "FN106

FN104.*Id.* at 108.

FN105.*In re Parmalat Sec. Litig.,* 414 F.Supp.2d 428, 440 (S.D .N.Y.2006).

FN106.*In re Scottish Re Group,* 524 F.Supp.2d at 385. *Accord In re Converium Holding AG Sec. Litig.,* No. 04 Civ. 7897, 2006 WL 3804619, at *14 (S.D.N.Y. Dec. 28, 2006) (quoting *In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 415-16 (S.D.N.Y.2003)).

**III. DISCUSSION**

**A. Section 10(b) and Rule 10b-5**

**1. Falsity**

Plaintiffs assert that Dabah and Riley made material misstatements and omissions by reporting artificially inflated financial results, failing to disclose significant problems with the Disney Stores and violating the Company's internal control policies.FN107Plaintiffs further allege that Dabah and Riley's certifications regarding internal controls were fraudulent.FN108 Defendants move to dismiss the section 10(b) and Rule 10b-5 claims on the ground that plaintiffs have failed to plead any false or misleading statement with the particularity required by Rule 9(b) and the PSLRA. Defendants assert that plaintiffs, looking backward in time, have seized on minor business delays, articulating a

"fraud by hindsight" pleading-prohibited by this Circuit.FN109However, as discussed below, plaintiffs have specified fraudulent statements, identified the speakers, stated when and where the statements were made and explained the reasons why the statements were fraudulent.FN110Plaintiffs have identified one hundred and twenty breaches of the License Agreement, suggesting that the Disney relationship was being mismanaged and in danger of being terminated. By not disclosing these breaches, it is plausible that the Company was attempting to inflate its stock price. Plaintiffs have pled particularized facts sufficient to support an inference that the allegedly omitted facts were material and actually existed at the time of the claimed misstatements.FN111Accordingly, plaintiffs have satisfied the particularity requirements of both Rule 9(b) and the PSLRA.

FN107.*See* Compl. ¶ 4.

FN108.*See id.*

FN109.*See, e.g., Caiafa,* 525 F.Supp.2d at 410-11.

FN110.*See Novak,* 216 F.3d at 306. *See also*15 U.S.C. § 78u-4(b)(l)(B).

FN111.*See In re NTL,* 347 F.Supp.2d at 23.

**\*7** Defendants also assert that the alleged misstatements and omissions are protected by the PSLRA's safe harbor provision and the bespeaks caution doctrine and are immaterial because they are statements of optimism or puffery. Plaintiffs contend that because the Company had no reasonable basis for these positive comments and did not provide sufficient accompanying cautionary language, the statements are beyond mere "puffery."FN112While some of the statements may have been forward-looking, many were not. Moreover, given the large number of breaches, it is certainly plausible that certain risks had become reality. As a result, any reasonable investor would

consider the statements important.FN113Accordingly, the statements are material and are not protected by the bespeaks caution doctrine or the PSLRA's safe harbor provision.FN114

FN112.*See In re Vivendi Universal,* 381 F.Supp.2d at 182.

FN113.*See In re Nortel Networks,* 238 F.Supp.2d at 629 (holding that statements not protected where the defendants "had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality").*See also Halperin,* 295 F.3d at 357.

FN114.*See, e.g., In re Nortel Networks,* 238 F.Supp.2d at 629.

Lastly defendants assert that the alleged misstatements are immaterial under the "truth-on-the-market" doctrine. This doctrine represents the assumption that "a misrepresentation is immaterial if the information is already known to the market."FN115While some facts regarding the maintenance of the Disney Stores were known, many were not. Disclosures such as the "ratcheting down" of the Disney Stores remodeling efforts did not fully reveal the numerous breaches of the License Agreement that occurred during 2006-2007. Whether the Disney problems were adequately disclosed to the market is a fact-intensive query that cannot be disposed of on a motion to dismiss.FN116Accordingly, falsity is adequately pled to survive a motion to dismiss.

FN115.*Ganino,* 228 F.3d at 167.

FN116.*See id.*

**a. The Disney Stores Acquisition**

Following the acquisition of the Disney Stores and during the Class Period, TCP "experienced ongoing problems and delays."FN117According to CW 1, the issues overlapped because problems and delays in store redesigns impacted merchandise develop-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

ment, selection, ordering, and, as a result, sales.FN118 Throughout the Class Period, TCP repeatedly made statements concerning the License Agreement and the Disney relationship.FN119 With respect to the Disney Stores, Dabah and the Company discussed the Mickey Store format favorably, commenting on the "continued positive trend of the business," the "continued strength," and the "consistent execution of our strategies." FN120 Once TCP chose to speak about these issues, it undertook a duty "to speak truthfully and to make such additional disclosures as ... necessary to avoid rendering the statements misleading."FN121 Plaintiffs contend that the Company nevertheless concealed information regarding the true extent of the Company's problems. As a result of their failure to meet certain deadlines and other violations of the License Agreement, TCP was "in breach of the License Agreement throughout 2006 and most of 2007."FN122 In 2007, Disney notified TCP that it had committed one hundred and twenty breaches of the License Agreement.FN123 Despite TCP's positive statements about the retail stores, the Company never fully informed investors about the extent of problems concerning the redesign of stores, merchandise development, selection, or ordering, nor did it disclose the Company's failure to meet Disney's expectations or obligations imposed by the License Agreement.FN124 Plaintiffs contend that the Company misled investors to believe that the scheduling delays were caused by mutual dissatisfaction, when in fact Disney was the only dissatisfied party.FN125

> FN117. Compl. ¶ 15.
>
> FN118. *See id.*
>
> FN119. *See, e.g.,* ¶¶ 80, 86, 99.
>
> FN120. *Id.* ¶¶ 82, 84, 88, 90.
>
> FN121. *In re Par Pharm,* 733 F.Supp. at 675.

> FN122. Compl. ¶ 58.
>
> FN123. *See id.* ¶ 59.
>
> FN124. *See id.* ¶¶ 44-45, 52-56.
>
> FN125. *See id.* ¶ 105.

**\*8** Plaintiffs' claim is supported by several alleged facts and reasonable inferences drawn from those facts. As an example, on the first day of the Class Period, March 9, 2006, the Company issued a press release announcing its financial results for the fourth quarter of 2005, reporting net income of $65.6 million.FN126 Dabah commented on these results, stating that TCP and the Disney Stores "can grow up to 1,800 stores, leaving us with 700 stores still to open ...,"FN127 The Complaint alleges that Dabah's statement about opening 700 more stores was materially false and misleading.FN128 The Complaint also alleges that in the press release Dabah and TCP overstated the Company's net income by $5.6 million.FN129 Plaintiffs allege that because of the problems the Company was having with Disney, there was no reasonable basis upon which to make these public statements.FN130 Given the large number of breaches of the License Agreement, it is as plausible that TCP did provide misleading and false information to the market and to investors.

> FN126. *See id.* ¶ 80.
>
> FN127. *Id.*
>
> FN128. *See id.* ¶ 81.
>
> FN129. *See id.*
>
> FN130. *See In re Vivendi Universal,* 381 F.Supp.2d at 182.

**b. Stock Option Grants and Financial Statements**

TCP represented to investors that the price of its stock options would be set "at the time of grant" and not less than the fair market value shares as of that date.FN131 The Complaint alleges that TCP is-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

sued stock options that were spring-loaded.FN132 An example of spring-loading occurred on April 29, 2005 when a total of 85,000 TCP stock options were issued to Dabah at the exercise price of $41.42 per share.FN133 On May 5, 2005, the Company announced increased earnings per share in its press release, causing its stock to trade at $44.72 per share.FN134 The Company admitted, "[i]n many instances options were dated before all grant-making processes were finalized [resulting in an] option exercise price [that] was lower than it should have been based on the trading price on the date the grant process was completed."FN135 TCP disclosed in its 2005 Form 10-K that "as a result of the inadequacy of the Company's governance, internal financial reporting and other controls over the option grant process, the APB 25 measurement dates used by the Company for a significant portion of the stock options granted during the Review Period were incorrect ...." FN136

> FN131. Compl. ¶¶ 65-66.
>
> FN132. *See id.* ¶ 68.
>
> FN133. *See id.* ¶ 71.
>
> FN134. *See id.*
>
> FN135. *Id.* ¶ 101.
>
> FN136. *Id.* ¶ 69.

Backdating the options had the effect of understating compensation expenses, thereby overstating net income and earnings per share on the Company's financial statements.FN137 In violation of GAAP, the Company materially understated its compensation expenses when it failed to expense the in-the-money portion of backdated option grants.FN138 Following an SEC investigation, the Company was forced to restate its financial statements for fiscal years 2003-2006.FN139 Plaintiffs contend that the Company admitted that the prior publicly disclosed financial statements from those years were materially false.FN140 The allegations

in the Complaint, taken as a whole and drawing all reasonable inferences in plaintiffs' favor, are adequate at this stage to plead that because the Company's stock options were backdated, its financial statements contained material misrepresentations.

> FN137. *See id.* ¶ 72.
>
> FN138. *See id.* ¶ 70.
>
> FN139. *See id.* ¶¶ 73, 80-81, 101.
>
> FN140. *See id.* ¶¶ 73-74.

**c. Sarbanes-Oxley Certifications**

**\*9** The Sarbanes-Oxley Act of 2002 requires certain officers and the accountants of a public company to execute certifications that are filed with the company's Forms 10-K and 10-Q.FN141 These certifications must discuss the company's internal control systems and must explain the effectiveness of those internal controls.FN142 The Complaint alleges that Dabah and Riley violated section 10(b) and Rule 10b-5 by providing false Sarbanes-Oxley certifications in connection with the Company's Forms 10-K and Forms 10-Q for the Class Period.FN143

> FN141. *See* Pub.L. No. 107-204, 116 Stat. 745 (2002).
>
> FN142. *See* 15 U.S.C. § 7241(a)(4).
>
> FN143. *See* Compl. ¶¶ 75-78.

The certifications state that to the best of their knowledge, each Form "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."FN144 Thus, for these certifications to be materially false, it is insufficient for the financial statements themselves to have been false-defendants must also have had knowledge of that falsity.FN145 Plaintiffs allege that these certifications were false in that Dabah

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

and Riley knew that the Company backdated stock options, thereby overstating its net income.

> FN144.*Id.* ¶ 78.

> FN145.*See Caiola,* 295 F.3d at 331.

The certifications also state that Dabah and Riley had implemented internal controls over the company's financial reporting sufficient "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."FN146Further, they explain that the Forms disclose "all significant deficiencies and material weaknesses in the design or operation" of those internal controls that are "reasonably likely to adversely affect" the financial statements.FN147As discussed above, plaintiffs have alleged sufficient facts to support the inference that Dabah and Riley knew or had access to information showing that stock options had been backdated.

> FN146. Compl. ¶ 78.

> FN147.*Id.*

Plaintiffs further claim that the financial statements were materially misleading in that the Company's internal controls were structurally inadequate. The allegations state that because the internal controls were lacking, the Company was able to improperly report compensation expenses.FN148 Moreover, plaintiffs allege that Dabah admittedly violated the Company's internal control policies by pledging shares of his common stock as collateral for margin loans in his brokerage account during a black-out period.FN149 Once this information was disclosed, Dabah and the Company's outside auditor, Deloitte & Touche LLP ("Deloitte"), resigned.FN150

> FN148.*See id.*

> FN149.*See id.* ¶ 8.

> FN150.*See id.* ¶¶ 131-132.

**2. Scienter**

Although plaintiffs have adequately pled falsity, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."FN151The Complaint alleges that Dabah and Riley's intent to deceive or reckless disregard for the truth is demonstrated by substantial circumstantial evidence supporting a strong inference of scienter.FN152This circumstantial evidence includes testimony from CWs showing that the Company consistently violated the terms of the License Agreement and had knowledge that its positive statements were unwarranted.FN153Defendants argue that the Complaint, including information gathered from the CWs, does not support a strong inference that Dabah and Riley acted with any intent to defraud when it failed to discuss breaches of the License Agreement. In fact, defendants contend that the CWs' allegations give rise to the opposing inference: that the Company did not believe that the problems with Disney were so material as to undermine TCP's business.

> FN151.*Novak,* 216 F.3d at 309 (quotations omitted).

> FN152.*See* Compl. ¶¶ 133-137.

> FN153.*See id.* ¶¶ 6, 44, 48-49, 54-56, 62, 108.

**\*10** "The threshold requirement is that the allegations must satisfy the court that plaintiff's claim is not unwarranted."FN154In the instant case, the allegations of the CWs provide an adequate basis for believing that the Company knew that the problems with Disney were material. The CWs, all of whom claim knowledge of a systemic failure in the Company's management, occupied positions that allowed for relevant hands-on experience in various parts of the Company. Accordingly, it is reasonable to assume that the CWs knew of the Company's

failure to meet certain deadlines and of other viola-
tions of the License Agreement. Because the CWs'
allegations are sufficiently particular to support
their plausibility, they provide sufficient support
for the inference that Dabah and Riley acted with the
requisite scienter. This Complaint, taken as a
whole, adequately pleads an inference of scienter as
to each of the defendants that is cogent and at least
as compelling as any plausible opposing
inference.FN155

> FN154.*In re Scottish Re Group,* 524
> F.Supp.2d at 392 (quotations omitted).

> FN155.*See Tellabs,* 127 S.Ct. at 2511.

**a. Dabah**

Plaintiffs allege that the following facts, considered
collectively as *Tellabs* requires, give rise to an in-
ference of scienter that is at least as likely as any
plausible opposing inference: (1) the statements and
omissions that the Company made with reckless, if
not knowing, disregard for the truth; (2) the admit-
ted backdating scheme; (3) the restatement of the
financials; (4) the resignations of Dabah and De-
loitte; and (5) the repeated and knowing violations
of the Company's internal controls, particularly
with respect to Dabah's pledged shares of
stock.FN156Dabah's pledge of shares in his person-
al brokerage account amounted to a "concrete and
personal benefit." FN157 This pledge provided Da-
bah with a financial incentive to conceal the problems
at the Company in order to avoid a decline in
the stock price that could trigger a margin call or a
decrease in available credit in his personal broker-
age account.FN158

> FN156.*See* Compl. ¶¶ 8, 130.

> FN157.*See Kalnit,* 264 F.3d at 139
> ("Motives that are generally possessed by
> most corporate directors and officers do
> not suffice; instead, plaintiffs must assert a
> concrete and personal benefit to the indi-
> vidual defendants resulting from the

fraud.").*See also Chemical Bank,* 726 F.2d
at 939 (holding that "a pledge is a sale and
purchase of a security under § 10(b)").

> FN158.*See* Compl ¶¶ 8, 130.

In the wake of the SEC investigation into the back-
dating of TCP's stock options, the Company admit-
ted that it had material weaknesses in its internal
controls-weaknesses probative of
scienter.FN159Dabah's forced resignation and De-
loitte's resignation "add to the overall pleading of
circumstantial evidence of fraud."FN160Defend-
ants have failed to suggest a plausible opposing in-
ference that is more likely than the strong inference
of scienter on the part of Dabah.

> FN159.*See In re Veeco Instruments,* 235
> F.R.D. at 232 (holding that a "failure to
> maintain sufficient internal controls to
> avoid fraud is ... indicative of scienter").

> FN160.*In re Scottish Re Group,* 524
> F.Supp.2d at 394 n. 176.

**b. Riley and the Company**

Scienter may be pled "by identifying circumstances
indicating conscious behavior by the defendant,
though the strength of the circumstantial allegations
must be correspondingly greater" than with motive
allegations.FN161 Here, plaintiffs' allegations,
taken as true, adequately plead that Riley's conduct
was "highly unreasonable" and "an extreme depar-
ture from the standards of ordinary care to the ex-
tent that the danger was either known to the defend-
ant or so obvious that the defendant must have been
aware of it."FN162In short, all of the reasons sup-
porting an inference that the financial statements
were false, as discussed above, were known to Ri-
ley at the time she made the Sarbanes-Oxley certi-
fications. The Complaint adequately alleges that Ri-
ley knew, or was at the very least reckless in not
knowing, that the financial statements were based
upon incorrect APB 25 measurement dates and
faulty internal control processes. Assuming the al-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

legations of the Complaint to be true, a reasonable person would consider the inference that Riley acted with the required scienter to be at least as strong as any opposing inference.[FN163]

> FN161.*Kalnit,* 264 F.3d at 142.

> FN162.*Id.* (quotation omitted).

> FN163.*See Tellabs,* 127 S.Ct. at 2511.

**\*11** With respect to the Company's liability, plaintiffs "must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation."[FN164] Plaintiffs have sufficiently alleged that Dabah and Riley, as agents of the corporation, have committed culpable acts with the requisite scienter. Therefore, their acts and accompanying scienter are attributable to TCP.

> FN164.*Teamsters Local,* 2008 WL 2521676, at *12.

**3. Loss Causation**[FN165]

> FN165. Defendants do not challenge transaction causation in this case.

All defendants move for dismissal on the ground that plaintiffs have failed to allege a causal connection between the Company's alleged fraud and plaintiffs' losses. Plaintiffs argue that TCP's misrepresentations artificially inflated the value of the stock at the time of purchase. Had the Company revealed its internal control weaknesses, investors could have arrived at a valuation of the securities that more accurately reflected the risk of the Company. Instead, trustmg that the Company possessed adequate internal controls, it is plausible that investors believed such financial problems would be discovered without undue delay.

Plaintiffs allege that the price of TCP securities declined in July and August 2007 as the Company revealed undisclosed problems with the Disney Stores.[FN166] They allege that TCP stock declined thirty percent after these disclosures came to light as a direct result of the revelation to investors of the nature and extent of the Company's fraud.[FN167] The allegations in the Complaint, taken as a whole and drawing all reasonable inferences in plaintiffs' favor, are adequate to plead that the Company's financial statements were materially misstated and the market was not informed of the nature and extent of TCP's problems. As a result of the false and misleading statements regarding its License Agreement and financial statements, plaintiffs contend that the Company caused its stock to trade at artificially inflated levels throughout the Class Period. A reasonable inference may be drawn from the facts and statements outlined above that disclosing the Company's alleged fraud in July and August of 2007 caused the stock price to fall and resulted in economic loss to the Shareholders.

> FN166.*See* Compl ¶ 140.

> FN167.*See id.* ¶ 141.

**B. Control Person Liability**

The Complaint alleges control person liability under section 20(a) against Dabah and Riley. Dabah and Riley challenge these claims on the basis that the Complaint fails to allege a primary violation. For the reasons stated above, this challenge fails.

Defendants assert that the control person claims fail because conclusory assertions of control status are insufficient as a matter of law. To plead control under Rule 8, the allegations in the complaint must meet the standard of "plausibility."[FN168] Moreover, "[w]hether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss."[FN169]

> FN168.*See Bell Atl.,* 127 S.Ct. at 1970.

> FN169.*In re Oxford Health,* 187 F.R.D. at 143.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2008 WL 2791526 (S.D.N.Y.)
**2008 WL 2791526 (S.D.N.Y.)**

Here, the Complaint alleges that Dabah and Riley occupied positions as CEO and CFO respectively and both were directly involved in day-to-day management of the Company and were responsible for statements made to the public.FN170 Further, the Complaint alleges that Dabah and Riley were "culpable participants" in the fraud with facts supporting an inference that they not only exerted control over TCP but also participated in the alleged improprieties with scienter.FN171 Thus, because the Complaint adequately pleads a primary violation under the Exchange Act, as discussed above, the Complaint states a claim for control person liability as to each of the alleged control persons.

FN170. *See* Compl. ¶¶ 17-22.

FN171. *See id.*

**IV. CONCLUSION**

**\*12** For the reasons discussed above, defendants' motions to dismiss are denied. The Clerk of the Court is directed to close these motions [nos. 22 and 25 on the docket sheet]. A conference is scheduled for July 31, 2008, at 3:30 p.m.

SO ORDERED:

S.D.N.Y.,2008.
Hall v. Children&apos;s Place Retail Stores, Inc.
Slip Copy, 2008 WL 2791526 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 9

948 A.2d 1152                                                              Page 1
948 A.2d 1152
**948 A.2d 1152**

**H**

Young v. Klaassan
Del.Ch.,2008.

Court of Chancery of Delaware.
Peter V. YOUNG and Ellen Roberts Young,
Plaintiffs,
v.
Paul J. KLAASSAN, Teresa M. Klaassan, David
W. Faeder, Timothy S. Smick, Thomas B. Newell,
Brian C. Swinton, Christian B.A. Slavin, Larry E.
Hulse, Tiffany L. Tomasso, Robert R. Slager, Carl
Adams, Ronald V. Aprahamian, Craig R. Callen,
David G. Bradley, J. Douglas Holladay, and
Thomas J. Donohue, Defendants,
andSunrise Senior Living, Inc., Nominal Defend-
ant.
**C.A. No. 2770-VCL.**

Submitted: April 8, 2008.
Decided: April 25, 2008.

**Background:** Individual shareholders brought de-
rivative action contesting granting of insider stock
options. Defendants moved to dismiss for failure of
plaintiffs to make demand on the board of directors.
Plaintiffs moved to compel production of docu-
ments from special committee formed by the board
to investigate the propriety of the timing of the op-
tions.

**Holding:** The Court of Chancery, Lamb, Vice
Chancellor, held that shareholders were entitled to
limited discovery of documents that defendants re-
lied on in support of motion to dismiss.
Motion to compel production of documents gran-
ted.

West Headnotes

**Pretrial Procedure 307A ⚖➛377**

307A Pretrial Procedure
    307AII Depositions and Discovery
        307AII(E) Production of Documents and

Things and Entry on Land
            307AII(E)3 Particular Documents or
Things
                307Ak377 k. Corporate Records. Most
Cited Cases
Shareholders in derivative action were entitled to
limited discovery of documents created by special
investigatory board committee that defendants com-
pany and its directors relied on in support of their
motion to dismiss complaint that alleged improper
backdating of grants of stock options; documents
relied on did not exist at the time the complaint was
filed, and defendants' reliance on excerpts from
those documents converted motion to dismiss to
one for summary judgment with right of plaintiffs
to some opportunity for discovery. Chancery Court
Rules 23.1, 56.

**\*1153** Joseph A. Rosenthal, Esquire, Carmella P.
Keener, Esquire, Rosenthal, Monhait & Goddess,
P.A., Wilmington, DE; Laurence D. Paskowitz, Es-
quire, Roy L. Jacobs, Esquire, Paskowitz & Asso-
ciates, New York City; Samuel R. Simon, Esquire,
Jacobs Law Group, P.C., Philadelphia, PA; Karin
E. Fisch, Esquire, Orin Kurtz, Esquire, Natalie
Marcus, Esquire, Abbey Spanier Rodd & Abrams,
LLP, New York City, for Peter V. Young and Ellen
Roberts Young.

Kenneth Nachbar, Esquire, Morris, Nichols, Arsht
& Tunnell, LLP, Wilmington, DE; John C. Millian,
Esquire, Matthew R. Estabrook, Esquire, Gibson,
Dunn & Crutcher, LLP, Washington, DC, for Paul
J. Klaassan, Teresa M. Klaassan, David W. Faeder,
Timothy S. Smick, Thomas B. Newell, Brian C.
Swinton, Christian B.A. Slavin, Larry E. Hulse,
Tiffany L. Tomasso, Robert R. Slager, Carl Adams,
Ronald V. Aprahamian, Craig R. Callen, J. Douglas
Holladay, and Thomas J. Donohue.

Arthur G. Connolly, III, Esquire, Jeremy D. Ander-
son, Esquire, Connolly Bove Lodge & Hutz, LLP,
Wilmington, DE; Philip A. Sechler, Esquire, Willi-
ams & Connolly, LLP, Washington, DC, for David
G. Bradley.

Lawrence C. Ashby, Esquire, Richard D. Heins, Esquire, Richard L. Renck, Esquire, Ashby & Geddes, Wilmington, DE; George H. Mernick, III, Esquire, Hogan & Hartson, LLP, Washington, DC; N. Thomas Connally, Esquire, Jon M. Talotta, Esquire, Hogan & Hartson, LLP, McLean, VA, for Sunrise Senior Living, Inc.

### OPINION

LAMB, Vice Chancellor.

This opinion addresses the plaintiffs' motion to compel the production of documents in connection with pending motions to dismiss for failure to make a demand.[FN1] As in *Fleischman v. Huang,*[FN2] the defendants' briefs in support of those motions expressly and repeatedly rely on the reportedly favorable findings of the special board committee that investigated the matters alleged in the complaint. In the **\*1154** interests of justice, and in accordance with *Fleischman,* the court will permit discovery of the documents prepared in connection with the special committee's findings concerning the matters alleged in the complaint.[FN3]

> FN1. While the plaintiffs move in the alternative for a motion to strike, the court will, as discussed in this opinion, direct the defendants to produce documents related to the work of the special committee.

> FN2. 2007 WL 2410386 (Del.Ch. Aug. 22, 2007).

> FN3. During the April 8 teleconference in connection with the motion to compel, the court learned that the special committee did not prepare a written report and, thus, the defendants will be expected to produce all documents prepared in support of the special committee's findings.

### I.

In response to a demand made by an institutional stockholder asking the board to inquire, *inter alia,* into the timing of certain stock option grants at

Sunrise Senior Living Inc., the nominal defendant in this case, the company formed a special investigative committee in December of 2006. The plaintiffs, Peter V. Young and Ellen Roberts Young, individual stockholders in Sunrise, did not make a demand on the board but, instead, filed their original complaint on March 7, 2007, and their amended complaint on September 17, 2007. The amended complaint alleges breaches of fiduciary duty by Sunrise officers and directors in connection with the allegedly improper issuance of options, as well as claims based on unjust enrichment and rescission. The complaint mentions the formation of the special committee and the company's public announcement regarding the same, but does not discuss the findings of the special committee, which had not yet been released. The complaint reads, in pertinent part:

> On December 11, 2006, Sunrise announced an SEC investigation of the Company and the appointment of a special committee whose bifurcated purpose was to review insider sales of Sunrise stock and the Company's historical practices relating to stock option grants....[FN4]

> FN4. Compl. ¶ 86.

The complaint also recites the contents of Sunrise's public announcement of the formation of the special committee.

The defendants (including the nominal defendant) filed motions to dismiss pursuant to Court of Chancery Rule 23.1 on October 5, 2007, and filed their opening briefs on November 2.[FN5] By that time, Sunrise had released the findings of the special committee, which reportedly found "no evidence of backdating or other intentional misconduct."[FN6] While Sunrise made two arguably benign references in its opening brief to the findings of the special committee,[FN7] its reply brief and the individual**\*1155** defendants' reply brief improperly rely upon the truth of the committee's findings. Specifically, the company's reply brief states:

**948 A.2d 1152**

"[p]articularly in light of the special independent committee's investigation and findings, Plaintiffs must present particularized allegations of demand futility in order to establish derivative standing."FN8  In addition, the individual defendants' reply brief argues that the plaintiffs cannot put forward sufficiently detailed allegations of backdating "given that an investigation commissioned by a Special Committee of the Board and conducted by independent counsel has 'found no evidence of backdating or other intentional misconduct in connection with the award of grants that were examined,' including all of the grants challenged by the plaintiffs."FN9

> FN5. The court notes the oddity of the procedural posture of this case. First, in response to what can only be characterized as a demand, the Sunrise board of directors formed a special investigative committee consisting of a single recently-appointed director (later augmented by the addition of a second newly-appointed director). Second, that committee did not prepare a written report; instead, its purported "findings" were reported in a public filing (which does not disclose either the composition of the committee or the absence of a written report). Third, when this derivative action was begun, all of the defendants (including the corporation) moved to dismiss on grounds of demand excusal although the corporation's motion to dismiss was, evidently, not authorized by any disinterested person or body. Fourth, in their briefs, the defendants relied on the committee's "findings" but omitted any mention of the composition of the committee or the absence of a written report. Needless to say, this posture is not one that will easily support a conclusion that the complaint should be dismissed for failure to make a demand on the board of directors.

> FN6. Pls.' Motion Ex. 3.

> FN7. Sunrise's opening brief generally states that "[t]he committee found no evidence of intentional backdating or other misconduct in connection with the options grants examined."  Sunrise Opening Br. 8. It also states: "[a]s noted ... the independent special committee found no evidence of intentional backdating."  Id. at 20 n. 15.

> FN8. Sunrise Reply Br. 2.

> FN9.  Individual Defs.' Reply Br. 1 (quoting Sunrise Form 8-K (Sept. 28, 2007) (filed Oct. 1, 2007)).

Following these statements, the plaintiffs filed the instant motion to compel. The plaintiffs seek the "documents constituting and supporting the purported factual findings and report by the special committee, arising out of the special committee's investigation into the backdating of options...."FN10 According to the plaintiffs, the defendants clearly rely upon the special committee's findings for their truth. The plaintiffs argue that the complaint merely recites Sunrise's public announcement concerning the formation of the special committee, making the defendants' references impermissible on a motion to dismiss. The plaintiffs contend, relying primarily on *Fleischman,* that the defendants' reliance on the special committee's findings in their motion to dismiss warrants production of the related documents.

> FN10. Pls.' Motion 1-2.

During the April 8 teleconference, the defendants offered to strike the references to the special committee in their submissions, but, since the court finds that these references warrant discovery, it is necessary to briefly outline their arguments. Foremost, the defendants argue that the plaintiffs' motion amounts to mere "misdirection" because their dismissal arguments do not depend on the truth or accuracy of the special committee's findings and independently warrant dismissal. The defendants also contend that the references to the special committee are not offered for their truth and that the court

could, in any case, take judicial notice of the publicly disclosed findings.

## II.

In reviewing the parties' respective arguments, this court is instructed by Chancellor Chandler's decision in *Fleischman*, which involved strikingly similar facts. In that case, there were allegations of backdating and the corporation directed the audit committee to investigate the timing of certain option grants. Due to the defendants' reliance in their dismissal briefs on the findings of the audit committee, which were outside the complaint, the court granted limited discovery into the "report or reports upon which" the audit committee based its publicly announced findings.[FN11]    In reaching this decision, the court noted that the plaintiff's motion to compel did not seek discovery "related to the facts alleged in the complaint," rather **\*1156** it sought "documents inserted into litigation by defendants" that were "not even in existence at the time the complaint was filed."[FN12]    The court found that the defendants improperly inserted these matters into the litigation by relying on the audit committee's favorable findings to support their motion to dismiss. For example, in their opening brief, the defendants "argued that where a board has pursued a prompt and complete investigation of problems relating to the grant of stock options, the proposition that a board faces a substantial likelihood of liability is diminished."[FN13]

> FN11. *Fleischman,* 2007 WL 2410386, at *2.

> FN12. *Id.* at *3.

> FN13. *Id.* at *2.  The Supreme Court also refused the interlocutory appeal for failing to meet the requirements of Supreme Court Rule 42(b). *See Huang v. Fleischman,* 2007 WL 2588851, at *1 (Del.2007) (TABLE).

The defendants in *Fleischman,* like the defendants

in this case, argued that their repeated references to the committee's findings were not offered for their truth, "but to show that plaintiff's complaint drew unreasonable inferences from ... earlier public filings."[FN14]    Here, as in *Fleischman,* this "is inconsistent with any fair reading" of the defendants' submissions to this court.[FN15]    The previously cited excerpts clearly demonstrate that the defendants offered the special committee's findings for their truth.[FN16]    Similarly unfounded is the defendants' argument that they included these references to counter the purported suggestion in the amended complaint "that the mere existence of the special committee's investigation somehow lends credence to the Plaintiffs' circumstantial backdating allegations."[FN17]    The plaintiffs' complaint makes a single direct reference to the special committee's investigation of the backdating allegations and it merely restates information released by Sunrise. Indeed, the bulk of the reference to the special committee is a direct quotation from a Sunrise press release.

> FN14. *Fleischman,* 2007 WL 2410386, at *1.

> FN15. *Id.*

> FN16. In addition, since the special committee's findings are subject to reasonable dispute, they are not subject to judicial notice. *See id.* at *3.

> FN17. Sunrise Opp'n 3.

It is well settled that "if a party presents documents in support of its Rule 12(b)(6) motion and the trial court considers the documents, the proceeding is converted to a Rule 56 motion for summary judgment...."[FN18]    In addition, "before the Court considers a motion for summary judgment, the non-moving party should normally have some opportunity for discovery."[FN19]    Due to the limited nature of the references in the defendants' motions to dismiss, as in *Fleischman,* the court will " 'grant [ ] a limited procedural right to plaintiff-access to docu-

948 A.2d 1152

**948 A.2d 1152**

ments that defendants have expressly relied upon in support of their motion to dismiss.' " [FN20] In this case, as previously noted, this consists of any documents that relate to the special committee' findings.

> FN18. *Vanderbilt Income & Growth Associates. v. Arvida/JMB Managers, Inc.,* 691 A.2d 609, 613 (Del.1996).

> FN19. *Fleischman,* 2007 WL 2410386, at *3.

> FN20. *Ryan v. Gifford,* 2008 WL 43699, at *5 (Del.Ch. Jan. 2, 2008) (quoting *Fleischman,* 2007 WL 2410386, at *4).

### III.

For the foregoing reasons, the motion to compel is GRANTED. IT IS SO ORDERED.

Del.Ch.,2008.
Young v. Klaassen
948 A.2d 1152

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.