**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DILORENZO,<br><br>     Plaintiff,<br><br>    v.<br><br>NORTON, et al.,<br><br>     Defendants. | Civil Action No. 1:07-cv-00144-RJL |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE FIRST AMENDED VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

Dated:  August 27, 2008

F. JOSEPH WARIN (DC Bar # 235978)
FWarin@gibsondunn.com
MICHAEL F. FLANAGAN (DC Bar # 435942)
MFlanagan@gibsondunn.com
JASON J. MENDRO (DC Bar # 482040)
JMendro@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, District of Columbia 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for Defendants*

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY ...................................................................................1

ARGUMENT ........................................................................................................................2

I.      Plaintiff Has Failed To Establish Standing .............................................................2

II.     Plaintiff Pleads No Viable Federal Claim And Thus No Basis For
        Jurisdiction ..............................................................................................................5

        A.      Plaintiff Has Not Adequately Alleged *Scienter* Under Section
                10(b) (Count I) ..............................................................................................5

        B.      The "Insider Selling" Claims Under Section 10(b) (Count I) Are
                Undefended And Indefensible ......................................................................8

        C.      *Cowin v. Bresler* Demolishes The Section 14(a) Claims (Count II)..........10

        D.      Plaintiff Did Not Support His Section 20(a) Claims (Count III) ...............10

        E.      The D.C. Circuit Has Authoritatively Rejected Private Section 304
                Claims (Count XII) .....................................................................................11

III.    Plaintiff Has Failed To Plead Any Valid Excuse For Not Making The
        Required Pre-Suit Demand .....................................................................................12

        A.      Reliance On Disclosures From Outside The Complaint Confirms
                That The Allegations Are Insufficient .......................................................12

        B.      The Delaware Supreme Court Has Squarely Rejected Plaintiff's
                *Per Se* Theories Of Pleading Scienter And Demand Futility ...................15

        C.      Plaintiff's Assertion That It Would Be Impossible To Issue The
                Disputed Options By Mistake Is Neither Correct Nor A Substitute
                For Particularized Allegations ..................................................................17

CONCLUSION....................................................................................................................19

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*,
    469 F.3d 129 (D.C. Cir. 2006) ................................................................. 2

*Belova v. Sharp*,
    No. CV 07-299-MO, 2008 WL 700961 (D. Or. Mar. 13, 2008) .................................... 3, 5, 7, 8

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975).......................................................................... 9

*CarrAmerica Realty Corp. v. Kaidanow*,
    331 F.3d 999 (D.C. Cir. 2003) ................................................................ 2

*Conrad v. Blank*,
    940 A.2d 28 (Del. Ch. 2007) ................................................................ 14

*Cowin v. Bresler*,
    741 F.2d 410 (D.C. Cir. 1984)............................................................. 9, 10

*Desimone v. Barrows*,
    924 A.2d 908 (Del. Ch. 2007) ........................................................ 15, 17, 18, 19

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005).......................................................................... 9

*Fin. Planning Ass'n v. S.E.C.*,
    482 F.3d 481 (D.C. Cir. 2007)............................................................... 2

*Freeland v. Iridium World Commc'ns, Ltd.*,
    233 F.R.D. 40 (D.D.C. 2006).................................................................. 9

*Haw. Laborers Pension Fund v. Farrell*,
    No. CV 06-06935 ODW (FMOx),
    2007 U.S. Dist. LEXIS 77777 (C.D. Cal. Aug. 22, 2007)........................................... 4

*In re Affymetrix Deriv. Litig.*,
    No. C 06-05353 JW. (N.D. Cal. Mar. 31, 2008)................................................... 3

*In re BISYS Group Inc. Deriv. Action*,
    396 F. Supp. 2d 463 (S.D.N.Y. 2005) ......................................................... 12

*In re CNET Networks, Inc. S'holder Deriv. Litig.*,
    483 F. Supp. 2d 947 (N.D. Cal. 2007) ........................................................ 16

*In re Computer Scis. Corp. Deriv. Litig.,*
   No. CV 06-05288 MRP,
   2007 U.S. Dist. LEXIS 25414 (C.D. Cal. Mar. 26, 2007) ........................................ 4

*In re Diebold Deriv. Litig.,*
   Nos. 5:06CV0233 & 5:06CV0418,
   2008 WL 564824 (N.D. Ohio Feb. 29, 2008) ........................................................... 11

*In re Digimarc Corp. Deriv. Litig.,*
   No. 05-1324-HA, 2006 WL 2345497 (D. Or. Aug. 11, 2006) ................................. 11

*In re Fed. Nat'l Mortgage Ass'n Secs., Deriv., & "ERISA" Litig.,*
   503 F. Supp. 2d 25 (D.D.C. 2007) ............................................................................. 8

*In re Goodyear Tire & Rubber Co. Deriv. Litig.,*
   Nos. 5:03CV2180, 2007 WL 43557 (N.D. Ohio Jan. 5, 2007) ............................... 11

*In re iBasis, Inc. Deriv. Litig.,*
   532 F. Supp. 2d 214 (D. Mass. 2007) ...................................................................... 11

*In re Infosonics Corp. Deriv. Litig.,*
   No. 06cv1336 BTM(WMc), 2007 WL 2572276 (S.D. Cal. Sept. 4, 2007) ............. 11

*In re Maxim Integrated Prods., Inc., Deriv. Litig.,*
   No. C 06-0334JW, 2007 WL 2745805 (N.D. Cal. July 25, 2007) ............................ 4

*In re Openwave Sys. Inc. S'holder Deriv. Litig.,*
   503 F. Supp. 2d 1341 (N.D. Cal. 2007) ..................................................................... 7

*In re Openwave Sys. Sec. Litig.,*
   528 F. Supp. 2d 236 (S.D.N.Y. 2007) ............................................................... 5, 6, 7

*In re Verisign, Inc. Deriv. Litig.,*
   531 F. Supp. 2d 1173 (N.D. Cal. 2007) ................................................................... 16

*In re Whitehall Jewellers, Inc. S'holder Deriv. Litig.,*
   No. 05 C 1050, 2006 WL 468012 (N.D. Ill. Feb. 27, 2006) .................................... 12

*In re Zoran Corp. Deriv. Litig.,*
   511 F. Supp. 2d 986 (N.D. Cal. 2007) ................................................................... 5, 7

*Kogan v. Robinson,*
   432 F. Supp. 2d 1075 (S.D. Cal. 2006) ................................................................... 11

*Mehlenbacher ex rel. Asconi Corp. v. Jitaru,*
   No. 6:04CV1118ORL-22KRS, 2005 WL 4585859 (M.D. Fla. June 6, 2005) ......... 12

*Middlesex Ret. Sys. v. Quest Software Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) ........................................................... 5, 6, 7

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
   No. CV 06-6863 DOC (C.D. Cal. July 10, 2008) ....................................... 6

*Neer v. Pelino*,
   389 F. Supp. 2d 648 (E.D. Pa. 2005) .................................................... 12

*Pedroli ex rel. Microtune, Inc. v. Bartek*,
   No. 4:07-CV-43, ___ F. Supp. 2d ___,
   2008 WL 901203 (E.D. Tex. Mar. 31, 2008) .......................................... 11

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines*,
   No. 07-7108, 2008 WL 3166142 (D.C. Cir. Aug. 8, 2008)........................... 11, 15, 17

*Rudolph v. UTStarcom*,
   No. C 07-04578 SI, ___ F. Supp. 2d ___ ,
   2008 WL 1734763 (N.D. Cal. Apr. 14, 2008) ................................. 17, 18

*Ryan v. Gifford*,
   918 A.2d 341 (Del. Ch. 2007) ......................................................... 14, 15

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998).......................................................................... 3

*United Mine Workers v. Gibbs*,
   383 U.S. 715 (1966)........................................................................ 5

*Wood v. Baum*,
   No. 621, 2007, __ A.2d __, 2008 WL 2600981 (Del. July 1, 2008) ................ 16, 17

**Statutes**

15 U.S.C. § 78u-4(b)(2) .................................................................... 5

Del. Code tit. 8, § 327 ...................................................................... 4

**Rules**

Fed. R. Civ. P. 23.1 ................................................................ 4, 7, 15

## INTRODUCTION AND SUMMARY

This Court heard oral argument on Defendants' motion to dismiss the First Amended Complaint on August 6, 2008. Defendants respectfully submit the following supplemental brief to address three issues raised during oral argument.

First, Plaintiff failed to establish that he has standing to assert his claims. Implicitly acknowledging that the standing allegations are deficient on their own terms, Plaintiff urged this Court to assess the merits of his claims before assessing his ability to bring them. This inverted analysis turns well-settled standing principles on their head, and it is unsupportable under the law of the D.C. Circuit. This failure alone compels outright dismissal of the complaint.

Second, Plaintiff failed to establish federal jurisdiction. At oral argument, Plaintiff declined to defend most of his federal claims. He attempted to save his Section 10(b) claims merely by arguing that allegations of committee membership suffice to establish scienter. But even the cases Plaintiff cites as his best authorities fail to endorse such an end-run around the particularized pleading required for federal securities claims. Having pleaded no viable federal claims, Plaintiff has failed to establish any basis for proceeding in federal court.

Third, Plaintiff did not justify his failure to make a pre-suit demand on ePlus's board of directors. Plaintiff sought to bolster his claims by selectively citing information from outside his complaint, and he argued that knowledge of wrongdoing could be established *per se* simply by alleging committee membership or generic assertions of backdating. As the Delaware Supreme Court has made clear, Plaintiff's attempt to smear Defendants by committee is no more successful for his state law claims than for his federal claims.

For each of these reasons and for the reasons explained in Defendants' memoranda of law in support of dismissal, this Court should dismiss the First Amended Complaint.

**ARGUMENT**

**I.     Plaintiff Has Failed To Establish Standing**

As explained in Defendants' papers and reiterated at oral argument, Plaintiff has failed to plead the minimum allegations of contemporaneous stock ownership that are essential to establish standing for his claims.  Defs.' Mot. Dismiss First Am. Compl. ("Mot."), Docket Entry ("DE") 15 at 31–32; Reply Mem. Supp. Defs.' Mot. Dismiss, DE 19 ("Reply") at 15–16; Tr. Mot. Hr'g, Aug. 6, 2008 ("Tr.") 5–8, 49–50.  When this Court asked about the standing problem, Plaintiff's counsel provided two ineffective responses.  Tr. 41.

First, counsel invited this Court to overlook the fundamental issue of justiciability and "sustain[] the complaint" without regard to his lack of standing.  Tr. 41–42.  This decide-claims-now-and-ask-questions-later approach is contrary to the long-settled rule that "[s]tanding to sue is a threshold question."  *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 876 (D.C. Cir. 2006); *see also Fin. Planning Ass'n v. S.E.C.*, 482 F.3d 481, 486 (D.C. Cir. 2007); *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006).  As a result, it is hardly surprising that the D.C. Circuit has rejected a derivative suit where the plaintiffs did not own shares at the time of the wrongs they alleged.  *See CarrAmerica Realty Corp. v. Kaidanow*, 331 F.3d 999, 1001 (D.C. Cir. 2003) ("[T]he action which underlies the plaintiffs' complaint occurred . . . [when] neither plaintiff was a shareholder, and thus neither has the requisite standing to challenge the propriety of that action.").  The fact that the D.C. Circuit has not yet had the opportunity to reach the same conclusion in a backdating case is hardly material; standing is a threshold issue in *every* case.

Moreover, as the Supreme Court has emphasized, "[m]uch more than legal niceties are at stake" in addressing the preliminary question whether the plaintiff has standing to sue.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998).  Rather, these jurisdictional issues are

"an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects." *Id.* Plaintiff's invitation for this Court to exceed appropriate limits on judicial authority should summarily be rejected.

Plaintiff's counsel asserted that the inverted approach he proposed was adopted in "*TriQuint*," referring to the District of Oregon's decision in *Belova v. Sharp*, No. CV 07-299-MO, 2008 WL 700961 (Mar. 13, 2008). But *Belova* did not sustain a deficient complaint. In fact, *Belova* addressed the very same standing allegations pleaded in this case and held that they are insufficient: "The Complaint states [that the plaintiffs] owned TriQuint stock at 'times relevant.' *This general allegation is not sufficiently particular* and is, in fact, inaccurate by the shareholders' own admissions." *Id.* at *3 (emphasis added; citation omitted). Because of this defect, the *Belova* court granted the defendants' motion to dismiss. *Id.* at *4.

*Belova* is not the only case Plaintiff cites that supports dismissal for lack of standing. The supplemental authorities Plaintiff filed with this Court, DE 26, also include *In re Affymetrix Derivative Litigation*, No. C 06-05353 JW, slip op. (N.D. Cal. Mar. 31, 2008), which dismissed a derivative complaint because the plaintiff had not adequately alleged standing. In *Affymetrix*, the plaintiffs alleged that they "were at all relevant times[] shareholders of nominal Defendant Affymetrix." *Id.* at 13 (quotation marks omitted). The court held that "[t]his statement is insufficient to plead continuous ownership because Plaintiffs have not alleged when they purchased the shares and whether they continue to hold them; similar conclusory allegations have been rejected as insufficient for purposes of Rule 23.1." *Id.* at 13–14. The same is true here.

Plaintiff's counsel's second response to the standing problem was that he could not have known that the allegations were insufficient when he filed the amended complaint because the

case-law was undeveloped at that time.  Tr. 41–42.  Even if it were a reasonable assertion, that is hardly a legal argument—misunderstanding is no cure for jurisdictional defects.  But this assertion is not reasonable.  Several courts had analyzed and rejected allegations similar to those pleaded here well *before* Plaintiff filed his amended complaint on November 29, 2007.  *See Haw. Laborers Pension Fund v. Farrell*, No. CV 06-06935 ODW (FMOx), 2007 U.S. Dist. LEXIS 77777, at *30 (C.D. Cal. Aug. 22, 2007) ("Plaintiff alleges that it 'is, and at relevant times hereto was, a shareholder of THQ.'  Defendant contends that this allegation falls short of Rule 23.1's contemporaneous ownership requirement.  Defendant is correct."); *In re Maxim Integrated Prods., Inc., Deriv. Litig.*, No. C 06-0334JW, 2007 WL 2745805, *3–*4 (N.D. Cal. July 25, 2007), ("Plaintiffs merely allege that they owned Maxim stock 'at all relevant times.'  This statement does not allege continuous ownership or ownership . . . ."); *In re Computer Scis. Corp. Deriv. Litig.*, No. CV 06-05288 MRP, 2007 U.S. Dist. LEXIS 25414, at *47–*48 (C.D. Cal. Mar. 26, 2007) ("This general allegation is insufficient to allege contemporaneous ownership during the period in which the questioned transactions occurred, and is, in fact, inaccurate by Plaintiffs' own varying admissions.").  Plaintiff's counsel in this case was also counsel of record in the *Hawaii Laborers* case.  Even if that were insufficient notice, Defendants raised the deficiencies in Plaintiff's standing allegations in the first motion to dismiss *in this very case*.  *See* DE 8 at 37. There is simply no excuse for ignoring this issue in the second complaint.

In short, a derivative plaintiff must, to establish standing, allege specifically when he became a shareholder, that he remained a shareholder during the alleged wrongs, and that he remains a shareholder today.  *See* Fed. R. Civ. P. 23.1; *see also* Del. Code tit. 8, § 327.  Plaintiff's inverted approach is not accepted by the D.C. Circuit.  Because the complaint fails to satisfy the standing requirements, dismissal is unavoidable.

## II.    Plaintiff Pleads No Viable Federal Claim And Thus No Basis For Jurisdiction

Even if this Court were to conclude that Plaintiff's unparticularized assertions of standing are sufficient, the Court should nonetheless dismiss the amended complaint for lack of jurisdiction.  Plaintiff's sole basis for litigating this case in federal court is his attempt to refashion his state-law claims for breach of fiduciary duty as federal-law claims for securities fraud.  Because each of Plaintiff's federal claims fails as a matter of law, this Court should dismiss this case in its entirety.  *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *see also* Mot. 20; Reply 2.

### A.    Plaintiff Has Not Adequately Alleged *Scienter* Under Section 10(b) (Count I)

Plaintiff's claims under Section 10(b) of the Exchange Act must be dismissed pursuant to the Private Securities Litigation Reform Act ("PSLRA"), among numerous other reasons, because he has not "state[d] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).[1]  Plaintiff illustrated this critical defect at oral argument by once again failing to identify specific facts alleged in the complaint that create any inference of scienter—let alone a "strong" one—with respect to *each* individual defendant.  *See* Tr. 45–49.

Plaintiff instead relied on four cases that, he claims, excuse his failure to plead particularized factual allegations:  *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164 (C.D. Cal. 2007); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236 (S.D.N.Y. 2007); *In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986 (N.D. Cal. 2007); and *Belova v. Sharp*.  According to

---

[1]  In addition, these claims should be dismissed because Plaintiff has insufficiently pleaded numerous other required elements of Section 10(b), including fraud in connection with the purchase or sale of securities, particular misstatements or omissions, materiality, loss causation, and reasonable reliance.  *See generally* Mot. 5–10; Reply 3–7.

Plaintiff, these cases hold that a plaintiff may plead scienter simply by alleging membership on a compensation committee or stock option incentive committee. *See* Tr. 47–48. They do not. In fact, these cases contradict Plaintiff's position in this litigation by holding that compensation committee membership is *insufficient* to establish scienter where, as here, the plaintiff has failed to plead *other* particularized allegations to support scienter.

In *Quest*, for instance, the court held that a complaint satisfied the PSLRA's pleading standard because "Plaintiff has pled *numerous particularized facts*" supporting a strong inference of scienter. 527 F. Supp. 2d at 1191 (emphasis added); *see also Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863 DOC, slip op. at 11 (C.D. Cal. July 10, 2008) (noting that "Plaintiff pleaded numerous particularized facts which give rise to a strong inference" of scienter). Although one of the numerous facts supporting scienter in *Quest* was the defendants' positions within the company, the court was careful to emphasize that it was "not finding that Defendant's [*sic*] positions alone are sufficient to establish scienter." 527 F. Supp. 2d at 1184 n.2. Rather, "it is this combination with *other particularized facts* that may allow the Court to find that scienter has been adequately pled." *Id.* (emphasis added). In this case, unlike *Quest*, Plaintiff has not adequately alleged "other particularized facts" to support the strong inference of scienter required by the PSLRA for each defendant.[2]

The plaintiffs in *Openwave* similarly relied on numerous particularized facts to plead scienter. Indeed, the plaintiffs "offer[ed] a variety of species of evidence to demonstrate [the required] intent, including confidential witness statements, statistical analysis of Openwave's stock option grants, the size and duration of the backdating scheme, violations of Generally Accepted

---

[2] Indeed, the "Officer Defendants," Messrs. Mencarini and Parkhurst, are not even alleged to have served on ePlus's board or any of its committees.

Accounting Principles (GAAP), defendants' receipt of backdated options, the resignation of several Openwave executives, and defendants' false certifications under the Sarbanes-Oxley Act." 528 F. Supp. 2d at 249. Contrary to Plaintiff's reading of the case, the defendants' membership on the compensation committee was only one of the numerous factors that the court considered in concluding that scienter was adequately pleaded. *Id.* at 250.[3] Many of the other factors, such as confidential witness statements, are conspicuously absent here.

*Zoran* also emphasized—contrary to Plaintiff's position in this litigation—that "[s]imply pleading that defendants surely would have known that the statements were false by virtue of their positions at the company is not automatically sufficient to show a strong inference" of scienter. 511 F. Supp. 2d at 1013. The plaintiff adequately alleged scienter in *Zoran* by relying (like the plaintiff in *Openwave*) on two confidential witnesses to establish the role and knowledge of each defendant. *Id.* at 1012; *see also*, *e.g.*, *id.* at 1013 (noting that "plaintiff has alleged, on information from a confidential witness, that [one of the defendants] gave final approval of options grants").

Finally, *Belova v. Sharp* is equally unhelpful to Plaintiff. *Belova* dismissed the plaintiffs' complaint because, as in this case, the plaintiffs did not adequately allege standing under Federal Rule of Civil Procedure 23.1(b)(1). *See* 2008 WL 700961, at *3–*4; *see also supra* Part I. Despite granting the defendants' motion to dismiss, however, the court addressed several other is-

---

[3] Moreover, both *Quest* and *Openwave* were direct securities class actions rather than derivative suits on behalf of the corporation. Those opinions therefore had no need to address whether the plaintiffs could satisfy the demand requirement applicable to derivative suits. Tellingly, when *Openwave* shareholders attempted to raise backdating allegations in a derivative suit, the Northern District of California dismissed their claims for failure to make a pre-suit demand. *See In re Openwave Sys. Inc. S'holder Deriv. Litig.*, 503 F. Supp. 2d 1341, 1353 (N.D. Cal. 2007).

sues raised by the pleadings. The opinion contains only a single paragraph of analysis regarding scienter; it notes that the plaintiffs "allege[d that] the defendants prepared or approved false and misleading public statements relating to the stock options in question." *Id.* at *6. Whatever the merits of this sparse reasoning, it does not establish—as Plaintiff contends—that compensation committee membership is sufficient to establish scienter.

But even if any of the out-of-circuit cases on which Plaintiff relies *had* held that a plaintiff may establish scienter by alleging membership on a compensation committee, this Court should reject that view as inconsistent with its well-reasoned decision in *In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation*, 503 F. Supp. 2d 25 (D.D.C. 2007) ("*Fannie Mae II*"). In *Fannie Mae II*, this Court held that committee membership was insufficient to establish scienter because the plaintiff (like Plaintiff here) had failed to plead "(1) what facts, if any, were brought to the attention of the [Stock Incentive, Compensation, or] Audit Committee[s]; (2) when these facts were brought; or (3) what, if anything, the . . . Committee[s] did in response." *Id.* at 40. Because Plaintiff's complaint fails to include "such specific allegations," his "allegations, at best, rise to the level of negligence" and "do not demonstrate the required state of mind of extreme recklessness." *Id.* at 40–41; *see also* Tr. 20–21. Accordingly, this Court should dismiss Plaintiff's Section 10(b) claim. *See* Mot. 11–12; Reply 2–3, 8–9.

### B.    The "Insider Selling" Claims Under Section 10(b) (Count I) Are Undefended And Indefensible

Plaintiff's counsel made no effort at argument, and little effort in his brief, to contend that the so-called "insider selling" claims have merit. Such a contention would fall flat in any event. As explained by Defendants' counsel, ePlus—which Plaintiff purportedly represents in this lawsuit—is not alleged to have purchased any shares of common stock that the Defendants sold on

the open market.  And ePlus certainly lacks standing to claim that *open-market purchasers*, who are not parties to this lawsuit, paid too much for shares *they* purchased.  Tr. 23; *see also* Reply 3 n.1 (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 754–55 (1975); *Cowin v. Bresler*, 741 F.2d 410, 420 (D.C. Cir. 1984) ("[O]nly purchasers or sellers of securities have standing to pursue private claims for damages under section 10(b) and Rule 10b-5  . . . .")).

Furthermore, Plaintiff fails to plead loss causation.  The nondisclosure of options errors had no effect on ePlus's stock prices.  Tr. 22–23; *see also* Mot. 9 & n.4, Reply 7–8 & n.5.  That fact is judicially noticeable.  *See Freeland v. Iridium World Commc'ns, Ltd*., 233 F.R.D. 40, 43 n.3 (D.D.C. 2006).  And it underscores the insufficiency of the allegations.  "The complaint's failure to claim that [ePlus's] share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient. . . . [H]owever, the 'artificially inflated purchase price' is not itself a relevant economic loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

If any portion of this case is permitted to proceed, these vague insider selling claims should be singled out for dismissal.  Plaintiff attempts to use them to inflate the amounts at issue dramatically.  *Compare* ePlus Form 10-K, FY 2006, at 4 (total restatement of $3.6 million); *id.* at 7 (only *$1.4 million* of incremental compensation expenses related to grants to officers and directors); *with* Compl. ¶¶ 1, 143 (alleging *$5 million* in so-called insider selling claims).  He should be denied the *in terrorem* effect of these defective and insupportable claims.

### C. *Cowin v. Bresler* Demolishes The Section 14(a) Claims (Count II)

Plaintiff's claims under Section 14(a) of the Exchange Act must be dismissed because, among other reasons, he has failed to plead the "essential link" element.[4]  As the D.C. Circuit explained in *Cowin v. Bresler*, Section 14(a) provides a remedy only for alleged harm that results from "corporate action *authorized* by the proxy statement."  741 F.2d at 428 (emphasis added); *see also* Mot. 12–14; Reply 9–11.  In this case, however, Plaintiff has admitted that the alleged backdating was *not authorized* by the stock option plans approved by shareholders.  *See*, *e.g.*, Pl.'s Opp. Defs.' Mot. Dismiss, DE 17 ("Opp.") at 6.

Plaintiff has failed to address *Cowin* despite being given numerous opportunities to do so. Defendants raised this issue in their motion to dismiss the original complaint, but Plaintiff made no effort to remedy the "essential link" defect in his amended complaint.  Defendants raised the same issue in their motion to dismiss the amended complaint, but Plaintiff's opposition brief does not even *mention Cowin*, let alone argue that it somehow does not foreclose his Section 14(a) claims.  Finally, this Court invited Plaintiff to address the Section 14(a) "problem" during oral argument, but Plaintiff simply refused to do so.  *See* Tr. 44–45 ("I prefer not to repeat my papers . . . .").  Plaintiff's repeated failure to address *Cowin* makes clear—as Defendants have argued since the beginning of this litigation—that the Section 14(a) claim must be dismissed.

### D. Plaintiff Did Not Support His Section 20(a) Claims (Count III)

Despite this Court's invitation to address the 20(a) problem during oral argument, Plaintiff did not bother to defend his claims for control person liability under Section 20(a) of the Exchange Act.  *See* Tr. 45.  There is nothing Plaintiff could have said to save this claim.  Not only

---

[4] The Section 14(a) claims are also defective for the reasons explained in the Defendants' previous memoranda of law.  *See* Mot. 14–16; Reply 10–11.

has Plaintiff failed to plead any viable primary violations of Section 10(b) or Section 14(a), he also has not adequately alleged that any of the Defendants controlled a primary violator or that they were culpable participants in any securities violations.  For each of these reasons, Plaintiff's Section 20(a) claims must be dismissed.  *See* Mot. 16–18; Reply 11–12.

      **E.**      **The D.C. Circuit Has Authoritatively Rejected Private Section 304 Claims (Count XII)**

Finally, this Court should dismiss Plaintiff's claims against Defendants Norton and Mencarini under Section 304 of the Sarbanes-Oxley Act because the D.C. Circuit has now held that Section 304 does not authorize private parties to sue to enforce its provisions.  *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines*, No. 07-7108, 2008 WL 3166142, at *10 (D.C. Cir. Aug. 8, 2008) (holding that section "304 does not create a private right of action").  At oral argument, defense counsel relied extensively on this Court's dismissal of a derivative suit on behalf of Fannie Mae.  *See, e.g.*, Tr. 4–5, 10–11.  *Pirelli* affirmed this Court's order of dismissal.  *See* Ex. A.  Although the plaintiffs claimed that Fannie Mae's directors should have sued its former CEO and CFO under Section 304, the D.C. Circuit rejected that argument because Section 304 does not create a private right of action.  *Id.*  This holding, which is consistent with the views of every other court to consider the issue, forecloses Plaintiff's attempt to plead a claim under Section 304.[5]

---

[5] *See, e.g.*, *Pedroli ex rel. Microtune, Inc. v. Bartek*, No. 4:07-CV-43, ___ F. Supp. 2d ___, 2008 WL 901203, at *2 (E.D. Tex. Mar. 31, 2008) ; *In re Diebold Deriv. Litig.*, Nos. 5:06CV0233 & 5:06CV0418, 2008 WL 564824, at *2 (N.D. Ohio Feb. 29, 2008); *In re iBasis, Inc. Deriv. Litig.*, 532 F. Supp. 2d 214, 223–25 (D. Mass. 2007); *In re Infosonics Corp. Deriv. Litig.*, No. 06cv1336 BTM(WMc), 2007 WL 2572276, at *8–*9 (S.D. Cal. Sept. 4, 2007); *In re Goodyear Tire & Rubber Co. Deriv. Litig.*, Nos. 5:03CV2180, etc., 2007 WL 43557, at *7 (N.D. Ohio Jan. 5, 2007); *In re Digimarc Corp. Deriv. Litig.*, No. 05-1324-HA, 2006 WL 2345497, at *2 (D. Or. Aug. 11, 2006); *Kogan v. Robinson*, 432 F. Supp. 2d 1075, 1082 (S.D. Cal. 2006); *In re Whitehall Jewellers, Inc. S'holder Deriv. Litig.*, No. 05 C

[Footnote continued on next page]

### III. Plaintiff Has Failed To Plead Any Valid Excuse For Not Making The Required Pre-Suit Demand

#### A. Reliance On Disclosures From Outside The Complaint Confirms That The Allegations Are Insufficient

At argument, Plaintiff's counsel subordinated the generic allegations pleaded in the complaint and largely relied instead on ePlus's Form 10-K for the fiscal year ended March 2006 (and filed with the SEC on August 16, 2007). Tr. 27–28, 33–34. This 10-K is not cited in the complaint.[6] As a procedural matter, Plaintiff's need to use materials outside the pleadings to justify his claims demonstrates that the pleadings are themselves insufficient.

As a practical matter, the 10-K undermines many of Plaintiff's allegations. Contrary to Plaintiff's cavalier assertion that it would be impossible for the so-called "suspicious" options to be misdated by negligence, *see* Tr. 45–46, the 10-K discloses that annual option grants to outside directors were flawed due to a misunderstanding over when they were due: "Until 2003, management believed that the annual awards should be given on the anniversary of the IPO, November 20." ePlus Form 10-K, FY 2006, at 9. In fact, grants were supposed to be issued on the anniversary of each director's appointment to the board. But since ePlus's first two directors were

---

[Footnote continued from previous page]

1050, 2006 WL 468012, at *8 (N.D. Ill. Feb. 27, 2006); *In re BISYS Group Inc. Deriv. Action*, 396 F. Supp. 2d 463, 464 (S.D.N.Y. 2005); *Neer v. Pelino*, 389 F. Supp. 2d 648, 657 (E.D. Pa. 2005); *Mehlenbacher ex rel. Asconi Corp. v. Jitaru*, No. 6:04CV1118ORL-22KRS, 2005 WL 4585859, at *10 (M.D. Fla. June 6, 2005).

[6] Plaintiff cites the 10-K in a filing styled "Plaintiff's Request for Judicial Notice in Support of Opposition to Defendants' Motion to Dismiss." DE 18. Defendants, who are otherwise limited to plaintiffs' version of the story at this stage of a case, commonly file judicial-notice motions to alert courts to facts that they may appropriately consider in support of dismissal. But plaintiffs control the allegations in the complaint and generally have no need for such motions—assuming they have adequately pleaded their allegations. Plaintiff's effort to introduce new information through this filing simply highlights the insufficiency of the complaint.

appointed on November 20, 1996, the IPO date, and were supposed to receive options on that day each year, management mistakenly assumed that *all* director options were due on that day. *Id*. Significantly, one of the grant dates that Plaintiff disputes corresponds to these ostensibly accidental director grants.[7] Given that Plaintiff cherry-picked only nine grant dates to challenge in the course of more than seven years, the circumstances surrounding this grant date significantly undermines the generic assertion of scienter.

The 10-K also refutes Plaintiff's repeated assertion that these errors resulted from management's efforts to reward itself; it discloses that the overwhelming majority of compensation expenses that had to be recorded as a result of misdated options stemmed not from options granted to the Defendants, but "to employees who were neither our executive officers nor our directors." *Id*. at 7. At oral argument, Plaintiff's counsel seized on the 10-K's statement that the "price of certain stock options were determined with hindsight." *Id*. at 4. But the 10-K does not say, and plaintiff does not allege, whether any of the *particular* Defendants that Plaintiff happened to sue played any *particular* role in such determinations. The Federal Rules and case law require that specificity.

Moreover, the 10-K discloses that ePlus *voluntarily* reviewed its options grants in response to a letter it received from a shareholder on June 20, 2006—long before the first (and later abandoned) complaint was filed in this case. *Id.* at 3. Although the shareholder's letter addressed only the 2004 option grants, ePlus's Audit Committee reviewed *all* of the company's option grants since its IPO in 1996. *Id*.

---

[7] Plaintiff contests grants to Messrs. Faulders and O'Donnell on November 19, 1999. Compl. ¶ 69. These options were not granted at a quarterly low, and they issued on the Friday before ePlus's Saturday IPO anniversary in 1999.

Following this review, ePlus undertook extensive remedial measures to correct its options-related errors. *Id*. at 11, 46–47, 65–66. Among other things, ePlus adopted a host of new policies and procedures to prevent similar errors in the future. *Id*. at 46–47. ePlus also disclosed that it not merely re-priced, but *canceled* options awarded to its four senior executives in 2004. *Id*. at 11, 46; *see also* ePlus Form 8-K (May 11, 2007). This disclosure belies Plaintiff's assertion that "ePlus' Board of Directors . . . was simply unable or unwilling" to recover amounts due to ePlus. Compl. ¶ 6. Yet these *canceled* 2004 options are *also* listed among the mere nine grant dates on which the complaint hinges. Compl. ¶ 77.

The 10-K's disclosures of error and voluntary correction set this case apart from the cases to which Plaintiff clings most desperately. *See, e.g.*, *Conrad v. Blank*, 940 A.2d 28, 34 (Del. Ch. 2007) ("Importantly, the filing makes no mention of any action taken by the corporation to remedy the effects of the uncovered errors."); *Ryan v. Gifford*, 918 A.2d 341, 361 (Del. Ch. 2007) ("[D]efendants make no allegations that [the recipient of backdated options] is precluded from exercising these options or that the options have expired."). Here, Plaintiff arrived at the courthouse steps not before, but almost *six months after* another shareholder initiated the process of correcting ePlus's options errors. Rather than allowing this process to unfold without litigation, as another shareholder proved willing to do, Plaintiff filed this opportunistic lawsuit without satisfying his obligation to make a pre-suit demand on ePlus's Board.

Of course, Defendants do not rely on ePlus's disclosures for their truth or otherwise proffer facts to the Court at this stage of the proceedings. But if Plaintiff intends to rest his case on ePlus's disclosures, he cannot weave a fiction through selective citation. He should explain why disclosures that are at odds with his claims do not defeat them. Or he should specifically allege that those disclosures are untrue—if he can do so within the requirements of Rule 11. His failure

to address these disclosures in their entirety does not make his pleadings particularized, cogent, or compelling; it makes them incomplete.

### B.    The Delaware Supreme Court Has Squarely Rejected Plaintiff's *Per Se* Theories Of Pleading Scienter And Demand Futility

Making a pre-suit demand on the board of directors "is ordinarily required for shareholder derivative suits." *See Pirelli*, 2008 WL 3166142, at *5. If a derivative plaintiff does not make a demand, he must plead his reasons for being excused from doing so with particularity. *Id.* (citing Fed. R. Civ. P. 23.1). At oral argument and in his briefing, Plaintiff relied extensively on *Ryan v. Gifford* in an effort to sidestep his obligation to plead demand excusal with particularity. Instead of pleading specifically what *these* Defendants knew or what *these* Defendants did with regard to the issues raised in *this* complaint, Plaintiff argued that his generic backdating allegations suffice to plead knowledge *per se* because "backdating is inherently knowing, fraudulent conduct." Opp. 26 (citing *Ryan*, 918 A.2d at 341); *see also* Tr. 32, 37. Plaintiff similarly argues, as he did in support of his Section 10(b) claims, that *Ryan* allows him to plead mere committee membership in place of specific allegations of wrongdoing. Tr. 34–35, 37, 40–41.

Defendants have explained at length why Plaintiff's reading of *Ryan* is incorrect. But even if *Ryan* could once have been read to support Plaintiff's pleading shortcuts, that reading has now been rejected by numerous courts. For example, the Delaware Chancery Court's later decision in *Desimone v. Barrows* rejects the notion that mere committee-membership allegations suffice to show knowledge of backdating: "The complaint alleges that the Incentive plan was 'administered by the Compensation Committee,' . . . . [T]hat vague and conclusory statement does not suggest in any way that the Compensation Committee was involved in or had knowledge of any backdating." 924 A.2d 908, 938 (Del. Ch. 2007). Similarly, the Northern District of California has recognized repeatedly that pleading "conclusory allegations regarding Committee ser-

vice" is insufficient to overcome the pre-suit demand requirement. *In re Verisign, Inc. Deriv. Litig.*, 531 F. Supp. 2d 1173, 1194 (N.D. Cal. 2007). "Mere membership on a committee or board, without specific allegations as to defendants' roles and conduct, is insufficient to support a finding that the directors were conflicted." *Id.* (quoting *In re CNET Networks, Inc. S'holder Deriv. Litig.*, 483 F. Supp. 2d 947, 963 (N.D. Cal. 2007)) (internal quotation marks omitted); *see also CNET*, 483 F. Supp. 2d at 965 ("Plaintiffs' allegations that because [defendants] were on the compensation committee, they must have known, do not constitute particularized facts.").

If despite these cases there was ever any doubt that committee-membership allegations or the mere utterance of the word "backdating" are insufficient to overcome the demand requirement, the Delaware Supreme Court has now authoritatively put that doubt to rest. Less than two months ago, the court squarely held that a plaintiff cannot overcome the demand requirement with respect to an exculpated board, like ePlus's, without alleging *particularized facts* to show that the directors acted with scienter:

> Where directors are contractually or otherwise exculpated from liability for certain conduct, 'then a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts.' Where . . . directors are exculpated from liability except for claims based on 'fraudulent,' 'illegal' or 'bad faith' conduct, a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had 'actual or constructive knowledge' that their conduct was legally improper.

*Wood v. Baum*, No. 621, 2007, __ A.2d __, 2008 WL 2600981, at *3 (Del. July 1, 2008) (footnotes and citations omitted; emphasis in original). The Delaware Supreme Court held that mere allegations that the board approved a disputed decision do not satisfy this pleading requirement. *Id.* ("Delaware law on this point is clear:  board approval of a transaction, even one that later proves to be improper, without more, is an insufficient basis to infer culpable knowledge or bad faith on the part of individual directors."). The court also dispensed with the plaintiff's similar

16

assertion that scienter could be inferred merely from audit committee membership: such an "assertion is contrary to well-settled Delaware law." *Id.* at *4. In support of these well-settled legal principles, the Delaware Supreme Court cited the Chancery Court's familiar decision in *Desimone*—a decision that dismisses backdating claims for the very reasons set forth in the motion to dismiss here. *Id.* at *3 n.14, *4 n.24 (citing *Desimone*, 924 A.2d at 933-35); *see also* Mot. 22, 35; Reply 18.

Because, as in *Wood* and *Desimone*, Plaintiff has failed to plead particularized facts regarding these Defendants' knowledge and actions, he has not pleaded demand futility and his claims should be dismissed. *See also Pirelli*, 2008 WL 3166142, at *12 (affirming this Court's dismissal of a derivative lawsuit for failure to make a pre-suit demand).

### C.    Plaintiff's Assertion That It Would Be Impossible To Issue The Disputed Options By Mistake Is Neither Correct Nor A Substitute For Particularized Allegations

In further defense of his deficient allegations, Plaintiff argued that the disputed options could not possibly have been misdated by mistake. When asked whether the options could have been misdated by negligence, Plaintiff's counsel answered no. Tr. 45–46. He is incorrect, and courts demonstrate his error.

Several courts have considered this issue and reached the opposite conclusion: backdating can result from mere negligence. For example, the court in *Rudolph v. UTStarcom* determined that a plaintiff's allegations related to "the company's admission in its restatement that some options had been backdated, defendants' responsibility for approving stock option grants, defendants' certification of the company's financial reports, and defendants' receipt and exercise of backdated stock options" could "equally support the inference that stock options had been backdated through innocent bookkeeping error." No. C 07-04578 SI, ___ F. Supp. 2d ___ , 2008 WL 1734763, at *6 (N.D. Cal. Apr. 14, 2008). This is particularly true when, as here, the plain-

tiff does not plead the total number of grant dates "to place these grant dates [at issue] in con-

text." *Id.*

In *Desimone*, the Delaware Chancery Court analyzed this issue extensively, and it out-

lined various scenarios in which directors could approve backdated options:

> In the first, which I will call 'Scenario I,' the compensation committee, although
> not acting with reasonable diligence, approves the option grants without realizing
> that the grants violate the terms of the stock option plan and without realizing that
> the corporation is accounting for them improperly.  In fact, they are advised by
> the corporation's general counsel, HR director, and CFO that the grants were ap-
> propriate under the plan.  The committee knew who was getting them, the incen-
> tives for performance they were intended to create, and the economic terms of the
> options, but it did not dig into the details, such as the actual date of the grants or
> the stock's trading price on those dates, after receiving reports from the key offi-
> cers. Even assume that the committee signed a written consent or two, circulated
> to them by company counsel.

924 A.2d at 932–33.  The court reasoned that in this scenario, "there is a serious argument that

the directors," assuming they are protected by an exculpatory charter provision like ePlus's,

"cannot be held liable in damages for breach of any duty."  *Id*. at 933.  Because of the charter

provision, the directors could be liable only if they acted with a state of mind that is disloyal, and

that "would likely require a finding that the compensation committee *knew* that the options vio-

lated the stock option plan and that the options were being accounted for in a manner that was

improper, or that their failure to obtain that information resulted from their knowing abdication

of their directorial duties."  *Id*. (emphasis added; footnote omitted).  Because the plaintiffs al-

leged only that certain defendants "administered" stock option plans, the court held that the

plaintiff failed to overcome the demand requirement:

> The complaint alleges that the Incentive plan was 'administered by the Compen-
> sation Committee,' which consisted of two of the Outside Directors . . . .  I accept
> this allegation as true, as I must.  Nonetheless, that vague and conclusory state-
> ment does not suggest in any way that the Compensation Committee was involved
> in or had knowledge of any backdating.

*Id*. at 938 (footnote omitted).

In this case, Plaintiff relies entirely on the very same inadequate allegations that certain Defendants sat on committees that "administered" stock options plans.  Tr. 34 (citing Compl. ¶ 61).  These allegations fail to demonstrate here, as they failed to demonstrate in *Desimone*, that ePlus's options were mispriced other than through negligence.  And since ePlus's directors are exculpated for negligence claims, Plaintiff has failed to show that he can proceed with this derivative lawsuit without first making a demand on ePlus's board.  *See* Mot. 20–31; Reply 16–21.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the Motion to Dismiss and its supporting memoranda, Defendants respectfully request that this Court dismiss the Amended Complaint.

Dated:  August 27, 2008                                   Respectfully submitted,

/s/ F. Joseph Warin
F. JOSEPH WARIN (DC Bar # 235978)
FWarin@gibsondunn.com
MICHAEL F. FLANAGAN (DC Bar # 435942)
MFlanagan@gibsondunn.com
JASON J. MENDRO (DC Bar # 482040)
JMendro@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, District of Columbia 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for Defendants*

<u>CERTIFICATE OF SERVICE</u>

A copy of the foregoing ***Supplemental Memorandum In Support Of Defendants' Motion To Dismiss The First Amended Verified Shareholder Derivative Complaint*** was filed electronically this 27th day of August 2008.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Jason J. Mendro

Jason J. Mendro (DC Bar # 482040)



**H**Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust ex rel. Federal Nat. Mortg. Ass'n v. Raines
C.A.D.C.,2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,District of Columbia Circuit.
PIRELLI ARMSTRONG TIRE CORPORATION RETIREE MEDICAL BENEFITS TRUST, Derivatively on Behalf of FEDERAL NATIONAL MORTGAGE ASSOCIATION and Wayne County Employees' Retirement System, Derivatively on Behalf of Federal National Mortgage Association, Appellants
v.
Franklin D. RAINES, et al., Appellees.
**No. 07-7108.**

Argued April 23, 2008.
Decided Aug. 8, 2008.

**Background:** Federal National Mortgage Association (Fannie Mae) shareholders brought consolidated derivative action asserting claims against company's directors for breach of fiduciary duties and gross mismanagement arising out of company's misapplication of accounting standards, and claims for corporate waste and unjust enrichment relating to board's approval of certain executives' severance compensation. Defendants filed multiple motions to dismiss. The United States District Court for the District of Columbia, Richard J. Leon, J., 503 F.Supp.2d 9, granted motions, and plaintiffs appealed.

**Holdings:** The Court of Appeals, Kavanaugh, Circuit Judge, held that:
(1) "sue and be sued" clause of statute enacting federal corporate charter of Fannie Mae confers federal subject-matter jurisdiction over cases in which Fannie Mae is a party;
(2) under Delaware law, shareholders failed to establish that pre-suit demand on board of directors would have been futile with respect to their accounting-related claims;
(3) shareholders failed to establish that pre-suit demand on board of directors would have been futile with respect to their severance-related claims; and

(4) directors' alleged business, professional, and personal relationships were insufficient to disqualify the challenged directors from evaluating pre-suit demand in an independent manner.

Affirmed.

Brown, Circuit Judge, filed opinion concurring in the judgment.

**[1] Corporations 101 ⟨⟩206(2)**

101 Corporations
    101IX Members and Stockholders
        101IX(C) Suing or Defending on Behalf of Corporation
            101k206 Refusal of Corporation, Officers, or Stockholders to Act
                101k206(2) k. Necessity of Demanding Action. Most Cited Cases
Under Delaware law, shareholders bringing a derivative suit first must make a demand on the corporation's board, in effect asking the board to have the corporation pursue the claims itself.

**[2] Federal Courts 170B ⟨⟩818**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk818 k. Dismissal. Most Cited Cases
Court of Appeals reviews for abuse of discretion the district court's decision to dismiss shareholders' derivative suit for their unexcused failure to have made pre-suit demand on board.

**[3] Federal Courts 170B ⟨⟩230**

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(C) Cases Arising Under Laws of the United States
            170Bk230 k. United States Corporations in General, Actions by or Against. Most Cited Cases
"Sue and be sued" clause of statute enacting federal

--- F.3d ----
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

corporate charter of Federal National Mortgage Association (Fannie Mae) confers federal subject-matter jurisdiction over cases in which Fannie Mae is a party. Federal National Mortgage Association Charter Act, § 309(a), 12 U.S.C.A. § 1723a(a).

**[4]** Federal Courts 170B 🗝230

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(C) Cases Arising Under Laws of the United States
            170Bk230 k. United States Corporations in General, Actions by or Against. Most Cited Cases

**Federal Courts 170B 🗝1141**

170B Federal Courts
    170BXIII Concurrent and Conflicting Jurisdiction and Comity as Between Federal Courts
        170Bk1131 Exclusive or Concurrent Jurisdiction
            170Bk1141 k. Other Particular Cases. Most Cited Cases
Words "of competent jurisdiction," as used in statute authorizing Federal National Mortgage Association (Fannie Mae) to "sue and to be sued, and to complain and to defend, in any court of competent jurisdiction, State or Federal," help clarify that: (1) litigants in state courts of limited jurisdiction must satisfy the appropriate jurisdictional requirements, (2) litigants, whether in federal or state court, must establish that court's personal jurisdiction over the parties, (3) litigants relying on the "sue-and-be-sued" provision can sue in federal district courts but not necessarily in all federal courts, and (4) where the Tucker Act otherwise might funnel cases to the Court of Federal Claims, the federal district courts still possess jurisdiction. Federal National Mortgage Association Charter Act, § 309(a), 12 U.S.C.A. § 1723a(a); 28 U.S.C.A. §§ 1346, 1491.

**[5]** Corporations 101 🗝206(4)

101 Corporations
    101IX Members and Stockholders
        101IX(C) Suing or Defending on Behalf of Corporation
            101k206 Refusal of Corporation, Officers, or Stockholders to Act

            101k206(4) k. Excuse for Failure to Demand. Most Cited Cases
To prove demand futility, so as to excuse the failure to have attempted to make a pre-suit demand on the board as is ordinarily required for shareholder derivative suits under Delaware law, plaintiffs must prove that a majority of the board of directors at the time of the complaint lacked the necessary disinterestedness and independence to evaluate the suit.

**[6]** Corporations 101 🗝320(5)

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k320 Actions Between Shareholders and Officers or Agents
                101k320(5) k. Failure of Action by Corporation and Demand That Action Be Brought. Most Cited Cases
Under Delaware law, Federal National Mortgage Association (Fannie Mae) shareholders who brought derivative action failed to establish that pre-suit demand on board of directors would have been futile with respect to their claims that directors breached their fiduciary duties by misapplying accounting standards; shareholders' complaint failed to establish a substantial likelihood of personal liability for Fannie Mae's outside directors on the accounting-related claims, and so the accounting-related allegations did not create a reasonable doubt about the disinterestedness of the board to consider a demand with respect to those claims.

**[7]** Corporations 101 🗝310(2)

101 Corporations
    101X Officers and Agents
        101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
            101k310 Management of Corporate Affairs in General
                101k310(2) k. Degree of Care Required and Negligence. Most Cited Cases
Under Delaware law, to establish liability predicated on a board's failure to exercise oversight, the standard requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care, that is, gross

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

negligence.

**[8] Corporations 101 🔑310(1)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k310 Management of Corporate Affairs in General
            101k310(1) k. In General. Most Cited Cases
Under Delaware law, to establish liability predicated on a board's failure to exercise oversight, plaintiffs must allege particularized facts demonstrating that the directors knew that they were not discharging their fiduciary obligations and failed to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities.

**[9] Corporations 101 🔑310(1)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k310 Management of Corporate Affairs in General
            101k310(1) k. In General. Most Cited Cases
Under Delaware law, a Board of Directors is not a Board of Accountants, for purposes of establishing director oversight liability.

**[10] Corporations 101 🔑310(1)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k310 Management of Corporate Affairs in General
            101k310(1) k. In General. Most Cited Cases
Under Delaware law, directors are insulated from liability when they rely in good faith on the opinions of outside experts who are acting within their expertise. 8 West's Del.C. § 141(e).

**[11] Corporations 101 🔑310(1)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k310 Management of Corporate Affairs in General
            101k310(1) k. In General. Most Cited Cases
Under Delaware law, the business judgment rule establishes a presumption that, in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.

**[12] Corporations 101 🔑310(1)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k310 Management of Corporate Affairs in General
            101k310(1) k. In General. Most Cited Cases
Under Delaware law, the business judgment rule protects decisions unless "no reasonable business person" would have made the decision.

**[13] Corporations 101 🔑310(1)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k310 Management of Corporate Affairs in General
            101k310(1) k. In General. Most Cited Cases
Under Delaware law, pursuant to the business judgment rule, courts rarely second-guess directors' compensation and severance decisions because the size and structure of executive compensation are inherently matters of judgment.

**[14] Corporations 101 🔑310(1)**

101 Corporations
   101X Officers and Agents

--- F.3d ----
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members

101k310 Management of Corporate Affairs in General

101k310(1) k. In General. Most Cited Cases

Under Delaware law, to establish their claim that directors' severance decision was not a valid business judgment, plaintiffs had to allege particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith, or (2) a reason to doubt that the board was adequately informed in making the decision.

**[15] Corporations 101 ☛320(5)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k320 Actions Between Shareholders and Officers or Agents
            101k320(5) k. Failure of Action by Corporation and Demand That Action Be Brought. Most Cited Cases

**Corporations 101 ☛320(8)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k320 Actions Between Shareholders and Officers or Agents
            101k320(8) k. Allegations as to Right to Sue. Most Cited Cases

Under Delaware law, Federal National Mortgage Association (Fannie Mae) shareholders who brought derivative action failed to establish that pre-suit demand on board of directors would have been futile with respect to their claim that board breached its fiduciary duties and wasted corporate assets in approving certain executives' severance compensation; shareholders failed to allege particularized facts demonstrating that board's process was flawed or that directors acted without adequate information or deliberation, and even if directors had grounds to invoke executives' "for cause" termination provisions, directors reasonably could have decided not to invoke those provisions, given the risk of lengthy and expensive litigation,

such that complaint failed to create reasonable doubt whether board exercised a valid business judgment.

**[16] Securities Regulation 349B ☛35.14**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)1 In General
            349Bk35.14 k. Persons Regulated or Liable in General. Most Cited Cases

Securities and Exchange Commission (SEC) may sue the chief executive officer (CEO) and chief financial officer (CFO) of a company when the company has been required to restate its earnings due to noncompliance with securities laws. Sarbanes-Oxley Act of 2002, § 304, 15 U.S.C.A. § 7243(a).

**[17] Securities Regulation 349B ☛35.17**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)1 In General
            349Bk35.17 k. Existence of Private Cause of Action. Most Cited Cases

No private right of action exists under provision of Sarbanes-Oxley Act providing for forfeiture of certain bonuses and profits by corporate officers if corporation was required to prepare accounting restatement due to company's noncompliance with securities laws. Sarbanes-Oxley Act of 2002, § 304(a), 15 U.S.C.A. § 7243(a).

**[18] Corporations 101 ☛206(4)**

101 Corporations
   101IX Members and Stockholders
      101IX(C) Suing or Defending on Behalf of Corporation
         101k206 Refusal of Corporation, Officers, or Stockholders to Act
            101k206(4) k. Excuse for Failure to Demand. Most Cited Cases

Under Delaware law, "independence" means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences.

**[19] Corporations 101 ☛320(5)**

--- F.3d ----                                                                          Page 5
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k320 Actions Between Shareholders and Officers or Agents
            101k320(5) k. Failure of Action by Corporation and Demand That Action Be Brought. Most Cited Cases

**Corporations 101 &#9755;320(8)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k320 Actions Between Shareholders and Officers or Agents
            101k320(8) k. Allegations as to Right to Sue. Most Cited Cases
Under Delaware law, Federal National Mortgage Association (Fannie Mae) shareholders who brought derivative action failed to establish that pre-suit demand on board of directors would have been futile because directors, due to their various alleged business, professional, and personal relationships, lacked the necessary "independence" to evaluate the demand; the kinds of relationships alleged by shareholders were common at many companies and were not remotely sufficient to satisfy the high bar set by Delaware law for using such relationships as a basis for finding a lack of independence, complaint failed to allege particularized facts showing that chairman of board of company's foundation controlled who received donations or determined size of grants, and mere fact that board often approved chairman's proposed decisions was insufficient to show that he so controlled directors' decisionmaking as to mean that board lacked independence to consider a demand.

**[20] Corporations 101 &#9755;320(5)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k320 Actions Between Shareholders and Officers or Agents
            101k320(5) k. Failure of Action by

Corporation and Demand That Action Be Brought. Most Cited Cases
Under Delaware law, for donations made by corporation's foundation to nonprofit organizations with which directors were affiliated to be relevant to the question of the directors' independence to consider pre-suit demand, as ordinarily required for shareholder derivative suit, plaintiffs had to allege that chairman of board of foundation had the unilateral power to decide whether the challenged director continued to receive a benefit.

**[21] Corporations 101 &#9755;211(5)**

101 Corporations
   101IX Members and Stockholders
      101IX(C) Suing or Defending on Behalf of Corporation
         101k211 Pleading
            101k211(5) k. Excuse for Failure to Allege Demand. Most Cited Cases
Under Delaware law, allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence.

**[22] Corporations 101 &#9755;320(5)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
         101k320 Actions Between Shareholders and Officers or Agents
            101k320(5) k. Failure of Action by Corporation and Demand That Action Be Brought. Most Cited Cases
Under Delaware law, only professional or personal friendships that border on or even exceed familial loyalty and closeness may raise a reasonable doubt whether a director can appropriately consider a pre-suit demand by shareholders seeking to bring a derivative action.

**[23] Corporations 101 &#9755;320(5)**

101 Corporations
   101X Officers and Agents
      101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members

--- F.3d ----                                                                                                                     Page 6
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

101k320 Actions Between Shareholders and Officers or Agents
101k320(5) k. Failure of Action by Corporation and Demand That Action Be Brought. Most Cited Cases

Under Delaware law, fact that corporation's board often approved chairman's proposed decisions did not suffice to demonstrate that chairman so controlled the directors' decisionmaking as to mean they lacked independence to consider a pre-suit demand by shareholders seeking to bring a derivative action.

Appeal from the United States District Court for the District of Columbia (No. 04cv01783).

Randall J. Baron argued the cause for appellants. With him on the briefs were Eric A. Isaacson and Benny C. Goodman III.

Maureen E. Mahoney argued the cause for appellees. With her on the briefs were Everett C. Johnson, Jr., J. Scott Ballenger, Jeffrey W. Kilduff, Michael J. Walsh, Jr., Barbara Van Gelder, James D. Wareham, James E. Anklam, John J. Clarke, Jr., Earl J. Silbert, James Hamilton, Rhonda D. Orin, Daniel J. Healy, William K. Dodds, Stephanie A. Joyce, Glenn B. Manishin, David E. Barry, William A. Krohley, Christopher C. Palermo, Steven M. Salky, Eric Delinsky, Holly A. Pal, Kevin M. Downey, and Paul Mogin. Barbara A. Miller entered an appearance.

Before: TATEL, BROWN, and KAVANAUGH, Circuit Judges.

Opinion for the Court filed by Circuit Judge KAVANAUGH, in which Circuit Judge TATEL joins.

Opinion concurring in the judgment filed by Circuit Judge BROWN.

KAVANAUGH, Circuit Judge:

**\*1** In 2004, Fannie Mae announced one of the largest corporate earnings restatements in U.S. history. Numerous investigations and official reports followed. The story of Fannie Mae told by these reports is disturbing. It thus comes as no surprise that the Fannie Mae accounting debacle has generated a wave of lawsuits. In this case, certain Fannie Mae shareholders filed a derivative suit on behalf of Fannie Mae against the Company's directors. The complaint targets the directors' failure to prevent the accounting irregularities. The complaint also

challenges the directors' decision to approve severance arrangements for two Fannie Mae officers, Franklin D. Raines and J. Timothy Howard.

The parties agree that Delaware law provides the substantive standards for evaluating plaintiffs' complaint. Shareholders ordinarily must make a demand on the company's board of directors in order to bring a derivative suit. Although these shareholders did not make such a demand, the law does not require demand when it would be futile. But consistent with the long-standing principle that directors and not shareholders manage a corporation, the Delaware precedents on demand futility make clear that the bar is high, the standards are stringent, and the situations where demand will be excused are rare.

Carefully applying the Delaware precedents, the District Court found that plaintiffs' complaint failed to meet the test for demand futility and dismissed the case. We affirm.

I

Fannie Mae is a federally chartered corporation authorized by Congress in 1934 and created in 1938. Initially established as a public entity, Fannie Mae was privatized in 1968. Fannie Mae thus has shareholders, directors, and officers like other non-governmental corporations.

Fannie Mae's mission is to increase affordable housing for moderate- and low-income families. It purchases mortgages originated by other lenders and helps lenders convert their home loans into mortgage-backed securities. The goal is to provide stability and liquidity to the mortgage market. This allows mortgage lenders to provide more loans, thereby increasing the rate of homeownership in America.

During the summer of 2003, Fannie Mae's sister organization Freddie Mac disclosed accounting irregularities. Shortly thereafter, the Office of Federal Housing Enterprise Oversight, an Executive Branch agency, reviewed Fannie Mae's accounting. In September 2004, OFHEO released an interim report that highlighted deficiencies in Fannie Mae's accounting policies, internal controls, and financial reporting. OFHEO's interim report led to an investigation by the Securities and Exchange

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Commission. On December 15, 2004, the SEC announced that it would require a $9 billion earnings restatement by Fannie Mae.

Six days after the SEC's announcement, two Fannie Mae officers (CEO Franklin D. Raines and CFO J. Timothy Howard) resigned. The Board did not fire Raines or Howard for cause; as a result, they were able to leave the company with approximately $31 million in severance benefits.

**\*2** In late 2004, shareholders filed multiple derivative suits on behalf of Fannie Mae against Fannie Mae's directors. *See* In re Fed. Nat'l Mortgage Ass'n Litig., 503 F.Supp.2d 9, 13 (D.D.C.2007). As relevant here, plaintiffs allege that Fannie Mae's Board of Directors failed to exercise sufficient oversight to prevent the accounting violations. Plaintiffs also contend that the outside directors on the Board should have (i) terminated Raines and Howard for cause, thereby denying them severance benefits, and (ii) sued to obtain disgorgement of previous compensation Raines and Howard received.

[1][2] Shareholders bringing a derivative suit first must make a demand on the Board, in effect asking the Board to have the corporation pursue the claims itself. The shareholders here did not do so. They assert that demand is excused in this case because a majority of the directors could not render a disinterested and independent decision whether to pursue those claims.[FN1] The District Court found that demand was not excused and dismissed the suit. [FN2]

II

Before turning to the merits of this appeal, we address jurisdiction. The parties all agree there is federal subject-matter jurisdiction based on 12 U.S.C. § 1723a(a), which authorizes Fannie Mae to "sue and to be sued, and to complain and to defend, in any court of competent jurisdiction, State or Federal." Based on an independent assessment, we also conclude that this provision establishes federal subject-matter jurisdiction.

In American National Red Cross v. S.G., the Supreme Court considered a statute providing that the Red Cross could " 'sue and be sued in courts of law and equity, State or Federal, within the jurisdiction of the United States.' " 505 U.S. 247, 248, 112 S.Ct. 2465,

120 L.Ed.2d 201 (1992) (quoting 36 U.S.C. § 2 (now codified as amended at 36 U.S.C. § 300105(a)(5))). The Court held that this sue-and-be-sued clause conferred federal subject-matter jurisdiction over cases in which the Red Cross was a party. *Red Cross,* 505 U.S. at 257, 112 S.Ct. 2465. In so ruling, the Court articulated the general principle that "a congressional charter's 'sue and be sued' provision may be read to confer federal court jurisdiction if, but only if, it *specifically mentions the federal courts.*" Id. at 255, 112 S.Ct. 2465 (emphasis added). The Red Cross Court stated that express reference to federal courts in a federally chartered entity's sue-and-be-sued clause was "necessary *and sufficient* to confer jurisdiction." Id. at 252, 112 S.Ct. 2465 (emphasis added).

The Red Cross majority repeatedly characterized this principle as a "rule," *see* id. at 255-57, 112 S.Ct. 2465, noting that it had been "established" in the early 19th Century by *Osborn v. Bank of United States,* 22 U.S. (9 Wheat.) 738, 818, 6 L.Ed. 204 (1824), and subsequently confirmed in *Bankers Trust Co. v. Texas & Pacific Railway Co.,* 241 U.S. 295, 304, 36 S.Ct. 569, 60 L.Ed. 1010 (1916), and *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 455-56, 62 S.Ct. 676, 86 L.Ed. 956 (1942). And the Red Cross dissenters similarly understood the rule's clarity, although they disagreed with the rule's content: "The Court today concludes that whenever a statute granting a federally chartered corporation the 'power to sue and be sued' specifically mentions the federal courts (as opposed to merely embracing them within general language), the law will be deemed ... to confer on federal district courts jurisdiction over any and all controversies to which that corporation is a party." 505 U.S. at 265, 112 S.Ct. 2465 (Scalia, J., dissenting) (emphasis omitted).

**\*3** [3] Applying the Red Cross rule to the present case, we find there is federal jurisdiction because the Fannie Mae "sue and be sued" provision expressly refers to the federal courts in a manner similar to the Red Cross statute. To be sure, the Fannie Mae sue-and-be-sued clause differs from the Red Cross statute in one respect: It refers to "any court of competent jurisdiction, State or Federal," whereas the Red Cross statute refers to "courts of law and equity, State or Federal." *Compare* 12 U.S.C. § 1723a(a), *with* 36 U.S.C. § 300105(a)(5). We agree, however, with the majority of district courts that have

confronted the question since *Red Cross*:Section 1723a(a) provides federal subject-matter jurisdiction in Fannie Mae cases. *See, e.g., Grun v. Countrywide Home Loans, Inc.,* 2004 WL 1509088, at *2 (W.D.Tex. July 1, 2004); *Connelly v. Fed. Nat'l Mortgage Ass'n,* 251 F.Supp.2d 1071, 1073 (D.Conn.2003); *C.C. Port, Ltd. v. Davis-Penn Mortgage Co.,* 891 F.Supp. 371, 372 (N.D.Tex.1994), *aff'd,*58 F.3d 636 (5th Cir.1995); *Peoples Mortgage Co. v. Fed. Nat'l Mortgage Ass'n,* 856 F.Supp. 910, 917 (E.D.Pa.1994).

[4] It is true that two district courts have reached the contrary conclusion, reasoning that applying the *Red Cross* rule to Fannie Mae is problematic because doing so, in their view, renders superfluous the words "of competent jurisdiction" in the Fannie Mae statute. *See Knuckles v. RBMG, Inc.,* 481 F.Supp.2d 559, 563 (S.D.W.Va.2007); *Fed. Nat'l Mortgage Ass'n v. Sealed,* 457 F.Supp.2d 41, 44-46 (D.D.C.2006). We disagree with the *Knuckles* and *Sealed* district court opinions. Applying the *Red Cross* rule to the Fannie Mae statute does not render the words "of competent jurisdiction" superfluous. The words of competent jurisdiction" help clarify that: (i) litigants in state courts of limited jurisdiction must satisfy the appropriate jurisdictional requirements, *see Osborn,* 22 U.S. (9 Wheat.) at 817-18 (finding federal jurisdiction because of statute empowering a federal corporation "to sue and be sued ...*in all state courts having competent jurisdiction,* and in any circuit court of the United States") (internal quotation marks omitted) (emphasis added); (ii) litigants, whether in federal or state court, must establish that court's personal jurisdiction over the parties, *see Blackmar v. Guerre,* 342 U.S. 512, 516, 72 S.Ct. 410, 96 L.Ed. 534 (1952) (noting that a "court of 'competent jurisdiction' " for the purpose of hearing suits against civil service commissioners must be one that possessed personal jurisdiction over those commissioners); *see also United States v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984); (iii) litigants relying on the "sue-and-be-sued" provision can sue in federal district courts but not necessarily in all federal courts, *see Red Cross,* 505 U.S. at 256 n. 8, 112 S.Ct. 2465;*id.* at 267, 112 S.Ct. 2465 (Scalia, J., dissenting); Brief of Petitioner-Appellant at 30-31, *Am. Nat'l Red Cross v. S.G.,* 505 U.S. 247, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992) (No. 91-594) ("it is obvious that the district courts are intended" to receive the jurisdiction conferred in "sue-and-be-sued" clauses); and (iv) where the

Tucker Act otherwise might funnel cases to the Court of Federal Claims, the federal district courts still possess jurisdiction, *see Ferguson v. Union Nat'l Bank,* 126 F.2d 753, 756 (4th Cir.1942) (applying "of competent jurisdiction" language in 12 U.S.C. § 1702: "It could hardly have been intended by Congress that suits for over $10,000 against the Administrator could be brought in any state court of general jurisdiction, but in the federal jurisdiction only in the Court of Claims...."). Applying the *Red Cross* rule to the Fannie Mae statute thus does not render the words "of competent jurisdiction" meaningless.[FN3]

**\*4** The Supreme Court's unanimous decision in *Breuer v. Jim's Concrete of Brevard, Inc.* is consistent with our conclusion. *See*538 U.S. 691, 123 S.Ct. 1882, 155 L.Ed.2d 923 (2003). There, the Court held that the Fair Labor Standards Act's right-to-sue clause did not bar removal of suits from state to federal court. *Id.* at 694-97, 123 S.Ct. 1882;29 U.S.C. § 216(b). In so holding, the Court stated that there was "no question that Breuer could have begun his action in the District Court" given the language in the FLSA statute-similar to the Fannie Mae statute-indicating that an action " 'may be maintained ... in any Federal or State court *of competent jurisdiction.*'" 538 U.S. at 694, 123 S.Ct. 1882 (quoting 29 U.S.C. § 216(b)) (alteration in original) (emphasis added). Therefore, despite the presence of an "of competent jurisdiction" phrase, the Court found no reason to doubt that the FLSA's right-to-sue clause conferred federal jurisdiction.

Judge Brown's separate opinion appears to acknowledge that the original Fannie Mae sue-and-be-sued clause in place from 1934 to 1954 conferred automatic federal jurisdiction in Fannie Mae cases, but says that Congress eliminated this jurisdictional grant in 1954 by adding the words "of competent jurisdiction." We disagree. After the 1954 statutory change, the jurisdictional provision of the Fannie Mae statute continues to refer to federal courts, thus still falling within the *Red Cross* rule we are bound to follow. Moreover, we disagree with the separate opinion about the meaning and effect of that 1954 statutory change.

Under the original 1934 statute, Fannie Mae was a governmental entity that could "sue and be sued, complain and defend, in any court of law or equity,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-00144-RJL     Document 31-2     Filed 08/27/2008     Page 9 of 21

--- F.3d ----                                                                                    Page 9
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

State or Federal."Pub.L. No. 73-479, § 301(c)(4), 48 Stat. 1246, 1256 (1934). The Housing Act of 1954 maintained Fannie Mae's governmental status, but completely revamped the 1934 legislation; the addition of the phrase "of competent jurisdiction" to the sue-and-be-sued clause was one of numerous changes. SeePub.L. No. 83-560, tit. II, 68 Stat. 590, 612-22 (1954). Unlike Judge Brown, we see no plausible reason that Congress in 1954 would have continued to refer to federal courts in the sue-and-be-sued clause-language understood since the *Osborn* case in 1824 to confer federal jurisdiction in cases involving federally chartered entities-and then used the words "of competent jurisdiction" in an attempt to negate automatic federal jurisdiction. If Congress in 1954 did not want to continue to confer federal jurisdiction in Fannie Mae cases, it logically would have omitted the word "Federal" from the statute, not attempted a bank shot by adding the words "of competent jurisdiction."

This analysis finds support from the fact that in 1954-the same year that Congress redrafted Fannie Mae's charter-Congress also revised the "sue-and-be-sued" provision of the Federal Savings and Loan Insurance Corporation statute by deleting "Federal" from the original FSLIC law. The FSLIC statute as amended read: "[t]o sue and be sued ... in any court of competent jurisdiction in the United States."Pub.L. No. 83-560, § 501(1), 68 Stat. 590, 633 (1954) (amending Pub.L. No. 73-479, § 402(c)(4), 48 Stat. 1246, 1256 (1934) ("[t]o sue and be sued ... in any court of law or equity, State or Federal")). In other words, in 1934 Congress established two substantially identical "sue-and-be-sued" provisions, one for Fannie Mae and one for the FSLIC. And in 1954, Congress dropped the word "Federal" from the FSLIC statute while keeping the word "Federal" in the Fannie Mae statute. We must assume that Congress knew the jurisdictional consequences of what it was doing in 1954. The fact that Congress chose to keep that all-important word in the Fannie Mae statute but to delete it from the FSLIC statute is compelling evidence that Fannie Mae's "sue-and-be-sued" provision was meant to ensure continuing federal jurisdiction in Fannie Mae cases.

**\*5** The separate opinion's analysis of the "of competent jurisdiction" language also does not account for the congressional expectations associated with "sue-and-be-sued" provisions during the middle

of the 20th Century when this statutory change was made. A number of cases relevant to this issue had been decided in the years before 1954. To begin with, since 1824, the courts had concluded that express reference to federal courts in a sue-and-be-sued clause of a federally chartered entity would ensure federal jurisdiction. See *Osborn,* 22 U.S. (9 Wheat.) at 818;*cf. Red Cross,*505 U.S. at 252, 112 S.Ct. 2465 (earlier cases placed Congress "on prospective notice of the language necessary and sufficient to confer jurisdiction"). In 1952, moreover, the Supreme Court's decision in *Blackmar v. Guerre* made clear that using the phrase "of competent jurisdiction" would serve the objective of requiring a plaintiff to establish personal jurisdiction in cases involving corporate entities like Fannie Mae. See *Blackmar,* 342 U.S. at 516, 72 S.Ct. 410.Because of *Blackmar,* Congress might have thought the textual formula approved in 1942 in D'Oench, Duhme-"in any court of law or equity, State or Federal"-did not suffice to require a showing of personal jurisdiction. In addition, as of 1954, Congress would not have thought that using the phrase "of competent jurisdiction" could negate federal jurisdiction in Fannie Mae cases; several recent circuit precedents had interpreted sue-and-be-sued clauses that included the phrase "of competent jurisdiction" and found federal jurisdiction. See *George H. Evans & Co. v. United States,* 169 F.2d 500, 502 (3d Cir.1948); *Seven Oaks v. Fed. Hous. Admin.,* 171 F.2d 947, 948-49 (4th Cir.1948); *Ferguson v. Union Nat'l Bank,* 126 F.2d 753, 756-57 (4th Cir.1942). The Evans and Ferguson cases specifically relied on the "of competent jurisdiction" language, moreover, to hold that federal district courts had jurisdiction over cases involving federal entities that otherwise might be considered subject to the Tucker Act and shoehorned into the Court of Claims. Therefore, we think it abundantly clear that Congress in 1954 would not have thought or intended the words "of competent jurisdiction" to negate automatic federal jurisdiction for Fannie Mae cases.[FN4]

In sum, in interpreting the Fannie Mae statute, we see no need to muddy the waters by departing from *Red Cross's* clear rule for interpreting the text of a federally chartered entity's sue-and-be-sued clause. And even if we were to go beyond that rule in this case, the legislative background to Congress's 1954 statutory amendment strongly supports automatic federal jurisdiction in Fannie Mae cases. We therefore hold that Fannie Mae's sue-and-be-sued

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-00144-RJL     Document 31-2     Filed 08/27/2008     Page 10 of 21

--- F.3d ----                                                                      Page 10
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

clause confers federal subject-matter jurisdiction.

The jurisdictional issue resolved, we turn to the merits of the complaint.

III

Plaintiffs concede that they did not attempt to make a pre-suit demand on the Board as is ordinarily required for shareholder derivative suits. Rather, plaintiffs allege that a demand on the Board would have been futile because a majority of the Board was not "disinterested" and "independent."

*6 [5] When plaintiffs filed the relevant complaint, there were 13 directors on Fannie Mae's Board. This included three corporate officers: then-CEO Franklin D. Raines, then-CFO J. Timothy Howard, and current-CEO Daniel H. Mudd. It also included 10 outside directors: Stephen B. Ashley, Kenneth M. Duberstein, Thomas P. Gerrity, Ann Korologos, Frederic V. Malek, Donald B. Marron, Anne Mulcahy, Joe K. Pickett, Leslie Rahl, and H. Patrick Swygert. To prove demand futility, plaintiffs must prove that a majority of the Board at the time of the complaint-here, at least seven directors-lacked the necessary disinterestedness and independence to evaluate the suit. For purposes of this appeal only, it is conceded that Raines, Howard, and Mudd were not disinterested and independent. So for demand to be excused, the complaint must create a "reasonable doubt" about the disinterestedness or independence of at least four of the 10 outside directors. *See Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984).

Federal Rule of Civil Procedure 23.1 mandates that a complaint in a shareholder derivative suit "state with particularity ... the reasons for ... not making the effort" to make a demand. FED. R. CIV. P. 23.1(b)(3). Plaintiffs state three main reasons to support their argument of demand futility.

*First,* plaintiffs allege that demand is excused on their accounting-related claims. They argue that there was a "reasonable doubt" about the directors' "disinterestedness" to consider a demand because, in plaintiffs' view, there is a "substantial likelihood" that a majority of the directors would be liable on the accounting-related claims for failure to exercise proper oversight. *See Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993) (internal quotation marks omitted).

*Second,* plaintiffs allege that demand is excused on their severance-related claims. They allege that there was a "reasonable doubt" about the Board's "disinterestedness" to consider a demand because, in plaintiffs' view, the directors did not exercise valid "business judgment" in approving the severance arrangements for Raines and Howard. *See Aronson,* 473 A.2d at 815.

*Third,* plaintiffs allege that demand is excused on both sets of claims because there was a "reasonable doubt" about a majority of the Board's "independence" to consider a demand in light of the various professional, charitable, and personal entanglements among Board members. *See Beam v. Stewart,* 845 A.2d 1040, 1049 (Del.2004).

A

[6] With respect to the accounting-related claims, plaintiffs contend that demand is excused because there was a reasonable doubt about the disinterestedness of a majority of the directors: They claim that a majority of the directors face a "substantial likelihood" of personal liability as a result of their failure to exercise sufficient oversight. *See Rales,* 634 A.2d at 934, 936.

[7][8] Liability predicated on a Board's failure to exercise oversight "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."*In re Caremark Int'l, Inc. Derivative Litig.,* 698 A.2d 959, 967 (Del.Ch.1996); *see also Stone v. Ritter,* 911 A.2d 362, 372 (Del.2006). The standard "requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)."*Stone,* 911 A.2d at 369.As relevant here, plaintiffs must allege particularized facts demonstrating that the directors "knew that they were not discharging their fiduciary obligations" and failed to act "in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities."*Id. at 370.*

*7 [9] According to plaintiffs, the complaint alleges that the directors crossed that line by failing to adequately respond to several "red flags": (1) a $200

--- F.3d ----                                    Page 11
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

million audit difference originating in 1998; (2) a whistleblower's complaints that Fannie Mae was improperly manipulating earnings; (3) signs that Fannie Mae management was using improper hedge accounting practices; and (4) sister company Freddie Mac's disclosure in 2003 that it had understated profits. Plaintiffs' Br. at 44-55. We disagree that these allegations create a "substantial likelihood" of personal liability for the directors. On each claim, the Board or its relevant committee looked into the matter and relied on internal or external accounting experts and officials responsible for those matters. As the District Court correctly stated, "plaintiffs' own allegations demonstrate that the directors actually responded to each of the 'red flags' cited by plaintiffs."*In re Fed. Nat'l Mortgage Ass'n Litig., 503 F.Supp.2d 9, 19 (D.D.C.2007)* (emphasis omitted). Under Delaware law, a Board of Directors is not a Board of Accountants. Although the allegations (if true) may show negligence by the Board, they do not meet the very high standards set by Delaware law for director oversight liability.

*First,* plaintiffs claim that the directors ignored a $200 million audit difference originating in 1998. Second Am. Comp. at ¶¶ 28-30. That year, Fannie Mae incurred $440 million of expenses on its mortgage holdings. *Id.* at ¶ 28.Instead of adjusting its income by $440 million, Fannie Mae adjusted its income by $240 million and deferred the remaining expenses to subsequent years. *Id.* at ¶ 29.Deferring the expenses and engaging in other manipulative accounting practices enabled Fannie Mae to meet its performance target and thus increased the company executives' incentive-based compensation. *Id.* at ¶¶ 31-32.

Plaintiffs claim that the directors ignored the audit difference. But plaintiffs' own allegations demonstrate that the directors did in fact address the issue. Second Am. Comp. at ¶ 30. The complaint states that the Audit Committee-a standing committee of the Board of Directors-met with KPMG, Fannie Mae's outside auditor, to discuss the audit difference. And KPMG agreed with Fannie Mae's treatment of the expenses. *Id.*

[10] Under Delaware law, directors are insulated from liability when they rely in good faith on the opinions of outside experts who are acting within their expertise. *See*DEL. CODE ANN. tit. 8 § 141(e);

*Brehm v. Eisner, 746 A.2d 244, 261-62 (Del.2000)*. The complaint shows that the Audit Committee relied on KPMG's opinions with respect to the audit difference, which turned this allegedly red flag into a green flag.

*Second,* according to plaintiffs, the directors ignored whistleblower Roger Barnes's complaints that Fannie Mae was improperly manipulating earnings. Second Am. Comp. at ¶ 98. Barnes was a mid-level accountant; in 2003, he wrote a detailed memorandum to internal auditors regarding what he considered to be improper accounting practices at Fannie Mae. *Id.* at ¶¶ 98, 362.The complaint alleges that the Audit Committee of the Board learned about the memorandum but deliberately dismissed Barnes's revelations, letting them lie without further investigation and permitting the accounting violations to continue.

**\*8** But again, the complaint shows that the Audit Committee responded.*Id.* at ¶ 365.Shortly after learning of the memo, the Audit Committee, company executives, and KPMG convened to review and discuss Barnes's allegations. *Id.*; OFHEO Final Report, Joint Appendix ("J.A.") 714. At this meeting, the Audit Committee "expressed satisfaction with the results of the review" and commended company officers for working quickly to address the concerns. Second Am. Comp. at ¶ 366 (internal quotation marks omitted).

As explained above, directors are insulated from liability when they rely in good faith on the opinions of outside experts who are acting within their expertise. Directors also are "fully protected in relying in good faith" upon the "opinions, reports or statements presented to the corporation by any of the corporation's officers or employees," so long as the Board "reasonably believes" that such matters are "within such other person's professional or expert competence."DEL. CODE ANN. tit. 8 § 141(e). With respect to the Barnes Memorandum, plaintiffs have not put forth particularized facts undermining the Audit Committee's reliance on officials who were responsible for these issues and who assured the Committee that the situation had been resolved. It is not as if the Audit Committee took the Barnes Memo from the in-box and put it in the out-box without taking any action.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----                                                              Page 12
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

*Third,* plaintiffs allege that the Assets and Liabilities Policy Committee-another standing committee of the Board of Directors-should have known that management was using improper "hedge accounting" practices. According to plaintiffs, Fannie Mae's executives improperly applied "hedge accounting" principles to derivatives, thereby spreading the company's losses on derivatives over a number of years rather than booking them immediately. But the complaint alleges only that the directors should have known about the accounting violations even though KPMG assessed the implementation of this accounting policy. Second Am. Comp. at ¶¶ 256-57, 399. Again, therefore, this allegation does not create a substantial likelihood of personal liability under the standards of Delaware law for director oversight claims.

*Fourth,* plaintiffs assert that the directors failed to sufficiently react after Fannie Mae's sister organization Freddie Mac disclosed in 2003 that it had "understated profits" in an effort to "smooth earnings and maintain its image on Wall Street as a steady performer."Second Am. Comp. at ¶ 343. Plaintiffs allege that the "similarities between Fannie Mae and Freddie Mac and the common issues that were the focus of the Freddie Mac violations should have ... serve[d] as 'red flags' " alerting the directors to Fannie Mae's financial manipulations. *Id.* at ¶ 346.The problem for plaintiffs is that the Board of Directors responded to the news about Freddie Mac. The directors met multiple times to discuss the Freddie Mac situation. Second Am. Comp. at ¶¶ 344, 345, 347, 348, 349, 351, 353. At those meetings, the company's financial officers contrasted Freddie Mac's practices with Fannie Mae's and assured the Board that Fannie Mae's accounting was sound. *See* OFHEO Final Report, J.A. 766-67. Again, because the outside directors relied on representations of internal financial experts, they are protected against personal liability.

**\*9** In sum, the complaint fails to establish a substantial likelihood of personal liability for the outside directors on the accounting-related claims. Therefore, under Delaware law, the accounting-related allegations do not create a reasonable doubt about the disinterestedness of the Board to consider a demand with respect to those claims.[FN5]

B

On the severance-related claims, plaintiffs allege that the directors' decisions to allow Raines and Howard "to resign or retire with more than $31 million in severance benefits" and to absolve the executives of their "legal obligation to disgorge compensation that they had procured via accounting manipulations and insider trading" create a "reasonable doubt" that they were the product of a valid business judgment by the directors. Plaintiffs' Br. at 29; *Aronson, 473 A.2d at 814.*[FN6]

[11][12][13][14]  The business judgment rule establishes a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."*Aronson, 473 A.2d at 812.*As plaintiffs acknowledge, the business judgment rule protects decisions unless "no reasonable business person" would have made the decision. Plaintiffs' Br. at 41 (internal quotation marks omitted). Under this principle, courts rarely second-guess directors' compensation and severance decisions because the "size and structure of executive compensation are inherently matters of judgment."*Brehm, 746 A.2d at 263.*Plaintiffs thus must allege "particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision."*See In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 286 (Del.Ch.2003)*(*Disney II* ).

[15]  To support their claim that the directors' severance decision was not a valid business judgment, plaintiffs rely on the *Disney II* case. There, the Delaware Chancery Court found that the board's decision not to seek a termination based on fault or to inquire into the terms and conditions of the termination agreement was not entitled to the protection of the business judgment rule. *See Disney II, 825 A.2d at 286-87.*As the *Disney II* court described it, the complaint demonstrated that the "defendant directors consciously and intentionally disregarded their responsibilities, adopting a 'we don't care about the risks' attitude concerning a material corporate decision."*Id. at 289* (emphasis omitted). The court accordingly concluded that plaintiffs sufficiently alleged that the directors breached their "obligation to act honestly and in good

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

faith in the corporation's best interests" and thus their decision "fell outside the protection of the business judgment rule."*Id.*

But plaintiffs here fail to allege particularized facts that demonstrate that the process was similarly flawed or that the directors acted without adequate information or deliberation. The complaint itself acknowledges that the termination decision was made in a *series* of board meetings held over *several days.*Second Am. Comp. at ¶ 414 (termination decision "discussed in Board meetings on December 19, 20 and 21, 2004").

**\*10** The complaint alleges that the "issue was not discussed by the Compensation Committee, which had no meetings during this timeframe."*Id.* But that is a red herring because the Compensation Committee is a standing committee of the Board of Directors. The individuals who sat on the Compensation Committee also sat on the Board of Directors, and the full Board met at length to discuss the severance issue.

Plaintiffs also point to the fact that the directors made the decision without the assistance of any compensation consultants. But that is irrelevant: The question in this case is not about an initial compensation package but instead a judgment about for-cause termination and what kind of severance was best for the short- and long-term interests of the company.

Plaintiffs allege that even if procedurally sound, the severance decision was substantively flawed because Raines's and Howard's fraudulent acts constituted grounds to terminate them for cause. But in the analogous case of *Brehm v. Eisner,* the Supreme Court of Delaware dismissed a similar claim because the complaint failed to allege that the directors did not act within their discretion in awarding an underperforming executive a severance package. *746 A.2d 244 (Del.2000).* The court found two business reasons that could support the directors' decision: First, the company would likely have to litigate any dispute over the reasons for termination and "persuade a trier of fact and law" that the decision was warranted under the contract. *Id.* at 265.Second, "that process of persuasion could involve expensive litigation, distraction of executive time and company resources, lost opportunity costs, more bad publicity

and an outcome that was uncertain at best and, at worst, could have resulted in damages against the Company."*Id.*

So too here. Even if the directors had grounds to invoke the "for cause" termination provisions, the directors reasonably could have decided not to invoke those provisions because Fannie Mae likely would have had to spend enormous time and resources over many years litigating the decision. The Board reasonably may have decided that going forward, it was more important to cut ties and dedicate the company's resources to righting the ship.

[16] Plaintiffs also contest the directors' decision not to sue Raines and Howard for disgorgement under § 304 of the Sarbanes-Oxley Act of 2002. *15 U.S.C. § 7243(a).* That statutory provision establishes that the SEC may sue the CEO and CFO of a company when the company has been required to restate its earnings due to noncompliance with securities laws. *Id.*

[17] The problem is that § 304 does not create a private right of action. And contrary to the suggestion in plaintiffs' brief, which relies on 1970s-era cases, courts today rarely create implied private rights of action; courts generally deem it Congress's prerogative to make that decision. *See Stoneridge Inv. Partners v. Scientific-Atlanta, --- U.S. ----, 128 S.Ct. 761, 772-73, 169 L.Ed.2d 627 (2008); Kogan v. Robinson, 432 F.Supp.2d 1075, 1076 (S.D.Cal.2006)* (holding that § 304 does not create private remedy); *In re Whitehall Jewellers, Inc. S'holder Derivative Litig., 2006 WL 468012, at \*7 (N.D.Ill.2006)* (same); *In re BISYS Group Inc. Derivative Action, 396 F.Supp.2d 463, 464 (S.D.N.Y.2005)* (same); *Neer v. Pelino, 389 F.Supp.2d 648, 655 (E.D.Pa.2005)* (same). As a result, the directors' decision not to devote corporate assets to pursue such an uncertain cause of action was certainly a reasonable one.

**\*11** In sum on the severance-related claims, the complaint fails to create a reasonable doubt about the Board's disinterestedness to consider a demand because it fails to create a reasonable doubt whether the Board exercised a valid business judgment.[FN7]

C

[18] Finally, plaintiffs argue that nearly all of the 10 outside directors lacked the necessary

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-00144-RJL   Document 31-2   Filed 08/27/2008   Page 14 of 21

--- F.3d ----                                                                 Page 14
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

"independence" to evaluate the demand because (1) the Raines-controlled Fannie Mae Foundation made charitable donations to non-profit organizations affiliated with individual Board members, (2) the directors had other conflicting business and personal relationships with each other, and (3) Raines otherwise controlled and dominated the directors. *See Rales, 634 A.2d at 934;Aronson, 473 A.2d at 814.*"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."*Aronson, 473 A.2d at 816*.

The brief for the directors dismisses those allegations as plainly insufficient under Delaware law. Yet in their 30-page reply brief, plaintiffs make no mention of this "independence" argument. Although not a waiver, the reply brief's silence on the subject is a telling indication of this argument's lack of weight under Delaware law.

[19] The basic hurdle for plaintiffs stems from the fact that the kinds of relationships alleged in the complaint exist at many companies. Directors tend to be experienced and accomplished business persons; those individuals also tend to be comparatively wealthy and have a wide range of professional and charitable affiliations and relationships. It is usually considered in the interests of corporations and their shareholders to attract experienced and accomplished business leaders as directors. So as not to preclude service by such persons, Delaware law creates a very high bar for using the kinds of relationships alleged here as a basis for finding a lack of independence and thereby excusing demand in a derivative suit.

[20]*First,* the complaint alleges that outside directors Duberstein, Gerrity, Malek, Marron, Swygert, and Korologos are beholden to Raines because he was Chairman of the Board of the Fannie Mae Foundation, which made charitable grants to non-profit organizations with which the directors were affiliated. Second Am. Comp. at ¶ 116. For those donations to be relevant, plaintiffs must allege that Raines "has the unilateral power ... to decide whether the challenged director continues to receive a benefit...."*Orman v. Cullman, 794 A.2d 5, 25 n. 50 (Del.Ch.2002)*. But the complaint does not allege any particularized facts showing that Raines controlled who received donations or determined the size of grants. We thus conclude that the contributions to

non-profit charities and organizations provide no basis for us to question the independence of the directors for purposes of Delaware law.

[21][22]*Second,* plaintiffs allege that outside directors Duberstein, Pickett, Korologos, Malek, Marron, Ashley, and Swygert have "business and/or personal relationships with each other, or with immediate families of other defendants, that would conflict with their ability to objectively determine whether it would be appropriate to bring suit against other Fannie Mae current and former officers and/or directors."Second Am. Comp. at ¶ 132. But allegations of "mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."*Stewart, 845 A.2d at 1050.*Only professional or personal friendships that "border on or even exceed familial loyalty and closeness[ ] may raise a reasonable doubt whether a director can appropriately consider demand."*Id.* (internal quotation marks omitted). The Delaware Supreme Court has instructed that "[n]ot all friendships, or even most of them, rise to this level and the Court cannot make a reasonable inference that a particular friendship does so without specific factual allegations to support such a conclusion."*Id.* (internal quotation marks and emphasis omitted). We need not dally long on this allegation: The commonplace business, professional, and personal relationships alleged in this case are not remotely sufficient under Delaware law to disqualify the challenged directors from evaluating demand in an independent manner.

**\*12** [23]*Third,* plaintiffs allege that the directors lacked independence because Raines "controlled" a majority of the Board. But the complaint cites no particularized facts to support this charge other than that the Board often approved Raines's proposed decisions. This does not suffice under Delaware law to demonstrate that Raines so controlled the directors' decisionmaking as to mean they lacked independence to consider a demand. As the Delaware courts have stated, the "shorthand shibboleth of dominated and controlled directors" is insufficient. *Aronson, 473 A.2d at 816* (internal quotation marks omitted).

In sum, under the standards set forth by Delaware law, the complaint's allegations do not create a reasonable doubt about the Board's independence to

--- F.3d ----                                                                    Page 15
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

consider a demand.

         * * *

We affirm the District Court's judgment dismissing
the complaint.

*So ordered.*

BROWN, Circuit Judge, concurring in the judgment:
After 182 pages of briefing by 39 attorneys who have
strained to squeeze this case into their preferred
courtroom, I still-even after reading the majority
opinion-haven't heard a decent argument for federal
subject-matter jurisdiction. All parties in this
litigation teamed up to manufacture jurisdiction, but,
needless to say, parties cannot create subject-matter
jurisdiction, *see Kline v. Burke Constr. Co.,* 260 U.S.
226, 233-34, 43 S.Ct. 79, 67 L.Ed. 226 (1922).
Neither can judges, for doing so misappropriates
Congress's jurisdiction-conferring role, *id.,* and
invalidly scoops cases out of state court. And these
principles are especially important in a case where
Congress amended the supposedly jurisdictional
statute to make clear Fannie Mae may only sue or be
sued in courts that have "competent jurisdiction"-that
is, subject-matter jurisdiction. The majority's
misreading of Supreme Court precedent and
disregard for statutory text lead it to erroneously
conclude we have jurisdiction.

         I

Fannie Mae's sue-and-be-sued clause does not, as the
majority contends, create "automatic" federal
subject-matter jurisdiction, *see* maj. op. at ----, ---- - -
---. Most of the majority's mistakes flow from its
misinterpretation of *American National Red Cross v.
S. G.,* 505 U.S. 247, 112 S.Ct. 2465, 120 L.Ed.2d 201
(1992).

         A

In *Red Cross,* the Court declared "a congressional
charter's 'sue and be sued' provision *may* be read to
confer federal court jurisdiction if, but only if, it
specifically mentions the federal courts."505 U.S. at
255, 112 S.Ct. 2465 (emphasis added). Based on this
language, the majority concludes Fannie Mae's sue-
and-be-sued clause creates jurisdiction *simply
because* it mentions the federal courts. I would apply

this silly test if *Red Cross* actually created it. But *Red
Cross* did no such thing. Rather, *Red Cross* stands for
the unremarkable rule that mentioning federal courts
is necessary, but not always sufficient, to confer
jurisdiction. Three key rationales support this
commonsense interpretation.

First, the majority's reading of *Red Cross* is
implausible. Consider this hypothetical statutory
provision: "Fannie Mae may sue and be sued in
federal court *only if* another statute independently
confers subject-matter jurisdiction."Under the
majority's test, this hypothetical provision would
create "automatic federal jurisdiction" simply
because it *mentions* federal courts-even though the
text evinces a contrary meaning. But that cannot be; a
mere mention of federal courts cannot justify
disregarding statutory barriers to federal jurisdiction.
In short, the phrase "federal courts" isn't a talisman.

**\*13** Second, the majority's (mis)interpretation of *Red
Cross* is belied by *Red Cross* itself. After all, if a
mere textual mention of federal courts was sufficient,
then the *Red Cross* Court wasted many pages
articulating other rationales and examining the
jurisprudential backdrop against which Congress
enacted the Red Cross charter. Certainly a brief
discussion would have sufficed to create the
talismanic "I see the phrase 'federal courts' so it *must*
be jurisdictional" test. Instead, *Red Cross*
substantially relied on the timing of an amendment to
Red Cross's charter by applying the canon that
Congress is "presumed to intend [the] judicially
settled meaning of terms."*Red Cross,* 505 U.S. at
252, 257, 112 S.Ct. 2465;*see K.V. Mart Co. v. United
Food & Commercial Workers Int'l Union, Local 324,*
173 F.3d 1221, 1224-25 (9th Cir.1999) (per curiam)
(*Red Cross* is "premised" on this canon).*Red Cross*
also discussed numerous sources of legislative
history. 505 U.S. at 261-62, 112 S.Ct. 2465.But the
majority's interpretation would render these portions
of *Red Cross* "entirely meaningless," [FN1] and "I am
reluctant to reach that conclusion about Supreme
Court decisions."*Agri Processor Co., Inc. v. NLRB,*
514 F.3d 1, 12-13 (D.C.Cir.2008) (Kavanaugh, J.,
dissenting).

Third, *Red Cross's* use of the word "may" is
significant. *Red Cross* announced that a sue-and-be-
sued clause mentioning federal courts "*may* be read
to confer federal court jurisdiction." *Id.* at 255, 112

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----                                                                                Page 16
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

S.Ct. 2465 (emphasis added). Importantly, the word "may" is generally "employed to imply permissive, optional or discretional, and not mandatory action."BLACK'S LAW DICTIONARY 979 (deluxe 6th ed.1990); *see, e.g., United States v. Lexington Mill & Elevator Co., 232 U.S. 399, 411, 34 S.Ct. 337, 58 L.Ed. 658 (1914).* Thus, when a sue-and-be-sued clause mentions federal courts, a court is *permitted* to interpret the clause as conferring jurisdiction, and it should do so only when the statutory text and amendment history support such a reading. *Red Cross* did not command federal courts to shirk their responsibility to examine "the ordinary sense of the language used [and] basic canons of statutory construction,"505 U.S. at 263, 112 S.Ct. 2465, in reaching an ultimate conclusion about the clause's meaning.[FN2]

In sum, under *Red Cross,* a sue-and-be-sued clause mentioning federal courts may (or may not) be jurisdictional-because mentioning federal courts is necessary (but not always sufficient) to confer jurisdiction. And even if *Red Cross* flirted with a magic-words test by emphasizing "federal courts" and ignoring other aspects of the Red Cross charter's text, the Court could not have intended to apply this test where Congress specifically amended the charter to add a jurisdictional limitation, as Congress did here.

B

Interpreting Fannie Mae's sue-and-be-sued clause according to "the ordinary sense of the language used [and] basic canons of statutory construction,"*Red Cross,* 505 U.S. at 263, 112 S.Ct. 2465, demonstrates the clause does not create subject-matter jurisdiction. According to the majority, a charter provision authorizing Fannie Mae to sue and be sued "*in any court of competent jurisdiction* " is a declaration that all federal district courts have competent jurisdiction. *See*12 U.S.C. § 1723a (emphasis added); Maj. Op. at ---- - ----. Because "competent jurisdiction"-a phrase not present in the Red Cross's charter-refers to subject-matter jurisdiction, Fannie Mae may only sue or be sued "in any court" that has an independent source of subject-matter jurisdiction.

***14** In 1954 Congress amended Fannie Mae's charter by inserting the words "[in any court of] competent jurisdiction."*Compare*Pub.L. No. 73-479, §

301(c)(3), 48 Stat. 1246, 1253 (1934) (authorizing Fannie Mae "[t]o sue and be sued, complain and defend, *in any court* of law or equity, State or Federal" (emphasis added)), *with*Pub.L. No. 83-560, § 201, 68 Stat. 590, 620 (1954) (authorizing Fannie Mae "to sue and to be sued, and to complain and to defend, *in any court of competent jurisdiction,* State or Federal" (emphasis added)).*Red Cross* explained that such "a change in language [should] be read, if possible, to have some effect."505 U.S. at 263, 112 S.Ct. 2465;*see also Fund for Animals, Inc. v. Kempthorne, 472 F.3d 872, 877 (D.C.Cir.2006)* ("[C]ourts presume that Congress has used its scarce legislative time to enact statutes that have some legal consequence.").

Our task is to determine what Congress accomplished by adding the phrase "[court of] competent jurisdiction." As the Supreme Court has repeatedly emphasized, the phrase "competent jurisdiction" almost always refers to subject-matter jurisdiction. *See, e.g., Wachovia Bank, Nat'l Ass'n v. Schmidt,* 546 U.S. 303, 316, 126 S.Ct. 941, 163 L.Ed.2d 797 (2006); *United States v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984); *Califano v. Sanders,* 430 U.S. 99, 106 n. 6, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (suggesting a statute required "an independent jurisdictional foundation" largely because it limited judicial review to " 'a court of competent jurisdiction,' " which "seem[ed] to look to outside sources of jurisdictional authority"); *cf.Kontrick v. Ryan,* 540 U.S. 443, 454, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004). Just two years ago, the Court unambiguously declared: "*Subject-matter jurisdiction* ... concerns a court's *competence* to adjudicate a particular category of cases." *Wachovia Bank,* 546 U.S. at 316, 126 S.Ct. 941 (emphasis added); *see Kontrick,* 540 U.S. at 454, 124 S.Ct. 906 (treating "what cases ... courts are competent to adjudicate" as an issue of subject-matter jurisdiction). "Competent jurisdiction" rarely refers to personal jurisdiction. Indeed, "[a]s far back as *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1878), [courts] drew a clear distinction between a court's 'competence' and its jurisdiction over the parties."*Morton,* 467 U.S. at 828 n. 6, 104 S.Ct. 2769.Leading commentators likewise treat a court's "competence" to hear a case as an issue of subject-matter jurisdiction. *See* 13 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 3522 (2d ed.1984). So does *Black's Law Dictionary.*BLACK'S

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

LAW DICTIONARY 355, 426 (rev. 4th ed.1968) (defining "court of competent jurisdiction" as one "having power and authority of law ... to do the particular act," and explaining the term "competent authority," "[a]s applied to courts," means "legal authority to deal with the particular matter in question"); *id.* 379, 459 (3d ed.1933) (same).

The majority contends the Supreme Court overruled this well-settled meaning of "competent jurisdiction" in one vague half-sentence in *Breuer v. Jim's Concrete of Brevard, Inc.,* 538 U.S. 691, 123 S.Ct. 1882, 155 L.Ed.2d 923 (2003).*See* Maj. Op. at ----. But "[c]ourts do not normally overturn a long line of earlier cases without mentioning the matter,"*John R. Sand & Gravel Co. v. United States,* --- U.S. ----, 128 S.Ct. 750, 756, 169 L.Ed.2d 591 (2008), and they especially do not do so in equivocal half-sentences. Perhaps this is why the parties-who have not exactly been shy about making jurisdictional arguments that stretch the bounds of credulity-refused to place much reliance on *Breuer,* even when specifically prompted to do so at oral argument.[FN3]

**\*15** Flailing to find some meaning for the statute's "competent jurisdiction" limitation, the majority claims Congress inserted this phrase to "clarify that ... litigants in state courts of limited jurisdiction must satisfy the appropriate jurisdictional requirements."*See* Maj. Op. at ----. I disagree. For if authorization "to sue and be sued ... in any court of competent jurisdiction, State or Federal," clarifies that there must be a separate source of state jurisdiction, why does it not also clarify that there must be an independent source of federal jurisdiction? *See*12 U.S.C. § 1723a(a). Surely "competent jurisdiction" modifies both "State" and "Federal" in Fannie Mae's charter. *See id.*In addition, the majority's citation of the statute construed in *Osborn v. Bank of the United States* is ironic, because the "competent jurisdiction" phrase in that statute only referred to state courts (but not federal courts).*See*22 U.S. (9 Wheat.) 738, 817, 6 L.Ed. 204 (1824) (authorizing suit "in all state courts having competent jurisdiction, and in any circuit court of the United States"). If, as the majority asserts, Congress added "competent jurisdiction" to Fannie Mae's charter to clarify that an independent jurisdictional grant is required in state (but not federal) courts, one would expect the verbal formulation to look something like the statute in *Osborn.*It does not.

In another effort to give "competent jurisdiction" some meaning, appellees imply the phrase might refer to personal jurisdiction. Although this interpretation is contrary to the phrase's ordinary meaning, *Morton,* 467 U.S. at 828 n. 6, 104 S.Ct. 2769, the majority embraces this interpretation, *see* maj. op. at ---- - ----. However, appellees' half-hearted argument is quite telling, because the furthest they will go is to argue personal jurisdiction *occasionally* represents one "*component* of a court's 'competent jurisdiction.' " Rule 28(j) Letter, Apr. 21, 2008 (emphasis added); *cf.*Blackmar v. Guerre, 342 U.S. 512, 513-16, 72 S.Ct. 410, 96 L.Ed. 534 (1952) (interpreting "competent jurisdiction" to require personal jurisdiction, but giving no indication that an independent source of subject-matter jurisdiction was not also required). There are two types of jurisdiction: personal jurisdiction and subject-matter jurisdiction. *Cf.* Kontrick, 540 U.S. at 455, 124 S.Ct. 906; 1 ROBERT C. CASAD & WILLIAM M. RICHMAN, JURISDICTION IN CIVIL ACTIONS § 1-1 (3d ed.2004). If, as appellees argue, personal jurisdiction is one of the components of a court's "competent jurisdiction," then the other component must be subject-matter jurisdiction. Thus, appellees' best argument is that the sue-and-be-sued clause requires personal jurisdiction *and* an independent source of subject-matter jurisdiction. If that is the case, the sue-and-besued clause does not create subject-matter jurisdiction.

The majority also suggests the words "competent jurisdiction" "clarify that ... litigants relying on the 'sue-and-besued' provision can sue in federal district courts but not necessarily in all federal courts."Maj. Op. at ---- - ----. But the authority cited by the majority directly undercuts this proposition. The majority cites the Supreme Court's conclusion that Red Cross's authorization to sue and be sued in federal court only includes district courts-not all federal courts. See Maj. Op. at ---- (citing Red Cross, 505 U.S. at 256 n. 8, 112 S.Ct. 2465;*id.* at 267, 112 S.Ct. 2465 (Scalia, J., dissenting)). But if that is the case, Congress would have no need to clarify this point by adding the "competent jurisdiction" language.

**\*16** At bottom, the majority provides no convincing reason to give the statute's words anything other than their ordinary meaning. Because "competent

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-00144-RJL    Document 31-2    Filed 08/27/2008    Page 18 of 21

--- F.3d ----                                                              Page 18
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

jurisdiction" refers to subject-matter jurisdiction, Fannie Mae's sue-and-be-sued clause is functionally equivalent to the hypothetical statute described at the beginning of this opinion: Fannie Mae may sue and be sued "in any court of competent jurisdiction," meaning it may only sue in a court with an independent basis of jurisdiction. Yet the majority presses its counter-textual conclusion that this clause *creates* jurisdiction. I disagree, and the additional interpretive principles to which I now turn support my textual analysis.

*Red Cross* relied on the canon that Congress is "presumed to intend [the] judicially settled meaning of terms,"505 U.S. at 252, 112 S.Ct. 2465, but that canon undercuts the majority's position here. In 1942, the Court held the FDIC's charter was jurisdictional. *See id.* at 254, 112 S.Ct. 2465.Just five years later, in 1947, Congress amended the Red Cross's charter, making its language "in all relevant respects identical" to the FDIC's charter. *Id.* at 257, 112 S.Ct. 2465.The *Red Cross* Court found this significant, explaining "Congress may well have relied on [the Court's 1942 holding] to infer" that amending the Red Cross's charter in this way would make it jurisdictional.*Id.* at 260, 112 S.Ct. 2465;*see id.* at 263, 112 S.Ct. 2465;*K.V. Mart*, 173 F.3d at 1224-25 (*Red Cross* is "premised" on this principle). But Red Cross's rationale cuts exactly the opposite way here. Fannie Mae's charter had contained text virtually identical to that already deemed jurisdictional by the Court, but then Congress decided to add a phrase that functions as a jurisdictional restriction. Thus, unlike Red Cross, where the amendment "tug [ged] hard toward a jurisdictional reading,"*id.* at 263, 112 S.Ct. 2465, here Congress inserted a phrase that militates against such a reading.

In addition, Congress placed the "competent jurisdiction" limitation in Fannie Mae's sue-and-be-sued clause-but not Freddie Mac's clause, which is almost the same in every other respect. *Compare*12 U.S.C. § 1723a(a) (authorizing Fannie Mae "to sue and to be sued, and to complain and to defend, *in any court of competent jurisdiction,* State or Federal" (emphasis added)), *with*12 U.S.C. § 1452(c) (authorizing Freddie Mac "to sue and be sued, complain and defend, in any State, Federal, or other court"). We should be reluctant to disregard this important difference in language-especially when the two provisions containing the disparate language

appear in the same title of the U.S. Code and involve such interrelated organizations as Fannie Mae and Freddie Mac. *See, e.g., Branch v. Smith*, 538 U.S. 254, 281, 123 S.Ct. 1429, 155 L.Ed.2d 407 (2003) (plurality) (noting "it is, of course, the most rudimentary rule of statutory construction ... that courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part").

*17 In sum, each interpretive tool utilized by the *Red Cross* Court-statutory text, the amendment timeline of the charter juxtaposed against relevant Supreme Court decisions, interpretive canons, and other statutory provisions-demonstrates Fannie Mae's sue-and-be-sued clause does not create jurisdiction.

                              C

At first blush, it might seem reasonable for subject-matter jurisdiction to exist in all cases where a federally chartered entity such as Fannie Mae is a party. However, a federal court cannot declare it has power (jurisdiction) over a case simply by declaring it would be good policy for it to have that power. *See Pub. Citizen v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1287-88 (D.C.Cir.2007) ("[T]his court simply is not at liberty to displace, or to improve upon, the jurisdictional choices of Congress," and "[d]iscretionary considerations of 'fairness or efficiency' do not authorize us ... to disregard plain statutory terms assigning a different court initial subject-matter jurisdiction over a suit."). I cannot employ such a self-aggrandizing approach, because it is not courts' job to make policy-much less when that policy inflates the judicial role at the expense of Congress and the states. *See Kline*, 260 U.S. at 234, 43 S.Ct. 79 (holding the lower federal courts "derive[ ] [their] jurisdiction wholly from the authority of Congress"); WRIGHT, MILLER, & COOPER,*supra,* § 3522 ("[I]f the federal courts ... entertain cases not within their jurisdiction," an "unconstitutional invasion of the powers reserved to the states" occurs.) Yet today the majority gives Fannie Mae an "automatic" ticket out of state court anytime it is sued-something only Congress can do.

Moreover, if policy choices are relevant to this inquiry, they at least need to comport with those of Congress. Two points are relevant here. First, Congress statutorily rejected the notion that federal courts should always have subject-matter jurisdiction

--- F.3d ----                                                                                         Page 19
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

in cases where a federally chartered entity is a party. While "involvement of a federally chartered corporation" *used to be* sufficient to create federal subject-matter jurisdiction, *Red Cross,* 505 U.S. at 251, 112 S.Ct. 2465, Congress in 1925 "diminish[ed] the flood of federal litigation" resulting from this policy, *Gov't Nat'l Mortgage Ass'n v. Terry,* 608 F.2d 614, 621 n. 10 (5th Cir.1979), by limiting "the [policy's] reach ... to federally chartered corporations in which the United States owned more than one-half of the capital stock," *Red Cross,* 505 U.S. at 251, 112 S.Ct. 2465.This statutory limitation remains today. *See* 28 U.S.C. § 1349. Second, we do not know why Congress placed the "competent jurisdiction" limitation in Fannie Mae's charter, but not in Freddie Mac's. Congress treated these similar entities differently in this respect. But, needless to say, it is not our role to upset that judgment. Moreover, if the disparate statutory language resulted from a legislative oversight, it is "beyond our province to rescue Congress from its drafting errors, and to provide for what we might think ... is the preferred result." *Lamie v. U.S. Trustee,* 540 U.S. 526, 542, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004).

II

**\*18** For the majority to be correct about the meaning of the sue-and-be-sued clause, one of the following three propositions must be true. First: The Supreme Court held that merely mentioning the phrase "federal courts" always creates jurisdiction, even where the rest of the clause plainly indicates it does not create jurisdiction. Second: Congress's amendment of Fannie Mae's charter to specifically insert the phrase "[in any court of] competent jurisdiction" is meaningless. Or third: The phrase "in any court of competent jurisdiction" has a meaning completely at odds with Supreme Court precedent (even though there is no convincing evidence to support such an interpretation). Because none of these is even plausible, I would hold we lack subject-matter jurisdiction.

FN1. The parties have agreed throughout the litigation that Delaware law applies to the analysis in this case of the demand requirement and the directors' potential liability. That is because the relevant Fannie Mae statute and regulation have been applied so as to incorporate Delaware

General Corporation Law. *See* 12 U.S.C. § 4513; 12 C.F.R. § 1710.10(b); Fannie Mae ByLaws, Corporate Governance Practices & Procedures, Art. 1, § 1.05, http://www.fanniemae.com/governance/pdf/bylaws.pdf.

FN2. Under *Gaubert v. Federal Home Loan Bank Board,* we review the District Court's decision for abuse of discretion. 863 F.2d 59, 68 n. 10 (D.C.Cir.1988). We tend to agree with plaintiffs that an abuse-of-discretion standard may not be logical in this kind of case, however, because the question whether demand is excused turns on the sufficiency of the complaint's allegations; and the legal sufficiency of a complaint's allegations is a question of law we typically review de novo. But there is no need to further consider this aspect of *Gaubert* at this time because we affirm the District Court's decision even under de novo review.

Relatedly, plaintiffs argue that that the District Court abused its discretion by relying on extraneous public reports and similar materials in evaluating the sufficiency of the complaint. The District Court's mention of those public materials did not affect its resolution of the case. In any event, those materials are not relevant to a de novo assessment of the complaint.

FN3. When the Supreme Court decided *Red Cross,* it was well aware of the opinion's significance for statutes that included the "of competent jurisdiction" language. Consistent with a position previously advanced by the Solicitor General, the Red Cross identified those "of competent jurisdiction" statutes to the Court and argued that the "of competent jurisdiction" language did not detract from the jurisdictional force of a sue-and-be-sued clause that referred to federal courts. *See* Brief of Petitioner-Appellant at 49, *Am. Nat'l Red Cross v. S.G.,* 505 U.S. 247, 112 S.Ct. 2465, 120 L.Ed.2d 201 (1992) (No. 91-594) (noting that "other entities besides the Red Cross will be affected" and explaining that "[t]he Solicitor General also has advised this Court: 'Plainly, Section

1702 [of the National Housing Act], by authorizing suit 'in any court of competent jurisdiction, State or Federal,' provides a basis for district court jurisdiction ....' ") (citing Brief for the Respondents in Opposition at 9, *Portsmouth Redevelopment & Housing Auth. v. Pierce,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983)); *see also* Petition for Writ of Certiorari at 23, *S.G. v. Am. Nat'l Red Cross,* 938 F.2d 1494 (1st Cir.1991); Brief for the United States as Amicus Curiae Supporting Petitioners at 5-6, *Am. Nat'l Red Cross v. S.G.,* 505 U.S. 247, 112 S.Ct. 2465, 120 L.Ed.2d 201 (arguing that the Supreme Court's sue-and-be-sued decisions "have established a clear rule that congressional charters provide for original jurisdiction in the federal courts whenever they specifically grant a right to sue and be sued in federal courts").

FN4. Interpreting Fannie Mae's sue-and-be-sued provision as a grant of federal jurisdiction is also consistent with the fact that Fannie Mae's later-created sibling, Freddie Mac, carries a "sue-and-be-sued" provision that, like the Red Cross's, does not include the phrase "of competent jurisdiction." *See*12 U.S.C. § 1452(c). It is logical to conclude that Congress used distinctive statutory language in the 1954 Fannie Mae statute in response to the precedents of that era. In addition, Freddie Mac-like the Red Cross-was originally created as a private entity, whereas Fannie Mae was a governmental entity until 1968. Therefore, Congress likely would not have been concerned that, absent the "of competent jurisdiction" language, Freddie Mac cases could be funneled only to the Court of Claims rather than to federal district courts, which was a potential concern in 1954 when Congress revised the Fannie Mae statute for that then-governmental entity. *Cf. Ferguson,* 126 F.2d at 756-57.

FN5. To support their claims, plaintiffs rely on the Sixth Circuit's decision applying Delaware law in *McCall v. Scott,* 239 F.3d 808 (6th Cir.2001), *amended on denial of*

*reh'g,*250 F.3d 997 (6th Cir.2001). In that case, the court excused demand in a case where the shareholders' claims arose out of "allegedly wide-spread and systematic health care fraud."*Id.* at 813.Even assuming arguendo that the result in *McCall* is consistent with the high standards set by Delaware law, *McCall* contained far more substantial allegations with respect to lack of proper directorial oversight than are contained in the complaint in this case.

FN6. It appears from the complaint that a 14th director, Wulff, was involved in the severance-related decisions, but that does not affect the analysis in this section because the complaint alleges that the severance decision was a collective decision by the outside directors (in other words, on this claim, either all were disinterested or none were disinterested).

FN7. Delaware law is not clear about whether, for this kind of *Aronson* business-judgment claim, plaintiffs' demand must show (i) a reasonable doubt about the Board's disinterestedness by showing a reasonable doubt whether the directors exercised a valid business judgment; (ii) a reasonable doubt about the Board's disinterestedness by showing a "substantial likelihood" that the directors will be personally liable for not exercising a valid business judgment; or (iii) both. It also is not clear whether there is a real difference in these formulations. Regardless, plaintiffs' severance-related claim here does not suffice under any of the possible formulations.

FN1. In the critical section of its opinion, the Court relied on the amendment to the Red Cross charter and the "judicially settled meaning" canon. *See*505 U.S. at 252, 257, 112 S.Ct. 2465.And although the Court discussed legislative history in the context of rejecting a party's arguments, it extensively analyzed the legislative materials rather than declaring such materials irrelevant in light of some newly announced magic-words test. *See id.* at 261-62, 112 S.Ct. 2465.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----                                           Page 21
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

FN2. Although the *Red Cross* Court used the phrase "necessary and sufficient," it did so when explaining that previous cases had notified Congress about language sufficient to create jurisdiction. *See* 505 U.S. at 252, 112 S.Ct. 2465. Just because those cases are examples of sufficient jurisdictional language, however, does not mean *any* reference to federal courts *always* suffices even if statutory text indicates otherwise. Moreover, the majority's contention that mentioning federal courts always suffices runs counter to *Red Cross's* holding that such a reference "may" suffice, *see id.* at 255, 112 S.Ct. 2465.

FN3. The majority's selective quotations from *Breuer* do not accurately reflect the vagueness of the relevant passage, in which the Court first concluded the plaintiff could bring his claim in district court, then quoted a statute containing "competent jurisdiction" language, and then remarked that "the district courts would *in any event* have original jurisdiction over FLSA claims under 28 U.S.C. § 1331 ... and § 1337(a)." 538 U.S. at 694, 123 S.Ct. 1882 (emphasis added).

C.A.D.C.,2008.
Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust ex rel. Federal Nat. Mortg. Ass'n v. Raines
--- F.3d ----, 2008 WL 3166142 (C.A.D.C.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.