UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHRISTOPHER DILORENZO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-144 (RJL) |
| | ) | |
| PHILLIP G. NORTON, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| EPLUS, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

$f

MEMORANDUM OPINION
(July 31, 2009)

Plaintiff Christopher DiLorenzo has brought this shareholder derivative action on behalf of ePlus inc. ("ePlus") against eight of the company's directors and/or officers (collectively, "defendants"). Plaintiff alleges that defendants were involved in a stock-options backdating scheme whereby millions of dollars of corporate assets were secretly diverted by, and/or to, defendants via the manipulation of stock-option grant dates. (Am. Compl. ¶ 1 [Dkt. #16].) Plaintiff asserts myriad federal securities law and state law claims arising out of, and in connection with, the alleged scheme. Presently before the Court is defendants' motion to dismiss [Dkt. #15]. Upon consideration of the parties' briefs, oral argument, and the entire record herein, the Court will GRANT the motion to dismiss.

1

## BACKGROUND

Companies commonly grant stock options to their officers and employees to augment such individuals' compensation and to provide an incentive for boosting the company's profitability and stock price. (*See* Am. Compl. ¶ 13.) Options are granted at a certain exercise price, or "strike price," and the recipient is given the right to purchase the company's stock at that price at a later date, after the options vest. (*Id.* ¶ 47.) Backdating occurs when the grant date for the options is selected retroactively, or in hindsight, to be a day when the market price of the stock was lower than the price on the date the option is actually granted. (*Id.* ¶ 48.) Such options are considered "in-the-money" because on the actual grant day the stock price is trading above the exercise price. (*Id.* ¶ 118.) While backdating is not necessarily illegal *per se*, companies are required to record compensation costs for in-the-money options and, for some companies, granting backdated options violates the terms of their stock-options plans.[1] *See generally, e.g., In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 949-50 (N.D. Cal. 2007).

ePlus is a Delaware corporation that provides information technology products and services.[2] (Am. Compl. ¶¶ 21, 46.) On August 11, 2006, ePlus filed a Form 8K report with the Securities and Exchange Commission ("SEC") announcing the preliminary

---

[1]     Numerous backdating lawsuits have been filed in recent years, and credit for the initial interest in backdating is often given to a *Wall Street Journal* article published in March 2006 suggesting, based on empirical analysis, that covert backdating was widespread in the 1990s and early 2000s. (*See, e.g.*, Am. Compl. ¶¶ 3, 7.) One Court has likened backdating to "past-posting," or betting on horse races after the results are known, as highlighted in the Academy-Award winning film *The Sting* (Universal Pictures, 1973). *In re UnitedHealth Group PSLRA Litig.*, 2007 WL 1621456, at *2 (D. Minn. June 4, 2007) (Rosenbaum, C.J.).

[2]     ePlus's principal place of business is in Herndon, Virginia. (Am. Compl. ¶ 21.)

results of a review of the company's stock options practices conducted by the board's Audit Committee. (*Id.* ¶ 53.) According to the announcement, the company initiated the investigation following its receipt of a stockholder letter "raising concerns regarding certain options issued to the Company's four senior officers in 2004." (*Id.*) The announcement followed to say that the Audit Committee had "preliminarily . . . concluded that the actual measurement dates for certain stock options granted by the Company in the fiscal years ended March 31, 1998 through March 31, 2005 differ from the recorded measurement dates" and that "certain stock option grants . . . were not in accordance with the Company's stock-based compensation plans." (*Id.*) Having failed to record the requisite compensation expenses in connection with those option grants, the company announced that it would need to restate certain previously issued financial statements.[3] (*Id.*)

Not long thereafter, on January 18, 2007, plaintiff filed this lawsuit alleging, in essence, that the defendants had participated in improper backdating and had violated the law in covering it up.[4] On that date, ePlus's board of directors had eight members: defendants Phillip Norton, Bruce Bowen, Milton Cooper, Jr., Terrence O'Donnell, Lawrence Herman, and C. Thomas Faulders III, as well as non-defendants Eric Hovde and Irving Beimler. (*Id.* ¶ 152.) Norton and Bowen serve as ePlus's CEO and Executive Vice President, respectively, and together constitute the Stock Incentive Committee,

---

[3]   The announcement stated that the company estimated that the aggregate stock-based compensation expense to be recorded would be approximately $3 million. (Am. Compl. ¶ 53.)

[4]   Plaintiff moved for leave to file an Amended Complaint on July 24, 2007, which this Court granted.

while Cooper, O'Donnell, Herman, and Faulders are independent directors who together

constitute the Audit and Compensation Committees. (*Id.* ¶¶ 22-23, 26-29.) Also named

as defendants were Steven Mencarini, ePlus's Senior Vice President and CFO, and

Kleyton Parkhurst, ePlus's Senior Vice President, Treasurer, and Assistant Secretary.

(*Id.* ¶¶ 24-25.) ePlus's Certificate of Incorporation contains the following exculpation

provision, consistent with Delaware General Corporation Law § 102(b)(7):

> No person shall be personally liable to the Corporation or its stockholders
> for monetary damages for breach of fiduciary duty as a director; provided,
> however, that the foregoing shall not eliminate or limit the liability of a
> director (i) for any breach of the director's duty of loyalty to the
> Corporation or its stockholders, (ii) for acts or omissions not in good faith
> or which involve intentional misconduct or a knowing violation of law, (iii)
> under Section 174 of the Delaware General Corporation Law, or (iv) for
> any transaction from which the director derived an improper personal
> benefit.

(Order Granting Mot. for Judicial Notice, Feb. 4, 2008 [Dkt. #20]); Del. Code

Ann., tit. 8, § 102(b)(7).

Plaintiff alleges that on at least nine occasions between fiscal years ending March

31, 1997 and March 31, 2006, defendants caused ePlus to issue "highly suspicious"

stock-options grants.[5] (Am. Compl. ¶¶ 64-78.) ePlus had two stock-option plans in

effect during that period: a Master Stock Incentive Plan, which was adopted by ePlus's

---

[5]    The dates and recipients of the nine allegedly "highly suspicious" options grants include:
September 8, 1997, to defendant Mencarini; February 5, 1998 to defendants Norton, Parkurst,
and Mencarini, as well as to former ePlus Vice President Thomas Howard, Jr.; July 15, 1998, to
defendant Faulders; November 19, 1999, to defendants Faulders and O'Donnell; December 27,
2000, to defendant Mencarini; September 21, 2001, to defendants Faulders, Herman, and
O'Donnell, as well as to former ePlus director Thomas Hewitt; November 30, 2001, to
defendants Faulders and O'Donnell; April 1, 2003, to defendants Faulders, Herman, and
O'Donnell; and November 16, 2004, to defendants Bowen, Norton, and Parkhurst. (Am. Compl.
¶¶ 64-78.)

shareholders in 1997, and a Long-Term Incentive Plan, which was adopted by the

shareholders in 1998 and amended in 2003 ("Amended LTIP"). (*Id.* ¶¶ 55-63.) The

Stock Incentive Committee administered the former, while the Compensation Committee

administered the latter. (*Id.* ¶¶ 56, 61.) Under both plans, stock options were required to

be granted at an exercise price not less than fair market value on the date of the grant.

(*Id.* ¶¶ 57-58, 61, 63.) Plaintiff alleges, however, that for each of the nine "highly

suspicious" options grants, that rule was violated. To support this allegation, plaintiff

compares the annualized 20-day stock returns following each option-pricing event to the

stock's fiscal year annual return, revealing large performance disparities.[6] (*Id.* ¶¶ 79-88.)

Plaintiff also alleges that ePlus's August 11, 2006 Form 8K and August 16, 2007 Form

10K annual report for fiscal year ending March 31, 2006 (the "2006 10K") include

statements amounting to public admissions of backdating.[7] (*Id.* ¶¶ 3, 13, 64; Mot. Hr'g

Tr. at 27-28, Aug. 6, 2008.) Specifically, plaintiff draws attention to ePlus's statement in

the latter that the company's Audit Committee had concluded that "[i]n some cases, the

exercise price and date of [a] grant was determined with hindsight to provide a more

---

[6]     For example, for the November 6, 2004 options grants, plaintiff calculates a 20-day
return of 12.1%, or 216.9% annualized, as compared to a -8.5% return for the company's stock
in fiscal year ended March 31, 2005. (Am. Compl. ¶ 87.)

[7]     On December 21, 2007, plaintiff requested judicial notice pursuant Rule 201(b) of the
Federal Rules of Evidence of ePlus's Form 10K annual report filed with the SEC on August 16,
2007, among other ePlus SEC filings. (Pl.'s Req. for Judicial Notice [Dkt. #18].) Because SEC
filings are matters of public record, they are properly the subject of judicial notice, and therefore
the Court may, and will, consider them on review of defendants' motion to dismiss. *See
Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993); *see
also, e.g., In re CNET Networks, Inc.*, 483 F. Supp. 2d at 953-54 (taking judicial notice of SEC
filings in reviewing motion to dismiss complaint alleging improper backdating).

favorable exercise price for such grants at quarterly or monthly low stock prices." (Pl.'s Req. for Judicial Notice [Dkt. #18], Ex. 1 at 5.)

Plaintiff alleges that each defendant either granted or received these covert backdated stock options, or both, as well as participated in the concealment of the backdating, including by issuing false or misleading proxy statements, press releases, and filings with the SEC. (Am. Compl. ¶¶ 1, 22-29, 155, 157-58.) Plaintiff alleges that the defendants' conduct in this regard has exposed ePlus to criminal and civil liability for issuing false or misleading statements, as well as diverted hundreds of millions of dollars of corporate assets to senior ePlus executives and caused Nasdaq to delist ePlus's stock due to ePlus's failure to timely file certain reports. (*Id.* ¶¶ 4-5.) In connection with this alleged conduct, plaintiff's Amended Complaint asserts violations of §§ 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934, a violation of § 304 of the Sarbanes-Oxley Act of 2002, and state law claims for breach of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, constructive fraud, corporate waste, and rescission. (*Id.* ¶¶ 167-230.)

Defendants have moved to dismiss the Complaint, arguing that plaintiff has failed to adequately plead standing to pursue these derivative claims, failed to adequately plead demand futility, and failed to otherwise state a claim upon which relief can be granted. For the following reasons, I agree with the defendants on the first two grounds, and therefore will dismiss the Amended Complaint without reaching the parties' arguments concerning whether plaintiff has otherwise stated a claim under federal and/or state law.

## ANALYSIS

### I.     Standing

Federal Rule of Civil Procedure 23.1 establishes certain pleading requirements for

derivative lawsuits.  Among them, the complaint must "allege that the plaintiff was a

shareholder or member at the time of the transaction complained of."  Fed. R. Civ. P.

23.1(b)(1); *see also* Del. Code Ann., tit. 8, § 327 (same).  Plaintiff has failed to meet this

requirement.

Plaintiff alleges that he "is and at relevant times was" a shareholder of ePlus.

(Am. Compl. ¶ 20.)  Such a thin allegation, however, is insufficiently particular to satisfy

Rule 23.1.  *See In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1202 (N.D.

Cal. 2007); *In re Affymetrix Derivative Litig.*, No. 06-5353, 2008 WL 5050147, at *8

(N.D. Cal. Mar. 31, 2008).  Without a specific allegation as to the date on which plaintiff

became a shareholder, it is unknown whether plaintiff was a shareholder at the time of

*each set* of challenged stock-options grants, which took place over seven years.  This is

critical because each set of options grants is a separate, discrete transaction.  *Desimone v.*

*Barrows*, 924 A.2d 908, 926 (Del. Ch. 2007) ("[T]he granting of a stock option is an

individual transaction that is completed the moment the options are granted." (internal

citation omitted)); *see also, e.g.*, *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d

986, 1009 (N.D. Cal. 2007) ("[E]ach grant of backdated stock options [i]s an integrated

transaction unto itself.")  Thus, in order to assert claims in connection with all nine sets of

grants, plaintiff must have been a shareholder at the time of each.[8]  Accordingly,

plaintiff's allegation that he "at relevant times was" a shareholder is insufficiently

particular to establish plaintiff's standing to pursue this derivative action.[9]

    Plaintiff's own concessions enforce this determination and exemplify the necessity

of this pleading requirement.  Rather than have his Amended Complaint dismissed,

plaintiff requests that this Court grant him leave to further amend.  (Mot. Hr'g Tr. at 41-

42; Pl.'s Suppl. Br. at 4, n.5 [Dkt. #32].)  Federal Rule of Civil Procedure 15 provides

that courts should "freely give leave" to parties to amend their complaints "when justice

so requires," Fed. R. Civ. P. 15(a)(2), and many courts have granted leave to amend in

similar circumstances, reasoning that a failure to sufficiently plead standing is curable.

*E.g.*, *In re Affymetrix Derivative Litig.*, 2008 WL 5050147, at *8; *Belova v. Sharp*, No.

07-299, 2008 WL 700961, at *3-4 (D. Or. Mar. 13, 2008).  Here, however, plaintiff's

supplemental brief in opposition to defendants' motion to dismiss, filed after oral

argument and at the invitation of the Court, revealed for the first time that plaintiff

became a shareholder on October 16, 2003 – six years *after* the issuance of the first

---

[8]    Plaintiff argues that so long as he has standing to challenge at least one set of grants, the "continuing wrong" doctrine saves his standing for all nine.  Some courts have found a narrow exception to the contemporaneous ownership requirement where the plaintiff acquired his stock "after a particular transaction has begun but before it is completed," *Desimone*, 924 A.2d at 925, or, in other words, where the company was engaged in a continuous, uninterrupted course of conduct that preceded plaintiff's acquisition of stock, *Bateson v. Magna Oil Corp.*, 414 F.2d 128, 130 (5th Cir. 1969).  Courts have uniformly held, however, that this exception does not apply in backdating cases, because each stock-options grant is a separate, discrete transaction.  *See, e.g.*, *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d at 1009-1010; *Conrad*, 940 A.2d at 41-42; *Desimone*, 924 A.2d at 924-27.  This Court agrees.

[9]    Plaintiff's counsel, to their credit, effectively conceded as much at oral argument.  (Mot. Hr'g Tr. at 41 ("[I]t is better practice that you do identify – plead your specific purchase date.").)

allegedly backdated options grants he challenges and prior only to *one* of the nine challenged sets of options grants, namely, the options granted in November 2004. (Pl's Suppl. Br. at 4.) Thus, if granted leave to amend, plaintiff would only have standing to challenge the November 2004 options grants. Plaintiff's allegation in his Amended Complaint that he "at relevant times was" a shareholder is inaccurate, if not misleading.

Notwithstanding this troubling fact, granting plaintiff leave to amend would nevertheless be appropriate *if* a second amended complaint properly pleading plaintiff's standing could withstand the defendants' motion to dismiss. *Cf. Belova*, 2008 WL 700961, at *12 (granting leave to amend standing allegations to challenge transactions after plaintiff became shareholder where complaint otherwise adequately alleged demand futility); *Ryan v. Gifford*, 918 A.2d 341, 358-59, 361 (Del. Ch. 2007) (dismissing all claims related to stock-options transactions that occurred before plaintiff became shareholder). Unfortunately for the plaintiff in this case, it could not!

## II.  Demand Futility

Defendants, in their motion to dismiss, contend that plaintiff has failed to sufficiently allege demand futility in connection with any of the allegedly "highly suspicious" options grants. As to the 2004 options grants, at a minimum, I agree. "Shareholders ordinarily must make a demand on the company's board of directors in order to bring a derivative suit." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines*, 534 F.3d 779, 782 (D.C. Cir. 2008). This requirement implements "the basic principle of corporate governance that the decisions of a corporation – including the decision to initiate litigation – should be made by the board of directors or the majority of

shareholders." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108 (1991) (quoting

*Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 530 (1984)). Here, plaintiff concedes that

he did not make a demand, but instead alleges that his failure to do so should be excused

because doing so would have been futile. (Am. Compl. ¶¶ 153-166.) Rule 23.1, in

addition to requiring contemporaneous stock ownership, requires derivative plaintiffs to

"state with particularity . . . the reasons for . . . not making the effort" to make a demand.

Fed. R. Civ. P. 23.1(b)(3). To determine the sufficiency of a demand futility allegation,

the Court applies the substantive law of the state of incorporation, which in this case is

Delaware. *Kamen*, 500 U.S. at 108-09.

To establish that pre-suit demand is excused, plaintiff must allege facts that, if

true, establish that the "directors are . . . incapable of making an impartial decision

regarding the pursuit of litigation." *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). Two

tests are available to determine whether this requirement is met. First, where it is alleged

that "the directors made a conscious business decision in breach of their fiduciary duties,"

the Court applies the *Aronson* test. *Id.* Under *Aronson*, a plaintiff must allege

particularized facts giving rise to a reason to doubt that "(1) the directors are disinterested

and independent and (2) the challenged transaction was otherwise the product of a valid

exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).

Alternatively, where the challenged conduct is *not* a business decision of the board of

directors, the *Rales* test applies. *Wood*, 953 A.2d at 140. Under *Rales*, a plaintiff must

allege particularized facts establishing a reason to doubt that "the board of directors could

have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

Here, defendants contend that the *Rales* test applies in this case,[10] while plaintiff essentially takes no position, arguing instead that he has met his burden under either test because he has sufficiently alleged that a majority of ePlus's board of directors were not disinterested at the time he filed this lawsuit.[11]  However, because the Amended Complaint alleges that the 2004 options grants were granted pursuant to ePlus's Amended LTIP, (Am. Compl. ¶ 78), which plaintiff alleges was administered by the four-director Compensation Committee, (*id.* ¶¶ 26-29, 61), the Court concludes that the *Aronson* test is the appropriate test to apply here.  *See Ryan*, 918 A.2d at 353 ("Where at least one half or more of the board in place at the time the complaint was filed approved the underlying challenged transactions, which approval may be imputed to the entire board for purposes of demand futility, the *Aronson* test applies."); *see also In re Cirrus Logic, Inc.*, No. 07-212, 2008 WL 4065925, at *3 (W.D. Tex. Aug. 28, 2008).  For the following reasons, plaintiff has failed to meet his burden under either prong of the *Aronson* test.

---

[10]     Defendants contend that the *Rales* test applies on the basis that plaintiff fails to *specifically* allege that ePlus's Board, or a majority thereof, approved or knew of backdating or the issuance of the "highly suspicious" options grants. (Defs.' Mot. to Dismiss at 23.)

[11]     Plaintiff advances this argument both specifically as to the 2004 options grants and as to all nine "highly suspicious" sets of options grants generally.  Plaintiff does not, however, meaningfully advance an argument that a majority of ePlus's directors were not independent at the time of his original complaint.

### A.    Directorial Interest

Plaintiff contends his allegations sufficiently call into doubt the disinterestedness of at least four of ePlus's directors.  A reasonable doubt as to a director's disinterestedness exists if a director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders," *Rales*, 634 A.2d at 936 (internal citation omitted), or if a "substantial likelihood" of director liability exists, *id.* (citing *Aronson*, 473 A.2d at 815).  Plaintiff contends that he has sufficiently alleged that certain directors received backdated options, and thus received a personal financial benefit not equally shared by the stockholders.  In particular, as to the 2004 options, plaintiff includes Bowen and Norton in this group.  (Am. Compl. ¶¶ 77, 156; Pl.'s Suppl. Br. at 5.)  Next, plaintiff contends that he has sufficiently alleged that certain directors participated in granting backdated options and/or in covering up the backdating, and thus face a substantial likelihood of liability.  Again, as to the 2004 options, plaintiff argues that Bowen and Norton are in this group as members of the Stock Incentive Committee, *as well as* Cooper, O'Donnell, Faulders, and Herman, as members of the Compensation Committee and/or Audit Committee.  (Am. Compl. ¶¶ 22-23, 26-29, 154-55, 158; Pl.'s Suppl. Br. at 5.)  To support his arguments on both points, plaintiff simply relies on the Delaware Chancery Court decisions in *Ryan v. Gifford*, 918 A.2d at 341, and *Conrad v. Blank*, 940 A.2d 28 (Del. Ch. 2007).  In both of those cases, the court determined that once the plaintiff established a reasonable inference that backdating had occurred – whether based on a statistical analysis, the company's own public statements, and/or some alternative method – the plaintiff's allegations that a majority of the board either

12

received backdated options or participated in granting such options satisfied the demand futility requirement.[12] That, alone, however, is not sufficient here.

Plaintiff has utterly failed to meet his burden with respect to a key requirement: scienter. In order to establish a substantial threat of liability, a plaintiff must plead with *particularity* facts sufficient to establish that the directors *knowingly* participated in the granting and/or concealment of backdated options. *See Wood*, 953 A.2d at 141; *Desimone*, 924 A.2d at 933, 945. Indeed, the Delaware Supreme Court recently held that where, as here, a board of directors is protected from monetary damages by an exculpation clause, "then a serious threat of liability may only be found to exist if the

---

[12]     In *Ryan*, the Delaware Court of Chancery held that the plaintiff's allegations established a reasonable inference that backdating had occurred based on plaintiff's identification of nine options grants made over a six-year period where each grant was issued during a low point and significantly outperformed the stock's annualized market returns. *Ryan*, 918 A.2d at 354-55. Given that inference, the court held that the plaintiff's allegations that the company's compensation committee, which constituted one-half of the board, granted such options, along with the plaintiff's allegation that a fourth director received such options, were sufficient to establish demand futility under both the *Rales* and *Aronson* tests. *Id.* at 355-56. The court reasoned that the plaintiff's allegations alleged "knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures," which excused demand both because such conduct raises doubt that such a decision is a valid exercise of business judgment and because such conduct violates a director's duty of loyalty. *Id.* at 355-356, n.35 (noting that "it is difficult to understand how a plaintiff can allege that directors backdated options *without* simultaneously alleging that such directors *knew* that the options were being backdated" (emphasis in original)).

Similarly, in *Conrad*, the Delaware Court of Chancery held that the plaintiff's allegations that twelve options grants made over a ten-year period were granted at or near the stock's lowest trading price for the month, combined with the company's own public statement that it issued options with "incorrect measurement dates," established an inference of backdating. *Conrad*, 940 A.2d at 39-40. The court went on to hold that the plaintiff's allegations that half of the board members had either received backdated stock options or granted such options as members of the company's compensation committee were sufficient to excuse demand under the *Rales* test. *Id.* at 40. The court reasoned, in relevant part, that the allegations established a "reasonable inference that the compensation committee members acted knowingly in awarding options priced at dates other than the actual dates of the grant." *Id.*

plaintiff pleads a non-exculpated claim against the directors based on particularized

facts." *Wood*, 953 A.2d at 141 (citing *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch.

2003)). The court went on to explain that if, for example, "directors are exculpated from

liability except for claims based on 'fraudulent,' 'illegal' or 'bad faith' conduct, a

plaintiff must also plead particularized facts that demonstrate that the directors acted with

scienter, i.e., that they had 'actual or constructive knowledge' that their conduct was

legally improper." *Id.* (internal citations omitted). Accordingly, the question before the

Court here is whether plaintiff's allegations plead with sufficient particularity that a

majority of the directors either received backdated options, or *knowingly* participated in

the granting and/or concealment of backdated options, in violation of their duty of

loyalty. *See Desimone*, 924 A.2d at 942 (plaintiff's backdating allegations did not

sufficiently plead demand futility where plaintiff had failed to plead facts "suggesting an

inference that the . . . board knowingly granted . . . backdated options" to the company's

officers); *see also, e.g., In re Extreme Networks, Inc. S'holder Derivative Litig.*, 573 F.

Supp. 2d 1228, 1241 (N.D. Cal. 2008). For the following reasons, plaintiff has failed to

do so.

Plaintiff contends that he has sufficiently alleged that the 2004 options grants were

backdated, that two directors received such options, and that at least five directors

participated in granting the options. (Pl.'s Suppl. Br. at 5.) Even assuming, however,

that plaintiff's quantitative analysis sufficiently supports an inference that the 2004

options were backdated or otherwise granted in violation of the stock options plan,

plaintiff fails to allege with particularity facts that would establish that any of the

directors had the requisite culpable knowledge.  Indeed, in his Amended Complaint,

plaintiff merely alleges that the 2004 options grants were made pursuant to the Amended

LTIP, (Am. Compl. ¶ 78), that the Amended LTIP required that the exercise price be not

less than the fair market value on the date of the grant, (*id.*. ¶¶ 61, 63), and that the

Amended LTIP was administered only by the Compensation Committee, (*id.* ¶ 61).

While these allegations compel an inference that the Compensation Committee members

approved the 2004 stock options grants as a general matter, they fail to allege with

particularity any facts concerning how, when, or by whom the options were actually

issued, or that the committee members otherwise had culpable knowledge.  In other

words, plaintiff fails to allege with particularity "whether and to what extent any director

was involved in the mechanics by which the options were issued."[13] *Desimone*, 924 A.2d

at 942.  "Delaware law on this point is clear: board approval of a transaction, even one

that later proves to be improper, without more, is an insufficient basis to infer culpable

knowledge or bad faith on the part of individual directors."  *Wood*, 953 A.2d at 142.

Accordingly, plaintiff's allegations that a majority of ePlus's directors at the time of the

complaint were involved in granting the 2004 options is insufficiently particular to

---

[13]     Illustrating the insufficiency of plaintiff's Amended Complaint in this respect is
plaintiff's own argument in support of demand futility.  In his supplemental brief, plaintiff argues
that his Amended Complaint sufficiently alleges that the 2004 options grant to defendant
Parkhurst was made by the Stock Incentive Committee, on which Bowen and Norton served, and
that the 2004 options grants to Bowen and Norton were made by the Compensation Committee,
on which O'Donnell, Faulders, and Herman served. (Pl.'s Suppl. Br. at 5.) These contentions,
however, do not match the allegations in the Amended Complaint.  In his Amended Complaint,
plaintiff alleges only that the 2004 options grants were made pursuant to the Amended LTIP,
(Am. Compl. ¶ 78) and that the Amended LTIP was administered by the Compensation
Committee, (*id.* ¶ 61).  The Stock Incentive Committee is not mentioned in connection with the
2004 options grants, either directly or by inference.

excuse demand based on a lack of disinterestedness.[14] *Cf. Desimone*, 924 A.2d at 942

(allegation of compensation committee membership was insufficient, alone, to support

inference that its members knowingly approved backdated options); *see also In re CNET*

*Networks, Inc.*, 483 F. Supp. 2d at 963, 965 ("Mere membership on a committee or board,

without specific allegations as to defendants' roles and conduct, is insufficient to support

a finding that directors were conflicted." (internal citation omitted)).

　　Further dispelling plaintiff's contention that culpable knowledge may be inferred

solely based on committee membership is ePlus's 2006 10K, to which the plaintiff,

coincidentally, draws significant attention.  In that filing, ePlus reported with specificity

on the Audit Committee's findings from its investigation into ePlus's stock options

practices, identifying myriad instances in which ePlus issued stock options in violation of

the company's stock-option plans.  Most notably, the report effectively admitted

backdating on several occasions, stating:

> [O]n one occasion in 1997, two occasions in 1998, and in each of the
> quarters from late 2000 to early 2003 in which options were granted, the
> date and exercise price of certain stock options were determined with
> hindsight to provide a more favorable exercise price for such grants.  These
> options were priced at the lowest closing price during the prior quarter, and
> not, as required by the applicable stock option plans, at the closing price on
> the date the options were actually awarded.[15]

---

[14]　　For the same reason, plaintiff's general allegations concerning the Audit Committee are
also insufficient to excuse demand.  Plaintiff alleges that ePlus's four independent directors
served on the Audit Committee during the relevant period and that the committee was
responsible for overseeing and approving financial reporting.  (Am. Compl. ¶ 158.)  As noted
above, such sparse allegations of mere committee membership are insufficient to excuse demand.
*Desimone*, 924 A.2d at 942 (holding that, without more, "the fact that [the company] accounted
for the backdated options grants incorrectly does nothing to suggest any conscious wrongdoing
on the part of the Audit Committee").
[15]　　The report further explained that the Audit Committee had

(Pl.'s Req. for Judicial Notice, Ex. 1 at 4); *cf. Conrad*, 940 A.2d at 37-39, n.28

(company's admission in public filings that it had erroneously granted stock

options with "incorrect measurement dates," without further explanation,

supported an inference of backdating).  However, as to the 2004 options grants,

the report made a materially different disclosure:

> [T]he 2004 Options, which were the initial subject of the Audit Committee
> Investigation, were effectively awarded (i.e., all necessary granting actions
> were completed) by the Compensation Committee in April 2004.  The
> Compensation Committee, believing that the options had not been
> effectively awarded in April 2004, approved a new award of the same
> options in November 2004, at the then fair market value of the stock, which
> was lower than the April value.  Because the original award of options was
> determined to be effective in April 2004, the November 2004 approval
> constituted a modification of the earlier awards to provide for a lower
> exercise price.  Such modification was not in accordance with the
> governing stock option plan.[16]

(*Id.*)  This admission directly addresses whether the Compensation Committee members

– or any other director – *knowingly* backdated the 2004 grants or otherwise issued them

in violation of ePlus's stock options plan.  While the disclosure admits that the November

2004 grant constituted an improper modification, it explains that the committee approved

the grant based on the mistaken belief that the options had not been effectively awarded

---

concluded that the exercise price for a number of option grants during the
Relevant Period were below the fair market value of our common stock on the
revised measurement date of the grant.  This resulted from certain option grant
dates having been established prior to the completion of all the final granting
actions necessary for those grants.  In some cases, the exercise price and date of
the grant was determined with hindsight to provide a more favorable exercise
price for such grants at quarterly or monthly low stock prices.

(Pl.'s Req. for Judicial Notice, Ex. 1 at 5.)

[16]   The report added that "these options have been cancelled." (Pl.'s Req. for Judicial
Notice, Ex. 1 at 4.)

earlier that year in April 2004.  In so doing, the disclosure squarely impedes any

inference of culpable knowledge that could be drawn from plaintiff's boilerplate

allegations as to certain directors' committee membership, and plaintiff points to no

additional allegations to overcome this explanation.  Indeed, ePlus's public disclosures

are clearly a driving force behind plaintiff's allegations that backdating occurred at the

company.  While plaintiff is entitled to inferences in his favor at the pleading stage, the

inferences must be reasonable, taking into account judicially-noticed public filings.  *See*

*In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d at 1001 ("Plaintiff cannot be allowed

to exclude the rest of the Form 10K because he wishes to pick and choose which

statements should be considered.").  Here, plaintiff fails to plead with particularity that

any directors issued the 2004 options with the requisite disloyal state of mind.[17]

Accordingly, given that plaintiff alleges that only two directors, at most, received the

2004 options grant, plaintiff has failed to plead demand futility on the basis that a

majority of the board was not disinterested.

---

[17]    The Court notes that this conclusion is not inconsistent with either *Ryan* or *Conrad*.  In *Ryan*, no similar public filings called into question whatever inference of purposeful backdating the plaintiff otherwise alleged.  Accordingly, that court's operative conclusion – namely, that the plaintiff's allegations concerning suspicious options grants and the directors' committee membership established "*knowing* and *purposeful* violations of shareholder plans and *intentionally* fraudulent public disclosures" – does not apply with equal force here.  *Ryan*, 918 A.2d at 355 (emphasis added).  In *Conrad*, by contrast, the company's public filings disclosed that it had issued grants with "incorrect measurement dates."  However, unlike here, the filings in *Conrad* failed to provide any explanation for how it came to be that the company used incorrect dates, a fact the court highlighted in its opinion.  *Conrad*, 940 A.2d at 30, 37-39, n.28 (noting that the company "has made no effort to explain which options had the erroneous measurement dates, how these errors occurred, or why it concluded that there was no intentional wrongdoing involved in fixing incorrect measurement dates").

### B.     Business Judgment

Finally, plaintiff's allegations also fail to raise a reason to doubt that the 2004

options grants were "otherwise the product of a valid exercise of business judgment."

*Aronson*, 473 A.2d at 814.   Under the business judgment rule, it is "presum[ed] that in

making a business decision the directors of a corporation acted on an informed basis, in

good faith and in the honest belief that the action taken was in the best interests of the

company." *Id.* at 812 (internal citations omitted).   Plaintiff, relying on *Ryan*, contends

that he meets the business judgment prong of the *Aronson* test because backdating *per se*

raises doubt that the directors' conduct was a valid exercise of business judgment.   *Ryan*,

918 A.2d at 355-56 ("Backdating options qualifies as one of those 'rare cases [in which]

a transaction may be so egregious on its face that board approval cannot meet the test of

business judgment, and a substantial likelihood of director liability therefore exists.'"

(internal citation omitted)).   In *Ryan*, however, the Court's determination was based on a

finding that the plaintiff's factual allegations alleged "*knowing* and *purposeful* violations

of shareholder plans and *intentionally* fraudulent public disclosures." *Id.* at 355

(emphasis added).   In this case, conversely, plaintiff has failed to allege with sufficient

particularity, as discussed above, that the directors violated ePlus's stock options plans

with that requisite knowledge.   As such, plaintiff's allegations as to the 2004 options also

fail to excuse demand under the second prong of the *Aronson* test.[18]   *See In re CNET*

*Networks, Inc.*, 483 F. Supp. 2d at 964-66.

---

[18]     The Court also notes that the circumstances under which ePlus initially disclosed its
options-pricing problems also favor a determination that demand would not have been futile in

Accordingly, because plaintiff only would have standing to challenge conduct in connection with the November 2004 options grants identified in his Amended Complaint if granted leave to amend, and because he does not adequately allege demand futility in connection with those options grants, plaintiff's Amended Complaint must, and will, be DISMISSED.

RICHARD J. LEON
United States District Judge

---

this case as to the 2004 options. ePlus's August 11, 2006 Form 8K, on which plaintiff relies heavily in his Amended Complaint, explained that the company's Audit Committee initiated its investigation into the company's stock options practices after defendant Norton forwarded the committee a June 2006 letter he had received from a stockholder raising concerns regarding the 2004 options. (Am. Compl. ¶ 53.) In other words, the board of directors took action in response to a stockholder asking the company to review its options grants – exactly what plaintiff asks this Court to excuse on his behalf.  The fact that ePlus not only investigated the 2004 options, but also expanded the investigation to include all options granted since the company's initial public offering in 1996 and later cancelled the 2004 options, belies plaintiff's contention, as a factual matter, that demand would have been futile. Notably, this conduct further distinguishes this case from *Conrad*, in which the Court highlighted the fact that the company at issue appeared to have not taken any action to remedy the effects of its options-pricing errors. *Conrad*, 940 A.2d at 34.